# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### DEL RIO DIVISION

| | | |
|---|---|---|
| **PETE ARREDONDO,** | § | **CIVIL ACTION** |
| *Plaintiff,* | § | |
| | § | |
| | § | **CASE NO.:**      **2:26-CV-18** |
| **V.** | § | |
| | § | **COMPLAINT PURSUANT TO** |
| | § | **THE ADMINISTRATIVE** |
| **UNITED STATES CUSTOMS** | § | **PROCEDURE ACT,** |
| **AND BORDER PROTECTION,** | § | **5 U.S.C. § 701,** *et seq.* |
| *Defendant.* | § | |

---

## COMPLAINT EXHIBIT 1:

***Touhy* Request for *State of Texas v. Pete Arredondo*, dated February 9, 2026**

---

# LOONEY SMITH CONRAD & HEFTI P.C.

### TRIAL LAWYERS

| | | |
|---|---|---|
| 11767 KATY FREEWAY, SUITE 740 | PAUL C. LOONEY | 918 AUSTIN STREET |
| HOUSTON, TEXAS 7707 | CLAY S. CONRAD, RET. PARTNER OF-COUNSEL | HEMPSTEAD, TEXAS 77445 |
| (281) 597-8818 – OFFICE | WADE B. SMITH | (979) 826-8484 – OFFICE |
| (281) 597-8284 – FACSIMILE | MATTHEW J. HEFTI | (979) 826-8488 – FACSIMILE |
| | RICHARD SENASAC | |
| | JEAN P. SUMERS | |
| | TREY DUHON, OF-COUNSEL | WWW.Lschlaw.com |

To:     Michael P. Clendenen
        Department of Justice, Trial Attorney
        Via: Michael.p.clendenen@usdoj.gov

        Associate Chief Counsel
        Gulf Southwest Region at U.S. Customs and Border Protection
        2323 S. Shepherd #1300
        Houston, TX 77019
        Via: Associatechiefcounsel-houston@cbp.dhs.gov

        Office of Chief Counsel, U.S. Customs and Border Protection
        1300 Pennsylvania Avenue, Suite 4.4-B
        Washington, DC 20229
        *via*: CBP-service-intake@cbp.dhs.gov and cbpserviceintake@cbp.dhs.gov


DATE: February 9, 2026


**SUBJECT**: *Touhy* Request for *State of Texas v. Pete Arredondo*, case no. 2024-06-16368-CR in the 38th Judicial District, Uvalde County, Texas.

Pursuant to the Department of Homeland Security *Touhy* regulations, 6 C.F.R. § 5.41, et seq., and 19 C.F.R. § 103.21 et. seq., this is a request for witness availability and testimony for the ongoing criminal case referenced herein.

As the requested testimony is for a state court criminal proceeding, there is no "complaint and summons" to provide with this request, but the grand jury indictment is included as its functional equivalent. (Attachment A).

This request is accompanied by an affidavit of specific written summary setting forth the nature of the information sought and its relevance to the proceeding. (Attachment B). *See* 6 C.F.R. § 5.43-5.45; 19 C.F.R. § 103.22(c), (d).

A response is demanded by February 27, 2026, which is at least 10 working days from the service of this request. 19 C.F.R. 103.22(d).

If the Department declines to make any of the requested witnesses available, we request particular reasons for the decision on each witness rather than a wholesale and unreasoned denial

of all witnesses. We request such a response we may respond appropriately and particularly to the Department's decisions.

If no answer is provided by February 27, 2026, the undersigned will construe that lack of a response as a final agency decision constructively denying this request for purposes of seeking appropriate remedies in a federal district court.

Sincerely,

**LOONEY SMITH CONRAD & HEFTI P.C.**
**Attorneys for Pete Arredondo**

_____

BY: Matthew J. Hefti

Enclosures:

Attachment A: Amended Indictment in Cause 2024-06-16368-CR

Attachment B: Affidavit of Matthew J. Hefti, dated February 9, 2026

# Attachment A

**ATTACHMENT "A"**

**Charge:**
ABANDONING/ENDANGERING
Child
10 Counts
Article 22.041(c) Texas Penal Code
**Degree-Each Count**:
State Jail Felony

## CAUSE NO.  2024-06-16368-CR

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT** |
| **V.** | § | **38TH JUDICIAL DISTRICT** |
| **PETE ARREDONDO** | § | **UVALDE COUNTY, TEXAS** |

500 East Nopal Street, Apt #7
Uvalde, Texas 78801

### AMENDED INDICTMENT

---

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

### COUNT I

THE GRAND JURY, for the County of Uvalde, State of Texas, duly selected impaneled, sworn, charged, and organized as such at the JANUARY Term A.D. 2024 of the 38th Judicial District Court for said County, and State upon their oaths present in and to said court at said term that **PETE ARREDONDO** hereinafter styled the Defendant, on or about the **24th day of May, 2022,** and before the presentment of this indictment, in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated Independent School District, and while incident commander of an incident involving an active shooter on a school campus which was under his control, to wit: Robb Elementary School in Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed Noah Oscar Orona, a child younger

*Cause No. 2024-06-16368-CR*

*Amended Indictment*
*Page 1 of 24*

than 15 years of age in imminent danger of bodily injury, death, physical impairment and mental impairment, by engaging in one or more of the following acts:

a.   After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

b.   After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

c.   After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

d.   Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District and instead by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement

officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

e.  Failing to follow active shooter training he received by deciding and by act declared to others to delay breaching a room occupied by a gunman at Robb Elementary School until classrooms were evacuated thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

f.  Failing to follow active shooter training he received by deciding to negotiate and by act attempted to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary School while the gunman was engaged in an active shooter incident thereby delaying the response by law enforcement officers to a gunman who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a designated emergency infant care provider under Section 262.302, Family Code.

## <u>COUNT II</u>

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment, in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated Independent School District, and while incident commander of an incident involving an active shooter on a school campus which was under his control, to wit: Robb Elementary School in Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed Khloie Melinda Torres a child younger than 15 years of age in imminent danger of bodily injury,

death, physical impairment and mental impairment, by engaging in one or more of the following acts:

    a.   After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    b.   After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    c.   After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    d.   Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an

active shooter who was hunting and shooting a child or children in Room 112 at Robb
Elementary School.

e.  Failing to follow active shooter training he received by deciding and by act declaring
to others to delay breaching a room occupied by a gunman at Robb Elementary
School until classrooms were evacuated thereby delaying the response by law
enforcement officers to an active shooter who was hunting and shooting a child or
children in Room 112 at Robb Elementary School.

f.  Failing to follow active shooter training he received by deciding to negotiate and by
act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary
School while the gunman was engaged in an active shooter incident thereby delaying
the response by law enforcement officers to a gunman who was hunting and shooting
a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a
designated emergency infant care provider under Section 262.302, Family Code.

## COUNT III

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the
Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment,
in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated
Independent School District, and while  incident commander of an incident involving an active
shooter on a school campus which was under his control, to wit: Robb Elementary School in
Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed
Jordan Demetrio Olivarez, a child younger than 15 years of age in imminent danger of bodily

injury, death, physical impairment and mental impairment, by engaging in one or more of the following acts:

a.  After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

b.  After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

c.  After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

d.  Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an

active shooter who was hunting and shooting a child or children in Room 112 at Robb
Elementary School.

e.   Failing to follow active shooter training he received by deciding and by act declaring
     to others to delay breaching a room occupied by a gunman at Robb Elementary
     School until classrooms were evacuated thereby delaying the response by law
     enforcement officers to an active shooter who was hunting and shooting a child or
     children in Room 112 at Robb Elementary School.

f.   Failing to follow active shooter training he received by deciding to negotiate and by
     act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary
     School while the gunman was engaged in an active shooter incident thereby delaying
     the response by law enforcement officers to a gunman who was hunting and shooting
     a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a
designated emergency infant care provider under Section 262.302, Family Code.

## COUNT IV

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the
Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment,
in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated
Independent School District, and while  incident commander of an incident involving an active
shooter on a school campus which was under his control, to wit: Robb Elementary School in
Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed
Jaydien Canizales, a child younger than 15 years of age in imminent danger of bodily injury,

death, physical impairment and mental impairment, by engaging in one or more of the following acts:

    a.   After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    b.   After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    c.   After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    d.   Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an

active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

e.  Failing to follow active shooter training he received by deciding and by act declaring to others to delay breaching a room occupied by a gunman at Robb Elementary School until classrooms were evacuated thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

f.  Failing to follow active shooter training he received by deciding to negotiate and by act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary School while the gunman was engaged in an active shooter incident thereby delaying the response by law enforcement officers to a gunman who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a designated emergency infant care provider under Section 262.302, Family Code.

## <u>COUNT V</u>

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment, in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated Independent School District, and while incident commander of an incident involving an active shooter on a school campus which was under his control, to wit: Robb Elementary School in Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed Samuel N. Salinas, a child younger than 15 years of age in imminent danger of bodily injury,

death, physical impairment and mental impairment, by engaging in one or more of the following acts:

a. After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

b. After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

c. After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

d. Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an

active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

e.  Failing to follow active shooter training he received by deciding and by act declaring to others to delay breaching a room occupied by a gunman at Robb Elementary School until classrooms were evacuated thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

f.  Failing to follow active shooter training he received by deciding to negotiate and by act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary School while the gunman was engaged in an active shooter incident thereby delaying the response by law enforcement officers to a gunman who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a designated emergency infant care provider under Section 262.302, Family Code.

## <u>COUNT VI</u>

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment, in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated Independent School District, and while incident commander of an incident involving an active shooter on a school campus which was under his control, to wit: Robb Elementary School in Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed Kendall Faith Olivarez, a child younger than 15 years of age in imminent danger of bodily

injury, death, physical impairment and mental impairment, by engaging in one or more of the following acts:

a.  After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

b.  After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

c.  After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

d.  Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an

active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

e.   Failing to follow active shooter training he received by deciding and by act declaring to others to delay breaching a room occupied by a gunman at Robb Elementary School until classrooms were evacuated thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

f.   Failing to follow active shooter training he received by deciding to negotiate and by act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary School while the gunman was engaged in an active shooter incident thereby delaying the response by law enforcement officers to a gunman who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a designated emergency infant care provider under Section 262.302, Family Code.

## COUNT VII

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment, in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated Independent School District, and while incident commander of an incident involving an active shooter on a school campus which was under his control, to wit: Robb Elementary School in Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence

placed Miah Cerillo, a child younger than 15 years of age in imminent danger of bodily injury, death, physical impairment and mental impairment, by engaging in one or more of the following acts:

    a.  After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    b.  After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    c.  After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

    d.  Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an

active shooter who was hunting and shooting a child or children in Room 112 at Robb

Elementary School.

e.  Failing to follow active shooter training he received by deciding and by act declaring

to others to delay breaching a room occupied by a gunman at Robb Elementary

School until classrooms were evacuated thereby delaying the response by law

enforcement officers to an active shooter who was hunting and shooting a child or

children in Room 112 at Robb Elementary School.

f.  Failing to follow active shooter training he received by deciding to negotiate and by

act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary

School while the gunman was engaged in an active shooter incident thereby delaying

the response by law enforcement officers to a gunman who was hunting and shooting

a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a

designated emergency infant care provider under Section 262.302, Family Code.

### COUNT VIII

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the

Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment,

in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated

Independent School District, and while  incident commander of an incident involving an active

shooter on a school campus which was under his control, to wit: Robb Elementary School in

Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed

A. J. Martinez, a child younger than 15 years of age in imminent danger of bodily injury, death,

physical impairment and mental impairment, by engaging in one or more of the following acts:

a.  After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

b.  After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

c.  After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

d.  Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

e.   Failing to follow active shooter training he received by deciding and by act declaring to others to delay breaching a room occupied by a gunman at Robb Elementary School until classrooms were evacuated thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

f.   Failing to follow active shooter training he received by deciding to negotiate and by act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary School while the gunman was engaged in an active shooter incident thereby delaying the response by law enforcement officers to a gunman who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a designated emergency infant care provider under Section 262.302, Family Code.

## COUNT IX

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment, in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated Independent School District, and while  incident commander of an incident involving an active shooter on a school campus which was under his control, to wit: Robb Elementary School in Uvalde, Texas, by act, intentionally, knowingly, recklessly and with criminal negligence placed Gilberto E. Mata, a child younger than 15 years of age in imminent danger of bodily injury, death, physical impairment and mental impairment, by engaging in one or more of the following acts:

a.  After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

b.  After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

c.  After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

d.  Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

e.  Failing to follow active shooter training he received by deciding and by act declaring to others to delay breaching a room occupied by a gunman at Robb Elementary School until classrooms were evacuated thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

f.  Failing to follow active shooter training he received by deciding to negotiate and by act attempting to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary School while the gunman was engaged in an active shooter incident thereby delaying the response by law enforcement officers to a gunman who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

And the said Defendant did not voluntarily deliver the child or children named above to a designated emergency infant care provider under Section 262.302, Family Code.

## COUNT X

AND IT IS FURTHER PRESENTED that **PETE ARREDONDO** hereinafter styled the Defendant, on or about the 24th day of May, 2022, and before the presentment of this indictment, in the County and State aforesaid, as a peace officer and police chief of Uvalde Consolidated Independent School District, and while incident commander of an incident involving an active shooter on a school campus which was under his control, to wit: Robb Elementary School in Uvalde, Texas, by act and omission, intentionally, knowingly, recklessly and with criminal negligence placed Mayah Zamorra, a child younger than 15 years of age in imminent danger of bodily injury, death, physical impairment and mental impairment, by engaging in one or more of the following acts or omissions:

a.  After hearing shots being fired in a room at Robb Elementary School, failed to identify the incident as an active shooter incident, failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

b.  After hearing shots being fired in a room at Robb Elementary School and after being advised that a teacher had been shot, failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident, and instead by act called for SWAT thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

c.  After being advised that a child or children were injured in a class at Robb Elementary School failed to identify the incident as an active shooter incident and failed to respond as trained to an active shooter incident and instead by act directed law enforcement officers to evacuate the wing before confronting the shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

d.  Failing to enforce an active shooter response plan developed by the Uvalde Consolidated Independent School District and instead by act evacuated students before stopping an active shooter thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

e.  Failing to follow active shooter training he received by deciding and by act declared to others to delay breaching a room occupied by a gunman at Robb Elementary School until classrooms were evacuated thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

f.  Deciding to negotiate and by act attempted to negotiate with a gunman in Rooms 111 and 112 of Robb Elementary School while the gunman was engaged in an active shooter incident thereby delaying the response by law enforcement officers to a gunman who was hunting and shooting a child or children in Room 112 at Robb Elementary School.

g.  By omission, failed to determine if the door to classroom 111 at Robb Elementary School was locked thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School; and the defendant as a peace officer had a duty under the provisions of Art. 6.06 of the Texas Code of Criminal Procedure to prevent an offense against a person about to be committed in his presence and use as much force as necessary to prevent the commission of the offense and no greater; and under the provisions of Art. 6.05 of the Texas Code of Criminal Procedure the defendant as a peace officer had a duty after being informed in any manner that a threat had been made by one person to do some injury to another person, to prevent the threatened injury if within his power; and the defendant as a chief of police of Uvalde Consolidated Independent School District had a duty under Sec. 37.081 of the Texas Education Code to protect the safety and welfare of people in his jurisdiction.

h. By omission, failed to timely provide keys and breaching tools to enter classrooms 111 and 112 of Robb Elementary School, thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School; and the defendant as a peace officer  had a duty under the provisions of Art. 6.06  of the Texas Code of Criminal Procedure to prevent an offense against a person about to be committed in his presence and use as much force as necessary to prevent the commission of the offense and no greater; and under the provisions of Art. 6.05 of the Texas Code of Criminal Procedure the defendant as a peace officer had a duty after being informed in any manner that a threat had been made by one person to do some injury to another person, to prevent the threatened injury if within his power; and the defendant as a chief of police of Uvalde Consolidated Independent School District had a duty under Sec. 37.081 of the Texas  Education Code to protect the safety and welfare of  people in his jurisdiction.

i. By omission, failed to follow an active shooter response policy developed by the Uvalde Consolidated Independent School District by failing to establish a command center and failing to direct others to establish a command center thereby leaving law enforcement officers  without clear information or direction regarding the active shooter incident at Robb Elementary School, thereby delaying the response by law enforcement officers to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School; and the defendant as a peace officer  had a duty under the provisions of Art. 6.06  of the Texas Code of Criminal Procedure to prevent an offense against a person about to be committed in his presence and use as much force as necessary to prevent the commission of the offense and no greater; and under the provisions of Art.

6.05 of the Texas Code of Criminal Procedure the defendant as a peace officer had a duty after being informed in any manner that a threat had been made by one person to do some injury to another person, to prevent the threatened injury if within his power; and the defendant as a chief of police of Uvalde Consolidated Independent School District had a duty under Sec. 37.081 of the Texas Education Code to protect the safety and welfare of people in his jurisdiction.

j.   By omission, Failed to develop an immediate action plan, direct others to develop an immediate action plan, and communicate to others an immediate action plan to respond to a gunman in the event the gunman resumed shooting in rooms 111 and 112 of Robb Elementary School thereby delaying the response by law enforcement officers to an active shooter who resumed shooting and was hunting and shooting a child or children in Rooms 111 and 112 at Robb Elementary School; and the defendant as a peace officer had a duty under the provisions of Art. 6.06 of the Texas Code of Criminal Procedure to prevent an offense against a person about to be committed in his presence and use as much force as necessary to prevent the commission of the offense and no greater; and under the provisions of Art. 6.05 of the Texas Code of Criminal Procedure the defendant as a peace officer had a duty after being informed in any manner that a threat had been made by one person to do some injury to another person, to prevent the threatened injury if within his power; and the defendant as a chief of police of Uvalde Consolidated Independent School District had a duty under Sec. 37.081 of the Texas Education Code to protect the safety and welfare of people in his jurisdiction.

And the said Defendant did not voluntarily deliver the child or children named above to a designated emergency infant care provider under Section 262.302, Family Code.

*Cause No. 2024-06-16368-CR*                                    *Amended Indictment*
                                                               *Page 23 of 24*

**AGAINST THE PEACE AND DIGNITY OF THE STATE**

 **/os/ *Janet L. Foley***
Foreperson of the Grand Jury

Filed on June 26, 2024, by Christina Ovalle, Clerk of the 38th Judicial District Court, of Uvalde County, Texas at 3:03 p.m.

By: /os/ ***Christina J. Ovalle,*** District Clerk

Witness: Jose M. Sanchez

# Attachment B

THE STATE OF TEXAS            §
                                            §
COUNTY OF HARRIS           §

## AFFIDAVIT OF MATTHEW J. HEFTI

BEFORE ME, the undersigned authority, on this day personally appeared Matthew J. Hefti, who being by me duly sworn, upon oath deposes and says the following:

1.     "My name is Matthew J. Hefti. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts stated:

### I.     Statement as to parties

2.     This is a request from counsel for Pete Arredondo relevant to an ongoing criminal case in the 38th Judicial District, Uvalde County, Texas.

3.     The United States is not reasonably anticipated to be a party in the case.

4.     The parties to *State v. Pete Arredondo*, case number 2024-06-16368-CR, are the State of Texas and Pete Arredondo.

### II.     Contact information for counsel in the case

5.     Paul Looney, Wade Smith, and Matthew J. Hefti of LOONEY SMITH CONRAD & HEFTI P.C. represent Pete Arredondo in *State of Texas v. Pete Arredondo*, case number 2024-06-16368-CR. The contact information for counsel in the case is as follows:

LOONEY SMITH CONRAD & HEFTI P.C.
ATTN: Matthew Hefti
11767 Katy Freeway, Suite 740
Houston, Texas 77079
mjhefti@looneyconrad.com
Phone: (281)-597-8818

Complaint Exhibit 1 at 30

### III.    Summary of the facts of the case

6.    The following summary of the facts of the case is taken verbatim from the executive summary of the agency's own report on the matter, prepared by USCBP OPR IOD[1]:

> On May 24, 2022, at 11:33:02 AM (CDT), a lone assailant, [REDACTED], entered Robb Elementary School through an unsecured exterior side door. Upon entering the school, the assailant quickly moved down the hallway and pulled open one of the doors to adjoining Classrooms 111 and 112, both fourth-grade classrooms full of students and their teachers. An internal doorway connected Classroom 111 and Classroom 112. By entering through either classroom door, the assailant had access to both classrooms. Upon entering the classroom, the assailant began firing a semi-automatic rifle at the children and their teachers in both classrooms. Approximately 77 minutes after the assailant entered the classroom, CBP personnel consisting of Border Patrol Agents (BPAs) assigned to the Border Patrol Tactical Unit (BORTAC), along with state and local law enforcement officials, entered the classroom and, after an exchange of gunfire, shot and killed the assailant. By the time the incident at Robb Elementary was over, the assailant had killed 19 children and 2 teachers. An additional 16 students, teachers, and law enforcement officers were wounded.
>
> A total of 188 CBP personnel, along with law enforcement officers from more than 20 other federal, state, and local agencies, responded or provided support during or following the incident.

7.    All additional factual representations in this affidavit regarding the events of May 24, 2022, and the specific actions of USCBP employees and agents included herein are made on information and belief based on discovery provided to Defense counsel by the prosectors for the State of Texas, including bodycam evidence, reports of Texas Rangers investigating the event, and statements made to the Texas Rangers and investigators by the USCBP employees themselves.

---

[1] Report of Investigation prepared by the Department of Homeland Security U.S. Customs and Border Protection Office of Professional Responsibility, Investigative Operations Directorate, Case # UF2022586, Case Title: Uvalde Texas School Shooting w/Fatalities.

## IV.    The witnesses sought

8.    This request is that USCBP make witnesses available to testify at trial in *State of Texas v. Pete Arredondo*, case number 2024-06-16368-CR. Medical, pay, or military service information is ***not*** being requested.

9.    The witnesses and information requested are reasonable in scope and described with particularity. 188 USCBP responded or provided support during the incident at Robb Elementary School, and no less than 126 USCBP employees voluntarily gave statements to the Texas Rangers during their investigation of the shooting at Robb Elementary School in Uvalde County, Texas. This request is limited in scope and seeks testimony from only 19 of those 188 employees. Specifically, we request that the following USCBP employees are made available for trial in this case because their testimony is relevant, material, and necessary for Mr. Arredondo's defense, and because each of these witnesses are percipient eyewitnesses each having their own perspectives and reasons for taking the actions they did or refraining from taking action, and the evidence is unavailable from any other source:

      a.    Agent Gilbert Alvarado

      b.    Agent Andrew Justin Aviles

      c.    Agent Warren John Becker III

      d.    Agent Austin Robert Buchanan

      e.    Agent Joe Dale Cumbie

      f.    Agent Erik Gomez

      g.    Agent Luis Eduardo Gonzalez

      h.    Agent Tyler Oryan Gramlin

      i.    Agent Paul Guerrero

      j.    Agent Randal Renee Hernandez

      k.    Supervisory Agent David Lee Joy

      l.    Agent Ryan Massey

    m.  Agent David Mendoza

    n.  Agent Christopher Paul Merrell

    o.  Agent Travis Edward Shrewsbury

    p.  Agent Jorge Tijerina

    q.  Agent Alberto Trevino

    r.  Agent Jaime Villarreal

    s.  Agent Shawn Michael Wagner

**V.**    **Time and date for the response and production**

10.    The dates for trial are not yet set because USCBP has denied the State's requests for necessary witnesses in this same case, and the State is litigating a lawsuit in U.S. District Court in the Western District of Texas regarding the denial of that request.

11.    Nevertheless, we seek an answer to this request as soon as possible, but in any event, no later than 5:00 P.M. Central Time on Friday, February 27, 2026, which is at least 10 working days from the service of this request on counsel for the agency with control over the witnesses from whom testimony is requested so that we know whether we must supplement our request with additional information, initiate our own lawsuit against the agency under the Administrative Procedures Act, or take some other course of action to ensure a fair adjudication of this matter for Mr. Arredondo.

**VI.**    **The procedural posture of the case**

12.    Mr. Arredondo was a Texas peace officer who responded to the shooting at Robb Elementary School on May 24, 2022, and has been indicted for acts and/or omissions during his response to the shooting. As relevant to this request, Mr. Arredondo has been indicted on 10 counts of endangering a child under Article 22.041(c) of the Texas Penal Code, under varying theories of culpability. *See* Amended Indictment in Cause No. 2024-06-16368-CR, attached as Attachment A and incorporated here in its entirety by reference.

## VII.    Areas of inquiry described with particularity

The following are the areas of inquiry for the requested testimony for each agent from whom testimony is requested, described with particularity:

13.    What position each agent held at the time of the incident and their level of training and experience.

14.    How each agent was first informed of a shooting incident that morning, what information he received, and from whom that information came.

15.    What actions each agent took as a result of the information he learned, and who made what requests of each agent.

16.    Who each agent contacted on the way to the incident—if anyone—why each agent contacted that person or agency he did, and what his beliefs were as to who was in charge of the response at the time he responded.

17.    Who each agent met with upon arriving at Robb Elementary school, what he personally observed while on scene, and what course of action or actions he took from the time he arrived until the shooter was killed.

18.    What each agent learned about the location of the shooter, what he observed about where the shooter was located, and how the information he learned through his personal observations shaped his decisions and actions during the time he was on scene from his arrival until the shooter was killed.

19.    What reasons each agent had for taking the actions he did during his time on scene or refraining from taking other actions.

20.    What basis in each agent's own training and experience supported taking the actions he did during his time on scene or refraining from taking other actions while on scene.

21.    Whether each agent considered taking other actions that he ultimately did not take while on scene and what risks he saw from taking other potential actions that he did not take while he was on scene.

22.    What information each agent received while on scene and from whom.

23.    What agencies each agent observed on scene, what agencies or personnel did he get information from, and what agencies or personnel gave him orders or directions.

24.    What each agent's understanding was about his chain of command and whose directions he was required to follow or not follow under the given circumstances.

25.    Whether each agent personally took any orders from Pete Arredondo.

26.    What reasons each agent had for not personally breaching the room and engaging the gunman immediately upon arrival and what actions each took instead and what reasons each had for taking those actions, refraining from taking those actions, or for taking alternate actions.

27.    What each agent's beliefs were regarding how the incident was classified at any given time, whether active shooter, barricaded suspect, or hostage situation and their reasons for that belief.

28.    What each agent personally observed about Rooms 111 and 112 and the area surrounding the classrooms, from either inside or outside.

29.    Whether each agent heard any gunfire during his time on scene and his belief about where those shots were directed and his reasons for those beliefs.

30.    What each agent's own training and experience led him to believe was needed in terms of resources or personnel to safely address the situation without the additional loss of innocent life.

31.    Whether each agent believes in his own training and experience and based on the risks he personally assessed and observed that it was reasonable and necessary for law enforcement personnel to evacuate children from surrounding classrooms before engaging in a kinetic firefight with a gunman inside Rooms 111 and Rooms 112 based on the potential dangers of such a firefight.

32.    What benefits each agent believes were gained by evacuating children from surrounding children before engaging in a kinetic firefight with a gunman inside Rooms 111 and Rooms 112 based on the potential dangers of such a firefight.

33.    Whether each agent was aware that children were inside Rooms 111 and 112 at any time during his time on scene and at what point that information was learned, if at all.

34.    What obstacles or difficulties presented themselves in immediately breaching Rooms 111 and 112, to include potential risks and dangers to each agent, law enforcement officer, or other innocents inside the school.

35.    Whether each agent believes in his own training and experience and based on the risks he personally assessed and observed that having a rifle-rated shield for the breach was necessary and ultimately saved lives.

36.    What benefits, if any, resulted from waiting until the proper resources and personnel were in place to breach the room and engage the shooter successfully.

37.    What additional harms, if any, were possible or likely to occur if law enforcement had immediately breached without the resources and personnel available at the time law enforcement breached the room and killed the shooter.

38.    Whether each agent believes in his own training and experience and based on the risks he personally assessed and observed that it was reasonable and necessary to take the actions he did.

## VIII.   Summaries of the testimony sought

39.    Agent Gilbert Alvarado

Agent Alvarado arrived at Robb Elementary School in his marked police vehicle at 11:44 AM, within the first fifteen minutes of the incident. Agent Alvarado voluntarily gave a statement to Texas Rangers investigators.

Agent Alvarado relayed a message over USBP's radio channel notifying any available agents to respond to Robb Elementary. Agent Alvarado entered the and exited through the West Door of the 4th Grade building multiple times, and he played a key role in evacuating children from Rooms 109.

Agent Alvarado explained he entered the west entrance of Robb Elementary School and met with Uvalde PD Officer Eduardo Canales. He noticed that Officer Canales had taken some shrapnel from a door when

the shooter engaged him. Agent Alvarado learned that the shooter had barricaded himself midway down the south hallway in a classroom.

Agent Alvarado noticed all the lights in the classrooms were off, and everything was very quiet. Agent Alvarado was informed there were children in the classroom.

Agent Alvarado stated he believed the shooter ran into the school, causing a hostage situation, and it was suggested that USBP's specialized team, Border Patrol Tactical Unit (BORTAC), should be utilized.

Since the shooter was seen with an AR-15 style long rifle, they requested a rifle-rated ballistic shield and breaching kits. An unknown school resource officer told Agent Alvarado that the classroom doors were locked because they were on "lockdown."

Agent Alvarado said teachers would not open the doors unless there was an all-clear or code word. Agent Alvarado assisted with planning the evacuation of the classrooms down the hallway to avoid any potential further loss of life. Agent Alvarado and other law enforcement officers exited the school and started breaking the outside windows on the west side to evacuate children and teachers.

Agent Alvarado explained that while they made their way back into the hallway, it was discovered the breaching kit or Halligan tool would not work, and they needed the door key to enter the door. Agent Alvarado heard what he believed were four to five shots fired while they were evacuating the east side classrooms. At the time, Agent Alvarado believed the shots were directed toward him and other law enforcement trying to evacuate the classrooms.

40.    Agent Andrew Justin Aviles

Agent Aviles voluntarily gave a statement to Texas Rangers investigators. He stated that USBP BORSTAR Agent Jorge Tijerina, AKA "TJ," sent a message to all the available BORSTAR Agents to head to Robb Elementary School to assist. Agent Aviles responded to Robb Elementary School.

Agent Aviles entered the west door entrance to Robb Elementary School and saw USBP Tactical Unit (BORTAC) Agent Paul Guerrero and asked what was going on. Agent Guerrero told Agent Aviles that there was a barricaded person in the school classroom.

Page **8** of **30**

Agent Aviles saw multiple law enforcement officers close to the classroom doors, which were both outward opening. Agent Aviles also saw the window in classroom door 111 had been shot enough times to cause a hole. Agent Aviles explained that Agent Guerrero had a Hooligan tool and explained to everyone how to use it. Agent Guerrero believed they still needed a rifle-rated ballistic shield and keys to the classroom.

At approximately 12:23 PM, Agent Aviles witnessed USBP Agent David Mendoza give a set of keys to USBP BORTAC Acting Commander Paul Guerrero.

41.    Agent Warren John Becker III

Agent Warrant Becker voluntarily gave a statement to Texas Rangers investigators. Agent Becker responded to Robb Elementary at the direction of his acting BORTAC Commander Paul Guerrero, who sent him a text stating, "get everyone to Robb school in Uvalde; there is a possible shooting, guy with AK-AR, he is barricaded." Agent Becker received information via text messages from a BORTAC team member that the suspect had thirty loaded magazines. Agent Becker had information that the suspect was locked inside a classroom, was shooting at the door, that multiple children were inside the classroom, and that the door was locked.

Agent Becker was a member of the team that breached Room 111 and killed the shooter. USCBP agents were provided a rifle-rated shield from a United States Marshal. At the direction of Agent Paul Guerrero, Agent Becker took possession of the shield and moved to the front of the breaching team to provide cover. Agent Becker personally observed the bullet holes in the doors to the locked classrooms. Agent Becker reported to Agent Guerrero that the room looked empty and that there was a closet and an opening into an additional classroom to the left of the classroom. He observed that the lights were off. Agent Becker used the shield to provide cover for Agent Paul Guerrero as Agent Guerrero used the master key to unlock the locked door.

Agent Becker entered the room first with the rifle-rated shield providing cover. Agent Becker personally witnessed the shooter emerge from a closed corner door and fire in his direction. Agent Becker felt the shield take impacts. Agent Becker fired three to four rounds at the suspect with his handgun.

42.    Agent Austin Robert Buchanan

Agent Buchanan voluntarily gave a statement to Texas Rangers investigators. Agent Buchanan arrived on scene at Robb Elementary around 11:51 AM. He met with Uvalde Police Department Personnel and a Uvalde County Constable and informed them that BORTAC was on its way. Agent Buchanan stood around in the hallway conferring with a Uvalde Constable, a TPWD Game Warden, Texas DPS Troopers, a Texas Ranger, Uvalde Policde Department Officers, and other USBP Agents to formulate a plan. No evidence suggests Agent Buchanan reported to or took any direction from Mr. Arredondo.

Agent Buchanan helped evacuate classrooms. He took directions from Agent Paul Guerrero. Even after Agent Guerrero took command at the scene, Agent Guerrero told Agent Buchanan that it was going to take time.

Agent Buchanan talked with Uvalde County Sheriff Ruben Nolasco and volunteered to enter the building. Agent Buchanan said several officers inside the hallway were trying to figure a way into the classroom where the suspect was. An officer approached Agent Buchanan and brought what he believed was flash-bangs and gas masks to get in. It turned out the officer did not have the flash-bangs. Agent Buchanan said he heard a few more gunshots while in the hallway.

Agent Buchanan and other officers were trying to figure out how to get into the classrooms. Agent Buchanan noted that other officers and himself moved up toward the classroom in a stack toward the door where officers believed the suspect was located. Agent Buchanan was fifth in the stack. Agent Buchanan said they had a Halligan tool but did not have another tool to jam the Halligan tool into the doorway to pry it open. Agent Buchanan said the door to the classroom was locked.

Agent Buchanan's stack did not enter or breach the classroom. Agent Buchanan said they were waiting for approval to go into the room. Agent Buchanan did not know who the incident commander on scene was, but he said he listened to the BORTAC Agent in the hallway, and that in his chain of command, the BORTAC Agents are in charge.

43.    Agent Joe Dale Cumbie

Agent Cumbie voluntarily gave a statement to Texas Rangers investigators. Agent Cumbie heard radio traffic around 11:44 AM that there had been shots fired at Robb Elementary. Agent Cumbie said he

rushed to the school and linked up with other USBP Agents that were staged outside the school. Agent Cumbie said he and other agents began assisting in evacuating children from multiple classrooms. Agent Cumbie estimated he helped by evacuating approximately four to five separate classrooms. Agent Cumbie advised that about 40 children were evacuated from those classrooms.

44.    Agent Erik Gomez

Agent Gomez voluntarily gave a statement to Texas Rangers investigators. Agent Gomez said that while working transport, he heard on the USBP radio that shots were fired at Robb Elementary School. Agent Gomez said he immediately responded to the school. Agent Gomez arrived at Robb Elementary at approximately 11:47 AM.

Agent Gomez advised upon entry into the school; he found four to six officers inside the hallway near rooms 130 & 131, who stated the shooter was in the direction of rooms 111 and 112. While in the hallway, Agent Gomez advised he heard approximately three shots fired. Agent Gomez did not try to advance on the shooter, but instead said he began looking for "work" as he was trained. While exiting the west side of the building, Agent Gomez stated he escorted a teacher to safety.

After exiting the building, Agent Gomez advised he broke the window in room 106 to assist kids and a teacher to safety. Agent Gomez advised additional first responders were also breaking windows and assisting victims. Agent Gomez advised that he continued around the building to room 110, assisting additional kids and a wounded teacher to safety.

Body Worn Camera of Uvalde County Sherrif's Office Brown picks up the sound of four gunshots being fired by the gunman at approximately 12:21 PM, and the same video shows Agent Gomez running away and out of the hallway as the gunfire is heard.

Inside, Mr. Arredondo and other officers discussed evacuating individuals from the surrounding classrooms, and they relayed that information to officers outside the south door, including Agent Gomez. Agent Gomez began evacuating students through the exterior window to Room 109 at 12:23 PM.

45.    Agent Luis Eduardo Gonzalez

Agent Gonzalez voluntarily gave a statement to Texas Rangers investigators. Agent Gonzalez was among the first officers inside the west

wing of the Robb Elementary School. Agent Gonzalez stated he was working in Uvalde and observed a Texas Department of Public Safety Trooper traveling in an emergency mode. He called the Uvalde USBP Station and asked if anything was happening. Agent Gonzalez followed the trooper and other officers to Robb Elementary School. Agent Gonzalez arrived at Robb Elementary at 11:36 AM, approximately 5 minutes after the incident at the school began. Agent Gonzalez first made contact with UCISD PD Officer Ruben Ruiz and Uvalde PD Officer Canales and was told where the gunman was located. Agent Gonzalez stated the officers started to make their way down the hallway towards the classrooms. The officers believed the suspect was in a classroom because the door window was shot through. Agent Gonzalez stated that was when the suspect saw the officers and started shooting at the officers. Agent Gonzalez retreated to take cover.

Some time later, body worn camera footage showed Agent Gonzalez warning other officers about the danger of crossfire, and he complained that he just had a rifle pointed at him. At 11:55 AM, body worn camera footage shows Agent Gonzalez taking a piece of wood from UCISD PD Officer Adrian Gonzalez to prop open the school door.

Agent Gonzalez helped evacuate individuals through the window to room 102, and he continued by helping evacuate rooms 102 and 104, then he helped escort escapees from rooms 15 and 16 to the east side of the school.

Agent Gonzalez stated he was certain that officers had checked the doors to determine if they were locked or unlocked. Agent Gonzalez stated Room 111, where the shooter was, was locked. He was unsure about room 112.

46.   Agent Tyler Oryan Gramlin

Agent Gramlin voluntarily gave a statement to Texas Rangers investigators. Agent Gramlin was a use of force instructor and was teaching use of force classes at the USBP Station when he learned of the shooting and responded.

Agent Gramlin could see that there were other officers inside the school at the northwest door and was told the shooter was contained inside. Agent Gramlin saw an officer at the southwest corner of the school start to break classroom windows that had been shot at and began to assist in extracting kids from the classrooms with other officers.

Complaint Exhibit 1 at 41

After the kids were evacuated, Agent Gramlin made his way to the south door and linked up with other officers. Agent Gramlin saw officers on the opposite (north side) end of the hallway, and a Chief (later identified as Uvalde Consolidated Independent School District Police Department Chief of Police Pete Arredondo) was standing in the hallway with a radio in hand. Agent Gramlin stated he tried to get the Chief to come back to them because he was standing in the middle of the hallway, but the Chief ignored him. So Agent Gramlin and a few other officers entered the hallway with shields in front of the Chief. After approximately 10 minutes inside the hall, Agent Gramlin heard two volleys of gunfire inside the classroom. When this occurred, Agent Gramlim heard the suspect yell at officers to come and end this. Agent Gramlin said that they communicated with the other group of officers in the hallway, and someone told them that the doors were locked and the windows outside were blocked.

Agent Gramlin stated that after several minutes, he watched the USBP Tactical Unit (BORTAC) attempt to breach room 111 with a hooligan breaching tool but failed because the door was locked. Agent Gramlin observed BORTAC members hold their position outside the door until a key was given. Once the door was opened, Agent Gramlin saw BORTAC going in, and after a brief pause, he heard gunfire.

47.    Agent Paul Guerrero

Agent Guerrero voluntarily gave a statement to Texas Rangers investigators. Agent Guerrero was the Acting BORTAC Commander who assumed command of the scene once he arrived. Agent Guerrero stated at approximately 11:45 a.m., he was contacted by USBP Agent Juan Gomez Jr. regarding a barricaded subject at Robb Elementary School in Uvalde, Texas. Agent Guerrero sent out a text to Agent Becker stating, "Get everyone to Robb school in Uvalde; there is a possible shooting, guy with AK-AR, he is barricaded." Agent Guerrero also sent a text to Border Patrol Agent Sauceda informing him there was a "barricaded" suspect at the school.

Agent Guerrero stated he immediately contacted on-duty BORTAC Supervisor Kevin Hardy and Luke Dougherty and advised them to respond to Robb Elementary School. Agent Guerrero stated he immediately changed into his BORTAC-issued uniform and responded to Robb Elementary School in his unmarked unit.

Page **13** of **30**

Agent Guerrero stated he was contacted by USBP Acting Patrol Agent in Charge Timothy Hay, who advised him that USBP Search Trauma and Rescue Unit (BORSTAR) would be deployed to the scene.

Agent Guerrero arrived at the school and parked at approximately 12:05 PM. He first entered the school at approximately 12:13 PM. Within the first minute after entering, Agent Guerrero received initial briefings and communications from Uvalde PD officers, including Uvalde PD Lt. Mariano Pargas, and Uvalde County Constable Johnny Field. Agent Guerrero advised the officers that it was going to take time. Agent Guerrero was notified there were victims in the room with the shooter and that a child called 911 stating there were victims in there.

BORTAC Acting Commander Paul Guerrero came to the north side of the building upon his arrival at Robb Elementary. In a post-incident statement, he said he was advised "that the subject had possibly shot multiple children and was still in the classroom." He requested surveillance through the back windows of Rooms 111 and 112 to possibly deploy gas as they made entry. He then went to retrieve a Halligan tool from his car.

Border Patrol Agent Joy told Agent Guerrero that the door to the classroom where the shooter was located was locked. Agent Guerrero attempted to pry open a door in the hallway to see if the Halligan tool would work. Agent Guerrero stated he discussed using CS gas and breaching tools to enter the classroom. He determined it would take too long and dangerously expose an officer to gunfire coming from inside the classroom. He observed that the classroom doorway had multiple holes consistent with bullet holes, and he did not want to expose or jeopardize the safety and lives of any officers by trying to pry the door open.

Agent Guerrero coordinated with Texas Ranger Kindell, who told Agent Guerrero that SWAT and SRT were on their way with armor. Agent Guerrero tried to ascertain the status of the door and how to breach into the room. For over 10 minutes Agent Guerrero talked to various law enforcement officers, tried various master keys to various doors, and discussed breaking windows and pouring CS gas into the room, warning of the dangers of bullets going through the wall and the gunman shooting at the door every time someone got close to it.

At approximately 12:36 PM, video footage captured Agent Guerrero relaying information on the telephone saying, "it's 'cause he's shooting at the door, and the door is locked. So, we need to get the keys. Nope, not yet. Let me get the door open, and we'll go from there. Alright. He's

shooting at the door though, be advised (unintelligible) gun in the back (unintelligible)."

Agent Guerrero asked Border Patrol Agent Tijerina if he had a tool to break and rake the window and said they were trying to get gas inside the classroom. Agent Tijerina did not have such a tool. Agent Tijerina then asked Agent Guerrero why they were not going into the classroom. Agent Guerrero said that they had tried a key, and the key would not open the door. Agent Guerrero said that someone had attempted to open the door, and the shooter fired shots at them through the door.

Agent Tijerina also asked if they were talking or trying to negotiate with the shooter. Someone nearby pointed down the hallway and stated that the school police chief was trying to talk and negotiate with the shooter, but the shooter was not responding. Agent Guerrero said they needed to get into the classroom as fast as they could and were trying to get a second set of keys from the janitor.

Agent Guerrero obtained a master key from an officer at the scene. As he made his way to the classroom door, an officer advised him to try it on another door first. He attempted to open another door along the hallway, and it did not work. He saw a few Border Patrol agents and advised them to start setting up for a triage situation of mass casualties. He then received a second master key, which he successfully used to open another door.

Preparing to make entry to room 111, Agent Guerrero had another agent use the rifle-rated ballistic shield to give him cover as he opened the classroom door. Agent Guerrero placed the key in the door to Room 111 and personally unlocked the door.

Agent Guerrero stated he entered the classroom behind Agent Becker and walked in toward the right of the classroom. Agent Guerrero stated he saw a man standing in front of a closet and began to hear gunfire. Agent Guerrero stated the subject was firing his weapon toward him and the other officers in an attempt to cause serious bodily injury or kill them.

Agent Guerrero stated he returned fire with his rifle until he observed the subject fall to the ground and stop moving.

48.     Agent Randal Renee Hernandez

Agent Guerrero voluntarily gave a statement to Texas Rangers investigators. Agent Hernandez arrived at Robb Elementary School at 11:44 AM and entered the school approximately 7 minutes later. At

around 11:57 PM, Agent Hernandez helped evacuate a teacher from room 132. By 12:03 PM, Agent Hernandez received and took possession of a shield from Uvalde PD Officer Justin Mendoza.

Agent Hernandez stated he was informed the shooter was believed to be in one of the classrooms down the hall on the right after entering the northwest door. Agent Hernandez said he set up on the corners of the hall facing the south. He stayed there for some time.

Agent Hernandez stated they had been advised the door to the room where the shooter was, was believed to be locked and they attempted to locate a key to the room. At some point, they were advised a 911 call was made by a child who stated they were in one of the rooms.

Agent Hernandez stated they heard three gunshots and advanced toward the room. Agent Hernandez stated they did not enter the room because they had been advised the door was locked, and they did not have a key or the ability to breach the door.

Agent Hernandez stated when they located a key, it was used to open the classroom door on the right. Agent Hernandez was handed the keys but did not have time to use the keys on the room on the left when the decision was made to enter the room on the right. Agent Hernandez stated that the suspect began to shoot at them about that time.

49.    Supervisory Agent David Lee Joy

Supervisory Agent Joy voluntarily gave a statement to Texas Rangers investigators. At approximately 11:30 a.m., Agent Joy learned through other agents at the USBP Station that shots had been fired at the Robb Elementary School. Agent Joy went to the armory, where he was issued a rifle, and then traveled to the school, where he arrived at approximately 11:40 a.m. to 11:45 a.m.

Supervisory Agent Joy helped evacuate kids and teachers from the rooms along the west side of the building.

He went around the east side of the building and saw officers stacked up in the hallway. Agent Joy stated he then went into the building and recognized additional agents.

Agent Joy stated there were multiple Uvalde Police Department Officers and Texas Department of Public Safety (DPS) Troopers inside the building where the shooter was located. Agent Joy questioned himself as to why none of the officers had gone into the room. Agent Joy stated he

contacted USBP Tactical Unit (BORTAC) Agent Paul Guerrero on his cell phone and asked where he was. Agent Guerrero stated he was just getting to the scene. Agent Joy stated he told Agent Guerrero that the door to the classroom was locked. Agent Joy stated this information was relayed to him by one of the DPS officers.

Agent Joy informed Agent Guerrero that they needed a sniper on the east side. Agent Joy stated USBP Agent Ryan Massey took the role of sniper.

Agent Joy could not remember if he went in and out of the school twice or once before they engaged the shooter. Agent Joy stated he witnessed an officer with a key ring, and the officer wanted to see if the keys would unlock a door behind them. Agent Joy stated Uvalde Consolidated Independent School District Chief of Police Pete Arredondo was talking to a police officer and requesting the key to unlock the door. Agent Joy stated none of the keys worked.

Agent Joy stated that it was probably approximately 30 minutes from when officers were busting windows to when they were handling the keys. He stated they finally had more keys brought in from agents on the north side of the hallway. Agent Joy heard them say, "This is the key." Once he heard they had the keys, he went back outside because they were going to make entry to engage. Agent Joy stated he started notifying everyone around that they were going to make entry, so they were not in the line of fire. Agent Joy stated the officers then made entry into the room.

50.    Agent Ryan Massey

Agent Ryan Massey responded to Robb Elementary School with Agent Becker. Agent Massey reported to Agent Guerrero upon his arrival and was briefed on the situation. After being briefed on the situation, Agent Massey took the role of sniper. Agent Tijerina then assisted BORTAC Agent Ryan Massey set up his precision rifle and gear by a tree on the east side of the building. Agent Tijerina and Agent Massey tried to determine what window was connected to the classroom with the shooter. Other officers nearby, including two State Troopers, then indicated which window they believed to be the correct one. Agent Massey said the windows were tinted, and he could not see through them.

51.    Agent David Mendoza

Agent Mendoza voluntarily gave a statement to Texas Rangers investigators. Agent Mendoza responded west of Uvalde and arrived

approximately 10-15 minutes after the initial call. Agent Mendoza stated he saw numerous other USBP Agents, Texas Department of Public Safety Troopers, Uvalde Police Department Officers, and Uvalde County Sheriff's Office Deputies.

During Agent Mendoza's time on scene at Robb Elementary School, he assisted with moving school-age children from the school into school buses located north of the school. Agent Mendoza heard approximately four to five shots in the west area of the school after being in the school for quite some time.

Agent Mendoza also assisted with staging emergency medical services (EMS) outside the school and setting up a triage location for the injured near the restrooms in the west part of Robb Elementary School. Agent Mendoza's main location was near the entrance door next to room 116.

Agent Mendoza stated he was approached by an older Hispanic male who handed him a set of keys to the school. Agent Mendoza stated he placed the keys in his pant cargo pocket and did not remember what the male subject said to him.

Agent Mendoza stated he returned to the west entrance of the school building and escorted emergency medical technicians toward the west entrance of the school building. Video footage shows that Agent Mendoza must have had the keys earlier than 12:21 PM, when he is shown entering the west door of the 4th Grade Building.

Agent Mendoza stated while he was standing outside by the west entrance, he heard what he believed to be four to six gunshots coming from inside the school.

Agent Mendoza stated he did not remember how much time had gone by when he heard officers saying they were about to go in. Agent Mendoza stated he understood "Going in" meant officers were preparing to breach the classrooms the suspect was in. Agent Mendoza stated he was standing inside the hallway by the west entrance when he heard USBP Tactical Operations Agent Paul Guerrero asking for keys.

Agent Mendoza stated he remembered he had a set of keys in his cargo pocket. Agent Mendoza stated he grabbed the keys from his pocket and tested them on a classroom door by the west entrance. Video footage shows this occurring at 12:23 PM. Agent Mendoza stated he did not want to give Agent Guerrero the keys without checking to see if they worked. Agent Mendoza stated he walked toward the hallway intersection and

Page **18** of **30**

threw Agent Guerrero the keys. It is believed that the keys Agent
Mendoza provided to Agent Guerrero were the keys that finally unlocked
the door to the room the shooter had locked himself in.

52.     Agent Christopher Paul Merrell

Agent Merrell voluntarily gave a statement to Texas Rangers
investigators. Agent Merrell stated he arrived at Robb Elementary School
at approximately 12:30 p.m. Agent Merrell stated he deployed his rifle,
extra magazines, helmet, and two individual first aid kits. Agent Merrell
stated he saw a young girl with blood on her face running across the street
from Robb Elementary School. Agent Merrell stated he attempted to catch
up to her to give her medical attention. Agent Merrell stated the girl was
attended to by medical personnel already at the scene.

Agent Merrell stated he then entered the school through the west entrance
and met with BORSTAR Agent Andrew Aviles. Agent Merrell stated
Agent Aviles asked him to retrieve all his medical supplies for the triage
area that was being organized by various law enforcement officers. Agent
Merrell stated he retrieved two medical kits from his unit and entered the
school again.

Agent Merrell stated he saw law enforcement officers staged on both sides
of two classroom doors. Agent Merrell stated he could see bullet holes
near the frame of the door to the classrooms. Agent Merrell stated he
could see that the lights were off in both classrooms. Agent Merrell stated
he did not hear any noise from inside the classrooms.

Agent Merrell stated he heard USBP Tactical Unit (BORTAC)
Commander Agent Paul Guerrero in the hallway inquiring about master
keys and entry tools as all the classroom doors were believed to be locked.
Agent Merrell stated Agent Guerrero obtained master keys and was able to
unlock a janitor's closet next to the classroom the shooter was believed to
be in. Agent Merrell stated Agent Guerrero asked him to make entry into
the classroom. Agent Merrell stated he was the fourth man in the stack.

Agent Merrell stated Agent Guerrero opened the classroom door on the
right. Agent Merrell stated he could see the classroom had a doorway to
the classroom on the left. Agent Merrell stated the light inside was dim,
with very little light coming in through the windows and light from the
hallway. Agent Merrell stated he took several steps inside the classroom
and heard a loud noise like a door being slammed. Agent Merrell stated he
saw a silhouette of a man with long hair facing the classroom. Agent

Merrell stated he saw a muzzle flash and gunshots being fired. Agent Merrell stated the man was discharging a firearm in his direction in an attempt to kill him and the officers inside the classroom. Agent Merrell stated he immediately returned fire until the subject fell to the ground and stopped moving.

53.    Agent Travis Edward Shrewsbury

Agent Shrewsbury voluntarily gave a statement to Texas Rangers investigators. Agent Shrewsbury advised that he was on scene at the school approximately 10 to 15 minutes after first learning of the shooting. Video footage shows him entering the school for the first time at approximately 11:51 AM.

Agent Shrewsbury stated he observed a mixture of law enforcement agencies and specifically mentioned the Uvalde Police Department and the Uvalde County Sheriff's Office. Agent Shrewsbury advised law enforcement officers were posted up in a hallway oriented down another hallway toward classrooms on the left side. Agent Shrewsbury advised that he learned it was the last known location of the active shooter.

At this time, Agent Shrewsbury and Agent Waggoner began clearing rooms in the hallway where the law enforcement officers were. While clearing the rooms, Agent Shrewsbury advised they observed an adult female hiding under a desk. Agent Shrewsbury and Agent Waggoner assisted her to a safe exit. Video footage shows he assisted other USBP agents to evacuate a teacher from room 132 at approximately 11:58 AM. At this point, Agent Shrewsbury moved back into the hallway with the other law enforcement officers. Agent Shrewsbury advised that officers were looking for a "Master Key." At some point, Agent Shrewsbury observed children being evacuated from classrooms across the hallway.

Agent Shrewsbury advised multiple USBP Tactical Unit (BORTAC) agents showed up, and shortly after, Agent Shrewsbury stated the shooter shot approximately three to four times. Agent Shrewsbury advised they began moving toward the classroom but had no way of entering the classroom. Video footage shows him advancing down the north/south hallway toward Room 111 and Room 112 at approximately 12:21 PM. Agent Shrewsbury advised that what took so long to get in was the fact that they had no key or breaching tools. Agent Shrewsbury advised that a plan was formed once a master key was obtained.

Agent Shrewsbury and a team of BORTAC and USBP Rescue, Search and Rescue (BORSTAR) agents began to approach the classroom believed to be where the active shooter was. Agent Shrewsbury advised he was the last man in the stack. As the team approached the door, Agent Shrewsbury observed bullet holes in the door. Through a window in the door, while standing in the hallway, Agent Shrewsbury advised he observed no threat or movement inside the classroom. Agent Shrewsbury advised that a key was used to open the door at this time.

Agent Shrewsbury explained that he observed a closet at the back of the classroom. Agent Shrewsbury explained that the first man on the entry team utilized a ballistic shield, and as they entered the room, the first man went right. Agent Shrewsbury explained that he observed and heard the closet door "bust open," and a male with a black bulletproof vest, long hair, and a black rifle began shooting before receiving return gunfire from agents on the entry team. Agent Shrewsbury advised that he saw the active shooter fall to the ground as he entered the room. Agent Shrewsbury advised he did not have priority of fire and did not fire any rounds at the active shooter.

54.    Agent Jorge Tijerina

Agent Tijerina voluntarily gave a statement to Texas Rangers investigators. Around 11:39 AM, Agent Tijerina sent a group text message notifying USBP agents, including his subordinates, that there was a school shooting in Uvalde, and he instructed everyone to respond.

At approximately 12:25 p.m., Agent Tijerina arrived at Robb Elementary School and parked his vehicle near the intersection of Old Carrizo Road and Cargill Street, east of Robb Elementary School. After gathering his gear, he ran across the school towards the south entrance of the west building. Officers there told him to go around to the west entrance instead.

Upon reaching the west entrance, Agent Tijerina immediately entered the building and met with USBP BORTAC Acting Commander Paul Guerrero. Commander Guerrero asked Tijerina if he had a tool to break and rake the window and said they were trying to get gas inside the classroom. Agent Tijerina did not have such a tool to break the window to get gas inside the classroom. TPWD Game Warden Gazaway informed Agent Tijerina that the subject was barricaded in Rooms 111 and 112.

Agent Tijerina then asked Commander Guerrero why they were not going into the classroom. Commander Guerrero said that they had tried a key,

and the key would not open the door. Commander Guerrero said that someone had attempted to open the door, and the shooter fired shots at them through the door.

Agent Tijerina also asked if they were talking or trying to negotiate with the shooter. Someone nearby pointed down the hallway and stated that the school police chief was trying to talk and negotiate with the shooter, but the shooter was not responding. Commander Guerrero said they needed to get into the classroom as fast as they could and were trying to get a second set of keys from the janitor.

Agent Tijerina assisted BORTAC Agent Ryan Massey set up his precision rifle and gear by a tree on the east side of the building. Agent Tijerina and Agent Massey tried to determine what window was connected to the classroom with the shooter.

Other officers nearby, including two State Troopers, then indicated which window they believed to be the correct one. Agent Massey said the windows were tinted, and he could not see through them.

Agent Tijerina went back inside the hallway, and Commander Guerrero said they now had the key to the classroom. Then about a minute or two later, officers entered the classroom.

55.    Agent Alberto Trevino

Agent Trevino voluntarily gave a statement to Texas Rangers investigators. Agent Trevino responded to Robb Elementary after hearing about shots fired over the radio. Upon entering the scene, Agent Trevino recalled seeing broken windows, believing they were shot. Upon entering, Agent Trevino observed numerous officers, including USBP Agents Chusberry, Rodriguez, Wagner, and an officer that was hit in the ear inside the building. Agent Trevino looked down the hall and observed several officers yelling at the suspect to come out.

Agent Trevino was cognizant of crossfire if the suspect was to walk out of the room. As a result of the possible crossfire, Agent Trevino went outside of the building and south to the other end, where officers were located. Agent Trevino recalled seeing a backpack on the exterior of the building. Agent Trevino observed that officers were evacuating children.

Agent Trevino then returned to where he started on the north. Agent Trevino recalled that officers around him began discussing options and planning and waiting for a tactical team. Agent Trevino received a master

key to open the doors from an individual whose name he did not know. After finding the master key, Agent Trevino passed the keys off.

Video footage shows that at 12:01 PM Texas DPS Sergeant Juan Maldonado handed keys to Agent Trevino, and Agent Trevino tried the keys on doors to rooms 131 and 132, and at 12:03 PM, Agent Trevino handed off the keys to Uvalde County SO Deputy Brandon McCutchen.

Agent Trevino recalled that numerous radios were going off, "Hot micing." This was causing considerable confusion, prompting Agent Trevino to say, "Hey, you guys decide. Hey, hey, hey, you guys decide, one guy on the radio. Who's gonna be on the radio, everybody 23 the net. So, only one guy on the radio. Decide who it's gonna be, call the shots."

Agent Trevino observed the tactical team get together and breach the room, but he did not personally try to breach the room to engage the shooter. During his interview with Texas Rangers investigators, Agent Trevino broke down, recalling what he had observed. Agent Trevino stated that it was not like "we trained." Agent Trevino told investigators he did not understand why no one went into the room but understood that his vest could not stop a rifle round, which was the reason why Agent Trevino stated he did not go in.

56.    Agent Jaime Villarreal

Agent Villarreal voluntarily gave a statement to Texas Rangers investigators. Agent Villarreal responded to Robb Elementary at the direction of Agent Tijerina. When he arrived at the school, Agent Villarreal was told to go inside the school by USBP Agent Supervisor Marcellus Smith. Agent Villarreal said he went inside the school and saw officers where he met up with his team at the "T" intersection of the hallway. Agent Villarreal said Agent Smith and USBP Agent Aviles were paramedics and getting the medical area together for triage.

Agent Villarreal said he saw USBP Tactical Unit (BORTAC), Commander Paul Guerrero, using a key to open room 111. Agent Villarreal got in the stack for room 112 and said there were about three or four guys in front of him. While there, someone brought in a shield for the room 111 stack. BORTAC Commander Guerrero opened the door and told everyone there was a wall between the rooms and a door connecting the rooms.

Agent Villarreal said there was no immediate shooting once the room 111 door was opened. Guerrero held the door open and communicated about

the wall. Agent Villarreal said it appeared someone threw something in the room to see if they could get a response. Agent Villarreal said the room 111 stack entered, and the shooting began. The room 112 stack did not move because the shooting began. Agent Villarreal was not certain about the guys at the beginning of the room 112 stack, but the person in front of him was not moving. Agent Villarreal could not identify the person in front of him but thought it was a USBP Agent.

Agent Villarreal told investigators he did not know who UCISD PD Chief Pete Arredondo was and did not remember seeing him at the scene. Agent Villarreal told investigators he never heard any orders to stand down or wait. Agent Villarreal stated he did not hear anything from inside the classrooms while staging outside and preparing to enter.

57.    Agent Shawn Michael Wagner

Agent Wagner voluntarily gave a statement to Texas Rangers investigators. Agent Wagner was working as a Use of Force Instructor at the USBP Uvalde Station when he learned of the shooting at Robb Elementary. He checked out an AR-15 rifle from the armory and traveled straight to the school. Agent Wagner stated he and multiple other law enforcement officers stacked up on the west entrance door, unaware that the suspect had entered that doorway earlier.

When Agent Wagner and the other law enforcement entered, they noticed Uvalde PD Officers and Uvalde County Sheriff's Office Deputies were stacked up at the T-intersection facing south in the south hallway. While looking at a Robb Elementary School Emergency Evacuation Map, Agent Wagner stated they were looking at rooms 111 and 112 and believed the suspect was in one of the rooms.

Agent Wagner stated someone brought two ballistic shields to their location and placed one on each corner of the hallway for ballistic cover; however, they later discovered the shields were not rifle-rated. Later, a rifle-rated ballistic shield found its way to the front of the stack of law enforcement officers.

Agent Wagner stated a Uvalde PD Officer was trying to negotiate with students and teachers in the classrooms nearest the west entrance and eventually cleared the rooms. Agent Wagner explained many of the doors were locked, and they had not yet retrieved a key to unlock the classroom doors. Agent Wagner explained once they received a master key for the

classroom doors, children and teachers were evacuated from the doors and windows of their classrooms around rooms 111 and 112.

Agent Wagner stated the initial officers who entered the school took rounds from the suspect from rooms 111 and 112 and were confident the suspect was in the room. Before the USBP Tactical Unit (BORTAC) arrived, Agent Wagner stated he and other law enforcement officers agreed that if shots were fired, they would run towards the gunfire.

Agent Wagner stated it was approximately 40 minutes before two to three rounds were fired from rooms 111 and 112. Agent Wagner and the other law enforcement officers approached the door but realized they had no way to enter the locked and outward-opening metal doors. Agent Wagner stated the master key was being utilized at that time to evacuate the other children from the rooms. The rifle-rated shield had not arrived yet either.

Once the master key arrived, they discovered it didn't match the room locks to 111 and 112. They tested multiple keys on the key ring and found the master key that matched, just as a rifle-rated shield and BORTAC arrived. Once BORTAC arrived, BORTAC split into one team while Agent Wagner and other agents split into another team. The BORTAC team then unlocked room 111 while Agent Wagner and his team covered down on room 112. Agent Wagner stated that rooms 111 and 112 were blacked out, and a light needed to be used to view inside.

As the team made entry, they noticed bullet holes in the wall by the classroom door. Agent Wagner did not see the initial shooting, and by the time the fourth law enforcement officer entered room 111, the shooting had begun. Agent Wagner believed the first officer entered room 111 and traveled south into the deep, unknown corner.

Agent Wagner heard a "boom," which was not gunfire but the suspect kicking the closet door open where he was hiding in room 111. Agent Wagner said the closet the suspect was hiding in was in the northwest corner of room 111. Agent Wagner stated the suspect wore dark clothing and a tactical vest with dark blue and grey camouflage. Agent Wagner noticed two fully loaded AR-15 magazines and an AR-15 rifle.

Agent Wagner heard a student in room 111 or room 112 called 911 to inform law enforcement that children were injured or hurt. Agent Wagner was worried that the phone call was coming from the suspect to lure officers into the room.

Complaint Exhibit 1 at 54

## IX.    The relevance to the proceedings and necessity to the defense of Mr. Arredondo

58.    The requested testimony is clearly relevant to the proceedings. Furthermore, the requested testimony is necessary for Mr. Arredondo's defense and necessary to Mr. Arredondo exercising his constitutional rights, including his right to present a complete defense, his right to compulsory process, and his right to cross-examine witnesses.

59.    Central to the State's theory of prosecution is that Mr. Arredondo personally delayed the law enforcement response, and the State will have to prove causation of that delay. CPB personnel comprised the largest contingent of the law enforcement response, so their part in the response, their actions, their time, and their reasoning must be accounted for in order for Mr. Arredondo to rebut the State's case that he was responsible for any delay in law enforcement's response. Testimony from the requested witnesses about first-hand observation, individual perceptions, and reasoning—all of which is necessary for Mr. Arredondo to rebut the State's allegations—are unavailable from any other source besides the witnesses themselves.

60.    The specific agents requested to testify all played key roles in the law enforcement response and roles central to the functions carried out as part of the law enforcement response to the shooting at Robb Elementary. The requested testimony of all of the key witnesses requested is necessary to show the complexity of the response, the difficulties of the response, and that law enforcement is not a single monolithic entity whose response and rationale can be generalized in a singular manner; but instead, the law enforcement response was made up of many individuals, some working independently without following direction and some working as smaller teams and units within the response, but none acting within or under a single unified incident command led by Mr. Arredondo.

61.    One of the State's allegations is that that Mr. Arredondo was the established incident commander, and thus he caused CBP agents to take or refrain from taking action. The requested testimony is necessary to show that Mr. Arredondo was not in command of CBP agents. In some cases, the requested testimony will show that key CBP responders took direction from others besides Mr. Arredondo, to include taking direction from other CBP personnel and from law enforcement personnel in other agencies like Texas DPS and Uvalde Police Department. Still, other CBP officers acted under their own volition without direction.

62.     Furthermore, Mr. Arredondo's actions must be judged from the perspective of a reasonable officer under similar circumstances. Part of the defense hinges on demonstrating that Mr. Arredondo's actions and the law enforcement response were reasonable under the circumstances and that reasonable officers made reasonable subjective decisions based on the dangers, threats, obstacles, and challenges present in the moment. Each individual officer had their own perspective, and because the State alleges that Mr. Arredondo is responsible for the decisions and actions of the other individual responding officers, the individual perspectives, reasoning, decision making, and actions of the other individual officers—to include CBP officers who comprised the largest contingent of the law enforcement response—must be presented to the jury.

63.     One of the State's allegations is that Mr. Arredondo failed to identify the situation as an active shooter scenario as opposed to a barricaded subject or hostage situation, which delayed the law enforcement response. The requested testimony is necessary to show that the communications among law enforcement officers—to include information relayed by CBP officers and received by CBP officers—was often conflicting and wrong and often changing. Furthermore, the requested testimony is necessary to show that CBP officers, including the acting commander of the CBP officers on scene, knew that there were children alive inside rooms 111 and 112, contrary to evidence the State will attempt to present at trial and the prevailing narrative that CBP officers did not know there were children inside rooms 111 and 112.

64.     Furthermore, the testimony is necessary to show that regardless of how the scenario was classified, the law enforcement response may not have been perfect, but it was ultimately successful in that it eliminated the gunman without any additional loss of life, a fact that cannot be demonstrated without the testimony of the responding CBP officers who were integral in completing the ultimately successful operation to eliminate the gunman without additional loss of life.

65.     One of the State's allegations is that Mr. Arredondo failed to respond as trained, while simultaneously trying to hold him accountable for the actions of all the law enforcement officers on scene by casting him as the incident commander with responsibility over all the officers who responded. It is therefore necessary to discuss each officer's training and

experience, which all vary, to show the varying levels of training and to show how the actions of law enforcement—and the responding CBP agents—were reasonable based on each individual's training and experience. This includes Mr. Arredondo deferring to the leadership of others at times, like BORTAC members and Commander Paul Guerrero, in light of their vastly superior training and experience in tactical and volatile situations. It's also necessary to discuss each officer's training and experience to establish or diminish as necessary the credibility of the requested witnesses in front of the jury as may be required by counsel based on the evidence actually presented by the State.

66.     One of the State's allegations is that Mr. Arredondo is criminally culpable because he called for SWAT or a tactical team to assist with the response. First, the testimony of the BORTAC team who responded and killed the gunman is necessary to establish that their response was not caused by a request from Mr. Arredondo. Next, their testimony is necessary to establish that any request for SWAT by Mr. Arredondo did not delay their own response. Third, the testimony of the BORTAC team who actually responded is necessary to establish the legal justification for doing so, including necessity, self-defense, and defense of others.

67.     Furthermore, the requested testimony of the requested agents is necessary to present to the jury the actions taken by CBP agents from the time they arrived until the time the gunman was killed and their reasons for taking such action to establish for the jury statutory and non-statutory defenses. These defenses include necessity, i.e., that any alleged delay in engaging the gunman was necessary to allow law enforcement agents and CBP agents to take the actions they did to prevent more significant harm than the harm of delay, such as the loss of more innocent life. These defenses also include impossibility, i.e., taking any alternative action proposed by the State would not have been possible or would have caused loss of more innocent life. These defenses also include defense of others, i.e., the actions taken during the law enforcement response were taken in defense of innocent third persons. These defenses include self-defense, i.e., the actions taken during the law enforcement response were taken by officers to preserve their own lives, not out of cowardice, but because a dead officer can save no one and does no child in danger any good.

68.     The testimony of the requested agents is necessary to rebut the State's allegations that Mr. Arredondo is criminally culpable for directing the evacuation of innocent children in the

classrooms around Rooms 111 and 112 and/or declaring to others to delay in engaging the suspect until the evacuation was complete. The requested testimony is first and foremost necessary to establish that evacuation was necessary and that it saved lives that would otherwise be at risk from crossfire in a situation where bullets had already shot through walls to injure students, teachers, and law enforcement officers. The testimony is also necessary to rebut causation in that Mr. Arredondo's own actions or words were not the cause of CBP officers' actions in evacuating teachers and students and were not the cause of CBP officers' choices to delay breaching Rooms 111 and 112.

69.     The requested testimony is also necessary to rebut the State's theory of defense that Mr. Arredondo is legally culpable for any delay in a law enforcement response because he failed to determine if the doors to Rooms 111 and 112 were locked and/or he failed to provide keys to those rooms. The requested testimony is necessary to rebut State's evidence claiming the door was never locked, to establish that the doors were indeed locked, that a CBP agent personally unlocked the door immediately prior to the breach, and that another CBP agent witnessed the door being unlocked. Furthermore, the requested testimony is necessary to rebut the State's theory that Mr. Arredondo's failure to provide keys personally caused delay in entering the room.

70.     The testimony is needed to show the jury that, even with keys, delay would have occurred because the on-scene tactical commander Paul Guerrero and others believed a rifle-rated ballistic shield was necessary before breaching, and the breach occurred as soon as that shield was available. And indeed the requested testimony is also necessary to show that such a belief was in fact reasonable and justified because the person carrying the shield during the breach took impact from the gunman's bullet while holding the shield, and that shield saved his life and the lives of the agents who ultimately shot the gunman and ended the threat.

71.     The testimony is also needed to show the jury that Mr. Arredondo is not personally responsible for the entire delay in providing keys. Specifically, the testimony of Agent Mendoza is necessary and unique in that Agent Mendoza was personally provided the keys, that he doesn't know who provided them, that Agent Mendoza forgot he had the keys, that Agent Mendoza doesn't know how long he had the keys, and that Agent Mendoza only turned the keys over much later after being prompted by Agent Gurrero right before the breach.

72.     One of the State's allegations is that Mr. Arredondo caused a delay in response to the shooter because he was attempting to negotiate with the gunman. The requested testimony is necessary to rebut the State's allegation by showing that any attempts by Mr. Arredondo to speak to the gunman did not cause a delay but was undertaken parallel to and simultaneously to other actions by CBP to get into the classroom as fast as possible, which was at the time an impossibility, and parallel to and simultaneously to other actions taken by CBP to retrieve a rifle-rated shield and evacuate innocent children and teachers in the rooms surrounding Rooms 111 and 112, which were at the time a necessity.

## X.     The substantive and procedural rules of the case

73.     The testimony would be appropriate under the rules of procedure governing the case in which this demand arises. Mr. Arredondo has the rights to due process, compulsory process, the effective assistance of counsel, and fair, speedy, and public trials. The public has the right to see that justice is done.

74.     On information and belief, making the limited number of requested personnel available to testify in accordance with this request will not further embroil the Department in controversial issues not related to its mission. The Department is already involved to the extent that 188 of its CBP personnel responded to the incident in question and became percipient fact witnesses to the alleged crimes. The Department is already involved to the extent it investigated the incident, interviewed all the witnesses, and authored and released its own ROI in redacted form. The response by CBP personnel and the subsequent statements given to Texas state law enforcement officials while investigating this matter occurred because the Department's already existing involvement was related to its mission."

_____

Matthew J. Hefti, Affiant

SUBSCRIBED AND SWORN to before me this 9th Day of February, 2026, to certify which witness my hand and seal of office.

_____

Notary Public, State of Texas



KARINA BARRON
Notary Public, State of Texas
Comm. Expires 06-26-2027
Notary ID 134425567

Page 30 of 30