## Resiliency Training

Comprehensive education and training will aid in building long-term resiliency in responder personnel. Pre-incident preparedness involves several different training paradigms, including models that help participants build a level of confidence and competence in their work. Other models involve preparing responders for what they might encounter in traumatic incidents so they are not completely shocked by exposure (which can still happen with some responders, especially in severe situations), especially now that so many have body-worn cameras that allow them to repeatedly watch video footage of traumatic events. They also include emotion regulation, such as cognitive behavioral work or cognitive strengthening to help responders control their autonomic stress response.[1206] These pre-incident training modules are not in widespread use, as budget constraints tend to lead agencies to focus only on competency skills and those training modules required by law or funding agencies.

As part of the TCOLE basic training requirements, all Texas-certified officers must complete 16 hours of Fitness, Wellness, and Stress Management training. The course focuses on total well-being that goes beyond performance and involves positive lifestyle and healthy behaviors for balanced physical, mental, spiritual, and socio-emotional well-being. It emphasizes that critical incident stress can occur from events such as working on a gruesome accident, involvement in a use-of-force incident or shooting, or body recovery of a child.[1207] Additionally, TCOLE mandates Stress, Health, and Awareness training for telecommunicators dispatchers in their basic training curriculum.[1208]

TXDPS, in collaboration with the FBI National Academy's Officer Safety and Wellness Committee, incorporates resilience training into all aspects of training with a goal of increased employee well-being and retention, improved communication, and an understanding of physical, mental, social, and spiritual resilience.[1209] TXDPS offers several standalone resilience training courses including a 32-hour train-the-trainer course.[1210] In addition, TXDPS offers wellness classes such as Coping with Grief, The TXDPS Resiliency Program, Incident Response: The After-Effects, Suicide Awareness for TXDPS Staff, Suicide Awareness for Supervisors, Stress Management, and Critical Incident Stress.[1211]

Reviewing the TCOLE records of involved nonfederal personnel reveals only minimal officer safety and wellness trainings.[1212] Out of the training records for 140 state and local responding officers, only 46 reported a health, physical fitness, and stress course or the TXDPS *Health, Safety, Physical, and Mental*

---

[1206] Bloom, Reddy, and Kleinman, "Trauma Debrief Prior to Release of Body-Worn Camera Footage."

[1207] TCOLE, "Basic Peace Officer Course 720;" CIR Document and Data Review.

[1208] TCOLE, "Basic Telecommunicator Licensing Course (2022)."

[1209] Texas Department of Public Safety, "Resilience Training."

[1210] Texas Department of Public Safety, "Resilience Training."

[1211] CIR Document and Data Review.

[1212] CIR analysis of the training records for 140 state and local responding officers.

*Fitness* course.[1213] The bulk of the safety and wellness courses include *Below 100* (27 officers), Officer Safety/Survival (27 officers), Suicide Prevention (20 officers), Stress Management (7 officers), and Bulletproof Mind and Mental Preparation for Combat (6 officers).[1214]

Outside of TXDPS, there is no indication that any other nonfederal agencies that responded to Robb Elementary provide specific training on wellness, stress management, or resiliency outside of the TCOLE mandates.

To learn more about establishing and maintaining a law enforcement support program, see "Establishing and Maintaining a Responder Support Services Program" in "Appendix F. Trauma and Support Services Supplemental Materials."

## Preparation and Planning in Schools to Mitigate the Extent of Trauma

Everyone needs a sense of safety and a secure environment starting from childhood. When these needs are absent or unaddressed, it can cause children to react with fear and anxiety.[1215] For children to learn, a school needs to be a safe environment. An essential component of creating a safe environment is preparedness. Moreover, preparedness activities are one of the most helpful ways to mitigate the development of traumatic stress reactions. A sense of helplessness or confusion in emergencies can increase traumatic stress responses, increasing the risk of someone developing a diagnosable mental health problem. Involving the students and school staff, along with family members in emergency drills and exercises, can help prepare everyone involved with information on what to expect in specific emergencies and equip them with some tools to manage their stress as well as the emergency itself.

Preparedness includes the development of policies and exercises based on best and emerging practices related to planning, organizing, equipping, and training on possible emergency scenarios. An evaluation of the exercises should be conducted, after which corrective actions should be implemented (based on the findings). Corrective actions might involve changing a policy, identifying or clarifying roles and responsibilities, or including multiple response options as practical examples.[1216] Before an incident occurs, students, staff, and family members can learn what actions to take, such as following instructions to evacuate an area where a dangerous situation is located. Preparedness for families and schools may include teaching children to react to an alarm, getting out of a building, or identifying a safe place to meet away from danger. It also involves learning how to initiate coping mechanisms that will help keep emotions (the fear response) under control or manageable, so one can use good judgment and make good decisions during the response phase.

---

[1213] CIR analysis of the training records for 140 state and local responding officers.

[1214] CIR analysis of the training records for 140 state and local responding officers. (An officer may take more than one course.)

[1215] Salston and Figley, "Secondary Traumatic Stress Effects of Working with Survivors of Criminal Victimization."

[1216] DHS, "Plan and Prepare for Disasters."

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8.Pre-Incident Planning and Preparation    391

AR001001

Lockdown drills can be conducted for a variety of reasons, such as online threats, local police activity, weather, and other situations. However, in some circumstances, lockdowns may produce anxiety, stress, and traumatic symptoms in some students or staff, as well as loss of instructional time. Proper planning before lockdowns should be part of the emergency operations or preparedness plan. To mitigate possible negative reactions to a lockdown, "planning should include considerations for age and developmental levels, disabilities that might impede mobility and access to instructions, sensory disabilities such as autism that might heighten a distress reaction and/or impede response to instruction, and intellectual disabilities that might impede understanding a situation or instructions. Additionally, second language considerations for students and families must also be addressed."[1217] See "Chapter 5. Public Communications During and Following the Crisis" for more on the lack of public messaging in Spanish.

In 2021, the National Association of School Resource Officers released *Best Practice Considerations for Armed Assailant Drills in Schools*, which recommends "nonsensorial drills (i.e., drill done by calmly walking and talking through the procedures, with no simulation of a real-life event)" be conducted with age-appropriate students since over stimulation of the senses during a drill can cause trauma.[1218] More recently in 2023, a study conducted by Everytown Research and Policy along with Georgia Tech University concluded that "active shooter drills in schools are associated with increases in depression (39 percent), stress and anxiety (42 percent), and physiological health problems (23 percent) overall, including children from as young as 5 years old up to high schoolers, their parents, and teachers."[1219] It is important for school districts to keep trauma-informed practices in mind as part of the planning and implementation of drills, especially post-incident in Uvalde.

As detailed in "Chapter 7. School Safety and Security," the Uvalde community did not sufficiently prepare and engage in disaster, emergency, or mass violence incident planning within their own staff, with law enforcement and other responders, nor with the students, family members, and other caregivers.

Similarly problematic, materials, instructions, and communication generally were only provided in English and did not consider the needs of individuals with limited English proficiency (LEP). In 2013, the population of Uvalde County was 11.69 percent LEP individuals according to the DOJ Civil Rights Division LEP Data Map.[1220] Forty-six percent of individuals speak only English at home, with 52.5 percent speaking Spanish at home per the American Community Survey of 2015 (see figure 8-2 on page 393).[1221]

---

[1217] National Association of School Psychologists, *Mitigating Psychological Effects of Lockdowns*.

[1218] National Association of School Psychologists, *Best Practice Consideration for Armed Assailant Drills in Schools*.

[1219] Everytown for Gun Safety Support Fund, "The Impact of Active Shooter Drills in Schools." Other articles and stories about this topic: Schonfeld et al., "Participation of Children and Adolescents in Live Crisis Drills and Exercises;" Shalchi, "Psychological Effects of Active Shooter Drills in Schools;" Garcia-Navarro, "Experts Worry Active Shooter Drills in Schools Could Be Traumatic for Students;" Schildkraut and Nickerson, "Should We Or Shouldn't We? Arguments for and Against Lockdown Drills."

[1220] DOJ, "2015 Language Map App."

[1221] U.S. Census Bureau, "Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over: Uvalde County, Texas."

**Figure 8-2. Language spoken at home by ability to speak English for the population of individuals ages 5 years and older in Uvalde County, Texas**



Source: U.S. Census Bureau, "Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over: Uvalde County, Texas."

Effective communications are crucial to responding to an emergency. Many schools use commercial apps for structured alert systems, such as the Raptor, which was used at Robb Elementary. Preparedness exercises that test communication systems are imperative. Internal communications with staff and students on campus that can provide a warning that danger is imminent and specific actions to take (e.g., go to your rooms, lock the doors, stay where you are, etc.) are critical in training exercises that can help reduce anxiety in general as well as worry about "what to do" and creates a familiarity with the process that can increase the odds of carrying out the instructions correctly in a time of need.

Preparedness exercises that address external communications with various audiences are crucial for many reasons. Again, knowing what to do, where to go, who to call, and under which circumstances these actions apply can decrease the anxiety which often accompanies emergencies. In school shooting drills, children and staff practice keeping quiet and not using their phones once the alert has been sent out. Families need to be included in exercises and/or instructions that inform them as to where to call when, whether or not they should approach the school, whether or not their child may be in a hospital, and where a reunification/notification center may be located and how to obtain all of this information. Parents, caregivers, and school staff's families need to be provided information that helps them to

understand that all these details may not be known in a preparedness drill; thus, following a prescribed set of instructions/procedures will be critical to respond efficiently as well as to help people remain calm. For most people, knowing what to expect can help decrease anxiety.

A good example is to explain in exercises/drills to parents, caregivers, and staff's families that they will likely be directed away from the site of the school in an emergency as it is critical for response vehicles, such as fire trucks and ambulances, to get through to the buildings without obstruction. Some schools may determine a meeting site (e.g., a nearby store parking lot) before an emergency occurs that is agreed upon with the site owner and the families in advance. Again, this type of preparedness planning can decrease some anxiety and chaos at the scene and increase the efficiency of the response overall.

Preparedness planning involves many aspects such as role determination (e.g., who is the primary caregiver with legal authority over school-aged children), decision trees (e.g., which caregiver is responsible on any given day for the well-being/whereabouts and communication with their child), up-to-date emergency contact information (with the school, within families, with the school-aged child who has memorized their own emergency contact information), and again, back-up information and plans in case the primary plan does not work for whatever reason. Involving parents, caretakers, school staff, and their families in preparedness exercises and drills can help them complete these plans for the school and their own families and identify gaps that need to be covered. All key players in the communications plans must know and utilize these systems from law enforcement radios to dispatch, 911, and 988 services for interoperability success.

Pre-incident preparedness regarding students' emotional and mental status while at school is generally the responsibility of school staff, including teachers, school counselors, social workers, and other staff whose role involves direct interactions with students. While a student's mental wellness is not often viewed from a pre-incident preparedness perspective, it can be a predictor of behavior and, with the proper attention, may help identify the need, which, if acted upon appropriately, has the potential to decrease the risk of a violent assault such as a school shooting. Specifics regarding best practices in assessing students' risk factors are found in "Chapter 7. School Safety and Security." But it is worth noting here that everyone can pay attention to engage with or refer a child in emotional distress or other serious need to appropriate caregivers, professionals, and other resources. Since we know that most mass violence in schools in recent decades has been committed by current and former students,[1222] then it is incumbent upon all who engage within the school setting to pay attention and to "say something," to those whose role it is to act upon a high-risk situation. And again, while a threat assessment needs to be conducted by trained professionals, these professionals need to be alerted to situations or people they may not encounter directly.

---

[1222] National Threat Assessment Center, U.S. Secret Service, *Averting Targeted School Violence: A U.S. Secret Service Analysis of Plots Against Schools*; Everly and Bienvenu, "'Profiling' School Shooters: Can we tell who will be the next to kill?"

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8.Pre-Incident Planning and Preparation     394

AR001004

Additionally, just as we can teach anyone to be a gatekeeper for suicide prevention by focusing on critical indicators, anyone can be trained to identify some of the signs of concern or red flags for the risk of school violence. These may include recent violent episodes or threats of violence, obsession with weapons, torture of animals, and clear threats to conduct violence advertised on social media posts or reported to family/friends or acquaintances. Coupled with a recent emotional loss, such as a breakup with a love interest, death of or serious conflict with an immediate family member, or incidents of public humiliation such as bullying (past or recent), these signs can indicate that someone needs some emotional/mental health support.[1223] While not all who require attention to emotional and mental health care will perpetrate incidents of violence, these signs do mean they should at least be referred for a proper, professional assessment.

## Planning and Preparation for Public Messaging

As described in "Chapter 5. Public Communications During and Following the Crisis," the communication during and after the tragic event in Uvalde was disjointed, contradictory, and at times inaccurate. While a certain amount of confusion is common with incidents of this magnitude, some of it may have been prevented with better planning and preparation for a large-scale incident.

### Communications Planning Principles

A crisis communications plan must exist prior to the onset of a critical incident. Each agency should create a crisis communication plan to achieve a rapid, organized, and open approach to communication during a crisis, and practice it at least once a quarter with smaller events. This will help identify problem areas and solutions and ensure everyone is familiar with the plan and knows their role instead of trying to figure that out during a critical incident.

All Public Information Officers (PIOs) in various fields of industry (e.g., police, government, schools) should obtain FEMA basic and advanced public information officer certifications as a baseline of training.[1224] Those courses teach the Joint Information System, which is a critical part of the Incident Command System. They also instruct on the use of a Joint Information Center (JIC) at a major incident to coordinate messaging and plan news briefings and other external communications.

The PIOs should also participate in regional training exercises to develop a system for sharing information and working together during unplanned major events, such as a mass casualty incident. This should take the form of a JIC that is tied to the operational aspect of training. All the partnering agencies should review their crisis communication plans together to ensure they complement each other. It is critically important that the idea of coordinating messaging is practiced with smaller events, so it is not a foreign concept when a large-scale incident takes place. Practice ensures the PIOs in the region have a

---

[1223] CIR Fact Finding.

[1224] FEMA, "Public Information Awareness and Basics;" FEMA, "Public Information Officer Advanced Level."

history of working together, establishing the lead agency, and coordinating messages before a mass incident. This planning should include agencies communicating with local journalists as a way of developing trust and good working relationships pre-incident.[1225]

PIOs can reference the U.S. Justice Department COPS Office publication, *Strategic Communications for Law Enforcement*, for insight and templates for developing a crisis communication plan.[1226]

In addition, school districts should also have a safety plan for each school which includes a reunification and communication section on how they will direct parents when a crisis occurs. District personnel should arrive to assist parents who are going to rush to the school or to redirect parents to the reunification location. Information about meeting locations should be as specific as possible, including the location address. This post can include pre-written phrases created during exercises testing the crisis communications plan.

## Communications Planning in Uvalde

Unfortunately, the concept of the JIS or the physical creation of a JIC did not occur during the Robb Elementary School shooting. Almost none of the PIOs involved in the response had ever heard of these concepts, let alone been trained to master them.

The CIR team learned through interviews with PIOs involved in the response that the region never held PIO meetings or trainings. Nearly 1 month before the mass casualty incident, on April 21, 2022, the school district hosted a mock drunk-driving car accident at Uvalde High School.[1227] While the "Think Twice" exercise was designed to send a safety message to students about the dangers of drinking and driving before prom, it also created an opportunity for the UCISD Communications Director and the UPD PIO to connect with a planned event. This would have been an excellent opportunity to coordinate messaging and practice elements of a crisis communication plan or a virtual JIC. The Uvalde community is small, and many of the PIOs knew each other. That was useful on the day of the shooting; however, the lack of planning and training was a detriment to producing swift, organized, and accurate public messaging. Poor communications erode public trust.

The following sections focus on the training and preparation of PIOs from the various agencies involved in the response. See "Chapter 5. Public Communications During and Following the Crisis" for more details on the precise communications during the tragedy.

### UPD

The UPD PIO took swift, proactive action when it came across over the radio that "shots were fired" at Robb Elementary School. The PIO confirmed with their first-line supervisor that there was a critical incident at the school. At 11:43 a.m., UPD was the first agency to post information about the incident.

---

[1225] CIR Fact Finding.

[1226] Pal et al., *Strategic Communications for Law Enforcement Executives*.

[1227] CIR Fact Finding.

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8.Pre-Incident Planning and Preparation        396

AR001006

The PIO was at Uvalde Memorial Hospital when the radio transmission occurred and quickly alerted the supervisor of the Emergency Department and the security supervisor so they could prepare for a possible influx of victims. Unfortunately, the hospital did not have anyone serving in a communications role on the date of the incident, so the chief executive officer (CEO) became the de facto PIO.[1228] Under a Joint Information System, a PIO from the lead agency would have contacted the people performing PIO roles at any local hospitals expected to receive victims. This is a vital step for coordinating the release of victim information. Hospital updates should be made public through the JIC and by the hospital simultaneously, in an organized and preplanned manner.

Another situation that could have benefited from pre-incident planning arose at the school. The UPD PIO responded to the scene and used the public announcement system in a sheriff deputy's car to guide parents to the Reunification Center.[1229] A brief time after arriving, the UPD PIO called the UCISD Communications Director to sort out confusion over the Reunification Center for parents and to suggest a news conference.[1230] The two never discussed coordinating messages and the UPD PIO assumed they would each post their own content.[1231] The PIO took the appropriate step of reaching out to a fellow PIO dealing with the incident; however, no one took the necessary step of establishing a JIC at the scene where media was arriving as a national tragedy was unfolding.

When the UPD PIO assumed the role of PIO in 2017, they were "thrown into the role, sink or swim."[1232] Unfortunately, this is quite common for law enforcement PIOs. On their own initiative, the UPD PIO completed PIO training through the Law Enforcement Management Institute of Texas in 2019.[1233] The UPD PIO also participated in the December 2021 tabletop exercise at the Uvalde EOC. The PIO had previously attended meetings at the EOC, but this was the first and only exercise that was offered during the 5 years that the PIO served.[1234]

Of course, not all PIOs take such steps, although that training could improve the likelihood that better communications will occur during multiagency incidents.

The PIO also proactively networked with the TXDPS PIO assigned to Uvalde, the UCSO employee who handles social media, and the UCISD Communication Director, who were helpful when the tragedy struck.[1235] And before the Robb Elementary School incident, the PIO worked with the TXDPS PIO on a reactive basis when there was an incident involving both agencies.[1236]

---

[1228] CIR Fact Finding.

[1229] CIR Fact Finding.

[1230] CIR Fact Finding.

[1231] CIR Fact Finding.

[1232] CIR Fact Finding.

[1233] CIR Fact Finding.

[1234] CIR Fact Finding.

[1235] CIR Fact Finding.

[1236] CIR Fact Finding.

The UPD PIO reported that they "rarely" had contact with the media before May 24, 2022. In the role as PIO, they managed the department's social media platforms and spent a significant percentage of time planning and executing community engagement activities. The PIO was proud of the community relationships they worked to build. In the months following the incident, the agency was left out of many events in which they typically played a significant role. The Department also stopped posting on social media due to the negative response that it would generate. Over time, the agency has slowly reconnected with the community. Its social media is now limited to a source of information versus an engagement tool with the community.[1237]

## UCISD

In the two years leading up to May 24, 2022, Uvalde experienced an increase in the number of critical incidents that impacted school campuses. A school going to secure status became commonplace rather than an anomaly due to occurrences of undocumented immigrants fleeing from law enforcement in high-speed chases that often resulted in a crash and bailout with people running to escape capture.

The UCISD responded to the uptick in critical incidents by putting the Raptor Technologies system in place on all school campuses. This system allowed any faculty or staff member to send out a message calling for a lockdown of a campus. UCISD also established a protocol for informing parents and the community in an efficient manner that a school campus was locked down.

The UCISD Executive Director of Communications and Marketing would typically receive a message from the school police chief about why the campus was in lockdown.[1238] Then the director would notify the parents and community. The first step was drafting an email to parents, followed by modifying that message for a recorded voice message sent via telephone. Next, a message shortened to a 144-character text would go out on the mass notification system called Blackboard. The last step would be copying and pasting the shortened message onto the district's social media sites.[1239]

These messages always used the same verbiage. Initially, they stated only that the campus was on lockdown, but parents would then rush to the campus, so the director adjusted the message to include why the school was in secure status and asked the parents not to go to the campus. The director eventually added that everyone was safe and secure inside. This same message was used for each episode, which explains how the community was told "students and staff are safe in the buildings" on the fateful day (see figure 8-3 on page 399).[1240]

---

[1237] CIR Fact Finding.

[1238] CIR Fact Finding.

[1239] CIR Fact Finding.

[1240] CIR Fact Finding.

**Figure 8-3. Initial UCISD post on May 24, 2022**



Uvalde CISD Police Department
May 24 at 1:06 PM · 🌐

All campuses are under a Lockdown Status
Uvalde CIDS Parents:
Please know at this time all campuses are under a Lockdown Status due to gun shots in the area. The students and staff are safe in the buildings. The buildings are secure in a Lockdown Status. Your cooperation is needed at this time by not visiting the campus. As soon as the Lockdown Status is lifted you will be notified.
Thank you for your cooperation!
Anne Marie Espinoza
Executive Director of Communications and Marketing
Uvalde CISD

The TXDPS, Border Patrol, and the UCSO were often involved in the high-speed pursuits and crashes, but the UCISD Communications Director never contacted those agencies before distributing a news release.[1241]

At the time of the incident, the director was in their 20th year as communications director for a Texas school district, with nine years spent in Uvalde. Despite those years of experience, they had little to no experience dealing with crisis communications. The director interacted with the local media, which consisted of an Uvalde newspaper and two radio stations, on a weekly basis. Most of the communication shared positive news or informational content for parents. The exception was the messaging to parents on the high-speed pursuits, which had become rote due to their high frequency.[1242]

Through the Texas School Public Relations Association, the director attended crisis communication tabletop exercises during professional development meetings or conferences.[1243] The next step, which has not taken place, would be crafting a crisis communication plan, and practicing it with school district personnel. The increased frequency of these tragic events makes crisis communication planning and training more critical than ever. These skills are versatile and once developed can be used during any major incident in a community.

---

[1241] CIR Fact Finding.

[1242] CIR Fact Finding.

[1243] CIR Fact Finding.

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8.Pre-Incident Planning and Preparation    399

AR001009

## Uvalde Memorial Hospital

Uvalde Memorial Hospital (UMH) learned of the incident within minutes of the first shots fired because the UPD PIO was coincidentally in the emergency department with a family member for an unrelated matter. At the time of the incident, the UMH CEO was handling the communications duties.[1244] Based on a news release posted on May 25, 2022, the hospital relied on an emergency operations plan to handle the influx of victims and public communications. The release stated, "UMH set up an emergency command center yesterday when we were made aware of the situation by law enforcement. We utilized our hospital emergency preparedness system to place on standby for additional support . . . Our staff consoled and comforted those while they waited to identify and reunite them with their children or provide information as it became available."

UMH posted its first social media content at 1:30 p.m. (see figure 8-4), less than an hour after the suspect was killed. This indicates the hospital's emergency preparedness system included a communication element that allowed them to keep community members informed. However, under FEMA's JIS, the information should have been released in coordination with the lead agency. Information about the victims should have been released in a holistic, planned, and coordinated fashion. That requires the hospital to plan and train with local law enforcement agencies and other responders, including EMTs. UMH did participate in the EOC tabletop exercise in December 2021; however, the public information component did not evolve from the training room to reality. Knowing fellow PIOs at partnering organizations is just the first step. Organizations must have a written plan that is practiced and improved before it is executed during a major event.

Figure 8-4. UMH post



**Uvalde Memorial Hospital**
May 24 at 2:30 PM · 🌐

‼️ Information at this time is that the active shooter at Robb Elementary is in custody. UMH is currently caring for several students in the ER. Immediate family of those students are to report to the cafeteria on the second floor. UMH staff will be in constant communication with the family members. If you are not an immediate family member, we are asking you to refrain from coming to the hospital at this time.

---

[1244] CIR Fact Finding.

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8. Pre-Incident Planning and Preparation    400

AR001010

### Texas Department of Public Safety

The TXDPS had a significant presence in Uvalde before the incident because it played a role in managing issues at the U.S.–Mexico border. The local PIOs worked regularly with the TXDPS PIO, but only on a reactive basis as incidents emerged. This interaction had increased in the 2 years prior to the incident, as ongoing border issues led to an increase in high-speed pursuits with crashes. Local agencies would discuss active scenes that involved TXDPS and sometimes mentioned TXDPS in news releases, but they did not draft joint news releases, nor did they plan, prepare, or train together for these incidents or a potential larger-scale incident.

On the day of the shooting, the regional supervisor of the TXDPS PIOs arrived between 5:00 p.m.–6:00 p.m.[1245] The TXDPS Regional Supervisor immediately took over messaging related to the incident. The Supervisor had served as the regional PIO supervisor for 2½ years, but was not certified through FEMA PIO classes, nor do their state records indicate that they took formal PIO courses.[1246] Training was limited to an internal class offered by TXDPS.[1247] That may explain why on May 24, 2022, the Regional Supervisor never spoke with any local agency PIOs or with UCISD. Instead, the Supervisor began conducting live national interviews based on the information they obtained from TXDPS operational supervisors. The Supervisor was not familiar with the concept of a JIC, nor was the TXDPS regional director, who served as the supervisor for the Regional Supervisor of the PIOs.[1248]

### UCSO

While the UCSO was one of the agencies to respond to the scene and played a significant role throughout the incident, it never messaged anything to the public about its deputies' actions. There was no coordination with the UPD PIO who was leading the initial public messaging for local law enforcement.[1249] UCSO did not share UPD's social media posts or create content of its own. As a primary responding agency, it should help keep the public informed of its actions during a high-profile incident. While the agency is small, someone is assigned to create social media content.[1250] It is clear that the agency's social media policy[1251] does not address using social media to communicate with the community during regular policing activities or during a large-scale critical incident. It primarily prohibits deputies from posting about police work on their personal social media platforms from agency devices and guides deputies' use of social media when off duty.

---

[1245] CIR Fact Finding.

[1246] CIR Fact Finding; CIR Training Analysis.

[1247] CIR Fact Finding; CIR Training Analysis.

[1248] CIR Fact Finding.

[1249] CIR Fact Finding.

[1250] CIR Fact Finding.

[1251] CIR Document and Data Review.

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8.Pre-Incident Planning and Preparation     401

AR001011

Inevitably, even with careful pre-planning, mistakes will happen during dynamic large-scale incidents. However, if PIOs, public and private officials, and law enforcement agencies can learn from this incident and other high-profile incidents, they can translate those lessons into practical steps for planning and preparing best practice communications for a high-profile event. Thoughtful pre-planning; good training; and consistent, accurate messaging can minimize the number of errors, creating a more positive outcome for the agencies while providing the victims with vital information and support, which is a necessary step in the healing process.

## Observations and Recommendations

**Observation 1:** Responding agencies lacked adequate related policies and, in most cases, any policy on responding to active attackers.

> **Recommendation 1.1:** Every agency must have a clear and concise policy on responding to active attacker situations.

> **Recommendation 1.2:** Agencies should regularly review AARs with other regional agencies to plan as a region for a coordinated and collaborative response to possible similar events.

> **Recommendation 1.3:** Agencies should consider obtaining state- or national-level accreditation to adopt and maintain standardized policies and procedures. This process also ensures accountability and transparency that can enhance confidence and trust in law enforcement among the communities they serve.[1252]

**Observation 2**: The Uvalde EOC developed an adequate emergency management plan. However, not all the relevant agencies and organizations actively participated in the process, drills, and exercises which ultimately contribute to a failed emergency response on May 24, 2022.

> **Recommendation 2.1**: Appointing authorities and senior officials of local government should develop a resilient emergency management system in which the emergency response plans of their respective units of government and operating departments, e.g., fire, police, sheriff, EMS, public health, public works, school system, planning, and social services, are understood and shared.[1253]

> **Recommendation 2.2**: Appointing authorities should direct the professional emergency manager at the highest level of local government to coordinate this system that would also include private sector stakeholders representing public utilities, healthcare providers and leaders responsible for critical infrastructure.[1254]

---

[1252] COPS Office, "Law Enforcement Agency (LEA) Accreditation."

[1253] FEMA, *Local and Elected Appointed Officials Guide*.

[1254] FEMA, *Local and Elected Appointed Officials Guide.*

**Recommendation 2.3**: Government leaders should consider adopting a resolution that demonstrates their commitment to NIMS.[1255]

**Recommendation 2.4**: Senior officials should guide all government, business, and organization leaders (including faith-based and secular nonprofit groups) to coordinate and collaborate with the emergency manager so they can act decisively before, during, and after disasters.[1256]

**Recommendation 2.5**: Senior officials should personally participate in and provide direction for conducting exercises and evaluation programs that enhance familiarity and coordination among the whole community.

**Recommendation 2.6**: Local governments should conduct outreach to state emergency management agencies and federal entities such as the Homeland Security Exercise and Evaluation Program and the NEP for assistance with exercise resources and training.[1257]

**Recommendation 2.7**: The Office of Emergency Management should identify volunteer groups and local businesses who will consistently play a role in emergency planning and preparedness before, during, and after disasters. Business and industry partners should work through voluntary organizations to support local government in planning, preparing, and providing resources when responding to emergency situations.[1258]

**Recommendation 2.8**: Senior officials should develop a pre-disaster recovery plan that enables them to anticipate what will be needed to restore the community as quickly as possible after an emergency. FEMA offers the Community Recovery Management Toolkit, which provides a three-step process of organizing, planning, and managing recovery.[1259]

**Recommendation 2.9**: Regional public safety partners should plan, train, and exercise unified command for complex incidents. This includes federal, state, and local law enforcement, fire, EMS, and emergency management as well as other governmental and non-governmental agencies that would respond to a critical incident.

**Recommendation 2.10**: Agencies should hold regular regional interdepartmental interoperability communication drills.[1260]

**Recommendation 2.11**: Elected officials should establish a Multi-Agency Coordination (MAC) Group to provide policy guidance to incident personnel and support resource prioritization and allocation. Typically, these groups are made up of government agency or private sector executives and

---

[1255] "Sample Municipal Resolution Adopting NIMS," Pennsylvania Emergency Management Agency.

[1256] FEMA, *Local and Elected Appointed Officials Guide.*

[1257] FEMA, *Local and Elected Appointed Officials Guide*; FEMA, "Homeland Security Exercise and Evaluation Program;" FEMA, "About the National Exercise Program."

[1258] *State of Texas Emergency Management Plan*, 12.

[1259] FEMA, "Community Recovery Management Toolkit."

[1260] Cybersecurity and Infrastructure Security Agency, *National Emergency Communications Plan.*

AR001013

administrators whose organizations are either impacted by, or provide resources to, an incident. MAC Groups enable decision-making among senior officials and executives, and delegate command authority to the incident commander to cooperatively define the response and recovery mission and strategic direction. Additionally, MAC Groups identify operational priorities and communicate those objectives to the Emergency Operations Center and the pertinent functions of the Incident command system and the joint information center.[1261]

Recommendation 2.12: Elected and senior officials should receive training made available through the FEMA Emergency Management Institute (EMI) that provides a menu of courses designed specifically for senior officials. In addition to independent online study courses in the NIMS, ICS, Unified Command, and other basic emergency management training, EMI offers specialized in-person training for senior officials. The portfolio of courses includes Emergency Management for Senior Officials, NIMS Overview for Senior Officials, and Recovery from Disaster: Local Community Roles. Senior officials should work with their professional emergency manager for specific course recommendations. States may also have specific training programs and offerings.[1262]

Observation 3: The MOU between UPD and UCISD PD that was active the day of the incident failed to adequately outline the expectations and authorities for a response to a mass violence event. The agencies failed to exercise the MOU, nor cross-train in preparation for a critical incident.

Recommendation 3.1: Senior officials should establish mutual aid agreements that set forth terms and conditions under which the parties will agree to provide resources, personnel, facilities, equipment, and supplies to support responses to critical incidents that create an extreme risk to public safety.

Observation 4: The Texas Legislature plays a significant role in mandating the types and frequencies of training for peace officers in the state of Texas through TCOLE.

Recommendation 4.1: State POSTs and other training entities should work with state legislatures and law enforcement leaders within their state to conduct coordinated routine reviews of mandatory training programs for peace officers within their state to determine what is the appropriate balance of training topics and courses. Mandatory training time/requirements should include training options focused on unique, complex tactical events, such as an active attacker.

Observation 5: UPD and UCSO appear to show budgetary and staffing shortages, which prevent training opportunities.

Recommendation 5.1: Whenever possible, multiagency training should be offered to lessen the load of any one law enforcement agency. Multiagency training allows for cost- and resource-sharing and, more importantly, allows peace officers to train with other agencies that are typically going to

---

[1261] Cybersecurity and Infrastructure Security Agency, *National Emergency Communications Plan.*

[1262] Cybersecurity and Infrastructure Security Agency, *National Emergency Communications Plan*; FEMA, "Emergency Management Institute | EMI Courses & Schedules."

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8.Pre-Incident Planning and Preparation     404

AR001014

respond jointly to a major incident. Building relationships through training and in advance of a major incident are critical in the successful response to, management of, and resolution of a major incident when one happens.

**Observation 6:** Responding agencies had minimal exposure to ICS/NIMS. Of those serving in top leadership positions within the primary responding agencies, only UCISD PD Chief Arredondo and the TXDPS regional director had taken training in ICS/NIMS.

> **Recommendation 6.1:** All law enforcement should be required to take awareness-level NIMS courses, such as ICS-100 and IS-700.

> **Recommendation 6.2:** All ranked individuals should be required to take courses and refresher training on ICS/NIMS. These skills should be exercised through an annual multijurisdictional, multidisciplinary tabletop.

**Observation 7:** Responding officers had levels of active shooter training that varied in terms of their length of time and quality, leading to failures in operationalizing the training.

> **Recommendation 7.1:** Law enforcement agencies should provide a total of 8 hours of scenario-based, stress-induced active shooter training annually for officers at all levels of ranks in the training.

> **Recommendation 7.2:** Law enforcement agencies should work closely with schools and other vulnerable places to understand how occupants are taught to respond to an active attacker threat (e.g., kids were taught to be quiet in a dark room, while some officers reported they were listening for voices and believed the dark classrooms meant they were unoccupied).

> **Recommendation 7.3:** Research should be conducted to determine if the response to an active attacker threat should include changing the "normal environment" (e.g., lights off).

> **Recommendation 7.4:** TCOLE should consider revising the SBLE training guidebook based on the recommendations in the CIR.

> **Recommendation 7.5:** Agencies must include in pre-incident planning timely access to building diagrams and universal building/room access, particularly critical infrastructure, schools, and buildings where large numbers of persons gather on a regular basis.

**Observation 8:** Personnel from responding agencies rarely trained and exercised in a multiagency environment.

> **Recommendation 8.1:** Interagency training, drills, and exercises help to build relationships at the front-line officer level and, if attended by law enforcement supervisors, can further strengthen relationships and the efficacy of a multiagency response to a mass casualty incident. Though policies may differ slightly among agencies, overarching commonalities are the same in an active attacker incident.

**Observation 9:** Responder agencies lacked sufficient training in trauma, resiliency, and mental health and wellness.

**Recommendation 9.1:** Agencies should provide preparedness education and training on trauma and stress management to all personnel, including coping strategies for managing stress and trauma during and after a mass casualty incident.

**Recommendation 9.2:** Agencies should develop and maintain a comprehensive crisis response plan to address the mental health needs of their personnel during a mass casualty incident.

**Recommendation 9.3:** Responder organizations should provide pre- and post-response behavioral health support to help mitigate and address the development of compassion fatigue, secondary traumatic stress, and vicarious trauma. This support can include education and training, policies and procedures, and services.

**Recommendation 9.4:** The stigma of seeking mental health and trauma support in the law enforcement community needs to be counteracted by education, training, policies, protocols, and leadership, which create an environment that acknowledges and respects the mental wellness of law enforcement to the same extent as the physical aspects of policing.

**Recommendation 9.5:** It is necessary to tailor the application of services for the diverse types of responders (fire/EMS, law enforcement, victim services, dispatchers, etc.) so that the language used and the examples of the types of symptoms they may experience are more applicable to their unique experiences and roles.

**Observation 10**: The Uvalde school community did not sufficiently prepare and engage in victim-centered disaster, emergency, or mass violence incident planning within their own staff, with law enforcement and other responders, nor with the students, family members, and other caregivers.

**Recommendation 10.1**: Preparedness exercises should include regularly scheduled age-appropriate, trauma-informed drills; prescribed instructions/procedures; and clear communication. All stakeholders (school personnel, law enforcement, parents and guardians, students, and other relevant stakeholders) should be involved in the process and informed to help decrease anxiety and chaos.

**Recommendation 10.2**: Preparedness planning should include considerations for language access for those with English as a second language. Materials, instructions, and communication should be provided in the languages prevalent in the community.

Critical Incident Review: Active Shooter at Robb Elementary School | Chapter 8.Pre-Incident Planning and Preparation     406

AR001016

**Observation 11:** Regional PIOs and their managers did not have necessary training for mass casualty incidents from a communications perspective, to include how to establish JIC or coordinate a Joint Information System.

**Recommendation 11.1:** Law enforcement, fire, and any other relevant stakeholder PIOs should obtain FEMA basic and advanced public information officer certifications as a baseline of training.

**Recommendation 11.2:** The FEMA PIO courses should be only a first step in communications training. Agencies should research regional and national training opportunities for building upon the FEMA classes.

**Recommendation 11.3:** Law enforcement PIOs should network at the state and national level (e.g., attend national police conferences that have a PIO section) to learn common practices for managing the public messaging of major incidents and to network with peers in the field.

**Recommendation 11.4:** Concepts learned in basic crisis communication classes must then be adopted into a crisis communication plan that is drilled and practiced with all involved personnel.

**Recommendation 11.5:** Partnering agencies should review their crisis communication plans together to ensure they complement each other. It is critically important that the commitment to coordinating messaging is practiced with smaller events, so it is not a foreign concept when a large-scale incident takes place.

**Recommendation 11.6:** The social media policies of law enforcement agencies should clearly state how social media should be used to communicate with the community during critical incident situations.

**Observation 12:** Regional PIOs did not formally coordinate, cross-train, or practice multiagency communications.

**Recommendation 12.1:** When an agency is hosting operational exercises, it should establish a JIC and engage all participating agencies to ensure coordinated public messaging is practiced and incorporated into planning for a large-scale incident.

**Recommendation 12.2:** Each PIO should draft a crisis communication plan and practice it at least four times a year with smaller events. This will help identify problem areas and solutions and ensure everyone is familiar with the plan and knows their role instead of trying to figure that out during a crisis.

**Recommendation 12.3:** The EOC should host regional PIO meetings every quarter. The meetings should include law enforcement, fire, city and county government, hospitals, public and private schools, universities, airports, military bases, universities, and other large organizations in the area. This creates an opportunity for relationship building, planning for joint operations and large-scale incidents that cross jurisdictional lines, and devising plans to support each other during major events.

**Recommendation 12.4:** After a comprehensive discussion, regional PIO meetings should be opened to the local media. This builds productive working relationships and allows the media and communication professionals to work out issues that arise.

**Observation 13:** On the day of the school shooting at Robb Elementary School, each PIO acted independently and failed to coordinate the public messaging aspect of the response.

**Recommendation 13.1:** When incidents involve multiple agencies, it is critical for the lead organization sending out the public messaging to have previously established a process by planning with the other agencies. On the day of an incident, the lead organization should coordinate with the others to ensure the accurate messaging that the public expects and deserves.

**Recommendation 13.2:** When a mass casualty incident occurs, the lead agency should organize news conferences through the JIC. All supporting agencies should have an opportunity to contribute information about the incident. This ensures a comprehensive release of consistent information.

# Conclusion

In summary, the response to the May 24, 2022, mass casualty incident at Robb Elementary School was a failure. The painful lessons detailed in this report are not meant to exacerbate an already tragic situation or further the pain and trauma to those directly impacted by the events on May 24 and the subsequent days, weeks, and months. This report provides an independent accounting of that tragic day and the events and activities leading up to June 8, 2023, when the Critical Incident Review (CIR) period ended. The CIR team kept accuracy in the forefront, while balancing transparency and trauma-informed approaches. The goal is that this report provides answers to those directly impacted, while also conveying recommendations and lessons learned to the nation. The CIR team included many recommendations for strengthening preparation and planning, improving tactical and strategic responses, increasing communications, and enhancing post-incident recovery, support, and investigations with the goal to help other communities in the preparation, response, and aftermath. We honor the victims, survivors, and all those impacted with this report. The bravery of the survivors and the lost voices of those murdered on May 24 should be a call to action for our nation's communities.

*The Federal Government provides free training and technical assistance including the DOJ COPS Office Collaborative Reform Initiative program,*[1263] *DOJ Bureau of Justice Assistance National Training and Technical Assistance Center,*[1264] *and the Department of Education Readiness and Emergency Management for School Technical Assistance Center.*[1265] *The COPS Office can assist in identifying government resources related to this report.*

---

[1263] COPS Office, "Collaborative Reform Initiative Technical Assistance Center."

[1264] BJA, "Bureau of Justice Assistance National Training and Technical Assistance Center."

[1265] Readiness and Emergency Management for Schools, "Readiness and Emergency Management for Schools Technical Assistance Center."

# Appendix A. Remembrance Profiles

The language in the profiles reflects our respectful attempt to capture the spirit of each victim. These profiles can also be viewed online at https://cops.usdoj.gov/uvalde.

## Nevaeh Alyssa Bravo



**Nevaeh Alyssa Bravo**, 10, is remembered as a little girl who always put a smile on everyone's face. Her name is Heaven spelled backwards. As part of the Healing Uvalde Mural Project, Artist Brittany "Britt" Johnson painted Nevaeh's mural, which includes a heart, two birds, a rose, and a handwritten note that reads "I love you." It also incorporates some of her favorite things, like purple and pink, butterflies, softball, and the TikTok symbol. The mural reflects cascading curls flowing over Nevaeh's shoulder, the way she loved to wear her hair.[1266]

---

[1266] CNN, "May 26 Texas Shooting News;" Briones, "Nevaeh Alyssa Bravo, an Uvalde Student Who Loved Her Family, Dies at 10;" Maldonado, "Nevaeh Alyssa Bravo."

## Jacklyn "Jackie" Cazares



**Jacklyn "Jackie" Cazares**, 9, was very proud of her new white dress as she showed it off in front of her family when celebrating her First Communion a week before she passed. She was a social butterfly who loved to be the center of attention. Her family remembers her as peaceful, loving, affectionate, and compassionate. She would go out of her way to help anyone and make anyone laugh, no matter how bad they felt. She is also remembered as someone who "didn't like bullies; she didn't like kids being picked on." She loved to sing, make TikTok videos, and interact with friends on Snapchat. Her four dogs were her world. When artist Kimie Flores painted her mural as part of the Healing Uvalde Mural Project, she incorporated Jackie's photo in her First Communion dress. Additionally, the mural reflects Jackie's love of the Eiffel Tower; her bedroom was filled with images of the iconic monument, and she dreamed of traveling to Paris to visit it and experience French culture. Jackie had started a piggy bank to collect loose change for her trip to Paris one day. Her favorite color was sage green. Jackie dreamed of becoming a veterinarian.[1267]

---

[1267] Montgomery et al., "'She Was My Sweet Girl;'" "As Uvalde Starts School, One Family Stops;" Andreano et al., "Remembering the Victims of the Uvalde School Shooting;" "Uvalde School Mass Shooting: What We Know;" Chappell et al., "What We Know about the Victims;" Maldonado, "Jackie Jaylen Cazares;" "Remembering Jacklyn Cazares as a Free Spirit."

## Makenna Lee Elrod



**Makenna Lee Elrod**, 10, was beautiful, funny, intelligent, and amazing. She had a big heart and loved her family and friends. It was often said that her smile would light up the room. Makenna loved to play softball and gymnastics, dance and sing, play with fidgets, and spend time with her family. She was a member of the 4-H club and loved animals, including Bailey the dog, Porkchop the pig, Twitty the steer, and Dude the horse; all the animals lived on the family's estate and were a big part of Makenna's life. She looked forward to going to the ranch with her dad to feed animals and ride on the range. The Texas 4-H Youth Development Foundation has set up a memorial scholarship honoring Makenna. She loved butterflies so much that they were released at her funeral. Makenna enjoyed writing notes to her family and leaving them in hidden places to be found later. She was a natural leader and loved school. Makenna's favorite color was purple. She had recently started reading the Bible and often sang her favorite song, "The Lion and the Lamb."[1268]

---

[1268] "Uvalde School Mass Shooting: What We Know;" Maldonado, "Makenna Lee Elrod;" "Makenna Lee Elrod Obituary;" Sturdevant, "Texas 4-H Scholarship;" Alfonseca and Estrada, "Mother of Uvalde Victim Speaks Out;" Briones, "Makenna Lee Elrod, a Bright and Caring;" Herron, "Exclusive: Father of Makenna Elrod-Seiler."

## Jose Flores Jr.



**Jose Flores Jr.**, 10, was fondly known as Josecito and Baby Jose; he loved cars and sports, especially baseball. Jose was a Houston Astros fan and wore number 6 on the Uvalde Little League team. He was often described as always energetic, and he enjoyed video games. Family and friends say they will always remember his big heart, and that he was in a perpetual good mood and always said hello to everybody. His favorite foods included Takis Chips and Cheetos Flamin' Hot. His favorite color was dark blue. When he grew up, Jose wanted to be a police officer to protect others. On the day of the shooting, he had just been honored for his academic work, earning a place on the honor roll.[1269]

---

[1269] Montgomery et al., "'She Was My Sweet Girl;'" Kantor, "Boy Killed in Texas Shooting;" "Uvalde School Mass Shooting: What We Know;" Hampton, "Texas School Shooting: What We Know;" Sandoval, "A Son Was Lost;" Briones, "Jose Manuel Flores, Jr.;" Uria, "Mourners Gather for Funerals of Student, Teacher."

## Eliahna "Ellie" Amyah Garcia



**Eliahna "Ellie" Amyah Garcia**, 9, was very happy and outgoing; she loved dancing and playing sports. She had just won the basketball championship the previous Saturday. Artist Abel Ortiz, who painted her mural as part of the Healing Uvalde Mural Project, reflected Ellie's love of basketball by showing her in her jersey—number 21, which she chose because it was her mother's birthday—with the title "All Star." Ortiz's painting also incorporates her spirit, love of life, and love for Jesus. Eliahna wanted to be a cheerleader. She loved hot sauce, ramen noodles, dancing, and the Disney movie *Encanto*. Ellie was buried in a custom-made *Encanto* dress that the Walt Disney costume design team gifted to her family. The dress was in her favorite color, purple, covered with lilac flowers and cascading ruffles. Eliahna would light up everyone's world with big smiles and big hugs. She came from a large family, the second oldest of five girls, and loved to spend time with her little sisters. She loved making videos and was already practicing a choreography with her older sister for her quinceañera party, even though it was still 5 years away. Her dream was to be a teacher.[1270]

---

[1270] "Uvalde School Mass Shooting: What We Know;" "Texas Artists Honor Uvalde Victims with Murals;" Ortiz, "Eliahna 'Ellie' Amyah Garcia;" Medina, "Tejano Community Attend Funeral of Eliahna 'Ellie' Garcia;" "Disney Sends Family of Ellie Garcia a Gift;" Briones, "Eliahna Amyah Garcia;" Gomez Licon, "Uvalde: Visitations, Funerals and Burials;" Yan et al., "Remembering the Victims of the Uvalde, Texas Massacre."

# Irma Linda Garcia



**Irma Linda Garcia**, 48, was a dedicated mother, wife, and educator known for her love of family and pride for her children and students. Mrs. Garcia was married to her high school sweetheart, Jose Garcia. She loved menudo and joining her husband in barbequing and listening to music. Fishing from the pier with her husband and children was another of her favorite pastimes. She started teaching a year after she married and was nearing 23 years of teaching at Robb Elementary School, 5 of which she co-taught with Ms. Eva Mireles. She received numerous professional honors, including Teacher of the Year in 2019. Mrs. Garcia was known for inspiring her students to go to college, and she celebrated her students returning for the "senior walk" ahead of their graduations. Her spirit is embodied in a post she wrote on social media at the time: "Seeing them return to their elementary schools wearing their cap and gown . . . is the reason every teacher in this district does what they do," Garcia wrote. "That moment makes all the struggles, long hours, and endless paperwork so worth it." Her husband, Jose Garcia, died 2 days after the shooting; they both are survived by 4 children, ranging from 12 to 23 years old.[1271]

---

[1271] Ura, "Irma and Joe Garcia;" "Irma Linda Garcia Obituary;" Sottile, "Their Mom Was Killed in Uvalde;" Anderson et al., "For Five Years, They Were Co-Teachers;" Wertheimer, "Texas Shooting: The Teachers Who Sacrificed."

## Uziyah Sergio Garcia



**Uziyah Sergio Garcia**, 10, known to most as Uzi, was a loving, smart, sweet, and energetic child. Uzi loved his entire family and anything active such as running, gorilla tag, football, and swimming. He was known for being competitive but also fair and kind. Uzi had a deep love for Jesus, and whenever his family said, "I love you and Jesus loves you," he would reply, "and Jesus loves you too!" He loved a Nutella sandwich with blue Takis, which he wanted to get others to try. He was silly, had a contagious laugh, and was known for his shaggy hair—but outside of his silliness, Uzi is remembered for his beautiful soul.[1272]

---

[1272] "Uziyah Sergio Garcia Obituary;" King, "'It's Been 4 Months and Nothing's Changed;" Fraire, "Uvalde Victim Uziyah Garcia;" Maldonado, "Uziyah Sergio Garcia;" "'Loving' Boy Last Texas School Shooting Victim."

## Amerie Jo Garza



**Amerie Jo Garza** turned 10 years old 2 weeks before the Robb Elementary shooting. She had spent her morning celebrating her appointment to the honor roll on that last day of school and went back to her classroom to finish out the day before anticipating her mother picking her up to start the summer vacation. Amerie is remembered as an outgoing child and a student who enjoyed excelling in class, hoping one day to combine teaching with one of her favorite subjects, art. She loved colored pencils and paint (especially the color purple), playing with clay, and wanting people to have fun. Amerie is described as having been the light in the room with the brightest attitude. She was confident and not afraid to be different, doing things that she liked regardless of others' opinions. A "daddy's girl," she also loved making things for her parents and brothers.[1273]

---

[1273] "Texas School Shooting Victims: Third and Fourth Graders, Beloved Teachers;" "Amerie Jo Garza Obituary."

## Xavier James Lopez



**Xavier James Lopez**, 10, was known as a fun-loving young man who, whether in school or at home, was always wearing a bright smile. And as a 4th grader, he never took things too seriously, often finding time to cheer up anyone who needed it. Still, he was excited about his recent academic achievement, proudly accepting his honor roll certificate. According to his family, "he really couldn't wait to go to middle school." Xavier enjoyed having fun with his friends, especially his classmate Annabell Guadalupe Rodriguez, and summertime activities like swimming and playing little league baseball. He learned at the age of 7 to make his father's favorite food, hot salsa. Xavier would sell his salsa to family and friends and use the money to buy toys for his little brothers. His outgoing and fun-loving nature was on display as he carried out pranks and joined in the South Texan partner dance, cumbia. He is fondly remembered as a boy with "lots of energy."[1274]

---

[1274] Cohen, "'I'm Not Ready:' 2 Uvalde Victims."

## Jayce Carmelo Luevanos



**Jayce Carmelo Luevanos**, a 10-year-old 4th grader, loved attending school as much as he loved his family. He lived with his mother and grandparents, for whom it was Jayce's custom to get up in the morning and make a pot of coffee before heading to school. He regularly expressed his strong ties to family and community through the special love notes he wrote to his family and the open invitation he extended to the neighborhood friends and classmates who were welcomed frequently at his family's home. With an endearing personality and the ability to communicate effectively, Jayce was always surrounded by friends with whom he enjoyed playing outdoor games and simply doing fun things. And there were always plenty of refreshments for everyone! His smile was infectious, and he always enjoyed making others laugh. Jayce loved his dog, Fifi, and his favorite hobbies included dinosaurs, ninjas, and coloring pictures.[1275]

---

[1275] Ball, "'They're So Young:' A Grandfather in Uvalde;" Esquivel, "Artist's Statement;" "Jayce Carmelo Luevanos."

## Tess Marie Mata



**Tess Marie Mata** loved her family dearly, as well as her cat, Oliver. Like many 10-year-olds, she wanted to follow in the footsteps of her older sibling. She even started saving for college because she wanted to attend the same school as her big sister, Texas State University, where she is now an honorary Bobcat.

To honor her life, the Tess Marie Mata Scholarship will be established to help students follow the fifth grader's dream to study the health sciences. Tess also saved money for a family vacation to Disney World. She loved the Nickelodeon show *Victorious,* and as an avid softball player, she enjoyed following her favorite baseball team, the Houston Astros. She played the same position as the Astros' Jose Altuve and cheered loudly for him whenever he came up to bat. Tess, known to others as "Tessy," had a love for TikTok videos and dreamed of one day going viral on the social media platform. Her TikTok dance video "My Sweet Baby Girl" has more than 200,000 views. Tess was athletic and loved sports. She also loved fancy dresses and pretty jewelry and will always be remembered for her beautiful smile and signature peace gesture.[1276]

---

[1276] Garcia, "Family of 10-Year-Old Uvalde Shooting Victim;" Craig and Waldman, "Scholarship Honors the Life;" Briones, "Tess Marie Mata;" Ronen, "Artist Statement."

## Maranda Mathis



**Maranda Mathis**, who turned 11 years old about 2 weeks before the Robb Elementary shooting, had a huge, loving heart. She was a sweet, smart, and shy young lady who enjoyed being in nature and spending time outdoors, where she collected things like rocks, shells, and feathers. Those who knew Maranda remember her great imagination and her expressed love for unicorns and mermaids, especially if they were her favorite color, purple. Maranda was fun, spunky, and very smart. Her family describes her as "sweet, smart, and a shy tomboy who enjoyed being in nature and the outdoors." She made a similar impact on her peers: one of her schoolmates added that "she had manners and was a bright girl." Maranda was known for her sweet personality, cute smile, and kind eyes; beyond these, it was her loving heart that endeared her to friends and classmates. She enjoyed spending time with her younger brother, playing Roblox on her tablet, and eating her favorite foods: pizza, tacos, and boneless wings. She had a special love for animals, too. Although at times she was shy and quiet, she did not hesitate to demonstrate her love for family and friends through heartfelt expressions and acts of kindness, for which she will always be remembered. To all of her family and friends, Maranda was loving, kind, bright, and a genuine sweetheart.[1277]

---

[1277] Jimenez, "From Her 'Love of Animals and Pizza;'" Briones, "Maranda Gail Mathis;" "What We Know about the Victims;" "Maranda Gail Mathis."

## Eva Mireles



**Eva Mireles**, 44, was a committed mother, wife, and educator known for her cheerful and active nature. Ms. Mireles had a love for CrossFit, hiking, and spending time with her family. She was known for combining her two passions by getting up before the sunrise to go for hikes during family gatherings. She lived her life to the fullest, with her daughter recalling memories of singing karaoke and re-enacting TikToks together. She was an educator for 17 years, specializing in special education; just a couple of years ago, she helped integrate children with developmental disabilities into regular classrooms in the Uvalde area. As one parent fondly remembered, Ms. Mireles "was a beautiful person and dedicated teacher [who] went above and beyond." Ms. Mireles co-taught 4th grade at Robb Elementary with Mrs. Garcia for 5 years. Ms. Mireles is survived by her husband and her daughter, who recently graduated college.[1278]

---

[1278] Wertheimer, "Texas Shooting: The Teachers who Sacrifice;" Anderson et al., "For Five Years, They Were Co-Teachers;" "Eva Mireles Obituary;" Dey et al., "21 Lives Lost."

## Alithia Haven Ramirez



**Alithia Haven Ramirez**, 10, was a bright, talented, reliable, and extremely loving young lady who dreamed of attending art school in Paris. Her family and friends remember her as trustworthy, always wanting to care for everyone, and serving as a role model to her siblings. She also loved to play soccer. Alithia loved the color purple, eating pizza, and playing with her two younger siblings, for whom she would create unique characters, often modeled on their favorite Nintendo games or anime. She wanted to go to Paris because that's where famous artists are known to go. In January 2023, an exhibit of Alithia's art was displayed in her dream destination by L'AiR Arts at Atelier 11. When Alithia was 8, her best friend who shared a love of soccer and drawing sketches was struck and killed by a car. It was devastating, but little Alithia became a surprising source of strength and comfort for her best friend's family. A drawing Alithia sent to console her best friend's parents showed him sketching her portrait in heaven while she drew him on earth, revealing a kindness far beyond her years. Actor and Uvalde native Matthew McConaughey displayed this drawing when he was speaking at the White House. "I want the world to see my art and show the world what I can do; I want people to be happy when they see my passion in art," Alithia wrote when she submitted her artwork for a Google Doodle contest. Google honored Alithia by spotlighting her work on the Google Doodle. The Beeville Art Museum (https://www.bamtexas.org/) (BAM) hosted an exhibition of select pieces by Alithia in 2022 entitled "Eyes on the World," which included 48 pieces highlighting her signature style of incorporating large inquiring eyes.[1279]

---

[1279] "Alithia Haven Ramirez Obituary;" "Young Uvalde Victim's Art Displayed in Texas and Paris;" Miles, "Uvalde Victim Alithia Ramirez;" "Texas Artists Honor Uvalde Victims with Murals;" "In Memoriam: 2022 Doodle;" Alfonseca and Rothenberg, "Uvalde Shooting Victim Alithia Haven Ramirez;" "Uvalde Victim's Dream of Sharing Art."

## Annabell Guadalupe Rodriguez



Known for her quiet demeanor, 10-year-old **Annabell Guadalupe Rodriguez** came from a close-knit family whom she loved dearly, always enjoying the many exciting and fun-filled experiences they shared. Annabell was a sweet young girl who loved the color blue, especially blue butterflies. She also enjoyed watching TikTok and spending quality time with her sisters and family. She was especially close to her cousin, Jackie Cazares, and her dear friend and 4th grade classmate, Xavier James Lopez. Their families arranged frequent cookouts together so the children could spend more time together, often playing tag. Annabell proudly wore a picture of Xavier around her neck at school and when attending his little league baseball games. She was also entrepreneurial, running a snow cone machine along with her family, who sold hot dogs. Annabell was conscientious and worked hard in school, earning a place on the honor roll. She rose each morning to first thank God for another day and would spend her evenings painting her grandmother's nails and braiding her hair. These acts of humility, kindness, and compassion reflected Annabell's strong values and underscored her remarkable character.[1280]

---

[1280] Martinez, "Two Best Friends;" Shakhnazarova, "Texas School Massacre Victims;" Helling, "10-Year-Old Uvalde Victims;" "'That Smile I Will Never Forget.'"

## Maite Yuleana Rodriguez



**Maite Yuleana Rodriguez** was just 10 years old when she was killed at Robb Elementary School on May 24, 2022. Maite's mother said she wanted everyone to know that Maite was "sweet, charismatic, loving, caring, loyal, free, ambitious, funny, silly, goal driven," and her best friend. "She was determined, focused and competitive. She was smart, bright, beautiful, and happy." Maite was an AB honor student who had high aspirations of doing good in the world, with plans to attend Texas A&M University to become a marine biologist. Maite loved anime, especially Attack on Titan, and all kinds of animals, like dogs, but mostly marine animals like dolphins. She enjoyed Whataburger burgers with jalapeños. Maite was known to be giving, intelligent, and charismatic, as well as courageous. Her bravery was clear: classmates reported that, faced with danger, Maite lost her life telling her classmates where to hide. She will be remembered by her green Converse sneakers, which she decorated with a heart, and by a scholarship named in her honor at Texas A&M in Corpus Christi. Maite is now officially an Islander.[1281]

---

[1281] "Texas School Shooting Victims: Third and Fourth Graders, Beloved Teachers;" "Maite Yuleana Rodriguez Obituary."

## Alexandria "Lexi" Aniyah Rubio



**Alexandria "Lexi" Aniyah Rubio**, 10, was an athlete who loved her family and school. Lexi was a fierce, intelligent girl who had dreams of earning a softball scholarship, majoring in math, and eventually becoming a lawyer. Lexi enjoyed practicing softball and basketball with her father and would practice on her own while he was at work. She was an impassioned debater who loved fishing with her dad, reciting jokes with her mom to see who would laugh first, baking with her great-grandmother, and hanging out with her five siblings. Her siblings fondly remember her love of the "Lexi burger"—a plain and dry McDonald's cheeseburger topped with fries and chicken nuggets, which McDonald's released as a special remembrance on her birthday. She had a love of bright colors, which reflected her bright personality inside and out.[1282]

---

[1282] Dey et al., "21 Lives Lost;" "Alexandria 'Lexi' Aniyah Rubio Obituary."

## Layla Marie Salazar



**Layla Marie Salazar**, 11, grew to love singing so much that she sang every day on the way to and from school with her parents. Layla also enjoyed dancing and adored koala bears. She was smart, quick-witted, and full of an energy evidenced by all of the activities she engaged in, including swimming. Running track, though, was her favorite—her passion. At 11 years old, Layla had never lost a race, taking home 6 first-place ribbons on Field Day. Layla also made TikToks and other videos singing along to her favorite songs. She was a big fan of the Dallas Cowboys. Her family describes Layla as a super special child who was social and welcoming, and who was always respectful and helpful to family and friends. She enjoyed time with her many close family members, including her brothers, parents, grandparents, great-grandparents, aunts, uncles, and cousins. She had the gift of a loving family both nearby and in Illinois, where she was born. Her grandparents would pick Layla up from school and treat her to tacos, so she was known to ask her grandparents to pick her up often. Her family moved to Uvalde to be in a safer community, but now they have buried their loving 11-year-old child there.[1283]

---

[1283] "Texas School Shooting Victims: Third and Fourth Graders, Beloved Teachers;" "Layla Marie Salazar Obituary."

## Jailah Nicole Silguero



**Jailah Nicole Silguero**, 10, was described as a big ray of sunshine with a big heart, especially with children younger than her. Jailah was a lovely little girl who enjoyed the outdoors, dancing, and making TikTok videos. Jailah was also a basketball player. She was very energetic and loved skateboarding, cycling, and playing with her cousins. Jailah and her cousin, Jayce Carmelo Luevanos, were both just 10 years old when they were killed on May 24, 2022, at Robb Elementary, lying next to each other.[1284]

---

[1284] "Texas School Shooting Victims: Third and Fourth Graders, Beloved Teachers;" "Jailah Nicole Silguero Obituary;" "Jailah Nicole Silguero."

# Eliahna Cruz Torres



**Eliahna Cruz Torres**, 10, was known to those closest to her as Elijah. Eliahna was described as a loving, nurturing, and compassionate child who always put others before herself. Family referred to her as "enfermerita," the little nurse. Her grandfather recalls how she accompanied him on his prescribed walks after he had heart surgery, and Eliahna routinely made sure both her grandparents took their medications. She liked to be silly and loved making people laugh. She also loved TikTok videos. She was said to have the most beautiful smile. Eliahna was also an avid baseball player who loved the game and played on a local little league whose final game of the season was scheduled for the afternoon of the shooting. She was very excited for the game and hoped to make the All Stars. Eliahna's father was only a week away from a visit with her at the time of her death. Eliahna was said to have made a big impact during her short life, and her family note that she "fulfilled her purpose."[1285]

---

[1285] "Texas School Shooting Victims: Third and Fourth Graders, Beloved Teachers;" "Eliahna Torres Obituary;" "Eliahna Torres."

## Rojelio Fernandez Torres



**Rojelio Fernandez Torres**, 10, was described by everyone who knew him as an intelligent, hardworking, and helpful person. Rojelio loved everybody and told his family he wanted to make a difference in the world. His teachers referred to him as a difference maker. Rojelio was very outgoing and loved life, showing this by always having a smile on his face and being willing to help wherever needed. He would help his mother with tasks and help his aunts, his teachers, and others. Rojelio was always wanting to do something and had many hobbies like playing Pokémon and video games. He was also very active and loved being outside with his brother and sisters, especially playing football.[1286]

---

[1286] "Rojelio Fernandez Torres Obituary;" "Texas School Shooting Victims: Third and Fourth Graders, Beloved Teachers;" "Rojelio Fernandez Torres;" Alvarado, "10-Year-Old Shooting Victim Rojelio Torres;" "Victims of the Texas School Shooting."

# Appendix B. Report Methodology

On May 29, 2022, the U.S. Department of Justice (DOJ) agreed to conduct a Critical Incident Review (CIR) of the tragedy that occurred at Robb Elementary School on May 24. The team, led by the Office of Community Oriented Policing Services (COPS Office), comprised subject matter experts in the areas of leadership, school safety, tactics, trauma services, communications, critical incident response, and public safety. The COPS Office developed and operationalized a comprehensive methodology to thoroughly review and assess the public safety response to the mass casualty incident at Robb Elementary School, and to improve the preparedness of law enforcement and other stakeholders across the nation.

## Areas of Examination

The CIR team was assigned to eight subteams based on the following areas of focus:

- Timeline and incident reconstruction
- Leadership, incident command, and coordination
- Tactics and equipment
- Public communications
- Post-incident response and investigation
- Trauma services and survivor support
- School safety and security
- Pre-incident planning and preparation

The scope for each area of examination is included in the respective chapter.

This process allowed the team members to leverage their areas of expertise, while focusing on the specific areas of examination in detail. Subteams regularly coordinated to allow for cross-pollination of ideas as well as team deliberations on the themes, observations, and recommendations across the report.

## Responding Agencies

The assessment primarily focused on the responding law enforcement agencies, including:

- Uvalde Police Department (UPD)
- Uvalde Consolidated Independent School District Police Department (UCISD PD)
- Uvalde County Sheriff's Office (UCSO)
- Texas Department of Public Safety (TXDPS)

AR001041

- U.S. Customs and Border Protection (CBP)

- U.S. Marshals Service (USMS)

- Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

- Federal Bureau of Investigation (FBI)

The planning, preparation, and response of the Uvalde Consolidated Independent School District (UCISD) were also part of this assessment.

Due to the scope and areas of examination, other responder agencies, government entities, victim services providers, and other key stakeholders were also included in this assessment.

## Period of Review

Based on the scope, the COPS Office determined that the period of review would extend for 1 year from the launch of the CIR work on June 8, 2022. Examining that tragic day and the subsequent events afterward up to June 8, 2023, allowed the team to assess the support services, public communications, and post-incident responses, including the 1-year mark (May 24, 2023). The team also examined pre-incident processes and planning in the days, weeks, and years prior to the incident.

## Assessment Approach

The assessment approach involved four primary means of information gathering and collection: open source media review, document and data review, on-site data collection, and research and data analysis. Each method is described in more detail in the sections that follow.

### Open Source Media Review

From the tragic day to the end of the review period (June 8, 2023), COPS Office staff collected and collated open source media on a daily basis. The CIR team read and analyzed news media articles, watched or listened to multimedia, reviewed social media posts, and more. This information, where probative, is incorporated throughout the report to provide context to interviews and other data points, as well as integrated heavily in "Chapter 5. Public Communications During and Following the Crisis," as well as "Appendix E: Public Communications Supplemental Materials."

### Document and Data Review

The team collected and reviewed policies, procedures, training curricula, reports, data, body-worn camera (BWC) footage, radio and other audio files, and other documents and data as provided by responding agencies (see the subsections below for broad lists of documents and data). The team collected more than 14,100 pieces of data and documents, including thousands of images, 68 hours of footage from BWCs and other sources, and more than 4,500 hours of audio. The team spent hundreds of hours reviewing the evidence, crime scene images, records—including 911 calls, BWC videos, and

closed-circuit television (CCTV) videos—and open source media articles, video footage, and social media articles. The team analyzed relevant videos and audio recordings regarding the incident in detail, second by second.

The CIR team made outreach to all responding agencies and organizations to request documents, data, and access to responding personnel. It takes courage to voluntarily undergo an assessment and the team acknowledges all agencies and organizations that provided documents and data, and in particular UPD, TXDPS, ATF, FBI, and CBP for their responsiveness and cooperation. Due to the multiple sources of verification, the CIR team was fully able to close any major gaps during the analysis, unless otherwise detailed in the text of the report.

## Document Request List

At the outset of the CIR, the COPS Office submitted a formal document request list that was tailored to the primary responding entities. The full list was:

- Mission, vision, and values statements

- Organizational chart

- Annual reports (three years)

- Duty manual and general orders manual

- Collective bargaining agreement

- Policies, procedures, and special orders related to the scope of the review, including:

  - Active shooter/threat

  - Body armor/personal protective equipment

  - Code of conduct/courtesy and demeanor

  - Communications and dispatch

  - Complaint procedures

  - Crime investigation

  - Critical incident response, including public messaging

  - Crisis intervention

  - Critical incident stress management

  - Crowd control/management, including process for developing a coordinated message

  - Deployment of police-issued equipment

  - Disaster behavioral health services

  - Emergency management

- Employee mental health services
- Family assistance center
- Hostage/barricaded subjects
- Hostage situations
- Incident command processes/procedures, including Joint Information Center
- Interagency communications processes/procedures
- Internal affairs/professional responsibility
- Mutual aid
- Officer deployment/self-deployment
- Officer safety, wellness, and resilience
- Public information/interaction and information sharing with the public, including media relations
- School safety, including family support, unification, and notification
- Social media
- Special Weapons and Tactics (SWAT)/tactical operations and deployment
- Threat assessment
- Use of force, officer-involved shootings—investigation, practices, review, and oversight
- Violence prevention
- Victims of crime and resources

- Training records of all responding personnel and supervisors

- Any mutual agreements or memoranda of understanding with surrounding agencies or the UCISD and UCISD PD

- Documents, memos, reports, records, witness statements (including written, audio, or video), audio or video recordings (including in-car cameras, BWCs, and CCTV), transcripts, crime scene photos, distributed news releases, social media posts, emails or other communication regarding the planning and coordinating of news conferences and the development of public messaging, and any other documents related to the police response to the school shooting at Robb Elementary

- Any incident command procedures and any incident action plans

- Communication (911) codes and transcripts

- Annual or ad hoc training logs, or reports documenting training for law enforcement personnel for the last three years, including active shooter, barricaded subjects, hostage situations, critical incident response, crowd control, investigations, and incident command

- Training materials and lesson plans for the following topics: active shooter, incident command, school safety, use of force, internal affairs, de-escalation techniques, SWAT, Leadership, and/or management training, communications/public information officer, trauma care/tactical medical care, and any other topics relevant to the goal and scope of the review

- Inventories of equipment, including protective equipment and firearms

- Documents related to school safety, including physical building security, agreements, and threat assessment

- All reports generated by the city or governmental entities over the last three years that address the scope, including use of force, investigations, complaints, crowd control, school safety, community engagement, release of public information, and other appropriate documents

**Data Requests**

At the outset of the CIR, the COPS Office submitted a formal data request list that was tailored to the primary responding entities. The full list was:

- Agency and community data, including sworn force, number of civilians, population served, and accreditation status

- Fiscal expenses, including resources, equipment, staffing, and overtime

- Training data, including number of hours (academy and in-service) and format (in-person vs. online, scenario vs. other), broken out by topic and type

## On-Site Data Collection

The team conducted nine site visits across 11 months:

- June 26–30, 2022

- July 17–21, 2022

- August 13–18, 2022

- August 22–24, 2022

- September 11–16, 2022

- November 13–18, 2022

- December 11–16, 2022

- April 4, 2023

- April 23–27, 2023

During these site visits, the team conducted and observed interviews[1287] with the following stakeholders:

- Local, state, and federal law enforcement personnel, including command staff; responding officers, deputies, troopers, and agents; SWAT/tactical teams; investigators; communication specialists; civilian staff; and others

- Other responding agencies, including federal, state, and local agencies that may have been involved in the pre-planning, response, post-incident response, and investigation

- Responding fire organizations

- Emergency medical services (EMS) and other medical responders

- Public information officers and media spokespersons

- Disaster coordinators

- Peer support members

- Victim services providers

- Businesses

- Other public safety responders

- State- and federal-level organizations responsible for training, leadership, union support, and mental health, as well as other relevant groups

- Victims, survivors, family members, and other community groups, to ensure their voices and experiences were reflected in our work

Due to the sensitivities and privacy considerations of its work, the team directly interviewed only adults and worked with appropriate officials and advocates to gather experiences from youth victims and witnesses, as well as gathered information from interviews with their families, review of media accounts, and review of other interviews and data. Additionally, due to privacy concerns regarding child victims, the CIR team did not have access to a full list of victim survivors, so was not able to make outreach to all victims or their families. The team utilized a "snowball approach"[1288] to make outreach to as many survivors and their families, victims' families, and other impacted individuals as possible using interviewee referrals.

The team also hosted two family and victim forums during the August 2022 and April 2023 site visits to provide updates to families and loved ones on the CIR and an opportunity for the team to hear, collectively, from those most directly impacted by the tragedy and answer questions as applicable.

---

[1287] Each interview conducted by the CIR team was voluntary. Participants were told that they had the option to answer or not answer, in whole or in part, any questions posed.

[1288] This refers to a nonprobability sampling technique in which each person contacted by the CIR team is asked to identify other individuals. This method is often used when there may be difficulty in identifying or reaching all individuals.

When appropriate, the team included a counselor or therapist on site during interviews and meetings to provide any assistance as needed. All team members were provided resources to assist with trauma-informed interviewing (see the section "Trauma-Informed Approach" below). The team also provided a Spanish interpreter during interviews and family forums.

Table B-1. Interviews conducted by CIR team, broken out by stakeholder type

| Stakeholder | Number of interviews |
|---|---|
| Community/Faith-Based/Businesses | 5 |
| Federal/Agency (Non-Law Enforcement) | 6 |
| Federal/Law Enforcement Agency | 31 |
| Hospital/Medical | 9 |
| Local/Campus Agency | 4 |
| Local/Emergency Management | 2 |
| Local/Government Agency | 12 |
| Local/Nongovernmental Organization | 3 |
| Local/Police Department | 37 |
| Local/School District | 35 |
| Local/School Law Enforcement Agency | 5 |
| Local/Sheriff's Office | 6 |
| National/Nongovernmental Organization | 21 |
| Paramedics/Regional transportation | 19 |
| State/Association | 3 |
| State/Law Enforcement Agency | 39 |
| State/Nongovernmental Organization | 7 |
| Training Provider | 8 |
| Victim/Family/Witness | 15 |
| Grand Total | 267 |

The team conducted multiple walkthroughs of Robb Elementary School and other critical locations, such as the Family Resiliency Center, the hospital, and the Reunification Center. More than 260 people were interviewed during these site visits and subsequent virtual meetings (see table B-1 for a complete tally).

In addition, the team participated in training observations of national-level active shooter trainings to inform its understanding of generally accepted practices and the available options. The following entities provided those trainings:

- Texas A&M Engineering Extension Service (online), January 24, 2023

- Texas State University Advanced Law Enforcement Rapid Response Training (ALERRT), February 20–22, 2023

- Louisiana State University (LSU) Academy of Counter-Terrorist Education, March 28–31, 2023

- National Tactical Officers Association, April 17–19, 2023

- ALERRT, April 24–27, 2023

- LSU, June 4–7, 2023

## Trauma-Informed Approach

CIR team members used a trauma-informed approach for all interviews and interactions with victims, survivors, family members, first responders, and all other individuals affected by the incident. The team was trained with the following objectives:

- Understand the impact of traumatic stress on victims' ability to accurately access available memories of the traumatic incident

- Avoid retraumatizing or over-activating traumatic stress responses

- Understand the common emotional distress reactions to expect in some victims, family members, responders, and other witnesses that are likely to occur in anticipation of, during, and after an interviewing process in which they are asked to recall and provide a narrative—their account—of the activities they observed and participated in related to the traumatic event

- Understand when to slow, delay, or end an interview process to help stabilize, ground, and mitigate negative emotional distress responses in interviewee

- Understand when to refer an interviewee for mental health supports

- Learn key, basic emotional regulation, cognitive structuring/boundaries, and coping skills to mitigate and address the team members' own secondary traumatic stress responses to their exposure to disturbing and graphic information, pictures, videos, sounds, and stories of the incident both pre- and post-deployment/engagement

- Create team-based structural supports to implement, model, and encourage actions that can mitigate the development of serious emotional distress, secondary traumatic stress, and post-traumatic stress (e.g., briefings, debriefings including psychoeducation, buddy system/peer support, and self-care activities)

As needed, victims, family members, responders, and other witnesses were connected to local disaster mental health supports, resources, and more formal mental health care. The CIR team facilitated these connections through Texas professionals trained, skilled, and available to support those at risk and in need of emotional and mental health care (e.g., state and local offices for victim services, disaster behavioral health crisis counselors, and state voluntary organizations active in disasters). The CIR team also connected people to national supports (e.g., National Disaster Distress Helpline, National Suicide Prevention Lifeline, Veterans Crisis Line), if needed.

## Research and Data Analysis

Throughout the duration of the project, the team researched open-source media; national standards, best practices, and generally accepted practices and standards in relevant areas of policing policy and practice; research literature; and any other relevant issues identified in the review to provide a foundation from which to conduct gap analysis. The team conducted a multidisciplinary literature review of promising and best practices, research, and other relevant standards and practices in the areas of active shooter, school safety, critical incident reviews, leadership, incident command, trauma, communications, and more.

Based on the information provided in the document and data requests, analysis was conducted to serve as the foundation for recommendations contained in the final report. The team analyzed hundreds of training records and certificates to develop a database of all relevant trainings. This analysis is included in "Chapter 8. Pre-Incident Planning and Preparation," "Chapter 3. Leadership, Incident Command, and Coordination," and "Chapter 7. School Safety and Security."

Moreover, the CIR team carefully analyzed daily media reports to determine major events, information sharing, inaccuracies, and misinformation. This analysis is included in "Chapter 5. Public Communications During and Following the Crisis."

In addition, the team analyzed in meticulous detail the movements, actions, and inactions of the responders. This involved second-by-second analysis over hundreds of hours. This analysis is included in "Chapter 3. Leadership, Incident Command, and Coordination."

The team recreated an incident timeline which is further detailed in the next section. Finally, the team analyzed available training data, which is discussed at the end of this chapter.

## Incident Timeline Reconstruction

A critical component in assessing the public safety response to the shooting at Robb Elementary was an incident timeline reconstruction. Constructing an accurate, detailed timeline was essential, as it provided a chronological framework of the incident and facilitated a comprehensive understanding of the sequence of events that led up to the law enforcement response, occurred during the response, and followed in the immediate aftermath. The detailed account provided transparency in the factual occurrences throughout.

The timeline presented in the CIR report is based on the independent analysis, validation, and corroboration of documented information that can be aligned to a specific point in time through various sources. The CIR team analyzed the times down to the second and, in instances where possible, the fraction of a second.

In reconstructing the timeline, it was important to balance the need for comprehensive facts, while at the same time detecting and transmitting the signal of the events. This was especially important given the voluminous body-worn camera, CCTV, and audio recordings of the incident.

## Data Sources

The CIR team reviewed and assessed voluminous primary and secondary data sources, including BWC footage, CCTV, radio communications, and 911 call logs, in addition to analytic products provided by CBP's Office of Professional Responsibility (OPR).

Primary sources of data included video, audio, and interviews from:

- Body-worn cameras
- CCTV
- Radio communications
- 911 calls
- CIR interviews and fact-finding activities

Secondary sources of data included the CBP OPR timeline data.

## Analysis

Key to the timeline reconstruction were the following analytical tasks: time synchronization, identification of locations, and identification of phases, events, and actions.

### Time synchronization

The various recording systems—such as officers' body-worn cameras, the nearby funeral home's CCTV, and radio communications—that were recording during this incident were not synchronized and, therefore, had different timestamps and inadvertently recorded the same event or action as occurring at different times. To resolve this issue, the CIR team conducted a careful analysis to align all actions in this Incident Timeline Reconstruction with one "true," synchronized time.[1289] The CIR team leveraged analytical work by the FBI and CBP OPR, which had aligned the time in the school hallway CCTV to the funeral home CCTV. This serves as the basis for "true time." All other times featured on body-worn cameras are aligned to this "true time," in order to synchronize across the data sources for this report.

---

[1289] All times, unless otherwise noted, are in Central Time.

## Phases

The Incident Timeline Reconstruction is organized in five phases. Within each phase, every minute of key actions and events is detailed and specified per location. Where relevant, associated events and actions are also included. Each phase represents a span of time that conceptually captures a series of de facto related events and actions. Notably, the phases *are not intended to represent* predetermined response operations by any of the law enforcement agencies on scene.

**Phase I** (11:21 a.m.–11:39 a.m.) comprises the time period from when the subject shoots his grandmother through the end of the first responding officers' initial approach toward the classroom doors.

**Phase II** (11:40 a.m.–12:21 p.m.) comprises the time period following the officers' initial approach through a series of four shots fired at 12:21 p.m., which is a catalyst event within the broader response timeline.

**Phase III** (12:22 p.m.–12:49 p.m.) comprises the time period following the 12:21 p.m. shots fired through the breach and entry into rooms 111 and 112.

**Phase IV** (12:50 p.m.–1:15 p.m.) comprises the time period following the entry though the completion of medical triage and evacuation inside rooms 111 and 112.

**Phase V** (1:16 p.m.–3:15 p.m.) comprises the time period from the beginning activities of the investigation and establishment of investigative command of the scene, through a secondary threat at the high school.

## Times

The timeline is largely a minute-by-minute narrative. For each minute of the incident, all data sources were reviewed for content that conveyed pertinent activities by officers, first responders, the subject, and victims—including movements inside and outside the hallway, key communication and direction being provided, and the request and arrival of various assets.

## Locations

The incident and response unfolded across various locations inside and outside of the Robb Elementary campus. Each entry in the timeline is coded with the location. Additionally, "radio traffic" and "911 communications" are coded as locations. When these communications occur *from* a specific location that is known and the location is pertinent to understanding its context, both pieces of information are provided. Location is the overarching organization of data within each phase of the timeline. Over the course of the incident response and timeline, there are a total of 18 locations:

- Communications: 911

- Communications: Radio Traffic

- Communications: UCISD Raptor Alert

- Funeral Home

- Grandparents' Residence

- Robb Elementary: Northeast Hallway

- Robb Elementary: Perimeter

- Robb Elementary: West Building

- Robb Elementary: West Building Exterior, Parking Lot

- Robb Elementary: West Building Northeast Hallway

- Robb Elementary: West Building North Side Hallway

- Robb Elementary: West Building Northwest Entrance

- Robb Elementary: West Building South Entrance

- Robb Elementary: West Building South Side Hallway

- Robb Elementary: West Building T-Intersection

- Robb Elementary: West Building West Exterior

- Robb Elementary: West Building, Inside Classrooms 111 and 112

- Robb Elementary: West Building, Outside Classrooms 111 and 112

## Events

The CIR team identified 33 events within the incident response, representing key thematic activities that recurred over the course of the incident and response. Notably, themes were often overlapping within the same time frame, and in some instances, a key activity was reflective of multiple events (for example, a communication by a first responder that referenced one or more of the events listed below).

The Key Events are:

- Air Support

- Callout of Containment and Barricade

- Closing off the Crime Scene

- Crowd Control

- Discussion of Classrooms 111/112 Layout

- EMS Arrivals and Actions

- Entry into Classrooms 111/112

- Establishing Incident Command Post

- Investigative Activity

- Medical Triage and Evacuation

- Negotiations

- Officer Arrivals

- Officers' Initial Approach to Classrooms 111 and 112

- Presence of Victims: Acknowledgment and Discussion

- Request for Shields

- Reunification

- Robb Elementary Lockdown

- Room Clearings and Evacuations

- Search for Keys

- Shooting at Grandparents' Residence

- Shots Fired

- Stack Formation

- Subject Enters School Grounds and Approaches West Building

- Subject Enters West Building and Classrooms 111 and 112

- Subject Identification

- Subject Killed

- Subject's Backpack: Observation and Recovery

- SWAT Callout

- Tactics: Sniper

- Tools and Equipment: Breaching

- Tools and Equipment: CS Gas

- UCISD: Other Campus Lockdowns

- Vehicle Crash Next to Robb Elementary

## Training Analysis

The CIR team analyzed the training provided to local, county, and state personnel who responded on May 24, 2022 (see table B-2 for the breakdown of agency and personnel).[1290] No training data was provided for the federal agency personnel, as such the focus of the analysis is on the local and state personnel. This data reflects training data provided to the CIR team.

Data after May 24, 2022, was excluded from this analysis. Although the data does not reflect all law enforcement personnel present, there is a breakdown proportionate to the agencies and associated personnel present.

Table B-2. Agencies and associated personnel

| State and local agencies | Number of personnel |
|---|---|
| Texas Department of Public Safety | 89 |
| Uvalde Police Department | 27 |
| Uvalde County Sheriff's Office | 7 |
| Uvalde Consolidated Independent School District Police Department | 5 |
| Southwest Texas Junior College | 2 |
| Hondo Police Department | 1 |
| Texas Parks and Wildlife Department | 1 |
| Uvalde County Constables | 2 |
| Zavala County Sheriff's Office | 1 |
| Grand Total | 135 |

---

[1290] The numbers in table B-2 reflect the training data provided directly to the CIR team from local and state agencies. These numbers will not match the number of personnel on the scene.

The data was collected from the Texas Commission on Law Enforcement (TCOLE) records and/or training certificates for personnel on site during the incident. The CIR team reviewed the records and created a database of relevant trainings, dates, and training providers, and then categorized the trainings into the following buckets:

- Active Shooter
- Leadership
- Emergency Management, including ICS/NIMS
- School Based
- Crowd Control
- Special Weapons and Tactics (SWAT)
- Breaching Specific
- Hostage Negotiations
- Other Tactical, such as courses on patrol/tactical, tactical firearms training, armorer/gunsmith, patrol rifle, etc.
- Tactical Medical
- Basic Medical
- Officer Safety and Wellness
- Communications
- Other Relevant Trainings, such as post critical incident training, telecommunications, crime victims, risk assessment, etc.

As with all analysis, there are some limitations. The CIR team analyzed the training records for all known responding officers using the best available data and information provided. Furthermore, in-service trainings are notated on TCOLE as "in service" without any further details or description. As such, one caveat to the analysis is that trainings relevant to this review may have been provided during in service training. Wherever the CIR team validated or verified training deliveries through interviews, it has been noted.

Personnel that responded to Robb Elementary School ranged in law enforcement experience from 10 months to 43 years on the job, and on average had 4,229 hours of career/professional and TCOLE hours (range 1,018 to 16,238).[1291]

Overall, many of the officers, of all ranks, who responded to Robb Elementary School on May 24, 2022, had extensive and impressive training records which included thousands of hours of specialized tactical response and active shooter response training.

---

[1291] CIR Training Analysis.

## Treatment of Names

Names are important. The team deliberated on the treatment of names and used the following:

- The subject's name is not used to avoid glorification.

- Only elected officials and chief executives of agencies are named where appropriate. All other individuals are left unnamed.

On a final note, this report refers to "victims" and "survivors" interchangeably to respect that some people prefer to be referenced as survivors and others as victims. In addition, the CIR team was cognizant of and attempted to avoid terminology like "triggered," "targeted," and other gun-related language as well as time frame references (which typically convey celebrations, such as "anniversaries"), out of respect for the fact that these terms are often activating for some victims, survivors, responders, and family members.

# Appendix C. Observations and Recommendations

## Chapter 2. Tactics and Equipment

**Observation 1:** The first officers on scene immediately moved toward the sound of gunfire and into the West Building of Robb Elementary to stop the shooter, which was in adherence to active shooter response generally accepted practices. Once inside the building, five of the first officers on scene continued to press down the hallway and toward a barrage of gunfire erupting inside of rooms 111/112.

**Observation 2:** Officer movements down the hallway were uncoordinated and not tactically sound, creating potential crossfire between officers entering on the south side and north side of the hallway.

> **Recommendation 2.1:** Officers responding to an active shooter and other dynamic scenes should maintain cognizance of potential crossfire upon their initial approach and make tactical adjustments as soon as feasible.

> **Recommendation 2.2:** Law enforcement agencies should ensure officers are trained on one-, two-, three-, and four-person team formations that are taught in active shooter training courses. These formations are designed to allow the greatest opportunity for success for officers in locating and addressing the threat with whatever weapon system they have on their person.

**Observation 3:** After officers suffered graze wounds from shrapnel, the first officers on scene did not penetrate the doors to rooms 111/112 and repositioned to a barricaded subject situation. This mindset permeated throughout much of the incident response, even impacting many of the later responding officers. Despite their training and despite multiple events indicating the subject continued to pose an active threat to students and staff in the building, including the likelihood and then confirmation of victims inside the room, officers on scene did not attempt to enter the room and stop the shooter until for over an hour after they entered the building. The shooter was not killed until approximately 77 minutes after law enforcement first arrived.

> **Recommendation 3.1:** Officers responding to an active shooter incident must continually seek to eliminate the threat and enable victim response. The shooter's immediate past actions and likely future actions serve as "triggering points" that indicate the appropriate response should be in line with active shooter response protocols. An active shooter with access to victims should *never* be considered and treated as a barricaded subject.

> **Recommendation 3.2:** Officers responding to an active shooter incident or dynamic scenes with evolving threats should continually assess their surroundings and stimuli and seek to obtain an accurate picture of the incident to inform their decision-making and tactical approach.

> **Recommendation 3.3:** Law enforcement training academies and providers should ensure that active shooter training modules include the factors in determining active shooter versus barricaded subject situations.

**Observation 4:** A callout over the radio that the subject is "contained" and "barricaded" was repeated time and again, and spread rapidly throughout the collection of agencies and individual officers responding to the scene. Although it was also stated that the subject was still shooting in some instances, the abundance of radio communications made it inevitable that some first responders would hear one communication but not the other.

> **Recommendation 4.1:** Officers on the scene of an active shooter incident should be cognizant of their description of the situation and how it can influence other officers as they arrive. These status updates, known as L-CANs (Location, Conditions, Actions, Needs) are integral to an effective and informed law enforcement response, particularly with assets en route to an evolving situation.

> **Recommendation 4.2:** Law enforcement agencies and training providers should ensure L-CANs are routinely included in training scenarios where applicable, including active shooter training. Other options for improving officer L-CAN discipline may include incorporating into rollcall, running L-CAN drills, and including as part of an agency's formal after action review process for all critical incidents.

**Observation 5:** Officers on scene did not consistently mark rooms that were cleared and evacuated, leading to instances of rooms unnecessarily and unintentionally being cleared multiple times over the course of the response.

> **Recommendation 5.1:** Room clearings and evacuations must be conducted systematically. Officers should establish a standard approach that physically mark rooms that are cleared. The approach should be simple and achievable for any room. For many law enforcement agencies, a marker or chalk is used to mark an "X" on the door once its room is cleared. Doing so serves both an officer safety and resource management purpose. Law enforcement agencies and training providers should ensure this instruction is provided when training on clearing buildings.

**Observation 6:** The effort to clear and evacuate the entire West Building was intentional and directed by Chief Arredondo, to preserve and protect the lives of the children and teachers who remained in the hot zone, while the shooter remained an active threat with multiple victims in rooms 111/112. This was a major contributing factor in the delay to making entry into rooms 111/112. The time it took to evacuate the entire building was 43 minutes, beginning at around 11:38 a.m., when Chief Arredondo realized there were occupants in room 109 that he could not access, and ending at 12:21 p.m., when four shots were fired, and that same room was finally evacuated through the windows. During this time and prior to 12:21 p.m., there were multiple stimuli indicating that there was an active threat in classrooms 111/112—including: the barrage of gunfire during the initial response; the children and teachers observed when evacuating the classrooms; the single shot fired at 11:44 a.m.; the notification that class was in session; the notification from an officer on scene that his wife, a teacher, was inside classrooms 111/112 and shot; and multiple radio broadcasts of a 911 call from a student inside the classroom.

> **Recommendation 6.1:** Officers responding to an active shooter incident must first and foremost drive toward the threat to eliminate it. In the event there are resources available and an opportunity to evacuate bystanders and victims from the hot zone, officers must balance the risk posed by evacuation versus the risk posed by remaining in lockdown and potentially in the crossfire. Evacuations in such circumstances must be conducted in the most expeditious manner, limited to

AR001058

those immediately in harm's way, and not at the expense of the priority to eliminate the threat. In the case of Robb Elementary, the CIR team concludes that the effort to evacuate was protracted and should not have caused such significant delay in the eventual entry into rooms 111/112.

**Observation 7:** Some officers on scene believed that they were waiting for more assets to arrive, such as shields and a specialized tactical team, to make entry.

> **Recommendation 7.1:** Officers responding to an active shooter incident must be prepared to approach the threat and breach or enter a room using just the tools they have with them, which is often a standard-issue firearm/service weapon.

> **Recommendation 7.2:** Law enforcement agencies should adopt active shooter training national standards. The adoption of such standards is critical in the support and development of effective response tactics. The training, by design, enables a de-facto team of similarly trained officers who could rapidly assemble, communicate, and act as a team to rapidly stop the killing and stop the dying.

> **Recommendation 7.3:** Law enforcement leaders on scene must work with available resources and personnel on scene and when the situation becomes stagnant, create an operational inner perimeter with a tactical team, removing all other personnel to avoid overcompensating the situation with unnecessary personnel.

**Observation 8:** The entry team assumed the door to rooms 111/112 were locked, based on information they received from officers who were on scene for a longer period of time. However, throughout the entirety of the incident, this assumption was never tested and the doorknob was never checked. Our analysis indicates that eight interior doors in the West Building were unlocked and discovered to be unlocked by responding officers during evacuations.

**Observation 9:** With master keys in hand and confirmed to work, the BORTAC commander paused on the room entry so that a sniper and drone could attempt to get a visual on the classroom. If successful, the sniper could have mitigated a great deal of risk posed by a gun battle inside the classroom. The sniper or drone could have provided valuable intelligence on the layout of the room, location of victims, and the shooter that would create a great tactical advantage for the entry team. However, assessing these options added 10 minutes to the overall response time.

> **Recommendation 9.1:** Leaders providing direction in an active shooter incident must balance the urgency to stop the shooter with capabilities and approaches that may be time-consuming. The amount of time that has passed and the probability of success or improved outcomes should be considered when making such decisions.

> **Recommendation 9.2:** The assessment on the viability of using a sniper should have been conducted earlier in the incident, as soon as the location of the subject was known. There were multiple officers with SWAT training and experience that could have conducted such an assessment within the first 10 minutes of the law enforcement response.

**Observation 10:** Active shooter incidents are responded to by law enforcement officers with a variety of experience and training, but rarely is there a fully functioning specialized tactical team on scene to respond.

AR001059

**Observation 11:** Active shooter response protocol does not require any equipment that is not standard to a patrol officer. Officers on scene during the initial response in the West Building, even with only their standard issue service weapon, had sufficient equipment to formulate a plan and attempt to make entry into classrooms 111/112, by first checking the doorknob and, if necessary, making a forced entry through the classroom window, or using ballistic breaching methods.

> **Recommendation 11.1:** All equipment assigned by an agency requires specific training and may only be utilized by those officers assigned to that particular piece of equipment. Ideally, an agency may consider assigning specialized equipment to patrol officers to enhance the operational capacity of an emergency response. It should be noted that the equipment listed is not all required as collective response and is recommended to be utilized individually as available to further enhance the on-scene capabilities of an officer(s) responding to a critical emergency such as an active shooter situation. Each tool enhances its capacity and capability, but no single piece of ancillary equipment is required for a response to an active shooter.

> **Recommendation 11.2:** Agencies should also consider ensuring equipment is available at critically vulnerable locations, such as schools and other soft targets. Depending on the capacity of the police department, "readily available" may be defined as having the equipment in the possession of a trained officer or within close proximity to acquire the equipment for an emergency response.

**Observation 12:** UPD radios did not work well inside of the West Building, causing communications challenges throughout the incident response. Despite the known challenges in radio communications, video evidence shows that there are radio communications being broadcasted on both sides of the hallway throughout the incident, sharing key facts and circumstances of the incident.

> **Recommendation 12.1:** When experiencing radio voids or dead zones inside a building, officers on scene must be prepared to identify and utilize other modes of communicating—especially in large complex incidents with multiple agencies operating in multiple locations. Some common practices in law enforcement for such circumstances is to assign "runners," who will relay information to key actors within an incident response.

> **Recommendation 12.2:** Law enforcement agencies must maintain and upgrade all equipment, including radios, when vulnerabilities are presented. In Uvalde, police radios should perform not just in the wide-open spaces that are prevalent throughout the county, but also in high density environments, such as school buildings. Furthermore, agencies should establish and train on radio operability contingency plans, such as point-to-point communication, which does not require repeaters or internal transmitters.

## Chapter 3. Leadership, Incident Command, and Coordination

**Observation 1:** All 11 FOS initially responded to Robb Elementary School as dictated by policy and practice for an active shooter response. However, only 5 of the 11 FOS ran toward the gunfire from rooms 111 and 112, but they retreated when UPD Lt. 1 and another FOS were grazed. After that initial response, only UPD Lt. 1 made further attempts to move toward the classrooms, and leadership did not direct entry into the classrooms.

**Recommendation 1.1:** Agencies should develop and annually review policy that directs officers to make entry and engage the subject as quickly as possible during an active attacker incident.

**Recommendation 1.2:** Agencies should provide training to direct officers to make entry and engage the subject as quickly as possible during an active attacker incident.

**Recommendation 1.3:** Agencies should train supervisors and implement accountability measures to direct officers to make entry and engage the subject as quickly as possible during an active attacker incident.

**Observation 2:** The FOS included experienced law enforcement personnel with sufficient training and equipment to engage the subject in rooms 111 and 112. Relevant policies and training directed officers to drive toward the threat and engage the subject to stop the killing. This did not happen.

**Recommendation 2.1:** The FOS should engage the subject regardless of whether they have additional officers on site.

**Observation 3:** The first information captured on video of possible victims in rooms 111 and 112 was heard on body-worn camera at 11:37 a.m. Within minutes there was confirmation that room 112 was in session. UCISD PD Chief Arredondo was told that there was an injured teacher. This information was not widely and immediately shared.

**Recommendation 3.1:** Any intelligence should be shared immediately with all law enforcement present via police radio or any means possible.

**Observation 4:** Leadership from UPD, UCISD PD, UCSO, and TXDPS demonstrated no urgency for establishing a command and control structure, which led to challenges related to information sharing, lack of situational statuses, and limited-to-no direction for personnel in the hallway or on the perimeter.

**Recommendation 4.1:** Agency leaders must immediately determine incident status and the appropriate command structure for the event. Leadership must continually assess and adjust as the threat and incident evolve.

**Recommendation 4.2:** Leadership should ensure responders are appropriately provided with a situation status and decisions that affect their responsibilities and actions.

**Recommendation 4.3:** As soon as leadership is aware of an emotionally involved responder, they should make every attempt to extricate that officer from the hot zone once sufficient personnel are present. Based on the involvement, that officer can be directed to the command post for sharing of any information relevant to the response and incident.

**Observation 5:** Failure to establish a unified command led to limited multiagency coordination.

**Recommendation 5.1:** As soon as possible and practical, the lead agency should establish a unified command that includes a representative from each primary first responder agency to facilitate communication, situational awareness, operational coordination, and allocation and delivery of resources.

**Recommendation 5.2:** As part of their pre-incident planning and preparation, regional agency leaders should determine a process for identifying a lead agency in a multi-jurisdiction response.

**Observation 6:** Local, county, state, and federal law enforcement personnel self-deployed, adding to the challenges at the scene. At least 380 law enforcement personnel were on the scene from 24 law enforcement agencies.

**Recommendation 6.1:** A staging area manager should be designated to identify an appropriate area and direct additional personnel there for assignment of duties.

**Recommendation 6.2:** Agencies should examine their policies and procedures to ensure they address self-deployment guidance and protocols, to include uniform, equipment, and resources.

**Recommendation 6.3:** Officers should follow agency policies and procedures that address self-deployment.

**Observation 7:** Leadership failed to establish an ICP until after the incident and, once the ICP was established, it was in a location that was also a crime scene. Lack of strong leadership extended to the establishment and start of an ICP and include failing to sweep the facility (which would have revealed more than 90 children and staff in need of support); create control measures to limit access to other personnel; or, crucially, provide any clarity of purpose, continuity, or unity of effort. However, within 30 minutes, TXDPS took control of the ICP along with the scene.

**Recommendation 7.1:** The establishment of an ICP for all agency leaders to report to so that brief and decisive action can be directed out toward the front-line officers is critical to resolving inaction and poor/no decision-making.

**Recommendation 7.2:** Agencies should be prepared to provide critical services or supplement these services by establishing interagency agreements and plans for mutual aid.

**Recommendation 7.3:** Agencies should engage with the EOC for assistance in implementing operational stability and a continuity of operations plan.

**Recommendation 7.4:** The ICP should provide timely direction, control, and coordination to the agency leadership, other agencies, and other critical stakeholders before, during, and after an event or upon notification of a credible threat. The ICP must also serve as an intelligence collection and dissemination hub.

**Recommendation 7.5:** Agency leadership should provide uninterrupted communication within the internal organization of the agency (or agencies if there is a unified command structure), externally to other agencies, and to all identified stakeholders.

**Recommendation 7.6:** The ICP should establish and enact time-phased implementation procedures to activate various components of the plan to provide sufficient operational capabilities relative to the event or threat.

**Observation 8:** There was no uniformly recognized incident commander on the scene throughout the incident.

**Observation 9:** UCISD PD Chief Arredondo was the de facto incident commander on the day of the incident. Chief Arredondo had the necessary authority, training, and tools. He did not provide appropriate leadership, command, and control, including not establishing an incident command structure nor directing entry into classrooms 111 and 112.

**Observation 10:** UPD Acting Chief Pargas did not have incident command training and did not demonstrate adequate command leadership during the incident.

**Observation 11:** Uvalde County Sheriff Nolasco, despite being the chief law enforcement officer for the county, lacked leadership and incident command training and did not demonstrate adequate command leadership during the incident by not coordinating the resources from the Sheriff's Office or helping to establish a unified command.

> **Recommendation 8–11.1**: Agencies should ensure that persons in positions of authority have the requisite training and qualifications to carry out the responsibilities and duties of the title, including those serving in an acting capacity.

> **Recommendation 8–11.2**: Agencies should train, plan, and prepare for mass violence incidents, including the need for incident command structure.

> **Recommendation 8–11.3**: Leaders should be trained and prepared to transition an incident or response to another leader within or outside of their agency when needed.

**Observation 12:** On the day of the incident, no leader effectively questioned the decisions and lack of urgency of UCISD PD Chief Arredondo and UPD Acting Chief Pargas toward entering classrooms 111/112, including within their respective agencies and agencies with concurrent/overlapping jurisdiction (e.g., Uvalde County Sheriff Nolasco, Constable Zamora, Constable Field, TX Ranger 1).

> **Recommendation 12.1:** Agencies should create and train on a policy, and set an expectation that leaders will act in a manner consistent with that policy during critical incidents.

> **Recommendation 12.2:** An MOU/memorandum of agreement (MOA) needs to be developed among agencies within a county or region that provides clarity on who is in command, taking into consideration an agency's training, experience, equipment, and capacity to take the lead during a multiagency response to a critical incident.

> **Recommendation 12.3:** Agencies should train and practice together the areas covered in the MOU/MOA. The drills should include all first responders, elected officials, and critical infrastructure stakeholders.

> **Recommendation 12.4:** Law enforcement policy and training should be informed by research on leadership and decision-making theories, behaviors, functions, and practices.

**Observation 13:** No law enforcement leadership established incident command or unified command.

> **Recommendation 13.1:** Agencies should use the Incident Command System (ICS) for more than large-scale tactical events. They should incorporate as many of the ICS principles as possible in response to varying levels of emergencies or planned events, so ICS becomes a regular component of the agency's culture.

> **Recommendation 13.2:** Agencies should fully adopt NIMS throughout the region, even if not mandated as a FEMA Preparedness Grant recipient.

> **Recommendation 13.3:** Agencies should consider using the NQS to improve response, command, and coordination.

**Recommendation 13.4:** Agencies should ensure training and retraining of all staff regarding NIMS and the importance of standardized ICS implementation.

**Recommendation 13.5:** Agencies should conduct drills, exercises, and tabletops on NIMS and include all first responders, elected officials, and other critical infrastructure stakeholders.

**Observation 14:** CBP- and TXDPS-trained medics provided leadership for establishing a CCP and triage area and developed a triage process. However, due to the overabundance of law enforcement personnel, the plan was not operationalized once the classrooms were entered by law enforcement.

**Recommendation 14.1:** Law enforcement agencies should develop and train personnel in tactical emergency medicine and provide the appropriate equipment, as well as collaborate with local EMS to provide this capability.

**Recommendation 14.2:** First responder agencies should train and equip personnel using a rescue task force model.

**Observation 15:** Due to the lack of leadership, incident command, and coordination, law enforcement medics failed to coordinate with medical responders, including EMS and hospitals.

**Recommendation 15.1:** Agencies should work with emergency medical responders to develop a response, triage, and transport plan for mass casualty events. The protocols should be agreed upon, and member agencies should enter a formalized MOU.

**Recommendation 15.2:** Agencies at the regional level should conduct executive-level, multiagency tabletop exercises through their EOC that include elected and appointed officials as well as department heads from other government agencies, relevant nongovernmental agencies, and hospitals and other responder agencies. This will not only prepare personnel, but also help define roles and responsibilities, identify available resources, and establish an agreed-upon unified command system.

**Recommendation 15.3:** Agencies should consider adopting the recommendations from the U.S. Fire Administration (USFA) publication Fire/Emergency Medical Services Department Operational Considerations and Guide for Active Shooter and Mass Casualty Incidents.

**Observation 16:** Local ambulances had difficulty accessing Robb Elementary School due to lack of coordination and law enforcement vehicles blocking the streets. This delayed critical medical services.

**Recommendation 16.1:** An incident safety officer should be designated as quickly as possible during incident response and should pay special attention to the access or egress of emergency vehicles.

## Chapter 4. Post-Incident Response and Investigation

**Observation 1:** The involvement of local agencies in the hallway during the incident led the district attorney, in consultation with TXDPS, to assign Texas Rangers to solely investigate the incident.

**Recommendation 1.1:** Agencies should have a formal agreement or understanding on investigative command after a multiagency response.

**Observation 2:** An investigative command post was initially established at the funeral home, which was soon discovered to be one of six crime scenes. As a result, the command post was moved into a TXDPS mobile command post.

> **Recommendation 2.1:** Agencies should carefully assess the location of any command post during and after a critical incident to ensure it is suitable for the operations of a command post. Some considerations include accessibility, size and capacity, availability of resources, and safety and security.

**Observation 3:** TXDPS did not maintain a log for the investigative command post. As a result of this oversight, there is no record of which agencies or individuals were present at various times throughout the crime scene investigation.

> **Recommendation 3.1:** Law enforcement agencies investigating any crime scene—especially complex, multiagency responses—should ensure a log is kept not only at the crime scene, but at the command post as well. The log ensures accurate record keeping and accountability for actions taken by the investigative team. Access to the command post should be limited to those with a need to be there.

**Observation 4:** Body-worn camera (BWC) video captures officers walking into the crime scene without an investigative purpose or responsibility in the immediate aftermath of the incident. Furthermore, in the days that followed, crime scene preservation was compromised, and the crime scene team had to continually stop and start their important work when non-investigatory personnel entered the hallway and classrooms 111/112 for the purpose of viewing the scene.

> **Recommendation 4.1:** Leaders must respect the integrity of the crime scene and only access it with a declared and documented legitimate purpose. Crime scenes need to be held without contamination until completed. The crime scene team should be permitted to do their methodical work without continuous interruptions by VIPs who want to enter the crime scene but have no probative need to do so.

> **Recommendation 4.2:** Investigative teams should ensure that inner and outer perimeters are established at all crime scenes. There was an outer security presence at the campus gate, but there was not a secured entrance to the building of the crime scene.

**Observation 5:** The crime scene at the car wreck was washed out by rain prior to the collection of any evidence. The FBI offered to process the truck and warned of the rain coming, suggesting they move the truck to a secure and dry location. They also offered to cover the truck with a tarp. These offers were rebuffed by TXDPS leadership.

> **Recommendation 5.1:** Investigative teams must properly assess weather conditions and the timing of investigative activities—particularly evidence collection—that must be conducted outside in the elements.

**Observation 6:** Texas Rangers conducted an exterior door test, documenting the operation and locking mechanisms of each exterior door in the West Building. The critical incident review (CIR) team was unable to ascertain whether the Texas Rangers conducted the same test on interior doors—specifically rooms 111 and 112—which witnesses have also indicated could have had faulty closing and locking

mechanisms. The interior doors were removed from their frames by the Uvalde County District Attorney as evidence. The functionality of the doors should have been assessed prior to their removal from the crime scene.

**Recommendation 6.1:** Law enforcement agencies investigating such incidents in which the form and functionality of physical evidence, such as doors, would benefit from testing should refrain from removing such items until they have been tested and such testing is formally documented via video recording and a written report.

**Observation 7:** The hellfire trigger system was not initially collected as evidence, as crime scene Rangers were not aware of its presence or that they should be looking for it. After reviewing crime scene photos, they uncovered an approximate location of the device at the crime scene and recovered the device.

**Recommendation 7.1:** Agencies in regional proximity to each other should conduct multiagency tabletop exercises (TTX) for complex investigations that may necessitate mutual aid and support from each other. Doing so will build greater interagency coordination in activities like evidence collection as well as understanding of jurisdictional boundaries, capabilities, processes, and expectations among partner agencies. The TTX should include local, state, and federal agencies, as appropriate, and be designed to exploit weaknesses, uncover strengths, and develop solutions.

**Observation 8:** Given the influx of investigative support assets from out of town, often spending multiple days on site, there were logistical challenges with lodging and transportation. Many hotels were sold out. The team lead was able to secure housing on a hunter's ranch, which helped alleviate the lodging issue.

**Recommendation 8.1:** Crime scene teams need to plan for logistical support, especially when traveling long distances to mass shootings. Identifying a dedicated coordinator for such efforts can help in the planning and ensure personnel arriving from out of town are able to find lodging nearby, including nontraditional options as needed, such as a private housing.

**Observation 9:** The Texas Rangers Crime Scene Team processed and exhaustively documented an incredibly challenging crime scene that put their training, policies, and procedures to the test. The team conducted an after-action review to examine their efforts and learn as an organization.

**Recommendation 9.1:** Organizational subunits should conduct after action reviews, particularly in the wake of critical incidents that provide a real-world test to their training, policies, and procedures.

**Observation 10:** To account for the number of victims and personal items, the Crime Scene Team implemented an alphanumeric tracking system for items found so that they could be quickly, easily, and accurately aligned.

**Recommendation 10.1:** Crime scene investigators responding to incidents of mass violence should be prepared with a predesignated system to collect and align personal belongings to victims.

**Observation 11:** Among the agencies with the most involved personnel, most have not completed administrative investigations into their officers' actions on May 24.

AR001066

**Recommendation 11.1:** Agencies should adopt parallel investigations policy for criminal and administrative investigations, including for major incidents, while taking diligent steps to ensure that information derived from compelled administrative interviews are completely walled off from any criminal investigation into the officer's or agent's actions.

**Observation 12:** CBP OPR stood up a comprehensive analytical operation, dedicating staff to the reconstruction of the incident, which provided high-value intelligence to investigators as they began conducting interviews with involved agents.

**Recommendation 12.1:** Agencies that engage in after action/critical incident reviews should adequately resource the effort to ensure high-quality and timely reports of lessons learned and areas for organizational improvement.

**Observation 13:** CBP OPR trained all investigators in trauma-informed interview techniques in advance of interviewing their involved agents, some of which were deeply involved in the incident response.

**Recommendation 13.1:** Agencies' personnel conducting interviews of individuals involved in a critical incident should be trained in trauma-informed interview techniques.

**Observation 14:** UPD officers involved in the incident did not maintain a record of their own incident reports. Rather, UPD records show a reference back to the Texas Rangers' records, which serve as the official statement of UPD officers.

**Recommendation 14.1:** Agencies should maintain a duty to collect officer statements for their own administrative records and investigations even as an external agency is conducting an investigation into the same matter.

**Observation 15:** UPD's internal investigation has been hampered by a lack of access to evidence that TXDPS was in possession of and not willing to share.

**Recommendation 15.1:** Memoranda of understanding on sharing investigative data should be established among partner agencies.

**Observation 16:** The FBI provided forensic interview specialists for conducting child witness interviews, filling a gap in available resources and expertise within the lead agency.

**Recommendation 16.1:** Agencies should ensure they have procedures in place to identify and utilize forensic child witness interviewers, whether in-house or through mutual aid agreements.

**Observation 17:** The FBI's child witness forensic interview specialists were not representative of the racial and gender makeup of the child witnesses.

**Recommendation 17.1:** When conducting investigations, law enforcement agencies should account for the racial, ethnic, gender, and cultural diversity of witnesses when making investigative assignments, including interviews.

## Chapter 5. Public Communications During and Following the Crisis

**Observation 1:** Inaccurate information combined with inconsistent messaging created confusion and added to the victims' suffering, both on the day of the incident and in the days after the mass shooting.

**Recommendation 1.1:** Due to the possible occurrence of mass shootings regardless of jurisdiction size, all law enforcement agencies and local governments should plan for such critical incidents from a public messaging and crisis communication perspective. This requires relationship building, planning, training, and preparing before a large-scale incident.

**Recommendation 1.2:** Organizations must be prepared to swiftly develop proactive messages in an organized fashion to keep community members informed and establish a source of strength and leadership that can unite a community and assist with the healing process.

**Observation 2:** UPD posted the first public message 10 minutes after the subject entered Robb Elementary School, a strong start for public messaging. However, the post was edited four times over the next 73 minutes. Since the Facebook algorithm does not recognize the edits as a new post, it did not reach as many users.

**Recommendation 2.1:** As quickly as possible, an agency should inform the public regarding the nature of the critical incident and how it will release information regarding it.

**Recommendation 2.2:** An agency should create a new social media post or message each time it has new information to release. This will help reach a larger audience instead of updating the initial post.

**Observation 3:** At no time was a specific agency designated as the official source of information, nor was a lead agency identified.

**Recommendation 3.1:** The first or second post from an agency should establish the agency as the official source of information, which reduces confusion about how information will be released.

**Recommendation 3.2:** Agencies should instruct the public that other modes of incoming communication, with the exception of emergency calls, will be shut down to allow staff to focus on the accuracy and timeliness of information via the official platform.

**Recommendation 3.3:** Messaging to the public should include identification of the lead agency or a transition to another agency as the lead. This level of transparency ensures accountability to the public when people are seeking reassurance, order, and answers.

**Observation 4:** UCISD PD posted their first public message 33 minutes after the subject entered Robb Elementary School. The message references that the students and staff are safe. This reassurance was false and never corrected.

**Recommendation 4.1:** Information should be confirmed by two sources if at all possible before it is shared publicly. If false information is shared, it must be corrected as soon as possible on social media, and if the content is highly newsworthy, it should be addressed in the next news conference as well. The agency should explain how the false information ended up being released. Delays will erode public trust in the organization.

**Recommendation 4.2:** Agencies should monitor social media and media coverage to understand the totality of the circumstances, which includes community sentiment. This may guide the incident commander to share information that initially was being withheld in order to refute a false narrative. The role of monitoring social media and media coverage should be assigned to a specific individual as stipulated by the communication plan and can even involve a neighboring agency.

AR001068

**Recommendation 4.3:** To establish leadership and a sense of order, the lead agency must be swift, proactive, accurate, and transparent in its messaging. Relevant information that is not law enforcement-sensitive should typically be released as soon as it is confirmed. However, speed must be balanced with the need for accuracy. It is critical that information is verified before it is released even when there is tremendous pressure to release information quickly.

**Observation 5:** Family members encountered many obstacles to locating their loved ones, getting access to the hospital, and getting information from leadership, law enforcement, and hospital staff in a timely manner. This includes initial information posted by UCISD on the reunification site followed by a series of contradictory posts between UPD and UCISD on reunification. This added to the confusion, pain, and frustration.

**Recommendation 5.1:** As part of a community-wide comprehensive emergency response protocol, school districts should have a safety plan for each school which includes a reunification and communication section on how they will direct parents/family members when a crisis occurs. Selected district personnel should be designated in advance to assist emergency personnel as family members rush to the school or reunification location.

**Recommendation 5.2:** School district leadership needs to develop a system for documenting which children are present and which parent or guardian has retrieved them using a sign in/out, checkoff, and/or smartphone picture system to document for safety, notification, and reunification purposes.

**Recommendation 5.3:** Information about locations for notification, family assistance, and property return should be as specific as possible, including the location address. These posts should be prepared in advance when possible and pre-tested during exercises testing the crisis communications plan.

**Recommendation 5.4:** As soon as any type of mass casualty or active assailant incident occurs, law enforcement should serve as the lead on public safety messaging and updates on status of the incident and the criminal investigation. Once the situation has been rendered safe, the affected entity should take the lead with providing information to the public about operations and issues affecting the facility. Each agency (e.g., school district and law enforcement agency) should share or link to the others' content on social media. This will help them avoid contradicting each other.

**Observation 6:** UPD and UCISD never posted when the threat to the community was over. UPD did post a message at 1:06 p.m., however, the post incorrectly stated that the subject was in custody and that information was never corrected.

**Recommendation 6.1:** When a community suffers a traumatic incident, a law enforcement leader should work to establish a feeling of safety in the community with a news briefing as soon as possible. The news briefing should announce the status of the situation and when the situation is resolved, and include details of how that was accomplished. If an incident is not quickly resolved, the leader should hold regular news briefings to keep the community informed. The leader should strive to show strength balanced with compassion and care for those suffering tragic injuries and losses.

**Recommendation 6.2:** When reunification is complete and the victims' families have been notified, the lead agency should release that information to the community. This is a crucial step in unifying the community to start the healing process.

AR001069

**Observation 7:** Uvalde Memorial Hospital and University Health San Antonio swiftly released information regarding patients arriving at the hospitals.

**Recommendation 7.1:** The lead agency should institute incident command and establish a JIC for coordinating the release of all public information, including victim information from all medical facilities that can be incorporated into coordinated news briefings.

**Recommendation 7.2:** Once the agency leading the JIC learns that patients are being transported to hospitals outside the region, a PIO should be assigned to call the hospitals to coordinate the release of information. This duty can be filled by an outside PIO who has arrived to assist, which should be outlined in the crisis communication plan.

**Observation 8:** Texas Governor Greg Abbott was the first official to publicly speak about the incident, during an unrelated press conference, and shared preliminary information that turned out to be incorrect. All officials who speak to an incident that is still unfolding should ensure that they have timely, accurate information.

**Observation 9:** At 4:16 p.m., UCISD held the first news conference at the Civic Center. Basic information was provided and did not include details such as the current number of victims. This information was never released. The media were not allowed to ask any questions.

**Recommendation 9.1:** A news conference with a law enforcement executive from the lead agency, who was not intrinsically involved in the response and so would not risk jeopardizing a criminal case or consciously or unconsciously provide unreliable facts, should take place on scene as soon as the scene is rendered safe. If the incident is elongated, a briefing should take place while the event is still in progress and should be held nearby the scene to reassure the community.

**Recommendation 9.2:** An on-scene location for the press conference helps instill confidence that law enforcement is effectively handling the situation and that the people watching the news conference are safe.

**Recommendation 9.3:** The law enforcement leader conducting news conferences should attempt to be responsive to all media questions. While it may not be possible to answer questions related to the ongoing investigation, it is possible to be responsive by explaining the process or announcing when more specific information may be released.

**Recommendation 9.4:** An agency should release the number of deceased and injured victims as soon as the information is confirmed. There is no benefit to gain from a delay.

**Recommendation 9.5:** Consistent leadership needs to unite the community through a projection of strength and empathy. This is also vital for the community's healing process.

**Observation 10:** TXDPS as the lead agency post-incident did not establish a JIC or media staging area and did not schedule a series of briefings and interviews with media. Instead, the TXDPS spokesperson conducted ad hoc interviews as they were flagged down.

**Recommendation 10.1:** The designated lead spokesperson and agency should establish a JIC and a media staging area in line of sight of the command post.

**Recommendation 10.2:** A schedule of briefings should be created, and other agencies should be invited to send PIOs to work with the lead spokesperson to coordinate the release of information. If possible, joint news conferences of local, state, and federal agencies should take place at this location, based on that schedule.

**Recommendation 10.3:** All media should be given the opportunity to receive the same information at the same time via news conferences or previously identified social media or other releases. This prevents inadvertent contradictory news stories that can be caused by using a different selection of words in each interview. It also avoids the appearance of an agency favoring a specific media outlet or outlets, which can cause other reporters to become more assertive.

**Observation 11:** Spokespersons for UCISD and TXDPS, the only agencies speaking publicly, did not coordinate their messaging the afternoon of the incident. Some conflicting information was shared by the two agencies.

**Recommendation 11.1:** The lead agency should be working to release basic details in follow-up news conferences, such as an update on the number of victims and their conditions, information about the subject, the type of weapon(s) used, and the status of the investigation. Some activities take place at every crime scene and can be shared, such as meeting with victims' family members, identifying witnesses, conducting interviews with witnesses and the involved officers, or processing the crime scene. Talking about these activities at the news conference does not compromise the investigation, and it shows the community that law enforcement is making progress.

**Observation 12:** Off-topic prescheduled posts appeared on the UPD's and Uvalde Memorial Hospital's Facebook pages while the incident was still immediately recent.

**Recommendation 12.1:** An agency should disable scheduled posts during a critical incident as part of its crisis communication plan.

**Observation 13:** During the May 25 news conference, Texas Governor Abbott and TXDPS Director McCraw provided inaccurate information. This further perpetuated the misinformation and rumors.

**Recommendation 13.1:** When an organization recognizes that an error has occurred, it should admit the mistake and share what actions it is taking to rectify the problem and prevent it from happening again. Even when the mistake is egregious, an agency can maintain or seek to regain public trust by being open and holding itself accountable to the community. In these moments, a law enforcement agency can build community trust by holding itself to the highest possible standard.

**Recommendation 13.2:** Agencies should use social media and the local media to reassure the community with clarity and confidence that any loss of life would be investigated quickly and appropriately. This accountability is necessary for any critical incident that significantly impacts a community.

**Recommendation 13.3:** Agency spokespersons should be briefed by those most knowledgeable on the facts of the incident prior to public comments.

**Observation 14:** The involved law enforcement agencies were unresponsive to the growing concerns in the community. Many of the media's questions were an extension of the pressing questions from the victims' family members and others.

**Recommendation 14.1:** Effective communication requires law enforcement agencies to listen to their communities' concerns and be responsive to them.

**Observation 15:** All social media public messaging was posted in English. The one exception to this was the FBI San Antonio Field Office's messaging starting on May 25.

**Recommendation 15.1:** In a community with a large population with limited English proficiency, officials should post emergency information in English and in other predominant languages. This inclusive approach will help ensure that critical public safety messages reach a larger audience and will help boost trust.

**Recommendation 15.2:** In a community with a large population with limited English proficiency, officials should enlist the assistance of a local television, radio, or social media channel that caters to the non-English predominant culture and language of the community.

**Observation 16:** On day 4, the TXDPS director changed the narrative from a heroic local law enforcement response to a failed response, but only during the question-and-answer section of the news conference. This approach prompted even more questioning from the media and caused anguish among family members of the victims.

**Recommendation 16.1:** An agency should be as direct as possible when it is revealing law enforcement mistakes in responses and actions. An indirect approach can undermine faith and trust in law enforcement.

**Observation 17:** Attending to the cultural needs of different community members is of the utmost importance and requires extensive effort to understand the community, familial, and individual impacts of cultural influences on victims. Local law enforcement and other responders in Uvalde rarely ensured that those impacted were given information in their primary language (Spanish). Behavioral health supports that were offered did not take into account cultural considerations that may have helped those impacted to accept behavioral health supports and seek help for other case management-type needs.

**Recommendation 17.1:** Formal and informal leaders and other community members can help responders to better understand the community's cultural beliefs around health, mental health, and help-seeking. Demographic information should be integrated into tailoring services to make them less stigmatized and more acceptable to those in need. Services should be culturally appropriate for the community they serve.

**Recommendation 17.2:** Agencies should incorporate culturally sensitive communications into early communications during a crisis.

**Observation 18:** The extent of misinformation, misguided and misleading narratives, leaks, and lack of communication about what happened on May 24 is unprecedented and has had an extensive, negative impact on the mental health and recovery of the family members and other victims, as well as the entire community of Uvalde.

**Recommendation 18.1:** All persons involved in delivering information during and after a mass violence incident should be trained in best practices that are victim-centered, trauma-informed, and culturally appropriate. Typically, a trained PIO or designated representative should be the person speaking to the press and family members or advising the designated representative as to the best-practices approach.

**Observation 19:** Investigative journalists and reporters became the main source of information, and their reporting served as the accountability measure for the victims, families, and the community due to a lack of open and transparent information from government officials.

**Recommendation 19.1:** Law enforcement and other government officials within the affected community should develop a comprehensive plan for media engagement to centralize information sharing, maintain consistency in messaging, and build trust within the community as a legitimate source of information.

**Observation 20:** There was extensive media exposure on mainstream and social media that included

- images of law enforcement entering Robb Elementary School;

- law enforcement officers restricting, yelling at, and falsely reassuring parents outside the school that they were taking care of the incident inside the school;

- audio recordings of young children calling 911 asking for help and reporting they were afraid to die; and

- a continuous flow of body camera footage showing a significant number of law enforcement officers not taking actions to save the children trapped in classrooms 111 and 112.

**Recommendation 20.1:** Images and reports of the details of violent crimes, especially those involving the injury and death of children, are traumatic to anyone exposed to them. Those who conduct investigations, legal representatives, and government officials, as well as family members who request such details, should be prepared and supported before and after such exposure.

**Observation 21:** Throughout the days, weeks, and months following the incident, there continued to be significant failings in public communications.

**Observation 22:** While notifying victims and families of an impending release of traumatic, violent, or graphic materials (e.g., body camera footage, crime scene images) is traditionally the role of government, in many instances, the media obtained a copy from a leak. Family members should be advised well ahead of the planned release of such materials. Not doing so was harmful.

**Recommendation 22.1:** Any details shared publicly by government officials should have a purpose and not be gratuitous.

**Observation 23:** Family members and victims who attended school board meetings felt their concerns and requests for information and accountability were ignored, experiencing a lack of communication and empathy from authorities.

**Recommendation 23.1:** Local leaders and law enforcement representatives providing information to victims and family members need to be trained or, at a minimum, knowledgeable about how and when it is appropriate to hold a family and victim forum, the purpose of such an informational

forum, and how to conduct it in a victim-centered, trauma-sensitive manner. Giving voice to victims and family members (active and deep listening), allowing them the time they need to express themselves, validating their concerns, identifying actions that can be taken, providing resources, and ensuring follow up to outstanding questions are all best practices that should be followed by anyone engaging with victims and family members.

**Observation 24:** Families asking what happened to their loved ones were traumatized by a re-enactment by a law enforcement official during the first family and victims' forum.

> **Recommendation 24.1:** Intentional transparency is needed for the victims, survivors, and loved ones who are seeking answers about what happened; however, authorities need to provide information in a trauma-informed, victim-centered, and culturally sensitive manner.

**Observation 25:** Family members in Uvalde have struggled for more than a year to be heard, to get a full accounting of what transpired during this incident, and to be able to fully grieve and begin to adapt to the losses in their lives as a result of the horrific circumstances of the deaths of their loved ones and the failed response. Their recovery is delayed and more complex than it needed to be due to the lack of attention to their needs.

> **Recommendation 25.1:** Law enforcement, local leaders, and other responders can support the recovery of victims and families by giving them opportunities to be fully heard, have their concerns validated, and receive information through a transparent lens.

**Observation 26:** The misinformation, lack of timely and accurate information, and the poor manner in which many families and other loved ones were treated at Robb Elementary at the time of the shooting can contribute to poorer mental health outcomes for the impacted individuals. The ongoing unresolved questions about the law enforcement response to the shooting can inhibit recovery for the entire community, individual victims, and family members.

## Chapter 6. Trauma and Support Services

**Observation 1:** Once the children and adults were rescued from their classrooms during the evacuation process, they received limited instruction and direction on where to proceed. Due to the chaotic nature of the evacuation, children and school personnel were not adequately evaluated medically prior to being transported to the Reunification Center. As such, injured victims had delayed medical care and were at risk of further injury.

> **Recommendation 1.1:** The responsibility of responders is to rely on training and preparation to remain calm when interacting with children so as not to increase the children's fear or lessen their sense of safety.

> **Recommendation 1.2:** Evacuation planning should involve designating dynamic evacuation routes and safe spaces where the evacuees will be guided for safety, medical triage, and emotional support.

> **Recommendation 1.3:** Evacuees should be provided clear instructions and directions on where to proceed. Where resources are available, a corridor of law enforcement personnel should be set up to ensure the evacuees are unimpeded and directed in a safe manner.

**Recommendation 1.4:** Evacuees should be triaged and medically assessed once evacuated and prior to reunification with next of kin to ensure that all injuries are immediately identified and that victims receive necessary care.

**Recommendation 1.5:** As part of evacuation planning, school officials should develop an identification system for tracking students who leave with their parents or guardians, to include on site where possible.

**Observation 2:** Not all victims of the incident at Robb Elementary School received medical and mental health screenings following the incident.

**Recommendation 2.1:** Officials should ensure all victims of a mass violence incident are screened medically and assessed for mental health concerns soon after evacuation and no later than 24-48 hours post-incident.

**Recommendation 2.2:** In the weeks and months following an incident, victims and family members should receive follow-up or continued monitoring to ensure they are receiving the necessary mental health care and other services.

**Observation 3:** At least 91 children were evacuated from the school and hid in the back chapel of the funeral home (which was an active crime scene) with funeral home staff, teachers, and some parents. They were held there for hours. At the same time, law enforcement personnel, many of whom were aware of the children and staff present, moved in and out of the front of the funeral home and throughout the perimeter. At least one child in the back chapel was bleeding and required medical attention. Parents and guardians were outside of the funeral home demanding access to their children.

**Recommendation 3.1:** School officials should create a process that allows reunification outside of the Notification/Reception Center, whenever necessary and collect victims' names, photos of their guardians, and location of reunification.

**Recommendation 3.2:** As part of establishing a command post, law enforcement and other officials should secure the entire facility around the post and, if possible, evacuate civilians. In all cases, family members, community members, media, and other onlookers need to be kept out of the hot zone for their safety.

**Observation 4:** At the scene of Robb Elementary, some families and loved ones on the perimeter seeking information and questioning the law enforcement delay were treated with physical and verbal aggression, were shown no compassion or empathy, and received limited information.

**Recommendation 4.1:** The incident commander should assign a communications officer or liaison officer to provide timely and accurate information on the status of the response to family members and the community, help provide a sense of calm and trust, and maintain order.

**Recommendation 4.2**: Agencies should incorporate de-escalation tactics and trauma-informed, victim-centered, culturally sensitive approaches into their training on crowd control, emergency management, mass casualty response, and emergency/crisis communications.

**Observation 5:** Those without a formal role in the response at Robb Elementary, such as community members, school personnel, and certain responder personnel, were unnecessarily exposed to the deceased victims' bodies or the crime scene.

**Recommendation 5.1:** Law enforcement and other responder agencies have a responsibility to limit exposure to traumatic crime scenes—including deceased victims' bodies—to those with a formal role. Leaders should consider using tents or vehicles to shield the crime scene from view, or widening the perimeter to keep it out of sight.

**Recommendation 5.2:** Responding agencies should also limit the exposure of community members, school staff, and their own agency staff to traumatic materials.

**Observation 6:** The establishment of a Reunification Center was delayed and chaotic. Families and next of kin received conflicting instructions on the location of the center.

**Recommendation 6.1:** As part of disaster preparedness, communities should plan to establish a Notification/Reception Center. Planning should include determining where the center will be, who will be in charge, what security measures it will have, how the reunification process will be conducted, what screening of victims and families will take place, and how public communications and media will be handled. Establishing and managing a Notification/Reception Center should also be part of the community's critical incident drills.

**Recommendation 6.2:** All evacuees and their next of kin should receive information about where to receive services and resources once they leave the Notification/Reception Center. Victim advocates should contact all identified victims for follow up at various points after the incident to ensure they are aware of services and engaging in help seeking.

**Observation 7:** The public, including family members, witnessed child victims being brought to Uvalde Memorial Hospital (UMH) via the visitors' front door. The UMH chapel door also inadvertently provided a view of the victims in the ER.

**Recommendation 7.1:** Pre-incident planning and preparation should include determining where to have families wait for their loved one during a mass violence incident.

**Observation 8:** Family members had unreasonable challenges accessing the hospital and their injured loved ones.

**Recommendation 8.1:** Pre-planning should include developing a plan that removes barriers for families and loved ones to enter the hospital, receive updates, and see their loved ones.

**Observation 9:** The death notification process was disorganized, chaotic, and at times not conducted in a trauma-informed manner.

**Recommendation 9.1:** Clear, accurate, and frequent communication needs to be provided to the families and loved ones at the Notification/Reception Center.

**Recommendation 9.2:** Any information about the number of deaths or the process of identification should be communicated by a single trained and trusted leader who has verified the information and invites each family to a private space to discuss the situation involving their loved one.

**Recommendation 9.3:** Law enforcement agencies should assign compassionate and trauma-trained personnel to collect identifying information and descriptions of victims, including clothing and photos. These individuals can also be a constant presence with the families, monitoring them for any medical or security needs, answering any questions, and ensuring they have necessities such as water, tissues, and medication.

**Recommendation 9.4:** Victim advocates should be assigned to communicate with and assist families. Each family member of a deceased person and each injured victim should be assigned a victim advocate who works with that family/victim consistently throughout the treatment and recovery period, having frequent communications to ensure the family/victim is aware of and able to access needed services and supports.

**Observation 10:** The TXDPS personnel, including the civilians who conducted the death notifications, varied in training and experience. Some did not have any experience in this type of communication. However, family members described the Rangers providing the notifications as compassionate and said that the Rangers gave them the time they needed before being escorted to their car.

**Recommendation 10.1:** Officers or other representatives tasked with death notification should be trained in accordance with agency policies and procedures. This is a highly sensitive function that should not be performed by those who have not received specialized training in how to conduct victim-centered, trauma-informed, and culturally appropriate death notifications.

**Observation 11:** An FBI notification team that was trained and experienced in trauma and death notifications was excluded from performing this task by staff from TXDPS who did not have the training or experience to provide this care.

**Recommendation 11.1:** Local officials engaging in trauma and death notifications should consult national resources and ensure best practices are followed when providing these notifications. Preparedness and planning can help a locality identify areas where they have fewer trained or experienced staff, thus the areas where they need mutual aid supports.

**Observation 12:** The number of people in the room during the death notifications varied. Some were made by the primary team only, while others—including the first death notification—were made in the presence of other law enforcement or school staff.

**Recommendation 12.1:** A trauma notification team should comprise two people: one law enforcement officer and one victim advocate or behavioral health provider.

**Recommendation 12.2:** The number of trauma notifications that an individual makes should be closely monitored, and trauma services should be made available to those providing notifications.

**Observation 13:** Each agency and organization providing support services for responders operated independently. The lack of coordination among the providers complicated the process for personnel interested in obtaining support, leading to overlaps and gaps in services.

**Recommendation 13.1:** The post-incident command post should assign a central coordinating entity to track law enforcement and responder agencies at the incident and others who may have been involved (e.g., dispatchers, technicians, and other support services personnel). This tracking should continue after the incident to ensure that appropriate trauma-related services are offered in a coordinated effort with appropriate follow-ups.

**Observation 14:** Responders were not provided timely, immediate access to trauma and support services, and many reported feeling abandoned and unsupported in the weeks and months following the critical incident. Others reported being aware of the services but electing not to use them.

**Recommendation 14.1:** A comprehensive approach to psychological support services for responder personnel during an MCI should include immediate and ongoing interventions, education, and training to promote mental health and wellness.

**Recommendation 14.2:** Support services for responder personnel should be provided on site for the duration of the incident, including while law enforcement and other personnel are on site processing the scene, collecting evidence, and conducting their investigation.

**Recommendation 14.3:** Responder agencies should have a system for monitoring personnel stress during and in the months after an MCI. This can include regular check-ins with personnel and using assessment tools to identify individuals who may be struggling.

**Recommendation 14.4:** Responder agencies should develop a comprehensive and integrated trauma support plan that includes outreach, follow-up, and ongoing support for responders.

**Recommendation 14.5:** Leaders from responder agencies need to provide services to all personnel involved in an MCI, which for some agencies means everyone on their staff. These services should include resources on post-disaster behavioral health and secondary traumatic stress, referrals to health care providers, and peer support.

**Recommendation 14.6:** Responder agencies should consider memoranda of understanding (MOUs) and memoranda of agreement (MOAs) with regional agencies for trauma support services if none exist in the local area.

**Observation 15:** In the MCI at Robb Elementary School, 587 children and many other teachers and staff members were present. At least 17 survivors were physically injured. Due to the lack of medical and mental screening of survivors/victims and lack of information sharing among agencies and providers, the exact number of survivors/victims both directly and indirectly impacted remains unknown. Based on interviews, there are both physical and emotional needs that have been unidentified and unattended.

**Recommendation 15.1:** Multiagency cooperation, collaboration, and communication are necessary to help identify all those impacted by an incident and ensure outreach and follow on to all victims. MOUs/MOAs between agencies, as part of a comprehensive incident response plan, should be considered.

**Observation 16:** Shared trauma is a concern for the Uvalde community due to compounding factors, including the size of the community and its interrelatedness. For the hundreds of law enforcement, medical, behavioral health, and government personnel who responded to this incident, shared trauma

can make what happened even more overwhelming. Law enforcement's trauma is also exacerbated by the backlash from the community–as the community's trauma is exacerbated by the lack of an adequate response from law enforcement.

**Recommendation 16.1:** Preparation for an MCI should include a plan for multiagency deployment when an incident impacts a large segment of the community. The plan should include a written agreement (e.g., MOUs, mutual aid agreements, interagency agreements, jurisdictional agreements) that can be operationalized at the time of an event and allow for rapid identification and deployment of responders. If possible, leaders should shift resources to avoid those who will not have the risk of a shared trauma experience.

**Recommendation 16.2:** A multiagency response can also assist in the transfer of services to other victim advocates when personal relationships impede generally accepted practices and when the scope of the trauma overwhelms the local community responders.

**Recommendation 16.3:** As part of disaster preparedness planning, communities—including law enforcement—need to plan for the aftermath of a critical incident. This planning should include generally accepted practice processes, education and training, support, and resources. A trauma-informed, culturally sensitive approach should be applied to the victims, survivors, and impacted community members, as well as responders and their families.

**Observation 17:** The mental health needs assessment conducted in Uvalde by MMHPI was not focused on the MCI that occurred at Robb Elementary School and did not identify all of those in the spheres of influence who may be direct and indirect victims. Based on CIR interviews, there are victims who remain unidentified and do not have the information, resources, and referrals they need to access support services.

**Recommendation 17.1:** Following an MCI, local and government officials should conduct a needs assessment within a specific time frame and in collaboration with the county or state health services authority to capture the needs of the community. In Uvalde, the Texas Office for Victims of Crime or another entity should complete a new, comprehensive mental health needs assessment that addresses the families, victims, responders, and community members of the impacted Uvalde community specifically. The agency performing this needs assessment should conduct extensive outreach efforts to find and attend to the victims and families in Uvalde who require guidance, referrals, and concrete assistance with obtaining funds, medical care, and behavioral health services.

**Recommendation 17.2:** The needs assessment should inform an outreach plan to identify impacted persons who may have been left out of the original assessment.

**Recommendation 17.3:** Post-incident care should ensure that all people in the spheres of influence receive outreach, support, and services either directly or through broad public communications outreach.

**Recommendation 17.4:** A lead community agency should be designated to take on this important activity and coordinate services with other response organizations in Uvalde and across Texas.

AR001079

**Observation 18:** The FAC was established the day after the MCI by the FBI and TXDPS, with assistance from the American Red Cross. The FAC provided access to a robust number and type of services. A process was established to keep the space safe and secure.

**Recommendation 18.1:** An FAC should be established within 24 hours of an incident with a security plan that includes external law enforcement presence and a process for internal vetting of providers and those seeking services.

**Recommendation 18.2:** The FAC should be staffed with a robust number and type of organizations that meet the needs of the community.

**Observation 19:** As victims and families arrived to the FAC, they were met by a victim navigator or law enforcement victim service staff member who accompanied them throughout the process. That initial person became the point of contact for the family as long as that individual was assigned to the FAC.

**Recommendation 19.1:** Victims, families, and community members should be met at the FAC by a professional and be aided throughout the process by a victim navigator or victim service personnel.

**Observation 20:** FAC/FRC leadership never received a complete list of all victims.

**Recommendation 20.1:** An MOU or MOA should be signed between key organizations (such as state law enforcement organizations and the FBI) to allow for the sharing of vital victim information, ensuring that outreach is made to all victims, families, and those affected.

**Observation 21:** Some victims' families reported that they would not use the FAC/FRC created for the Robb Elementary incident due to concerns about the location and confidentiality.

**Recommendation 21.1:** The location for an FAC/FRC needs to be decided based on space, convenience, public transportation accessibility, and privacy, if possible.

**Observation 22:** There was limited housing available to family members, victim service personnel, and other authorities arriving from out of town. In Uvalde, authorities took creative approaches to meet the housing challenges, such as bringing in RVs, using dorms at the local college, and partnering with local ranches.

**Recommendation 22.1:** As part of the pre-planning for an MCI, FAC leadership officials need to consider housing implications. It may be useful to model housing needs based on Uvalde or use local partnerships to reserve room blocks with the goal of having space for families, service providers, and law enforcement coming into the area.

**Observation 23:** Spontaneous, unaffiliated volunteers descended on Uvalde to help. Their presence was overwhelming, unmanageable, and disruptive.

**Recommendation 23.1:** Unaffiliated, unknown, and spontaneous volunteers need to be managed by an agency with experience in identifying needs in the community, managing volunteers, and verifying the credentials or experience of those who come to help but are not affiliated with any known response agency. There is training available to learn how to address this phenomenon.

**Observation 24:** The FBI facility dogs were reported to be a help, especially when working with young victims as they were being interviewed.

**Recommendation 24.1:** Therapy dogs or crisis response dogs that have completed their certification and handler training may be of help in mass violence events, especially when victims include children. Organizations can deploy certified, trained teams of dogs and handlers to support victims.

**Observation 25:** Victims and families experienced a number of challenges with receiving and accessing financial assistance, including redundant forms, eligibility criteria, and fraudulent accounts.

**Recommendation 25.1:** When establishing eligibility for support programs, the "spheres of influence" or other similar models should be factors for eligibility. Eligibility criteria for state compensation programs should be in line with those established by state law and federal rules.

**Recommendation 25.2:** A single form should be used to capture basic contact information, as well as information needed about the victim and the incident. This form should be usable for all applications for financial and other support services, to avoid adding to the burden of the victims and families.

**Recommendation 25.3:** Law enforcement agencies need to be prepared for scammers to establish fraudulent accounts and other criminals to use a tragedy for their personal gain. The FAC should have law enforcement representation to assist families with navigating these situations.

**Recommendation 25.4:** The FAC/FRC, including victim service providers, law enforcement, and other authorities, should proactively work with the families of victims and survivors to set up alerts, freeze credit reports, and quickly identify other criminal and fraudulent activity.

**Recommendation 25.5:** In preparing for long-term needs, the FRC should provide financial literacy and security education and awareness to victims and family members.

**Observation 26:** The FBI VSRT effectively handled the initial cleaning and returning of personal effects to family members. This trauma-informed, victim-centered approach demonstrated compassion and respect during a difficult task.

**Recommendation 26.1:** Law enforcement agencies should develop a trauma-informed, victim-centered process for returning personal effects.

**Observation 27:** The CISD method was used by at least two responding agencies, even though studies have revealed no evidence that one CISD session is useful treatment for the prevention of PTSD after traumatic incidents and have also shown that several aspects of CISD could cause harm.

**Recommendation 27.1:** Responder agencies should use a modified version of CISD, such as SFA, as part of their trauma and support services following an incident.

**Observation 28:** TLEPN was deployed on the day of the shooting for law enforcement officers and their families. TLEPN partnered with CopLine and Endeavors to provide urgent clinical services for responding personnel.

**Recommendation 28.1:** Agencies should include peer support services and resources in their comprehensive support services plan, which may include regional or statewide networks.

**Observation 29:** FBI VSD rapidly deployed a team that took the lead for victim services in the first two weeks. The team received praise from victims, family members, and other service providers. Victim service personnel from TXDPS and the FBI reported that they did not receive enough support from their agencies when the deployment ended.

> **Recommendation 29.1:** Agency leadership needs to support the supporters and ensure that adequate trauma leave is provided to help deployed personnel decompress and return from a traumatic event.

> **Recommendation 29.2:** Responder agencies should provide in-depth trauma and counseling services to staff who provide victim services at an MCI.

> **Recommendation 29.3:** Agency leadership should consider offering or expanding the window for trauma leave to ensure that a deployed member can take the necessary leave and will not be perceived as incapable of future deployments simply because they utilized available resources.

**Observation 30:** Law enforcement victim services personnel were deployed without coverage of their normal victim service duties.

> **Recommendation 30.1:** Agency leaders should ensure there is coverage for the normal duties of deployed personnel so that the deployed individuals can focus on their deployment and take the necessary leave.

**Observation 31:** The mental health needs of the dispatchers exposed to the stress in this incident were unidentified and untreated.

> **Recommendation 31.1:** Dispatchers should be recognized as first responders to a critical incident and screened for services. They should be included in efforts to provide mental health screenings and care as well as peer and other supports post-incident. All agencies should have policies and resources for the well-being of their personnel and families.

> **Recommendation 31.2:** The definition of responders should be expanded, consistent with generally accepted practices, to include disciplines other than law enforcement, fire, and rescue staff, such as dispatchers, EMTs, health care providers, ambulance drivers, behavioral health providers, and faith-based leaders. This should be reflected in all support services provided by resiliency centers, nongovernmental and governmental entities, and other support service providers.

**Observation 32:** Family members of law enforcement and other responders became the support system for the responders and may not be receiving assistance themselves.

> **Recommendation 32.1:** When developing or reviewing trauma support and counseling services, agencies should include spouses, partners, and family members of responders.

**Observation 33:** Responder agencies are not prepared for the long-term impact of the incident.

> **Recommendation 33.1:** Responder agencies should organize and implement a formalized plan that outlines the roles and responsibilities of each stakeholder for the effective management of emotional and trauma support.

**Recommendation 33.2:** Responder agencies should provide initial support services within hours of a critical incident and within 24 hours should provide access to services such as PFA/SFA, crisis counseling, debriefing, and peer support.

**Recommendation 33.3:** Responder leaders can reduce the stigma associated with seeking help for emotional and psychological distress and can promote the importance of self-care through training, education, and effective messaging and modeling.

**Recommendation 33.4:** After a critical incident, responder agencies should evaluate the effectiveness of their emotional and trauma support services. This can be achieved through gathering feedback from responders and their family members and using this information to improve future services and support.

**Observation 34:** FBI victim services personnel transitioned services for victims and families to TXDPS and the Uvalde County District Attorney's Office prior to their departure. However, TXDPS and the District Attorney's Office did not have enough personnel to provide the needed level of care.

**Recommendation 34.1:** A transition plan and a warm, organized handoff should occur whenever law enforcement victim services personnel, or other victim navigators, transition away from the FAC/FRC.

**Recommendation 34.2:** A checklist should be used by the FAC/FRC to ensure that all transitions are conducted in a deliberate and compassionate manner.

**Recommendation 34.3:** Agencies should consider MOUs/MOAs with neighboring or state agencies for assistance providing victim services.

**Observation 35:** Victims require multiple efforts by victim advocates to contact them and to share information about available resources. Months after the shooting at Robb Elementary, victims and family members reportedly did not have active victim compensation applications on file and had little to no information about what medical, mental health, lost wages, or other resources they may be eligible for.

**Recommendation 35.1:** Research on trauma-informed care teaches that some victims will have memory deficits and other cognitive impacts as a result of the brain's response to the trauma. This means that advocates and other support staff need to provide continuous support, follow on, and monitoring to ensure that applications for services and referrals are completed.

**Observation 36:** The City of Uvalde eventually identified another building that was renovated to meet the longer-term needs of the UTRC. This permanent site in town is an inviting and comfortable space to meet with victims, family members, and other community members.

**Recommendation 36.1:** The UTRC should offer more community-based activities with opportunities for victims, family members, and the community to come together, receive services, and share space to help them on their recovery path.

**Recommendation 36.2:** The UTRC should engage with the OVC-funded National Mass Violence Victimization Resource Center Resiliency Center Director Forum network. Connecting with other FRCs can help the UTRC ensure it is meeting the Uvalde community's needs in a trauma-informed, victim-centered approach and appropriate cultural adaptations.

AR001083

**Recommendation 36.3:** The UTRC must develop a plan to ensure all victims, family members, and responders receive outreach and education on its services, crime victim compensation, and resources.

**Observation 37:** Some family members and victims in Uvalde shared that seeking help from mental health professionals is not something that is commonly acceptable to them culturally. They tend to seek informal care and social support as a way of helping themselves and those they care about. This may help some people to adapt and recover, but those who require formal mental health services for a diagnosable mental health concern may not seek services for a long period of time.

**Recommendation 37.1:** The UTRC should plan to sustain this space and its offerings, especially since support services need to be made available for an extended period of time in this community.

**Recommendation 37.2:** Behavioral health services offered in various modalities, such as individual, group, and family therapies, may help people feel more comfortable, as they will be able to choose which modality they prefer.

**Recommendation 37.3:** Evidence-based mental health care is necessary so that victims and family members do not become discouraged by continuing symptoms and a lack of effective treatment.

**Recommendation 37.4:** Training on evidence-based behavioral health supports—including resilience-building activities, cognitive behavioral therapy for disaster distress, peer support for victims of mass violence, writing for recovery, and other supports—should begin as soon as possible so that providers in the community have the knowledge and skills to provide effective mental health treatment.

**Recommendation 37.5:** Efforts to attract professionals who are interested and able to live and work in the Uvalde community also need to begin as soon as possible.

**Recommendation 37.6:** Advocating for the broader use of teletherapy could increase access to competent providers who could serve this highly impacted population.

**Observation 38:** Due to the nature of the deaths, and the young age and the number of victims, funeral arrangements took longer than they normally would. Families had to navigate the process with limited emotional and mental support.

**Recommendation 38.1:** Victim advocates and grief specialists can support victims' families through the funeral arrangement process and help the community determine where to hold activities like candlelight vigils.

**Observation 39:** Media and other onlookers attempted to access the funerals and services for some of the victims.

**Recommendation 39.1:** Law enforcement and other governmental officials need to create a security plan to protect the safety, security, and privacy of those mourning their loved ones during funerals for an MCI.

**Recommendation 39.2:** As part of the planning for a disaster, authorities should assign a public information officer or communications representative who will work with the media in advance of funerals. This role should include setting up a media staging area as well as consulting with families to determine if relatives or friends would like to speak on their behalf.

AR001084

**Observation 40**: Since the day of the incident, informal memorials expressing the grief and sorrow of the entire Uvalde community have been set up at the site of the former school campus and across town. The Healing Uvalde Mural Project, the result of a partnership between a local artist and a nonprofit, organized a creative collaborative memorial across downtown. Artists from across the world came to Uvalde to paint giant portrait murals of the 21 victims fatally wounded on May 24. The Smithsonian National Museum of the American Latino is currently featuring an online virtual exhibit, which allows anyone around the world to view these beautiful and impactful murals.

**Observation 41:** Items left at informal memorials in Uvalde have been moved, removed, or cleared out without proper discussion and planning with the victims and family members.

> **Recommendation 41.1:** Victims and family members need to be involved in the movement of any informal memorials prior to action being taken.

**Observation 42:** As of the end of the review period, there is no known plan for gathering representative community members together to plan a permanent memorial to those killed, injured, and impacted on May 24, 2022.

> **Recommendation 42.1:** The planning for a permanent memorial should include a broad community coalition of advisers, including survivors, family members of victims, school personnel, victim service providers, and other relevant stakeholders.

> **Recommendation 42.2:** The memorial should honor those lost, those injured, and all those directly impacted by the incident.

**Observation 43:** The Uvalde community continues to need support and guidance as it struggles with the negative impacts of the failed response, a lack of accountability for those implicated in this failure, and remaining gaps in the information about what happened to their loved ones.

> **Recommendation 43.1:** The Uvalde community could benefit from long-term support from grief and loss specialists who can help guide the community in rituals, memorial planning, spiritual activities, and social supports as they move through the next few years.

> **Recommendation 43.2:** Community organizers, disaster behavioral health specialists, victim support staff, and those skilled in helping communities repair societal damage and build resilience may be able to help Uvalde get onto a recovery path. This will require strong, compassionate, collaborative, and honest efforts by community leadership.

## Chapter 7. School Safety and Security

**Observation 1:** UCISD PD had jurisdictional authority at the onset of the incident on May 24 as per governing doctrine (i.e., UCISD's EOP and MOU) between UCISD PD and UPD. This MOU, however, is silent on other agencies. Each agency, UPD and UCISD PD, is not only a signatory to the MOU but serves on UCISD's School Safety and Security Committee, which manages updates to the EOP. These documents signal an expectation to both agencies that UCISD PD would take command in an active shooter incident and UPD would respond to requests for assistance and follow the direction of the ICS leader. This comports with the prevailing perception among many officers on the scene that Chief Arredondo was in charge that day.

**Observation 2:** UCISD PD has an MOU establishing jurisdictional responsibilities in place with just one neighboring law enforcement agency, UPD. The majority of agencies on scene on May 24—at the local, state, and federal level—did not have any mutual aid agreements with UCISD PD. This includes agencies which, like UPD, have concurrent jurisdiction with UCISD PD, such as the Uvalde County Sheriff's Office (UCSO), Zavala County Sheriff's Office (ZCSO), and TXDPS.

> **Recommendation 2.1:** School district police departments should enter into MOUs that establish mutually agreed upon clear jurisdictional responsibilities with other neighboring agencies that are likely to respond to a critical incident on school property. The MOUs should account for not only routine criminal activity, but also critical incidents. The MOU should address the issue of unified command, in addition to incident command, and account for the capacity and capabilities of the respective agencies.

**Observation 3:** UCISD's EOP and Active Shooter Policy were considered viable by the Texas School Safety Center and satisfied requirements set forth by TEA. However, the response on May 24 demonstrated that agencies responding to such an incident within UCISD's jurisdiction were not prepared for the large-scale multiagency response resulting from the incident.

> **Recommendation 3.1:** Law enforcement, first responders, emergency management, and other municipal government agencies should coordinate with school districts to conduct multiagency preparedness exercises on at least an annual basis. Exercises should operate in accordance with the state and local regulations regarding active threat exercises. The exercises should be incorporated into the EOPs and Campus Safety Plans.

**Observation 4:** The UCISD School Safety and Security Committee has not had any participation from the UCSO, which is the largest law enforcement agency in the county and had more than a dozen members respond to the active shooter incident at Robb Elementary. Additionally, ZCSO—which had four members respond—does not participate in the committee, despite being the local law enforcement agency for one of UCISD's eight campuses.

> **Recommendation 4.1:** All law enforcement agencies within school districts should participate in safety and security planning. Law enforcement agencies with jurisdiction should assign leaders from within their agencies (either the sheriff or chief deputy sheriff) to participate on the committee. That individual can serve as a liaison between the school district and the sheriffs' offices and help both entities maintain awareness of safety and security concerns that may intersect the two.

> **Recommendation 4.2:** Communities should adopt a multidisciplinary approach to school safety that includes school police, law enforcement, school officials, mental health professionals, and other community stakeholders. It is especially important that all voices in the school community be heard, including faculty, staff, administrators, counselors, nurses, resource officers, parents, and students. Every stakeholder must feel empowered to play a role in reducing fear and raising the level of safety in and around schools. Each campus should establish and train school safety committees that will meet at least monthly for this purpose.

**Observation 5:** UCISD's campus safety teams met infrequently, and annual safety plans were based largely on templated information that was, at times, inaccurate.

**Recommendation 5.1:** School district campus safety teams must be intentional and deliberative in the development of their campus-specific plans and ensure they are reviewed and updated regularly. UCISD should work with campus administrators across the district to institutionalize a set of expectations for these plans that reflects the specific physical and social environments and safety and security needs of each campus.

**Observation 6:** The district Threat Assessment Team has been complacent and in need of strong oversight of its implementation. The new district leadership, including the school police chief, has expressed a stronger commitment to ensure they become fully operational as soon as possible. As of June 8, 2023, the UCISD threat assessment team does not have standard operating procedures and has been noncompliant with Texas Education Code.

**Recommendation 6.1:** School district threat assessment teams must establish a systematic procedure for identifying, assessing, and managing threat assessments under their review.

**Recommendation 6.2:** Threat assessment teams must develop an operations manual that governs and documents their activities, outputs, roles and responsibilities, and coordination across the school district. At minimum, the manual should adhere to standards set forth by oversight bodies. In the case of UCISD, this would be the Texas School Safety Center, as required in the Texas Education Code.

**Observation 7:** Teachers and school staff at UCISD received no training on developmentally appropriate responses to students with behavioral problems, although they were required to document and report immediately to administrators any student whose behavior posed an obvious threat or safety risk.

**Recommendation 7.1:** All school district staff and school district police personnel should receive training on the district's threat assessment processes, including the role of all staff in appropriately identifying and reporting concerning behavior. The training should be interactive and include scenarios and discussion to help trainees practice applying the course content.

**Observation 8:** UCISD had a culture of complacency regarding locked-door policies. Both exterior and interior doors were routinely left unlocked, and there was no enforced system of accountability for these policies. Door audits were conducted, but not done systematically, nor were they documented. On May 24, all of the exterior doors and at least eight interior doors of the West Building, where the incident took place, were unlocked.

**Recommendation 8.1:** School districts should implement a system of door audits that are conducted routinely and systematically, and they should be documented. At UCISD, this responsibility can be assigned to the new safety monitor positions it has recently created. Door audits should be incorporated into school district campus safety plans. All school district staff and school district police personnel should have a shared responsibility to ensure doors are locked, as per policy.

**Observation 9:** The exterior and interior doors require a UCISD staff member or student to expose themselves to a threat to check that a door is locked or to lock a door in the event of a school lockdown.

**Recommendation 9.1:** School districts should invest in upgrading or replacing all doors (or locks) throughout its campuses to remedy this issue, so that doors can be locked from the inside.

AR001087

**Observation 10:** Law enforcement arriving on scene searched for keys to open interior doors for more than 40 minutes. This was partly the cause of the significant delay in entering to eliminate the threat and stop the killing and dying inside classrooms 111 and 112.

> **Recommendation 10.1:** School districts should implement universal access boxes. A universal access box refers to a locked box that contains master keys, located near the entry points of school buildings, that can be accessed by authorized emergency first responders and school district staff.

**Observation 11:** The rollout of the Raptor system caused some confusion in emergency alert procedures and some UCISD staff did not find the training helpful. Some teachers were under the belief that the Raptor system was supplanting the traditional PA system.

> **Recommendation 11.1:** School districts should ensure that emergency alert systems are well-understood by all staff. In the case of UCISD, district leadership should issue a district-wide clarification on the use of PA systems in conjunction with Raptor emergency alerts.

> **Recommendation 11.2:** School districts should offer both standard training and refresher training, as needed, on the use of their emergency alert system, available to all district employees.

**Observation 12:** UCISD Raptor alerts indicate the type of response, but not the type of emergency (e.g., bailout, suspicious person on campus, hail storm). The Raptor emergency alert system enables users to offer more detail, though this feature is rarely used by UCISD staff.

> **Recommendation 12.1:** School districts should implement a policy that requires the type of emergency event to be formally documented in their emergency alert system, so that school administrators can better identify and report trends and the most frequent causes of lockdowns and other emergency response protocols.

**Observation 13:** The poor reception (Wi-Fi and cell) issues at Robb Elementary are well documented. While the Raptor alert was promptly initiated through the system, it was not received by all teachers and staff.

> **Recommendation 13.1:** School districts must ensure that all campus buildings where there is student activity are retrofitted for Wi-Fi communication to ensure that emergency alerts are received in a timely manner.

**Observation 14:** UCISD drills are typically conducted inside classrooms. On May 24, there were several classes outside of their classrooms at the time the incident began.

> **Recommendation 14.1:** Active threat training for students and staff should be expanded to include all areas of the school campus. UCISD should ensure that drills take place in the many settings that teachers and students find themselves in throughout the school year, not just inside the classroom. While the classroom is the most likely location of students in a real-life emergency, they should be prepared to engage in standard response protocols from other locations on campus.

> **Recommendation 14.2:** UCISD should invite other law enforcement agencies to attend, observe, and participate in drills.

**Observation 15:** According to documents provided and reviewed by the CIR team, Robb Elementary School was in compliance with Texas Education Code 37.114 regarding drills during the 2019–2020 school year but not in the 2020–2021 school year. No documents were provided by UCISD for the 2021–2022 school year.

>   **Recommendation 15.1:** Drills should be conducted in accordance with the Texas Education Code 37.114, and proper documentation should be submitted to appropriate UCISD leadership for record-keeping.

**Observation 16:** Lockdown procedures are predicated on a locked door, impenetrable doors and walls, and other physical security that did not exist at Robb Elementary. One teacher at Robb was shot through several walls and many other teachers and students were at risk of the same fate, given the high-powered rifle used in the attack.

>   **Recommendation 16.1:** UCISD must reconsider the preeminence of the lockdown procedure in a dynamic, evolving situation, where the risk of remaining in place may outweigh the risk of finding a way to exit the area, which in the incident at Robb Elementary led to UCISD staff and students running *into* the building to lock down. Teachers, staff, and students must be provided with options for protecting themselves and helping to protect others.

**Observation 17:** At the time the UCISD PD was established, there was no coordination of safety plans with any other city agency, nor was there any citywide coordination of school safety planning. The superintendent did not meet regularly with the school police chief (reportedly they met "from time to time"). Despite reporting directly to the superintendent, the UCISD PD chief was not a member of the district senior leadership team and would only attend the weekly leadership team meetings "as needed," e.g., planning for special events like football games and other activities that would draw large crowds to school facilities. The chief did attend quarterly school safety meetings that were convened by the superintendent.

**Observation 18:** Four years into its existence, the UCISD PD was functioning without any standard operating procedures. A range of UCISD employees, including administrators, faculty, support staff, and police officers, told the CIR team they had no knowledge of, nor had they been informed about, their school police department's policies and procedures. The UCISD PD has recently drafted standard operating procedures.

>   **Recommendation 18.1:** School districts should meticulously consider, plan, and execute if they decide to establish their own police department. Budgeting, hiring practices, training, development of standard operating procedures, and student/community engagement should all be built into the design and execution of a school district police department.

**Observation 19:** The existing UCISD policies and procedures do not include information or guidelines around crisis management, MOUs, threat assessment or emergency response and multi-hazard planning. These topics are instead covered in the UCISD Revised EOP and EOP annexes for Active Shooter and Active Threat, which should not serve as the UCISD PD's standard operating procedures on these issues.

AR001089

**Recommendation 19.1:** The draft version of the UCISD PD policies, procedures, and operational plans should be evaluated to ensure alignment with the highest industry standards, starting with high-risk operations such as response to an active attack and other potential crises that threaten school climate and safety. Professional organizations, including the International Association of Chiefs of Police and National Association of School Resource Officers, offer a range of model policies, toolkits, technical assistance, training, and other resources to inform the policy and operational planning evaluation process.

**Recommendation 19.2:** UCISD PD should undergo an accreditation process that measures compliance against generally accepted standards and practices. Accreditation is a voluntary process administered by state police associations as well as national organizations like the Commission on Accreditation for Law Enforcement Agencies. Many standards require the development of written directives or activities that reflect the agency's policies, procedures, and general orders. The accreditation process enables the review and revision of policies to ensure practices meet current professional criteria for excellence in service, strengthen agency operations, and increase public trust.

**Observation 20:** Some staff reported being unfamiliar with the school police department due to UCISD PD officers' sporadic presence on elementary school campuses. Reportedly, the UCISD PD chief would come at the beginning of the school year to deliver informal training in the event of an active shooter, reminding teachers to lock doors, turn off lights, and hide away from windows. Essentially, the chief would give a briefing to the teachers.

**Recommendation 20.1:** A school police department has the responsibilities of both a law enforcement agency and a member of the school environment, necessitating a heavy burden on the agency and officers to serve in these dual roles. The reconstituted UCISD PD must make intentional efforts to routinely engage with UCISD staff and students at all campuses. Regular engagement can help contribute to a safer learning environment by promoting safety, fostering positive relationships, discouraging misconduct, and improving the perception of law enforcement throughout the school district. The UCISD PD chief and all officers should be evaluated on these efforts.

## Chapter 8. Pre-Incident Planning and Preparation

**Observation 1:** Responding agencies lacked adequate related policies and, in most cases, any policy on responding to active attackers.

**Recommendation 1.1:** Every agency must have a clear and concise policy on responding to active attacker situations.

**Recommendation 1.2:** Agencies should regularly review AARs with other regional agencies to plan as a region for a coordinated and collaborative response to possible similar events.

**Recommendation 1.3:** Agencies should consider obtaining state- or national-level accreditation to adopt and maintain standardized policies and procedures. This process also ensures accountability and transparency that can enhance confidence and trust in law enforcement among the communities they serve.

**Observation 2**: The Uvalde EOC developed an adequate emergency management plan. However, not all the relevant agencies and organizations actively participated in the process, drills, and exercises which ultimately contribute to a failed emergency response on May 24, 2022.

> **Recommendation 2.1**: Appointing authorities and senior officials of local government should develop a resilient emergency management system in which the emergency response plans of their respective units of government and operating departments, e.g., fire, police, sheriff, EMS, public health, public works, school system, planning, and social services, are understood and shared.

> **Recommendation 2.2**: Appointing authorities should direct the professional emergency manager at the highest level of local government to coordinate this system that would also include private sector stakeholders representing public utilities, healthcare providers and leaders responsible for critical infrastructure.

> **Recommendation 2.3**: Government leaders should consider adopting a resolution that demonstrates their commitment to NIMS.

> **Recommendation 2.4**: Senior officials should guide all government, business, and organization leaders (including faith-based and secular nonprofit groups) to coordinate and collaborate with the emergency manager so they can act decisively before, during, and after disasters.

> **Recommendation 2.5**: Senior officials should personally participate in and provide direction for conducting exercises and evaluation programs that enhance familiarity and coordination among the whole community.

> **Recommendation 2.6**: Local governments should conduct outreach to state emergency management agencies and federal entities such as the Homeland Security Exercise and Evaluation Program and the NEP for assistance with exercise resources and training.

> **Recommendation 2.7**: The Office of Emergency Management should identify volunteer groups and local businesses who will consistently play a role in emergency planning and preparedness before, during, and after disasters. Business and industry partners should work through voluntary organizations to support local government in planning, preparing, and providing resources when responding to emergency situations.

> **Recommendation 2.8**: Senior officials should develop a pre-disaster recovery plan that enables them to anticipate what will be needed to restore the community as quickly as possible after an emergency. FEMA offers the Community Recovery Management Toolkit, which provides a three-step process of organizing, planning, and managing recovery.

> **Recommendation 2.9**: Regional public safety partners should plan, train, and exercise unified command for complex incidents. This includes federal, state, and local law enforcement, fire, EMS, and emergency management as well as other governmental and non-governmental agencies that would respond to a critical incident.

> **Recommendation 2.10**: Agencies should hold regular regional interdepartmental interoperability communication drills.

**Recommendation 2.11**: Elected officials should establish a Multi-Agency Coordination (MAC) Group to provide policy guidance to incident personnel and support resource prioritization and allocation. Typically, these groups are made up of government agency or private sector executives and administrators whose organizations are either impacted by, or provide resources to, an incident. MAC Groups enable decision-making among senior officials and executives, and delegate command authority to the incident commander to cooperatively define the response and recovery mission and strategic direction. Additionally, MAC Groups identify operational priorities and communicate those objectives to the Emergency Operations Center and the pertinent functions of the Incident command system and the joint information center.

**Recommendation 2.12**: Elected and senior officials should receive training made available through the FEMA Emergency Management Institute (EMI) that provides a menu of courses designed specifically for senior officials. In addition to independent online study courses in the NIMS, ICS, Unified Command, and other basic emergency management training, EMI offers specialized in-person training for senior officials. The portfolio of courses includes Emergency Management for Senior Officials, NIMS Overview for Senior Officials, and Recovery from Disaster: Local Community Roles. Senior officials should work with their professional emergency manager for specific course recommendations. States may also have specific training programs and offerings.

**Observation 3**: The MOU between UPD and UCISD PD that was active the day of the incident failed to adequately outline the expectations and authorities for a response to a mass violence event. The agencies failed to exercise the MOU, nor cross-train in preparation for a critical incident.

**Recommendation 3.1**: Senior officials should establish mutual aid agreements that set forth terms and conditions under which the parties will agree to provide resources, personnel, facilities, equipment, and supplies to support responses to critical incidents that create an extreme risk to public safety.

**Observation 4:** The Texas Legislature plays a significant role in mandating the types and frequencies of training for peace officers in the state of Texas through TCOLE.

**Recommendation 4.1:** State POSTs and other training entities should work with state legislatures and law enforcement leaders within their state to conduct coordinated routine reviews of mandatory training programs for peace officers within their state to determine what is the appropriate balance of training topics and courses. Mandatory training time/requirements should include training options focused on unique, complex tactical events, such as an active attacker.

**Observation 5:** UPD and UCSO appear to show budgetary and staffing shortages, which prevent training opportunities.

**Recommendation 5.1:** Whenever possible, multiagency training should be offered to lessen the load of any one law enforcement agency. Multiagency training allows for cost- and resource-sharing and, more importantly, allows peace officers to train with other agencies that are typically going to respond jointly to a major incident. Building relationships through training and in advance of a major incident are critical in the successful response to, management of, and resolution of a major incident when one happens.

**Observation 6:** Responding agencies had minimal exposure to ICS/NIMS. Of those serving in top leadership positions within the primary responding agencies, only UCISD PD Chief Arredondo and the TXDPS regional director had taken training in ICS/NIMS.

**Recommendation 6.1:** All law enforcement should be required to take awareness-level NIMS courses, such as ICS-100 and IS-700.

**Recommendation 6.2:** All ranked individuals should be required to take courses and refresher training on ICS/NIMS. These skills should be exercised through an annual multijurisdictional, multidisciplinary tabletop.

**Observation 7:** Responding officers had levels of active shooter training that varied in terms of their length of time and quality, leading to failures in operationalizing the training.

**Recommendation 7.1:** Law enforcement agencies should provide a total of 8 hours of scenario-based, stress-induced active shooter training annually for officers at all levels of ranks in the training.

**Recommendation 7.2:** Law enforcement agencies should work closely with schools and other vulnerable places to understand how occupants are taught to respond to an active attacker threat (e.g., kids were taught to be quiet in a dark room, while some officers reported they were listening for voices and believed the dark classrooms meant they were unoccupied).

**Recommendation 7.3:** Research should be conducted to determine if the response to an active attacker threat should include changing the "normal environment" (e.g., lights off).

**Recommendation 7.4:** TCOLE should consider revising the SBLE training guidebook based on the recommendations in the CIR.

**Recommendation 7.5:** Agencies must include in pre-incident planning timely access to building diagrams and universal building/room access, particularly critical infrastructure, schools, and buildings where large numbers of persons gather on a regular basis.

**Observation 8:** Personnel from responding agencies rarely trained and exercised in a multiagency environment.

**Recommendation 8.1:** Interagency training, drills, and exercises help to build relationships at the front-line officer level and, if attended by law enforcement supervisors, can further strengthen relationships and the efficacy of a multiagency response to a mass casualty incident. Though policies may differ slightly among agencies, overarching commonalities are the same in an active attacker incident.

**Observation 9:** Responder agencies lacked sufficient training in trauma, resiliency, and mental health and wellness.

**Recommendation 9.1:** Agencies should provide preparedness education and training on trauma and stress management to all personnel, including coping strategies for managing stress and trauma during and after a mass casualty incident.

**Recommendation 9.2:** Agencies should develop and maintain a comprehensive crisis response plan to address the mental health needs of their personnel during a mass casualty incident.

**Recommendation 9.3:** Responder organizations should provide pre- and post-response behavioral health support to help mitigate and address the development of compassion fatigue, secondary traumatic stress, and vicarious trauma. This support can include education and training, policies and procedures, and services.

**Recommendation 9.4:** The stigma of seeking mental health and trauma support in the law enforcement community needs to be counteracted by education, training, policies, protocols, and leadership, which create an environment that acknowledges and respects the mental wellness of law enforcement to the same extent as the physical aspects of policing.

**Recommendation 9.5:** It is necessary to tailor the application of services for the diverse types of responders (fire/EMS, law enforcement, victim services, dispatchers, etc.) so that the language used and the examples of the types of symptoms they may experience are more applicable to their unique experiences and roles.

**Observation 10**: The Uvalde school community did not sufficiently prepare and engage in victim-centered disaster, emergency, or mass violence incident planning within their own staff, with law enforcement and other responders, nor with the students, family members, and other caregivers.

**Recommendation 10.1**: Preparedness exercises should include regularly scheduled age- appropriate, trauma-informed drills; prescribed instructions/procedures; and clear communication. All stakeholders (school personnel, law enforcement, parents and guardians, students, and other relevant stakeholders) should be involved in the process and informed to help decrease anxiety and chaos.

**Recommendation 10.2**: Preparedness planning should include considerations for language access for those with English as a second language. Materials, instructions, and communication should be provided in the languages prevalent in the community.

**Observation 11:** Regional PIOs and their managers did not have necessary training for mass casualty incidents from a communications perspective, to include how to establish JIC or coordinate a Joint Information System.

**Recommendation 11.1:** Law enforcement, fire, and any other relevant stakeholder PIOs should obtain FEMA basic and advanced public information officer certifications as a baseline of training.

**Recommendation 11.2:** The FEMA PIO courses should be only a first step in communications training. Agencies should research regional and national training opportunities for building upon the FEMA classes.

**Recommendation 11.3:** Law enforcement PIOs should network at the state and national level (e.g., attend national police conferences that have a PIO section) to learn common practices for managing the public messaging of major incidents and to network with peers in the field.

**Recommendation 11.4:** Concepts learned in basic crisis communication classes must then be adopted into a crisis communication plan that is drilled and practiced with all involved personnel.

**Recommendation 11.5:** Partnering agencies should review their crisis communication plans together to ensure they complement each other. It is critically important that the commitment to coordinating messaging is practiced with smaller events, so it is not a foreign concept when a large-scale incident takes place.

**Recommendation 11.6:** The social media policies of law enforcement agencies should clearly state how social media should be used to communicate with the community during critical incident situations.

**Observation 12:** Regional PIOs did not formally coordinate, cross-train, or practice multiagency communications.

**Recommendation 12.1:** When an agency is hosting operational exercises, it should establish a JIC and engage all participating agencies to ensure coordinated public messaging is practiced and incorporated into planning for a large-scale incident.

**Recommendation 12.2:** Each PIO should draft a crisis communication plan and practice it at least four times a year with smaller events. This will help identify problem areas and solutions and ensure everyone is familiar with the plan and knows their role instead of trying to figure that out during a crisis.

**Recommendation 12.3:** The EOC should host regional PIO meetings every quarter. The meetings should include law enforcement, fire, city and county government, hospitals, public and private schools, universities, airports, military bases, universities, and other large organizations in the area. This creates an opportunity for relationship building, planning for joint operations and large-scale incidents that cross jurisdictional lines, and devising plans to support each other during major events.

**Recommendation 12.4:** After a comprehensive discussion, regional PIO meetings should be opened to the local media. This builds productive working relationships and allows the media and communication professionals to work out issues that arise.

**Observation 13:** On the day of the school shooting at Robb Elementary School, each PIO acted independently and failed to coordinate the public messaging aspect of the response.

**Recommendation 13.1:** When incidents involve multiple agencies, it is critical for the lead organization sending out the public messaging to have previously established a process by planning with the other agencies. On the day of an incident, the lead organization should coordinate with the others to ensure the accurate messaging that the public expects and deserves.

**Recommendation 13.2:** When a mass casualty incident occurs, the lead agency should organize news conferences through the JIC. All supporting agencies should have an opportunity to contribute information about the incident. This ensures a comprehensive release of consistent information.

AR001095

# Appendix D. Leadership, Incident Command, and Coordination Supplemental Materials

The following sections provide further context and information related to "Chapter 3. Leadership, Incident Command, and Coordination."

## Stimuli Throughout the Incident

Table D-1 provides a high-level timeline of the incident, indicating stimulus events, which should have driven the law enforcement response to take steps to immediately stop the killing per active shooter protocols and guidance. The stimulus count starts once law enforcement are on the scene.

Table D-1. Stimulus events throughout the incident

| Stimulus Once Law Enforcement Are Present | True Time | Time from Building Entry by Subject | Time to Entry by Law Enforcement into Rooms 111 and 112 | Event | Source |
|---|---|---|---|---|---|
| | 11:33:02 | 0:00:00 | 1:16:55 | Subject enters the school's west door. | Robb Elementary School CCTV Footage. |
| | 11:33:25 | 0:00:23 | 1:16:32 | Subject fires into room 112, enters the alcove, and backs into the hallway. | Robb Elementary School CCTV Footage. |
| | 11:33:48 | 0:00:46 | 1:16:09 | Subject appears to enter room 111. | Robb Elementary School CCTV Footage. |
| | 11:33:56 | 0:00:54 | 1:16:01 | Firing continues inside the classrooms. | Robb Elementary School CCTV Footage. |
| | 11:33:57 | 0:00:55 | 1:16:00 | Sounds of gunfire go from rapid fire to single action. Shooting continues sporadically until 11:34:31. | Robb Elementary School CCTV Footage. |

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix D. Leadership, Incident Command, and Coordination Supplemental Materials

486

AR001096

| Stimulus Once Law Enforcement Are Present | True Time | Time from Building Entry by Subject | Time to Entry by Law Enforcement into Rooms 111 and 112 | Event | Source |
|---|---|---|---|---|---|
| | 11:34:31 | 0:01:29 | 1:15:26 | Shooting temporarily stops. | Robb Elementary School CCTV Footage. |
| | 11:34:43 | 0:01:41 | 1:15:14 | One shot fired. | Robb Elementary School CCTV Footage. |
| | 11:35:07 | 0:02:05 | 1:14:50 | Shooting resumes until 11:35:27. | Robb Elementary School CCTV Footage. |
| | 11:35:18 | 0:02:16 | 1:14:39 | Unknown person runs from light-colored truck parked by the funeral home toward school and disappears near the west door (LEO #1). | Hillcrest Memorial Funeral Home Footage. |
| | 11:35:27 | 0:02:25 | 1:14:30 | Firing stops. Approx. 30 rounds fired since 11:35:07. | Robb Elementary School CCTV Footage. |
| | 11:35:27 | 0:02:25 | 1:14:30 | UPD Lt. 1 runs toward school and disappears by west door (LEO #2). | Hillcrest Memorial Funeral Home Footage. |
| | 11:35:33 | 0:02:31 | 1:14:24 | LEO runs toward school and disappears outside west door (LEO #3). | Hillcrest Memorial Funeral Home Footage. |
| 1 | 11:35:39 | 0:02:37 | 1:14:18 | Subject resumes shooting; continues until 11:35:47. | Robb Elementary School CCTV Footage; Uvalde Police Department Body-Worn Camera Footage. |
| | 11:35:40 | 0:02:38 | 1:14:17 | LEOs (#4 and #5) run toward school and disappear near west door. | Hillcrest Memorial Funeral Home Footage. |

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix D. Leadership, Incident Command, and Coordination Supplemental Materials 487

AR001097

| Stimulus Once Law Enforcement Are Present | True Time | Time from Building Entry by Subject | Time to Entry by Law Enforcement into Rooms 111 and 112 | Event | Source |
|---|---|---|---|---|---|
| | 11:35:42 | 0:02:40 | 1:14:15 | "Shots fired! Get inside! Go, go, go!" UPD Sgt. 1 hears the shots from outside. He directs UPD Sgt. 3 and UCISD PD Ofc. 2 to enter the building. They are outside the south door and enter during subject's active shooting. | Uvalde Police Department Body-Worn Camera Footage. |
| | 11:35:45 | 0:02:43 | 1:14:12 | LEO #6 runs toward school and west door. | Hillcrest Memorial Funeral Home Footage. |
| | 11:35:47 | 0:02:45 | 1:14:10 | Shooting stops temporarily. Approx. eleven rounds fired between 11:35:39 and 11:35:47. | Robb Elementary School CCTV Footage. |
| | 11:35:48 | 0:02:46 | 1:14:09 | UPD Sgt. 3 and UCISD PD Ofc. 2 enter the south hallway door. | Robb Elementary School CCTV Footage; Uvalde Police Department Body-Worn Camera Footage. |
| | 11:35:51 | 0:02:49 | 1:14:06 | LEO #7 runs toward school's west door. | Robb Elementary School CCTV Footage. |
| 2 | 11:35:54 | 0:02:52 | 1:14:03 | Shooting resumes with last round heard at 11:36:08. | Robb Elementary School CCTV Footage. |
| | 11:35:54 | 0:02:52 | 1:14:03 | Three officers race down the hallway from the north toward the active shooting in classrooms 111 and 112. Smoke from gun powder is in the air. | Robb Elementary School CCTV Footage. |

| Stimulus Once Law Enforcement Are Present | True Time | Time from Building Entry by Subject | Time to Entry by Law Enforcement into Rooms 111 and 112 | Event | Source |
|---|---|---|---|---|---|
| | 11:35:58 | 0:02:56 | 1:13:59 | UCISD PD Chief Arredondo enters the south hallway. | Robb Elementary School CCTV Footage; Uvalde Police Department Body Worn Camera Footage. |
| | 11:36:08 | 0:03:06 | 1:13:49 | Shooting stops. Approx. 17 rounds fired between 11:35:54 and 11:36:08. | Robb Elementary School CCTV Footage. |
| | 11:36:09 | 0:03:07 | 1:13:48 | UPD Sgt. 1 enters south hallway with Chief Arredondo in front of him approaching rooms 111 and 112. | Uvalde Police Department Body-Worn Camera Footage. |
| 3 | 11:36:58 | 0:03:56 | 1:12:59 | UPD Lt. 1 and UPD Sgt. grazed as four shots fired by the subject. Shooting continues for several seconds. | Robb Elementary School CCTV Footage; Uvalde Police Department Body-Worn Camera Footage. |
| 4 | 11:37:09 | 0:04:07 | 1:12:48 | Four shots end at 11:37:17. | Uvalde Police Department Body-Worn Camera Footage. |
| 5 | 11:37:50 | 0:04:48 | 1:12:07 | Three rounds fired. UPD Lt. 1 composes himself and goes back down the hallway. | Robb Elementary School CCTV Footage. |
| 6 | 11:38:37 | 0:05:35 | 1:11:20 | Subject fires possibly one round. UPD Lt. 1 is at the fire doors at this time. | Robb Elementary School CCTV Footage. |

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix D. Leadership, Incident Command, and Coordination Supplemental Materials          489

AR001099

| Stimulus Once Law Enforcement Are Present | True Time | Time from Building Entry by Subject | Time to Entry by Law Enforcement into Rooms 111 and 112 | Event | Source |
|---|---|---|---|---|---|
| 7 | 11:44:02 | 0:11:00 | 1:05:55 | Single shot fired. | Uvalde Police Department Body-Worn Camera Footage; Uvalde County Sheriff's Office Body-Worn Camera Footage; Uvalde County Sheriff's Office Body-Worn Camera Footage. |
| 8 | 11:56:54 | 0:23:52 | 0:53:03 | UCISD Ofc. 1 remarks to Constable Field that his wife has been shot. | Uvalde Police Department Body-Worn Camera Footage. |
| 9 | 12:13:48 | 0:40:46 | 0:36:09 | UPD Acting Chief Pargas says "A child just called. They have victims in there. Called 911." | Uvalde Police Department Body-Worn Camera Footage. |
| 10 | 12:21:07 | 0:48:05 | 0:28:50 | Shots fired four times. | Numerous BWC, Uvalde Police Department Radio Traffic; Uvalde Police Department 911 calls. |
|  | 12:49:57 | 1:16:55 | 0:00:00 | Law enforcement enters classrooms 111/112. |  |

## Rescue Task Force

A rescue task force (RTF) is designed to expedite access to medical care of victims in active shooter or human-made mass casualty incidents. The RTF is made up of emergency medical services (EMS) trained personnel supported by law enforcement officers who serve as protection. The RTF is generally deployed into a warm zone. The roles of the team members are extremely specific, with medical team

members quickly evaluating, treating, stabilizing, and removing injured victims to either a casualty collection point (CCP) or triage area. Law enforcement personnel within an RTF are tasked with protecting the medical providers and victims.

A CCP is generally located within a warm zone and is under force protection by law enforcement personnel. Based on the physical layout of the scene and preparation time, a CCP may not be the best system for rapid treatment and transportation of victims. In certain situations, victims should be moved directly from the initial location to either triage and treatment or an ambulance for transportation.

The assessment team noted that while emergency medical technicians from U.S. Customs and Border Protection set up a CCP near the classrooms, the extensive delay in rescue and treatment allowed time for a more comprehensive medical plan. This plan should have included an RTF that followed the entry team into the classroom and then established and coordinated a triage treatment area for immediate evacuation of victims. The triage area should have been staffed by advanced life support personnel, with mobile and air ambulances staged immediately adjacent. What the critical incident review team observed from video and learned through interviews, however, was an entry that did not take into consideration the assessment and treatment of victims. Dozens of law enforcement personnel—without purpose, need, or a plan—rushed into the classrooms behind the entry team and began removing victims to the hallway or outside the building.

The RTF model provides a planned, organized, and rapid response to treating the casualties resulting from an active shooter or similar mass casualty incident. The agencies in the region should adopt the model, training as a multiagency/multidisciplinary group to better respond to a critical incident. Equipment should include ballistic vests and helmets.

## Zones

### Hot Zone

The most dangerous zone of care within the tactical medicine environment, where active weapon use and shooting are present, is known as the "hot" or "red zone." This zone poses the highest risk to life, and limited care should be provided in this environment. An environment with active weapons use is not safe for anyone, regardless of firepower, protection, or training. In an area of active shooting, further injury or death is possible. Only the quickest and most necessary life-saving treatments should be employed to limit caregiver and patient risk.[1292] The emphasis in this zone is on threat suppression, preventing further casualties, extracting casualties from the high-threat area, and implementing control of life-threatening extremity hemorrhage.[1293]

---

[1292] Goldstein et al., *EMS Zones of Care*.

[1293] Pennardt and Schwartz, "Hot, Warm, and Cold Zones."

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix D. Leadership, Incident Command, and Coordination Supplemental Materials                 491

AR001101

## Warm Zone

The "warm zone" is where tactical field care takes place. This zone is less dangerous than the hot zone but still not completely safe. This zone is dynamic in nature and depends on the location of the threat, the mobility of the threat, and the mobility of the patient. In tactical medicine, the warm zone is where most of the care for injured patients is accomplished. Care can vary depending on the equipment available, the location of local hospitals, and the expertise of personnel.[1294] Warm zone care includes the other life-saving interventions associated with applying the MARCH algorithm (massive hemorrhage, airway, respiration, circulation, and hypothermia) in the tactical environment. CCPs and RTFs are typically employed within the warm zone.[1295]

## Cold Zone

Finally, the "cold zone" is the area where no significant threat is reasonably anticipated and additional medical/transport resources may be staged.[1296] Basic emergency management services can be performed in this location. The zone is outside of the immediate danger area, and transportation is generally available.[1297]

## Redefined Zones

The Hartford Consensus identified that the traditional hot, warm, and cold zones in an active shooter or intentional mass casualty event need to be compressed, following the military model to allow for a more rapid response from law enforcement and fire/EMS[1298] (see figure D-1 on page 493).

---

[1294] Goldstein et al., *EMS Zones of Care*.

[1295] Pennardt and Schwartz, "Hot, Warm, and Cold Zones."

[1296] Pennardt and Schwartz, "Hot, Warm, and Cold Zones."

[1297] Goldstein et al., *EMS Zones of Care.*

[1298] *Strategies to Enhance Survival*.

## Figure D-1. Improving survival from an active shooter*





Goldstein et al., *EMS Zones of Care.*

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix D. Leadership, Incident Command, and Coordination Supplemental Materials 493

AR001103

# Appendix E. Public Communications Supplemental Materials

The following sections provide further context and information related to "Chapter 5. Public Communications During and Following the Crisis."

## Public Media Campaign Examples

The development of a public awareness campaign is an excellent approach to ensuring that outreach extends to all individuals who are impacted by an event. Although these two examples are from larger cities, these campaigns can be developed with a lower budget and designed for use on a smartphone, via social media.

Figure E-1. Examples of commercials addressing the general public, youth, responders, older adults, and parents



Critical Incident Review: Active Shooter at Robb Elementary School | Appendix E. Public Communications Supplemental Materials

494

AR001104

## New York 9/11 Project Liberty Media Campaign

To this day, one of the most successful post-disaster public media campaigns was launched in the aftermath of 9/11 by the New York state mental health response program, Project Liberty. The state's Office of Mental Health launched a $5 million public education campaign using television commercials (see figures E-1 on page 494 and E-2 on page 496), ads in train stations and bus shelters, billboards, radio, print and other traditional as well as electronic media. Social media did not exist in the formats or the extent to which it does today. But the lessons learned from this and later mass violence and terrorist incidents still apply:[1299]

- "Responding effectively requires an expansion of focus to the entire population. . . . The first step in doing so, was to use a broad Public Health approach to education in our media campaign."

- Outreach plans must focus on the general population, not just those individuals who present themselves for formal treatment.

- Public education materials need to incorporate normal psychological reactions to trauma and effective strategies for processing trauma.

- Public media creators should receive broad-based training in mental health interventions that are community-based, preventive, and restorative.

- Public media should foster the view that mental health is primary rather than secondary to mental illness, encouraging a wellness model that emphasizes personal and community resilience.

- A greater public health focus brings many other potential opportunities beyond disaster mental health preparedness, such as advancing an overall prevention agenda and further normalizing and reducing the stigma of mental health service.

## The Boston Marathon Campaign

The Boston Marathon has historically received local, national, and international news coverage. Due to the unprecedented nature of the 2013 bombing incident, it received extensive media airtime, and videos of the actual bombing—full of graphic images of severely injured runners, spectators, and rescue and recovery staff—were repeatedly televised and shared on social media continuously for weeks. Much of this news coverage contravened social rules of privacy and even many journalists' own recommendations for coverage of traumatic events.[1300] This intense and extensive exposure exacerbated the behavioral health risks and concerns for those both directly and indirectly involved in the disaster.[1301]

---

[1299] Naturale, "Outreach Strategies: An Experiential Description."

[1300] Dart Center, "Resources for Covering Mass Shootings."

[1301] Hopwood and Schutte, "Psychological Outcomes in Reaction."

**Figure E-2. Bus and subway campaigns featured real-life stories from New Yorkers who called the disaster hotline**







Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix E. Public Communications Supplemental Materials                                    496

AR001106

In response in 2015, the Massachusetts Office for Victim Assistance (MOVA) subsequently created a large-scale media and communications plan to provide outreach, information, and education to the overall community—everyone affected by their exposure to the event (see figure E-3).[1302] The campaign's goal was to provide messages of support, hope, recovery, and resiliency and to raise awareness of the long-term impacts of violence on families, first responders, and children. For many, learning that some of their symptoms were common and even expected in a post-disaster environment and being reassured that their symptoms would likely decrease over time was an effective behavioral health support.[1303] MOVA's television ads also encouraged people to call the organization for questions and help. In 2019, AskMOVA rebranded to expand the range of services to cover various types of crimes beyond mass violence.[1304]

**Figure E-3. MOVA television commercials featuring bombing victims and their families**







Source: Used with permission from the Massachusetts Office for Victim Assistance

---

[1302] CIR Fact Finding.

[1303] Naturale, et al., "Lessons Learned from the Boston Marathon Bombing."

[1304] CIR Fact Finding. For more information, visit www.mass.gov/askmova.

## Social Media Coverage

Media and public communication stories are driven by the situation, as well as the prevalence of interest from the public, and social media is one way to track that. Social media is also one tool to track community sentiment and the reach of the story. Starting on May 26, Twitter posts using the word "Uvalde" peaked at 133,535 tweets and then dropped by 42 percent in 48 hours.[1305] The San Antonio Express-News collected 10,000 to 18,000 tweets about Uvalde nearly every hour between May 26 to July 5, with approximately one million messages in the end (see figure E-4).[1306]

Figure E-4. Uvalde-related tweets collected by the Express-News



Source: San Antonio Express-News/ZUMA Press

---

[1305] Seline, "So Long 'Thoughts and Prayers.'"

[1306] Seline, "So Long 'Thoughts and Prayers.'"

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix E. Public Communications Supplemental Materials

498

AR001108

The most cited person was Texas Governor Greg Abbott at 9,002 tweets, followed by Uvalde native and actor Matthew McConaughy (7,564) and Uvalde Consolidated Independent School District Police Department Chief Pete Arredondo (7,099).[1307] The three most common two-word phrases in order of use were "Uvalde police," "school shooting," and "Uvalde Texas" (see figure E-5), and the top hashtag was #uvalde (see figure E-6 on page 500).[1308]

World leaders—including those from New Zealand, China, Ukraine, Mexico, the United Kingdom, and Canada—commented and expressed condolences via social media or their home news organizations.[1309]

Figure E-5. Top two-word phrases used in Uvalde-related tweets over time between late May and mid-July 2022



Graph: Libby Seline, Source: Twitter

Source: San Antonio Express-News/ZUMA Press

---

[1307] Seline, "So Long 'Thoughts and Prayers.'"

[1308] Seline, "So Long 'Thoughts and Prayers.'"

[1309] Treisman and Alex Leff, "How World Leaders Are Reacting to the Uvalde School Shooting."

**Figure E-6. Top hashtags used in Uvalde-related tweets over time between late May and mid-July 2022**



Source: San Antonio Express-News/ZUMA Press

## How Public Communications Impact Outcomes from Traumatic Experiences

A traumatic experience is one that creates a risk of serious injury or death to a person, or to someone they love.[1310] Exposure to the event can inflict psychological harm in varying degrees. The threat and one's proximity to the threat, or even the perception of such a threat, increase the risk of developing a diagnosable mental health condition such as depression, anxiety, or post-traumatic stress disorder (PTSD). This risk is based on other variables that are unique to each victim, including their past trauma history, current mental health concerns, social and economic status, language proficiency, and cultural and ethnic influences. While most people will recover from traumatic events in a reasonable time frame with good coping and social supports, a small but significant percentage of people will go on to develop a diagnosable mental illness as a result of the experience.[1311]

---

[1310] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition*.

[1311] Norris et al., "60,000 Disaster Victims Speak: Part I."

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix E. Public Communications Supplemental Materials

500

AR001110

In incidents that are caused by humans with intent to harm, such as mass violence and terrorism, the percentage of those at higher risk of developing a mental illness (20 percent) is twice that of natural disasters or accidents (10 percent).[1312] Additional variables influence whether those impacted actually go on to develop a diagnosable mental illness or recover from their acute stress reactions in a reasonable amount of time. In a large-scale event such as the mass casualty incident at Robb Elementary School, 20 percent of the affected population—as many as 3,000 people–could be at elevated risk of developing a mental illness such as PTSD, depression, or other anxiety disorders.

Mental illness can interrupt a person's ability to engage in a healthy way with others, complete school, succeed at work, have relationships, or be a productive member of the community. While many people who have a mental illness can function well with proper treatment, the rate of unemployment is higher among U.S. adults who have mental illness (7.4 percent) compared to those who do not (4.6 percent).[1313] Of those who are in the public mental health system, almost 80 percent are unemployed.[1314] Additionally, people experiencing the traumatic stress of a mass violence incident can experience more health-related illnesses, such as cardiac problems, immunodeficiency illnesses, and obesity.

Early interventions provided after traumatic events can help mitigate the development of these problems, but many factors inhibit disaster victims, survivors, family members, and responders from receiving the types of services from which they might benefit. Typically, most people do not see themselves in need of mental health services, even in the aftermath of a disaster, emergency, or mass violence event when they are experiencing acute stress and distress. For many people, the stigma surrounding those with mental health concerns and the perception that seeking mental health treatment is a sign of weakness prevent them from identifying themselves as someone in need of or accepting help. Cultural and religious beliefs can also inhibit help seeking, and some lack confidence in health and mental health service providers.

With effective messaging that encourages and normalizes accessing diverse types of support services after a mass violence event, those impacted may be more likely to seek help. Television, radio, and print ads showing everyday people struggling and reaching out for services have been effective in previous mass violence events.[1315] Public awareness and marketing campaigns should be funded as part of a disaster response program. Moreover, planning should include consideration of needs over the long term, which at minimum is considered a three- to five-year period. The negative emotional impacts of mass violence can remain with victims throughout their lives. For many, it takes years to realize that their distress is a result of their exposure to the event, thus it is not unusual for victims to seek services many years after an incident. Communities can help victims understand that reaching out for help months or years later is common and that these disaster-specific supports can help.

---

[1312] Norris et al., "60,000 Disaster Victims Speak: Part I."

[1313] NAMI, "Mental Health By the Numbers."

[1314] NAMI, "Employment and Mental Illness."

[1315] Naturale, "Outreach Strategies: An Experiential Description;" Naturale et al., "Lessons Learned from the Boston Marathon Bombing."

Another way to combat the stigma is to refrain from referring to recovery and resilience activities as "mental health services." Most interventions related to distress experienced after a disaster or mass violence incident are not traditional mental health treatments.

## Psychoeducation

Psychoeducation is an evidence-based therapeutic intervention for victims and their loved ones that provides information and support to help those individuals better understand and cope with traumatic events. Psychoeducation was originally used in the early 1980s to work with patients who had a serious illness, along with their families, but today it is more commonly used to work with anyone experiencing acute stress or distress as a result of a traumatic event.[1316]

Psychoeducation is a recommended intervention offered to victims and family members to help them identify the core, most common distress symptoms they may be at risk of experiencing as a result of a traumatic experience (along with other risk factors) and what they can do to reduce distressing symptoms and mitigate the development of a mental illness as a result. These symptoms can occur in any or all of five domains, often overlapping:

- Physical (heart racing, headaches, stomachaches, exhaustion, sleep problems)

- Behavioral (irritability, shaking, impulsivity)

- Emotional (anger, depressive-like signs such as crying and numbness)

- Cognitive (inability to focus, poor decision-making, poor judgement)

- Spiritual (angry at God, questioning one's faith, loss of a sense of meaning)

The focus is on helping people understand that in the aftermath of a traumatic event (and possibly for an extended period of time, often past the first-year marker of an event), these reactions and symptoms are common, expected, usually short-lived, and can be decreased more quickly with good coping and social supports. Of consideration, too, are external impacts that can increase or decrease distress, such as the economic status of the individual, family, and community; expectations and support or lack thereof (trauma-informed public communications are considered a positive social support that can help in the healing process); social structures, such as racism and inequality; as well as geographic and community-capacity concerns, especially in rural areas and some segments of cities where fewer resources of any kind exist.

---

[1316] New York State Psychiatric Institute, "Patient and Family Library."

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix E. Public Communications Supplemental Materials

502

AR001112

Psychoeducation teaches problem-solving and communication skills and provides education and resources in an empathetic and supportive environment. Psychoeducation can also mean teaching victims and family members specific coping skills that they can use to manage their symptoms (e.g., rest, breathing, and meditation exercises; mild physical exercise like walking and stretching; eating healthy; being with social supports who understand and accept how you feel; reaching out and asking for help). When developing coping skills, victims and family members are more likely to use these skills successfully if they understand why the skills might be helpful and how they work. Results from more than 30 studies indicate that psychoeducation improves well-being, lowers rates of reoccurring symptoms, and improves recovery.[1317] Research in post-disaster situations informs us that victims and family members who have experienced a traumatic event can see a statistically significant decrease in distress symptoms when they are provided with psychoeducational information. Being informed about which acute stress reactions to expect, patterns of recovery, potentially activating events and timelines, and helpful interventions for stress reduction, coping, and self-care can have the effect of decreasing anxiety.[1318]

There were no best practice–based victim/family forums or informational sessions offered to the Robb Elementary victims and family members in the immediate aftermath of the event. Families were not provided details about what happened in the last hour of their loved ones' lives. Nor was any informational meeting arranged that provided psychoeducational information about distress reactions, grief, activating events, coping, or recovery to family members and other victims. Additionally, many responders reported that they were not offered any operational or stress reaction debriefings that could have provided psychoeducation and coping information to help them in their recovery process.

Family and victim forums that are focused on providing psychoeducation regarding what to expect in terms of physical, behavioral, emotional, cognitive, and spiritual impacts; anticipation of activating events and timelines; social supports and good coping vs. negative coping; victim services; and resources and lessons learned from previous events and from peers have become best practices in the aftermath of mass violence events. Holding these events and having victim advocates in attendance with resource and referral information can help victims and family members be informed and feel cared for and cared about in a way that can support their recovery.

---

[1317] Vreeland, "An Evidence-Based Practice of Psychoeducation for Schizophrenia."

[1318] Hamblen et al., "Cognitive Behavioral Therapy for Postdisaster Distress."

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix E. Public Communications Supplemental Materials

503

AR001113

# Appendix F. Trauma and Support Services Supplemental Materials

The following sections provide further context and information related to "Chapter 6. Trauma and Support Services."

## A Shift in Disaster Mental Health Response

The Oklahoma City Bombing in 1995 was one of the first incidents of mass violence for which a formalized mental health response was launched. In that incident, one of the lessons learned was that not only were the negative mental health impacts felt by victims and family members, but that the effects on responders were also severe. This was found to be related to the expansiveness of the physical destruction, which covered a 16-block radius; the overwhelming numbers of those killed (168) and injured (680); and the responders' exposure to the gruesome deaths of 19 very young children and babies. The impact was so emotionally devastating that the American Red Cross provided counseling to support the Oklahoma City first responders 10 years after the event.[1319]

Six years after the Oklahoma City bombing, the largest U.S. disaster mental health response—which included a multimillion-dollar public communications campaign to promote recovery—would be launched in New York after the 9/11 terrorist attacks.[1320] More than 4,800 crisis counselors spent close to 3 years providing individual, group, and community counseling, psychoeducation, and support services to millions of adults and children, including victims and family members of those killed, the injured, those who escaped but experienced the threat of death in the attacks, responders, and their family members. Most notably, the entire nation was affected by excessive exposure to this violence for years. The exposure came via print media, visual images, and the distressing emotional cries of victims and witnesses repeatedly played on television newscasts and social media platforms. In addition to the event itself, this level of exposure negatively impacted our sense of safety as a nation. For many people, their perspective on their place in the world, as well as their previous sense of meaning and the decisions they made about how to live their lives going forward, was changed significantly. See the "Public Media Campaign Examples" in "Appendix E. Public Communications Supplemental Materials" for more on this public awareness campaign.

The program evaluations from those impacted by mass violence, terrorism, and other community violence/crimes have taught us valuable lessons. We understand the need to mitigate the development of mental health problems in the aftermath of these events. We know that we must attend to

---

[1319] OVC, "Antiterrorism and Emergency Assistance Program (AEAP);" Pfefferbaum et al., "Disaster Mental Health Services Following the 1995 Oklahoma City Bombing."

[1320] Draper, McCleery, and Schaedle, "Mental Health Services Support in Response to September 11th."

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

504

AR001114

responders and their families in addition to victims and victims' family members.[1321] Helping those exposed to such disasters understand that they can access crisis counseling, learn good coping skills, reach out to social supports, and access their innate strengths to build their resilience can decrease the number of people who go on to develop a mental illness as a result of their exposure to traumatic events and their aftermath. The goal is to return affected individuals and communities to their pre-disaster level of functioning or achieve a sufficient level of adaptation, so they can get back to their lives and back to doing the things they would normally do—working, participating in family and community events, and having moments of joy again.[1322] This is why attention to behavioral health (i.e., mental health and substance use) service delivery matters. It matters to people directly impacted and their families; it matters to those indirectly affected, such as responders and their families; and it matters to the community at large. Crisis intervention and other mental health supports can help mitigate severe emotional distress or the development of a mental illness and allow people to remain productive members of their communities.

While national attention to these incidents usually lasts only until the next event is picked up by the press and public media, for the victims of mass violence events, the experience typically lasts for the rest of their lives. Survivors report that they do not believe in the concept of closure, as they never forget the person they lost and will live with the impact of losing the loved one for the rest of their lives. And as we have learned from mass violence events, the negative mental health impacts of these traumas can be passed on generationally.[1323] Thus, the long-term needs of those who are impacted by incidents of mass violence are becoming a focus of the field, and there is a need for lessons learned as well as formal research on interventions for these populations.

## High-Risk Populations Identified in the Literature

The literature shows that exposure to a disaster is the single most important predictor of adverse emotional outcomes. This group includes people:

- Experiencing bereavement (most predictive of PTSD)

- Who sustained an injury or have an injured family member (most predictive of PTSD)

- Whose lives were threatened (most predictive of PTSD)

- Who experienced panic, horror, or feared for their lives

- Who experienced separation from family

---

[1321] Salston and Figley, "Secondary Traumatic Stress Effects of Working with Survivors of Criminal Victimization."

[1322] Hobfoll et al., "Five Essential Elements of Immediate and Mid-Term Mass Trauma Intervention;" Norris et al., "Toward Understanding and Creating Systems of Postdisaster Care."

[1323] Danieli, Norris, and Engdahl, "Multigenerational Legacies of Trauma;" Danieli et al., "The Danieli Inventory of Multigenerational Legacies of Trauma, Part I;" Healing Collective Trauma, "What Is Collective Trauma?"

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

505

AR001115

- Who experienced an extensive loss of property as a result of the incident/disaster

- Who were relocated or displaced because of the incident/disaster

- Who were responders having experienced a threat to their own lives, risking their lives to help others, suffering from injuries, and witnessing injury to others

Additional factors that contribute to adverse emotional effects post-disaster include:

- **Neighborhood/Community-Level Exposure**: This translates to those in the immediate and nearby communities. In this case of a school shooting incident, this would include those exposed to the alleged perpetrator, those who experienced lockdown, those whose family members/children were at some time, or who would generally have been at the school that day.

- **Gender**: Disasters affect women and girls more adversely than men or boys. Mothers are particularly at risk for substantial distress.

- **Age and Experience**: Middle-aged adults are more adversely affected than other adult age groups. Children can be more negatively affected than adults depending on their developmental level and ability to understand what is happening around them, how their carers respond, and the level of exposure to the event both directly and indirectly.

- **Ethnicity**: Minorities are at greater risk if more severely exposed and/or if beliefs impede help-seeking behavior.

- **Language and Accessibility**: Community members in the United States who do not speak English or for whom English is not their first language are at higher risk for mental health distress especially if language translation is not accessible in the form of a translator or trusted advocates who can act on their behalf.

- **Socioeconomic Status (SES)**: Lower SES has been associated with more significant post-disaster distress.[1324]

- **Family Functioning**: Husbands' and wives' partners and significant others' responses affect each other. Marital stress increases after disasters.

  - Parental status can add to post-disaster stress (e.g., single parents can struggle to manage alone; informal guardians worry about being able to access health and mental health care for children they parent without legal status to do so; multiple parents in the form of stepparents and other loved ones may disagree on parenting issues causing conflict and distress for each other and the children).

  - Children are sensitive to familial disaster distress and conflict: Parental responses are the best predictor for children's responses.

---

[1324] Norris, Friedman, and Watson, "60,000 Disaster Victims Speak: Part II;" Norris et al., "60,000 Disaster Victims Speak: Part I;" Kaniasty and Norris, "In Search of Altruistic Community: Patterns of Social Support Mobilization following Hurricane Hugo."

- ***Pre-Disaster Functioning***: People with higher pre-disaster psychological symptoms are more strongly affected by disasters. A "neurotic" personality increases the likelihood of post-disaster distress.

- ***Psychological Resources***: The following can increase resilience and decrease adverse mental health outcomes:

  - Coping skills

  - Beliefs about capabilities to cope

  - Self-efficacy, proficiency, perceived control, self-esteem, hope, and optimism

  - Received and perceived social support-perception of help

- ***Resource Deterioration***: The more significant the resource loss, the greater the psychological distress. Resources include loss of facilities such as school buildings and the ability for the community to hold classes, refueling stations and the availability of gasoline for car, truck and bus uses, grocery stores and food distribution centers, office space and the availability of the workforce in the impacted area.

- ***Environmental Factors***: The ecological perspective tells us that after traumatic incidents, every aspect of a survivor's environment (familial, social, economic, cultural, educational, physical, intellectual, geographic, spiritual) has the potential to have a strong impact on whether a person develops chronic PTSD or other major mental illnesses such as depression and anxiety. Two of the strongest predictive factors are previous life stress and social support from others.[1325] The most recent research done with trauma survivors of individual trauma (e.g., assault, motor vehicle accidents) has consistently shown that the absence of social support impedes recovery.[1326] Further, negative support reactions such as critical comments about the length of time taken for recovery, from family members in particular, seem to stand in the way of recovery among trauma victims in treatment for PTSD. In disaster studies, the survivor's social network size, vitality, and closeness are also strongly and consistently related to positive mental health outcomes. Disaster survivors who believe that they are cared for by others and that help will be available if needed fare better psychologically than disaster survivors who believe they are unloved and alone.[1327]

---

[1325] Dunmore, Clark, and Ehlers, "A Prospective Investigation of the Role of Cognitive Factors;" Filipas and Ullman, "Social Reactions to Sexual Assault Victims ;" Zoellner, Foa, and Brigidi, "Interpersonal Friction and PTSD in Female Victims of Sexual and Nonsexual Assault*."*

[1326] Zoellner et al., "Changes in Negative Beliefs following Three Brief Programs."

[1327] Zoellner et al., "Changes in Negative Beliefs following Three Brief Programs."

## Unique Challenges in Addressing Behavioral Health Concerns for Various Responders

There can be differences between fire/emergency medical services (EMS) departments and law enforcement agencies in providing psychological support services, especially after a mass casualty event. While the members of both fire/EMS departments and law enforcement agencies may suffer with trauma and stress from such events, their experiences can be different due to the nature of their work.

Firefighters and EMS providers may face trauma from the physical demands of responding to a mass casualty event. They may also experience stress from the emotional toll of responding to such events, working long hours, and being away from their families for extended periods.

Law enforcement officers may face trauma from the risks involved in responding to a mass casualty event, such as the potential for violence or exposure to hazardous materials. They may also experience stress from managing crowds, securing the scene, performing rescues, and interacting with victims and their families. In the situation at Robb Elementary, law enforcement also faced additional trauma due to the backlash in the community once information about the length of time for the response to the active shooter became known.

Law enforcement behavioral health needs will be related to the different trauma cues, while fire/EMS behavioral health needs will be based on their inability to go in and help, along with the waiting.[1328] This also applies along the responder continuum, which includes hospital staff as well. Thus, it is necessary to tailor the application of services so that the language used and the examples provided of the types of symptoms they may experience are applicable to their unique experiences and roles.[1329]

As a result of these differences, agencies and departments may have different approaches to providing psychological support services after a mass casualty event. Irrespective of the industry, leaders of responder agencies need to recognize the importance of supporting their personnel's mental health and well-being in the aftermath of such events.

Fire/EMS organizations have historically focused on prevention and preparedness, while law enforcement agencies have focused more on response and enforcement. This historical context may contribute to a different approach to stress management and officer wellness. One expert says 95 percent of fire departments across the country have an embedded peer support program.[1330]

---

[1328] CIR Fact Finding.

[1329] Watson and Westphal, *Stress First Aid for Health Care Workers.*

[1330] CIR Fact Finding.

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

508

AR001118

## Law Enforcement

There are approximately 18,000 law enforcement agencies in the United States, according to the most recent estimate from the Bureau of Justice Statistics.[1331] These agencies include federal, state, local, and tribal law enforcement agencies. Law enforcement agencies are primarily regulated at the state and local level, with each state and local jurisdiction setting its standards and requirements for hiring, training, and certification of law enforcement officers. Although there are no national standards, national guidelines for psychological wellness after a traumatic event are available to law enforcement in the United States.

The Office of Community Oriented Policing Services, in conjunction with St. Petersburg College, developed guidelines for law enforcement agencies to address the mental health needs of their personnel after critical incidents. The guidelines include recommendations for establishing a department-wide crisis response plan, training officers and supervisors on trauma and stress management, and making counseling services available to all personnel.[1332]

Additionally, the International Association of Chiefs of Police (IACP) developed a model policy on officer wellness, which includes recommendations for addressing the mental health needs of officers after a traumatic event. The policy recommends that departments provide access to confidential counseling services, establish peer support programs, and provide education and training on mental health and wellness.[1333]

Furthermore, the Federal Bureau of Investigation (FBI) has developed the National Center for the Analysis of Violent Crime (NCAVC), which supports law enforcement agencies in the aftermath of critical incidents. The NCAVC offers numerous services, including crisis intervention and psychological support for law enforcement personnel.[1334]

## Fire Departments

On the fire side, the National Fire Protection Association (NFPA) Standard on Fire Department Occupational Safety, Health, and Wellness Program specifies the minimum requirements for an occupational safety and health program for fire departments and EMS. The standard addresses critical incident stress management and member wellness, along with other areas.[1335]

---

[1331] Banks et al., "National Sources of Law Enforcement Employment Data."

[1332] Sewell, *Guide for Developing an Effective Stress Management Policy for Law Enforcement*.

[1333] IACP, *Critical Incident Stress Management*.

[1334] FBI, "Investigative Programs Critical Incident Response Group: National Center for the Analysis of Violent Crime."

[1335] *NFPA 1500TM: Standard on Fire Department Occupational Safety, Health, and Wellness Program*.

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

509

AR001119

The National Volunteer Fire Council (NVFC) is an association representing the interests of volunteer fire, EMS, and rescue services.[1336] The NVFC's Share the Load Program assists individuals seeking help for behavioral health issues, such as anxiety, depression, burnout, and post-traumatic stress disorder. Additionally, the program assists departments looking to implement or enhance a behavioral health program.[1337]

A recent study looked at the differences in psychiatric symptoms and barriers to mental health care between volunteer and career firefighters. Volunteer firefighters generally reported elevated psychiatric symptoms, including depression, post-traumatic stress, and suicide plans and attempts, whereas career firefighters reported elevated levels of problematic alcohol use.[1338] Greater structural barriers to mental health care (e.g., cost and availability of resources) may explain the increased levels of psychiatric symptom observed among volunteer firefighters, which is one of the reasons the study recommended that organizational differences should be considered.[1339] It should be noted that Uvalde's only fire department is a volunteer fire department.

## Hospitals

Most hospitals, according to the Center for Disease Control and Prevention, offer workplace wellness programs:

- 83 percent of hospitals in the United States provide workplace wellness programs, compared to 46 percent of all employers.

- 63 percent of hospitals offer health screenings, also known as biometrics, compared to 27 percent of all employers.

- 31 percent of hospitals provide health coaches, compared to 5 percent of all employers.

- 56 percent of hospitals have stress-management programs, compared to 20 percent of all employers.[1340]

---

[1336] National Volunteer Fire Council, "Home: NVFC."

[1337] National Volunteer Fire Council, "Share the Load Program."

[1338] Stanley et al., "Differences in Psychiatric Symptoms and Barriers to Mental Health Care."

[1339] Stanley et al., "Differences in Psychiatric Symptoms and Barriers to Mental Health Care."

[1340] CDC, "Hospital Employees' Health."

## EMS

The 2020 National EMS Assessment determined that only six states and three U.S. territories recommend health and wellness programs for their EMS professionals. However, in 37 states EMS professionals have access to a critical incident stress management (CISM) resource. The differences lie in the fact that health and wellness programs tend to derive from specific issues addressed by government occupational health and safety agencies, while CISM resources are more regionalized.[1341]

The Texas EMS Alliance has an EMS Peer Referral Program provided by the Texas Health and Human Services Commission.[1342]

## Texas First Responders

In September 2017, the Texas Legislature established the Work Group on Mental Health Access for First Responders.[1343] The study, which surveyed Texas police, sheriffs, paid and volunteer firefighters, dispatch/communications, and emergency medical technician (EMT) departments, showed that most paid firefighters (83 percent), paramedics (74 percent), police (66 percent), and EMTs (53 percent) had a formal employee assistance program (EAP) within their departments. Conversely, half of volunteer fire (55 percent), sheriffs' (55 percent), and dispatch/communications (50 percent) departments did not have an EAP. The size of the departments had an impact on whether there was a formal EAP; 78 percent of large departments (>100) had a program, compared to only 42 percent of small departments (<99). There was also a large geographic and demographic discrepancy; only 30 percent of the surveyed first responders in rural departments (<25,000 population) had access to EAPs that addressed mental health needs, compared to 66 percent in urban departments.[1344]

There was an additional disparity by profession in how EAPs were promoted within the first responder departments. When comparing professions, police officers, paid firefighters, and paramedics were more often made aware of their EAP via different avenues (e.g., writing, orientation, newsletter, supervisor), whereas EMTs, staff of sheriffs' departments, volunteer firefighters, and dispatch/communications personnel were least likely to be made aware of their EAP.[1345]

The study concluded that there was a lack of information about mental health resources available and accessible to first responders, especially in smaller departments and rural and frontier areas of the state.[1346]

---

[1341] NASEMSO, "NASEMSO Releases 2020 National EMS Assessment."

[1342] Texas EMS Alliance, "Peer Assistance."

[1343] HB 1774, Relating to actions and liability associated with certain insurance claims, Texas State Legislature, Legislative Session 85(R).

[1344] *Report on Mental Health Access for First Responders*.

[1345] *Report on Mental Health Access for First Responders*.

[1346] *Report on Mental Health Access for First Responders*.

## Establishing and Maintaining a Responder Support Services Program

Table F-1 provides an overview of key best practices to consider when establishing and maintaining a law enforcement support services and counseling program. However, it is important to adapt and customize these practices based on the specific needs and resources of an agency, as well as any local regulations or guidelines.[1347]

Table F-1. Best practices for establishing and maintaining a law enforcement support services and counseling program

| Best Practice | Description |
|---|---|
| Recruiting, Hiring, and Screening for Mental Wellness | Mental wellness starts in the beginning and should be ingrained in all phases of the selection process for new hires. |
| Training Academy Resiliency and Self-Care | Training in wellness, stress management, and resiliency should be part of all academy/basic training curricula. |
| In-Service Training on Mental Wellness | In-service training is another opportunity to train and reinforce the concepts of mental wellness; the agency's trauma services resources, including suicide prevention; and resiliency/self-care. |
| Supervisors Training as Front-Line Mental Health First Aid | First-line supervisors should be trained in the signs of trauma/stress, ensuring officer health and wellness during challenging times. |
| Early Warning System | An early warning system can identify officers who may be having problems, including with mental health, and provide appropriate counseling or training. |
| Chaplaincy Program | A chaplaincy program can provide emotional, moral, and spiritual support to officers, staff, and families. |
| Psychological Counseling Program | Agency leaders should provide personnel with internal or external psychological counseling. |
| Employee Assistance Program | An EAP can assist all sworn and civilian employees in resolving problems affecting their job performance or personal life. |
| Spousal Support, Healthy Families, or Family Day | Agencies should involve the families of agency personnel with communal activities and support. |
| Leadership Support | Agency leadership should actively support the program, promote its importance, and encourage officers to seek support when needed. Leaders should also lead by example and prioritize their own mental health and well-being. |
| Creating a Culture of Openness and Support | Agencies should create a culture in which officers feel comfortable seeking help for mental health issues. This can be done by providing regular training on mental health awareness, promoting a stigma-free environment, and making it easy for officers to access counseling services. |
| Offering Counseling Services | Agencies should offer a variety of counseling services to meet the needs of their officers. This could include individual counseling, group counseling, family counseling, and crisis intervention services. |

---

[1347] Adapted from COPS Office, "Law Enforcement Mental Health and Wellness (LEMHWA) Program Resources."

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

512

AR001122

| Best Practice | Description |
|---|---|
| **Making Counseling Services Accessible** | Agencies should make counseling services accessible to their officers. This could include offering services during work hours, providing transportation to appointments, and waiving copays. |
| **Confidentiality** | Confidentiality should be protected at all times. Agencies should have clear policies in place regarding confidentiality, and counselors should be trained on how to protect information. Information shared by law enforcement personnel should be treated with strict confidentiality, emphasizing that their privacy will be protected unless there is a risk of harm to themselves or others. |
| **Peer Support Program and Training** | Agencies should provide comprehensive training to peer supporters, focusing on active listening, effective communication, crisis intervention, and recognizing signs of stress, trauma, or mental health issues. |
| **Providing Peer Support** | Peer support can be an effective way for officers to connect with others who understand what they are going through. |
| **Training on Stress Management and Coping Skills** | This training can help officers to manage the stress of their job and to develop healthy coping mechanisms. |
| **Well-Being Initiatives** | Agencies should implement well-being initiatives such as stress management programs, mindfulness training, physical fitness activities, and access to mental health resources. |
| **Referral and Resource Network** | Agencies should establish a network of mental health professionals, counselors, and support services that officers can access for professional help when needed. |
| **Evaluation and Improvement** | Agencies should continuously evaluate the effectiveness of the program through feedback from participants, monitor outcomes, and make necessary improvements to better meet the needs of law enforcement personnel. |

## Trauma Services and Survivor Support Additional Resources

### Trauma Notifications

- Death Notification Policy Center (requires IACP membership) provides guidelines for notifying next of kin of the death of a family member. [IACP] https://www.theiacp.org/resources/policy-center-resource/death-notification

- Death Notification Template is included in the *Law Enforcement-Based Victim Services— Template Package II: Next Steps* and is intended to provide sample language and content to help assess, develop, and refine program and professional victim service standards. [IACP] https://www.theiacp.org/sites/default/files/2023-10/TemplatePackageII.pdf

- We Regret To Inform You . . . is an online training for law enforcement on conducting trauma notifications. [FBI and Pennsylvania State University] https://www.deathnotification.psu.edu/

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

513

AR001123

## Resiliency Resources

- Community-Police Engagement: How Law Enforcement Parents Can Talk to Their Children About Current Events provides considerations for parents in law enforcement. [IACP] https://www.theiacp.org/sites/default/files/243807_IACP_OSW_CPE_Talk_to_Children_3%20(1).pdf

- Mental Wellness, Resiliency, and Suicide Prevention Information for Family and Friends of Law Enforcement outlines warning signs, immediate risks, and where to get help. [COPS Office and IACP] https://www.theiacp.org/sites/default/files/2020-03/Officer%20Suicide%20Prev.%20Brochure.pdf

- Officer Safety and Wellness Resources web page includes a collection of resources, trainings, and other publications focusing on officer and family wellness. [U.S. Department of Justice (DOJ)] https://www.justice.gov/asg/officer-safety-and-wellness-resources

- Resilience Strategies for Your Role project page includes resources on resilience strategies. [IACP] https://www.theiacp.org/resources/resilience-strategies-for-your-role

- Supporting Law Enforcement Families in Understanding Trauma is designed to help family and friends of law enforcement identify potential effects of trauma in their loved ones and inform them on how to respond. [Bureau of Justice Assistance (BJA) and IACP] https://www.theiacp.org/sites/default/files/256944_IACP_21_SupportingFamilies_508c_0.pdf

- VALOR Officer Safety App promotes mental and physical preparation to help law enforcement keep safety and wellness at the forefront. [BJA and IACP] https://www.valorforblue.org/VALOR-App

- The Vicarious Trauma Toolkit includes tools and resources tailored specifically to various audiences that provide the knowledge and skills necessary for organizations to address the vicarious trauma needs of their staff. [Office for Victims of Crime (OVC)] https://ovc.ojp.gov/program/vtt/introduction

## Suicide Prevention and Intervention

- 988 Suicide & Crisis Lifeline provides 24/7, free, and confidential support for people in distress; prevention and crisis resources; and best practices for professionals in the United States. https://988lifeline.org/

- Comprehensive Framework for Law Enforcement Suicide Prevention is a central resource for law enforcement agencies to use in implementing strategic, holistic, and intentional suicide prevention strategies across the continuum of prevention and intervention and after a suicide loss. [IACP, BJA, Education Development Center, and National Action Alliance for Suicide Prevention] https://www.theiacp.org/sites/default/files/2020-11/_NOSI_Framework_Final%20%28002%29.pdf

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

514

AR001124

- Messaging About Suicide Prevention in Law Enforcement focuses on the importance of safe messaging and provides information for leadership to use to help promote and support suicide prevention efforts. [IACP]
https://www.theiacp.org/sites/default/files/2021-04/244736_IACP_NOSI_Messaging_p7.pdf

- Preventing Suicide Among Officers highlights resources available from BJA. [BJA]
https://www.bja.ojp.gov/program/law-enforcement-officer-safety-and-wellness/preventing-suicide-among-officers

## Victim Compensation

- Help for Victims web page covers victim compensation and assistance by state. [OVC]
https://ovc.ojp.gov/help-for-victims/help-in-your-state

- Law Enforcement's Role in Victim Compensation project page includes training videos and resources to help law enforcement provide a critical connection between the justice system and victim support services. [IACP]
https://www.theiacp.org/LE-Role-in-Victim-Compensation

- National Association of Crime Victim Compensation Boards provides contact information for each state. [National Association of Crime Victim Compensation Boards]
https://nacvcb.org/state-information/

- National Compassion Fund website provides a single, trusted way for the public to give directly to victims of mass casualty crimes. [National Compassion Fund]
https://nationalcompassion.org/

## Victims and Loved Ones Tools and Resources

- Coping Tips for Traumatic Events and Disasters web page provides coping strategies, including preparation, self-care, and identifying support systems. [Substance Abuse and Mental Health Services Administration (SAMHSA)]
https://www.samhsa.gov/find-help/disaster-distress-helpline/coping-tips

- Coping With Anger Disaster Technical Assistance Center web page provides tips for self-help and boosting resilience. [SAMHSA]
https://www.samhsa.gov/dtac/disaster-survivors/coping-anger-after-disaster

- Crisis Counseling web page provides access to immediate help. [National Mass Violence Victimization Resource Center (NMVVRC)]
https://nmvvrc.org/survivors/get-help-now/#tab1

- Help for Victims of Terrorism and Mass Violence web page covers victim helplines, compensation, and assistance by state. [OVC]
https://ovc.ojp.gov/help-for-victims/terrorism-and-mass-violence

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials
515

AR001125

- <u>Legal Assistance</u> web page covers agencies and organizations that provide legal assistance. [NMVVRC]
  https://nmvvrc.org/survivors/get-help-now/#tab3

- <u>Resources and Support for the Victims in Uvalde, Texas</u> web page includes resources available to help victim service providers, educators, law enforcement, first responders, and community and faith leaders responding to this tragedy. [OVC]
  https://ovc.ojp.gov/resources-and-support-victims-uvalde-texas#r4dere

- <u>Resources To Help Youth Cope After a Mass Shooting</u> includes a list of resources to help youth, families, educators, and community members cope with and talk about community trauma, as well as provide psychological first aid. [Youth.gov]
  https://youth.gov/feature-article/resources-help-youth-cope-after-mass-shooting

- <u>Restoring a Sense of Safety in the Aftermath of a Shooting: Tips for Parents and Professionals</u> offers parents, caregivers, and professionals guidance for restoring a sense of safety after a mass shooting. [The National Child Traumatic Stress Network (NCTSN)]
  https://www.nctsn.org/resources/restoring-sense-safety-aftermath-shooting-tips-parents-and-professionals

- <u>Self-Help</u> web page provides information about the path of recovery and ways to begin the healing process or help a child or someone close to you. [NMVVRC]
  https://nmvvrc.org/survivors/self-help/

- <u>Suggestions for Parents—Mass Violence Incidents</u> provides information on talking to your children about mass violence incidents. [NMVVRC]
  https://nmvvrc.org/media/0f4p4efn/tipsheet18.pdf

- <u>Taking Care of Your Emotional Health After a Disaster</u> provides information on how to recognize current feelings and tips for taking care of the emotional health of yourself, your family, and your friends. [American Red Cross]
  https://www.redcross.org/content/dam/redcross/atg/PDF_s/Preparedness___Disaster_Recovery/General_Preparedness___Recovery/Emotional/Recovering_Emotionally_-_Large_Print.pdf

- <u>Talking to Children About the Shooting</u> provides information on how to talk to children about mass shootings. [NCTSN]
  https://www.nctsn.org/resources/talking-children-about-shooting

- <u>Tips for Retaining Staff After a Disaster</u> is a resource for facility executives to consider when trying to retain and care for staff after a disaster or mass casualty incident. [Technical Resources, Assistance Center, and Information Exchange]
  https://files.asprtracie.hhs.gov/documents/tips-for-retaining-and-caring-for-staff-after-disaster.pdf

- <u>Tips for Survivors: Coping With Anger after a Disaster or Traumatic Event</u> contains information about anger, the grieving process, and what happens when the process is interrupted and complicated or traumatic grief occurs. [SAMHSA]
  https://store.samhsa.gov/sites/default/files/d7/priv/pep19-01-01-002_0.pdf

- Tips for Survivors: Coping With Grief After a Disaster or Traumatic Event contains information about grief, the grieving process, and what happens when the process is interrupted and complicated or traumatic grief occurs. [SAMHSA] https://store.samhsa.gov/sites/default/files/d7/priv/sma17-5035.pdf

- Tips for Survivors of a Disaster or Other Traumatic Event: Managing Stress explores stress management techniques for survivors of disasters and other traumatic events by explaining reactions individuals may experience and providing tips for building resilience. [SAMHSA] https://store.samhsa.gov/sites/default/files/d7/priv/sma13-4776.pdf

- Twelve Self-Help Tips for Coping in the Aftermath of Mass Violence Incidents is a brief tip sheet that offers practical things that can be done to help reduce the distress created by mass violence incidents. [NMVVRC] https://nmvvrc.org/media/rucl1xdd/twelve-self-help-tips-for-coping-general.pdf

- Resources for the Victims of Recent Mass Violence Incidents web page highlights resources for communities impacted by mass shootings. [OVC] https://ovc.ojp.gov/news/announcements/view-resources-victims-recent-mass-violence-incidents

## Law Enforcement Tools and Resources

- 16 Best Practices for an effective response to criminal mass violence and domestic terrorism incidents provide a framework for planning and preparation. [OVC] https://icptta.com/16-best-practices/

- Don't Name Them campaign is focused on shifting the media focus from the subjects who commit these acts to the victims, survivors, and heroes who stop them. [Advanced Law Enforcement Rapid Response Training, I Love U Guys Foundation, and FBI] https://www.dontnamethem.org/

- Employee Mental Health and Wellness document is intended to provide agencies with items for consideration when developing their policies related to employee mental health and wellness, including providing all personnel with access to mental health services and addressing the management of stress resulting from exposure to traumatic incidents. [IACP] https://www.theiacp.org/sites/default/files/2020-05/Employee%20Mental%20Health%2005-06-2020.pdf

- Identifying and Securing Funding for Victim Response Efforts outlines funding options for law enforcement-based services. [COPS Office and IACP] https://cops.usdoj.gov/RIC/Publications/cops-w0991-pub.pdf

- Law Enforcement Mental Health and Wellness Act Program Resources web page includes resources for law enforcement agencies addressing the mental health and well-being of their employees, including the report to Congress and case studies. [COPS Office] https://cops.usdoj.gov/lemhwaresources

- Mass Fatality Incident Family Assistance Operations Recommended Strategies for Local and State Agencies provides an overview of the components of the family assistance process and family assistance center operations as they relate to transportation and criminal incidents. [FBI and National Transportation Safety Board] https://nmvvrc.org/media/tw5lw23j/mass-fatality-incident-family-assistance-operations.pdf

- Mass Violence Advisory Initiative (MVAI) provides peer-to-peer assistance to law enforcement leaders following a mass violence event to maximize the safety and wellness of officers, other first responders, and the community. [BJA and IACP] https://www.theiacp.org/projects/mass-violence-advisory-initiative

- MVAI Considerations for Law Enforcement Leaders provides a list of recommendations that law enforcement leaders should consider to best support their agencies and communities if they are impacted by tragedy. [BJA and IACP] https://www.theiacp.org/sites/default/files/MVAI/ MVAI%20Considerations%20for%20LE%20Leaders%20Booklet.pdf

- MVAI Library of Resources is a searchable database of resources related to preparation, response, and recovery efforts for mass violence and mass casualty events. [BJA and IACP] https://www.myiacp.org/apex/MVAIresource

- Officer Safety and Wellness Resources web page includes a collection of resources, trainings, and other publications focusing on officer and family wellness. [DOJ] https://www.justice.gov/asg/officer-safety-and-wellness-resources

- Psychological First Aid Manual assists people in the immediate aftermath of disasters and terrorism to reduce initial distress and foster short- and long-term adaptive functioning. [U.S. Department of Veterans Affairs (VA)] https://www.ptsd.va.gov/professional/treat/type/psych_firstaid_manual.asp

- Response to Victims of Crime provides a model policy, a concepts and issue paper, and key points for consideration. [IACP] https://www.theiacp.org/sites/default/files/2020-07/ Victims%20of%20Crime%20FULL%20-%2007282020.pdf

- 10 Essential Actions To Improve School Safety identifies 10 essential things schools, school districts, and law enforcement agencies can do to mitigate and prevent school violence, as well as to facilitate swift and essential law enforcement assistance when it is necessary. [COPS Office] https://cops.usdoj.gov/RIC/Publications/cops-w0891-pub.pdf

- The Role of Police Executives in Assisting Victims of Mass Violence: Lessons From the Field discusses the immediate aftermath and post-event recovery efforts. [Police Executive Research Forum] https://www.policeforum.org/assets/AssistingVictimsMassViolence.pdf

Critical Incident Review: Active Shooter at Robb Elementary School | Appendix F. Trauma and Support Services Supplemental Materials

518

AR001128

## Other First and Second Responders Tools and Resources

- Active Shooter Incidents in Health Care Settings web page provides national and state resources for hospitals and health care facilities. [American Hospital Association] https://www.aha.org/hospitals-against-violence/active-shooter-incidents-health-care-settings

- Best Practices in Behavioral Wellness for Emergency Responders provides information on emotional intelligence, resilience, and other behavioral wellness. [International Fire Chiefs Association] https://www.iafc.org/about-iafc/sections/vcos/vcos-resource-detail/vcos-yellow-ribbon-report-update

- Emergency Responders: Tips for Taking Care of Yourself gives important steps responders can take to ensure they are able to do their jobs and cope with challenging situations. [Centers for Disease Control and Prevention (CDC)] https://emergency.cdc.gov/coping/responders.asp

- EMS Safety Practices outlines creating a safety culture within an EMS department. [Federal Emergency Management Agency (FEMA)] https://www.usfa.fema.gov/downloads/pdf/publications/ems-safety-practices.pdf

- Fire Service Behavioral Health Management Guide covers clinical support, peer support, firefighters, and leadership. [National Fallen Firefighters Foundation] https://www.firstrespondercenter.org/wp-content/uploads/2020/09/behavioral-health-mgmt-guide-122017.pdf

- First Responders and Disaster Responders Resource Portal describes signs of stress and stress management, including additional resources and online trainings. [SAMHSA] https://www.samhsa.gov/dtac/disaster-responders

- Mass Violence web page covers resources for health care emergency facilities. [Administration for Strategic Preparedness and Response (ASPR)] https://asprtracie.hhs.gov/mass-violence

- Mass Casualty Trauma Triage Paradigms and Pitfalls provides lessons learned and practices for EMS medical directors, EMS system planners, and hospital emergency planners on responding to mass casualty events. [ASPR] https://files.asprtracie.hhs.gov/documents/aspr-tracie-mass-casualty-triage-final-508.pdf

- Operational Templates and Guidance for EMS Mass Incident Deployment helps EMS prepare and develop response policies for mass care incidents. [FEMA] https://www.usfa.fema.gov/downloads/pdf/publications/templates_guidance_ems_mass_incident_deployment.pdf

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

519

AR001129

- Responder Peer Support web page discusses issues faced by responders and peer support resources. [SAMHSA]
https://www.samhsa.gov/dtac/disaster-responders/peer-support

- School and Workplace Violence web page covers resources for active shooter incidents, including in recovery. [U.S. Department of Homeland Security]
https://www.dhs.gov/school-and-workplace-violence

## Schools and Campuses Tools and Resources

- Active Shooter Situations: After an Active Shooter Incident web page discusses reunification and other recovery aspects. [Readiness and Emergency Management for Schools Technical Assistance Center]
https://rems.ed.gov/IHEAfterAnActiveShooter.aspx

- Best Practice Considerations for Armed Assailant Drills in Schools provides guidance on the crucial factors that schools must take into account when considering and conducting armed assailant drills. [National Association of School Psychologists (NASP), National Association of School Resource Officers, and Safe and Sound Schools]
https://www.nasponline.org/resources-and-publications/resources-and-podcasts/school-safety-and-crisis/systems-level-prevention/best-practice-considerations-for-armed-assailant-drills-in-schools

- Mitigating Psychological Effects of Lockdowns provides best practice guidelines for lockdowns. [NASP]
https://www.nasponline.org/resources-and-publications/resources-and-podcasts/school-safety-and-crisis/systems-level-prevention/mitigating-psychological-effects-of-lockdowns

- The NASSP Principal Recovery Network Guide to Recovery is a collection of best practices and practical advice from principals and assistant principals who led schools in recovery after a shooting. [National Association of Secondary School Principals]
https://www.nassp.org/wp-content/uploads/2022/08/PRN-Guide-FINAL.pdf

- School Violence Resources web page outlines resources for educators and administrators who support students and families in coping with bullying and school violence. [NASP]
https://www.nasponline.org/resources-and-publications/resources-and-podcasts/school-safety-and-crisis/school-violence-resources

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

520

AR001130

- Teacher Guidelines for Helping Students After Mass Violence offers teachers guidance on helping students after a mass violence event. [NCTSN]
https://www.nctsn.org/resources/teacher-guidelines-helping-students-after-mass-violence

- Tip Lines for School Safety describes the prevalence of tip lines, types of schools that are more likely to use tip lines, ways in which tip lines are designed and implemented, challenges of operating tip lines, and perceived effectiveness of tip lines. [RTI International]
https://www.theiacp.org/sites/default/files/MVAI/Library%20of%20Resources/Tip%20Lines%20for%20School%20Safety.pdf

## Government Leadership Tools and Resources

- Mass Shooting Protocol and Playbook discusses planning and responding to mass violence incidents from a city leadership perspective. [International City/County Management Association (ICMA)]
https://icma.org/documents/mass-shooting-protocol-and-playbook-tabletop-exercise

- Mass Shootings in American Cities: Mayors' Experiences and Lessons Learned captures key points from cities that have experienced mass shootings in recent years. [COPS Office and U.S. Conference of Mayors]
https://cops.usdoj.gov/RIC/Publications/cops-w0968-pub.pdf

- Robb Elementary School Shootings Response and Recovery Resources highlights relevant resources in both English and Spanish. [Uniformed University Services Center for the Study of Traumatic Stress]
https://www.cstsonline.org/resources/resource-master-list/robb-elementary-school-shootings-response-and-recovery-resources

## Victim Assistance Professionals Tools and Resources

- After the Death Notification: 10 Guidelines for Assisting Victims and Survivors of Mass Violence focuses on steps that victim assistance professionals can take after the initial death notification has been delivered. [NMVVRC]
https://www.nmvvrc.org/media/fmcb5jxo/tipsheet10.pdf

- Attorney General Guidelines for Victim and Witness Assistance, 2022 Edition establishes guidelines to be followed by officers and employees of DOJ investigative, prosecutorial, correctional, and parole components in the treatment of victims of and witnesses to crime. [DOJ]
https://ovc.ojp.gov/library/publications/attorney-general-guidelines-victim-and-witness-assistance-2022-edition

- Disaster Technical Assistance Center Supplemental Research Bulletin—Disaster Behavioral Health Interventions Inventory provides an inventory of current intervention options. [SAMHSA]
https://www.samhsa.gov/sites/default/files/dtac-disaster-behavioral-health-interventions-inventory.pdf

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

521

AR001131

- Managing the Finances and Volunteers web page provides resources for organizing and managing volunteers and victim compensation. [NMVVRC] https://nmvvrc.org/community-leaders/rebuild-your-community/managing-the-finances-and-volunteers/

- Mass Violence Initiative Core Compendium includes 26 modules that feature written and audiovisual resources, as well as intensive training strategies, to increase knowledge and build professional and practical skills. [NMVVRC] https://nmvvrc.org/learn/mvi-core-compendium/

- Organizing Support for Victims and Survivors web page provides resources for family assistance centers, how community leaders can support victims and survivors, victim liaisons, and a matrix for providing support. [NMVVRC] https://nmvvrc.org/community-leaders/rebuild-your-community/organizing-support-for-victims-and-survivors/

- Planning and Implementation Guide for Comprehensive, Coordinated Victim Assistance for Mass Violence Incident Trials helps prosecutors, victim services and mental/behavioral health providers, and allied professionals plan for high-profile trials with a focus on victims' and survivors' needs, and effective and coordinate strategies to meet them. [NMVVRC] https://nmvvrc.org/community-leaders/rebuild-your-community/court-planning-guide/

- Planning How To Cope With Commemorations, Special Events, and Timeframes That Activate Trauma Memories describes the signs and risk factors for managing commemorative events, holidays, and other special time frames that may bring distressing memories and reactions from a traumatic event. [OVC] https://cdnsm5-ss8.sharpschool.com/UserFiles/Servers/Server_733753/Image/Mass_Violence_Commemorations_Special_Events_Quick_Tips_Final_508c_09292020%20(002).pdf

- Prepare Your Community toolkit contains information and tools for victim assistance professionals, as well as local, state, and federal government officials, that can be used to prepare communities for mass violence incidents. [OVC and NMVVRC] https://nmvvrc.org/community-leaders/prepare-your-community/

- Psychological Impact of the Recent Shooting describes issues that may be helpful to consider after violence occurs. [NCTSN] https://www.nctsn.org/resources/psychological-impact-recent-shooting

- Responding to a Mass Violence Incident: Developing a Personal "Go Kit" and Victim Assistance Agency/Organization "Go Kit" provide suggestions for victim assistance professionals who may be deployed to a mass violence incident. [NMVVRC] https://nmvvrc.org/media/ix5aamse/individual-go-kit-checklist-for-vaps.pdf; https://nmvvrc.org/media/hdnh0cnu/victim-assistance-agency-go-kit-checklist.pdf

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

522

AR001132

- Victim List Template allows a community to quickly start to build a database of all victims in an incident. [OVC]
https://www.myiacp.org/MVAIResourcedetails?id=a4G3s0000009FAEEA2

- Victim Service Professionals web page includes resources and tools for readiness, response, resilience, and recommended reading. [NMVVRC]
https://nmvvrc.org/vsps-clinicians/vsp-resources/

## Communities Tools and Resources

- Active Shooter Safety Resources includes training videos, the role of the FBI, and FBI-produced documentaries. [FBI]
https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources

- Faith Communities and the Disaster Distress Helpline is a tip sheet for U.S. religious leaders responding to disasters. [National Disaster Interfaiths Network]
https://n-din.org/wp-content/uploads/2021/08/12_NDIN_TS_DisasterDistressHelpline.pdf

- Family Reunification and Support web page provides a collection of resources and guidance documents. [ASPR]
https://asprtracie.hhs.gov/technical-resources/64/family-reunification-and-support/0

- Incidents of Mass Violence web page provides information about those most at risk for emotional distress from incidents of mass violence and where to find disaster-related resources. [SAMHSA]
https://www.samhsa.gov/find-help/disaster-distress-helpline/disaster-types/incidents-mass-violence

- Language Access Planning provides resources for those developing a language access program. [DOJ]
https://www.lep.gov/language-access-planning

- Mass Shooting Protocol and Playbook discusses planning and responding to mass violence incidents from a city leadership perspective. [ICMA]
https://icma.org/documents/mass-shooting-protocol-and-playbook-tabletop-exercise

- Mass Violence and Terrorism Resources web page includes resources to assist communities and government agencies in planning for and responding to victims of mass violence and terrorism. [OVC]
https://www.ovcttac.gov/massviolence/?nm=sfa&ns=mvt&nt=resources

- Mental Health: A Guide for Faith Leaders provides information to help faith leaders work with members of their congregations and their families who are facing mental health challenges. [American Psychiatric Association Foundation]
https://www.psychiatry.org/File%20Library/Psychiatrists/Cultural-Competency/faith-mentalhealth-guide.pdf

- Remembering web page provides resources around remembering tragic events as a community, anniversaries, and permanent memorials. [NMVVRC]
https://nmvvrc.org/community-leaders/rebuild-your-community/remembering/

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix F. Trauma and Support Services Supplemental Materials

523

AR001133

- Resource Guide for Uvalde, TX/Página de Recursos para Uvalde, TX provides resources to help the community and is available in both English and Spanish. [NMVVRC] https://nmvvrc.org/media/4xtjzna0/nmvvrc-resources-for-uvalde.pdf; https://nmvvrc.org/media/51mhs4iw/nmvvrc-resources-for-uvalde-spanish.pdf

- Stress First Aid: Manuals and Resources for Health Care Workers provides a framework to improve recovery from stress reactions, both in oneself and in coworkers. [VA] https://www.ptsd.va.gov/professional/treat/type/stress_first_aid.asp

- Supporting Resilience and Recovery in the Community web page describes ways the community and leadership can support community resilience. [NMVVRC] https://nmvvrc.org/community-leaders/rebuild-your-community/supporting-resilience-and-recovery-in-the-community/

- Transcend NMVC Mobile App was developed to assist those recovering from the psychological and behavioral response that can occur following direct or indirect exposure to mass violence incidents. The app provides information about common reactions to mass violence, crime, and other highly stressful events; guides the user through state-of-the-art self-help strategies to reduce the risk of stress-related behavioral health problems and promote recovery; and connects the user with victim/survivor services and financial, legal, and mental health resources. [NMVVRC] https://nmvvrc.org/survivors/transcend-nmvc/

- Unexpected Challenges for Communities in the Aftermath of a Mass Violence Incident covers some issues that many communities experiencing a mass violence incident say caught them by surprise and suggests solutions for how to manage them. [NMVVRC] https://nmvvrc.org/media/301cm3if/unexpected-challenges-for-communities.pdf

- Unexpected Challenges for Communities in the Recovery Phase of a Mass Violence Incident covers some issues that many communities experiencing a mass violence incident say caught them by surprise in the recovery phase and suggests solutions for how to manage them. [NMVVRC] https://nmvvrc.org/media/00tbio4n/tip-sheet-unexpected-challenges-for-communities-in-recovery-phase.pdf

# Appendix G. Pre-Incident Planning and Preparation Supplemental Materials

The following section provides further context and information related to "Chapter 8. Pre-Incident Planning and Preparation."

## Training Providers

Although not the primary focus of the CIR, it became apparent when the team reviewed training materials and observed training delivery methods that training providers, training content, and instructors are vastly different. It is essential that leadership from all agencies and organizations provide quality, vetted, and approved training to employees.

The Texas Commission on Law Enforcement (TCOLE) has 211 "Contract Training Providers" approved to teach TCOLE-approved courses to law enforcement in the state of Texas.[1348] Of those 211, 182 are law enforcement agencies (police departments, sheriffs' offices, training academies) and the balance of 29 are private companies or law enforcement associations (Texas Police Chiefs Association, etc.)

Of the 29 private companies, most have a broad range of courses they offer for TCOLE certification, while a few have specific focus areas they target for instruction (tactics-focused, leadership-focused, etc.). At least 3 of the 29 had course offerings in active shooter response for law enforcement. Additionally, a small number of these 29 private companies have established leadership structures defined on their websites, to include a "President/CEO/Executive Director" or equivalent, "Training Coordinators," and some sort of "Regional Representative." One in particular is run by a single individual with no identified law enforcement experience. This company hosts a central repository of training courses that can be taught across the state; one such course was delivered at UCISD PD.[1349]

---

[1348] TCOLE, "Training Providers."

[1349] CIR Fact Finding.

Critical Incident Review: Active Shooter at Robb Elementary School |
Appendix G. Pre-Incident Planning and Preparation Supplemental Materials 525

AR001135

TCOLE lists requirements for Training Providers on their website to ensure course participants receive appropriate credit for attending the course, which must include the full lesson plan, learning objectives, instructor(s) biographies and areas of expertise, learning assessment instruments, and course/instructor evaluation.[1350] TCOLE has a curriculum review team embedded in their Training Committee and solicit subject matter experts to consult on this team. To do so, one must submit a letter of interest in the areas of desired instruction, obtain law enforcement agency chief approval, and provide a resume highlighting the desired instruction area and the person's expertise in this area.

More needs to be done to ensure that the highest quality training is being provided to law enforcement agencies across the state of Texas. The International Association of Directors of Law Enforcement Standards and Training (IADLEST) National Certification Program,[1351] which conducts a desk review to ensure the materials include sound learning objectives and practices, is a step in the right direction in ensuring that trainings meet professional standards.

As part of the training provider discussion, the instructors themselves need to be assessed. According to IADLEST, instructors should be evaluated and recertified every 2 years by the entity from which they were originally certified to ensure adherence to course curriculum and so that any modifications to course curriculum are adhered to.[1352]

---

[1350] TCOLE, "Training Providers."

[1351] IADLEST, "National Certification Program."

[1352] CIR Fact Finding.

# About the Team

The Office of Community Oriented Policing Services (COPS Office) led the critical incident review with the support of a team of federal staff, subject matter experts, and other contractual support staff.

## COPS Office Leadership Team

- Shanetta Y. Cutlar, Esq., Senior Counsel to the Director
- Robert E. Chapman, Deputy Director

## COPS Office Project Management Team

- Nazmia E.A. Comrie, Senior Program Specialist
- George J. Fachner, Senior Program Specialist

## Subject Matter Experts

- Rick Braziel, Chief of Police (ret.), Sacramento (California) Police Department
- Gene Deisinger, PhD, Deputy Chief of Police and Director, Threat Management Services (ret.), Virginia Tech (Virginia) Police Department
- Frank Fernandez, Director of Public Safety, Coral Gables, Florida; Deputy Chief (ret.), Miami (Florida) Police Department
- James "Jim" Golden, Deputy Chief (ret.) of School Operations and Chief Safety Executive, School District of Philadelphia
- Albert Guarnieri, Supervisory Special Agent, Federal Bureau of Investigation
- Mark Lomax, Major (ret.), Pennsylvania State Police
- Laura McElroy, Chief Executive Officer, McElroy Media Group
- John Mina, Sheriff, Orange County (Florida) Sheriff's Office
- April Naturale, PhD, Assistant Vice President, Vibrant Emotional Health
- Kristen Ziman, Chief (ret.), Aurora (Illinois) Police Department

# Abbreviations and Acronyms

| Acronym | Definition |
| --- | --- |
| AACR | animal-assisted crisis response |
| AAR | after action review |
| ADD | Avoid-Deny-Defend |
| ALERRT | Advanced Law Enforcement Rapid Response Training |
| ARC | American Red Cross |
| ASG | Associate Attorney General |
| ASPR | Administration for Strategic Preparedness and Response |
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| BJA | Bureau of Justice Assistance |
| BORSTAR | Border Patrol Search, Trauma, and Rescue |
| BORTAC | Border Patrol Tactical Unit |
| BPA | Border Patrol Agent |
| BWC | body-worn camera |
| CBP | U.S. Customs and Border Protection |
| CCP | casualty collection point |
| CCTV | closed-circuit television |
| CDC | Centers for Disease Control and Prevention |
| CDS | [Church of the Brethren] Children's Disaster Services |
| CEO | chief executive officer |
| CERC | Crisis and Emergency Risk Communications |
| CIR | Critical Incident Review |
| CIRS | Critical Incident Response Services (TXDPS) |
| CISM | critical incident stress management |
| CLEAT | Combined Law Enforcement Associations of Texas |
| COPS Office | Office of Community Oriented Policing Services |
| CVC | Crime Victims' Compensation [Program] |
| DA | district attorney |
| DBHS | Disaster Behavioral Health Services [Program] |
| DHS | Department of Homeland Security |
| DOJ | U.S. Department of Justice |

| Acronym | Definition |
| --- | --- |
| DPS | Department of Public Safety |
| EAP | Employee Assistance Program |
| EMC | Emergency management coordinator |
| EMI | Emergency Management Institute |
| EMS | emergency medical services |
| EMT | emergency medical technician |
| EOC | emergency operations center |
| EOP | Emergency Operations Plan |
| ER | emergency room |
| ERT | Evidence Response Team |
| FAC | Family Assistance Center |
| FBI | Federal Bureau of Investigation |
| FEMA | Federal Emergency Management Agency |
| FERPA | Family Educational Rights and Privacy Act |
| FOS | first on scene |
| FRC | Family Resiliency Center |
| HHS | [Texas Department of] Health and Human Services |
| HHSC | (Texas) Health and Human Services Commission |
| HSPD | Homeland Security Presidential Directive |
| IACP | International Association of Chiefs of Police |
| IADLEST | International Association of Directors of Law Enforcement Standards and Training |
| ICMA | International City/County Management Association |
| ICP | incident command post |
| ICS | Incident Command System |
| JIC | Joint Information Center |
| JIS | Joint Information System |
| L-CAN | Location, Conditions, Actions, Needs |
| LE | law enforcement |
| LEO | law enforcement officer |
| LEP | limited English proficiency |
| LSU | Louisiana State University |
| MAC Group | Multiagency Coordination Group |
| MARCH | massive hemorrhage, airway, respiration, circulation, and hypothermia |
| MCI | mass casualty incident |

| Acronym | Definition |
| --- | --- |
| MMHPI | Meadows Mental Health Policy Institute |
| MOA | memorandum of agreement |
| MOU | memorandum of understanding |
| MOVA | Massachusetts Office for Victim Assistance |
| MVAI | Mass Violence Advisory Initiative |
| NASP | National Association of School Psychologists |
| NCAVC | National Center for the Analysis of Violent Crime |
| NCF | National Compassion Fund |
| NCTSN | National Child Traumatic Stress Network |
| NEP | National Exercise Program |
| NFPA | National Fire Protection Association |
| NIMS | National Incident Management System |
| NMVVRC | National Mass Violence Victimization Resource Center |
| NQS | National Qualification System |
| NTOA | National Tactical Officers Association |
| NVFC | National Volunteer Fire Council |
| OEM | [Uvalde County] Office of Emergency Management |
| OPR | Office of Professional Responsibility |
| OVC | Office for Victims of Crime |
| PA | public announcement |
| PBIS | positive behavior intervention supports |
| PFA | Psychological First Aid |
| PII | personally identifiable information |
| PIO | public information officer |
| PM-EMT | paramedic–emergency medical technician |
| POST | Peace Officer Standards and Training |
| PTSD | post-traumatic stress disorder |
| RTF | rescue task force |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SBLE | school-based law enforcement |
| SBTA | School Behavioral Threat Assessment [policy] |
| SES | socioeconomic status |
| START | simple triage and rapid treatment |
| STRAC | Southwest Texas Regional Advisory Council |

| Acronym | Definition |
| --- | --- |
| SWAT | special weapons and tactics |
| SWTJC | Southwest Texas Junior College |
| TAG | Trauma and Grief [Center] |
| TCOLE | Texas Commission on Law Enforcement |
| TEA | Texas Education Agency |
| TGCT | Trauma and Grief Component Therapy |
| THREAT | Threat suppression, Hemorrhage control, Rapid Extrication to safety, Assessment by medical providers, and Transport to definitive care |
| TLEPN | Texas Law Enforcement Peer Network |
| TTAC | Training and Technical Assistance Center |
| TTX | multiagency tabletop exercises |
| TXDPS | Texas Department of Public Safety |
| TXSSC | Texas School Safety Center |
| UC | Unified Command |
| UCISD | Uvalde Consolidated Independent School District |
| UCISD PD | Uvalde Consolidated Independent School District Police Department |
| UCSO | Uvalde County Sheriff's Office |
| UEMS | Uvalde Emergency Medical Services |
| UMH | Uvalde Memorial Hospital |
| UPD | Uvalde Police Department |
| USMS | U.S. Marshals Service |
| UTRC | Uvalde Together Resiliency Center |
| VESS | Victim and Employee Support Services (TXDPS) |
| VOAD | Voluntary Organizations Active in Disaster |
| VOCA | Victims of Crime Act |
| VSD | Victim Services Division (FBI) |
| VSRT | Victim Services Response Team |
| ZCSO | Zavala County Sheriff's Office |

# Bibliography

"'Loving' Boy Last Texas School Shooting Victim Laid to Rest." KXXV, June 25, 2022. https://www.kxxv.com/news/texas-school-massacre-2022/loving-boy-last-texas-school-shooting-victim-laid-to-rest.

"'That Smile I Will Never Forget': The Victims of the Texas School Shooting" [Image]. *The Guardian,* May 29, 2022. https://www.theguardian.com/us-news/2022/may/25/uvalde-texas-school-shooting-victims.

"Alexandria 'Lexi' Aniyah Rubio Obituary." Rushi-Estes-Knowles Mortuary, 2022. https://www.rekfunerals.com/obituary/AlexandriaLexi-Rubio.

"Alithia Haven Ramirez Obituary." Rushing-Estes-Knowles Mortuary, June 2, 2022. https://www.rekfunerals.com/obituary/Alithia-Ramirez.

"Amerie Jo Garza Obituary." Hillcrest Memorial Funeral Home, 2022. https://www.hillcrestmemorialfuneralhome.com/obituaries/Amerie-Garza.

"As Uvalde Starts School Year, Mistrust Runs High." CBS News, September 6, 2022. https://www.cbsnews.com/news/uvalde-new-school-year-mistrust-high.

"As Uvalde Starts School, One Family Stops to Remember the Little Girl They Lost." *The Today Show,* September 7, 2022. https://www.today.com/parents/parents/uvalde-victims-family-remembers-jackie-cazares-school-starts-rcna46398.

"City of Uvalde Sues DA for 'Concealing Essential Law Enforcement Information.'" CBS Austin, December 1, 2022. https://cbsaustin.com/news/local/city-of-uvalde-sues-da-for-concealing-essential-law-enforcement-information.

"Disney Sends Family of Ellie Garcia a Gift; She Was Days Away from 10th Birthday Party." KENS 5, June 3, 2022. https://www.kens5.com/article/news/special-reports/uvalde-school-shooting/disney-sends-family-of-uvalde-victim-a-gift-she-was-days-away-from-big-birthday-party-news/273-bcb5dfcd-3633-42b6-bb62-8524fdb3be38.

"Eliahna Torres Obituary." Rushing-Estes-Knowles Mortuary, 2022. https://www.rekfunerals.com/obituary/Eliahna-Torres.

"Eliahna Torres." Legacy.com, May 27, 2022. https://www.legacy.com/us/obituaries/name/eliahna-torres-obituary?id=34954567.

"Eva Mireles Obituary." Rushing-Estes-Knowles Mortuary, 2022. https://www.rekfunerals.com/obituary/Eva-Mireles.

"First Interior Image Released in Uvalde School Shooting Shows Officers with More Firepower Than Previously Believed." KVUE, June 20, 2022. https://www.kvue.com/article/news/special-reports/uvalde-school-shooting/interior-images-uvalde-police/269-b1be96cb-aa8a-4edc-aa51-d4cbd41382f4.

"Gov. Abbott Announces DPS Security Measures for Uvalde ISD." KENS 5, August 30, 2022. https://www.kens5.com/article/news/local/gov-abbott-announces-dps-security-measures-for-uvalde-isd-mass-shooting-robb-elementary/273-0ac97491-05bb-4902-ae2a-294e6ae7cc48.

"Hernandez Nears End of Contract." *Uvalde Leader-News,* May 7, 2023. https://www.uvaldeleadernews.com/articles/hernandez-nears-end-of-contract.

"Husband of Teacher Killed at Robb Elementary Resigns from Uvalde CISD Police Department." KENS 5, November 21, 2022. https://www.kens5.com/article/news/special-reports/uvalde-school-shooting/husband-of-teacher-killed-robb-elementary-resigns-from-uvalde-cisd-police-department/273-55a94fcb-595b-4645-b876-b33adfe3e437.

"In Memoriam: 2022 Doodle for Google contestant Alithia Haven Ramirez, 10, 2012–2022." Doodle for Google. https://doodles.google.com/intl/en_us/d4g/honoringalithia.

"Irma Linda Garcia Obituary" [Image]. Rushing-Estes-Knowles Mortuary. https://www.rekfunerals.com/obituary/Irma-Garcia.

"Jailah Nicole Silguero Obituary." Hillcrest Memorial Funeral Home, 2022. https://www.hillcrestmemorialfuneralhome.com/obituaries/Jailah-Silguero/#!/TributeWall.

"Jailah Nicole Silguero." Find a Grave, June 3, 2022. https://www.findagrave.com/memorial/240030599/jailah-nicole-silguero.

"Jayce Carmelo Luevanos" [Image]. Find a Grave, June 3, 2022. https://www.findagrave.com/memorial/240018379/jayce-carmelo-luevanos/photo.

"Layla Marie Salazar Obituary." Rushing-Estes-Knowles Mortuary, 2022. https://www.rekfunerals.com/obituary/Layla-Salazar.

"Maite Yuleana Rodriguez Obituary." Rushing-Estes-Knowles Mortuary, 2022. https://www.rekfunerals.com/obituary/Maite-Rodriguez.

"Makenna Lee Elrod Obituary." Rushing-Estes-Knowles Mortuary, June 4, 2022. https://www.rekfunerals.com/obituary/Makenna-Elrod.

"Maranda Gail Mathis." Legacy.com, May 27, 2022. https://www.legacy.com/us/obituaries/name/maranda-mathis-obituary?id=34946641.

"May 26 Texas Shooting News." Last updated May 27, 2022. https://www.cnn.com/us/live-news/texas-elementary-school-shooting-05-26-22#h_95da3daf9c7951c6ddd986295fb158e8.

"Mayor of Uvalde Sits Down with CNN One Year after School Shooting." May 29, 2023. https://www.cnn.com/videos/us/2023/05/19/uvalde-texas-robb-shooting-actws-accountability-mclaughlin-sot-prokupecz-vpx.cnn.

"New Footage Shows Texas Officer Arrived at Uvalde School Earlier Than Previously Known." July 26, 2022. https://www.cnn.com/videos/us/2022/07/26/uvalde-video-police-response-report-earlier-newday-vpx.cnn.

"Remembering Jacklyn Cazares as a Free Spirit and Always Wanting to Help Others." KENS 5, June 2, 2022. https://www.youtube.com/watch?v=ibwtL0fXV2k.

"Rojelio Fernandez Torres Obituary." Rushing-Estes-Knowles Mortuary, 2022. https://www.rekfunerals.com/obituary/Rojelio-Torres.

"Rojelio Fernandez Torres." Legacy.com, May 28, 2022. https://www.legacy.com/us/obituaries/name/rojelio-torres-obituary?id=34958659.

"SALT Mass Casualty Triage: Concept Endorsed by the American College of Emergency Physicians, American College of Surgeons Committee on Trauma, American Trauma Society, National Association of EMS Physicians, National Disaster Life Support Education Consortium, and State and Territorial Injury Prevention Directors Association." *Disaster Medicine and Public Health Preparedness* 2, no. 4 (2008): 245-246. https://doi.org/10.1097/DMP.0b013e31818d191e.

"Sample Municipal Resolution Adopting NIMS." *Commonwealth of Pennsylvania National Incident Management Implementation Strategy: 2022–2027*, 56. Harrisburg: Pennsylvania Emergency Management Agency, 2022. https://www.pema.pa.gov/Preparedness/NIMS/Pages/default.aspx.

"Surviving Uvalde." The Whole Story with Anderson Cooper. Podcast. May 22, 2023. https://www.cnn.com/audio/podcasts/the-whole-story-with-anderson-cooper/episodes/a714eda3-f1b7-404e-a316-b00800aa9fa4.

"Texas Artists Honor Uvalde Victims with Murals." *The Kelly Clarkson Show*, September 13, 2022. https://www.youtube.com/watch?v=pE1Q_GuQwZQ%29+.

"Texas Gov. Greg Abbott's Statement about Robb Elementary School Shooting in Uvalde on May 24, 2022." KSAT 12, May 24, 2022. https://youtu.be/pjf3VoBiNYk.

"Texas Ranger Suspended Amid Investigation into Uvalde Response." KENS 5, July 5, 2022. https://www.kens5.com/article/news/local/texas/uvalde-shooting-robb-elementary-school-texas-ranger-investigation-dps/273-19d06e62-2a2b-46c6-bf47-0ac6a84254d8.

"Texas Rangers Turns Over Initial Report on Uvalde Shooting to DA." KVUE, January 5, 2023. https://www.kvue.com/video/news/special-reports/uvalde-school-shooting/texas-rangers-turns-over-initial-report-on-uvalde-shooting-to-da/269-2dc17e42-b4c4-40db-8b99-c7ea0577e313.

"Texas School Shooting Victims: Third and Fourth Graders, Beloved Teachers." NBC 5 Dallas–Fort Worth. Last modified May 31, 2022. https://www.nbcdfw.com/news/local/texas-news/uvalde-texas-school-shooting-names-of-victims-begin-to-release/2976993/.

"Two Uvalde CISD Police Officers Leave Department." KSAT 12, February 2, 2023. https://www.ksat.com/video/news/2023/02/02/two-uvalde-cisd-police-officers-leave-department.

"Uvalde District Attorney Gives Update on Investigation into Robb Elementary Mass Shooting." News 4 San Antonio. Last modified May 25, 2023. https://news4sanantonio.com/news/local/uvalde-district-attorney-gives-update-on-investigation-into-robb-elementary-mass-shooting-students-teachers-mayor-rangers-texas-criminal-grand-jury-accountable.

"Uvalde Report Translated to Spanish by USA TODAY Network Journalists." *USA Today,* July 28, 2022. https://www.usatoday.com/videos/opinion/2022/07/28/uvalde-report-translated-spanish-usa-today-network-journalists/10172512002.

"Uvalde School Mass Shooting: What We Know about the Victims." KHOU, May 25, 2022. https://www.khou.com/article/news/local/texas/uvalde-school-shooting-victims/285-496f26a0-7b05-4bcf-9ec6-4c125db8a951.

"Uvalde School Shooting: Call Logs Released between Gov. Abbott, Texas DPS Director." Fox 7 Austin, November 7, 2022. https://www.fox7austin.com/news/uvalde-school-shooting-gov-abbott-texas-dps-director.

"Uvalde Victim's Dream of Sharing Art Comes True." Beeville Art Museum, August 30, 2022. https://www.prnewswire.com/news-releases/uvalde-victims-dream-of-sharing-art-comes-true-301612757.html.

"Uvalde Voters Support Abbott, Suspended Interim Police Chief in Wake of Scrutiny over Robb Massacre." KSAT 12, November 9, 2022. https://www.ksat.com/vote-2022/2022/11/09/uvalde-voters-support-abbott-suspended-interim-police-chief-in-wake-of-scrutiny-over-robb-massacre.

"Uziyah Sergio Garcia Obituary." Gutierrez Funeral Home, 2022. https://www.gutierrezfuneralchapels.com/obituary/Uziyah-Garcia.

"Victim's Father Confronts Uvalde Mayor Over Why He Was Kicked Out of Meeting." July 17, 2022. https://www.cnn.com/videos/us/2022/07/17/father-of-uvalde-victim-confronts-mayor-flores-nr-vpx.cnn.

"Victims of the Texas School Shooting." Reuters, May 26, 2022. https://www.reuters.com/news/picture/victims-of-the-texas-school-shooting-idUSRTS85J5H.

"What to Know about the Allen, Texas, Mall Shooting." *The New York Times*, May 7, 2023. https://www.nytimes.com/article/texas-mall-shooting-allen.html.

"What We Know about the Victims of the Uvalde Shooting." *The New York Times,* June 16, 2022. https://www.nytimes.com/article/uvalde-shooting-victims.html.

"Young Uvalde Victim's Art Displayed in Texas and Paris, Fulfilling Her Stolen Dream." *The Today Show*, September 21, 2022. https://www.today.com/parents/moms/uvalde-victim-alithia-ramirez-art-texas-paris-museums-rcna47352.

*1 October: After-Action Review.* Las Vegas, NV: Las Vegas Metropolitan Police Department, 2019. https://www.lvmpd.com/en-us/Documents/1_October_AAR_Final_06062019.pdf.

10 U.S.C. § 892 Art. 92, Failure to obey order or regulation (1956). https://www.govinfo.gov/content/pkg/USCODE-2022-title10/html/USCODE-2022-title10-subtitleA-partII-chap47-subchapX-sec892.htm.

42 U.S.C. § 5121, Robert T. Stafford Disaster Relief and Emergency Assistance Act (1974), as amended. https://www.govinfo.gov/content/pkg/USCODE-2021-title42/html/USCODE-2021-title42-chap68-subchapI-sec5121.htm.

Administration for Strategic Preparedness and Response; Technical Resources, Assistance Center, and Information Exchange. *Mass Violence/Active Shooter Incidents: EMS Considerations.* Tip Sheet. Washington, DC: U.S. Department of Health and Human Services, 2022. https://asprtracie.hhs.gov/mass-violence#mass-violence-active-shooter-incident-tip-sheets.

Administration for Strategic Preparedness and Response; Technical Resources, Assistance Center, and Information Exchange. *Mass Casualty Trauma Triage: Paradigms and Pitfalls.* Washington, DC: U.S. Department of Health and Human Services, 2019. https://asprtracie.hhs.gov/technical-resources/resource/7082/mass-casualty-trauma-triage-paradigms-and-pitfalls.

ALERRT (Advanced Law Enforcement Rapid Response Training Center). *Active Shooter Response Level 1 Version 7.2*. San Marcos, TX: Texas State University, 2020.

ALERRT (Advanced Law Enforcement Rapid Response Training Center). *Robb Elementary School Attack Response Assessment and Recommendations.* San Marcos, TX: Texas State University, 2022. https://alerrt.org/reading.

Alfonseca, Kiara, and Ismael Estrada. "Mother of Uvalde Victim Speaks out for 1st Time." ABC News, August 3, 2022. https://abcnews.go.com/US/mother-uvalde-victim-speaks-1st-time/story?id=87824941.

Alfonseca, Kiara, and Nicolas Rothenberg. "Uvalde Shooting Victim Alithia Haven Ramirez Honored with Google Doodle." ABC News, July 22, 2022. https://abcnews.go.com/Technology/uvalde-shooting-victim-alithia-haven-ramirez-honored-google/story?id=87242430.

Alfonseca, Kiara. *Uvalde in Focus: The Kids of Robb Elementary*. ABC News. Accessed August 8, 2023. https://abcnews.go.com/immersive/uvalde?id=90972980.

Critical Incident Review: Active Shooter at Robb Elementary School | Bibliography

536

AR001146

Allen, Hugh. "Uvalde School District Officials Hold Press Conference 6/09/22 Transcript." Rev. Last modified June 9, 2022. https://www.rev.com/blog/transcripts/uvalde-school-district-officials-hold-press-conference-6-09-22-transcript.

Alliance of Therapy Dogs. "Therapy Dog Certification." Last modified March 23, 2017. https://www.therapydogs.com/therapy-dog-certification.

Alsharif, Mirna. "Inspector Posing as Intruder Slips into Uvalde School during Safety Audit, Superintendent Says." NBC News, December 20, 2022. https://www.nbcnews.com/news/us-news/inspector-posing-intruder-slips-uvalde-school-safety-audit-superintend-rcna62573.

Alvarado, Caroll. "10-Year-Old Shooting Victim Rojelio Torres Was an 'Intelligent, Hardworking and Helpful Person,' His Aunt Says." CNN, May 27, 2022. https://www.cnn.com/us/live-news/texas-elementary-school-shooting-05-27-22/h_f834f699ca617a40e823722b28e48555.

American Humane, *Definition of a Service Dog vs. Emotional Support Animal vs. Therapy Dog*. Washington, DC: American Humane, 2018. https://www.americanhumane.org/initiative/service-dogs-what-you-need-to-know.

Anderson, Nick, Moriah Balingit, Marissa J. Lang, and Ian Shapira. "For Five Years, They Were Co-Teachers. Then They Were Gunned Down." *The Washington Post,* May 25, 2022. https://www.washingtonpost.com/education/2022/05/25/uvalde-teachers-garcia-mireles.

Andreano, Caterina, et al. "Remembering the Victims of the Uvalde School Shooting." *Good Morning America,* April 8, 2022. https://www.goodmorningamerica.com/news/story/remembering-victims-uvalde-school-shooting-85621161.

Aronie, Jonathan, and Christy E. Lopez. "Keeping Each Other Safe: An Assessment of the Use of Peer Intervention Programs to Prevent Police Officer Mistakes and Misconduct, Using New Orleans' EPIC Program as a Potential National Model." *Police Quarterly* 20, no. 3 (2017). https://doi.org/10.1177/1098611117710443.

ATF (Bureau of Alcohol, Tobacco, Firearms and Explosives). "Benefits for Federal Employees." Last modified February 8, 2023.

Atkins, Campbell. "Program Deploys to Uvalde to Provide Support." *Today @Sam*, July 6, 2022. Sam Houston State University. https://www.shsu.edu/today@sam/T@S/article/2022/program-uvalde-support.

*ATLS: Advanced Trauma Life Support for Doctors (Student Course Manual), Eighth Edition*. Chicago: American College of Surgeons, 2008.

Ball, Andrea. "'They're So Young:' A Grandfather in Uvalde, Texas, Mourns 10-Year-Old Jayce Luevanos." *USA Today,* May 25, 2022. https://www.msn.com/en-us/news/us/they-re-so-young-a-grandfather-mourns-10-year-old-jayce-luevanos-among-the-victims/ar-AAXJra2.

Banks, Duren, Joshua Hendrix, Matthew Hickman, and Tracey Kyckelhahn. "National Sources of Law Enforcement Employment Data." Washington, DC: Bureau of Justice Statistics, 2016. https://bjs.ojp.gov/content/pub/pdf/nsleed.pdf.

Barragan, James, and Zach Despart. "Chief Pete Arredondo Defends Police Response to Uvalde School Shooting." *The Texas Tribune,* June 9, 2022. https://www.texastribune.org/2022/06/09/uvalde-chief-pete-arredondo-interview.

Barragan, James. "House Speaker Dade Phelan Announces Legislative Committee to Investigate Uvalde Shooting." *The Texas Tribune*, June 3, 2022. https://www.texastribune.org/2022/06/03/uvalde-texas-house-investigative-committee.

*Basic Emergency Management Plan for Uvalde County, City of Uvalde, and the City of Sabinal, Ver 1.10, 2021–22*. Uvalde, Texas: Uvalde County, 2021.

Bennett, Adam. "Uvalde Mayor on Release of Video Showing Response to Shooting." KHOU, July 13, 2022. https://www.khou.com/article/news/special-reports/uvalde-school-shooting/uvalde-community-reacts-hallway-video-robb-elementary-mass-shooting/285-d65d4386-bd64-46f9-940c-f77d13734d10.

BJA (Bureau of Justice Assistance). "Bureau of Justice Assistance National Training and Technical Assistance Center." Accessed December 5, 2023.

Bleiberg, Jake, and Paul Weber. "Texas State Police Launch Internal Review of Uvalde Response." Associated Press, July 19, 2022. https://apnews.com/article/police-shootings-texas-education-a3cab77498a8e9b97ea7d331c1aa5e5d.

Bloom, Adam, Lokesh Reddy, and Eli Kleinman. "Trauma Debrief Prior to Release of Body-Worn Camera Footage." *FBI Law Enforcement Bulletin*, July 11, 2023. https://leb.fbi.gov/articles/featured-articles/trauma-debrief-prior-to-release-of-body-worn-camera-footage.

Braziel, Rick, Frank Straub, George Watson, and Rod Hoops. *Bringing Calm to Chaos: A Critical Incident Review of the San Bernardino Public Safety Response to the December 2, 2015, Terrorist Shooting Incident at the Inland Regional Center*. Washington, DC: Office of Community Oriented Policing Services, 2016. https://portal.cops.usdoj.gov/resourcecenter?item=cops-w0808.

Brinsfield, Kathryn H., and Ernest Mitchell Jr. "The Department of Homeland Security's Role in Enhancing and Implementing the Response to Active Shooter and Intentional Mass Casualty Events." In *Strategies to Enhance Survival in Active Shooter and Intentional Mass Casualty Events: A Compendium*, supplement to the *Bulletin of the American College of Surgeons* 100, no. 1S (2015): 24–27. https://www.stopthebleed.org/media/0svpk45s/hartford_consensus_compendium.pdf.

Briones, Sofia. "Eliahna Amyah Garcia, a Sweet Girl with a Beautiful Soul, Dies at 9." NOWCastSA, 2022. https://nowcastsa.com/obituary/eliahna-amyah-garcia.

Briones, Sofia. "Jose Manuel Flores, Jr., a Baseball Player Who Loved Video Games, Dies at 10." NOWCastSA, 2022. https://nowcastsa.com/obituary/jose-manuel-flores-jr.

Briones, Sofia. "Makenna Lee Elrod, a Bright and Caring Natural Born Leader, Dies at 10." NOWCastSA, 2022. https://nowcastsa.com/obituary/makenna-lee-elrod.

Briones, Sofia. "Maranda Gail Mathis, a Kind Student with a Love for Mermaids, Dies at 11." NowCastSA, May 2022. https://nowcastsa.com/obituary/maranda-gail-mathis.

Briones, Sofia. "Nevaeh Alyssa Bravo, an Uvalde Student Who Loved Her Family, Dies at 10." NOWCastSA, 2022. https://nowcastsa.com/obituary/nevaeh-alyssa-bravo.

Briones, Sofia. "Tess Marie Mata, an Introverted and Charismatic Girl Who Was Saving Up for a Trip to Disney World, Dies at 10." NowCastSA, May 2022. https://nowcastsa.com/obituary/tess-marie-mata.

Brooks, David B. *2021 Guide to Texas Laws for County Officials*. Austin, TX: Texas Association of Counties, 2021. https://www.county.org/TAC/media/TACMedia/Legal/Legal%20Publications%20Documents/2021/2021-Guide-to-Laws-for-County-Officials.pdf.

Buch, Jason. "State Police Terminate Another Officer for Response to Uvalde Mass Shooting." *The Texas Tribune*, January 6, 2023, https://www.texastribune.org/2023/01/06/texas-ranger-uvalde-shooting-criminal-cases-kindell.

Cabral, Marika, Bokyung Kim, Maya Rossin-Slater, Molly Schnell, and Hannes Schwandt. *Trauma at School: The Impacts of Shootings on Students' Human Capital and Economic Outcomes.* Working Paper 28311. Revised edition. Cambridge, MA: National Bureau of Economic Research, 2022. https://doi.org/10.3386/w28311.

Campoamor, Danielle. "Brett Cross, Dad Of Uvalde Shooting Victim, Protests At District." *The Today Show,* October 6, 2022. https://www.today.com/parents/dads/brett-cross-dad-uvalde-shooting-victim-protests-district-rcna51033.

Campoamor, Danielle. "Texas Schools Send Parents DNA Kits to Identify Their Kids' Bodies in Emergencies." *The Today Show,* October 18, 2022. https://www.today.com/parents/family/texas-parents-schools-dna-kits-identify-kids-bodies-rcna52769.

Carey, Bill. "New Uvalde Assistant Chief Looks Forward to Repairing Relationship between Community and Officers." Police1. Last modified April 24, 2022. https://www.police1.com/chiefs-sheriffs/articles/new-uvalde-assistant-chief-looks-forward-to-repairing-relationship-between-community-and-officers-ksDdbGiX2q8w5FFc.

Carlson, Shonna. "Why Prosecutors Need to Understand the Impact of Trauma." *The Crime Report,* March 20, 2020. https://thecrimereport.org/2020/03/20/why-prosecutors-need-to-understand-the-impact-of-trauma.

Carpenter, Michael. "Put It in Writing." *FBI Law Enforcement Bulletin* 69, no. 10 (2000): 1–9. https://leb.fbi.gov/file-repository/archives/oct00leb.pdf/view.

CBP (U.S. Customs and Border Protection). "Employee Assistance Program (EAP)." Last modified July 13, 2023. https://www.cbp.gov/employee-resources/family/employee-assistance-program.

CDC (Centers for Disease Control and Prevention). "Adverse Childhood Experiences (ACEs)." Violence Prevention. Last modified June 29, 2023. https://www.cdc.gov/violenceprevention/aces/index.html#print.

CDC (Centers for Disease Control and Prevention). "CERC Manual." Emergency Preparedness and Response. Last modified January 23, 2018.

CDC (Centers for Disease Control and Prevention). "Training." Emergency Preparedness and Response. Last modified January 23, 2018.

Center for the Study of Traumatic Stress. *Leadership Communication: Anticipating and Responding to Stressful Events*. Bethesda, MD: Uniformed Services University, n.d. https://www.cstsonline.net/resources/resource-master-list/leadership-communication-anticipating-responding-stressful-events.

Centers for Disease Control and Prevention. "Hospital Employees' Health." Workplace Health Promotion. Last updated May 28, 2020. https://www.cdc.gov/workplacehealthpromotion/features/hospital-employees-health.html.

Chappell, Bill, Joe Hernandez, and Rachel Treisman. "What We Know about the Victims of the Uvalde School Shooting." WUSF Public Media, May 31, 2022. https://wusfnews.wusf.usf.edu/2022-05-27/what-we-know-about-the-victims-of-the-uvalde-school-shooting.

Chemical Hazards Emergency Medical Management. "SALT Mass Casualty Triage Algorithm (Sort, Assess, Lifesaving Interventions, Treatment/Transport)." U.S. Department of Health and Human Services. Last modified September 5, 2023. https://chemm.hhs.gov/salttriage.htm.

Chow, Shern-Min. "Texas Police Chiefs Association Responds to Uvalde Shooting Video." KHOU, July 13, 2022. https://www.khou.com/article/news/special-reports/uvalde-school-shooting/texas-police-chiefs-association-president-reacts-to-uvalde-shooting-video/285-c62b2d54-bab6-4709-b90c-2f211e897a0f.

Christenson, Sig, and Claire Bryan. "School Trustee Rushed to Robb Elementary; Now Victims' Families Want Him Booted from Board." *San Antonio Express-News,* October 30, 2022. https://www.expressnews.com/news/local/article/Jesus-Suarez-board-member-17542540.php.

Chute, Nate. "Police Boasted of Heroism after Uvalde Parents Begged for Rescue of Their Children amid School Shooting." *Austin American-Statesman,* September 15, 2022. https://www.statesman.com/videos/news/2022/09/15/uvalde-shooting-parents-children-police-false/8034139001.

Cieciura, Jack. "A Summary of the Bystander Effect: Historical Development and Relevance in the Digital Age." *Inquiries Journal* 8, no. 11 (2016): 1. http://www.inquiriesjournal.com/a?id=1493.

Cohen, Miles. "'I'm not ready": 2 Uvalde Victims Who Texted 'I love you' to Be Buried Next to One Another." *Good Morning America,* June 8, 2022. https://www.goodmorningamerica.com/news/story/im-ready-uvalde-victims-texted-love-buried-85208670.

Cole, Allysa, and Ben Spicer. "Uvalde City Council Approves Updated Memorandum between Police Department, Uvalde CISD." KSAT, March 15, 2023. https://www.ksat.com/news/local/2023/03/15/uvalde-city-council-approves-updated-memorandum-between-police-department-uvalde-cisd.

Collier, Dillon. "Families of Uvalde Shooting Victims Ask Court to Force DPS to Release Records." KSAT, March 15, 2023. https://www.ksat.com/news/local/2023/03/15/families-of-uvalde-shooting-victims-ask-court-to-force-dps-to-release-records.

Collier, Dillon. "Records Detail Secret Council Swearing-In of Uvalde CISD Chief Pete Arredondo." KSAT, June 17, 2022. https://www.ksat.com/news/defenders/2022/06/17/records-detail-secret-council-swearing-in-of-uvalde-cisd-chief.

Combined Law Enforcement Associations of Texas. "Response to Uvalde Mass Shooting." News release, May 31, 2022. https://www.cleat.org/cleat-response-to-uvalde-mass-shooting.

*Communicating in a Crisis: Risk Communication Guidelines for Public Officials*. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2019.

Contreras, Guillermo. "A 15-Year-Old German Girl Knew the Uvalde Shooter's Plan. She Was Prosecuted for Her Inaction." *San Antonio Express-News,* May 24, 2023. https://www.expressnews.com/news/article/german-teen-uvalde-18116721.php.

COPS Office (Office of Community Oriented Policing Services). "Collaborative Reform Initiative Technical Assistance Center." Accessed December 5, 2023. https://cops.usdoj.gov/cri-tac.

COPS Office (Office of Community Oriented Policing Services). "Law Enforcement Mental Health and Wellness Act (LEMHWA) Program Resources." Accessed December 6, 2023. https://cops.usdoj.gov/lemhwaresources.

COPS Office (Office of Community Oriented Policing Services). "Law Enforcement Agency (LEA) Accreditation." Accessed December 5, 2023. https://cops.usdoj.gov/LEA_accreditation.

COPS Office (Office of Community Oriented Policing Services). "Overcoming Language Barriers in Policing and Building an Effective Language Access Program." https://copstrainingportal.org/project/overcoming-language-barriers-in-policing.

COPS Office (Office of Community Oriented Policing Services). *Guiding Principles for School Resource Officer Programs.* Washington, DC: Office of Community Oriented Policing Services, 2022. https://portal.cops.usdoj.gov/resourcecenter?item=cops-p460.

Cornyn, John. *Opinion No. JC-0125 Re: Authority of County to Provide Law Enforcement Services in a Municipality within its Boundaries*. Office of the Attorney General, State of Texas, October 13, 1999. https://www.texasattorneygeneral.gov/opinions/john-cornyn/jc-0125.

Courts, Jenny Wagnon. "Texas DPS Releases Video of Altercation with Uvalde Victim's Mother." ABC7 Eyewitness News, April 7, 2023. https://abc7chicago.com/texas-dps-releases-video-of-altercation-with-uvalde-victims-mother/13096309.

Covucci, David. "Uvalde Cop Seen with Punisher Lock Screen Goes Viral." *Daily Dot*, July 14, 2022. https://www.dailydot.com/debug/uvalde-police-punisher.

Cowen, Tracie William. "Mother Who Was Cuffed by Marshals Amid Response to Uvalde School Shooting Speaks Out as New Details Emerge." *Complex*, June 2, 2022. https://amp.www.complex.com/life/mother-cuffed-by-marshals-amid-uvalde-shooting-response-speaks-out-new-details-emerge.

Craig, Matthew, and Leigh Waldman. "Scholarship Honors the Life of Robb Elementary Victim Tess Mata." KSAT, February 6, 2023. https://www.ksat.com/news/local/2023/02/07/scholarship-honors-the-life-of-robb-elementary-victim-tess-mata.

C-SPAN. "Governor Abbot News Conference on School Shooting in Uvalde, Texas." Last modified May 25, 2022. https://www.c-span.org/video/?520589-1/governor-abbott-news-conference-school-shooting-uvalde-texas.

Cybersecurity and Infrastructure Security Agency. *National Emergency Communications Plan.* Washington, DC: U.S. Department of Homeland Security, 2019. https://www.cisa.gov/national-emergency-communications-plan.

Danieli, Yael, Fran H. Norris, and Brian Engdahl. "Multigenerational Legacies of Trauma: Modeling the What and How of Transmission." *American Journal of Orthopsychiatry* 86, no. 6 (2016): 639–651. https://psycnet.apa.org/record/2016-02082-001.

Danieli, Yael, Fran H. Norris, Jutta Lindert, Vera Paisner, Brian Engdahl, and Júlia Richter. "The Danieli Inventory of Multigenerational Legacies of Trauma, Part I: Survivors' Posttrauma Adaptational Styles in their Children's Eyes." *Journal of Psychiatric Research* 68 (September 2015): 167–175. https://www.researchgate.net/publication/279070329_The_Danieli_Inventory_of_Multigenerational_Legacies_of_Trauma_Part_I_Survivors'_Posttrauma_Adaptational_Styles_in_their_Children's_Eyes.

Dart Center for Journalism & Trauma. "Resources for Covering Mass Shootings." Last modified March 15, 2019. https://dartcenter.org/resources/resources-covering-mass-shootings.

DeAngelis, Tori. "The Legacy of Trauma: An Emerging Line of Research is Exploring how Historical and Cultural Trauma Affect Survivors' Children for Generations to Come." *Monitor on Psychology* 50, no. 2 (2019): 36. https://www.apa.org/monitor/2019/02/legacy-trauma.

Despart, Zach, Lomi Kriel, Alejandro Serrano, Joyce Sohyun Lee, Arelis R. Hernandez, Sarah Cahlan, Imogen Piper, and Uriel J. Garcia. "Uvalde Shooting Victims' Care Was Delayed by Medical Response." *The Texas Tribune*, December 20, 2022. https://www.texastribune.org/2022/12/20/uvalde-medical-response.

Despart, Zach, William Melhado, and Lomi Kriel. "Texas State Trooper Who Responded to Uvalde Shooting Fired Amid Investigations into Police Response." *San Antonio Current,* October 22, 2022. https://www.sacurrent.com/news/texas-state-trooper-who-responded-to-uvalde-shooting-fired-amid-investigations-into-police-response-30150004.

DeWolfe, Deborah J. *Training Manual for Mental Health and Human Service Workers in Major Disasters*. Second Edition. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2000. https://eric.ed.gov/?id=ED459383.

Dey, Sneha, et al. "21 Lives Lost: Uvalde Victims Were a Cross-Section of a Small, Mostly Latino town in South Texas." *The Texas Tribune,* May 27, 2022. https://www.texastribune.org/2022/05/25/uvalde-school-shooting-victims/#d37e262a-fa08-4bc1-b639-784afe9900cb.

DHS (U.S. Department of Homeland Security). *Law Enforcement Active Shooter Emergency Response Version 3.1: Instructor Guide*. Washington, DC: U.S. Department of Homeland Security, 2019.

*Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*. Washington, DC: American Psychiatric Association, 2013.

DOJ (U.S. Department of Justice). "2015 Language Map App." Accessed August 3, 2023. https://www.lep.gov/maps/lma2015/Final_508.

DOJ (U.S. Department of Justice). "Readout of Associate Attorney General Vanita Gupta's Meeting with Uvalde Families." Press release, April 26, 2023. https://www.justice.gov/opa/pr/readout-associate-attorney-general-vanita-gupta-s-meeting-uvalde-families.

Draper, John, Gerald McCleery, and Richard Schaedle. *"*Mental Health Services Support in Response to September 11th: The Central Role of the Mental Health Association of New York City." In *9/11: Mental Health in the Wake of Terrorist Attacks*, edited by Yuval Neria, Raz Gross, and Randall D. Marshall, 282–310. New York: Cambridge University Press, 2006.

Dunmore, Emma, David M. Clark, and Anke Ehlers. "A Prospective Investigation of the Role of Cognitive Factors in Persistent Posttraumatic Stress Disorder (PTSD) after Physical or Sexual Assault." *Behavioral Research and Therapy* 39, no. 9 (2001): 1063–1084. https://doi.org/10.1016/S0005-7967(00)00088-7.

Eaton-Stull, Yvonne. "Mental Health Monitor: Animal-Assisted Crisis Response." *Social Work Today* 16, no. 5 (2016): 32. https://www.socialworktoday.com/archive/092116p32.shtml.

Elkins, Faye. "Prepare Today for What Can Happen Tomorrow: Coordinated Active Attack Training for All First Responders." *Community Policing Dispatch* 11, no. 6 (2018). https://cops.usdoj.gov/html/dispatch/06-2018/airr_prepare.html.

Esquivel, Ruben. "Artist's Statement." National Museum of the American Latino, 2022. https://latino.si.edu/exhibitions/healing-uvalde/twenty-one-healing-uvalde-murals/jayce-carmelo-luevanos.

Estrada, Ismael, Jenny Wagnon Courts, and Lucien Bruggeman. "Abbott Meeting with Uvalde Victims, Families Under Scrutiny." ABC News, August 13, 2022. https://abcnews.go.com/US/texas-gov-abbott-meets-uvalde-victims-amid-scrutiny/story?id=88339909.

Everly Jr., George S., and O. Joseph Bienvenu. "'Profiling' School Shooters: Can we tell who will be the next to kill?" *Psychology Today.* Last modified March 29, 2018. https://www.psychologytoday.com/us/blog/when-disaster-strikes-inside-disaster-psychology/201803/profiling-school-shooters.

Everytown for Gun Safety Support Fund. "The Impact of Active Shooter Drills in Schools." Last modified February 20, 2023. https://everytownresearch.org/report/the-impact-of-active-shooter-drills-in-schools.

FBI (Federal Bureau of Investigation). "Finding Solace: FBI Crisis Response Canines Help Victims Cope with Tragedy." Last modified July 15, 2016.

FBI (Federal Bureau of Investigation). "In the Aftermath." YouTube, October 7, 2020. https://www.youtube.com/watch?v=3sKyH68L7OE.

FBI (Federal Bureau of Investigation). "Investigative Programs Critical Incident Response Group: National Center for the Analysis of Violent Crime." Accessed March 19, 2023.

FBI (Federal Bureau of Investigation). "We Regret to Inform You. . . Impact Video." Accessed August 11, 2023. https://www.fbi.gov/video-repository/newss-we-regret-to-inform-you-impact-video/view.

FBI (Federal Bureau of Investigation). *Active Shooter Incidents in the United States in 2021*. Washington, DC: U.S. Department of Justice, 2022. https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view.

FBI (Federal Bureau of Investigation). *Active Shooter Incidents: 20-Year Review 2000–2019*. Washington, DC: U.S. Department of Justice, 2021. https://www.fbi.gov/file-repository/active-shooter-incidents-20-year-review-2000-2019-060121.pdf/view.

Federspill, Melissa. "UCISD Not Pursuing JPPI Review." *Uvalde Leader-News,* February 5, 2023. https://www.uvaldeleadernews.com/articles/ucisd-not-pursuing-jppi-review.

FEMA (Federal Emergency Management Agency). "About the National Exercise Program." Last modified May 3, 2023.

FEMA (Federal Emergency Management Agency). "Active Shooter | Run (Evacuate): Avoid Shooter." Accessed August 8, 2023. https://community.fema.gov/ProtectiveActions/s/article/Active-Shooter-Run-Evacuate-Avoid-Shooter.

FEMA (Federal Emergency Management Agency). "Command and Coordination." Accessed December 4, 2023.

FEMA (Federal Emergency Management Agency). "Community Recovery Management Toolkit." Last modified February 10, 2023. https://www.fema.gov/emergency-managers/practitioners/recovery-resources/community-toolkit.

FEMA (Federal Emergency Management Agency). "Emergency Management Institute | EMI Courses & Schedules." Last updated December 29, 2021.

FEMA (Federal Emergency Management Agency). "Emergency Management Institute | ICS Resource Center." Accessed August 3, 2023.

FEMA (Federal Emergency Management Agency). "Homeland Security Exercise and Evaluation Program." Last modified August 2, 2023.

FEMA (Federal Emergency Management Agency). "National Incident Management System." Last modified July 14, 2023. https://www.fema.gov/emergency-managers/nims.

FEMA (Federal Emergency Management Agency). "Public Information Awareness and Basics." Accessed December 5, 2023.

FEMA (Federal Emergency Management Agency). "Public Information Officer Advanced Level." Accessed December 5, 2023.

FEMA (Federal Emergency Management Agency). *Developing and Maintaining Emergency Operations Plans.* Washington, DC: U.S. Department of Homeland Security, 2021.

FEMA (Federal Emergency Management Agency). *Local and Elected Appointed Officials Guide: Roles and Resources in Emergency Management*. Washington, DC: U.S. Department of Homeland Security, 2022. https://www.fema.gov/event/fema-releases-local-elected-and-appointed-officials-guide-roles-and-resources-emergency.

FEMA (Federal Emergency Management Agency). *National Incident Management System: Third Edition*. Washington, DC: U.S. Department of Homeland Security, 2017. https://www.fema.gov/sites/default/files/2020-07/fema_nims_doctrine-2017.pdf.

FEMA (Federal Emergency Management Agency). *National Incident Management System Guidance for Public Information Officers.* Washington, DC: U.S. Department of Homeland Security, 2020.

FEMA (Federal Emergency Management Agency). *National Incident Management System Guideline for Mutual Aid.* Washington, DC: U.S. Department of Homeland Security, 2017.

FEMA (Federal Emergency Management Agency). *National Incident Management System Guideline for the National Qualification System.* Washington, DC: U.S. Department of Homeland Security, 2017.

FEMA (Federal Emergency Management Agency). *National Incident Management System Training Program: Summer 2020*. Washington, DC: U.S. Department of Homeland Security, 2020.

FEMA (Federal Emergency Management Agency). *NIMS Implementation Objectives for Local, State, Tribal, and Territorial Jurisdictions*. Washington, DC: U.S. Department of Homeland Security, 2018.

Fetcher, Joshua, and Reese Oxner. "'The Wrong Decision': Texas DPS Says Local Police Made Crucial Error as School Shooting Continued." *The Texas Tribune*, May 27, 2022. https://www.texastribune.org/2022/05/27/uvalde-school-shooting-police-errors.

Fetcher, Joshua, Reese Oxner, and Uriel Garcia. "Authorities Ignore Spanish Speakers at Uvalde Press Conferences." Axios, May 31, 2022. https://www.axios.com/2022/05/31/uvalde-shooting-spanish-speakers-police.

Fetcher, Joshua, Reese Oxner, and Uriel Garcia. "Narratives, and Blame, Shift Again as Dysfunction Engulfs Shooting Probe." *The Texas Tribune,* June 1, 2022. https://www.texastribune.org/2022/05/31/uvalde-school-police-chief-investigation.

Filipas, Henrietta H., and Sarah E. Ullman. "Social Reactions to Sexual Assault Victims from Various Support Sources." *Violence and Victims* 16, no. 6 (2001): 673–692.

FireRescue1 Academy. "NFPA 3000: Preparing and Training Firefighters for Active Shooter Incidents." Last updated August 6, 2019. https://www.firerescue1.com/fire-products/online-training/articles/nfpa-3000-preparing-and-training-firefighters-for-active-shooter-incidents-ebook-B06ex9Lp3fDhJ5YF.

Critical Incident Review: Active Shooter at Robb Elementary School | Bibliography

546

AR001156

*First Responder Guide for Improving Survivability in Improvised Explosive Device and/or Active Shooter Incidents*. Washington, DC: U.S. Department of Homeland Security, 2015. https://www.dhs.gov/publication/iedactive-shooter-guidance-first-responders.

Fisher, Andrew D., Max Dodge, Wren Nealy Jr., Eric A. Bank, and Dominic Thompson. "Whole Blood in EMS May Save Lives." *Journal of Emergency Medical Services.* Last modified February 1, 2018. https://www.jems.com/patient-care/whole-blood-in-ems-may-save-lives.

Flores, Rosa. "Uvalde City Council to Investigate Every City Officer Who Responded to School Massacre." CNN. Last modified July 26, 2022. https://www.cnn.com/2022/07/26/us/uvalde-city-council-meeting/index.html.

Florio, Adrian. "What New Footage of the Uvalde Shooting Recording Tells Us About the Police Response." *Morning Edition*. NPR, July 13, 2022. https://www.npr.org/2022/07/13/1111244795/what-new-footage-of-the-uvalde-shooting-recording-tells-us-about-the-police-resp.

Flynn, Brian W., Mary C. Vance, and Joshua C. Morganstein. *Curriculum Recommendations for Disaster Health Professionals: Disaster Behavioral Health, Second Edition.* Bethesda, MD: Uniformed Services University, 2020. https://www.cstsonline.org/whats-new/curriculum-recommendations-for-disaster-health-professionals-disaster-behavioral-health.

Fortenbery, Jay. "Developing Ethical Law Enforcement Leaders: A Plan of Action." *FBI Law Enforcement Bulletin.* Last modified May 5, 2015. https://leb.fbi.gov/articles/featured-articles/developing-ethical-law-enforcement-leaders-a-plan-of-action.

Fraire, Rosanna. "Uvalde Victim Uziyah Garcia Laid to Rest in Hometown of San Angelo." *San Angelo Standard-Times,* June 25, 2022. https://www.gosanangelo.com/story/news/2022/06/25/uvalde-victim-uziyah-garcia-san-angelo-funeral/7736547001.

Friedman, Matthew, and Shimon Prokupecz. "Uvalde Shooting: 2 more Texas DPS Officers to be Investigated Over Actions on Day of Massacre." CNN, September 24, 2022, https://www.cnn.com/2022/09/13/us/uvalde-texas-dps-referrals-massacre/index.html.

Gamboa, Suzanne. "Uvalde Shooter Wrote 'LOL' on Whiteboard in Victims' Blood, Lawmaker Tells Families at Emotional Hearing." NBC News, April 19, 2023. https://www.nbcnews.com/news/latino/uvalde-shooter-wrote-lol-white-board-blood-families-gun-laws-hearing-rcna80287.

Garcia, Ariana. "Family of 10-Year-Old Uvalde Shooting Victim Carries Out Daughter's Wish With Viral TikTok." *Houston Chronical,* June 1, 2022. https://www.chron.com/news/houston-texas/article/Uvalde-shooting-familiy-Tess-Marie-Mata-TikTok-17209650.php.

Garcia, Uriel J., and Lexi Churchill. "Uvalde Families, DA at Odds over Release of Public Records." *The Texas Tribune*, March 8, 2023. https://www.texastribune.org/2023/03/08/uvalde-district-attorney-fights-release-public-records-despite-family.

Garcia-Navarro, Lulu, Sophia Alvarez Boyd, and James Doubek. "Experts Worry Active Shooter Drills in Schools Could Be Traumatic for Students." NPR. Last modified November 10, 2019. https://www.npr.org/2019/11/10/778015261/experts-worry-active-shooter-drills-in-schools-could-be-traumatic-for-students.

Global Programme on Preventing and Countering Violent Extremism. *Crisis Communications Toolkit.* Geneva, Switzerland: United Nations Counter-Terrorism Centre, United Nations Office of Counter-Terrorism, n.d. https://www.un.org/counterterrorism/publication/UNOCT-UNCCT-Crisis-Communications-Toolkit.

Goldman, Robert. "Restorative Justice as a Trauma-Informed Approach." *Psychology Today,* January 17, 2023. https://www.psychologytoday.com/us/blog/building-resilient-minds/202301/the-use-of-restorative-justice-as-a-trauma-informed-approach.

Goldstein, Scott, LeeAnne M. Martin Lee, and Joseph Roarty. *EMS Zones of Care*. Treasure Island, FL: StatPearls Publishing, 2023. https://www.ncbi.nlm.nih.gov/books/NBK436017.

Gomez Licon, Adriana. "Uvalde: Visitations, Funerals and Burials, One after Another." *Albuquerque Journal*, May 31, 2022. https://www.abqjournal.com/2503784/uvalde-visitations-funerals-and-burials-one-after-another.html.

Guerilus, Stephanie. "Uvalde Principal Reinstated at Robb Elementary School Following Suspension." ABC News, July 28, 2022. https://abcnews.go.com/US/uvalde-principal-reinstated-robb-elementary-school-suspension/story?id=87600921.

Hamblen, Jessica L., Fran H. Norris, Siobhan Pietruszkiewicz, Laura E. Gibson, April Naturale, and Claudine Louis. "Cognitive Behavioral Therapy for Postdisaster Distress: A Community Based Treatment Program for Survivors of Hurricane Katrina." *Administration and Policy in Mental Health and Mental Health Services Research* 36, no. 3 (2009): 206–214. https://pubmed.ncbi.nlm.nih.gov/19365725.

Hammer, Alex. "Mother of Girl Shot Dead in Uvalde School Massacre Slams Leak of Security Video." *Daily Mail,* July 13, 2022. https://www.dailymail.co.uk/news/article-11009621/Mother-girl-shot-dead-Uvalde-school-massacre-slams-leak-security-video.html.

Hampton, Daniel. "Texas School Shooting: What We Know about Uvalde Victims." *San Antonio, TX Patch,* May 25, 2022. https://patch.com/texas/sanantonio/texas-school-shooting-what-we-know-uvalde-victims.

Hannah, Jason, and Steve Alsmay. "Uvalde School District Police Chief Pete Arredondo Fired in Unanimous Board Vote." CNN, August 25, 2022. https://www.cnn.com/2022/08/24/us/uvalde-school-police-pete-arredondo/index.html.

HB 1774, Relating to actions and liability associated with certain insurance claims (2017). Texas State Legislature, Legislative Session 85(R). https://capitol.texas.gov/tlodocs/85R/billtext/pdf/HB01774F.pdf.

Healing Collective Trauma. "What Is Collective Trauma?" Accessed August 3, 2023. https://www.healingcollectivetrauma.com.

Helling, Steve. "10-Year-Old Uvalde Victims Who Texted 'I Love You' to Each Other at Bedtime Will be Buried Side by Side." *People,* June 8, 2022. https://people.com/crime/uvalde-victims-texted-i-love-you-buried-side-by-side.

*Helping Victims of Mass Violence and Terrorism: Planning, Response, Recovery, and Resources*. Washington, DC: Office for Victims of Crime, 2015. https://ovc.ojp.gov/library/publications/helping-victims-mass-violence-and-terrorism-planning-response-recovery-and-0.

Hernandez, Emily. "What is Operation Lone Star? Gov. Greg Abbott's Controversial Border Mission, Explained." *The Texas Tribune*, March 30, 2022. https://www.texastribune.org/2022/03/30/operation-lone-star-texas-explained.

Herron, Daranesha. "Exclusive: Father of Makenna Elrod-Seiler Speaks out for First Time Following Uvalde Mass Shooting That Took His Daughter's Life." KVUE, August 12, 2022. https://www.kvue.com/article/news/special-reports/uvalde-school-shooting/exclusive-makenna-elrod-seiler-father-speaks-uvalde-mass-shooting/269-7a9421d8-8ef5-434e-bc9d-f8fded0adbfe.

HHS (U.S. Department of Health and Human Services). "Bounce Back." Title IV-E Prevention Services Clearinghouse. Accessed August 3, 2023. https://preventionservices.acf.hhs.gov/programs/414/show.

HHS (U.S. Department of Health and Human Services). "Plan and Prepare for Disasters." Accessed August 3, 2023. https://www.dhs.gov/plan-and-prepare-disasters.

HHS (U.S. Department of Health and Human Services). "Program and Service Ratings." Title IV-E Prevention Services Clearinghouse. Accessed August 3, 2023. https://preventionservices.acf.hhs.gov/review-process/psr.

HHS (U.S. Department of Health and Human Services). "Welcome." Title IV-E Prevention Services Clearinghouse. Accessed August 3, 2023. https://preventionservices.acf.hhs.gov.

Hinojosa, Maria. *After Uvalde: Guns, Grief & Texas Politics*. PBS Frontline, 2023. https://www.pbs.org/wgbh/frontline/documentary/after-uvalde-guns-grief-texas-politics.

Hobfoll, Stevan E., Patricia Watson, Carl C. Bell, Richard A. Bryant, Melissa J. Brymer, Matthew J. Friedman, Merle Friedman, et al. "Five Essential Elements of Immediate and Mid-Term Mass Trauma Intervention: Empirical Evidence." *Psychiatry: Interpersonal and Biological Processes* 70, no. 4 (2007): 283–315. https://doi.org/10.1521/psyc.2007.70.4.283.

*Homeland Security Presidential Directive 5.* Washington, DC: U.S. Department of Homeland Security, 2003. https://www.dhs.gov/publication/homeland-security-presidential-directive-5.

Hopwood, Tanya L., and Nicola S. Schutte. "Psychological Outcomes in Reaction to Media Exposure to Disasters and Large-Scale Violence: A Meta-Analysis." *Psychology of Violence* 7, no. 2 (2017): 316–327. https://psycnet.apa.org/record/2016-22453-001.

Houston, Matt. "Robb Elementary Autopsy Reports Are Done, but a Judge Blocked Their Release." KENS 5, November 7, 2022. https://www.kens5.com/article/news/special-reports/uvalde-school-shooting/robb-elementary-autopsy-reports-done-but-a-judge-blocked-their-release/273-48e42dcc-a72c-448d-a645-68b262b747cd.

Houston, Matt. "Uvalde School Staff Missed Emails Regarding Pete Arredondo Seeking to Upgrade His Discharge Status." KENS 5, February 24, 2023. https://www.kens5.com/article/news/local/texas/pete-arredondo-uvalde-cisd-police-texas-robb-shooting/273-e8035e43-e877-4c91-b3b4-a3ab5de7de3c.

Houston, Matt. "Uvalde Superintendent Explains Why District Nixed Review of School Police Department's Response to Robb Shooting." KENS 5, February 13, 2023. https://www.kens5.com/article/news/special-reports/uvalde-school-shooting/uvalde-superintendent-explains-why-district-nixed-review-school-police-departments-response-to-robb-shooting/273-697b149f-faea-4331-9b06-04d8008ef734.

Hulsman, Sean. "When the Guns Go Silent: How to Manage the Aftermath of a Mass Shooting." EMS1. Last modified August 14, 2019. https://www.ems1.com/mass-shooting/articles/when-the-guns-go-silent-how-to-manage-the-aftermath-of-a-mass-shooting-JcurqDG0NxbeysGc.

Human Resources Division. *Employee Assistance Program Policy Guide*. Washington, DC: Federal Bureau of Investigation, 2022.

Hyde, George E. "Chief Arredono's Attorney Issues Press Statement In Response to Uvalde ISD's Unconstitutional Limitations Placed Upon Name Clearing Hearing and Requested UCISD Read This Statement Out Loud at the Hearing." Statement released by Russell Rodriguez Hyde Bullock LLP, August 24, 2022. https://s3.documentcloud.org/documents/22187659/uvalde-school-police-chief-pete-arredondo-issues-17-page-press-statement-ahead-of-meeting-to-decide-his-fate.pdf.

IACP (International Association of Chiefs of Police). "Law Enforcement Code of Ethics." Accessed December 4, 2023. https://www.theiacp.org/resources/law-enforcement-code-of-ethics.

IACP (International Association of Chiefs of Police). "Law Enforcement-Based Victim Services (LEV) Webinar Series." Accessed August 3, 2023. https://learn.theiacp.org/products/law-enforcement-based-victim-services-lev-webinar-series?_ga=2.96339476.964528332.1679590803-405409729.1651157022#tab-product_tab_contents__79.

IACP (International Association of Chiefs of Police). "Tactical Emergency Medical Training for Law Enforcement Personnel." Resolution adopted at the 120th Annual Conference, October 23, 2013. https://www.theiacp.org/resources/resolution/tactical-emergency-medical-training-for-law-enforcement-personnel.

IACP (International Association of Chiefs of Police). *Critical Incident Stress Management*. Alexandria, VA: International Association of Chiefs of Police, 2011. https://www.theiacp.org/sites/default/files/all/c/CriticalIncidentStressPaper.pdf.

IACP (International Association of Chiefs of Police). *Incident Command Model Policy.* Alexandria, VA: International Association of Chiefs of Police, 2009. https://www.theiacp.org/sites/default/files/2018-08/IncidentCommandPolicy.pdf.

IACP (International Association of Chiefs of Police). *Law Enforcement-Based Victim Services – Template Package IV: Pamphlets*. Alexandria, VA: International Association of Chiefs of Police, 2021. https://www.theiacp.org/sites/default/files/LEV/Publications/TemplatePackageIV_MainDocument_Final-July2021.pdf.

IACP (International Association of Chiefs of Police). *Law Enforcement Oath of Honor.* Alexandria, VA: International Association of Chiefs of Police, n.d. https://www.theiacp.org/sites/default/files/2021-01/246910_IACP_Oath_of_Honor_11x8.5_p1%20%281%29.pdf.

IACP (International Association of Chiefs of Police). *Model Policy on Active Shooter*. Alexandria, VA: International Association of Chiefs of Police, 2018. https://www.theiacp.org/resources/policy-center-resource/active-shooter.

IACP (International Association of Chiefs of Police). *Model Policy on Mutual Aid.* Alexandria, VA: International Association of Chiefs of Police, 2005. https://www.theiacp.org/resources/policy-center-resource/mutual-aid.

IACP (International Association of Chiefs of Police). *Model Policy on Response to Barricaded Individuals*. Alexandria, VA: International Association of Chiefs of Police, 2020. https://www.theiacp.org/sites/default/files/2020-05/Barricaded%20Individuals%2005-26-2020.pdf.

IADLEST (International Association of Directors of Law Enforcement Standards and Training). "National Certification Program." Accessed August 3, 2023. https://iadlest-ncp.org.

Inter-Agency Standing Committee. *IASC Guidelines on Mental Health and Psychosocial Support in Emergency Settings, 2007.* Geneva, Switzerland: United Nations Office for the Coordination of Humanitarian Affairs, 2007. https://interagencystandingcommittee.org/iasc-task-force-mental-health-and-psychosocial-support-emergency-settings/iasc-guidelines-mental-health-and-psychosocial-support-emergency-settings-2007.

Investigative Committee on the Robb Elementary Shooting. *House Investigative Committee on the Robb Elementary Shooting Interim Report 2022.* Austin: Texas House of Representatives, 2022. https://house.texas.gov/committees/reports.

Jacobo, Julia, and Nadine El-Bawab. "Timeline: How the Shooting at a Texas Elementary School Unfolded." ABC News. Last modified December 12, 2022. https://abcnews.go.com/US/timeline-shooting-texas-elementary-school-unfolded/story?id=84966910.

Jimenez, Stephanie. "From Her 'Love of Animals and Pizza,' Maranda Mathis, 11, Remembered as Sweet Girl." KSAT, December 6, 2022. https://www.ksat.com/news/local/2022/12/06/from-her-love-of-animals-and-pizza-maranda-mathis-11-remembered-as-sweet-girl.

Johnson, Phillip M. "Effects of Groupthink on Tactical Decision-Making." Monograph. Leavenworth, KS: School of Advanced Military Studies, 2001. https://apps.dtic.mil/sti/pdfs/ADA387009.pdf.

Justice Technology Information Center. *Law Enforcement Vehicle Lighting and Reflectivity Studies: An Overview.* Washington, DC: National Institute of Justice, 2019. https://www.ojp.gov/library/publications/law-enforcement-vehicle-lighting-and-reflectivity-studies-overview.

Kaniasty, Krzysztof, and Fran H. Norris. "In Search of Altruistic Community: Patterns of Social Support Mobilization following Hurricane Hugo." *American Journal of Community Psychology* 23, no. 4 (1995): 447–477. https://doi.org/10.1007/BF02506964.

Kantor, Wendy Grossman. "14 Months After Uvalde School Shooting, Survivors' Mom Shares His Mental Health Battle: 'Lives with His Scars Daily.'" *People,* July 23, 2023. https://people.com/uvalde-school-shooting-survivor-ptsd-mental-health-struggles-7564236.

Kantor, Wendy Grossman. "Boy Killed in Texas Shooting Wanted to Be Police Officer. Now Uncle Says Cops 'Didn't Even Protect Him.'" *People*, May 28, 2022. https://people.com/crime/boy-killed-texas-shooting-wanted-to-be-police-officer.

Kilander, Gustaf. "New Video from Uvalde Massacre Shows Police Officers Vomiting and Sobbing after Discovering Victims." *The Independent*, May 23, 2023. https://www.independent.co.uk/news/world/americas/crime/uvalde-shooting-video-police-texas-b2343635.html.

King, Cody, Leigh Waldman, Gavin Nesbitt, Andrew Wilson, and Adam Barraza. "Senator Calls for Investigation after Video Shows DPS Officer Shoving Parent of Uvalde Shooting Victim." KSAT, April 5, 2023. https://www.ksat.com/news/local/2023/04/06/senator-calls-for-investigation-after-video-shows-dps-officer-shoving-parent-of-uvalde-shooting-victim.

King, Cody. "'It's Been 4 Months and Nothing's Changed,' Uziyah Garcia's Legal Guardian Calls For Action, Accountability After Robb Elementary Shooting" [Image]. KSAT News, September 25, 2022. https://www.ksat.com/news/local/2022/09/25/its-been-four-months-and-nothings-changed-father-of-uziyah-garcia-calls-for-action-4-months-after-robb-elementary-shooting.

Kochi, Sudiksha. "Fact Check: No Truth to Conspiracy Labeling Uvalde a 'False Flag'." *USA Today,* June 2, 2022. https://www.usatoday.com/story/news/factcheck/2022/06/02/fact-check-no-truth-conspiracy-labeling-uvalde-false-flag/9975616002.

Korrs, Ivan. "Ex-Robb Elementary Principal Takes New Position on Uvalde District School Board | Who's Replacing Her?" *Latin Post,* August 8, 2022. https://www.latinpost.com/articles/156271/20220808/ex-robb-elementary-principal-takes-new-position-uvalde-district-school.htm.

Korrs, Ivan. "Texas Department of Public Safety Facing Legal Heat Over Alleged Withholding of Uvalde Shooting Docs." *Latin Post,* August 1, 2022, https://www.latinpost.com/articles/156176/20220801/texas-department-public-safety-facing-legal-heat-over-alleged-witholding.htm.

La Greca, Annette M., Wendy K. Silverman, Eric M. Vernberg, and Michael C. Roberts, eds. *Helping Children Cope with Disasters and Terrorism.* Washington, DC: American Psychological Association, 2002.

Lass-Hennemann, Johanna, Sarah K Schäfer, Sonja Römer, Elena Holz, Markus Streb, and Tanja Michael. "Therapy Dogs as a Crisis Intervention after Traumatic Events? – An Experimental Study." *Frontiers in Psychology* 9 (2018): 1627. https://doi.org/10.3389/fpsyg.2018.01627.

Lerner, E. Brooke, Richard B. Schwartz, Phillip L. Coule, Eric S. Weinstein, David C. Cone, Richard C. Hunt, Scott M. Sasser, et al. "Mass Casualty Triage: An Evaluation of the Data and Development of a Proposed National Guideline." *Disaster Medicine and Public Health Preparedness* 2, no. S1 (2008): S25–S34. https://doi.org/10.1097/DMP.0b013e318182194e.

Linehan, Patrick, and Olivia Osteen. "Acting Police Chief During Uvalde School Shooting Quits in Wake of Criticism." ABC News, November 17, 2022. https://abcnews.go.com/US/mariano-pargas-acting-police-chief-uvalde-school-shooting/story?id=93507538.

Linehan, Patrick. "Uvalde Police Chief Wins Appeal to Upgrade Termination Record." ABC News, February 21, 2023. https://abcnews.go.com/US/uvalde-police-chief-wins-appeal-upgrade-termination-record/story?id=97372289.

Linehan, Patrick. "Uvalde School District Hires New Police Officers, While Keeping Report from Public." ABC7 Los Angeles, February 14, 2023. https://abc7.com/uvalde-school-district-hires-new-police-officers-while-keeping-rep/12816805.

Lopez, Victoria, Kolten Parker, and Rebecca Salinas. "Uvalde Police Department's Acting Police Chief Placed on Leave After Report Outlines Failed Response." KSAT 12, July 17, 2022. https://www.ksat.com/news/local/2022/07/17/uvalde-police-departments-acting-police-chief-placed-on-leave-after-report-outlines-failed-response.

Lunenburg, Fred C. "Group Decision Making: The Potential for Groupthink." *International Journal of Management, Business, and Administration* 13, no. 1 (2010): 1–6. http://www.nationalforum.com/Journals/IJMBA/IJMBA.htm.

Madden, Monica. "No More DPS Officers Will Be Disciplined for Uvalde Shooting Response, Director Says." KXAN, February 10, 2023. https://www.kxan.com/news/texas/uvalde-school-shooting/uvalde-accountability-dps-director-says-2-employees-to-be-disciplined.

Maldonado, Monica. "Jackie Jaylen Cazares." National Museum of the American Latino, 2022. https://latino.si.edu/exhibitions/healing-uvalde/twenty-one-healing-uvalde-murals/jackie-jaylen-cazares.

Maldonado, Monica. "Makenna Lee Elrod." National Museum of the American Latino, 2022, https://latino.si.edu/exhibitions/healing-uvalde/twenty-one-healing-uvalde-murals/makenna-lee-elrod.

Maldonado, Monica. "Nevaeh Alyssa Bravo." National Museum of the American Latino, 2022. https://latino.si.edu/exhibitions/healing-uvalde/twenty-one-healing-uvalde-murals/nevaeh-alyssa-bravo.

Maldonado, Monica. "Uziyah Sergio Garcia." National Museum of the American Latino, 2022. https://latino.si.edu/exhibitions/healing-uvalde/twenty-one-healing-uvalde-murals/uziyah-garcia.

Margolin, Josh, Jenny Wagnon Courts, Kate Holland, Alex Hosenball, and Hannah Prince. "'I Am Suffering Mentally,' Uvalde Educator Says After False Blame in Shooting Aftermath." ABC News, October 24, 2022. https://abcnews.go.com/US/suffering-mentally-uvalde-educator-false-blame-shooting-aftermath/story?id=91886661.

Marshall, Randall D. "Learning from 9/11: Implications for Disaster Research and Public Health." In *9/11: Mental Health in the Wake of Terrorist Attacks*, edited by Yuval Neria, Raz Gross, and Randall D. Marshall, 617–630. New York: Cambridge University Press, 2006.

Martaindale, M. Hunter, and J. Pete Blair. "The Evolution of Active Shooter Response Training Protocols Since Columbine: Lessons From the Advanced Law Enforcement Rapid Response Training Center." *Journal of Contemporary Criminal Justice* 35, no. 3 (2019): 342–356. https://doi.org/10.1177/1043986219840237.

Martinez, Gina. "Two Best Friends at Uvalde Elementary School Who Texted Each Other 'I Love You' Nightly Before Being Killed in Mass Shooting Will Be Buried Next to Each Other." *Daily Mail,* June 8, 2022. https://www.dailymail.co.uk/news/article-10897749/Two-best-friends-killed-Texas-school-shooting-buried-other.html.

Matkin, Holly. "Ex-Uvalde School Police Chief Won't Have 'Dishonorable' Discharge After School District Failed to Show Up at Hearing." *The Police Tribune,* February 22, 2023. https://policetribune.com/ex-uvalde-school-police-chief-wont-have-dishonorable-discharge-after-school-district-failed-to-show-up-at-hearing.

McElroy, Laura. *Developing a Crisis Communication Plan: 5 Important Strategies.* Body-Worn Camera Training & Technical Assistance Program. Washington, DC: Bureau of Justice Assistance, n.d. http://bwctta.com/bwcs-and-crisis-communication.

McGee, Kevin, and Chris Reilly, "Terrorism and Homeland Security: Hot, Warm and Cold Zones." International Association of Fire Chiefs. Last modified November 8, 2018. https://www.iafc.org/membership/iCHIEFS/iCHIEFS-article/terrorism-and-homeland-security-hot-warm-and-cold-zones.

McNeel, Bekah. "On the Day of the Uvalde Shooting, Her School Bus Became a Makeshift Ambulance." *The Texas Tribune,* December 20, 2022. https://www.texastribune.org/2022/12/20/uvalde-shooting-bus-ambulance.

Medina, Dani. "Cop Leading Uvalde Shooting Investigation Quietly Retires." News Radio 1200 WOAI, October 27, 2022. https://woai.iheart.com/content/2022-10-27-cop-leading-uvalde-shooting-investigation-quietly-retires.

Medina, John Henry. "Tejano Community Attend Funeral of Eliahna 'Ellie' Garcia, One of the Victims of the Uvalde School Shooting." Tejano Nation, June 7, 2022. https://tejanonation.net/2022/06/06/tejano-community-attend-funeral-of-eliahna-ellie-garcia-one-of-the-victims-of-the-uvalde-school-shooting.

Menchaca, Megen. "Texas Politicians Respond to Video of Uvalde Shooting Police Response." *Austin Statesman,* July 13, 2022. https://www.statesman.com/story/news/politics/2022/07/13/uvalde-shooting-video-texas-politicians-respond-police-action/65372606007.

Méndez, María. "Almost 100 Texas School Districts Have Added Their Own Police Departments since 2017, but Not Everyone Feels Safer." *The Texas Tribune*, June 15, 2022. https://www.texastribune.org/2022/06/15/uvalde-school-officers-texas-shootings.

Mental Health Technology Transfer Center. *After a School Tragedy . . . Readiness, Response, Recovery, & Resources.* Rockville, MD: Substance Abuse and Mental Health Services Administration, 2019. https://mhttcnetwork.org/centers/mhttc-network-coordinating-office/product/after-school-tragedyreadiness-response-recovery.

Mercedes, Cheryl. "Uvalde Mass Shooting Families to See Hallway Video." KHOU, July 15, 2022. https://www.khou.com/article/news/special-reports/uvalde-school-shooting/uvalde-victim-families-robb-elementary-hallway-video/285-251a989c-ef05-41af-92f4-04a628227fcf.

Miles, J.D. "Uvalde Victim Alithia Ramirez Remembered for Her Kind Heart." CBS News, May 26, 2022. https://www.cbsnews.com/texas/news/alithia-ramirez-uvalde.

Miller, Laurence. "Law Enforcement Traumatic Stress: Clinical Syndromes and Intervention Strategies." American Academy of Experts in Traumatic Stress, 2020. https://www.aaets.org/traumatic-stress-library/law-enforcement-traumatic-stress-clinical-syndromes-and-intervention-strategies.

Milliard, Beth. "Utilization and Impact of Peer-Support Programs on Police Officers' Mental Health." *Frontiers in Psychology* 11 (2020): 1686. https://doi.org/10.3389/fpsyg.2020.01686.

Mitchell, Taiyler S. "CNN Provides Footage Of Uvalde Shooting to Parents a Year after the Massacre." *Huffpost.* Last modified May 22, 2023. https://www.huffpost.com/entry/cnn-uvalde-video_n_646a787ae4b0ab2b97e85a44.

Montgomery, David, et al. "'She Was My Sweet Girl': Remembering the Victims of the Uvalde Shooting." *The New York Times,* June 5, 2022. https://www.nytimes.com/2022/06/05/us/uvalde-shooting-victims.html.

Moody, Joe (@moodyforelpaso). "This is the husband of teacher Eva Mireles, who contacted him on his phone from her classroom while he was on-scene to say that she'd been shot and was dying. 1/2 #txlege #Uvalde." X (formerly known as Twitter), July 13, 2022, 2:48 pm. https://twitter.com/moodyforelpaso/status/1547291847332069376.

Moreno, Julie, and Leigh Waldman. "Parents Block Entrance at Uvalde CISD Headquarters Demanding Action Against District Officers." KSAT 12, September 27, 2022. https://www.ksat.com/news/local/2022/09/27/parents-block-entrance-at-uvalde-cisd-headquarters-demanding-action-against-district-officers.

Moreno, Julie, and Leigh Waldman. "Uvalde CISD Assistant Superintendent is 4th in Central Office to Retire After Robb Elementary Massacre." KSAT 12, October 26, 2022. https://www.ksat.com/news/local/2022/10/26/uvalde-cisd-assistant-superintendent-is-4th-in-central-office-to-retire-after-robb-elementary-massacre.

Moreno-Lozano, Luz. "Color del dolor: 21 Uvalde Murals of Robb Elementary Victims Use Paint to Heal Pain." *Austin American-Statesman*, October 25, 2022. https://www.statesman.com/in-depth/news/2022/10/25/healing-uvalde-21-murals-memorialize-tell-story-robb-elementary-victims/69520352007.

Morgan, Jack. "Texas Artists Honor the Uvalde Victims with 21 Murals They Hope Will Help Healing." NPR, August 20, 2022. https://www.npr.org/2022/08/20/1118439845/texas-artists-honor-the-uvalde-victims-with-21-murals-they-hope-will-help-healin.

Critical Incident Review: Active Shooter at Robb Elementary School | Bibliography 556

AR001166

Morris, Cheryl. "The Importance of Leading by Example." *American Police Beat.* Last modified October 31, 2021. https://apbweb.com/2021/10/the-importance-of-leading-by-example.

Morrissey, Jim. "EMS Response to Active-Shooter Incidents." *EMS World.* Last modified July 2011. https://www.hmpgloballearningnetwork.com/site/emsworld/article/10279321/ems-response-active-shooter-incidents.

MPD (Metropolitan [D.C.] Police Department). *After Action Report, Washington Navy Yard, September 16, 2013: Internal Review of the Metropolitan Police Department, Washington, D.C.* Washington, DC: July 2014. https://mpdc.dc.gov/publication/mpd-navy-yard-after-action-report.

NAMI (National Alliance on Mental Illness). "Employment and Mental Illness: Investing in Programs that Work." July 14, 2014. https://www.nami.org/Blogs/NAMI-Blog/July-2014/Employment-and-Mental-Illness-Investing-in-Program.

NAMI (National Alliance on Mental Illness). "Mental Health By the Numbers." Last modified April 2023. https://nami.org/mhstats.

NASEMSO (National Association of State EMS Officials). "NASEMSO Releases 2020 National EMS Assessment." April 9, 2020. https://nasemso.org/news-events/news/news-item/nasemso-releases-2020-national-ems-assessment-2.

NASEMSO (National Association of State EMS Officials). *National Model EMS Clinical Guidelines: Version 2.2.* Falls Church, VA: National Association of State EMS Officials, 2019. https://nasemso.org/projects/model-ems-clinical-guidelines.

National Association of School Psychologists. *Best Practice Consideration for Armed Assailant Drills in Schools.* Bethesda, MD: National Association of School Psychologists, 2021. https://www.nasponline.org/resources-and-publications/resources-and-podcasts/school-safety-and-crisis/systems-level-prevention/best-practice-considerations-for-armed-assailant-drills-in-schools.

National Association of School Psychologists. *Mitigating Psychological Effects of Lockdowns.* Bethesda, MD: National Association of School Psychologists, 2018. https://www.nasponline.org/resources-and-publications/resources-and-podcasts/school-safety-and-crisis/systems-level-prevention/mitigating-psychological-effects-of-lockdowns?te=1&nl=debatable&emc=edit_db_20200805.

National Center for PTSD. "Stress First Aid: Manuals and Resources for Health Care Workers." U.S. Department of Veterans Affairs. Last modified July 6, 2023. https://www.ptsd.va.gov/professional/treat/type/stress_first_aid.asp.

National Center for PTSD. "Types of Debriefing Following Disasters." Last updated October 6, 2022. https://www.ptsd.va.gov/professional/treat/type/debrief_after_disasters.asp.

National Center for PTSD. *Stress First Aid (SFA) for Law Enforcement*. Police Officer Toolkit. U.S. Department of Veterans Affairs, 2016. https://ptsd.va.gov/PTSD/professional/treat/care/toolkits/police/resourcesHandouts.asp.

National Child Traumatic Stress Network. "Mass Violence Resources." Accessed August 8, 2023. https://www.nctsn.org/what-is-child-trauma/trauma-types/terrorism-and-violence/mass-violence?page=1.

National Institute for Health and Care Excellence. "Post-Traumatic Stress Disorder." Last modified December 5, 2018. https://www.nice.org.uk/guidance/ng116/chapter/recommendations#disaster-plan.

National Museum of the American Latino. "Healing Uvalde: Community Healing and Resiliance." Accessed August 3, 2023. https://latino.si.edu/exhibitions/healing-uvalde.

National Threat Assessment Center, U.S. Secret Service. *Averting Targeted School Violence: A U.S. Secret Service Analysis of Plots Against Schools.* Washington, DC: U.S. Department of Homeland Security, 2021. https://www.secretservice.gov/sites/default/files/reports/2021-03/USSS%20Averting%20Targeted%20School%20Violence.2021.03.pdf.

National Threat Assessment Center, U.S. Secret Service. *Mass Attacks in Public Spaces: 2016–2020.* Washington, DC: U.S. Department of Homeland Security, 2023. https://www.secretservice.gov/sites/default/files/reports/2023-01/usss-ntac-maps-2016-2020.pdf.

National Volunteer Fire Council. "Home: NVFC." Accessed December 6, 2023. https://www.nvfc.org.

National Volunteer Fire Council. "Share the Load Program." Accessed June 22, 2023. https://www.nvfc.org/programs/share-the-load-program.

Naturale, April J. "Outreach Strategies: An Experiential Description of the Outreach Methodologies Used in the September 11, 2001, Disaster Response in New York." In *Interventions Following Mass Violence and Disasters,* edited by Elspeth Cameron Ritchie, Patricia J. Watson, and Matthew J. Friedman, 365–386. New York: Guilford Press, 2007.

Naturale, April, Liam T. Lowney, and Corina Sole Brito. "Lessons Learned from the Boston Marathon Bombing Victim Services Program." *Clinical Social Work Journal* 45, no. 4 (2017): 99–188. https://www.researchgate.net/publication/316525844_Lessons_Learned_from_the_Boston_Marathon_Bombing_Victim_Services_Program.

Navarro, Marian. "Uvalde Asks Public for Private Space as One-Year Mark of Robb Elementary Shooting Looms." Texas Public Radio, May 15, 2023. https://www.tpr.org/news/2023-05-15/uvalde-asks-public-for-private-space-as-one-year-mark-of-robb-elementary-shooting-looms.

Neria, Yuval, Sandro Galea, and Fran H. Norris, eds. *Mental Health and Disasters.* Cambridge, UK: Cambridge University Press, 2010. https://doi.org/10.1017/CBO9780511730030.

New York State Psychiatric Institute. "Patient and Family Library." Archived July 1, 2007. https://web.archive.org/web/20070701061820/http:/www.nyspi.org/Kolb/nyspi_pf_library/index.html.

*NFPA 1500TM : Standard on Fire Department Occupational Safety, Health, and Wellness Program*. Quincy, MA: National Fire Protection Association, 2021. https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=1500.

Norris, Fran H., Jessica L. Hamblen, Patricia J. Watson, Josef I. Ruzek, Laura E. Gibson, Betty J. Pfefferbaum, Jennifer L. Price, Susan P. Stevens, Bruce H. Young, and Matthew J. Friedman. "Toward Understanding and Creating Systems of Postdisaster Care: A Case Study of New York's Response to the World Trade Center Disaster." In *Interventions Following Mass Violence and Disasters*, edited by Elspeth Cameron Ritchie, Patricia J. Watson, and Matthew J. Friedman, 343–364. New York: Guildford Press, 2006.

Norris, Fran H., Laurie B. Slone, Charlene K. Baker, and Arthur D. Murphy. "Early Physical and Health Consequences of Disaster Exposure and Acute Disaster-Related PTSD." *Anxiety, Stress, and Coping: An International Journal* 19, no. 2 (2006): 95–110. https://doi.org/10.1080/10615800600652209.

Norris, Fran H., Matthew J. Friedman, and Patricia J. Watson. "60,000 Disaster Victims Speak: Part II. Summary and Implications of the Disaster Mental Health Research." *Psychiatry: Interpersonal and Biological Processes* 65, no. 3 (2002): 240–260. https://doi.org/10.1521/psyc.65.3.240.20169.

Norris, Fran H., Matthew J. Friedman, Patricia J. Watson, Christopher M. Byrne, Eolia Diaz, and Krzysztof Kaniasty. "60,000 Disaster Victims Speak: Part I. An Empirical Review of the Empirical Literature, 1981–2001." *Psychiatry* 65, no. 3 (2002): 207–239. https://doi.org/10.1521/psyc.65.3.207.20173.

NTOA (National Tactical Officers Association). *Tactical Response and Operations Standard for Law Enforcement Agencies.* Colorado Springs, CO: National Tactical Officers Association, 2023. https://www.ntoa.org/tros.

O'Callaghan, Erin, ed. "What is Generational Trauma and How Long Can it Last?" Brightside.com. Accessed August 3, 2023. https://www.brightside.com/blog/what-is-generational-trauma-and-how-long-can-it-last.

Office of Senator Robert Nichols. "Nichols Named Chair of Senate Special Committee to Protect All Texans." Press release, June 2, 2022. https://www.senate.texas.gov/members/d03/press/en/p20220602a.pdf.

Office of the Texas Attorney General. "Costs Covered by the Crime Victims' Compensation Program." Accessed August 3, 2023. https://www.texasattorneygeneral.gov/crime-victims/crime-victims-compensation-program/costs-covered-crime-victims-compensation-program.

Office of the Texas Governor. "Governor Abbott Announces New Chief of School Safety and Security." Press release, October 3, 2022. https://gov.texas.gov/news/post/governor-abbott-announces-new-chief-of-school-safety-and-security.

Office of Transportation Disaster Assistance. *Federal Family Assistance Framework for Aviation Disasters*. Washington, DC: National Transportation Safety Board, 2008. https://www.ntsb.gov/tda/er/Pages/tda-fa-aviation.aspx.

Ohlheiser, Abby. "Malcolm Gladwell's Cockpit Culture Theory and the Asiana Crash." *The Atlantic*, July 13, 2013. https://www.theatlantic.com/national/archive/2013/07/malcolm-gladwells-cockpit-culture-theory-everywhere-after-asiana-crash/313442.

Olidepo, Gloria. "Principal of Uvalde Elementary School Suspended in Wake of Deadly Shooting." *The Guardian,* July 26, 2022. https://www.theguardian.com/us-news/2022/jul/26/uvalde-shooting-texas-robb-elementary-principal-suspended.

Orrick, W. Dwayne. *Best Practices Guide: Developing a Police Department Policy-Procedure Manual.* Alexandria, VA: International Association of Chiefs of Police, n.d. https://www.theiacp.org/sites/default/files/2018-08/BP-PolicyProcedures.pdf.

Ortiz, Abel. "Eliahna 'Ellie' Amyah Garcia." National Museum of the American Latino, 2022. https://latino.si.edu/exhibitions/healing-uvalde/twenty-one-healing-uvalde-murals/eliahna-ellie-amyah-garcia.

Osteen, Olivia, Patrick Linehan, Josh Margolin, and Lucien Bruggeman. "Uvalde Residents Confront School Board Over Response to Shooting." ABC News, August 9, 2022. https://abcnews.go.com/US/uvalde-residents-confront-school-board-response-shooting/story?id=88145074.

OVC (Office for Victims of Crime) Training and Technical Assistance Center. "About Us." Last modified August 1, 2023. https://www.ovcttac.gov/views/index.cfm?nm=au.

OVC (Office for Victims of Crime) Training and Technical Assistance Center. *"Helping Victims of Mass Violence and Terrorism: How to Design and Implement a Community Resiliency Center."* Webinar, June 28, 2021. https://www.ovcttac.gov/massviolence/?nm=sfa&ns=mvt&nt=webinars.

OVC (Office for Victims of Crime). "Antiterrorism and Emergency Assistance Program (AEAP)." Accessed August 3, 2023. https://ovc.ojp.gov/program/antiterrorism-and-emergency-assistance-program-aeap/overview.

OVC (Office for Victims of Crime). "Mass Violence and Terrorism Death Notification." Webinar, January 21, 2020. https://ovc.ojp.gov/events/mass-violence-and-terrorism-death-notification-webinar-0.

OVC (Office for Victims of Crime). "Mass Violence: Death Notifications: Best Practices." Accessed August 3, 2023. https://www.ovcttac.gov/videos/dspMV_DeathNotifications.cfm.

OVC (Office for Victims of Crime). "The VOCA Fix." Last modified December 16, 2021. https://ovc.ojp.gov/about/crime-victims-fund/voca-fix.

OVC (Office for Victims of Crime). "Types of Assistance Available Through AEAP." https://ovc.ojp.gov/program/antiterrorism-and-emergency-assistance-program-aeap/types-assistance.

Pal, Judy, Khadijah Carter, Eric Kowalczyk, and Christine Townsend. *Strategic Communications for Law Enforcement Executives*. Washington, DC: Office of Community Oriented Policing Services, 2023. https://portal.cops.usdoj.gov/resourcecenter?item=cops-r1127.

Parker, Kolten, and Cody King. "Uvalde City Council Denies Leave of Absence from Future Meetings for Pete Arredondo." KSAT 12, June 21, 2022. https://www.ksat.com/news/local/2022/06/21/uvalde-city-council-to-vote-on-a-leave-of-absence-from-future-meetings-for-pete-arredondo.

Parsons, Jim, and Tiffany Bergin. "The Impact of Criminal Justice Involvement on Victims' Mental Health." *Journal of Traumatic Stress* 23, no. 2 (April 2010): 182–188. https://onlinelibrary.wiley.com/doi/10.1002/jts.20505.

Patton, Mary Claire, and Leigh Waldman. "Video Inside Robb Elementary Shows Gunman Enter School, Police Gathering in Hallway for More Than Hour." KSAT 12, July 13, 2022. https://www.ksat.com/news/local/2022/07/12/video-inside-robb-elementary-school-shows-gunman-enter-school-police-gathering-in-hallway-for-more-than-hour.

Patton, Mary Claire. "Uvalde CISD Announces Plans for Displaced Robb Elementary Students." KSAT 12, July 13, 2022. https://www.ksat.com/news/local/2022/07/13/uvalde-cisd-announces-plans-for-displaced-robb-elementary-students.

Pearce, Jimmy, and Scott Goldstein. "EMS Tactical Movement Techniques." *StatPearls*. Treasure Island, FL: StatPearls Publishing, 2022. https://www.ncbi.nlm.nih.gov/books/NBK499869.

Pennardt, Andre, and Richard Schwartz. "Hot, Warm, and Cold Zones: Applying Existing National Incident Management System Terminology to Enhance Tactical Emergency Medical Support Interoperability." *Journal of Special Operations Medicine* Fall 2014: 78–79. https://www.jsomonline.org/JournalArticles/20143.php.

PERF (Police Executive Research Forum). "ICAT: Integrating Communications, Assessment, and Tactics: A Training Guide for Defusing Critical Incidents." Accessed December 4, 2023. https://www.policeforum.org/icat-training-guide.

Pfefferbaum, Betty, Carol S. North, Brian W. Flynn, Fran H. Norris, and Robert DeMartino. "Disaster Mental Health Services Following the 1995 Oklahoma City Bombing: Modifying Approaches to Address Terrorism." *CNS Spectrums* 7, no. 8 (2002): 575–579. https://www.cambridge.org/core/journals/cns-spectrums/article/abs/disaster-mental-health-services-following-the-1995-oklahoma-city-bombing-modifying-approaches-to-address-terrorism/DCB85284D003F6F3DC9DA442C0B0EAE7.

Phelps, Scot. "Why Paramedics Are Qualified Emergency Care Providers." EMS1. Last modified May 6, 2015. https://www.ems1.com/education-and-training/articles/why-paramedics-are-qualified-emergency-care-providers-ze63hPelbZuctOFP.

Pike, Sarah M. "Memorializing in the Aftermath of Disaster." Counterpoint: Navigating Knowledge, April 17, 2019. https://www.counterpointknowledge.org/memorializing-in-the-aftermath-of-disaster.

Planas, Antonio. "Uvalde Commissioners Launch Review of Sheriff's Office, Which Lacked Active Shooter Policy Before Massacre." NBC News, July 25, 2022. https://www.nbcnews.com/news/us-news/uvalde-commissioners-launch-review-sheriffs-office-lacked-active-shoot-rcna39864.

Plohetski, Tony. "Surveillance Video of Uvalde School Shooting Shows Police Response." *Austin Statesman,* July 12, 2022. https://www.statesman.com/story/news/2022/07/12/uvalde-school-shooting-video-of-robb-elementary-shows-police-response/65370384007.

Plohetski, Tony. "Texas Lawmakers Signed NDAs to Obtain Uvalde Shooting Case File." KVUE, December 1, 2022. https://www.kvue.com/article/news/special-reports/uvalde-school-shooting/uvalde-shooting-texas-lawmakers-nda/269-5d43e735-37b3-4a93-b656-f829ef6c05bb.

Pokorny, Douglas M., Maxwell Braverman, Philip M. Edmundson, David M. Bittenbinder, Caroline S. Zhu, Christopher J. Winckler, Randall Schaefer, et al. "The Use of Prehospital Blood Products in the Resuscitation of Trauma Patients: A Review of Prehospital Transfusion Practices and a Description of Our Regional Whole Blood Program in San Antonio, TX." *ISBT Science Series* 14, no. 3 (2019): 332–342. https://doi.org/10.1111/voxs.12498.

Police Organization Providing Peer Assistance. "Mission." Accessed December 4, 2023. https://poppanewyork.org/about/mission.

Pomerantz, Jay. "Can Posttraumatic Stress Disorder Be Prevented?" *Psychiatric Times* 23, no. 4 (2006). https://www.psychiatrictimes.com/view/can-posttraumatic-stress-disorder-be-prevented.

Power DMS. "Writing Effective Policies and Procedures in Law Enforcement." Last modified December 29, 2020. https://www.powerdms.com/policy-learning-center/writing-effective-policies-and-procedures-in-law-enforcement.

Prieb, Natalie. "Last Uvalde Victim Injured in School Shooting Discharged from San Antonio Hospital." *The Hill,* July 30, 2022. https://thehill.com/homenews/3580709-last-uvalde-victim-injured-in-shooting-discharged-from-san-antonio-hospital.

Prince, Hannah, Josh Margolin, and Emily Shapiro. "Uvalde Families Slam Texas DPS Chief, Call for His Resignation at Public Safety Meeting." ABC News, October 27, 2022. https://abcnews.go.com/US/texas-dps-chief-steven-mccraw-give-update-uvalde/story?id=91883125.

Prokupecz, Shimon, Matthew J. Friedman, and Rachel Clarke. "10-Year-Old Trapped with the Uvalde School Shooter Repeatedly Called 911 for Help. It Took Officials 40 Minutes to Act." CNN, November 2, 2022. https://www.cnn.com/2022/11/01/us/uvalde-911-classroom-call-delay/index.html.

Prokupecz, Shimon, Matthew J. Friedman, and Rachel Clarke. "Exclusive: Uvalde Sheriff Had Vital Information about School Shooter That Was Not Shared." CNN, December 7, 2022. https://www.cnn.com/2022/12/07/us/uvalde-sheriff-ruben-nolasco-robb-elementary-massacre/index.html.

Prokupecz, Shimon, Matthew J. Friedman, and Rachel Clarke. "Officer Being Investigated Over Shooting Response Gave Order to Delay Classroom Breach." CNN, October 20, 2022. https://www.cnn.com/2022/10/20/us/texas-uvalde-dps-investigation-betancourt/index.html.

Prokupecz, Shimon, Matthew J. Friedman, and Rachel Clarke. "Uvalde Shooting: New Audio Shows Acting Police Chief Knew That Children Needed Rescuing." CNN, November 14, 2022. https://www.cnn.com/2022/11/14/us/uvalde-investigation-acting-police-chief-mariano-pargas/index.html.

Prokupecz, Shimon, Matthew J. Friedman, and Rachel Clarke. "Uvalde Shooting: School District Fires Officer After CNN Identifies Her as Trooper Under Investigation for Her Response to Massacre." CNN, October 6, 2022. https://www.cnn.com/2022/10/05/us/texas-uvalde-school-officer-investigation/index.html.

Prokupecz, Shimon, Matthew J. Friedman, and Rachel Clarke. "Uvalde Massacre: School Police Chief Told Investigators Why He Didn't Try to Stop Gunman: 'There's Probably Going to Be Some Deceased in There, But We Don't Need Any More from Out Here.'" CNN, January 11, 2023. https://www.cnn.com/2023/01/10/us/uvalde-school-massacre-arredondo-interview/index.html.

*Psychology Today.* "Bystander Effect." Accessed August 3, 2023. https://www.psychologytoday.com/us/basics/bystander-effect.

*Psychology Today.* "Groupthink." Accessed August 3, 2023. https://www.psychologytoday.com/us/basics/groupthink.

Rabb, Shaun. "Texas Launches First-of-Its-Kind Mental and Emotional Support Group for Law Enforcement." FOX 4 News Dallas-Fort Worth, September 9, 2022. https://www.fox4news.com/news/texas-launches-first-of-its-kind-mental-and-emotional-support-group-for-law-enforcement.

Ramirez, Marizen, Karisa Harland, Maisha Frederick, Rhoda Shepherd, Marleen Wong, and Joseph E. Cavanaugh. "Listen Protect Connect for Traumatized Schoolchildren: A Pilot Study of Psychological First Aid." *BMC Psychology* 1, no. 26 (2013). https://doi.org/10.1186/2050-7283-1-26.

Readiness and Emergency Management for Schools. "Readiness and Emergency Management for Schools Technical Assistance Center." Accessed December 5, 2023. https://rems.ed.gov.

Ready.gov. "Emergency Response Plan." Last modified September 7, 2023. https://www.ready.gov/business/emergency-plans/emergency-response-plan.

*Regional Field Triage Algorithm.* San Antonio, TX: Southwest Texas Regional Advisory Council, 2021. https://www.strac.org/prehospital.

*Report of Governor Bill Owens' Columbine Review Commission*. Denver, CO: Columbine Review Commission, 2001.

*Report on Mental Health Access for First Responders*. Carson City, NV: Nevada State Legislature. https://www.leg.state.nv.us/Session/80th2019/Exhibits/Assembly/HHS/AHHS848I.pdf.

Riesman, Abraham Josephine. "Why Cops and Soldiers Love the Punisher." *Vulture,* June 2, 2020. https://www.vulture.com/article/marvel-punisher-police-cops-military-fandom.html.

Robino, Ariann E., David M. Feldman, Alyssa N. Stein, Melody A. Schmaltz, Hailey A. Fitzpatrick, Jaime L. Tartar, Frankie Pizzo, Marah Friedman, and Olivia Feldman. "Sustained Effects of Animal-Assisted Crisis Response on Stress in School Shooting Survivors." *Human-Animal Interaction Bulletin* 12, no. 2 (2022): 65–85. https://doi.org/10.1079/hai.2022.0019.

Ronen, Anat. "Artist Statement." National Museum of the American Latino, 2022. https://latino.si.edu/exhibitions/healing-uvalde/twenty-one-healing-uvalde-murals/tess-mata.

Rose, Suzanna C., Jonathan Bisson, Rachel Churchill, and Simon Wessely. *Psychological Debriefing for Preventing Post Traumatic Stress Disorder (PTSD).* Cochrane Database of Systematic Reviews, 2002. https://doi.org/10.1002/14651858.CD000560.

Ryser, Rob. "Trauma by Association." *GreenwichTime*. Last modified June 19, 2016. https://www.greenwichtime.com/printpromotion/article/Trauma-by-association-8312393.php.

Salinas, Rebecca, and Leigh Waldman. "KSAT's 'One Year In: Uvalde' Honors Victims of Robb Elementary Shooting, Highlights Impact in Community." KSAT. Last modified May 25, 2023. https://www.ksat.com/news/local/2023/05/18/ksats-one-year-in-uvalde-honors-victims-of-robb-elementary-shooting-highlights-impact-in-community.

Salinas, Rebecca, Andrew Wilson, Leigh Waldman, and Gavin Nesbitt. "Students in Uvalde Protest Gun Violence on National School Walkout Day." KSAT. Last modified April 5, 2023. https://www.ksat.com/news/local/2023/04/05/watch-live-students-at-uvalde-walk-out-of-school-in-national-protest-of-gun-violence.

Salinas, Rebecca. "Uvalde Officials Told DPS That Police Had 'Zero Hesitation,' 'Each Minute Was Used to Save Lives,' Document Shows." KSAT, July 16, 2022. https://www.ksat.com/news/local/2022/07/16/uvalde-officials-told-dps-that-police-had-zero-hesitation-each-minute-was-used-to-save-lives-document-shows.

Critical Incident Review: Active Shooter at Robb Elementary School | Bibliography

564

AR001174

Salston, MaryDale, and Charles R. Figley. "Secondary Traumatic Stress Effects of Working with Survivors of Criminal Victimization." *Journal of Traumatic Stress* 16, no. 2 (2003): 167–175. https://doi.org/10.1023/a:1022899207206.

SAMHSA (Substance Abuse and Mental Health Services Administration). "Crisis Counseling Assistance and Training Program (CCP)." Last modified April 14, 2022. https://www.samhsa.gov/dtac/ccp.

SAMHSA (Substance Abuse and Mental Health Services Administration). "Mass Violence and Behavioral Health*." Disaster Technical Assistance Center Supplemental Research Bulletin,* 2017. https://www.samhsa.gov/dtac/disaster-behavioral-health-resources/ supplemental-research-bulletin.

SAMHSA (Substance Abuse and Mental Health Services Administration). "Provide Support." Last modified July 18, 2022. https://www.samhsa.gov/workplace/employer-resources/provide-support.

SAMHSA (Substance Abuse and Mental Health Services Administration). "Stress First Aid for Fire and EMS Personnel." Accessed August 3, 2023. https://www.samhsa.gov/resource/dbhis/stress-first-aid-fire-ems-personnel.

Sanchez, Ray. "'We're in Trouble.' 80 minutes of Horror at Robb Elementary School." CNN, May 29, 2022. https://www.cnn.com/2022/05/29/us/uvalde-texas-elementary-school-shooting-week/index.html.

Sandoval, Edgar. "A Son Was Lost, a Daughter Saved." *The New York Times,* May 30, 2022. https://www.nytimes.com/2022/05/30/us/victims-texas-shooting-family.html.

SB 64, Relating to a peer support network for certain law enforcement personnel (2021). Texas State Legislature, Legislative Session 87(R). https://capitol.texas.gov/billlookup/BillStages.aspx?LegSess=87R&Bill=SB64.

Schildkraut, Jaclyn, and Amanda B. Nickerson. "Should We Or Shouldn't We? Arguments for and Against Lockdown Drills." *The MIT Press Reader.* Last modified June 9, 2022. https://thereader.mitpress.mit.edu/arguments-for-and-against-lockdown-drills.

Schlenger, William E., Juesta M. Caddell, Lori Ebert, Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank, and Richard A. Kulka. "Psychological Reactions to Terrorist Attacks: Findings From the National Study of Americans' Reactions to September 11." *Journal of the American Medical Association* 288, no. 5 (2002): 581–588. https://doi.org/10.1001/jama.288.5.581.

Schonfeld, David J., Marlene Melzer-Lange, Andrew N. Hashikawa, Peter A. Gorski, Steven Krug, Carl Baum, Sarita Chung, et al. "Participation of Children and Adolescents in Live Crisis Drills and Exercises." *Pediatrics* 146, no. 3 (2020). https://doi.org/10.1542/peds.2020-015503.

Schonfeld, Zach. "What We Know about the Uvalde Victims Who Were Hospitalized." Yahoo! News, May 30, 2022. https://news.yahoo.com/know-uvalde-victims-were-hospitalized-032425461.html?guccounter=1.

Schweit, Katherine W. "Addressing the Problem of the Active Shooter." *FBI Law Enforcement Bulletin.* Last modified May 7, 2013. https://leb.fbi.gov/articles/featured-articles/addressing-the-problem-of-the-active-shooter.

Seline, Libby. "So Long 'Thoughts and Prayers:' 4 Months Later, an Analysis of How Twitter Reacted to Uvalde." *San Antonio Express-News*, September 13, 2022. https://www.expressnews.com/news/local/article/Uvalde-shooting-twitter-analysis-17413430.php.

Serrano, Alejandro, and Uriel J. Garcia. "Uvalde School District Suspends its Entire Police Department*." The Texas Tribune,* October 7, 2022, https://www.texastribune.org/2022/10/07/uvalde-school-police-suspended.

Serrano, Alejandro. "DPS Chief Steve McCraw Says His 'Institution Did Not Fail' in Uvalde*." The Texas Tribune,* October 27, 2022. https://www.texastribune.org/2022/10/27/steve-mccraw-dps-response.

Sewell, James D. *Guide for Developing an Effective Stress Management Policy for Law Enforcement: Psychological Support, Training of Agency Personnel, Cardiovascular Disease, and Police Suicide*. Washington, DC: Office of Community Oriented Policing Services, 2021. https://portal.cops.usdoj.gov/resourcecenter?item=cops-w0943.

Shakhnazarova, Nika. "Texas School Massacre Victims Who Exchanged 'I Love You Texts' Will Be Buried Next to One Another." *New York Post,* June 8, 2022. https://nypost.com/2022/06/08/annabell-rodriguez-james-lopez-to-be-buried-next-to-each-other.

Shalchi, Homa. "Psychological Effects of Active Shooter Drills in Schools." Baylor College of Medicine. Last modified August 19, 2019. https://www.bcm.edu/news/psychological-effect-of-active-shooter-drills.

Silver, Ashley. "Uvalde School District Hires New Interim Police Chief." Police1, November 17, 2022. https://www.police1.com/chiefs-sheriffs/articles/uvalde-school-district-hires-new-interim-police-chief-QzrJTMmKLyEUDLNA.

Silverman, W. K., and A.M. La Greca. "Children Experiencing Disasters: Definitions, Reactions, and Predictors of Outcomes." In *Helping Children Cope with Disasters and Terrorism*, edited by Annette M. La Greca, Wendy K. Silverman, Eric M. Vernberg, and Michael C. Roberts, 11–33. Washington, DC: American Psychological Association, 2002.

Smith, Kelli. "Hundreds of Police Officers Have Signed up for Texas Mental-Health Program, Officials Say." *Dallas Morning News*, September 8, 2022. https://www.dallasnews.com/news/public-safety/2022/09/08/hundreds-of-police-officers-have-signed-up-for-texas-mental-health-program-officials-say/.

Sottile, Zoe. "Their Mom Was Killed in Uvalde, Then Their Dad Died of A Heart Attack – Now People Are Donating Millions for Their Family." CNN, May 29, 2022. https://www.cnn.com/2022/05/29/us/uvalde-family-gofundme-trnd/index.html.

Southwest Texas Regional Advisory Council. "About Us." Accessed December 4, 2023. https://strac.org/index.

Stanley, Ian H., Joseph W. Boffa, Melanie A. Hom, Nathan A. Kimbrel, and Thomas E. Joiner. "Differences in Psychiatric Symptoms and Barriers to Mental Health Care between Volunteer and Career Firefighters." *Psychiatry Research* 247 (2017): 236–242. https://doi.org/10.1016/j.psychres.2016.11.037.

Staub, Ervin. *Overcoming Evil: Genocide, Violent Conflict, and Terrorism.* Oxford, UK: Oxford University Press, 2010. https://doi.org/10.1093/acprof:oso/9780195382044.001.0001.

Staub, Ervin. *The Roots of Goodness and Resistance to Evil: Inclusive Caring, Moral Courage, Altruism Born of Suffering, Active Bystandership, and Heroism*. Oxford, UK: Oxford University Press, 2015.

Stein, Robin, and Alexander Cardia. "State Investigation Fueled Flawed Understanding of Delays During Police Response in Uvalde." *The New York Times,* October 12, 2022. https://www.nytimes.com/2022/10/12/us/uvalde-shooting-police-response-investigation.html.

Steinberg, Alan M., Melissa J. Brymer, Soeun Kim, Ernestine C. Briggs, Chandra Ghosh Ippen, Sarah A. Ostrowski, Kevin J. Gully, and Robert S. Pynoos. "Psychometric Properties of the UCLA PTSD Reaction Index: Part I." *Journal of Traumatic Stress* 26, no. 1 (2013): 1–9. https://doi.org/10.1002/jts.21780.

*Strategies to Enhance Survival in Active Shooter and Intentional Mass Casualty Events: A Compendium*. Supplement to the Bulletin of the American College of Surgeons 100, no. 1S (2015). https://www.stopthebleed.org/media/0svpk45s/hartford_consensus_compendium.pdf.

Straub, Frank, Blake Norton, Jennifer Zeunik, Brett Meade, Ben Gorban, Rebecca Benson, Joyce Iwashita, Alyse Folino Ley, and Michael Johnson. *Recovering and Moving Forward: Lessons Learned and Recommendations Following the Shooting at Marjory Stoneman Douglas High School*. Washington, DC: National Policing Institute, 2019. https://www.policinginstitute.org/publication/recovering-and-moving-forward-lessons-learned-and-recommendations-following-the-shooting-at-marjory-stoneman-douglas-high-school.

Straub, Frank, Jeffrey Brown, Roberto Villaseñor, Jennifer Zeunik, Ben Gorban, Blake Norton, and Eddie Reyes. *Advancing Charlotte: A Police Foundation Assessment of the Charlotte-Mecklenburg Police Department Response to the September 2016 Demonstrations*. Arlington, VA: National Policing Institute (formerly known as the Police Foundation), 2018. https://www.policinginstitute.org/publication/advancing-charlotte-a-police-foundation-assessment-of-the-charlotte-mecklenburg-police-department-response-to-the-september-2016-demonstrations.

Sturdevant, Neil. "Texas 4-H Scholarship Honors Makenna Lee Elrod Seiler." *Uvalde Leader-News,* December 22, 2022. https://www.uvaldeleadernews.com/articles/texas-4-h-scholarship-honors-makenna-lee-elrod-seiler.

TCOLE (Texas Commission on Law Enforcement). "Basic Peace Officer Course 720." Last modified February 17, 2022. http://www.tcole.texas.gov/content/basic-peace-officer-course-720.

TCOLE (Texas Commission on Law Enforcement). "Basic Telecommunicator Licensing Course (2022)." Last modified September 6, 2022. http://www.tcole.texas.gov/content/basic-telecommunicator-licensing-course-2022.

TCOLE (Texas Commission on Law Enforcement). "Legislatively Mandated Training." Memorandum, June 13, 2022. Austin, TX: Texas Commission on Law Enforcement.

TCOLE (Texas Commission on Law Enforcement). "Proficiency Certificates." Accessed August 3, 2023. http://www.tcole.texas.gov/content/proficiency-certificates.

TCOLE (Texas Commission on Law Enforcement). "School Based Law Enforcement Training." *Technical Assistance Bulletin.* August 27, 2019. https://www.tcole.texas.gov/content/technical-assistance-bulletins.

TCOLE (Texas Commission on Law Enforcement). "TCOLE History." Accessed December 5, 2023. http://www.tcole.texas.gov/content/tcole-history.

TCOLE (Texas Commission on Law Enforcement). "TCOLE Mission." Accessed August 3, 2023. http://www.tcole.texas.gov/content/tcole-mission.

TCOLE (Texas Commission on Law Enforcement). "Training Providers." Accessed August 3, 2023. https://www.tcole.texas.gov/content/training-providers.

TCOLE (Texas Commission on Law Enforcement). "Training Requirements." Accessed August 8, 2023. https://www.tcole.texas.gov/content/training-requirements.

TCOLE (Texas Commission on Law Enforcement). *Active Shooter Response for School-Based Law Enforcement: Course #2195.* Austin: Texas Commission on Law Enforcement, 2020. https://s3.documentcloud.org/documents/22046076/active-shooter-sble-2195-course-final-1-30-20.pdf.

Tedeschi, Richard G., Jane Shakespeare-Finch, Kanako Taku, and Lawrence G. Calhoun. "Developmental Research on Posttraumatic Growth." In *Posttraumatic Growth: Theory, Research and Applications,* 199–125. New York: Routledge, 2018.

TEX. ADMIN. CODE § 221.1, Texas Commission on Law Enforcement: Proficiency Certificate Requirements (2011, as amended). https://texreg.sos.state.tx.us/public/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=37&pt=7&ch=221&rl=1.

TEX. ADMIN. CODE § 221.43, Texas Commission on Law Enforcement: School-Based Law Enforcement Proficiency Certificate (2016, as amended). https://texreg.sos.state.tx.us/public/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=37&pt=7&ch=221&rl=43.

TEX. ADMIN. CODE § 392.303(14), Texas Health and Human Services Commission: Definitions—Memorandum of Understanding (MOU) (2015). https://texreg.sos.state.tx.us/public/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=1&pt=15&ch=392&rl=303.

TEX. CRIM. CODE § 2.17, General Duties of Officers: Conservator of the Peace (1965, as amended). https://statutes.capitol.texas.gov/Docs/CR/htm/CR.2.htm#2.17htm.

TEX. EDUC. CODE § 37.103, Enforcement of Rules (1995). https://statutes.capitol.texas.gov/Docs/ED/htm/ED.37.htm#37.103.

TEX. EDUC. CODE § 37.108(g), Multihazard Emergency Operations Plan; Safety and Security Audit (2005). https://statutes.capitol.texas.gov/Docs/ED/htm/ED.37.htm#37.108.

TEX. EDUC. CODE § 37.109, School Safety and Security Committee (2009, as amended). https://statutes.capitol.texas.gov/Docs/ED/htm/ED.37.htm#37.109.

TEX. EDUC. CODE § 37.114, Best Practices for Emergency School Drills and Exercises; Mandatory School Drills (2019, as amended). https://statutes.capitol.texas.gov/Docs/ED/htm/ED.37.htm#37.114.

TEX. EDUC. CODE § 37.115, Threat Assessment and Safe and Supportive School Program and Team (2019). https://statutes.capitol.texas.gov/Docs/ED/htm/ED.37.htm#37.115.

TEX. EDUC. CODE § 37.201, Texas School Safety Center (2001). https://statutes.capitol.texas.gov/Docs/ED/htm/ED.37.htm#37.201.

TEX. GOV. CODE § 418.1015, Emergency Management Directors (2007, as amended). https://statutes.capitol.texas.gov/Docs/GV/htm/GV.418.htm#418.1015.

Texas Department of Criminal Justice. "Definitions and Acronyms." Accessed August 3, 2023. https://www.tdcj.texas.gov/divisions/vs/index.html.

Texas Department of Public Safety. "Human Resource Operations." Accessed August 3, 2023. https://www.dps.texas.gov/section/human-resource-operations.

Texas Department of Public Safety. "Operation Lone Star: In the News." Last modified May 26, 2023. https://www.dps.texas.gov/operationlonestar.

Texas Department of Public Safety. "Resilience Training." Accessed August 3, 2023. https://www.dps.texas.gov/section/training-operations-tod/resilience-training.

Texas Department of Public Safety. "Statement by Director Steven McCraw on Release of Uvalde Video." News release, July 12, 2022. https://www.dps.texas.gov/news/statement-director-steven-mccraw-release-uvalde-video.

Texas Division of Emergency Management. *State of Texas Emergency Management Plan: Basic Plan.* Del Valle, TX: Texas Division of Emergency Management, 2020. https://www.tdem.texas.gov/preparedness/state-planning.

Texas Education Agency. "Texas Schools." Accessed December 5, 2023. https://tea.texas.gov/texas-schools.

Texas EMS Alliance. "Peer Assistance." Accessed August 7, 2023. https://txemsa.com/peer-assistance.

Texas Health and Human Services Network. "Texas Critical Incident Stress Management Network." Accessed August 3, 2023. https://www.hhs.texas.gov/about/process-improvement/improving-services-texans/behavioral-health-services/disaster-behavioral-health-services/texas-critical-incident-stress-management-network.

Texas School Safety Center. "About." Texas State University. Accessed August 3, 2023. https://txssc.txstate.edu/about.

Texas School Safety Center. "Drill Frequently Asked Questions." In *Training, Drilling, and Exercising Toolkit: 2.1 Drill Requirements.* San Marcos, TX: Texas State University, n.d. https://txssc.txstate.edu/tools/tde-toolkit/drill-requirements.

Texas School Safety Center. "School Safety Law Toolkit: 86th Session Updates (2019)." Texas State University. Accessed August 8, 2023. https://txssc.txstate.edu/tools/law-toolkit/updates/86th.

Texas State Association of Firefighters. "TSAFF Peer Support." Accessed August 3, 2023. https://www.tsaff.org/peer-support.

*Texas Tribune.* "Uvalde CISD." Accessed August 8, 2023. https://schools.texastribune.org/districts/uvalde-cisd.

Thomas, Jake. "Uvalde Hallway Video Reignites Fury at Police as Families Condemn Release." *Newsweek,* July 13, 2022. https://www.newsweek.com/uvalde-hallway-video-reignites-fury-police-families-condemn-release-1724104.

Tiesman, Hope M., Katherine L. Elkins, Melissa Brown, Suzanne Marsh, and Leslie M. Carson. "Suicides Among First Responders: A Call to Action." Centers for Disease Control and Prevention, April 6, 2021. https://blogs.cdc.gov/niosh-science-blog/2021/04/06/suicides-first-responders.

Tosone, Carol, John P. McTighe, Jennifer Bauwens, and April Naturale. "Shared Traumatic Stress and the Long-Term Impact of September 11th on Manhattan Clinicians." *Journal of Traumatic Stress* 24, no. 5 (2011): 546–552. https://doi.org/10.1002/jts.20686.

Tosone, Carol, Orit Nuttman-Shwartz, and Tricia Stephens. "Shared Trauma: When the Professional is Personal." *Clinical Social Work Journal* 40 (2012): 231–239. https://doi.org/10.1007/s10615-012-0395-0.

*Trauma and Grief Component Therapy for Adolescents.* Los Angeles: The National Child Traumatic Stress Network, 2018. https://www.nctsn.org/interventions/trauma-and-grief-component-therapy-adolescents.

Treisman, Rachel, and Alex Leff. "How World Leaders Are Reacting to the Uvalde School Shooting." NPR, May 25, 2022. https://www.npr.org/2022/05/25/1101256376/leaders-reaction-to-uvalde-school-shooting-texas-zelenskyy-pope-trudeau.

U.S. Census Bureau. "Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over: Uvalde County, Texas." *American Community Survey.* Accessed August 3, 2023. https://data.census.gov/table?q=B16001+&g=050XX00US48463&tid=ACSDT5Y2015.B16001.

U.S. Census Bureau. "QuickFacts: Uvalde city, Texas." Accessed August 8, 2023. https://www.census.gov/quickfacts/uvaldecitytexas.

U.S. Department of Education. "An Eligible Student Guide to the Family Educational Rights and Privacy Act (FERPA)." https://studentprivacy.ed.gov/sites/default/files/resource_document/file/An%20Eligible%20Student%20Guide%20to%20FERPA_0.pdf.

U.S. Department of Education. "Does FERPA Protect the Education Records of Students that are Deceased?" Accessed August 8, 2023. https://studentprivacy.ed.gov/faq/does-ferpa-protect-education-records-students-are-deceased.

U.S. Fire Administration. *Fire/Emergency Medical Services Department Operational Considerations and Guide for Active Shooter and Mass Casualty Incidents*. Washington, DC: Federal Emergency Management Agency, 2013. https://www.usfa.fema.gov/downloads/pdf/publications/active_shooter_guide.pdf.

UCISD (Uvalde Consolidated Independent School District). "U.C.I.S.D. School Board." Accessed August 8, 2023. https://www.ucisd.net/about-ucisd/schoolboard.

*Unexpected Challenges for Communities in the Recovery Phase of a Mass Violence Incident.* Charleston, SC: National Mass Violence Victimization Resource Center, 2023. https://nmvvrc.org/media/00tbio4n/unexpected-challenges-for-communities-in-recovery-phase.pdf.

University of North Texas at Dallas. "Texas Law Enforcement Peer Network." Accessed August 3, 2023. https://www.untdallas.edu/cpi/tlepn.

Ura, Alexa. "Irma and Joe Garcia, a Teacher and Her Heartbroken Husband, are Buried Together in Uvalde." *The Texas Tribune,* June 1, 2022. https://www.texastribune.org/2022/06/01/garcia-funeral-uvalde-shooting.

Uria, Daniel. "Mourners Gather for Funerals of Student, Teacher Killed in Uvalde Shooting." UPI, June 2, 2022. https://www.upi.com/Top_News/US/2022/06/01/mourners-gather-funerals-student-teacher-killed-Uvalde-shooting/8631654134736.

Usher, Laura, Stefanie Friedhoff, Sam Cochran, and Anand Pandya. *Preparing for the Unimaginable: How Chiefs Can Safeguard Officer Mental Health before and after Mass Casualty Events*. Washington, DC: Office of Community Oriented Policing Services, 2016. https://portal.cops.usdoj.gov/resourcecenter?item=cops-p347.

Uvalde County. "Contact Us: Constables." Accessed August 3, 2023. https://uvaldecounty.com/index.php/county/constables/constables-contact.

Uvalde Municipal Code of Ordinances. Title 2, Chapter 2.56, Police Department. https://library.municode.com/tx/uvalde/codes/code_of_ordinances?nodeId=TIT2ADPE_CH2.56PODE.

*Uvalde Region Mental Health Needs Assessment*. Hill Country Mental Health & Developmental Disabilities Center, 2022. https://www.hillcountry.org/uvalde-region-mental-health-needs-assessment.

Uvalde Together Resiliency Center. "Participating Organizations." Accessed August 3, 2023. https://uvaldetogether.org/#participating-organizations.

Virgin, Yami. "New Body Camera Video from Uvalde School Tragedy." KEYE, October 26, 2022. https://cbsaustin.com/newsletter-daily/new-body-camera-video-from-uvalde-school-tragedy.

Virgin, Yami. "Top Texas Ranger Suddenly Retires in Middle of Uvalde School Shooting Investigation." NBC News 4 San Antonio, October 25, 2022. https://news4sanantonio.com/news/local/top-texas-ranger-suddenly-retires-in-middle-of-uvalde-school-shooting-investigation-teachers-students-murder-police-troopers-robb-elementary.

Virginia Tech Review Panel. Mass Shootings at Virginia Tech, April 16, 2007: Report of the Review Panel Presented to Governor Kaine, Commonwealth of Virginia. Blacksburg, VA: Virginia Tech, 2007. https://scholar.lib.vt.edu/prevail/docs/VTReviewPanelReport.pdf.

Vreeland, Betty. "An Evidence-Based Practice of Psychoeducation for Schizophrenia: A Practical Intervention for Patients and Their Families." *Psychiatric Times* 29, no. 2 (2012): 34–40. https://www.psychiatrictimes.com/view/evidence-based-practice-psychoeducation-schizophrenia.

Walton, Xavier. "Uvalde CISD Announces Recommendation to Fire Pete Arredondo." KHOU, July 21, 2022. https://www.khou.com/article/news/special-reports/uvalde-school-shooting/uvalde-cisd-plans-termination-pete-arredondo/285-56df553b-7271-4298-902d-c71cfc13125f.

War Trauma Foundation. *Psychological First Aid: Guide for Field Workers.* Geneva, Switzerland: World Health Organization, 2011. https://www.who.int/publications/i/item/9789241548205.

Watson, Patricia J., Vickie Taylor, Richard Gist, Erika Elvander, Frank Leto, Bob Martin, Jim Tanner, et al. *Stress First Aid for Firefighters and Emergency Medical Services Personnel: Student Manual*. Emmitsburg, MD: National Fallen Firefighters Foundation, 2015. https://www.ptsd.va.gov/professional/treat/type/stress_first_aid_asp.

Watson, Patricia, and Richard J. Westphal. *Stress First Aid for Health Care Workers.* Washington, DC: U.S. Department of Veterans Affairs, 2020. https://www.ptsd.va.gov/professional/treat/type/stress_first_aid.asp.

Weber, Paul J. "Statesman, Other News Media Sue Uvalde Officials for Shooting Records." *Austin American-Statesman,* August 30, 2022, https://www.statesman.com/story/news/2022/08/30/uvalde-shooting-records-lawsuit-statesman-other-news-media-sue/65464656007.

Weber, Paul J. "Uvalde Students Go Back to School For 1st time Since Attack." Associated Press, September 6, 2022. https://apnews.com/article/shootings-texas-education-3e0fc3ec61c1135f8bdae5a18f786ef7.

Wertheimer, Tiffany. "Texas shooting: The teachers who sacrificed their lives to protect children." BBC News, May 26, 2022. https://www.bbc.com/news/world-us-canada-61593071.

The White House. "A Proclamation Honoring The Victims Of The Tragedy In Uvalde, Texas." May 24, 2022. https://www.whitehouse.gov/briefing-room/presidential-actions/2022/05/24/a-proclamation-honoring-the-victims-of-the-tragedy-in-uvalde-texas.

The White House. "Remarks by President Biden on Gun Violence in America." June 2, 2022. https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/02/remarks-by-president-biden-on-gun-violence-in-america.

The White House. "Remarks by President Biden on the School Shooting in Uvalde, Texas." May 24, 2022. https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/05/24/remarks-by-president-biden-on-the-school-shooting-in-uvalde-texas.

Wiley, Kelly. "Texas School Shooting in Uvalde Prompts DPS to Change Active Shooter Policy." KXAN, September 9, 2022. https://www.kxan.com/news/active-shooter-policy-changed-in-wake-of-uvalde-according-to-dps-emails.

Willis, Dan. "Perspective: Principles of Effective Law Enforcement Leadership." *FBI Law Enforcement Bulletin.* Last modified March 1, 2011. https://leb.fbi.gov/articles/perspective/perspective-principles-of-effective-law-enforcement-leadership.

Wilson, Laura C. "A Systematic Review of Probable Posttraumatic Stress Disorder in First Responders Following Man-Made Mass Violence." *Psychiatry Research* 229, no. 1–2 (2015): 21–26. https://doi.org/10.1016/j.psychres.2015.06.015.

Wolfe, Elizabeth, and Andy Rose. "Texas Department of Public Safety Must Release Documents Related to Uvalde School Shooting, Judge Rules." CNN, June 29, 2023. https://www.cnn.com/2023/06/29/us/uvalde-texas-dps-shooting-response-records-ruling/index.html.

World Health Organization. "Definition of Health." Accessed August 11, 2023. https://www.publichealth.com.ng/world-health-organizationwho-definition-of-health.

Yan, Holly, Harmeet Kaur, Melissa Alonso, Amir Vera, and Sharif Paget. "Remembering What We Know about the Victims at Robb Elementary School." CNN, July 23, 2022. https://www.cnn.com/2022/05/25/us/victims-uvalde-texas-school-shooting/index.html.

Yousef, Odette. "The Texas School Shooting Conspiracies Show Far-Right Misinformation is Evolving." NPR, May 26, 2022. https://www.npr.org/2022/05/26/1101479269/texas-uvalde-school-shooting-misinformation-conspiracy-far-right.

Zoellner, Lori A., Edna B. Foa, and Bartholomew D. Brigidi. 1999. "Interpersonal Friction and PTSD in Female Victims of Sexual and Nonsexual Assault*." Journal of Traumatic Stress* 12, no. 4 (1999): 689–700. https://doi.org/10.1023/A:1024777303848.

Zoellner, Lori A., Norah C. Feeny, Afsoon Eftekhari, and Edna B. Foa. "Changes in negative beliefs following three brief programs for facilitating recovery after assault." *Depression and Anxiety* 28, no. 7 (2011): 532–540. https://doi.org/10.1002/da.20847.

# Additional References

CIR Document and Data Review

CIR Training Analysis

Hillcrest Memorial Funeral Home CCTV Footage

Robb Elementary School CCTV Footage

Texas Department of Public Safety Body-Worn Camera Footage

Texas Department of Public Safety Dashboard Footage

Texas Department of Public Safety Radio Traffic

Texas Parks and Wildlife Body-Worn Camera Footage

Uvalde County Constables Body-Worn Camera Footage

Uvalde County Sheriff's Office Body-Worn Camera Footage

Uvalde County Sheriff's Office Radio Traffic

Uvalde Police Department 911 Calls

Uvalde Police Department Body-Worn Camera Footage

Uvalde Police Department Calls for Service

Uvalde Police Department Dispatch Landline

Uvalde Police Department Incident Call Log

Uvalde Police Department Radio Traffic

AR001186



U.S. Department of Justice
Office of Community Oriented Policing Services
145 N Street NE
Washington, DC 20530

To obtain details about COPS Office programs,
call the COPS Office Response Center at 800-421-6770.

Visit the COPS Office online at **cops.usdoj.gov**.

 An official website of the United States government

**United States® Census Bureau**

## QuickFacts
### Uvalde city, Texas

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more.*

## Table

| All Topics ▼ | Uvalde city, Texas |
|---|---|
| P pulation E mates, Jul 1, 2022 ( 2022) | ⚠ 15,4 0 |
| 👤 **PEOPLE** | |
| **Population** | |
| **Population Estimates, July 1, 2022, (V2022)** | ⚠ **15,430** |
| Population estimates base, April 1, 2020, (V2022) | ⚠ 15,219 |
| Population, percent change - April 1, 2020 (estimates base) to July 1, 2022, (V2022) | ⚠ 1.4% |
| Population, Census, April 1, 2020 | 15,217 |
| Population, Census, April 1, 2010 | 15,751 |
| **Age and Sex** | |
| Persons under 5 years, percent | ⚠ 7.8% |
| Persons under 18 years, percent | ⚠ 28.7% |
| Persons 65 years and over, percent | ⚠ 14.4% |
| Female persons, percent | ⚠ 50.8% |
| **Race and Hispanic Origin** | |
| White alone, percent | ⚠ 81.6% |
| Black or African American alone, percent  (a) | ⚠ 1.7% |
| American Indian and Alaska Native alone, percent  (a) | ⚠ 0.9% |
| Asian alone, percent  (a) | ⚠ 1.7% |
| Native Hawaiian and Other Pacific Islander alone, percent  (a) | ⚠ 0.0% |
| Two or More Races, percent | ⚠ 9.0% |
| Hispanic or Latino, percent  (b) | ⚠ 81.8% |
| White alone, not Hispanic or Latino, percent | ⚠ 14.5% |
| **Population Characteristics** | |
| Veterans, 2017-2021 | 816 |
| Foreign born persons, percent, 2017-2021 | 12.4% |
| **Housing** | |
| Housing units, July 1, 2022, (V2022) | X |
| Owner-occupied housing unit rate, 2017-2021 | 67.7% |
| Median value of owner-occupied housing units, 2017-2021 | $91,300 |
| Median selected monthly owner costs -with a mortgage, 2017-2021 | $1,136 |
| Median selected monthly owner costs -without a mortgage, 2017-2021 | $412 |
| Median gross rent, 2017-2021 | $846 |
| Building permits, 2022 | X |
| **Families & Living Arrangements** | |
| Households, 2017-2021 | 5,143 |
| Persons per household, 2017-2021 | 2.90 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2017-2021 | 87.7% |
| Language other than English spoken at home, percent of persons age 5 years+, 2017-2021 | 59.0% |
| **Computer and Internet Use** | |
| Households with a computer, percent, 2017-2021 | 81.3% |
| Households with a broadband Internet subscription, percent, 2017-2021 | 76.0% |
| **Education** | |
| High school graduate or higher, percent of persons age 25 years+, 2017-2021 | 71.1% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2017-2021 | |

**Is this page helpful?** ✖

AR001188    👎 No

| **Health** | |
|---|---|
| With a disability, under age 65 years, percent, 2017-2021 | 16.2% |
| Persons without health insurance, under age 65 years, percent | ⚠ 19.1% |
| **Economy** | |
| In civilian labor force, total, percent of population age 16 years+, 2017-2021 | 60.9% |
| In civilian labor force, female, percent of population age 16 years+, 2017-2021 | 59.3% |
| Total accommodation and food services sales, 2017 ($1,000)  (c) | 40,691 |
| Total health care and social assistance receipts/revenue, 2017 ($1,000)  (c) | 178,469 |
| Total transportation and warehousing receipts/revenue, 2017 ($1,000)  (c) | 42,289 |
| Total retail sales, 2017 ($1,000)  (c) | 365,777 |
| Total retail sales per capita, 2017  (c) | $22,508 |
| **Transportation** | |
| Mean travel time to work (minutes), workers age 16 years+, 2017-2021 | 15.0 |
| **Income & Poverty** | |
| Median household income (in 2021 dollars), 2017-2021 | $46,439 |
| Per capita income in past 12 months (in 2021 dollars), 2017-2021 | $23,579 |
| Persons in poverty, percent | ⚠ 20.9% |

## 🏭 BUSINESSES

| **Businesses** | |
|---|---|
| Total employer establishments, 2021 | X |
| Total employment, 2021 | X |
| Total annual payroll, 2021 ($1,000) | X |
| Total employment, percent change, 2020-2021 | X |
| Total nonemployer establishments, 2020 | X |
| All employer firms, Reference year 2017 | 532 |
| Men-owned employer firms, Reference year 2017 | 299 |
| Women-owned employer firms, Reference year 2017 | 28 |
| Minority-owned employer firms, Reference year 2017 | 114 |
| Nonminority-owned employer firms, Reference year 2017 | 314 |
| Veteran-owned employer firms, Reference year 2017 | S |
| Nonveteran-owned employer firms, Reference year 2017 | 342 |

## 🌐 GEOGRAPHY

| **Geography** | |
|---|---|
| Population per square mile, 2020 | 1,985.5 |
| Population per square mile, 2010 | 2,058.8 |
| Land area in square miles, 2020 | 7.66 |
| Land area in square miles, 2010 | 7.65 |
| FIPS Code | 4874588 |

**Is this page helpful?** ✖

👎 No

AR001189

About datasets used in this table

**Value Notes**

⚠ Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. ] Click the Quick Info ⓘ icon to the left of each row in T. learn about sampling error.

In Vintage 2022, as a result of the formal request from the state, Connecticut transitioned from eight counties to nine planning regions. For more details, please see the Vintage 2022 release notes available here: Release Notes.

The vintage year (e.g., V2022) refers to the final year of the series (2020 thru 2022). Different vintage years of estimates are not comparable.

Users should exercise caution when comparing 2017-2021 ACS 5-year estimates to other ACS estimates. For more information, please visit the 2021 5-year ACS Comparison Guidance page.

**Fact Notes**

(a)    Includes persons reporting only one race
(b)    Hispanics may be of any race, so also are included in applicable race categories
(c)    Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**

D     Suppressed to avoid disclosure of confidential information
F     Fewer than 25 firms
FN    Footnote on this item in place of data
NA    Not available
S     Suppressed; does not meet publication standards
X     Not applicable
Z     Value greater than zero but less than half unit of measure shown
-     Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper interval of an open end
N     Data for this geographic area cannot be displayed because the number of sample cases is too small.

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, Sta Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

**CONNECT WITH US**   f     🐦     in     ▶     ⓞ

Information Quality | Data Linkage Infrastructure | Data Protection and Privacy Policy | Accessibility | FOIA | Inspector General | No FEAR Act | U.S. Department of Commerce | USA.gov

**Measuring America's People, Places, and Economy**

**Is this page helpful?** ✖

AR001190      👎 No



Bailout events within a 1-mile radius of Robb Elementary
4 total from 1/1/2020 to 5/24/2022
(SOURCE: CBP Analytical Framework for Intelligence)

AR001191



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

**DIRECTIVE NUMBER:** 51735-013B

**SUPERSEDES:** 51735-013A

**SUBJECT CODE:**

**DISTRIBUTION:**

**EFFECTIVE DATE:** December 9, 2020

**OFFICE:** Enterprise Services

**SUB OFFICE:** Human Resources Management

**PROGRAM OFFICE:** Human Resources Policy and Programs Directorate/Human Resources Policy and Regulatory Affairs Division

## U.S. CUSTOMS AND BORDER PROTECTION
## STANDARDS OF CONDUCT

### 1   PURPOSE

1.1     This Directive establishes the U.S. Customs and Border Protection (CBP) policy on the ethical conduct and responsibilities of all CBP employees.

### 2   POLICY

2.1     It is the policy of CBP to maintain a workforce that demonstrates high standards of ethical and professional conduct in order to ensure efficient performance of government service.

### 3   INTRODUCTION

3.1     In fulfilling its mission, CBP and its employees must sustain the trust and confidence of the public they serve.  All employees must maintain high standards of honesty, integrity, impartiality, character, and professionalism to ensure the proper performance of government business and the continued trust and confidence of the public.  The conduct of CBP employees must reflect the qualities of integrity and loyalty to the United States; a sense of responsibility for the public trust; courtesy and promptness in dealing with and serving the public; and a standard of personal behavior that reflects positively upon, and will be a credit to, both CBP and its employees.

3.2     Certain conduct, on or off-duty, may subject an employee to appropriate disciplinary action.  This holds true whether or not such conduct is specifically addressed in these standards, or in related statutes or regulations, to include those noted in the Authorities section below. ***The absence of a specific standard of conduct does not mean that an act is permissible or would not result in disciplinary action.***  Employees are held accountable for their actions, to include activity on social media, and are subject to appropriate disciplinary action when there is a nexus

AR001192



(connection) between their misconduct (on or off-duty) and the efficiency of the service.  For example:

- Failing to conform to these standards or related statutes and regulations.
- The nature and gravity of the conduct (e.g., criminal conduct) creates the presumption of a connection between the employee's conduct and the efficiency of the service.
- Directly and negatively impacting the job performance of an employee or his/her co-workers, or management's trust and confidence in an employee's job performance.
- Adversely affecting or interfering with the accomplishment of CBP's mission.

## 4   SCOPE

4.1   This Directive applies to all CBP employees.  Where there are differences in this Directive and a negotiated union agreement, the negotiated union agreement shall govern over those matters concerning bargaining unit employees.

## 5   AUTHORITIES

5.1   Executive Order (E.O.) 12674, Principles of Ethical Conduct for Government Officers and Employees.

5.2   Department of Homeland Security (DHS) Management Directive System - MD Number 0480.1, Standards of Conduct (March 1, 2003).

5.3   Title 5, Code of Federal Regulation (C.F.R.) Part 2635, Standards of Ethical Conduct for Employees of the Executive Branch.

5.4   5 C.F.R. Part 735, Employee Responsibilities and Conduct.

5.5   6 C.F.R. Part 115, Sexual Abuse and Assault Prevention Standards.

5.6   Department of Homeland Security Policy Directive 045-06, Required Reporting of Off-Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension and/or Revocation of Authority to Carry a Firearm or Other Weapon and Perform Law Enforcement Duties (January 10, 2017).

5.7   CBP Policy on Zero Tolerance of Sexual Abuse and Assault (March 11, 2015).

5.8   Information Systems Security Policies and Procedures Handbook, HB 1400-05D (November 16, 2017).

5.9   Arrest of CBP Employees, Directive 51735-014A (December 9, 2020).

5.10   CBP Drug-Free Workplace Plan (October 1, 2017).

## 6   RESPONSIBILITIES

AR001193



6.1     The Commissioner of CBP is responsible for establishing the standards of professional and ethical conduct for all CBP employees.

6.2     The Assistant Commissioner, Office of Human Resources Management (HRM), is responsible for formulating CBP's policy and guidance on the standards of professional and ethical conduct.

6.3     The HRM Human Resources Policy and Programs Directorate (HRPPD) is responsible for the overall administration, interpretation, and application of the Standards of Conduct and applicable rules and regulations.

6.4     HRPPD is responsible for providing advice and guidance to supervisors and managers on the application of the Standards of Conduct; and for issuing a Standards of Conduct reminder to all employees, at least annually, to maximize employee awareness of the Standards.

6.5     CBP managers and supervisors are responsible for providing advice and guidance to employees under their supervision concerning conduct questions, and for providing clarification of the Standards of Conduct when needed.

6.6     The HRM Talent Management Directorate is responsible for providing the Standards of Conduct, as part of the initial orientation package, to each newly hired employee upon their initial entrance on duty.

6.7     Every CBP employee is required to: (1) know the Standards of Conduct and their application to his or her behavior; (2) seek clarification from his or her supervisor if unsure of the application of the Standards of Conduct; (3) adhere to the Standards of Conduct; and (4) be aware of the consequences of violation of the Standards of Conduct, applicable statutes, regulations, and rules regarding conduct.

6.8     Every CBP employee is required to immediately report allegations of misconduct using at least one of the following methods:

- Calling the toll-free Joint Intake Center Hotline at 1-877-2INTAKE (1-877-246-8253) or sending a fax to (202) 344-3390;
- Sending an e-mail message to Joint.Intake@dhs.gov;
- Writing to CBP Office of Professional Responsibility (OPR); P.O. Box 14475, 1200 Pennsylvania Avenue, NW, Washington, DC 20044;
- Calling the Office of Inspector General (OIG) at 1-800-323-8603;
- Accessing the online DHS OIG Complaint/Allegation Form at: http://www.oig.dhs.gov/hotline/;
- Writing to the Department of Homeland Security, Office of Inspector General, Attention: Office of Investigations - Hotline, Mailstop 0305, 245 Murray Lane SW, Washington, DC 20528; or

AR001194


- Notifying his or her immediate supervisor or other management official within his or her chain of command.

## 7   STANDARDS OF CONDUCT

7.1    CONDUCT PREJUDICIAL TO THE GOVERNMENT.  Employees will not engage, on or off-duty, in criminal, infamous, dishonest, or notoriously disgraceful conduct, or any other conduct prejudicial to the government.

7.2    PROHIBITED ACTIONS.  Employees will avoid any action, whether or not specifically prohibited by these Standards of Conduct, which might result in, or reasonably create the appearance of:

- Using public service for private gain;
- Giving preferential treatment to a private organization or individual in connection with official government duties and/or responsibilities;
- Impeding government efficiency or economy; or
- Engaging in activities which conflict with official government duties and/or responsibilities, or adversely interfere with the accomplishment of the mission of CBP.

7.3    INTEGRITY-RELATED MISCONDUCT.  Integrity is one of CBP's Core Values, and is essential to the effective functioning of CBP.  As an Agency charged with law enforcement activities, it is imperative that CBP employees demonstrate high standards of integrity.  Only by each and every employee maintaining the highest standards of integrity and professionalism can CBP keep the public trust and confidence that are critical to the accomplishment of law enforcement, homeland security, and other missions. The list of integrity-related misconduct identified below is not intended to be a comprehensive list, but provides frequently addressed integrity-related misconduct.  All CBP employees are encouraged to consult the CBP Table of Offenses and Penalties for additional guidance.

7.3.1    Employees will not directly or indirectly solicit or accept gifts, money, or anything of value for the performance of an official act or duty or for the failure to perform an official act or duty.

7.3.2    In addition to other requirements to report misconduct, employees will promptly report any offer of a gift, money, or anything of value, when the offer concerns, or is affected by, the performance of an official act or duty or the failure to perform an official act or duty.

7.3.3    Employees will not take any official act, or fail to do so, for personal benefit or gain to the employee, or any other individual or group.

7.3.4    Employees will not use the authority of their position in any way that might adversely affect public confidence in the integrity of CBP or the government.

AR001195


7.3.5    Employees will not use any CBP identification, or other form of identification associated with their employment, in a manner which may reasonably give the perception that they are using the identification for personal benefit, attempting to exert undue influence, or to obtain, directly or indirectly, a favor, reward, or preferential treatment for themselves or others, or to improperly enhance their own image.

7.3.6    Inappropriate Association.  Employees will not, except as may be necessary in connection with official assignments or duties, or in connection with family obligations, knowingly associate with individuals or groups who are believed or known to be connected with criminal activities.  This limitation on association applies to any social, sexual, financial, or business relationship with a source of information, a suspected or known criminal, or a known or suspected illegal alien, subject to being removed from the United States of America.

7.3.7    Arrests.  CBP regards any violation of law by a CBP employee as being inconsistent with and contrary to the Agency's law enforcement mission.  Therefore, employees will not engage in any activities which violate local, state, and/or Federal laws, which may result in their arrest or their receipt of a summons to appear in court on criminal charges.  This prohibition also applies to activities which violate foreign laws, which may result in an employee's arrest.

7.3.8    In the event of an employee's arrest or receipt of a summons to appear in court on criminal charges, the employee must report the occurrence in accordance with the procedures outlined in the Arrest of CBP Employees Directive.

7.3.9    Procedures Unique to Employees who Exercise Law Enforcement Authority.  CBP employees who exercise law enforcement authority who are off-duty and not acting in an official capacity and are questioned, interviewed, or detained as a subject of an enforcement action or investigation by a law enforcement agency during the course of the agency's official duties to determine if the CBP employee was a party to an alleged violation of law, must report this contact with law enforcement within 48 hours. These CBP employees must also report within 48 hours the known issuance of any protective order, temporary restraining order, or other court order restricting contact with another individual or ability to carry a firearm. This reporting excludes civil or traffic violations where there is no allegation of violence, threat of violence, or where the civil or traffic violation did not include the possession or use of alcohol or drugs.

7.4    FALSE STATEMENTS.

7.4.1    Employees will not knowingly make false, misleading, incomplete, or ambiguous statements, whether oral or written, in connection with any matter of official interest.

7.4.2    When directed by proper authority, employees must truthfully and fully testify, provide information, and respond to questions (under oath when required) concerning matters of official interest that are being pursued administratively.  Proper authority

AR001196



pursuant to an investigation refers to both internal law enforcement and external law enforcement authority (i.e. local, state or Federal law enforcement outside of the Agency). These examples are not all inclusive. The Agency expects employees not to knowingly make false, misleading, incomplete or ambiguous statements, whether oral or written, in connection with any matter of official interest."

7.5     DISCLOSURE AND SAFEGUARDING OF OFFICIAL INFORMATION.

7.5.1   Employees will not disclose, use, or store official information without proper authority. Examples of official information include: information that is protected from disclosure by statute, Executive Order or regulation; proprietary business information; classified National Security Information; and sensitive information retrieved from CBP automated systems. Information not within these categories may also constitute official information for purposes of this section. Official information includes any information that an employee acquires in connection with CBP employment, that he or she knows, or reasonably should know, has not been made available to the general public.

7.5.2   CBP utilizes automated systems that are considered, "sensitive but unclassified." These systems include the TECS, Automated Commercial Environment, Automated Commercial System, the National Criminal Information Center, National Automated Immigration Lookout System, as well as others. They contain, for example, financial, law enforcement, trade-sensitive, and counter-narcotics information. Employees must safeguard all sensitive information against unauthorized access, disclosure, alteration, or loss. Unauthorized accessing of these systems, and use of these systems for unofficial purposes, including "browsing" (querying the systems for information for other than official reasons) is prohibited.

7.5.3   Employees will not access, conceal, alter, remove, mutilate, or destroy documents or data in the custody of CBP or the Federal Government without proper authority. Employees are required to care for and conserve such documents according to Federal law and CBP policy. Upon separation from CBP employment, employees are responsible for adhering to DHS and CBP standards governing the removal of official documents and/or data from the Agency.

7.5.4   Nothing in the Standards of Conduct should be construed or applied to interfere with an employee's right to communicate with their Congressional representatives and to engage in conduct protected by all Whistleblower Protection Acts, including the Whistleblower Protection Enhancement Act (WPEA) of 2012.

7.6     USE OF CONTROLLED SUBSTANCES. CBP is charged with the responsibility for interdicting illegal drugs that are being brought into the United States. Therefore, in accordance with the CBP Drug-Free Workplace Plan, CBP employees are prohibited from using, possessing, selling, or distributing illegal drugs. CBP employees are also prohibited from using illegal drugs in states or foreign countries where such use has been legalized. Users of illegal drugs will not

AR001197


be selected for employment in CBP, and removal action will be initiated with respect to any CBP employee who is found to use, possess, sell, or distribute illegal drugs.

7.7    GENERAL CONDUCT.

7.7.1    Pursuant to applicable policies and negotiated agreements, employees will be appropriately dressed for their workplace, business contacts, and duties, and will maintain a neat and professional appearance.  All employees will be properly groomed.  Unless otherwise authorized, uniformed employees will report for duty in proper uniform attire, and will comply with applicable uniform and grooming standards.

7.7.2    Employees are required to perform their duties to the government and the public conscientiously, respond readily to the lawful direction of their supervisors, and follow Agency policies and procedures.

7.7.3    Employees will be professional in their contact with supervisors, subordinates, co-workers, and members of the public.  "Professional" for the purposes of this provision means being polite, respectful, and considerate.  This requirement to be professional must be adhered to so long as it does not compromise employee safety or impede the performance of official duties.

7.7.4    Employees must observe designated duty hours and be punctual in reporting for work, including overtime assignments, and in returning from lunch and breaks.

7.7.5    Employees will use official duty time to perform official duties.

7.7.6    Employees assigned to inspectional, border protection, or other enforcement duties will not leave their assigned posts until properly relieved or otherwise authorized to depart.  In all situations where employees are required to remain at their assigned posts beyond their normal tour of duty, they will be compensated in accordance with the appropriate compensation laws, rules, and/or regulations.

7.7.7    Leave is to be used in accordance with its intended purpose and must be approved in advance whenever possible, and in accordance with laws, rules, regulations, CBP policy, negotiated agreements, and local requirements.

7.7.8    CBP does not tolerate violence in the workplace.  Therefore, employees will not provoke, participate in, or condone activities that may cause, lead to, or involve violence in the workplace.  Such violence includes communicating a direct or indirect threat of physical, mental, or emotional harm.  Threats can take the form of written or verbal statements, stalking activity, and/or physical gestures.  This does not preclude the use of force in accordance with Agency policies regulating its use in the conduct of law enforcement activities.

AR001198


7.7.9   Domestic violence is strictly prohibited. In accordance with the Domestic Violence Policy, CBP does not tolerate any acts or threats of domestic violence, whether committed on or off-duty.  Domestic violence is felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.  Domestic violence may include, but is not limited to, acts or threatened acts of: physical or sexual violence; emotional and/or psychological intimidation; verbal abuse; stalking; economic control; harassment; threats; physical intimidation; or injury.

7.7.10  CBP prohibits employees from committing acts of sexual abuse, coercion, and/or assault of any detainee under CBP custody.  CBP also prohibits any form of retaliation against any person, to include detainees, who reports, files a complaint, or participates in an investigation into an allegation of sexual abuse or assault or participation in sexual activity as a result of force, coercion, threats, or fear of force.

7.8    CARE OF MONEY AND PROPERTY.

7.8.1   Employees who have access to, receive, or come into possession, custody, or control of property, money, or other items of value in relation to their employment with the Agency shall follow established procedures, and use standards of care that are reasonable under the circumstances, when they account for, conserve, protect, or dispose of such property, money, or items of value.

7.8.2   Employees must promptly report to their supervisors any loss, misplacement, theft, damage, or destruction of property, money, or other items of value that is (was) under the control of the Agency.

7.8.3   Upon separation, transfer, or reassignment, or on demand from the proper authority, employees will promptly return all government-owned or leased property, money, or other items of value issued to them for use in carrying out their official duties.

7.9    USE OF GOVERNMENT PROPERTY OR OTHER RESOURCES.

7.9.1   Computers and Other Office Equipment.

7.9.1.1     Pursuant to CBP's Directive concerning "Limited Personal Use of Government Office Equipment Including Information Technology," CBP employees may use government computers and office equipment for authorized purposes only. However, limited personal use of government computers and office equipment by employees during non-work time is considered to be an "authorized use" of

AR001199



government property if such use involves only minimal additional expense to CBP and does not: adversely affect the performance of official duties; interfere with the mission or operations of CBP; overburden any CBP information resources; or violate any standard of conduct herein. Permissible use of CBP computers or equipment does not include activities such as social networking, audio or video streaming, peer-to-peer networking, gaming, use of personal email accounts, or instant messaging. The privilege to use government-owned computers and office equipment for personal purposes may be revoked or limited by the employee's supervisor or other authorized official for inappropriate use. All such reasons will be in writing and promptly provided to the affected employee(s).

7.9.1.2     The use of government computers or other equipment to access, view, store, or transmit sexually explicit material is prohibited.

7.9.1.3     Employees will only use <u>CBP authorized</u> software or technology devices on CBP computers. All software use must comply with copyright laws and/or license agreements. Employees will adhere to security policies and procedures regarding the use and protection of their computer identification and passwords.

7.9.1.4     Employees will not use government documents for private or unofficial purposes, circulate them to audiences for which they were not intended, or in any way alter the intended distribution of such documents with respect to their limited organizational or other application. CBP employees may not use postage-paid official envelopes or letterhead for personal purposes.

7.9.2     Government-Sponsored Credit Cards.

7.9.2.1     Employees will safeguard government-sponsored credit cards under their care, including travel cards, phone cards, fleet cards, and purchase cards, and will promptly report the loss of such cards to their supervisors and to the issuing company. As cardholders, employees are responsible for using the credit card strictly in accordance with both the government requirements and those of the financial institution issuing the card.

7.9.2.2     Pursuant to the Federal Travel Regulations (41 C.F.R. § 301), government-sponsored travel (credit) cards may be used only for official travel and official travel-related expenses away from an employee's official duty station and may not be used for personal purposes. Only the employee whose name appears on the credit card may use the card. An employee who holds a government-sponsored travel card must pay all valid charges appearing on the credit card statement in full when due each month. Unusual and/or mitigating circumstances will be considered consistent with any collective bargaining agreements.

7.9.2.3     Fleet cards will be used only to pay for authorized goods and services for government-owned vehicles (GOVs).

AR001200



7.9.2.4    Purchase cards will be used only for authorized goods and services for CBP.  When planning and making purchases, purchase cardholders are required to comply with officially designated mandatory sources of supply and funding limitations of their cards.  Cardholders are responsible for being cognizant of the rules, policies, and procedures regarding the use of their cards and will not circumvent or disregard those rules, policies, or procedures (e.g., split-purchases, etc.).  Cardholders are required to consult with a warranted contracting officer or the appropriate program official when any question arises about a potential source for purchase of a service or supply.

7.9.3    Government Identification.  Badges, credentials, and identification cards are to be used by CBP employees only for official purposes.  Employees will promptly report the loss of any badges, credentials, and/or identification cards to their supervisor.

7.9.4    Government-Owned Vehicles (GOVs).

7.9.4.1    GOVs are "passenger carriers" which include, but are not limited to: passenger motor vehicles; aircraft; boats; ships; snow mobiles; all-terrain vehicles; or other similar means of transportation that are owned, rented, or leased by the United States.  Employees will not use, or authorize the use of, a GOV except for official purposes, i.e., those deemed essential to the successful completion of the official mission.  The transportation of individuals in a GOV, including family members, is prohibited, unless officially authorized.  Willful use of a GOV for other than official purposes carries a <u>minimum</u> statutory penalty of a 30-day suspension from duty and pay.

7.9.4.2    Employees will not consume alcoholic beverages while operating or occupying a GOV and will not consume alcoholic beverages for a reasonable period of time prior to operating a GOV.  Driving a GOV while impaired by alcohol is prohibited under all circumstances.

7.9.4.3    Any employee operating a GOV must observe all applicable state and local traffic laws consistent with the flexibility required for the performance of law enforcement activities.  Employees are responsible for exercising due caution to ensure the safe operation of their vehicle.

7.9.5    Firearms/Use of Force Weaponry.  Unless firearms and other CBP-issued use of force weaponry are authorized and required in the performance of duty, employees will not carry firearms or other CBP-issued weaponry, either openly or concealed, while on government property or on official duty.  Employees authorized to carry firearms and other CBP-issued use of force weaponry will do so strictly in accordance with applicable firearms and use of force related policies.

AR001201



7.10    USE OF ALCOHOLIC BEVERAGES.

7.10.1  Employees will not report for duty or remain on duty under the influence of alcohol.

7.10.2  Unless specifically authorized, employees may not consume alcoholic beverages while on official duty.

7.10.3  Under no circumstances will employees operate a GOV, on-or-off duty, while under the influence of alcohol.

7.10.4  As a law enforcement organization, it is important that CBP maintains credibility with the public it serves.  An employee's arrest for driving under the influence of alcohol (DUI), driving while intoxicated (DWI), or reckless driving and endangerment, on or off-duty, could reflect negatively upon the Agency.  Therefore, employees must not operate motorized conveyances, on or off-duty, while impaired.

7.10.5  Uniformed employees will not purchase or consume alcoholic beverages, on-or off-duty, while in uniform.

7.10.6  Members of aircrews will not consume alcoholic beverages within eight hours prior to their performing scheduled flight duties.  Any member of an aircrew who is found to have done so will be considered impaired for duty.  Even if a member of an aircrew has not consumed an alcoholic beverage during the eight-hour period immediately preceding flight duties, he or she may be considered impaired for duty if he or she, upon reporting for duty, is found to be suffering the residual effects of alcohol consumption.

7.11    BIAS-MOTIVATED CONDUCT.

7.11.1  Employees will not act or fail to act on an official matter in a manner which improperly takes into consideration an individual's race, color, age, sexual orientation, religion, sex, national origin, disability, union membership, or union activities.

7.11.2  Employees will not make abusive, derisive, profane, or harassing statements or gestures, or engage in any other conduct evidencing hatred or invidious prejudice to or about another person or group on account of race, color, religion, national origin, sex, sexual orientation, age, or disability.

7.11.3  Employees will not engage in sexual harassment.  Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of unreasonably interfering with

AR001202



an individual's work performance or creating an intimidating, hostile, or offensive working environment.

7.12    GAMBLING.  CBP employees will not engage in any gambling activity on government premises, and/or using government equipment, including an office pool or any game with financial stakes.  This prohibition also covers gambling on the Internet.

7.13    FINANCIAL MATTERS.

7.13.1  Lending and Borrowing Money.

7.13.1.1    An employee cannot give, make a donation to, or ask for contributions for a gift to his or her supervisor (immediate or in the chain of command).  A gift includes any gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value.  In addition, an employee cannot accept a gift from another employee who earns less pay, unless the person giving the gift is not a subordinate and the gift is based on a strictly personal relationship.  There are exceptions to these prohibitions.  There is an exception for voluntary gifts worth more than $10 on a special occasion such as marriage, illness, or retirement.  Gifts valuing less than $10 may be given and received on occasions when gifts are traditionally given or exchanged.  An employee may give and/or receive items of food and refreshments to be shared at work among employees.

7.13.1.2    Supervisors will not request or require an employee under their supervision to act as a co-maker, co-signer, or endorser in financial matters.  In addition, supervisors will not act as co-makers, co-signers, or endorsers in financial matters for employees under their supervision.

7.13.2  Financial Disclosures.  Employees who occupy certain positions are required to file statements of employment and financial interests within 30 days of their entrance on duty and are further required to file annual supplemental statements.  Affected employees will be notified of their requirement to file such statements.

7.13.3  Fund Raising Campaigns.  Employees may refuse to participate in government-sponsored fund raising campaigns.  Supervisors will not exert pressure on employees to participate in such fund raising campaigns.

7.13.4  Gifts.  Except as provided in the Standards of Ethical Conduct for Employees of the Executive Branch, an employee will not directly or indirectly solicit or accept a gift from a prohibited source, or a gift given because of the employee's official position.

7.13.5  Just Financial Obligations.  Employees will satisfy all just financial obligations in a timely manner, especially Federal, state, or local taxes that are imposed by law.

AR001203



7.13.6  Prohibition on Purchase of Certain Assets.  Employees will not purchase, directly or indirectly, property owned by the government and under the control of CBP or sold under the direction or incident to the functions of CBP, except items sold generally to the public at fixed prices.

7.14  SAFETY.  Employees will observe safe practices as well as all safety regulations in the performance of their duties.  Employees will promptly report to their supervisors any injury, accident, or illness that occurs in connection with the performance of their official duties by the most expeditious means available.

7.15  OUTSIDE/FAMILY MEMBER EMPLOYMENT.

7.15.1  Employees must complete and submit the appropriate form through their supervisor for approval before entering into any outside employment or business activity.  As a general rule, employees may, with prior approval, engage in outside employment or business activity, provided such employment or activity is not prohibited and does not interfere or conflict with performance of their official duties.  No CBP employee will work for a Customs broker, international carrier, bonded warehouse, foreign-trade zone, cartman, or law firm engaged in the practice of customs or immigration law, any businesses or service organizations which assist aliens, or other companies engaged in services related to Customs or Immigration matters.  This prohibition includes employment in the importation department of a business, employment in any private capacity related to the importation or exportation of merchandise or agricultural products requiring inspection, and employment related to immigration.

7.15.2  Any employee, who has a family member (spouse, child, or other relative, by marriage or blood, who is dependent upon the employee and/or resides in the employee's household) employed in one of the above listed categories, must file an annual report through their supervisor to Office of Chief Counsel, for a determination as to whether the employment constitutes a conflict of interest or the appearance of a conflict of interest with the CBP employee's performance of official duties.

7.16  POLITICAL ACTIVITY.  NOTE: CBP recognizes that it does not have authority to define permitted and prohibited political activity under the Hatch Act and that the Office of Special Counsel has the sole authority to enforce such statutory and regulatory provisions.  As such, the following information is provided for informational purposes.  Hatch Act violations can have serious consequences up to and including removal from Federal service.

7.16.1  Employees may take an active part in political management or in political campaigns to the extent permitted by law (5 U.S.C. §§ 7321-7325), vote as they choose, and openly express their opinions on political subjects and candidates.  Employees may not use their official authority or influence to interfere with or affect election results.  Employees may be disqualified from employment for knowingly supporting or advocating the violent overthrow of our constitutional form of government.

AR001204



7.16.2  The following list contains examples of permissible activities for CBP employees who are not members of the Senior Executive Service (SES).  *See* 5 C.F.R. Part 734, Subpart B.

- Stand as candidates for public office in nonpartisan elections.
- Register and vote as they choose.
- Assist in voter registration drives.
- Express opinions about candidates and issues.
- Contribute money to political organizations.
- Attend political fund-raising functions.
- Campaign for or against candidates in partisan elections.
- Make campaign speeches for candidates in partisan elections.
- Distribute campaign literature in partisan elections.
- Hold office in political clubs or parties.
- Attend and participate in political rallies and meetings.
- Join and be active members of a political party or club.
- Sign nominating petitions.
- Campaign for or against referendum questions, constitutional amendments, and municipal ordinances.

7.16.3  The following list contains examples of prohibited activities for CBP employees who are not members of the SES.  *See* 5 C.F.R. Part 734, Subpart C.

- Engage in political activity (an activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group) while on duty, in a government office, wearing an official uniform, or driving a GOV.
- Use official authority or influence to interfere with an election.
- Solicit or discourage political activity on the part of anyone with business before CBP.
- Solicit or receive political contributions from any person except in certain limited situations as specified in 5 U.S.C. § 7323 (a)(2).
- Be candidates for public office in partisan elections.
- Wear partisan political buttons while on duty.

7.16.4  Career employees who are members of the SES are subject to greater restrictions than those identified above.  These individuals should refer to 5 C.F.R. Part 734, Subpart D, or consult the Office of Chief Counsel.

7.16.5  Employees who reside in localities (designated by the Office of Personnel Management) where the majority of voters are employed by the Federal Government are covered by additional provisions (*See* 5 C.F.R. Part 733).

AR001205



DEC 1 1 2020

_____
Mark A. Morgan

Date

Chief Operating Officer and
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

AR001206

# CBP Use of Force Policy

Law Enforcement Safety and Compliance Directorate
Operations Support

*January 2021*

**U.S. Customs and Border Protection**

**For Official Use Only
Law Enforcement Sensitive**



# FOREWORD FROM THE COMMISSIONER

U.S. Customs and Border Protection (CBP) is entrusted with the critical responsibility of protecting our nation's borders.  This mandate carries with it the authority to use force up to and including the use of deadly force.  The following policy provides guidance and parameters under which force may be used.  It also provides the levels of oversight when force is used, and the ongoing training and demonstration of decision-making and skill surrounding the use of force.

A respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties.  In all instances, covered in this policy or not, Authorized Officers/Agents shall only use objectively reasonable and necessary force to effectively bring an incident under control, while minimizing the risk of injury for all involved parties.

The use of excessive force by CBP law enforcement personnel is strictly prohibited.

As CBP employees, this *Policy*, in conjunction with the *Administrative Guidelines and Procedures Handbook*, serves as your authoritative reference for firearms procedures and use of force related issues.  By conforming to standard use of force policies, procedures, training, and equipment, Authorized Officers/Agents can more effectively protect themselves and the public they serve.

This *Policy* establishes the minimum CBP policy standards regarding the use of force.  CBP offices may establish additional policy guidance where they deem necessary, in accordance with the minimum standards articulated in this *Policy*.

CBP adheres to the *DHS Policy on the Use of Force* and the *Department of Homeland Security Commitment to Nondiscriminatory Law Enforcement and Screening Activities* policy statement.

Violation of the *CBP Use of Force Policy* may constitute grounds for disciplinary action.

This document sets forth policy and training guidance for CBP employees, while meeting the requirements of the *DHS Policy on the Use of Force*, and does not create or confer any right, privilege, or benefit for any person, party or entity.  United States v. Caceres, 440 U.S. 741 (1979).


Mark A. Morgan
Senior Official Performing the Duties of Commissioner
U.S. Customs and Border Protection

# Table of Contents

FOREWORD FROM THE COMMISSIONER ................................................................i

Chapter 1: General Guidelines.................................................................3

    A. Use of Force By Authorized Officers/Agents ........................................3

    B. Objectively Reasonable and the Totality of Circumstances .............................5

    C. Use of Safe Tactics................................................................6

    D. De-Escalation ....................................................................6

    E. Emergency Situations ..............................................................7

    F. Duty to Intervene In and Report Improper Use of Force ...............................7

    G. Procurement, Instruction, and Devices..............................................7

    H. DHS Commitment to Nondiscriminatory Law Enforcement Activities.................8

Chapter 2: Use of Deadly Force.................................................................9

    A. General Guidelines and Responsibilities .............................................9

Chapter 3: Use of Less-Lethal Force .........................................................11

    A. General Guidelines and Responsibilities ............................................11

    B. Use of Less-Lethal Devices/Techniques .............................................14

    C. Warning Shots and Disabling Fire...................................................20

Chapter 4: Vehicular Immobilizations and Pursuit Intervention................................22

    A. General Guidelines and Responsibilities ............................................22

    B. Vehicle Immobilization Devices (VID)................................................22

    C. Offensive Driving Techniques (ODT)................................................25

Appendix I: DHS Policy on the Use of Force ..................................................27

Appendix II: DHS Commitment to Nondiscriminatory Law Enforcement Activities .....38

Appendix III: DHS Policy Statement #045-06 ..................................................40

Appendix IV: CBP Domestic Violence Policy....................................................47

Appendix V: Use of Force Policy Clarification - Emergency Situations ......................56

Appendix VI: Glossary..........................................................................58

This *Policy* is consistent with the *DHS Policy on the Use of Force, and* supersedes the *U.S. Customs and Border Protection Use of Force Policy, Guidelines and Procedures Handbook* (HB 4500-01C) dated May 2014, and any prior CBP policy or directive to the extent that it is inconsistent with the content of this *Policy*.

## Chapter 1:   General Guidelines

A.  Use of Force By Authorized Officers/Agents

1.  A respect for human life and the safety of the communities we serve, as well as CBP's officers and agents, is paramount and shall guide all employees in the performance of their duties.

2.  Among other duties, CBP has the responsibility to deter, prevent, detect, respond to, and interdict the unlawful movement or illegal entry of terrorists, drug smugglers and traffickers, human smugglers and traffickers, aliens, and other persons who may undermine the security of the United States.[1]

3.  CBP policy on the use of force by Authorized Officers/Agents is derived from constitutional law, as interpreted by federal courts in cases such as <u>Graham v. Connor</u>, 490 U.S. 386 (1989) and <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985), federal statutes and applicable DHS and CBP policies.

4.  Authorized Officers/Agents may use "objectively reasonable" force only when it is necessary to carry out their law enforcement duties.

5.  The "reasonableness" of a particular use of force is based on the totality of circumstances known by the officer/agent at the time of the use of force, and weighs the actions of the officer/agent against the rights of the subject, in light of the circumstances surrounding the event.[2]  Reasonableness will be judged from the perspective of a reasonable officer/agent on the scene rather than with the 20/20 vision of hindsight.

6.  The calculus of reasonableness embodies an allowance for the fact that law enforcement officers/agents are often forced to make split-second decisions - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

7.  A use of force is "necessary" when it is reasonably required to carry out the Authorized Officer's/Agent's law enforcement duties in a given situation, considering the totality of facts and circumstances of such particular situation.

---

[1] 6 U.S.C. §211; 8 U.S.C. § 1357 (INA § 287).

[2] The Supreme Court has further determined that a Fourth Amendment "seizure" of a person occurs when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied* (emphasis in original)." <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007)(citations omitted).

AR001210

A use of deadly force is "necessary" when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of death or serious bodily injury to the officer/agent or to another person.

8.  An Authorized Officer/Agent may have to rapidly escalate or de-escalate through use of force options, depending on the totality of facts and circumstances of the particular situation.  Once used, physical force[3] must be discontinued when resistance ceases or when the incident is under control.

9.  Based on the totality of circumstances, different officers/agents may have different responses to the same situation, any of which may be both reasonable and necessary.

    a.  CBP Authorized Officers/Agents are permitted to use force that is objectively reasonable and necessary in light of the totality of the circumstances.  This standard does not require Officers/Agents to meet force with equal or lesser force.

    b.  CBP Authorized Officers/Agents do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

10. When feasible, prior to the application of force, an Authorized Officer/Agent must attempt to identify him- or herself and issue a verbal warning to comply with the officer/agent's instructions.  In determining whether a warning is feasible under the circumstances, an officer/agent may be guided by a variety of considerations including, but not limited to, where the resulting delay by issuing the warning is likely to:

    a.  Increase the danger to the officer/agent or others, including any victims and or bystanders;

    b.  Result in the destruction of evidence;

    c.  Allow for a subject's escape; or

    d.  Result in the commission of a crime.

---

[3] Department of Homeland Security, *Department Policy on the Use of Force*, Policy Statement #044-05 (2018) FN 5. "Other than the force reasonably required to properly restrain a subject and safely move him or her from point to point.  That is, once a subject is secured with restraints, a LEO may maintain physical control of the subject via the use of a 'come along or other control techniques' to safely and securely conclude the incident."

In the event that an officer/agent issues such a warning[4], where feasible, the officer/agent should afford the subject a reasonable opportunity to voluntarily comply before applying force.

11. Following any incident involving the use of force, Authorized Officers/Agents shall seek medical assistance for any person who appears, or claims to be injured, or as otherwise required by subsections of this policy.

B. Objectively Reasonable and the Totality of Circumstances

1. The reasonableness inquiry for an application of force is an objective one: the question is whether the officer's/agent's actions are objectively reasonable in light of the totality of facts and circumstances confronting him or her, without regard to underlying intent or motivation.

2. In determining whether a use of force is "objectively reasonable," an Authorized Officer/Agent must give careful attention to the totality of facts and circumstances of each particular case, including:

   a. Whether the subject poses an imminent threat to the safety of the officer/agent or others;

   b. The severity of the crime at issue;

   c. Whether the subject is actively resisting seizure or attempting to evade arrest by flight;

   d. Whether the circumstances are tense, uncertain, and rapidly evolving; and

   e. The foreseeable risk of injury to involved subjects and others.

3. "Totality of circumstances" refers to all factors existing in each individual case. In addition to those listed in Subsection B.2 above, these factors may include (but are not limited to):

   a. The training, age, physical build, and strength of the officer/agent(s);

   b. The training, mental attitude, age, physical build, and strength of the subject(s);

   c. Disproportionate number of subjects present;

---

[4] Officers/agents should have a reasonable basis to believe that the subject can comprehend the warning.

    d.  Subject's demonstrated propensity for violence;

    e.  Statements of intent from subject(s);

    f.  Weapon(s) involved; present, or in proximity;

    g.  Prior intelligence;

    h.  National security;

    i.  The presence of other officers/agents, subjects, vehicle passengers, or bystanders;

    j.  Subject vehicle speed and type; and

    k.  Environmental conditions and/or road conditions.

C.  Use of Safe Tactics

1. Authorized Officers/Agents should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of the officer/agent and the public, and that minimize the risk of unintended injury or serious property damage.

2. Except where otherwise required by inspections or other operations, Authorized Officers/Agents should avoid standing directly in front of or behind a subject vehicle.  Officers/agents should not place themselves in the path of a moving vehicle or use their body to block a vehicle's path.

3. Authorized Officers/Agents should avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

4. Authorized Officers/Agents shall not discharge their firearms in response to thrown or launched projectiles unless the officer/agent has a reasonable belief, based on the totality of circumstances, that the subject of such force poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.  Officers/agents may be able to obtain a tactical advantage in these situations through measures such as seeking cover or distancing themselves from the immediate area of danger.  Officers/agents do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

D.  De-Escalation

1. De-escalation tactics and techniques seek to minimize the likelihood of the need to use force, or minimize force used during an incident, to increase the probability of voluntary compliance.

2. Authorized Officers/Agents shall employ de-escalation tactics and techniques, when safe and feasible, that do not compromise law enforcement priorities.

E. Emergency Situations[5]

1. An emergency situation is an unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat.

   In such threatening and emergent situations, Authorized Officers/Agents are authorized to use any available weapon, device, or technique in a manner that is reasonable and necessary for self-defense or the defense of another person.

F. Duty to Intervene In and Report Improper Use of Force

1. CBP is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability. As such, this *Policy* ensures that CBP law enforcement personnel fully understand and adhere to the following:

   The use of excessive force is unlawful and will not be tolerated. Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.

2. CBP law enforcement personnel have a duty to intervene to prevent or stop a perceived use of excessive force by another officer/agent - except when doing so would place the observing/responding officer/agent in articulable, reasonable fear of death or serious bodily injury.

3. Any CBP employee with knowledge of the improper use of force by law enforcement personnel shall, without unreasonable delay, report it to his or her chain of command and/or the Office of Professional Responsibility.

4. Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution.

G. Procurement, Instruction, and Devices

1. The Executive Director of the LESC is responsible for the approval of firearms and less-lethal device Instructor Guide Books, training materials, and certification standards.

---

[5] See Appendix V: Use of Force Policy Clarification - Emergency Situations.

2. Firearms and less-lethal devices, systems, and associated equipment shall only be purchased through contracts and procedures established or approved by the LESC. Additional information regarding the procurement of less-lethal devices and equipment may be found on the CBP Authorized Equipment List.

3. The LESC shall be responsible for the periodic review of the usage of firearms and less-lethal devices, systems, and associated equipment, in order to evaluate compliance with policy, as well as to assess their overall safety and effectiveness.

H. DHS Commitment to Nondiscriminatory Law Enforcement and Screening Activities

1. The DHS *Commitment to Nondiscriminatory Law Enforcement and Screening Activities* policy statement (Appendix II) is applicable to all situations in which officers/agents exercise their use of force authority.

# Chapter 2: Use of Deadly Force

A. General Guidelines and Responsibilities

1. Deadly force is force likely to cause serious bodily injury or death of a person.

2. Authorized Officers/Agents may use deadly force only when necessary; that is, when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

   a. Serious Bodily Injury - Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

3. Discharging a firearm at a person shall be done only with the intent of stopping that person from continuing the threatening behavior that justifies the use of deadly force.

4. Discharging a firearm as a warning is prohibited except for the limited circumstances described in Chapter 3.C.

5. Discharging a firearm as a distress signal is permitted in emergency situations.[6]

6. Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the officer/agent has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the officer/agent or others and such force is necessary to prevent escape.[7]

7. Authorized Officers/Agents shall not discharge their firearms at the operator of a moving vehicle, vessel, or aircraft unless deadly force is necessary, that is, when the officer/agent has a reasonable belief that the operator poses an imminent danger of serious bodily injury or death to the officer/agent or to another person.

---

[6] An unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat. *See* Appendix IV Use of Force Policy Clarification – Emergency Situations.

[7] See Tennessee v. Garner, 471 U.S. 1, 11-12 (1985). To further illustrate a "threat of serious physical harm," the Garner Court explained: "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." The Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

    a.  Such deadly force may include a moving vehicle aimed at officers/agents or others present, but would not include a moving vehicle merely fleeing from officers/agents unless the vehicle or the escape of the subject poses an imminent threat of serious bodily injury or death to the officer/agent or to another person.

    b.  The hazard of an uncontrolled conveyance shall be taken into consideration prior to the use of deadly force.

8. Firearms shall not be fired solely to disable motor vehicles, vessels, aircraft, or other conveyances. The only exception is that Authorized Officers/Agents, when conducting maritime law enforcement operations, may use specifically authorized firearms and ammunition to disable moving vessels or other maritime conveyances (See Chapter 3.C).

9. A firearm may be used in self-defense or in defense of another person to prevent an imminent attack by an animal. A firearm may also be used to euthanize an animal that appears to be seriously injured or diseased. This discharge does not constitute a use of deadly force.

10. The act of establishing a grip, drawing a weapon, or pointing a weapon does not constitute the use of deadly force.

# Chapter 3:  Use of Less-Lethal Force[8]

A.  General Guidelines and Responsibilities

1.  Less-lethal force is force not likely or intended to cause serious bodily injury or death.

2.  Any use of less-lethal force must be both objectively reasonable and necessary in order to carry out the Authorized Officer's/Agent's law enforcement duties.

3.  Less-lethal devices/weapons may be used in situations where empty-hand techniques are not sufficient, practical, or appropriate to control disorderly or violent subjects.

4.  Authorized Officers/Agents may use objectively reasonable and necessary force to address a threat posed from the degradation of the International Boundary Barriers (IBB).[9]  Officers/Agents should seek to employ tactics and techniques that effectively prevent the threat posed by the activity while minimizing any unintended injury.

5.  In order to fulfil the national security obligation to protect its borders, the United States employs IBB at and between Ports of Entry, capable of controlling the flow of people and goods crossing its border.  The degradation of such capabilities may facilitate the unimpeded access of unknown subjects and materials into the United States.[10]

    a.  An individual cutting, destroying, or attempting to destroy IBB is committing, or has committed, one or more crimes.[11] Authorized Officers/Agents shall make all reasonable efforts to apprehend the individual for a violation of applicable federal criminal law.

    b.  When feasible, prior to the application of force, Authorized Officers/Agents who encounter an individual engaging in degradation of the IBB shall issue a

---

[8] Referenced in prior versions of CBP policy or applicable regulations as "intermediate force" or "non-deadly force" and used herein with the same purpose and effect.

[9] The International Boundary Barrier (IBB), as defined in this policy, is the physical barrier at or between Ports of Entry and placed along the international boundary.

[10] 6 U. S. C. §211(c)(5); Hernandez v. Mesa, 140 S. Ct. 735, 746 (2020); United States v. Flores-Montano, 541 U.S. 149, 152-53 (2004).

[11] See, e.g., 18 U.S.C. § 1361 (willful government property depredation), 8 U.S.C. § 1325 (improper entry by an alien), 19 U.S.C. § 1459 (requirement to report arrival in the United States).

---

verbal warning[12] to direct the subject(s) to cease the criminal activity and should afford the subject a reasonable opportunity to voluntarily comply.

c.  While every use of force scenario is unique, officers/agents should consider a number of factors in determining whether to employ a reasonable amount of force when dealing with IBB destruction: whether the subject refuses to comply following a verbal warning; whether the individual continues to engage in federal criminal activity; lack of other law enforcement options to prevent the continued criminal activity; potential use of a weapon or tool used to degrade IBB; imminence of any threat posed by the IBB degradation; and the unlawful entry of goods/contraband or persons.

d.  If Authorized Officers/Agents determine that a reasonable amount of force is necessary to address a threat posed by IBB degradation, they may use authorized less-lethal devices for area saturation, or any lesser degree of force, to effect arrest and/or prevent the continued commission of federal criminal activity.

   (1) Prior to deploying such force, Authorized Officers/Agents must give reasonable consideration to any factors which may counsel against the use of such force, such as the presence of vulnerable subjects including small children, the elderly, those who are visibly pregnant, or individuals who lack the ability to quickly disperse from the area.[13]

   (2) Authorized Officers/Agents must cease application of force, and seek medical assistance where feasible, when criminal activity ceases or when the incident is under control.

   (3) Authorized Officers/Agents may not use deadly force solely in defense of the IBB unless there is an imminent threat of death or serious bodily injury to the officer/agent or others.

e.  The guidance provided in this subsection is a baseline by which to assess commonly occurring scenarios regarding destruction of IBB. Every incident is unique, and additional facts, intelligence, information, etc. may warrant a different response.  Nothing in this section prohibits, limits, or restricts the ability of Authorized Officers/Agents to use reasonable force, and authorized use of force devices, to carry out their law enforcement duties.

---

[12] Officers/agents should have a reasonable basis to believe that the subject can comprehend the warning.
[13] Nelson v. City of Davis, 685 F.3d 867, 877 (9th Cir. 2012).

6. As part of a mass unlawful entry event, if individuals enter the United States using acts of violence, or threats of violence, a reasonable amount of force may be used to effect arrests, or to protect Authorized Officers/Agents and others from an imminent threat.

   a. Authorized Officers/Agents may utilize chemical area saturation, or any lesser degree of force, to effect an arrest or to defend self or others against imminent threats caused by mass unlawful entries when:

      (1) There is probable cause to believe that multiple individuals in the group are using force or threatening to use force to effect an unlawful entry; and

      (2) The criminal actions of the group have continued after the issuance of lawful commands and verbal warnings to cease the criminal activity; and

      (3) Reasonable consideration has been given to any factors which may counsel against the use of such force, such as the presence of vulnerable subjects including, small children, the elderly, those who are visibly pregnant, or individuals who lack the ability to quickly disperse from the area.[14]

   b. The guidance provided in this subsection is a baseline by which to assess commonly occurring incidents regarding mass unlawful entries. Every incident is unique, and additional facts, intelligence, information, etc. may warrant a different response. Nothing in this section prohibits, limits, or restricts the ability of Authorized Officers/Agents to use reasonable force, and authorized use of force devices, to carry out their law enforcement duties or to protect officers/agents and others from an imminent threat.

   c. When arrests of individuals involved in a mass entry event are not feasible, the use of chemical munitions is authorized only in defense of self or others. Officers/agents do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

7. Authorized Officers/Agents who are trained and LESC-certified in their use may use the following less-lethal options:

   a. Empty-Hand Strikes;

   b. Oleoresin Capsicum (OC) Spray;

---

[14] Nelson v. City of Davis, 685 F.3d 867, 877 (9th Cir. 2012).

    c.  Collapsible Straight Batons (CSB);

    d.  Electronic Control Weapons (ECW);

    e.  Compressed Air Launchers  (e.g., Pepperball® Launching System (PLS), FN303);

    f.  Munition Launchers (e.g., 40mm);

    g.  Less-Lethal Specialty Impact - Chemical Munitions (LLSI-CM);

    h.  Vehicle Immobilization Devices (VID); or

    i.  Other less-lethal devices or techniques (e.g. Controlled Noise and Light Distraction Devices (CNLDDs), etc.) authorized by the Executive Director of the LESC and approved for use by the Designated Official (DO).

8. While performing uniformed law enforcement duties, Authorized Officers/Agents who carry firearms are also required to carry one or more of the following: OC Spray, an ECW, or a CSB.

    a.  Officers/agents may only be issued and carry devices in which they are certified.

    b.  Responsible Officials (ROs) may require that Authorized Officers/Agents carry additional less-lethal devices (that the Authorized Officer/Agent is certified to carry) while performing uniformed law enforcement duties.

9. ROs may establish requirements for non-uniformed carriage of less-lethal devices based on operational needs.

10. A less-lethal device or technique may be used in self-defense, or in defense of another person, to prevent an imminent attack by an animal.  This use shall not constitute a use of less-lethal force.

B. Use of Less-Lethal Devices/Techniques

1. Guidelines and Responsibilities

The following guidelines and responsibilities apply to all CBP less-lethal techniques, devices, systems, and associated equipment.  Additional device-specific guidelines are contained in following subsections.

    a.  The use of choke-holds, neck restraints, and/or any other restraint technique that applies prolonged pressure to the neck that may restrict blood flow or air passage, are strictly prohibited, absent circumstances where deadly force would be objectively reasonable.

b.  Only Authorized Officers/Agents may discharge a CBP less-lethal device, except during CBP-authorized training, events, or activities.

Non-CBP personnel who wish to use CBP less-lethal devices during joint operations should receive CBP-approved training in the use of the less-lethal device(s) prior to use.

c.  The use of less-lethal devices/techniques (or any other weapon) as deadly force (i.e., in a manner that could reasonably cause death or serious bodily injury) is not precluded if the use of deadly force would otherwise be objectively reasonable.

d.  Only less-lethal devices, systems, and associated equipment authorized by LESC shall be carried and deployed by Authorized Officers/Agents.

e.  Less-lethal devices, systems, and associated equipment shall not be altered in any way without the written authorization of the Executive Director of the LESC.

2.  Contact Controls

a.  Contact Controls such as strategic positioning, escort holds, joint manipulation or immobilization, or touch pressure point stimulation may be utilized as a compliance technique on a subject offering, at a minimum, passive resistance.

3.  Empty-Hand Strikes

a.  Strike Pressure Point Techniques may be utilized as a compliance tool on a subject offering, at a minimum, active resistance.

b.  Other strikes (e.g., punches, kicks, etc.) may be utilized as a defensive tactic on a subject offering, at a minimum, assaultive resistance.

c.  Authorized Officers/Agents shall not intentionally target the throat or spine when using Empty Hand Strikes.

4.  Oleoresin Capsicum (OC) Spray

a.  OC Spray may be utilized as a compliance tool on a subject offering, at a minimum, active resistance.

b.  Authorized Officers/Agents may only use chemical agents authorized by the Executive Director of the LESC.  Officers/agents may not carry personally-owned OC devices for duty use.

c. Authorized Officers/Agents should not use OC, and should consider other force options, with respect to subjects who are: small children; visibly pregnant; and operators of motor vehicles.

d. Authorized Officers/Agents shall decontaminate subjects in custody that have been exposed as soon as practicable.

e. Authorized Officers/Agents are responsible for advising their supervisors when the devices issued to them are approaching the end of their useable life so that the devices may be replaced prior to their expiration date.

f. The Transportation Security Agency (TSA) and Federal Aviation Administration (FAA) do not permit any chemical agents in the cabin of a commercial aircraft. As provided by 49 C.F.R. § 175.10, self-defense spray (mace or pepper spray) may be carried in checked baggage, provided the container does not exceed four fluid ounces and has a positive means to prevent accidental discharge. All CBP employees will comply with this regulation. Chemical agents shall be carried aboard CBP aircraft only in accordance with *CBP Air Operations Handbook (AOH)* guidelines.

5. Collapsible Straight Baton (CSB)

a. A CSB may be utilized as a defensive tool on a subject offering, at a minimum, assaultive resistance.

b. Authorized Officers/Agents may only use CSBs authorized by the Executive Director of the LESC. Officers/agents may not carry personally-owned batons for duty use.

c. The following acts and techniques with the CSB are prohibited when using less-lethal force:

(1) Use of a baton to apply "come-along" holds to the neck area; and

(2) Intentional strikes with the baton to the head, the neck, the face, the groin, the solar plexus, the kidneys, or the spinal column.

6. Electronic Control Weapon (ECW)

An ECW is a less-lethal weapon which is designed to deliver short duration electronic pulses (Drive-Stun Mode), or Neuro-Muscular Incapacitation/NMI (Probe Deployment Mode), with minimal risk of serious bodily injury or death.

a. An ECW may be utilized as a compliance tool on a subject offering, at a minimum, active resistance in a manner that the Authorized Officer/Agent reasonably believes may result in injury to themselves or to another person.

AR001223

b.  An ECW should be deployed for one standard device cycle and then the situation should be evaluated to determine if additional cycles are both reasonable and necessary.

c.  If the use of the ECW is unsuccessful, the Authorized Officer/Agent should transition to another reasonable force option.

d.  CBP personnel should not use an ECW, and should consider other force options, with respect to subjects who are: small children; elderly; visibly pregnant; low body mass index (BMI) persons; near known flammable materials; on elevated surfaces; operating conveyances; adjacent to traffic; in water sufficient to drown; running; or handcuffed.

    (1) Authorized Officers/Agents should use an ECW on a subject who is running only when the officer/agent has reasonable belief that the subject presents an imminent threat of injury to an officer/agent or another person. The threat presented by the subject must outweigh the risk of injury to the subject that might occur as a result of an uncontrolled fall while the subject is running.

e.  Authorized Officers/Agents should not intentionally expose a subject to more than one ECW at a time.

f.  Authorized Officers/Agents shall not intentionally target the head, neck, groin, or female breast.

g.  When practical and when other officers/agents are present, Authorized Officers/Agents should verbalize "TASER, TASER, TASER" prior to deployment to notify fellow officers/agents of the imminent use of an ECW. This will alert fellow officers/agents to prepare to control a subject under the power of an ECW.

h.  ECWs shall be carried with a cartridge installed, on the non-gun side in a cross-draw manner.

i.  Any subject in CBP custody who has been exposed to an ECW shall, as soon as possible, be seen by an Emergency Medical Technician or other trained medical professional.

j.  CBP personnel trained and certified in the use of an ECW may remove probes embedded in a person's skin, provided the probes are not embedded in a sensitive area like the head, neck, genitals, or female breast tissue. Probe removals in those instances shall be performed by a trained medical professional.

AR001224

k.  ECW probes are considered a biohazard and shall be disposed of according to established biohazard disposal protocol.

l.  Each ECW shall have all stored utilization data downloaded quarterly. ROs shall ensure that all downloaded ECW data is securely stored and maintained for a minimum of three years.

m.  After each ECW deployment, data related to that deployment shall be downloaded and saved. If the deployment was the result of a reportable use of force a copy of the data report shall be attached to the use of force report in the CBP Enforcement Action Statistical Analysis and Reporting System (E-STAR).

7.  Compressed Air Launchers (e.g., PLS and FN303)

Compressed air launchers are less-lethal impact/chemical irritant delivery systems that are powered by compressed air. The launchers can deliver a variety of less-lethal projectiles including kinetic impact, PAVA pepper powder, and non-toxic marking rounds.

a.  A compressed air launcher may be used for area saturation against subject(s) who, at a minimum, demonstrate active resistance.

b.  A compressed air launcher may be used as a kinetic impact delivery system on subject(s) who, at a minimum, demonstrate assaultive resistance, with exceptions during maritime operations outlined in Chapter 3.C.3 of this *Policy*.

c.  Authorized Officers/Agents may use a compressed air launcher to mark a conveyance for identification purposes in situations where a conveyance has failed to comply with another officer's/agent's lawful attempt to stop it, in situations where the use of a vehicle immobilization device would not be reasonable, or if an involved vehicle is leaving the scene of an enforcement action without authorization. When deploying a compressed air launcher for marking and identification purposes, officers/agents may not intentionally target the conveyance's windows.

d.  Authorized Officers/Agents should not use a compressed air launcher, and should consider other force options, on subjects who are: small children; elderly; visibly pregnant; or operating a conveyance.

e.  Authorized Officers/Agents shall not use a PLS for kinetic impact on subjects less than 3 feet away unless the use of deadly force is reasonable and necessary.

f.  The FN303 shall not be deployed if the officer/agent is less than 10 feet from the subject unless the use of deadly force is reasonable and necessary.

g. The intentional targeting of areas where there is a substantial risk of serious bodily injury or death is considered a use of deadly force. Authorized Officers/Agents shall not intentionally target the head, neck, spine, or groin of the intended subject, unless the use of deadly force is reasonable.

8. Munition Launchers (e.g., 40mm) and Less-Lethal Specialty Impact and Chemical Munitions (LLSI-CM)

   Munition Launchers are a delivery system for less-lethal specialty impact/chemical munitions (LLSI-CM) that are designed to deliver an impact projectile, a chemical irritant projectile, or a combination projectile with more accuracy, higher velocity, and longer range than a projectile deployed by hand.

   LLSI-CM can also be delivered by means of a device that is designed to be hand-thrown by an Authorized Officer/Agent.

   a. Subject to the exceptions described in subsection c below, a Less-Lethal Chemical Munition (LLCM) may be utilized as a compliance tool on a subject offering, at a minimum, active resistance.

   b. Subject to the exceptions described in subsection c, below, a Less-Lethal Specialty Impact (LLSI) munition may be utilized as a compliance tool on a subject offering, at a minimum, assaultive resistance.

   c. Authorized Officers/Agents should not use an LLSI-CM and should consider other force options with respect to subjects who are: small children; elderly; visibly pregnant; near known flammable materials (when using a pyrotechnic device); or operating conveyances.

   d. Authorized Officers/Agents shall not intentionally target the head, neck, groin, spine, or female breast.

   e. Any subject in CBP custody who has been exposed to an LLSI-CM shall, as soon as practicable, be seen by an Emergency Medical Technician or other trained medical professional.

   f. The (FAA) prohibits the transportation of LLCMs and LLSI-CM combinations (e.g., CS (O-Chlorobenzylidene-malononitrile), Stingball) onboard commercial aircraft. All CBP employees will comply with this regulation. Transportation of LLSI-CM munitions will be accomplished by the use of a CBP vehicle/vessel and/or an authorized commercial ground carrier.

   g. The transportation of LLSI-CM onboard CBP vessels shall conform with the appropriate safety standards such as storage and transportation of the devices in insulated, water-proof containers to prevent damage or unintended discharge.

h. Approval from the Executive Director of the LESC is required prior to each individual purchase of LLSI-CM.

9. Controlled Noise and Light Distraction Devices (CNLDD)

A CNLDD is a pyrotechnic device that, once activated, emits a bright light and loud noise to momentarily disorient and confuse subjects giving officers/agents a brief tactical advantage.

a. CNLDDs may be utilized with supervisory approval during pre-planned law enforcement operations when actionable intelligence of pre-assault indicators or other relevant intelligence information has been identified which requires their use to gain a tactical advantage.

b. In all other instances, CNLDDs may be used as a compliance tool on a subject offering, at a minimum, assaultive resistance.

c. Authorized Officers/Agents should not use a CNLDD, and should consider other force options, on subjects who are: small children; elderly; visibly pregnant; or near known flammable materials.

d. Responsible Supervisory personnel shall ensure that ATF regulations and guidelines are known and followed by all subordinate personnel involved in the handling, storage, or use of CNLDDs.

e. The RO (or his or her designee) shall ensure that CNLDDs are only issued to trained and certified officers/agents with an articulated need for a CNLDD.

C. Warning Shots and Disabling Fire

1. Warning Shots - Warning shots are not permitted except as follows:

a. Maritime Law Enforcement Operations: Authorized Officers/Agents conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

b. Aviation Law Enforcement Operations: Authorized Officers/Agents conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave airspace, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

2. Disabling Fire - Firearms may not be used solely to disable moving vehicles, vessels, aircraft, or other conveyances, except when Authorized Officers/Agents are conducting maritime law enforcement activities against maritime conveyances.

    a. When a pursued vessel fails to comply with an order to stop, and warning shots have been deployed, the CBP Vessel or Aircraft Commander may elect to authorize disabling fire.

    b. The authority to commence disabling fire rests with the Vessel or Aircraft Commander. The decision to fire, however, ultimately rests with the shooter. It is the shooter's responsibility to ensure the safe deployment of the disabling rounds.

3. Authorized Officers/Agents may use CBP less-lethal devices specifically approved by the LESC for use against subjects who are intentionally preventing the deployment of marine disabling fire (e.g., by blocking access to or covering the engine of a vessel) if the failure to stop the vessel would pose an imminent threat to the safety of the officer/agent or others.

4. Warning shots and disabling fire shall be deployed with adherence to CBP-approved programs, policies, procedures, and directives.

5. Only ordnance approved by the Executive Director of the LESC, shall be authorized for use in conducting warning and/or disabling fire.

6. Only those Authorized Officers/Agents who have successfully completed LESC-approved training are authorized to utilize warning shots and/or disabling fire.

7. Warning shots and/or disabling fire pose a potential hazard; therefore, good judgment shall be exercised at all times. They cannot be fired where there is a reasonable belief that personal injury, death, or unintended property damage will occur. Safety shall always be the first consideration when utilizing warning shots and/or disabling fire.

8. The use of warning shots and/or disabling fire is considered less-lethal force, and shall be reported in accordance with the requirements of this chapter.

AR001228

**CBP Use of Force Policy**                                      **January 2021**

# Chapter 4:   Vehicular Immobilizations and Pursuit Intervention

A.  General Guidelines and Responsibilities

1.  Vehicular Immobilization Devices (VIDs) and Offensive Driving Techniques (ODT) are specialized devices and techniques designed and deployed with the intended result of causing a vehicle to stop through the controlled deflation of a vehicle tire, intentional vehicular contact, or other means of restraint.

2.  Any use of VIDs and/or ODT must be both objectively reasonable and necessary in order to carry out the Authorized Officer's/Agent's law enforcement duties.

3.  VIDs and ODT may be used in situations where the law enforcement benefit and the need to immobilize the subject vehicle and/or otherwise end a vehicle pursuit outweighs the immediate or foreseeable risk of injury to involved subjects and others created by the deployment of a VID or use of an ODT.

    a.  While every use of force scenario is unique, factors to consider in determining the reasonableness of a contemplated deployment of a VID or ODT include, but are not limited to:

        (1) Vehicle Speed;

        (2) Proximity of Population Centers;

        (3) Traffic Flow;

        (4) Weather or Road Conditions; and

        (5) Availability of Alternative Measures.

4.  The direction contained within this chapter, regarding the use of VIDs and ODTs are not to supersede the direction found within the *Emergency Driving, Including Vehicular Pursuits by U.S. Customs and Border Protection Personnel Directive* (CBP Directive 4510-26).

B.  Vehicle Immobilization Devices (VID)

1.  VIDs (including Controlled Tire Deflation Devices or CTDDs) are specialized less-lethal devices whose deployment is intended to result in the controlled deflation of a vehicle tire or otherwise cause a vehicle to stop.

**Chapter 4: Vehicular Immobilizations and Pursuit Intervention**         **Page 22**

AR001229

2. The immediate or potential danger to the public created by the deployment of the VID should be less than the immediate or potential danger to the public should the suspect vehicle be allowed to proceed without deployment of the VID. The VID shall be deployed in a manner that minimizes risk of injury to persons or damage to property.

3. Authorized Officers/Agents will announce the use of a VID on the service radio. A supervisor can deny (terminate) the deployment. Preapproval for the use of a VID is not required.

4. When otherwise objectively reasonable a VID may be deployed:

   a. When an Authorized Officer/Agent directs a motor vehicle to stop and the vehicle fails to comply with the officer's/agent's order;

   b. When a vehicle attempts to avoid inspection at a primary or secondary inspection area of a checkpoint or port of entry (POE);

   c. When a vehicle unlawfully crosses the border between POEs;

   d. When an Authorized Officer/Agent, acting within the guidelines set forth in this *Handbook*, is trying to prevent a suspect vehicle from leaving the area where a warrant is being served or where officers/agents have determined, or developed at least reasonable suspicion, that a crime is being or may have been committed that the officer/agent has the authority to enforce;

   e. When another law enforcement agency requests deployment of the VID in an emergency. Supervisory approval is required unless exigent circumstances can be articulated; or

   f. When the configuration at checkpoints, or Ports of Entry, allows for the placement of the VID on stationary vehicles for safety of the officers/agents and others. Placement of a VID in this manner does not constitute a reportable use of force unless accompanied by an attempt to flee.

5. The road where an Authorized Officer/Agent is considering the deployment of a VID should provide an unimpeded view of vehicular traffic from all directions. The VID may be used only in areas where topography, roadway surfaces, and vehicular conditions indicate that deployment can be accomplished with reasonable safety.

6.  The Authorized Officer/Agent who deploys the VID should:

    a.  During deployment of a VID, remain in visual contact and control of the VID unless the deploying officer/agent can articulate why visual contact and control are not safe and/or practical;

    b.  Prior to deploying the VID, ensure that all CBP and other agency personnel involved are notified of the pending deployment via available communication methods. Communication shall be maintained between officers/agents in the deployment area unless exigent circumstances preclude such communication;

    c.  Remove or deactivate the VID before becoming involved in the apprehension of the subject(s) unless exigent circumstances preclude such removal or deactivation; and

    d.  Remember that safety is paramount. The officer/agent retains the discretion not to deploy the VID.

7.  Authorized Officers/Agents shall not deploy a VID in school zones when children are present or traveling to or from the school, or in cases when the danger to the public outweighs the enforcement benefit.

8.  Authorized Officers/Agents conducting enforcement operations on CBP aircraft are permitted to overtake a pursued vehicle in order to deploy a VID. Authorized Officers/Agents operating on the ground shall not overtake a pursued vehicle without prior authorization from a supervisor in order to deploy a VID.

9.  Authorized Officers/Agents shall not deploy a VID to stop the following types of vehicles, except where an immediate danger to life makes it reasonable to deploy the VID:

    a.  Two or three-wheeled vehicles;

    b.  Vehicles known or reasonably believed to be transporting hazardous materials; or

    c.  Vehicles that are believed to pose an unusual hazard to officers/agents or the public.

10. When a VID causes *unintentional* damage to a vehicle:

    a.  The involved officer/agent will immediately report the incident to the duty supervisor;

   b. The duty supervisor shall provide a tort claim form (SF-95) to the driver of the vehicle for the damages to the vehicle that may have been caused by the VID along with instructions on how to complete the form and where to send the claim; and

   c. In cases when the vehicle is rendered immobile, procedures shall be in place to assist the driver in making the vehicle mobile.

C. Offensive Driving Techniques (ODT)

   1. ODTs are any driving technique that is consistent with CBP training and is intended to end a pursuit through intentional vehicle-to-vehicle impact.

   2. ODT are uses of force that may be considered less-lethal force or deadly force depending on a number of variables. As such, ODTs are classified in two different classes; Class 1 and Class 2.

      a. Class 1 ODTs are techniques performed at low speeds, under good road/environmental conditions, resulting in a low foreseeable risk of injury to the subject; therefore Class 1 ODTs are considered less-lethal applications of force.

      b. Class 2 ODTs are techniques used when the risk of injury to the subject is elevated due to excessive speeds and/or other known circumstances. Class 2 ODTs should only be authorized when the actions of the subject driver presents an imminent threat of death or serious bodily harm; Class 2 ODTs are considered applications of deadly force.

      c. Officers/agents and supervisors must consider all the factors above and presented in Chapter 1, Subsection B, of this policy, as well all material presented during ODT training to determine the appropriate class.

   3. ODTs may be utilized to end a vehicular pursuit when:

      a. A supervisor that is currently certified and trained by CBP to manage/authorize the use of ODT has given authorization to employ the technique (this requirement is a must absent an articulable, exigent circumstance that warrants the use of deadly force after considering the all the factors presented in Chapter 1.B of this policy);

      b. The officers/agents employing the ODT has been certified and trained by CBP to perform the technique;

    c. The immediate or potential danger to the public created by the use of the ODT is less than the immediate or potential danger to the public created by allowing the vehicle to proceed without deployment of the ODT or ending the pursuit via other means is less safe or has been determined impossible or ineffective; and,

    d. The ODT is employed in a manner consistent with CBP ODT training that minimizes risk of injury to all involved parties and/or damage to property.

4. Remember that safety is paramount. The officer/agent retains the discretion not to employ an ODT.

5. Authorized Officers/Agents shall not employ ODT in school zones when children are present or traveling to or from the school, or in cases when the danger to the public outweighs the enforcement benefit.

6. Authorized Officers/Agents shall not employ ODT to stop the following types of vehicles, except where an immediate danger to life makes it reasonable to employ an ODT:

    a. Two or three-wheeled vehicles;

    b. Vehicles known or reasonably believed to be transporting hazardous materials; or

    c. Vehicles that are believed to pose an unusual hazard to officers/agents or the public.

## Appendix I:  DHS Policy on the Use of Force



Issue Date:  September 7, 2018

Policy Statement 044-05

MEMORANDUM FOR:     Component Heads

FROM:     Claire M. Grady
Acting Deputy Secretary of Homeland Security and
Under Secretary for Management

SUBJECT:     **Department Policy on the Use of Force**

### I.     Purpose

Pursuant to the Secretary's authority under Title 6, United States Code (U.S.C.) § 112, this policy articulates Department-wide standards and guidelines related to the use of force by Department of Homeland Security (DHS) law enforcement officers and agents (LEOs) and affirms the duty of all DHS employees to report improper uses of force. All DHS Components employing LEOs are directed to implement this guidance, including investigation and documentation practices, through Component-specific policy, procedure, and training.

This memorandum supersedes the Memorandum from Secretary Tom Ridge, "Department of Homeland Security Policy on the Use of Deadly Force" (June 25, 2004).

### II.     Use of Force Standard

#### A.     Introduction

In determining the appropriateness of a particular use of force, the Department is guided by constitutional law, as interpreted by the U.S. Supreme Court.[1] The Fourth Amendment supplies a constitutional baseline for permissible use of force by LEOs in the course of their official duties; law enforcement agencies may adopt policies that further constrain the use of force. This policy describes the governing legal framework and articulates additional principles to which the Department will adhere.

#### B.     General Statement

Unless further restricted by DHS Component policy, DHS LEOs are permitted to use force to control subjects in the course of their official duties as authorized by law, and in defense of themselves and others. In doing so, a LEO shall use only the force that is **objectively reasonable** in light of the facts and circumstances confronting him or her at the time force is applied.

---

[1] See, e.g., *Graham v. Connor*, 490 U.S. 386 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985).

AR001234

C.      Discussion: The Fourth Amendment "Reasonableness" Standard

1.The Supreme Court has ruled that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[2] This standard is an objective one that, in the context of use of force policy and practice, is often referred to as "objective reasonableness."

2.Because this standard is "not capable of precise definition or mechanical application," its "proper application requires careful attention to the facts and circumstances of each particular case."[3] The reasonableness of a LEO's use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[4] In determining whether the force a LEO used to effect a seizure was reasonable, courts allow for the fact that LEOs are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving.

3.Consequently, there may be a range of responses that are reasonable and appropriate under a particular set of circumstances.

4.Once used, physical force[5] must be discontinued when resistance ceases or when the incident is under control.

## III.    General Principles

A.      Respect for Human Life

All DHS personnel have been entrusted with a critical mission: safeguarding the American people, our homeland, and our values. In keeping with this mission, respect for human life and the communities we serve shall continue to guide DHS LEOs in the performance of their duties.

---

[2] *Graham*, 490 U.S. at 396. The Court has further determined that a Fourth Amendment "seizure" of a person occurs when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied* (emphasis in original)." Brendlin v. California, 551 U.S. 249, 254 (2007)(citations omitted).

[3] *Graham.* (citing *Garner*, 471 U.S at 8-9: "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure'"). The "totality of the circumstances" refers to all factors surrounding a particular use of force. In *Graham*, the Court lists three factors, often referred to as the "*Graham* factors," that may be considered in assessing reasonableness: the severity of the crime/offense at issue, whether the subject poses an immediate threat to the safety of the LEO or others, and whether the subject is actively resisting arrest or attempting to evade arrest by flight. Other factors include, but are not limited to: the presence and number of other LEOs, subjects, and bystanders; the size, strength, physical condition, and level of training of the LEO(s); the apparent size, strength, physical condition, and level of training of the subject(s); whether an individual is forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a LEO while the LEO is engaged in, or on account of the performance of, official duties; proximity and type of weapon(s) present; criminal or mental health history of the subject(s) known to the LEO at the time of the use of force; and the perceived mental/emotional state of the subject.

[4] *Id.*

[5] Other than the force reasonably required to properly restrain a subject and safely move him or her from point to point. That is, once the subject is secured with restraints, a LEO may maintain physical control of the subject via the use of "come-along or other control techniques" to safely and securely conclude the incident.

---

B. De-escalation

To ensure that DHS LEOs are proficient in a variety of techniques that could aid them in appropriately resolving an encounter, DHS Components shall provide use of force training that includes de-escalation tactics and techniques.

C. Use of Safe Tactics

DHS LEOs should seek to employ tactics and techniques that effectively bring an incident under control while promoting the safety of LEOs and the public, and that minimize the risk of unintended injury or serious property damage. DHS LEOs should also avoid intentionally and unreasonably placing themselves in positions in which they have no alternative to using deadly force.

D. Additional Considerations

1.DHS LEOs are permitted to use force that is reasonable in light of the totality of the circumstances. This standard does not require LEOs to meet force with equal or lesser force.

2.DHS LEOs do not have a duty to retreat to avoid the reasonable use of force, nor are they required to wait for an attack before using reasonable force to stop a threat.

E. Warnings

1.When feasible, prior to the application of force, a DHS LEO must attempt to identify him- or herself and issue a verbal warning to comply with the LEO's instructions. In determining whether a warning is feasible under the circumstances, a LEO may be guided by a variety of considerations including, but not limited to, whether the resulting delay is likely to:

a.Increase the danger to the LEO or others, including any victims and/or bystanders;

b. Result in the destruction of evidence;

c. Allow for a subject's escape; or

d. Result in the commission of a crime.

2.In the event that a LEO issues such a warning, where feasible, the LEO should afford the subject a reasonable opportunity to voluntarily comply before applying force.

AR001236

F.      Exigent Circumstances

In an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is reasonable in light of the circumstances.

G.      Medical Care

As soon as practicable following a use of force and the end of any perceived public safety threat, DHS LEOs shall obtain appropriate medical assistance for any subject who has visible or apparent injuries, complains of being injured, or requests medical attention. This may include rendering first aid if properly trained and equipped to do so, requesting emergency medical services, and/or arranging transportation to an appropriate medical facility.

H.      Duty to Intervene In and Report Improper Use of Force

1.The Department is committed to carrying out its mission with honor and integrity, and to fostering a culture of transparency and accountability. As such, DHS law enforcement Components will ensure that their policies and procedures unambiguously underscore the following:

> **The use of excessive force is unlawful and will not be tolerated. Those who engage in such misconduct, and those who fail to report such misconduct, will be subject to all applicable administrative and criminal penalties.**

2.DHS LEOs have a duty to intervene to prevent or stop a perceived use of excessive force by another LEO—except when doing so would place the observing/responding LEO in articulable, reasonable fear of death or serious bodily injury.

3.**Any DHS employee** with knowledge of a DHS LEO's improper use of force shall, without unreasonable delay, report it to his or her chain of command, the internal affairs division, the DHS Office of Inspector General, and/or other reporting mechanism identified by Component policy or procedure.

4.Failure to intervene in and/or report such violations is, itself, misconduct that may result in disciplinary action, with potential consequences including removal from federal service, civil liability, and/or criminal prosecution. DHS Components shall ensure that all personnel are aware of these obligations, as well as the appropriate mechanism(s) by which such reports should be made.

IV.     **Less-Lethal Force and Less-Lethal Devices**

A. All DHS Components employing LEOs shall have appropriate written policies and procedures regarding the use of authorized control tactics or techniques; authorized less-lethal devices; and necessary training and certifications—both initial and recurring.

B. DHS Components shall conduct less-lethal use of force training no less than every two years and incorporate decision-making and scenario-based situations in these training programs.

C. DHS LEOs are prohibited from carrying any unauthorized less-lethal device for duty use.

D. LEOs shall demonstrate proficiency, in accordance with established Component standards, for each less-lethal device that they are authorized and certified to carry. If a certification or valid waiver expires, a LEO is prohibited from carrying that device for duty use until he or she meets the requirements for recertification on that device.

V.     **Warning Shots and Disabling Fire**

A.     General Prohibition

Except in the limited circumstances described in Section V.B., "Exceptions," DHS LEOs are prohibited from discharging firearms solely:

    1.     As a warning or signal ("warning shots") or

    2.     To disable moving vehicles, vessels, aircraft, or other conveyances ("disabling fire").

B.     Exceptions

    1.     Warning Shots

       a.     Maritime Law Enforcement Operations: Authorized U.S. Coast Guard (USCG), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) personnel conducting maritime law enforcement operations may use warning shots only as a signal to a vessel to stop, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

b.     Aviation Law Enforcement Operations: Authorized USCG, CBP, and ICE personnel conducting aviation law enforcement operations may use warning shots only as a signal to an aircraft to change course and follow direction to leave the airspace, and only after all other available means of signaling have failed. Such warning shots are classified as less-lethal force.

2.     Disabling Fire

a.     Maritime Law Enforcement Operations: Authorized USCG, CBP, and ICE personnel, when conducting maritime law enforcement operations, may discharge firearms to disable moving vessels or other maritime conveyances. Such disabling fire is classified as less-lethal force.

b.     Physical Protection: Authorized United States Secret Service (USSS) personnel exercising USSS's protective responsibilities, and other authorized and appropriately trained DHS LEOs assigned to assist USSS in exercising these responsibilities, may discharge firearms to disable moving vehicles, vessels, and other conveyances, and such disabling fire is classified as less-lethal force—EXCEPT: Aircraft in Flight: Disabling fire against an aircraft in flight is permitted only if the use of deadly force against the occupants of the aircraft, or in response to the threat posed by the aircraft, itself, is otherwise authorized under this policy. This is classified as a use of deadly force. [6]

C.     Safety Considerations

1. Warning shots and disabling fire are inherently dangerous and, when authorized under this policy, should be used with all due care. DHS LEOs must exercise good judgment at all times and ensure that safety is always the primary consideration.

2. When authorized LEOs deem warning shots or disabling fire warranted, each shot must have a defined target.

## VI.   **Deadly Force**

A.     General Guidelines

1.     As with any use of force, a LEO's use of deadly force must be reasonable in light of the facts and circumstances confronting him or her at the time force is applied.

---

[6] As a use of deadly force, this is not mere "disabling fire," which by definition is not intended to cause bodily injury.

2.A DHS LEO may use deadly force only when the LEO has a reasonable belief that the subject of such force poses an imminent threat of death or serious bodily injury to the LEO or to another person.[7]

a.Fleeing Subjects: Deadly force shall not be used solely to prevent the escape of a fleeing subject. However, deadly force is authorized to prevent the escape of a fleeing subject where the LEO has a reasonable belief that the subject poses a significant threat of death or serious physical harm to the LEO or others and such force is necessary to prevent escape.[8]

B. Discharge of Firearms

1. General Guidelines

a.Discharging a firearm against a person constitutes the use of deadly force and shall be done only with the intent of preventing or stopping the threatening behavior that justifies the use of deadly force.

b.The act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force.

2. Moving Vehicles, Vessels, Aircraft, or other Conveyances

a.DHS LEOs are prohibited from discharging firearms at the operator of a moving vehicle, vessel, aircraft, or other conveyance unless the use of deadly force against the operator is justified under the standards articulated elsewhere in this policy. [9] Before using deadly force under these circumstances, the LEO must take into consideration the hazards that may be posed to law enforcement and innocent bystanders by an out-of- control conveyance.

b.Firearms shall not be discharged solely as a warning or signal or solely to disable moving vehicles, vessels, aircraft, or other conveyances, except under the limited circumstances described in Section V., Warning Shots and Disabling Fire.

---

[7] For more detailed discussion of the use of force standard and the "reasonableness" determination, see Section II., Use of Force Standard.

[8] See *Garner*, 471 U.S. at 11-12. To further illustrate a "threat of serious physical harm," the *Garner* Court explained: "…if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* The Supreme Court has further explained that this "necessity" refers not to preventing the flight, itself, but rather the larger context: the need to prevent the suspect's potential or further serious physical harm to the LEO or other persons.

[9] Here, a distinction is drawn between firing at the operator, i.e., targeting the operator with the intent to cause serious physical injury or death, and firing at a moving vehicle or other conveyance solely as a warning or signal or to disable the vehicle, and with no intent to injure (see section V., Warning Shots and Disabling Fire).

AR001240

## VII. Reporting Requirements and Incident Tracking

A.     Uses of force shall be documented and investigated pursuant to Component policies.

B. It is a Department priority to ensure more consistent Department-wide reporting and tracking of use of force incidents. More consistent data will enable both the Department and Components to more effectively assess use of force activities, conduct meaningful trend analysis, revise policies, and take appropriate corrective actions.

C. DHS Components employing LEOs shall establish internal processes to collect and report accurate data on Component use of force activities. At a minimum, Components shall report the following as a "use of force incident" when resulting from a use of force:

    1. A less-lethal device is utilized against a person (except when the device is deployed in a non-striking control technique);

    2.     Serious bodily injury occurs;

    3. Deadly force is used against a person, to include when a firearm is discharged at a person; or

    4.     Death occurs.

D. Components shall report this data to the Deputy Secretary, through the Deputy Assistant Secretary for Law Enforcement Policy, on no less than an annual basis (in accordance with a process and timeline to be determined) and to others as required for official purposes.

## VIII. Departmental Review and Oversight

A. Each DHS Component employing LEOs will establish and maintain a use of force review council or committee to perform internal analysis of use of force incidents from the perspective of training, tactics, policy, and equipment; to identify trends and lessons learned; and to propose any necessary improvements to policies and procedures.

B. The Office of Strategy, Policy, and Plans, working in consultation with DHS Components employing LEOs, shall establish the DHS Use of Force Council to provide a forum by which Components can share lessons learned regarding use of force policies, training, and oversight. The DHS Use of Force Council will be chaired by the Office of Strategy, Policy, and Plans and comprised of one executive-level representative from each of the following DHS Components:

    1.     Office of the Under Secretary for Management
    2.     National Protection and Programs Directorate

3. United States Customs and Border Protection
4. United States Coast Guard
5. United States Secret Service
6. Federal Emergency Management Agency
7. Transportation Security Administration
8. United States Immigration and Customs Enforcement
9. Office of the General Counsel
10. Federal Law Enforcement Training Centers
11. Office for Civil Rights and Civil Liberties
12. Privacy Office

C. Representatives of affected DHS Components will be responsible for reporting on use of force-related trends, developments, and lessons learned within their respective Components.

## IX. Military Activities

This policy shall not apply to the United States Coast Guard when operating under the Standing Rules of Engagement, or to other DHS personnel when they fall under Department of Defense control as civilians accompanying the force.

## X. No Right of Action

This policy is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## XI. Definitions

A. *Deadly Force*: Any use of force that carries a substantial risk of causing death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Deadly force does not include force that is not likely to cause death or serious bodily injury, but unexpectedly results in such death or injury. In general, examples of deadly force include, but are not limited to, intentional discharges of firearms against persons, uses of impact weapons to strike the neck or head, any strangulation technique, strikes to the throat, and the use of any edged weapon.

B. *De-Escalation*: The use of communication or other techniques during an encounter to stabilize, slow, or reduce the intensity of a potentially violent situation without using physical force, or with a reduction in force.

C. *Disabling Fire*: Discharge of a firearm for the purpose of preventing a non-compliant moving vehicle, vessel, aircraft, or other conveyance from operating under its own power, but not intended to cause bodily injury.

**D. Less-Lethal Device**: An instrument or weapon that is designed or intended to be used in a manner that is not likely to cause death or serious bodily injury (see "Serious Bodily Injury"). Examples include, but are not limited to, conducted electrical weapons/electronic control weapons, impact weapons, and certain chemical agents. These are also commonly referred to as "intermediate force" or "less-than-lethal" weapons or devices.

**E. Less-Lethal Force**: Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

**F. Lessons Learned**: Information gleaned through internal review and analysis of use of force incidents that is sufficiently significant or critical to consider a change to policies, procedures, or training standards. Lessons learned may include, for example, information that can enhance law enforcement personnel skills; identify gaps in current training; identify current unique criminal trends being experienced in the field; provide information on new equipment recommendations or gaps; identify concerns with standard less lethal equipment/tactics; or any information that can prevent harm to the community, law enforcement, or arrestees.

**G. Serious Bodily Injury**: Physical injury that involves protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

**H. Use of Force**: The intentional application by law enforcement of any weapon, instrument, device, or physical power in order to control, restrain, or overcome the resistance, or gain compliance or custody, of another.

I. **Warning Shot**: Discharge of a firearm as a warning or signal, for the purpose of compelling compliance from an individual, but not intended to cause bodily injury.

Distribution:

Under Secretary for Science and Technology
Under Secretary for Management
Under Secretary for National Protection and Programs Directorate
Under Secretary of Intelligence and Analysis
Commissioner, U.S. Customs and Border Protection
Commandant, United States Coast Guard
Director, United States Secret Service
Director, U.S. Citizenship and Immigration Services
Administrator, Federal Emergency Management Agency
Administrator, Transportation Security Administration
Assistant Secretary, U.S. Immigration and Customs Enforcement
General Counsel
Inspector General
Director, Federal Law Enforcement Training Centers
Assistant Secretary of Countering Weapons of Mass Destruction Office
Under Secretary for Strategy, Policy, and Plans Policy
Assistant Secretary for Legislative Affairs
Assistant Secretary for Public Affairs
Assistant Secretary for Partnership and Engagement
Director, Operations Coordination
Officer for Civil Rights & Civil Liberties
Chief Privacy Officer
Citizenship and Immigration Services Ombudsman
Military Advisor to the Secretary
Director, Community Partnerships
Executive Secretary

AR001244

## Appendix II:  DHS Commitment to Nondiscriminatory Law Enforcement and Screening Activities



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

Homeland
Security

April 26, 2013

MEMORANDUM FOR COMPONENT HEADS

FROM:                           Secretary Napolitano

Subject:                        The Department of Homeland Security's Commitment to
                                Nondiscriminatory Law Enforcement and Screening Activities

The Department of Homeland Security's mission is to ensure that the Nation remains a safe, secure, resilient place where the American way of life can thrive.  As former Secretary Ridge explained in the predecessor to this policy, "In all we do to secure America, our strategies and our actions must be consistent with the individual rights and civil liberties protected by the Constitution and the rule of law."

The Department of Homeland Security's policy is to prohibit the consideration of race or ethnicity in our investigation, screening, and enforcement activities in all but the most exceptional instances.  The following is the Department's official policy on this issue:

*"Racial profiling" is the invidious use of race or ethnicity as a criterion in conducting stops, searches, and other law enforcement, investigation, or screening activities. It is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity.  The Department of Homeland Security (DHS) has explicitly adopted the Department of Justice's "Guidance Regarding the Use of Race by Federal Law Enforcement Agencies," issued in June 2003.  It is the policy of DHS to prohibit the consideration of race or ethnicity in our daily law enforcement and screening activities in all but the most exceptional instances, as defined in the DOJ Guidance.  DHS personnel may use race or ethnicity only when a compelling governmental interest is present, and only in a way narrowly tailored to meet that compelling interest. Of course, race- or ethnicity-based information that is specific to particular suspects or incidents, or ongoing criminal activities, schemes or enterprises, may be considered, as stated in the DOJ Guidance.*

*Except as noted below, it is DHS policy, although not required by the Constitution, that tools, policies, directives, and rules in law enforcement and security settings that consider, as an investigative or screening criterion, an individual's simple connection to a particular country, by birth or citizenship, should be reserved for situations in which such consideration is based on an assessment of intelligence and risk, and in which alternatives do not meet security needs, and*

*such consideration should remain in place only as long as necessary. These self-imposed limits, however, do not apply to antiterrorism, immigration, or customs activities in which nationality is expressly relevant to the administration or enforcement of a statute, regulation, or executive order, or in individualized discretionary use of nationality as a screening, investigation, or enforcement factor).*

All Components should include the DHS policy stated above in all manuals, policies, directives, and guidelines regarding any activity in which the use of race, ethnicity, or nationality may arise as a security screening, enforcement, or investigative criterion. Each Component, in coordination with the Department's Office for Civil Rights and Civil Liberties, should implement Component-specific policy and procedures to implement this guidance for law enforcement, investigation, and security activities. Moreover, all Components should ensure that all law enforcement personnel, including supervisors and managers, are trained to the standards set forth in the DOJ Guidance and the DHS policy stated above, and are held accountable for meeting those standards.

2

# Appendix III:  DHS Policy Statement #045-06

FOR OFFICIAL USE ONLY

*Deputy Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



January 10, 2017

MEMORANDUM FOR DEPARTMENT COMPONENT HEADS

FROM:            Russell C. Deyo
                 Acting Deputy Secretary

SUBJECT:         **Required Reporting of Off-Duty Contact with Law
                 Enforcement by DHS Law Enforcement Personnel and
                 the Suspension and/or Revocation of Authority to Carry a
                 Firearm or other Weapon and Perform Law Enforcement
                 Duties**

Secretary Johnson and I greatly appreciate that every day, Department of
Homeland Security (DHS or the Department) law enforcement personnel put their lives
on the line in protection of our homeland.  We recognize that law enforcement is a
challenging occupation, characterized by high risks and inherent dangers.  At the same
time, DHS maintains an expectation that its law enforcement personnel will uphold the
highest standards of conduct in both their personal and professional lives.  To account for
those occasions when a DHS law enforcement officer is involved in a situation where
their conduct brings them into contact with, and places them under the scrutiny of law
enforcement or the judiciary, this memorandum outlines the Department's policy for
reporting such contact, and the potential implications on the law enforcement officer's
authority to carry a firearm or other weapon and perform law enforcement duties.

<u>Policy</u>

This policy requires that DHS Components shall, at a minimum:

*Expand or Ensure DHS Law Enforcement Officers' Notification Requirements
Include All Off-Duty Reportable Law Enforcement Officer/Agency or Judicial
Contact*

FOR OFFICIAL USE ONLY

www.dhs.gov

**CBP Use of Force Policy**                                    **January 2021**

FOR OFFICIAL USE ONLY

To ensure officer behavior is consistent with the Department's law enforcement mission, responsibilities, and values, the Department requires all law enforcement officers report to their supervisor all off-duty reportable contact with a law enforcement officer/agency as defined in Appendix A. DHS law enforcement officers must immediately report their arrest to their supervisor. DHS law enforcement officers must report all other off-duty reportable contact to their supervisor within 48 hours of the incident.

> *Require Quarterly Advisement to DHS Law Enforcement Officers of their Duty Regarding Notification of Reportable Contact, the Lautenberg Amendment's Prohibitions on Carriage of Firearms, and Annual Lautenberg Certification*

As part of the Department's strong stand against crimes of domestic violence, DHS requires that all law enforcement officers receive a quarterly verbal advisement, during quarterly firearms qualifications, of their duty to notify management of any off-duty reportable contact with a law enforcement officer/agency, to include convictions for misdemeanor crimes of domestic violence and issuance of protective or temporary restraining orders, as well as notification of the Lautenberg Amendment's prohibitions on carriage of firearms. DHS also requires all law enforcement officers complete, on an annual basis, Lautenberg Amendment certifications regarding no conviction of a misdemeanor crime of domestic violence, as defined in Appendix A.

> *Notification of Lautenberg Amendment Convictions Shall Result in the Immediate Suspension and Subsequent Revocation of Authority to Carry a Firearm or Perform Law Enforcement Duties*

The Lautenberg Amendment requires that a law enforcement officer convicted of a misdemeanor crime of domestic violence may not possess a firearm or ammunition. DHS law enforcement officers convicted of such crimes, including pleas of no contest or sentences of probation before judgment, will no longer be authorized to carry a firearm or perform law enforcement functions. When a Component is initially notified of a potentially qualifying conviction, the Component is required to suspend the law enforcement officer's authority to carry a weapon and perform law enforcement duties within 24 hours of such notification. Once the Component is able to confirm the existence of a qualifying conviction, in consultation with the Component's legal counsel as appropriate, the authority to carry a weapon and perform law enforcement duties must be revoked. Subsequently, Components will pursue reassignment from a law enforcement position, an adverse action for failure to meet a condition of employment, or an adverse action based on the underlying misconduct.

> *DHS Law Enforcement Officer's Mandatory Notification of the Issuance of Protective Orders, Temporary Restraining Orders or any Other Court Order*

FOR OFFICIAL USE ONLY
2

**Appendix III:  DHS Policy Statement #045-06**                    **Page 41**

AR001248

FOR OFFICIAL USE ONLY

*Restricting a DHS Law Enforcement Officer's Contact with Another Individual or Ability to Possess a Firearm*

Consistent with DHS's law enforcement mission, the Department requires all law enforcement officers report to their supervisor all protective and temporary restraining orders restricting their contact with another individual or their ability to possess a firearm, about which they are aware. Notification is required to be made within 48 hours of the law enforcement officer becoming aware of the protective order, temporary restraining order, or any other court order restricting the employee's contact with another individual or ability to possess a firearm. Upon notification of the issuance of protective or restraining orders, DHS Components must implement a process by which supervisors make an initial determination of the appropriate course of action, in consultation with Component leadership, Component counsel, the Component's Office of Professional Responsibility (or equivalent) and the Component's Office of Employee and Labor Relations (or equivalent) as appropriate.

*Mandatory Suspension of Authority to Carry a Firearm or other Weapon and to Perform Law Enforcement Duties Following Notification of Law Enforcement Officer/Agency Contact Involving an Allegation of Off-Duty Violence by a DHS Law Enforcement Officer and/or Issuance of a Protective or Temporary Restraining Order Related to an Allegation of Domestic Violence or Other Alleged Violent Behavior*

To best protect the interests of the public, the Department, the officer involved, and the alleged victim(s), this policy mandates the immediate suspension of an officer's authority to carry government-issued or otherwise authorized weapon(s) and to perform law enforcement duties upon notification of (1) an off-duty DHS law enforcement officer's contact with a law enforcement officer/agency where the allegation contains a component of unlawful or unjustified violence by the law enforcement officer; or (2) the issuance of a protective or temporary restraining order against a DHS law enforcement officer related to an allegation of domestic violence or based on some other form of alleged violent behavior, or the officer's ability to possess a firearm.

This policy requires that Components provide verbal notice to the officer at the time of suspension, with formal written documentation of the suspension of these authorities within five (5) business days after the date of verbal notification. This policy coincides with Component obligations to report all allegations of criminal misconduct and all allegations of serious, noncriminal conduct in accordance with DHS Management Directive 0810.1, dated June 10, 2004.

- For all circumstances requiring the formal reporting of misconduct in accordance with DHS Management Directive 0810.1, further assessments pertaining to the suspension of an officer's authority to carry government-issued or otherwise

FOR OFFICIAL USE ONLY

AR001249

FOR OFFICIAL USE ONLY

authorized weapon(s) and to perform law enforcement duties will be coordinated with the appropriate DHS internal investigative entity (Office of Inspector General and/or the Component Office of Professional Responsibility, or equivalent).

- For all circumstances that do not require the formal reporting of misconduct in accordance with DHS Management Directive 0810.1, Components will develop procedures to determine if continued suspension of an officer's authority to carry government-issued or otherwise authorized weapon(s) and to perform law enforcement duties is warranted. This will include an assessment into the facts and circumstances conducted by Component leadership (not less than a second-line supervisor) to determine whether continued suspension is warranted. In conducting such assessments, Component managers will consider both the law enforcement contact, action or order issued and the conduct of the officer involved. Even if a state or local court or law enforcement agency declines to take action, a review by Component managers may reveal that the officer's conduct is inconsistent with the continued authority to carry a firearm or other weapon or perform federal law enforcement duties.

In all situations where a Component suspends or revokes an officer's law enforcement authority to carry a firearm, DHS requires that Components immediately take custody of any government-issued firearms or other weapons, and where applicable, rescind, in writing, any previous authorizations to utilize a personally-owned firearm in the performance of the officer's duties.

*Take Prompt Remedial Action for Failure to Report Law Enforcement and Judicial Contact*

In accordance with this directive, upon awareness of an off-duty reportable contact that was not reported by a DHS law enforcement officer as required by this policy, DHS Components will review the situation, the factors underlying the failure to report, and take appropriate actions based on the information received, including discipline for misconduct as appropriate and in a manner consistent with law and regulation. DHS Components' policies will include penalties for a failure to report off-duty reportable contact.

*Mandatory Biannual Reporting of All Suspensions or Revocations of DHS Law Enforcement Officer's Authority to Carry a Firearm and Perform Law Enforcement Duties*

To promote greater transparency and accountability, DHS mandates that Department Components track and report to the Deputy Assistant Secretary for Law Enforcement Policy the number of law enforcement officers who have had their authorities suspended or revoked following off-duty contact with a law enforcement

FOR OFFICIAL USE ONLY
4

AR001250

FOR OFFICIAL USE ONLY

officer/agency or the issuance of a protective or temporary restraining order, and those who have subsequently had their authorities reinstated following internal agency review and assessment.

> *Require Annual Training for all Department Supervisors of Law Enforcement Officers on Federal Law, Regulations, and Department Policy Regarding the Suspension or Revocation of an Officer's Law Enforcement Authorities*

As part of the Department's effort to establish sound policy and consistent practice regarding the suspension or revocation of a law enforcement officer's authorities, annual training will be provided to managers regarding the decision-making process associated with this policy.

> *Require Annual Domestic Violence Awareness Training for all Department Law Enforcement Officers*

As part of the Department's strong stand against crimes of domestic violence, annual training will be provided to all Department law enforcement officers regarding these crimes to reinforce Department values and assist in preventing domestic violence.

Within 60 days from the date of this policy, each DHS Component shall designate an executive-level point of contact at the Component's headquarters office who will be responsible for the implementation of this policy, and for promoting compliance with its provisions, within his or her area of responsibility and who will consult with their Component privacy office to ensure appropriate Privacy Act coverage for the collection of this information. Upon designating a POC for this policy, DHS Components will provide DHS Law Enforcement Policy with their designee's contact information. In addition, within 60 days from the date of this policy, each DHS Component shall provide to DHS Law Enforcement Policy their plan to implement the policy, ensuring that responsibilities under labor relations statutes and union agreements are fulfilled, as applicable.

All questions regarding the scope and implementation of this policy should be directed to the Deputy Assistant Secretary for Law Enforcement Policy, Office of Policy.

FOR OFFICIAL USE ONLY
5

AR001251

FOR OFFICIAL USE ONLY

APPENDIX A

**Required Reporting of Off-Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension and/or Revocation of Authority to Carry a Firearm or other Weapon and Perform Law Enforcement Duties**

For the purposes of this policy, the following terms have the definitions set forth below:

*Convicted of a Misdemeanor Crime of Domestic Violence:* a law enforcement officer who has been found guilty under federal, state or tribal law of a crime defined by 18 U.S.C. § 921(a)(33)(A), provided that the law enforcement officer "was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case," and, if the law enforcement officer was entitled to a trial by jury, the case was, in fact, tried by jury or the law enforcement officer "knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise," 18 U.S.C. § 921(a)(33)(B). Convictions include no contest pleas and sentences of probation.

*Government-Authorized Personally Owned Weapon:* A firearm or other weapon that is not government-owned, but is authorized by the government for use by a law enforcement officer in performance of their official duties.[1]

*Government-Owned Weapon:* A firearm or other weapon owned by the government and assigned to a law enforcement officer for use in performance of their official duties.

*DHS Law Enforcement Officer:* For the purpose of this policy, a law enforcement officer is any employee within the Department who is duly sworn and authorized by law to carry a weapon, make arrests, or execute search and arrest warrants.

*Lautenberg Amendment:* Specifically refers to 18 U.S.C. § 922(g)(9), which prohibits anyone who has been convicted in any court of a misdemeanor crime of domestic violence from possessing any firearm or ammunition.

*Off-Duty Reportable Contact:* All instances where a DHS law enforcement officer is off-duty and not acting in an official capacity and is questioned, interviewed, detained, or arrested as a subject of an enforcement action or investigation by a law enforcement agency (either internal to DHS or external) during the course of said agency's official duties to determine if the DHS law enforcement officer was a party to an alleged violation of law. Reportable contact also includes the known

---

[1] Nothing in this policy shall be construed as interfering with the right of law enforcement officers to carry privately owned firearms for personal use as private citizens. Law enforcement officers are expected to comply with all applicable federal, state, and local laws when exercising this right.

FOR OFFICIAL USE ONLY
6

AR001252

FOR OFFICIAL USE ONLY

issuance of any protective order, temporary restraining order, or other court order restricting a DHS law enforcement officer's contact with another individual. Reportable contact excludes instances when a DHS law enforcement officer is contacted for civil violations or traffic violations where there was no allegation of violence, threat of violence, or where the civil or traffic violation did not include the possession or use of alcohol or drugs.

*Suspend Law Enforcement Authorities:* an affirmative management action, in writing and pursuant to any procedures which have been or may be established, which temporarily removes a law enforcement officer's authority to perform law enforcement duties and carry a government-issued firearm or other weapon, as well as the authority granted through their law enforcement position to carry a personally-owned or off-duty weapon as a result of alleged misconduct (including self-reported misconduct) or disciplinary action. The action results in the law enforcement officer's surrender of all DHS-issued firearms or other weapons, badges and credentials, and temporary removal of the authorization to carry a firearm in the performance of the officer's official duties and perform law enforcement duties, to include the authorization of home-to-work privileges.

*Revoke Law Enforcement Authorities:* an affirmative management action, in writing and pursuant to any procedures which have been or may be established, which permanently terminates a law enforcement officer's authority to perform law enforcement duties and carry a government-issued firearm or other weapon, as well as any authority previously granted through their law enforcement position to carry a personally-owned firearm while on duty. This action results in the law enforcement officer's surrender of all DHS-issued firearms or other weapons, badges and credentials, and termination of the authorization to carry a firearm in the performance of the officer's official duties, to include the authorization of home-to-work privileges. In accordance with law, regulation, and policy, a permanent revocation of firearms credentials may be grounds for reduction in grade, reassignment, or removal.

FOR OFFICIAL USE ONLY

AR001253

# Appendix IV:  CBP Domestic Violence Policy



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

**DIRECTIVE NUMBER:** 51000-004       **EFFECTIVE DATE:**  December 9, 2020

**SUPERSEDES:** N/A       **OFFICE:** Enterprise Services

**SUBJECT CODE:**       **SUB OFFICE:** Human Resources Management

**DISTRIBUTION:**       **PROGRAM OFFICE:** Human Resources Policy and Programs Directorate/Human Resources Policy and Regulatory Affairs Division

## U.S. CUSTOMS AND BORDER PROTECTION
## DOMESTIC VIOLENCE POLICY

**1   PURPOSE**

1.1     U.S. Customs and Border Protection (CBP) strives to promote a safe and healthy work environment for all employees, and to sustain a workforce that is free from the harmful effects of domestic violence.

**2   POLICY**

2.1     It is the policy of CBP to provide assistance to employees who are victims of domestic violence.  It is also the policy of CBP to prohibit employees from committing domestic violence, and to ensure domestic violence offenders are held accountable for their actions.

**3   AUTHORITIES / REFERENCES**

3.1     Presidential Memorandum, Establishing Policies for Addressing Domestic Violence in the Federal Workforce (April 18, 2012);

3.2     Office of Personnel Management, Guidance for Agency-Specific Domestic Violence, Sexual Assault, and Stalking Policies (February 2013);

3.3     Title 5, Code of Federal Regulations, Part 735, Employee Responsibilities and Conduct;

3.4     Title 18, United States Code § 922(g)(9);

3.5     Department of Homeland Security Policy Directive 045-06, Required Reporting of Off-Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension and/or Revocation of Authority to Carry a Firearm or Other Weapon and Perform Law Enforcement Duties (January 10, 2017);

3.6     CBP Standards of Conduct, Directive 51735-013B (December 9, 2020);

AR001254



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

3.7     CBP Table of Offenses and Penalties (December 9, 2020);

3.8     Arrest of CBP Employees, Directive 51735-014A (December 9, 2020);

3.9     CBP Use of Force Policy, Guidelines and Procedures Handbook, HB 4500-01C (May 2014);

3.10    Delegation of Authority for Disciplinary and Adverse Actions, Delegation Order Number 20-017 (October 6, 2020).

**4   SCOPE**

4.1     This Directive applies to all CBP employees.  Where there are differences in this Directive and a negotiated union agreement, the negotiated union agreement shall govern over those matters concerning bargaining unit employees.

**5   RESPONSIBILTIES**

5.1     Executive Assistant Commissioners; Chief, U.S. Border Patrol; Assistant Commissioners; and headquarters office executive leadership are responsible for ensuring compliance with the provisions of this Directive within their respective program offices, and for ensuring the necessary support and resources are available to supervisors and managers in their efforts to address employee and workplace issues caused by domestic violence.

5.2     The Assistant Commissioner, Office of Human Resources Management, is responsible for ensuring the provisions of this Directive are compliant with Federal regulations and OPM guidance, for providing administrative advice and support to supervisors and managers on domestic violence matters affecting the workplace, and promoting employee awareness of CBP's domestic violence policies.

5.3     The Office of Professional Responsibility (OPR) is responsible for investigating allegations of domestic violence and any workplace incidents related to acts of domestic violence, whether an employee is a victim or offender, and for serving as a CBP liaison with outside law enforcement entities.

5.4     Supervisors and managers are responsible for ensuring employees are aware of the provisions of this Directive, for maintaining a safe and non-threatening work environment, for offering assistance through the Employee Assistance Program (EAP) to employees who either commit or are affected by domestic violence, for following Agency policies and procedures, and for promptly initiating administrative action against employees who are domestic violence offenders.

5.5     Employees at all levels of CBP are responsible for upholding CBP's integrity and professionalism standards. With exception of employee victims, who are urged, all CBP

Page 2 of 9

AR001255



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

employees are responsible for reporting any acts, suspected acts, or threats of domestic violence through their supervisory chain of command and OPR, and for considering use of the EAP and other resources that are available to improve personal health, wellness and safety.

## 6   DEFINITIONS

6.1     Domestic Violence – Felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

6.2     Domestic Violence Offender – An individual who commits or threatens to commit an act of domestic violence.

6.3     Protection or Restraining Order – A protection order, also called a restraining order or stay-away order, is an order issued by a court to protect a victim from a perpetrator.  Protection orders may be issued in criminal cases as a condition of probation or condition of release, particularly in a domestic violence, sexual assault, or stalking related crime.

6.4     Workplace – An employee's official duty station or alternative work location that is associated with the employee's established tour of duty (working hours).  The employee is considered to be in the workplace while in or using the resources of CBP, or anywhere that he or she is conducting CBP business, or while on work-related travel.

6.5     Workplace-related incidents – Refers to incidents of domestic violence affecting the employee outside the workplace, including acts, attempted acts, or threatened acts by or against the employee and/or against the employee's family or property that are brought into the workplace, or that occur outside the workplace but have an impact on the workplace, or that occur inside the workplace.

## 7   STATEMENT OF CONFIDENTIALITY

7.1     CBP recognizes an employee's right to privacy and the need for confidentiality of all incidents of domestic violence.  CBP will maintain the confidentiality of employee disclosures of domestic violence, both orally and in writing, received from both victims and perpetrators, to the extent permitted by law.  In the event information must be disclosed to protect the safety of the disclosing employee or for the protection of others, CBP will limit such disclosure to that which is minimally necessary for protection and safety.  CBP will attempt to provide advance notice to the disclosing employee that the information minimally necessary will be disclosed, to whom it will be disclosed, the reasons for the disclosure and the information being disclosed.  Written disclosures must be kept in a confidential and separate file from employee personnel records.

Page 3 of 9

AR001256



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

## 8    PROCEDURES

8.1    General Awareness

8.1.1    Supervisors must ensure their employees are aware of the policies and provisions of this Directive, and the Agency's prohibition against domestic violence.

8.1.2    Supervisors and managers are required to complete agency-sponsored training on how to manage and respond to employee victims or employee offenders of domestic violence, and any workplace-related incidents stemming from domestic violence.

8.1.3    CBP employees who exercise law enforcement authority.

8.1.3.1    CBP employees are required to receive a quarterly verbal advisement, during quarterly firearms qualifications (normally), of their duty to notify management of any off-duty reportable contact, as outlined in 8.3.4, with a law enforcement officer/agency, to include convictions for misdemeanor crimes of domestic violence and issuance of protective or temporary restraining orders, as well as notification of the Lautenberg Amendment's prohibitions on carriage of firearms. These employees are also required to complete an annual Lautenberg Amendment certification which certifies they have no convictions of a misdemeanor crime of domestic violence.

8.1.4    CBP employees are required to complete annual domestic violence awareness training.

8.2    Employee Victims of Domestic Violence

8.2.1    Reporting Requirements – Employees who are victims of domestic violence are urged, but are not required to immediately report the incident to their first-line supervisor, and/or to the Office of Professional Responsibility through the toll-free Joint Intake Center Hotline at 1-877-2INTAKE (1-877-246-8253) or Joint.Intake@dhs.gov.

8.2.1.1    Supervisors and managers are to act promptly and in accordance with applicable Agency procedures upon receiving a report of an employee victim of domestic violence.  Relevant facts must be assessed to properly address any immediate effects on the employee and the workplace.  Supervisors should consult with their senior management officials and contact the EAP for guidance.

8.2.2    Workplace Flexibilities – Various workplace flexibilities may be extended to employee victims of domestic violence, to the greatest extent permissible by law, and in accordance with CBP policies.  Workplace flexibilities may include:  various forms of paid, unpaid, and advanced leave, telework arrangements, and flexible work schedules. All possible leave options should be considered for employee victims of domestic violence.  Employees must be sure to comply with procedural requirements of workplace

Page **4** of **9**

AR001257



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

flexibilities programs. The employee must disclose sufficient details about a domestic violence incident to enable the supervisor to make workplace flexibilities approval decisions. When the need for time off is foreseeable, an employee must provide reasonable advance notice to the agency.

8.2.3    Proof/Evidence – In making workplace flexibilities considerations, a supervisor may use an employee's credible statements as proof of a domestic violence incident. Supervisors may request additional proof or verification, such as police or court reports, a service provider's statement, a protection order, medical verification, or other forms of credible evidence, but employee-victims shall not be required to provide this information. If a supervisor believes that more information is needed before making a workplace flexibility decision, but more information is not provided by the employee-victim, then the agency will make a decision based on evidence already in the agency's possession from the employee-victim.

8.2.4    Employee Autonomy – Supervisors <u>must not</u> request or require an employee victim of domestic violence to report the domestic violence incident to law enforcement authorities. To do so could ultimately place victims of domestic violence in greater danger. Furthermore, filing a report with law enforcement authorities should not be a condition for approving requests for leave or other workplace flexibilities.

8.2.5    Work Status – An employee can be charged absent without leave (AWOL) if the employee is absent from work without supervisory approval. Employee victims of domestic violence may later request to have charges of AWOL substituted by another form of leave, as permitted by Agency leave policies. AWOL substitutions are subject to supervisory approval, and based on the circumstances of each individual case.

8.2.6    Employee Referrals – Employees who are victims of domestic violence are encouraged to seek assistance through professional services (see Appendix A). In all instances, supervisors must refer employees to the EAP. Employee victims of domestic violence are advised to utilize EAP support services, although use of the EAP is not mandatory.

8.3    Employee Offenders of Domestic Violence

8.3.1    Workplace Incidents – Employees who commit acts of domestic violence in the workplace will be removed from the premises, reported to OPR, subject to arrest and/or prosecution, and subject to disciplinary/adverse action, up to and including removal from Federal service.

8.3.2    Employee Reporting Requirements – An employee who (whether on or off-duty) is arrested, receives a summons or citation to appear in court on criminal charges, is indicted or convicted of domestic violence, or is the subject of a protection or restraining order must report the incident to their first line supervisor (or other manager within their chain of command) and to OPR (1-877-2INTAKE) as soon as possible. If arrested, an

AR001258



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

employee must report the arrest immediately, or as soon as possible, but not more than 24 hours after the arrest. If reporting the arrest within the prescribed timeframe is precluded by circumstances of the arrest, then it must be reported as soon as circumstances allow, along with a full explanation of the reason the arrest was not reported immediately.

8.3.3    Arrest Notification – Upon receiving notification of an employee arrest/incarceration for domestic violence, supervisors must promptly follow Agency procedures as outlined in the Arrest of CBP Employees Directive (#51735-014A).

8.3.4    Law Enforcement and Judicial Contact Notification – CBP employees who exercise law enforcement authority who are off-duty and not acting in an official capacity and are questioned, interviewed, or detained as a subject of an enforcement action or investigation by a law enforcement agency during the course of the agency's official duties to determine if the CBP employee was a party to an alleged violation of law, must report this contact with law enforcement within 48 hours to their first-line supervisor. These CBP employees must also report the known issuance of any protective order, temporary restraining order, or other court order restricting contact with another individual or ability to carry a firearm. This reporting excludes civil violations or traffic violations where there is no allegation of violence, threat of violence, or where the civil violations or traffic violations did not include the possession or use of alcohol or drugs.

8.3.5    Work Status (Arrest/Incarceration) – Leave requests will be handled consistent with negotiated agreements, Directives, and Federal regulations.

8.3.6    Administrative Action – In accordance with the CBP Standards of Conduct and Table of Offenses and Penalties, employees who commit or threaten to commit acts of domestic violence will have administrative action taken against them. Both on and off duty acts of domestic violence can result in administrative action, i.e., disciplinary action ranging up to removal from Federal service, even for a first offense. Supervisors should contact their servicing LER Specialist early in the process for advice, and initiate swift and immediate administrative action for domestic violence offenses.

8.3.6.1    Indefinite Suspension – Where a nexus exists, an employee will be placed on indefinite suspension when there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed. Indefinite suspension places an employee in a temporary non-duty/non-pay status pending investigation, inquiry, or further Agency action, in accordance with Agency procedures and consistent with Federal regulations. Supervisors should immediately consult with their LER Specialist to ensure employees are placed on indefinite suspension expeditiously, as circumstances warrant.

8.4    CBP Firearms/Defensive Equipment – Employees with authority to carry a firearm, ammunition, and other CBP defensive equipment in the performance of their duties will normally have their authority revoked following an arrest or charge of domestic violence for thirty days following the arrest or charge. After 30 days, CBP will follow the procedures set

AR001259



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

forth in the Collective Bargaining Agreement (if applicable), and decide whether under all of the circumstances the Officer's firearm carriage authority should be reinstated. In rare circumstances, if no nexus exists, management will reinstate the officer's authority to carry a firearm and return the service-issued firearm as soon as practicable, within the initial 30 days. The revocation of authority to carry a firearm will continue throughout the disposition or proceedings of a domestic violence case. An employee who commits domestic violence will have all law enforcement authority revoked during the pendency of the matter, in accordance with Agency procedures.

8.5     Conviction of Domestic Violence (Lautenberg Amendment) – Under certain provisions of the Federal Gun Control Act, employees who are subject to a protective order related to domestic violence or convicted of a qualifying misdemeanor crime of domestic violence are prohibited from possessing or carrying firearms or ammunition (18 U.S.C. 922(g)). The provision regarding misdemeanor crimes of domestic violence is known as the "Lautenberg Amendment," which does not afford an exemption for those who carry firearms in the performance of their official duties. Within 24 hours of receiving notification of a potentially qualifying conviction, CBP will temporarily rescind and may subsequently revoke the employee's authority to carry a firearm and perform law enforcement duties. Therefore, any employee who must carry a firearm or ammunition in the performance of their duties as a condition of employment may face disciplinary action, up to and including removal from Federal service, if impacted by the Lautenberg Amendment. In the cases where the conviction has been expunged, consult the collective bargaining agreement. Absent other outstanding misconduct issues, an authorized officer who has had a domestic violence conviction (i.e., Lautenberg Amendment) expunged will be treated as if the conviction had never occurred, e.g. the authorized officer will be permitted to carry a firearm in accordance with the provisions of the CBP Use of Force Policy, Guidelines and Procedures Handbook, HB 4500-01C.

8.6     Self-Help Referrals – Employees who commit domestic violence are encouraged to seek self-help through professional services, to include services offered by the EAP. However, appropriate disciplinary action may still be imposed for committing an act of domestic violence even if an employee seeks self-help. The employee's supervisor should remind the employee of the availability of EAP services, although use of the EAP is not mandatory.

**9     WORKPLACE SAFETY AND PRECAUTIONS**

9.1     Office Security – Supervisors should be prepared to follow their local safety procedures with regards to threats or emergencies related to acts of domestic violence. Workplace safety plans should be properly executed. Supervisors and security personnel should ensure office safety precautions are administered to protect employees against impermissible entry into a work environment by unauthorized individuals.

9.2     Workplace-Related Incidents - Supervisors should appropriately address any employee circumstances that may lead to domestic disturbances in the workplace. In some instances, both a domestic violence victim and offender may be assigned to the same work unit or locale, and may need to be separated during work hours. If an employee has a protective order against

AR001260



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

another employee, and the order allows the alleged offender to report to a nearby or same work location, consideration should be given to changing the alleged offender's duty location or the employee-victim's duty location (if more feasible and the employee-victim requests/or agrees to the change), granting telework options, or changing tours of duty as preventive and protective measures. Impacted employees should be directed to avoid contact while on duty.

## 10    NON-DISCRIMINATION

10.1    CBP is committed to treating all individuals in a non-discriminatory manner, without regard to their protective status under Federal law, Executive Order, regulation, or policy in all employment programs and management decisions, to include those involved in or affected by domestic violence. CBP policy strictly prohibits any form of unlawful discrimination. Any employee, applicant for employment, or former employee who believes he or she has been discriminated against because of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age, physical or mental disability, status as a parent, genetic information, or experienced retaliation for prior EEO involvement, and wishes to file an EEO complaint, must seek informal EEO counseling within 45 calendar days of the alleged discriminatory event by: emailing the CBP EEO Complaint Filing Mailbox at cbpeeocomplaintfiling@dhs.gov; calling 1-877-MY-EEO-HELP (1-877-693-3643); or contacting the servicing EEO Specialist.

10.2    CBP is committed to ensuring domestic violence communications, resources, assistance, and workplace flexibilities are afforded to all employees, including those with limitations or disabilities.

DEC 1 1 2020

_____                    _____
Mark A. Morgan                                                    Date
Chief Operating Officer and
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Page 8 of 9

AR001261



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
CBP DIRECTIVE

**APPENDIX**

**<u>DOMESTIC VIOLENCE ASSISTANCE AND RESOURCES</u>**

**Local law enforcement – Dial 911 in case of an emergency**

**CBP Office of Professional Responsibility – Joint Intake Center**
**877-246-8253**

**CBP Employee Assistance Program**
**800-755-7002**

**National Coalition Against Domestic Violence**
**www.ncadv.org**

**National Domestic Violence Hotline**
**1-800-799-SAFE**
**www.thehotline.org**

**U.S. Office of Personnel Management**
**www.opm.gov**

**U.S. Department of Justice**
**www.doj.gov**

AR001262

# Appendix V: Use of Force Policy Clarification - Emergency Situations



440 Koonce Road
Harpers Ferry, WV 25425

**U.S. Customs and
Border Protection**

AUG 1 2 2019

MEMORANDUM FOR:        See Distribution

THROUGH:                         William A. Ferrara
                                         Executive Assistant Commissioner
                                         Operations Support

FROM:                               Christopher A. Bishop
                                         Acting Director
                                         Law Enforcement Safety and Compliance Directorate

SUBJECT:                          Use of Force Policy Clarification – Emergency Situations

Generally, prior to being issued any U.S. Customs and Border Protection (CBP) authorized use of force device or firearm, the CBP Use of Force Policy mandates that all CBP law enforcement personnel receive training and demonstrate an acceptable level of proficiency on each of the devices or firearms they are issued. Failure to ensure the proper training of its personnel and/or require its personnel to demonstrate proficiency exposes the agency to allegations of negligent or inadequate training, judgment or supervision. Furthermore, officers and agents that carry or deploy use of force devices or firearms on which they have not received the appropriate training or demonstrated the required level of proficiency may also be found negligent. In either of the above cases, the agency may be liable under relevant tort law statutes. However, understanding the often unpredictable nature of law enforcement encounters, the CBP Use of Force Policy contains specific exceptions for emergency situations. The purpose of this memorandum is to clarify what constitutes an emergency situation.

An emergency situation can be defined as an unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat. In such threatening and emergent situations, authorized officers and agents may use any available weapon in a manner that is reasonable, and necessary for self-defense or the defense of another person.[1] In these situations officers and agents must remember that the manner in which any less-lethal device or firearm is used must still comply with the objectively reasonableness analysis to which all law enforcement uses of force are subjected. For instance, deadly force must not be used unless there is a reasonable belief that the subject of such force poses an imminent threat of death or serious physical injury.

---

[1] CBP Use of Force Policy, Guidelines and Procedures Handbook, Office of Training and Development, HB 4500-01C, Chapter 4: *Guidelines and Procedures on the Use of Less Lethal Force*, at 37.

AR001263

Use of Force Policy Clarification – Emergency Situations
Page 2

In contrast, an emergency situation does not exist when the agency has advance notice, with time to plan operations and prepare for incidents that may occur in the near future. As a proactive measure to address potential threats, officers or agents must not be issued, carry, or use a less-lethal device or firearm for which they have not met the minimum training and proficiency standards.

In addition to the training and proficiency requirements listed above, CBP law enforcement personnel may only be issued and carry use of force devices or firearms that are listed on the Authorized Equipment List.

Please feel free to contact me if you have any questions. If members of your staff have any questions, they may contact Christopher A. Bishop, Acting Director, LESC, at (304) 724-5922 or email Christopher A. Bishop@cbp.dhs.gov.


Distribution:    Commissioner
                 Deputy Commissioner
                 Executive Assistant Commissioners
                 Chief, U.S. Border Patrol
                 Assistant Commissioners

AR001264

## Appendix VI:  Glossary

Active Resistance - A type of resistance where physical attributes are being used to resist an officer/agent's control efforts.  The efforts are not directed toward the officer/agent but rather appear intended to thwart an officer's/agent's control efforts.

Authorized Officers/Agents - CBP Officers, Border Patrol Agents, Air and Marine Officers and Agents, OPR Special Agents and Investigators, and other qualified CBP personnel as designated by the Commissioner of CBP.

Assault

>   Reportable Assault (Reportable in E-STAR) - Any action which meets the definition of Assault, Assaultive Resistance (Physical Injury, Serious bodily injury), or Transferred Intent regardless of whether or not the subject was apprehended, identified, or the prosecutorial disposition.
>
>> Assault - A physically manifested attempt or threat to inflict injury on CBP personnel, whether successful or not, which causes a reasonable apprehension of imminent bodily harm.
>>
>> Assaultive Resistance (Physical Injury) - Resistance characterized by a level of aggression or violence that causes or has the potential to cause physical injury to the officer/agent, others, or self.  This includes a subject's attempts (or apparent intent) to make physical contact in an attempt to control or assault the officer/agent.
>>
>> Assaultive Resistance (Serious Bodily Injury/Death) - Resistance characterized by a level of aggression or violence that causes or has the potential to cause serious bodily injury or death to the officer/agent, others, or self.
>>
>> Transferred Intent - When an intent to cause harm to one person results in harm or damage to another person or a thing instead of the intended human target. (e.g., when a launched or thrown projectile strikes an officer or agent's vehicle, but misses the area in which an officer/agent is sitting).

Authorized Equipment List (AEL) - A list of equipment that the LESC has tested, evaluated, and authorized for use within CBP.  All equipment must be approved for field use by the DO.  The AEL can be found on the LESC section of CBPnet.

Body Armor Coordinator (BAC) - A designated employee who is responsible for ordering and issuing body armor as required.

AR001265

<u>Carry</u> - Carry (of a handgun) refers to any manner of carry that implies the handgun is ready to be drawn and fired if necessary.  Carry (of a shoulder-fired weapon) refers to any manner of carry that implies the firearm is ready to be utilized for law enforcement operations.

<u>CBP Firearm</u> (as referenced in this Handbook) - A firearm that has been authorized by the Executive Director of the LESC, and approved for use by a Designated Official.

<u>Co-Authority (COA)</u> - An individual designated by the Responsible Official to act in his/her stead in all functions in the Firearms, Armor and Credentials Tracking System (FACTS).

<u>Collapsible Straight Baton (CSB)</u> - A less-lethal device composed of cylindrical shafts that lock into each other when expanded. The shafts are usually made of steel, but lightweight baton models may have shafts made from aluminum alloy.

<u>Compliance Techniques</u> - Actions taken by an Authorized Officer/Agent on a subject to establish and maintain control.  Examples of compliance techniques include the use of Oleoresin Capsicum (OC) spray, strike pressure points, stunning techniques, takedowns, joint manipulations and use of an Electronic Control Weapon (ECW).

<u>Compressed Air Launcher</u> - A less-lethal impact/chemical irritant delivery system that is powered by compressed air. The launcher can deliver a variety of less-lethal projectiles including, PAVA pepper powder, non-toxic marking rounds, and those designed for kinetic impact.

<u>Contact Controls</u> - Actions taken by an Authorized Officer/Agent on a subject to establish and maintain control.  Contact controls may include measures such as strategic positioning, escort holds, joint manipulation or immobilization, or touch pressure point stimulation.

<u>Controlled Noise and Light Distraction Device</u> (CNLDD) - A pyrotechnic less-lethal device designed to emit a bright light and loud noise to momentarily disorient and confuse subjects.

<u>Cooperative Controls</u> - Actions taken by an Authorized Officer/Agent on a subject to establish and maintain control.  Cooperative controls may include verbal commands.

<u>Counter Assault Techniques</u> - Actions taken when a subject has either assaulted the officer/agent or is displaying a willingness and intent to do so.  Examples of counter assault techniques are concentrated strikes involving the use of empty-hand techniques (e.g., the use of body parts as weapons), the CSB and the ECW.

AR001266

Deadly Force - Any use of force that carries a substantial risk of causing death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Deadly force does not include force that is not likely to cause death or serious bodily injury, but unexpectedly results in such death or injury. In general, examples of deadly force include, but are not limited to, intentional discharges of firearms against persons, uses of impact weapons to strike the neck or head, any strangulation technique, strikes to the throat, and the use of any edged weapon.

Designated Official - Executive Assistant Commissioners and Chief, United States Border Patrol (or their Headquarters designees); Assistant Commissioner, Office of Professional Responsibility; and the Executive Director, Law Enforcement Safety and Compliance Directorate.

Disabling Fire - Discharge of a firearm for the purpose of preventing a non-compliant moving vehicle, vessel, aircraft, or other conveyance from operating under its own power, but not intended to cause bodily injury.

Electronic Control Weapon (ECW) - A less-lethal device which is designed to use short-duration electronic pulses to cause Neuro-Muscular Incapacitation (NMI) and/or pain, with minimal risk of serious bodily injury or death.

Emergency Situation - An unplanned event or exigent circumstance that occurs with no advanced warning, rapidly evolves, and which requires a reactive response to address an imminent threat.

Employee Assistance Program (EAP) - A CBP program established to provide assistance and guidance to employees.

Empty Hand Strikes - Strikes delivered by a body part (e.g. palm heel strike, jab, cross, elbow strike, snap kick, or knee strike).

Enforcement Action Statistical Analysis and Reporting System (E-STAR) - A CBP computer system for recording assaults, reportable uses of force, pursuits, reportable firearms discharges, and other related data.

Field Armorer (FA) - A CBP-certified firearms instructor who has been LESC trained and certified to conduct limited maintenance and repair of CBP firearms.

Firearms Coordinator (FCO) - A designated employee who is responsible for receiving, controlling and issuing CBP firearms and associated equipment to CBP personnel within their duty area.

Firearms Instructor (FI) - An Authorized Officer/Agent who has been LESC trained and certified to conduct firearms training, tactics, and proficiency evaluations for CBP Authorized Officers/Agents.

AR001267

Firearms, Armor, and Credential Tracking System (FACTS) - A CBP computer system that provides oversight and lifecycle accountability for specified law enforcement assets and equipment (including firearms, body armor, ECWs, and munition launchers).

FN303 - A less-lethal launcher, powered by compressed air, that delivers frangible, plastic projectiles filled with capsaicin powder.  The projectiles are designed to burst upon impact and disperse the capsaicin powder either into the environment (area saturation) or onto the subject(s) (kinetic impact).

International Boundary Barrier (IBB) - A physical barrier at or between Ports of Entry and placed along the international boundary, which has been designed, manufactured and/or constructed with the capability of controlling the flow of people and goods crossing the border.

The Law Enforcement Safety and Compliance Directorate (LESC) - A division of CBP Operations Support responsible for development of CBP use of force policy, procurement of CBP firearms and tactical equipment, and the development and oversight of use of force training for CBP.

Less-Lethal Coordinator (LLCO) - A designated employee who is responsible for receiving, controlling, and issuing CBP less-lethal use of force equipment to CBP personnel within their duty area.

Less-Lethal Force: Any use of force that is neither likely nor intended to cause death or serious bodily injury (see "Use of Force" and "Serious Bodily Injury"). Also known as "non-deadly," "intermediate," or "less-than-lethal" force.

Less-Lethal Instructor (LLI) - An Authorized Officer/Agent who has been LESC trained and certified to conduct less-lethal training, tactics, and proficiency evaluations for CBP Authorized Officers/Agents.

Less-Lethal Training Safety Officer (LLTSO) - An officer/agent trained in less-lethal safety procedures to augment safety requirements during authorized less-lethal training.

Less-Lethal Specialty Impact and Chemical Munition (LLSI-CM) - Less-lethal munitions that are designed to deliver impact, chemical irritant, or both.  LLSI-CM can be delivered by means of designated hand thrown munitions or by a munitions launcher.

Mechanical Resistance - A type of active resistance where an object external to physical attributes is used to increase the effectiveness of resistance to an officer/agent's control efforts.  The efforts are not directed toward the officer/agent but rather appear intended to thwart an officer's/agent's control efforts by physically securing or holding another object.

AR001268

Munition Launcher - A less-lethal specialty impact/chemical munition (LLSI-CM) delivery system that is designed to deliver an impact projectile, a chemical irritant projectile, or a combination projectile with more accuracy, higher velocity, and longer range than a projectile deployed by hand.

Non-Standard Firearm - A firearm that is not on the CBP Authorized Equipment List.

O-Chlorobenzylidenemalononitrile (CS) - The active ingredient in CS gas or spray.

Offensive Driving Techniques (ODT) - ODTs are any driving technique that is consistent with CBP training and is intended to end a pursuit through intentional vehicle-to-vehicle impact.

Oleoresin Capsicum (OC) - The active ingredient in OC spray, derived from cayenne pepper.

OC Spray - A hand held aerosol less-lethal device that disperses the inflammatory agent capsaicin in a conical mist, stream, gel or foam.

Passive Resistance - A type of resistance that is not believed to represent an immediate threat or flight risk, and which is not physical resistance to an Authorized Officer's/Agent's control efforts, but is not cooperative.

Pepperball Launching System (PLS) - A less-lethal launcher, powered by compressed air, that typically delivers frangible, plastic projectiles filled with capsaicin powder. The projectiles are designed to burst upon impact and disperse the capsaicin powder either into the environment (area saturation) or onto the subject(s) (kinetic impact).

Personal Property Management Oversight Board (PPMOB) - A board composed of representatives from all CBP offices that determines the disposition of lost or stolen CBP assets.

Range Safety Officer (RSO) - An officer/agent trained in range safety procedures and utilized as a safety officer.

Reportable Use of Force (Reportable in E-STAR) - Any use of deadly force; any intentional deployment of a CBP less-lethal device; or any use of a vehicle, weapon, physical tactic or technique that delivers (or is intended to deliver) a kinetic impact to a subject.

Responsible Officials (RO) - Executive Assistant Commissioners (EACs), Chief, U.S. Border Patrol (USBP); Assistant Commissioners (ACs); Chief Patrol Agents (CPA); Directors, Field Operations (DFO); Directors, Air Operations and Marine Operations (DAO, DMO); Executive Director of the Law Enforcement Safety and Compliance Directorate (LESC); Executive Directors, Office of Professional Responsibility (OPR);

AR001269

Division Directors, Office of Training and Development (OTD); and other officials designated in writing by the Commissioner.

<u>Serious Bodily Injury</u> - Physical injury that involves long-term and obvious disfigurement; long-term loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death.

<u>Shoulder-Fired Weapon (SFW)</u> - A CBP rifle, shotgun, or other long arm.

<u>Totality of Circumstances</u> - The consideration of all facts and circumstances applicable in a particular law enforcement encounter.

<u>Uniformed Law Enforcement Officer/Agent</u> - Authorized Officers/Agent wearing the official uniform of the three uniformed components of CBP: Air and Marine Operations, Office of Field Operations, or United States Border Patrol.

<u>Use of Force</u> - When a law enforcement tactic, technique, less-lethal device or weapon is used to arrest a subject, address a potential threat, or ensure compliance with a lawful order.

<u>Use of Force Device</u> - Any item designed or marketed as a device which is intended to cause pain or discomfort to modify the behavior of an individual or group.  This includes, but is not limited to, devices that may modify an individual's behavior through:

1. Acoustics;
2. Focused or Directed Light;
3. Electrical Current;
4. Directed Energy;
5. Kinetic Impact; or
6. Chemicals.

<u>Vehicle Immobilization Device (VID)</u> - A specialized device whose deployment is intended to result in the controlled deflation of a vehicle tire or otherwise cause a vehicle to stop.

AR001270



# Model Uniform Core Criteria for Mass Casualty Incident Triage:

## Addendum to the Emergency Medical Technician Instructional Guidelines

U.S. Department of Transportation

**National Highway Traffic Safety Administration**

AR001271

**Acknowledgements**

Development of this document was led by the National Center for Disaster Medicine and Public Health (NCDMPH) at the Uniformed Services University of the Health Sciences. The NCDMPH serves as the Nation's academic center of excellence for education, training, and educational research in disaster medicine and public health preparedness.

Contributing Subject Matter Experts:
Sabina Braithwaite, MPH, MD
Art Cooper, MD
E. Brooke Lerner, PhD
Juan A. March, MD
Mike Touchstone
Jolene Whitney

NCDMPH Staff:
Brian Altman, PhD
Kenneth Schor, MD
Kandra Strauss-Riggs

U.S. Department of Health and Human Services (HHS) Office of the Assistant Secretary for Preparedness and Response (ASPR):
Gregg S. Margolis, PhD

U.S. Department of Homeland Security (DHS) Office of Health Affairs (OHA):
Ray Mollers

U.S. Fire Administration (USFA):
Mike Stern

National Highway Traffic Safety Administration (NHTSA) Office of Emergency Medical Services:
Dave Bryson, EMT
Drew Dawson
Ellen Schenk, MPH
Gamunu Wijetunge, NRP

AR001272

EMS Operations

Addendum to Mass Casualty Incidents Due to Terrorism and Disaster: Model Uniform Core Criteria (MUCC) for Mass Casualty Incident Triage

## EMT Education Standard

Knowledge of operational roles and responsibilities to ensure the safety of patients, the public, and personnel.

## EMT – Level Instructional Guideline Addendum

This instructional guideline addendum covering the MUCC for Mass Casualty Incident Triage is intended for all levels of EMS providers, as outlined in "Mass Casualty Triage: An Evaluation of the Science and Refinement of a National Guideline." (http://journals.cambridge.org/download.php?file=%2FDMP%2FDMP5_02%2FS1935789300003360 a.pdf&code=e91e3a089bd382a9ff41ae708a1ef5e1).

This addendum covers mass casualty incident (MCI) triage and is **not** to be confused with individual trauma field triage as outlined by the Centers for Disease Control and Prevention (www.cdc.gov/mmwr/preview/mmwrhtml/rr6101a1.htm).

## Material To Be Taught to Students

I. Mass casualty incident triage is "the process of prioritizing multiple victims when resources are not sufficient to treat everyone immediately."[1]

II. How it differs from everyday triage, including guidelines for the field triage of injured patients.

III. The triage system utilized in your learners' jurisdiction(s) is _____, and should emphasize:

- a. General considerations;
- b. Global sorting;
- c. Lifesaving interventions; and
- d. Individual assessment.

IV. While there exist multiple systems for mass casualty triage, there is one national guideline: the MUCC for Mass Casualty Incident Triage which can be used to measure the essential elements within various MCI triage systems.

AR001273

V. "MUCC is a group of 24 criteria that have been recommended as essential elements of an MCI triage system. Having a standard for triage systems increases interoperability between MCI triage systems and provides guidelines for the revision of existing MCI triage systems."[1]

VI. MUCC Compliant Triage Systems

    a.    MUCC is not a mass casualty triage system

    b.    Adapting existing triage systems to MUCC

    c.    Connecting your prior triage training to MUCC

## Additional Background Information for Instructors

I. Background

The MUCC criteria are provided here as background knowledge for instructors. MUCC was created to address the issues inherent in mass casualty incidents that cross jurisdictional lines, where responders may be using different triage systems. As Lerner et al. (2011) write, "for operational simplicity, communication interoperability, and clinical efficiency, it is preferable for all of the responders at a given incident to use the same triage system, or at the very least operate from some common elements."[1]

    a.    History of MUCC

    b.    Rationale

    c.    Development process

        i.    Sort-Assess-Lifesaving Interventions-Triage/Treatment (SALT) triage (see Appendix A of the FICEMS report *National Implementation of the Model Uniform Core Criteria for Mass Casualty Incident Triage*[3])

        ii.    Levels of evidence supporting MUCC: Science, Indirect Science and Consensus

    d.    Scope

        i.    Primary triage

II. MUCC Categories

    a.    General Considerations

        1.1 Triage systems and all of their components must apply to all ages and populations of patients.

        1.2 Triage systems must be applicable across the broad range of mass casualty incidents in which there is a single location with multiple patients.

AR001274

1.3 Triage systems must be simple, easy to remember, and amenable to quick memory aids.

1.4 Triage systems must be rapid to apply and practical for use in an austere environment.

1.5 Triage systems are resource dependent, and the system must allow for dynamic triage decisions based on changes in available resources and patient conditions.

1.6 The triage system must require that the assigned triage category for each patient be visibly identifiable (e.g.,triage tags, tarps, markers).

1.7 Triage is dynamic and reflects patient condition and available resources at the time of assessment. Assessments must be repeated whenever possible and categories adjusted to reflect changes.

b. Global Sorting

2.1 Simple commands must be used initially to prioritize patients for individual assessment.

2.2 The first priority for individual assessment is to identify those who are likely to need a lifesaving intervention.They can be identified as those who are unable to follow commands and do not make purposeful movements,or those who have an obvious threat to life (e.g., life-threatening external hemorrhage).

2.3 The second priority for individual assessment is to identify those who are unable to follow the command to ambulate to an assigned place but are able to follow other commands (e.g., wave) or make purposeful movement.

2.4 The last priority for individual assessment is to identify those who follow commands by ambulating to an assignedplace (or make purposeful movements) and have no obvious life-threatening conditions (e.g., life-threatening external hemorrhage).

2.5 All patients must be assessed individually regardless of their initial prioritization during global sorting. This includes the assessment of walking patients as soon as resources are available.

c. Lifesaving Interventions

3.1 Lifesaving interventions are considered for each patient and provided as necessary, before assigning a triage category. Patients must be assigned a triage category according to their condition after any lifesaving interventions.

3.2 Lifesaving interventions are performed only if the equipment is readily available, the intervention is within the provider's scope of practice, the intervention can be

AR001275

performed quickly (i.e., in less than 1 minute), and the intervention does not require the provider to stay with the patient.

3.3 Lifesaving interventions include the following: controlling life-threatening external hemorrhage,opening the airway using basic maneuvers (for an apneic child, consider two rescue breaths), performing chest decompression, and providing autoinjector antidotes.

d. Individual Assessment

4.1 Each patientmust be assigned to 1 of 5 triage categories (immediate, delayed, minimal, expectant, dead). Each category must be represented with an associated color: immediate/red, delayed/yellow, minimal/green, expectant/gray, dead/black.

4.2 Assessment must not require counting or timing vital signs and instead use yes-or-no criteria. Diagnostic equipment must not be used for initial assessment.

4.3 Capillary refill must not be used as a sole indicator of peripheral perfusion.

4.4 Patients who are not breathing after one attempt to open their airway (in children, two rescue breaths may also be given) must be classified as dead and visually identified as such.

4.5 Patients are categorized as immediate if they are unable to follow commands or make purposeful movements, OR if they do not have a peripheral pulse, OR they are in obvious respiratory distress, OR they have a life-threatening external hemorrhage; provided their injuries are likely to be survivable given available resources.

4.6 Patients are categorized as expectant if they are unable to follow commands or make purposeful movements OR they do not have a peripheral pulse, OR they are in obvious respiratory distress, OR they have a life-threatening external hemorrhage, AND they are unlikely to survive given the available resources. These patients should receive resuscitation or comfort care when sufficient resources are available.

4.7 Patients are categorized as delayed if they are able to follow commands or make purposeful movements, AND they have peripheral pulse, AND they are not in respiratory distress, AND they do not have a life-threatening external hemorrhage, AND they have injuries that are not considered minor.

4.8 Patients are categorized as minimal if they are able to follow commands or make purposeful movements, AND they have peripheral pulse, AND they are not in respiratory distress, AND they do not have a life-threatening external hemorrhage, AND their injuries are considered minor.

4.9 Patients categorized as immediate are the first priority for treatment and/or transport, followed by patients categorized as delayed and minimal. Patients categorized as expectant should be provided with treatment and/or transport as resources allow. Efficient use of transport assets may include mixing categories of

AR001276

patients and using alternate forms of transport.

III. Additional Implications for Learners

    a.   Use of MUCC-compliant triage systems supporting interoperability in a multi-jurisdictional response

    b.   See the full Instructional Guidelines for the age-related variations for pediatric and geriatric assessment and management

    c.   Triage tags/labeling mechanism

IV. References

1.   Lerner, E. et al. (2011). Mass Casualty Triage: An Evaluation of the Science and Refinement of a National Guideline. *Disaster Med Public Health Preparedness,* *5*:129-137, doi: 10.1001/dmp.2011.39.

2.   Model Uniform Core Criteria for Mass Casualty Triage. (2011). *Disaster Med Public Health Preparedness*, *5*:125-128, doi: 10.1001/dmp.2011.41.

3.   National Implementation of the Model Uniform Core Criteria for Mass Casualty Incident Triage: A Report of the FICEMS. July 8, 2013.

AR001277

DOT HS 812 457c
December 2017



U.S. Department of Transportation

**National Highway Traffic Safety
Administration**



AR001278

12703c-122117-v4

**2021**

NATIONAL EMERGENCY MEDICAL SERVICES
# EDUCATION STANDARDS





**NHTSA**
NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION

AR001279

This publication is distributed by the U.S. Department of Transportation (DOT), National Highway Traffic Safety Administration (NHTSA), in the interest of information exchange.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

The United States Government assumes no liability for its content or use thereof. If trade or manufacturers' names or products are mentioned, it is because they are considered essential to the object of the publication and should not be construed as an endorsement. The United States Government does not endorse products or manufacturers.

National EMS Education Standards 2021. Washington, DC: National Highway Traffic Safety Administration.

AR001280

# Technical Report Documentation Page

AR001281

# Table of Contents

Executive Summary ........................................................................................ 3

Introduction and the Evolution of EMS in the United States ........................ 5

About the Revised EMS Education Standards ............................................. 15

Summary of Significant Changes to the EMS Education Standards ............ 23

National EMS Education Standards ............................................................. 28

    Preparatory ............................................................................................... 28

    Anatomy and Physiology ........................................................................... 31

    Medical Terminology ................................................................................. 31

    Pathophysiology ........................................................................................ 31

    Life Span Development .............................................................................. 31

    Public Health ............................................................................................. 32

    Pharmacology ........................................................................................... 33

    Airway Management, Respiration and Artificial Ventilation ...................... 35

    Assessment ............................................................................................... 36

    Medicine .................................................................................................... 38

    Shock and Resuscitation .......................................................................... 45

    Trauma ...................................................................................................... 46

    Special Patient Populations ...................................................................... 50

    EMS Operations ........................................................................................ 52

    Clinical Behavior/Judgment ...................................................................... 54

    Educational Infrastructure ......................................................................... 56

Glossary ...................................................................................................... 59

References ................................................................................................... 62

Acknowledgements and Stakeholder Input ................................................. 63

Appendix A: Resources for EMS ................................................................. 65

AR001282

# Executive Summary

In 2009, the EMS community came together to create the original *National EMS Education Standards* (the *Standards).* This represented a major step toward realizing the vision put forth in the 1996 *EMS Agenda for the Future* and was further outlined in the *EMS Education Agenda for the Future: A Systems Approach* four years later. This new version of the *Standards* builds on the foundation created by those landmark documents and other achievements of the last quarter-century, including *EMS Agenda 2050* and the *National Scope of Practice Model*.

The *National EMS Education Standards* outline the minimal competencies for entry-level EMS clinicians to perform their roles as outlined in the 2019 and 2021* updated *National EMS Scope of Practice Model*. The *Standards*, while a national effort, were intentionally created in a way that allows for diverse implementation methods to meet local needs and evolving educational practices. This less prescriptive format of the *Standards* allows for ongoing revision of EMS educational content consistent with scientific evidence, educational practices, and community standards of care.

Noteworthy revisions found in the 2021 edition of the *Standards* are based upon input and considerations obtained from numerous sources. These include stakeholder and public comments, national guidance documents (the original 2009 *National EMS Education Standards, EMS Agenda 2050,* and the 2019 and 2021* updated *National Scope of Practice Model*), the National Registry of EMT's practice analysis, technological advances, known and evolving best practices, and evidence-based medicine.

\* As a result of the 2020-21 public health emergency, several changes were made under the urgent update process to the 2019 National EMS Scope of Practice Model which are reflected in these education standards.

The following areas within the *Standards* had notable revisions: public health; pediatrics; geriatrics, behavioral/psychiatric; cultural humility; EMS operations; pharmacology; and EMS safety, wellness and resilience. Input was provided and every suggestion or recommendation was considered. Revision and adjustments were based on a team discussion, with expert consultation when needed.

When applying the *Standards* to individual programs and classes, EMS educators have the freedom to develop their own curricula or use any of the wide variety of lesson plans and instructional resources that are available. This ensures that each program can specifically address individual and community needs.

The *Standards* are not intended to stand as a comprehensive document guiding the entire development of EMS clinicians, but rather one part of a comprehensive system. EMS education programs will incorporate each element of the education system proposed in the *Education Agenda*.

These elements include:

- National EMS Core Content
- National EMS Scope of Practice Model
- National EMS Education Standards
- National EMS Certification
- National EMS Program Accreditation

This integrated system approach to EMS education is essential to achieving the goal of developing EMS clinicians across the country who are competent in the appropriate knowledge, skills, and abilities for their licensure level.

AR001283

# Revision Process



**January 2019**
*Project Commencement*

**March 2021**
*Project Completion*

## Inputs

**Stakeholder Comments**
**Public Comments**
**Technological Advances**

**NREMT Practice Analysis**
**Evidence-Based Medicine**
**Known/Evolving Best Practices**

**Related Government Resource Documents**

4

AR001284

# Introduction and the Evolution of EMS in the United States

EMS has evolved and grown significantly since the first organized, national effort to develop EMS systems began in the 1960s. Compared to colleagues in health care and public safety, EMS remains a young profession and continues to advance as we further define and enhance our structure, oversight and organization.

As EMS system operations have developed, so has EMS education. In the early 1970s, registered nurses and physicians taught most EMS programs. Few student and instructor resources related directly to prehospital emergency care. No standards existed to define what EMS clinicians should know and what they should be able to do. By the early 2000s, most of this original framework was being replaced, and national education standards and a scope of practice were defined for the first time. Today, the profession has become more sophisticated, and community expectations have increased. With health care, technology and science evolving faster than ever, it is also important to revisit these topics and update these guidelines more frequently.

## EMS Agenda for the Future

In August 1996, the *EMS Agenda for the Future* (the *Agenda*) was published. Developed with funding from the National Highway Traffic Safety Administration and the Health Resources and Services Administration, and led by the National Association of EMS Physicians and the National Association of State EMS Directors, the *Agenda* brought together stakeholders from throughout EMS to create a unifying vision for emergency medical services in the United States.

The *Agenda* was designed to guide government and private organizations in EMS planning, development, and policymaking at the national, state and local levels. It addressed 14 attributes of EMS, including the EMS education system, and defined a vision for EMS education "based on research" and "conducted by qualified instructors" while employing "sound educational principles."

## EMS Education Conference

Soon after publication of the *Agenda,* representatives of 30 EMS-related organizations met at an EMS Education Conference sponsored by NHTSA to identify the necessary steps for implementing that vision.

The EMS Education Conference resulted in several recommendations, including:

- *The National EMS Education and Practice Blueprint* (the *Blueprint*) is a valuable component of the EMS education system. A multidisciplinary panel, led by NHTSA, to identify core educational content more explicitly for each licensure level, should revise it.

- National EMS Education Standards are necessary but need not include specific declarative material or lesson plans. NHTSA should support and facilitate the development of national EMS Education Standards.

- The *Blueprint* and national EMS Education Standards should be revised periodically, with major revisions occurring every 5 to 7 years, and minor updates made every 2 to 3 years.

5

AR001285

## EMS Education Agenda for the Future

In 1998, NHTSA convened a group of educators who developed a document titled *EMS Education Agenda for the Future: A Systems Approach* (the *Education Agenda*). The EMS education system envisioned in the *EMS Agenda for the Future* was further defined and articulated in the *Education Agenda* (see Figure 1). The *Education Agenda*'s authors also stated that, to be most effective, each component in the EMS education system should be structured, coordinated and interdependent.

## National EMS Core Content

The *National EMS Core Content* was published in 2005. Core Content defines the entire domain of out-of-hospital practice and identifies the universal body of knowledge and skills for EMS clinicians who do not function as independent practitioners.

Funded by NHTSA and HRSA, this project was led by the National Association of EMS Physicians and the American College of Emergency Physicians.

## EMS Education Agenda for the Future: A Systems Approach



**Figure 1: Model EMS System**

AR001286

## National EMS Scope of Practice

The *National EMS Scope of Practice Model* (the *Scope of Practice*) is a consensus document that was published in 2007 and revised in 2019. This document defines four levels of EMS licensure—emergency medical responder (EMR), emergency medical technician (EMT), advanced emergency medical technician (AEMT) and paramedic—and delineates the practices and minimum competencies for each level. The *Scope of Practice* does not have regulatory authority but provides guidance to states. Adherence to the *Scope of Practice* would increase uniformity in EMS practice throughout the U.S. and facilitate reciprocity between states. Leadership for this project was delegated to the National Association of State EMS Officials and funded by NHTSA and HRSA.

The *Scope of Practice* further defines practice, suggests minimum educational preparation, and designates appropriate psychomotor skills at each level of licensure. Further, the document describes each level of licensure as distinct and distinguished by unique "skills, practice environment, knowledge, qualifications, services provided, risk, level of supervisory responsibility, and amount of autonomy and judgment/critical thinking/decision-making."

## National EMS Education Standards

The *National EMS Education Standards* replaced the NHTSA National Standard Curricula at all licensure levels when first published in 2009. The *Standards* define the competencies, clinical behaviors, and judgments that should be met by entry-level EMS clinicians to meet practice guidelines defined in the *Scope of Practice*. Content and concepts defined in the *National EMS Core Content* are also integrated within the *Standards*. Leadership for this project was delegated to the RedFlash Group and National Association of EMS Educators, and funded by NHTSA and HRSA. With input from a large number of stakeholders, the team chose

not to update the separate Instructional Guidelines for each clinician level originally published as companion documents to the 2009 Standards. Instead, the Instructional Guidelines have been incorporated within the *Standards*, replacing the need for those supplemental materials.

National EMS certification and national EMS education program accreditation are the "bookends" that support the other key elements of the system. The *Education Agenda* recommended an individual should graduate from a nationally accredited EMS education program to be eligible for National EMS Certification. Essential components of the *EMS Agenda* include a single National EMS Accreditation Agency and a single National EMS Certification Agency to ensure consistency and quality of EMS personnel.

7

AR001287

# A Brief History of EMS Education in the United States

This timeline outlines key events in the development of EMS education in the United States from the 1950s to the present.

**1950s — American College of Surgeons**

Developed the first training program for ambulance attendants

**1960 — President's Committee for Traffic Safety**

Recognized the need to address emergency care in reducing traffic fatalities

**1966 — National Academy of Science published *Accidental Death and Disability: The Neglected Disease of Modern Society***

Quantified the scope of traffic-related death in the U.S., including the deficiencies in prehospital care

**1966 — Highway Safety Act of 1966**

Required each State to adopt highway safety programs to comply with federal standards, including "emergency services"

**1970s — Robert Wood Johnson Foundation and Federal Government**

Funded regional EMS systems and demonstration projects

**1970s — *Crash Injury Management for the Law Enforcement Officer* published by NHTSA**

40-hour program that evolved into First Responder: NSC in 1979

**1970 — National Registry of EMTs (NREMT)**

Held first board meeting, with goal to provide uniform standards for credentialing ambulance attendants

**1971 — *Emergency Care and Transportation of the Sick and Injured* published by the American Academy of Orthopedic Surgeons (AAOS)**

One of the first EMS textbooks

**1973 — Emergency Medical Services Act of 1973 enacted by Congress as Title XII of the Public Health Services Act**

Provided more than $300 million in EMS funding over 8 years that allowed for EMS system planning and implementation, mandated states to focus on EMS personnel and training, and resulted in legislation and regulation of EMS personnel levels

AR001288

**1975**

**American Medical Association (AMA)**

Recognized EMT-Paramedic as an allied health occupation

**1977**

*National Standard Curriculum (NSC) for EMT-Paramedic* published by NHTSA

The original NSC consisted of 15 instructional modules

**1978**

*The Essentials for Paramedic Program Accreditation* developed by AMA

Joint Review Committee on Education Programs for the EMT-Paramedic (JRCEMT-P) adopted *The Essentials* as the standard for accreditation

**1985**

First Responder, EMT-Ambulance (EMT-A), EMT-Intermediate (EMT-I), and EMT-Paramedic (EMT-P): NSC revised by NHTSA

EMT-Paramedic reformatted into six divisions

**1990**

NHTSA hosts EMS Training Workshop

Facilitated the development of the 1990s curricula and introduced the assessment-based education concept

**1992**

**EMS Education and Practice Blueprint**

Document served as a template for the revised format of the 1990s NSC revision projects

**1994**

NREMT Practice Analysis

Determined frequency and criticality of EMS interventions, and provided the foundation for NREMT test blueprint

**1994**

EMT-A revised and renamed EMT-Basic (EMT-B): NSC

**1995**

First Responder: NSC is revised

**1996**

*EMS Agenda for the Future* is created

Vision statement created by NAEMSP and NASEMSO for integration of EMS into the health care system; funded by NHTSA and HRSA

**1998**

PEW Health Professions Commission Taskforce on Health Care Workforce Regulation published *Strengthening Consumer Protection: Priorities for Health Care Workforce Regulation*

Recommended a National Policy Advisory Board to establish standards and model legislative language for uniform scope of practice authority for health professions



9

AR001289

**1998**
EMT-P: NSC revised

**1999**
EMT-I: NSC revised

**2000**
*Education Agenda for the Future: A Systems Approach* published by NHTSA

Funded by NHTSA and HRSA, developed an integrated system of EMS regulation, certification and licensure

**2004**
*2004 National EMS Practice Analysis* published by NREMT

Updated the 1994 *Practice Analysis*

**2005**
*National EMS Core Content* published by NHTSA and HRSA

Defines the EMS personnel domain of knowledge described in the *National Scope of Practice*, and the universal knowledge and skills of EMS personnel

**2005**
*The State of EMS Education EMS Research Project: Characteristics of EMS Educators* by Ruple et al. in *Prehospital Emergency Care*

Research related to identifying characteristics of EMS instructors, describing infrastructure available to instructors, and identifying instructor attributes necessary for implementing education standards

**2006**
*EMS at the Crossroads* Institute of Medicine Report

Among other recommendations, required national accreditation of paramedic programs, adopting a common scope of practice for EMS personnel with state licensing reciprocity and national certification as a prerequisite for state licensure and local credentialing of EMS providers

**2007**
*National EMS Scope of Practice Model* published by NHTSA

National guidelines based on the National EMS Core Content that defined levels of EMS licensure and their scopes of practice

**2009**
*National EMS Education Standards* published by NHTSA

National set of guidelines that defined the entry-level education requirement for each level of EMS clinician, and contained four companion Instructional Guideline documents to assist educators in transitioning from the NSC

**2019**
*National EMS Scope of Practice Model* revised and published by NHTSA

The document adjusted for changes in EMS delivery and made revisions between the first edition (2007) and current times (2019)

**2019**
*EMS Agenda 2050*

A people-centered, community-driven vision document describing EMS in the future

**2019**
*2019 Practice Analysis* conducted by NREMT

**2021**
*National EMS Education Standards* revised and published by NHTSA

National guideline to define the entry-level education requirement for each level of EMS clinician. The document contains revised education standards reflecting the *EMS Agenda 2050*, *National EMS Scope of Practice Model* (as updated), advances in technology, evidence-based medicine and evolving known best practices.

AR001290

# The National EMS Education Standards

Each statement in the *Standards* presumes that the expected knowledge and behaviors are within the scope of practice for that EMS licensure level, as defined by the *National EMS Scope of Practice Model.* Each competency applies to patients of all ages.

The *Standards* also assume there is a progression in practice from the emergency medical responder level to the paramedic level. That is, licensed personnel at each level are responsible for all knowledge, judgments, and behaviors at their level and at all levels preceding their level. For example, a paramedic is responsible for the knowledge and tasks described for the paramedic as well as the other three levels of licensure.

## The National EMS Education Standards is comprised of four components (Table 1):

1. **Competency** (yellow) – This statement represents the minimum competency required for entry-level clinicians at each licensure level.

2. **Knowledge** (blue) – This represents an elaboration of the knowledge within each competency (when appropriate) that entry-level clinicians would need to master to achieve competency.

3. **Clinical Behaviors/Judgments** (green) – This section describes the clinical behaviors and judgments essential for entry-level EMS clinicians at each licensure level.

4. **Educational Infrastructure** (gray) – This section describes the support standards necessary for conducting EMS training programs at each licensure level.

## Table 1: Format of National EMS Education Standards

|  | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Content Area** | Competency | Competency | Competency | Competency |
| **Elaboration of Knowledge** | Additional knowledge related to the competency | Additional knowledge related to the competency | Additional knowledge related to the competency | Additional knowledge related to the competency |
|  | Clinical behaviors and judgments | Clinical behaviors and judgments | Clinical behaviors and judgments | Clinical behaviors and judgments |
|  | Educational Infrastructure | Educational Infrastructure | Educational Infrastructure | Educational Infrastructure |

AR001291

The descriptors used to illustrate the increasing complexity of knowledge and behaviors through the progression of licensure levels originate, in part, from the *National EMS Scope of Practice Model*. These terms reflect the differences in the breadth, depth and actions required at each licensure level (Figures 2 and 2.1).

The *depth* of knowledge is the amount of detail a student needs to know about a particular topic. The *breadth* of knowledge refers to the number of topics or issues a student needs to learn in a particular competency. For example, EMS instructors need to ensure the emergency medical responder has a thorough understanding of how to use the bag valve mask (BVM) safely and effectively. The amount of detail the instructor provides about how to use that BVM represents the depth of knowledge. Some instructors might adjust their specific curriculum to provide slightly more information about the BVM compared to other instructors, but every graduating EMR will know how to use the device.

## Figure 2: Depth/Breadth Terminology



**Simple Breadth/ Simple Depth**
- Minimal Knowledge
- Minimal Range of Skills or Tasks

**Foundational Breadth/ Fundamental Depth**
- Elemental Knowledge
- Increased Range of Skills or Tasks

**Comprehensive Breadth/ Complex Depth**
- Deep Level of Knowledge
- Wide-Ranging, Broad and Extensive Skills or Tasks
- Lifelong Learning

AR001292

Because of the limited scope of practice for the EMR (fewer tools in the airway box), the instructor may supplement BVM education with a few additional concepts (breadth) surrounding management of a patient's airway, such as airway anatomy and assessment. Supplementing the education with additional concepts adds to the breadth of the material, with each concept having its own level of detail (depth) limited only by the amount of the time the instructor has to teach the material. As more airway management tools are added to the toolbox for each licensure level (EMT, AEMT, paramedic), the level of detail will also change, and curriculum length will need to reflect this increased depth.

## Figure 2.1: Depth/Breadth Terminology



To describe the intended depth of knowledge of a particular concept within a provider level, the revision team uses the terms *simple, fundamental* and *complex*. These terms can seem ambiguous and confusing when used in isolation (e.g., learning to correctly use a BVM is not a "simple" task). Instead, the meaning of each term is relative to the other terms. For example, knowledge that is categorized as "simple" is only simple relative to another curriculum that provides more detail, such as when comparing EMT to AEMT. EMT students may need a greater level of airway anatomy detail because the scope of practice is different. Scope of practice is even more different for the AEMT and paramedic student, who will need increasingly greater levels of airway anatomy detail (complex). Course directors, instructors, medical directors and local stakeholders can decide the precise level of detail based on community and student needs rather than establishing a single prescriptive curriculum for the entire nation.

Similarly, the intended breadth of knowledge surrounding a concept is reflected in the terms *simple, foundational* and *comprehensive*. As curricula include an increasing level of detail about the use of the BVM, airway assessment and airway anatomy, the increasing size of the toolbox reflected by the increased scope of practice necessitates a broader list of related subjects. For example, the addition of CPAP, nasopharyngeal airway and oxygen delivery devices at the EMT level broadens the curriculum for the EMT instructor. For instructors teaching paramedic students, the increased scope of practice broadens the knowledge base even more. Clearly, the use of CPAP requires the EMT to have an increased depth and more complex breadth of knowledge than the EMR, but not nearly as much as the paramedic.

13

AR001293

# EMS Personnel Licensure Levels

These licensure levels are from the *National EMS Scope of Practice Model.* Each educational level assumes mastery of previously stated competencies. Every clinician must demonstrate each competency within their scope of practice and for patients of all ages.

| Emergency Medical Responder | Emergency Medical Technician | Advanced Emergency Medical Technician | Paramedic |
|---|---|---|---|
| The emergency medical responder (EMR) is an out-of-hospital practitioner whose primary focus is to initiate immediate lifesaving care to patients while ensuring patient access to the emergency medical services system. EMRs possess the basic knowledge and skills necessary to provide lifesaving interventions while awaiting additional EMS response and rely on an EMS or public safety agency or larger scene response that includes other higher-level medical personnel. When practicing in less populated areas, EMRs may have a low call volume coupled with being the only care personnel for prolonged periods awaiting arrival of higher levels of care. EMRs may assist, but should not be the highest-level person caring for a patient during ambulance transport. EMRs are often the first to arrive on scene. They must quickly assess patient needs, initiate treatment and request additional resources. | An emergency medical technician (EMT) is a health professional whose primary focus is to respond to, assess and triage emergent, urgent and non-urgent requests for medical care, and to apply basic knowledge and skills necessary to provide patient care and medical transportation to/from an emergency or health care facility. Depending on a patient's needs and/or system resources, EMTs are sometimes the highest level of care a patient will receive during an ambulance transport. EMTs often are paired with higher levels of personnel as part of an ambulance crew or other responding group. With proper supervision, EMTs may serve as a patient care team member in a hospital or health care setting to the full extent of their education, certification, licensure and credentialing. In a community setting, an EMT might visit patients at home and make observations that are reported to a higher-level authority to help manage a patient's care. When practicing in less populated areas, EMTs may have low call volume coupled with being the only care personnel during prolonged transports. EMTs may provide minimal supervision of lower-level personnel. EMTs can be the first to arrive on scene; they are expected to quickly assess patient conditions, provide stabilizing measures and request additional resources as needed. | The advanced emergency medical technician (AEMT) is a health professional whose primary focus is to respond to, assess and triage non-urgent, urgent and emergent requests for medical care; apply basic and focused advanced knowledge and skills necessary to provide patient care and/or medical transportation; and facilitate access to a higher level of care when the needs of the patient exceed the capability level of the AEMT. The additional preparation beyond EMT prepares an AEMT to improve patient care in common emergency conditions for which reasonably safe, targeted and evidence-based interventions exist. Interventions within the AEMT scope of practice may carry more risk if not performed properly than interventions authorized for the EMR/EMT levels. With proper supervision, AEMTs may serve as a patient care team member in a hospital or health care setting to the full extent of their education, certification, licensure and credentialing. In a community setting, an AEMT might visit patients at home and make observations that are reported to a higher-level authority to help manage a patient's care. | The paramedic is a health professional whose primary focus is to respond to, assess and triage emergent, urgent and non-urgent requests for medical care; apply basic and advanced knowledge and skills necessary to determine patient physiologic, psychological, and psychosocial needs; administer medications, interpret and use diagnostic findings to implement treatment; provide complex patient care; and facilitate referrals and/or access to a higher level of care when the needs of the patient exceed the capability level of the paramedic. Paramedics often serve as a patient care team member in a hospital or other health care setting to the full extent of their education, certification, licensure and credentialing. Paramedics may work in community settings where they take on additional responsibilities monitoring and evaluating the needs of at-risk patients, as well as intervening to mitigate conditions that could lead to poor outcomes. Paramedics help educate patients and the public in the prevention and/or management of medical, health, psychological and safety issues. |

AR001294

# About the Revised EMS Education Standards

## 2019 National EMS Scope of Practice Model Relationship

The recently released 2019 *National EMS Scope of Practice Model,* funded by NHTSA and HRSA, assembled experts to evaluate the scope of EMS practice for each of the four national practitioner levels (EMR, EMT, AEMT and paramedic). The 2019 *Scope of Practice Model* is the launching pad and guide for this revision of the *National EMS Education Standards*. The *Education Standards* reflect the 2019 and 2021 updated *Scope of Practice Model* and ensure practitioners receive the education and training they need to perform within their scopes and best serve their patients and communities.

The revision of the *National EMS Scope of Practice Model* and *National EMS Education Standards* are naturally interrelated, as one informs the other. As such, the team brought together to lead the revision of the *National EMS Education Standards* was funded by NHTSA and HRSA, and included 10 proven and renowned EMS educators. The *National EMS Scope of Practice Model,* recommendations from *EMS Agenda 2050*, known best practices, emerging technology, evidence-based medicine, information from the National EMS Database and societal issues were all considered. EMS stakeholder input and public comment were solicited and received multiple times throughout the revision process. The National Registry of EMTs also provided its Practice Analysis findings.

## NREMT Practice Analysis

Several members of the EMS Education Standards Revision Team were involved in the NREMT's practice analysis working group. This process has informed the team regarding the most encountered EMS emergencies, according to the National EMS Database, made possible by the National EMS Information

System (NEMSIS). In addition, the project revision team has reached out to NREMT throughout the revision project to obtain input and feedback. NREMT's practice analysis has been one of many critical resources consulted by the revision team.

## Domains of EMS: Learning, Competency, Authorization and Operational/Local Qualification

The 2019 *National EMS Scope of Practice Model* identifies four domains within the "Professional Scope of Practice" and provides a structure for the differences between education, certification, licensure and credentialing (see definitions below). The EMS Education Standards Revision Team focused on education, or the learning domain.

- **Education, the learning domain** – This domain includes all didactic, psychomotor, and affective learning that an EMS learner should be taught during an EMS course to become an entry-level apprentice.

- **Certification, the competency verification domain** – This domain includes all external evaluation and verification processes that are led by an outside entity to ensure that a learner has achieved competency to be safe and effective when conducting duties as an entry-level EMS clinician. In most states, National Registry certification is used to verify competency.

- **Licensure, the legal authorization domain** – Licensure refers to the legal authority, granted by a state, to an individual to perform certain defined and restricted duties. The clinical duties usually vary from one state to the next. The term is not to be confused or referred to as "certification." As defined in the 2019 *Scope of Practice*

**15**

AR001295

*Model*, certification and licensure are independent yet related processes. When state requirements are met, a state license is issued along with the legal authority to perform a role at the appropriate level of licensure.

- **Credentialing, the operational/local qualification domain** – Credentialing is the responsibility of the individual EMS organization and, in most cases, the medical director. Being that a learner has been educated, certified and licensed, the duty falls to the organization and local community to ensure that the EMS clinician is able to operate safely by following appropriate clinical and operational guidelines and philosophies set forth by the physician EMS medical director. Typically, this involves orientation courses with an evaluation and structured operational and clinical training programs. Credentialed providers have been taught and assessed on skills and actions that are beyond the entry-level education and training of an EMS school. For instance, if allowed by the state, ultrasound may be a role performed after proper credentialing by the local EMS medical director and jurisdiction, even though ultrasound is not included in the *National EMS Scope of Practice Model* or the *National EMS Education Standards*.

Because most EMS education programs teach students who will not all practice in the same organization, communities or even states, a one-size-fits-all education is not possible. The writing of a detailed national curricula for each of the four levels would be problematic. No educational institution can teach a learner every possible clinical or operational guideline or associated philosophy, nor can an educational entity train an individual about every clinical device used by EMS services across the nation. As a result, the credentialing process is a critical piece of preparing EMS clinicians to practice in their respective organizations after the completion of initial education and certification.

When a learner successfully concludes coursework and has satisfied a program's identified terminal requirements (Education Domain), the apprentice can then sit for an evaluation that provides verification of competency (Certification Domain). After successfully navigating the Licensure Domain with a state, a learner is deemed "entry-level." Finally, the entry-level clinician is ready for the Credentialing Domain of an employer, after which the learner is "job-ready." The term "entry-level" indicates that a learner has completed the education, certification, and licensure domains. "Job-ready" indicates that a learner has been credentialed by an employer and the local medical director, and is competent in the system's operational and clinical guidelines, policies and philosophies.

Common comments and recommendations that were received by the revision team addressed content areas that clearly did not apply to the entry-level education of an apprentice EMS clinician. Many suggestions fit within the credentialing domain and are not appropriate for national adoption at this time. The team worked hard to stay within the education domain for entry-level EMS clinicians.

## Education Standards vs. Instructional Guidelines vs. Curriculum

The *National EMS Education Standards* outline the minimal competencies for entry-level EMS clinicians to achieve within the parameters outlined in the 2019 and 2021 updated *Scope of Practice Model*. Education programs should contemplate the *Standards* when developing curricula for national consistency. The *Standards'* format will allow diverse implementation methods to meet local needs and evolving education practices. The less prescriptive format of the *Standards* will also allow for ongoing revision of content consistent with scientific evidence, advances in technology, known "best practices" and community standards of care.

AR001296

In general, the content of education standards can range from largely non-prescriptive to detailed and very prescriptive.

Non-Prescriptive Education Standards:

- increase teacher autonomy
- increase instructional flexibility
- increase responsiveness to student learning needs
- increase responsiveness to local needs and situations
- increase responsiveness to national trends

Prescriptive Education Standards:

- improve education consistency
- protect from societal harm that may result from low education expectations and/or low-quality instruction
- have been labeled as "burdensome checklists" by some educators and are problematic in medicine due to rapid changes in technology, scientific evidence and best practices

The *National EMS Education Standards* are not meant to stand as a comprehensive document guiding all of the development of EMS clinicians, but rather one part of a comprehensive system (Figure 3). EMS education programs will incorporate each element of the education system proposed in the *Education Agenda*. These elements include:

- National EMS Core Content
- National EMS Scope of Practice
- National EMS Education Standards
- National EMS Certification
- National EMS Program Accreditation

This integrated system is essential to achieving the goals of program efficiency, consistency of instructional quality and student competence as outlined in the *Education Agenda*.

While the *Education Standards* are developed at the national level, each state retains the right to wholly adopt the *Standards* or adopt and modify the *Education Standards* to fit a state's unique needs. The *National EMS Education Standards* have been created to provide states with a vetted, consensus-driven foundation for EMS education. They also benefit clinicians by paving the way for national certification and easier transition from one locality or state to another.

Individual EMS educators and local communities select or create curricula based on a multitude of curriculum influencers. These influencers can also be strong mechanisms for education program accountability. Regional needs, accreditation standards and state and local policies and regulations are a few examples. Curricula design, implementation and adjustment are complex processes. Specific curricular content, instructional strategies and competency evaluation processes should be resolved at the education program level through implementation and feedback. Regulatory rules must be adhered to as well. Decisions on curriculum implementation are based on local situations, students' needs and available resources. Figure 3 illustrates numerous inputs and points for accountability when curricula are designed, implemented and adjusted. Program directors, faculty and education institutions would be wise to consider each influence.

AR001297

## Figure 3: Influences on EMS Education Curriculum Development



**Federal**
- *EMS Education Agenda for the Future: A Systems Approach*
- *National EMS Core Content*
- *National EMS Scope of Practice Model*
- *National EMS Education Standards*
- *EMS Agenda 2050*
- Stakeholder interests

**State & Regional**
- State laws and regulations
- Regional requirements
- Stakeholder interests

**Accrediting & Certifying Organizations**
- CAAHEP/CoAEMSP[1]
- National Registry of EMTs
  - Practice analysis
- Stakeholder interests

**Advances in EMS**
- Evidence-based medicine
- Technology
- Known and evolving best practices

**Local**
- Resources
- Student needs
- Community needs
- Medical direction
- Local advisory committees
- Stakeholder interests
- Employers

*Implementation*
*Feedback*

**Program and Course Curriculum**

1 CAAHEP: Commission on Accreditation of Allied Health Education Programs, CoAEMSP: Committee on Accreditation of Educational Programs for the Emergency Medical Services Professions

## Where are the Instructional Guidelines?

The 2009 instructional guidelines (IGs) were originally designed to help educators transition from the *National Standard Curricula* developed in the 1990s to the 2009 *Education Standards*.

When the revision team met, a discussion ensued regarding the ongoing usefulness of the IGs in their current form. It was agreed that the addition of the existing four IGs (EMR, EMT, AEMT and paramedic) to the *Education Standards* made the documents too cumbersome to be easily useful.

It was also evident that, while much of the IGs remained relevant, several sections had become outdated because of changes in evidence-based medicine, best practices or technology. Simultaneously, it was felt that it would be useful to have a level of specificity within the *Education Standards* rather than require educators to look in multiple places when seeking guidance to create curricula.

The resulting document combined elements of the IGs with the overarching principles of the *Education Standards*. A level of knowledge depth and breadth is provided for each section

AR001298

of the *Standards*. At a glance, trained educators will be able to determine the extent of information to be provided to their students. The result is an enriched blueprint of the education and training of today's EMS clinicians.

## Beyond the Scope of the Project

There are four areas that were frequently brought up by stakeholders but not part of the project. Specialty certification education (critical care paramedic, community paramedic, tactical medic); degree requirements at any clinician level; nomenclature of the EMS profession and clinicians; and continuing education requirements were beyond the scope of this effort. Instead, the focus was to align the *Education Standards* with the newly released 2019 *Scope of Practice Model*.

### Degree Requirements

The revision team heard numerous comments regarding degree requirements. Clearly, some parties strongly desire degree requirements for paramedics. Others strongly oppose them. Currently, there is not an industry consensus for degree requirements for EMS personnel. In many cases, several significant EMS stakeholders and the "larger" EMS community take a more neutral position. Time will allow for further discussion and debate on the topic. Early in the process, the team was advised that the debate for or against degrees was beyond the scope of the project as the 2021 *National EMS Education Standards* do not address degree requirements.

The team also received recommendations for education related to deeper clinical subject matter, leadership and management, public health, education, social work, research, and other areas related to EMS systems. One national stakeholder called for courses in health systems science and value-based care. Suggested courses included:

- Health care system structure and processes
- Health care policy, economics, and management
- Clinical informatics and health information technology
- Public/population health
- Health system improvement and person-centered care
- Structure and processes beyond EMS
- Health care reimbursement and finance
- Health care quality and safety

## AEMT Accreditation

The 2019 *National EMS Scope of Practice Model* subject matter expert panel recommended requiring AEMT program accreditation by January 1, 2025. The panel deliberated and came to a consensus on the matter with the involvement of 13 stakeholders and various independent contributors. Despite this understanding in 2019, the topic continues to be passionately debated. The *Education Standards* revision team supports this recommendation. The revision team deliberated the topic and concluded that accreditation is an original and identified goal of the *2000 EMS Education Agenda*. Through the use of collegial evaluation practices and the identification of recognized routines for establishing sound EMS education programs, program accreditation is expected to promote clinical and educational excellence by ensuring the availability of adequate resources and services for educators and their students.

## Portable Technologies

During the public comment periods, many participants identified the need for education standards that covered new and

19

AR001299

emerging technologies. There were specific and repeated recommendations for Point-of-Care Ultrasound (POCUS); the 2019 *Scope of Practice Model* subject matter experts directly addressed this skill and have determined that "portable technology" (which includes POCUS) has been left to the "credentialing" process of the EMS organization and medical director. The *Standards* revision team believes that the ideal time for use of these technologies is when a person has been educated, deemed competent, licensed and credentialed with knowledge and skill. The local EMS medical director should be involved in the selection of technologies. Widespread education based on specific technologies should be decided at the local or state level. Only after national adoption and inclusion in a practice analysis should technologies be included in the *National EMS Education Standards* and *National EMS Scope of Practice Model*.

## Instructional Practices: Simulation, Shadowing & Interprofessional Education

Because education standards are not intended to be a curriculum, the instructional strategies of simulation, shadowing and interprofessional education are addressed here but not in the *Standards* themselves. The team does believe that an education program should implement numerous instructional techniques to accommodate the diversity of student learning needs inside and outside the EMS classroom. Using numerous instructional strategies will help reach every learner. A heavy reliance on the traditional lecture is not ideal and is not equitable, as some students learn better in different settings and every student benefits from experiencing other methods of instruction. Three types of instructional practices were identified by the public and various stakeholders: simulation, shadowing and interprofessional education. The team believes that each practice has merit and should be considered as an additional instructional strategy.

### Simulation

EMS simulation begins in the classroom with educators creating realistic scenarios to train all levels of EMS personnel. The practice of allowing students to memorize and verbalize a check sheet is no longer acceptable and should be changed. Simulation has proven to increase critical thinking skills and reduce medical errors in our health care system. Simple to complex simulation comes in many forms, from table-top exercises and practicing intramuscular injections on an orange to standardized live patients and high-fidelity manikins. Cost will vary, but simulation does not have to be expensive to be successful. Simulation in EMS can achieve:

- The creation of a "safe-to-fail" environment in which students can make mistakes without dire consequences and learn from those mistakes
- Higher success rates on the NREMT psychomotor exams
- Enhanced understanding and more robust therapeutic communication
- Increased understanding and demonstration of affective domain competencies
- Improvement in critical thinking skills of entry-level personnel
- Improved safety, effectiveness and efficiency of services
- Substitution for infrequent or unattainable clinical scenarios

### Shadowing

Shadowing a practicing clinician offers students experiential, hands-on learning opportunities, and many learners have a special affinity for it. Shadowing affords a prospective EMS

AR001300

professional the chance to be immersed in the actual job environment, making it possible to see an experienced worker apply the skills and traits needed to accomplish the work.

### Interprofessional Education

Health care is best when delivered in a cooperative team environment; collaboration can result in improved communications, thus reducing medical errors, reducing costs for patients and improving patient outcomes. Interprofessional Education is a proven instructional method that results in positive outcomes in clinical preparation, health care profession education and public safety. Interprofessional Education helps a learner realize how EMS fits into the larger "continuum of care" and plays a role in critical "systems of care." Learning how patients move through the health care system, from dispatch to discharge to follow-up care, plays a critical role in patient safety. Interaction with other health care providers and first responders during initial education will mutually enhance an understanding of everyone's roles in the system.

Out-of-hospital care is becoming more diverse and complex. As a result, individual EMS instructors may not possess the expertise or knowledge to teach all subjects within the revised *Standards*. When this occurs, a subject matter expert should be enlisted for the given topic. For instance, the public health section has been expanded and it would be a "best practice" to bring in a qualified content expert to cover the topic. Many areas related to EMS operations would also require a qualified content expert. Rescue operations have become extremely broad and specialized. Bodies of knowledge such as incident command, hazardous materials and other unique topics require experience and specialized knowledge for quality instruction. The instructor should have a proper background, relevant knowledge and a degree or a recognized and credible credential in the topic. It is

recommended that the EMS educator work with the subject matter experts to ensure relevance of the content to the practice of prehospital medicine.

## Eminence of the Affective Domain

Competence in the affective domain of learning is critical to the success of EMRs, EMTs, AEMTs and Paramedics. The *National EMS Education Standards* focus on the knowledge and skills that an entry-level practitioner needs to treat sick or injured patients. The third dimension needed for any skilled EMS clinician is related to values, attitude, professional behavior, compassion and a willingness to serve. Values provide the foundation for decisions, and attitudes reflect values and influence interpersonal dynamics. Professional behavior is a key component of medical practice, and compassion is a required characteristic of medical professionals supporting clinical knowledge and skill. A willingness to serve underlies all that a health care provider does.

The importance of affective domain competence cannot be overstated. Every EMS education program director and faculty member should consider this aspect of medical practice. Modeling and setting professional-level expectations for affective domains are part of the educational duty of an educator within career and technical school. From the very first day of class until course conclusion, the importance of teaching and evaluating affective domain competency to ensure graduates are fully prepared for professional practice should be identified as a high priority and a universal goal.

## Sequence of Instruction

The order of the *National EMS Education Standards* does not imply any particular sequence of instruction. For example, some topics, such as public health, could be taught early on or later in a course, despite appearing early in these *Standards*. Other topics, such as basic assessment skills, would likely

AR001301

come early in the clinician's education and precede concepts that build upon them. Curricular flow should be determined by the education program director, with input from faculty, medical direction and advisory committees.

## Locally Identified Topics

The revision team recognized and heard numerous comments regarding clinical content that is of great local need and yet may not be essential as an item for the entire nation. As a result, the team believed it would be best to include a statement that some content should be locally determined and developed at the simple depth, simple breadth level (or higher when desired). This content should be identified, developed and implemented using a program medical director, advisory boards, the larger medical community or faculty judgement.

## Implicit Expectations

For a given illness, condition, or traumatic injury, the implicit expectation is that an educational program will include instruction of the relevant anatomy, physiology, pathophysiology, assessments and accepted treatments. The team determined that this expectation is known by educators and repeating the statement in each section of the document is not required or desired.

## Additional Resources

It is impossible for EMS instructors to know everything about the profession, and trying to stay up to date on the latest evidence-based guidelines, best practices, industry standards and research is a very difficult task. The resources found in Appendix A are intended as tools for educators to use as needed to remain current on changes in the field.

Two critical sources that educators should consider referencing as they create learning content are the National Model EMS Clinical Guidelines, maintained by the National Association of State EMS Officials (NASEMSO), and pre-hospital evidence-based guidelines, many of which are produced through the efforts of The Prehospital Guidelines Consortium, maintained by the National Association of EMS Physicians (NAEMSP). The guidance provided by these sources is a result of collaboration among many national EMS stakeholders intent on promoting consensus and evidence to inform a general standard of prehospital care.

AR001302

# Summary of Significant Changes to the EMS Education Standards

## Behavioral/Psychiatric

Many, if not most EMS systems have seen a steady rise in behavioral emergencies and patients experiencing acute and chronic manifestations of psychiatric illnesses. Moreover, a lack of available in-patient beds at mental health facilities has resulted in EMS clinicians needing to manage these patients for longer periods of time and over longer distances.

As a result, the behavioral/psychiatric section of the *Education Standards* was revised to include more information regarding acute behavioral crisis and mental health disorders. Greater depth and breadth of knowledge were recommended for areas involving potential safety hazards to patients and EMS clinicians. Conversely, certain psychiatric disease and syndrome areas were revised and simplified.

## Cultural Humility

Throughout health care and related fields, there has been a recognition of the importance of maintaining an awareness of the assumptions and biases related to cultural issues and how they may affect our patients, co-workers and students. Cultural humility is a lifelong, ongoing process of self-reflection and self-critique in which one learns about others' cultural identities and looks at how one's own background and social environment have shaped the individual. Cultural humility in EMS should address:

- **Education:** Are our EMS educators diverse? Does our student population reflect the community? Are our classrooms free of stereotypes? Do we understand our own biases and the differences between all of our students?

- **EMS workforce:** Are we creating a diversified and equitable workforce reflective of our population? Promoting cultural humility can help strengthen relationships among staff, leadership, patients and families and other health care personnel we interact with on a daily basis.

- **Patient care:** Are we teaching cultural competency and humility to our EMS students? After graduation, can our students provide culturally competent, equitable and medically appropriate prehospital care to each and every patient no matter their background? Cultural humility leads to higher-quality care and better communication and trust between patients and clinicians.

## EMS Operations

EMS operations, while extremely important, are determined by a variety of factors, including the setting, the clinician's role and the EMS system design. Therefore, it is not possible to provide strict and straightforward training requirements that would be appropriate across these diverse settings. Next is a summary of the intent of each section of the EMS operations education standards. EMS educators and EMS institutions need to be able to work with local and state agencies to determine the appropriate level of knowledge that providers need to perform their duties safely and efficiently.

AR001303

- **Principles of Safely Operating EMS Emergency Response Vehicles**

  The intent of this section is to give an overview of emergency response to ensure the safety of EMS personnel, patients and others during EMS response vehicle operations. This does not prepare the entry-level student to be an experienced and competent driver. Appropriate driver training designed for the entry-level provider must be completed as required by state and local regulations and is not intended to be part of a requirement to achieve national certification as an emergency medical responder. Information related to the clinical management of the patient during emergency response is found in the clinical sections of the *National EMS Education Standards* for each personnel level.

- **Incident Management**

  Information related to the clinical management of the patient within components of the Incident Management System is found in the clinical sections of the *National EMS Education Standards* for each licensure level. The material presented in this section should be delivered by an individual who has been trained and has the proper credentials to educate students in these areas. The material may be obtained in-person or through distance learning as determined by state and local requirements.

- **Mass Casualty Incidents**

  The intent of this section is to give an overview of operating during a mass casualty incident when a multiple casualty incident plan is activated. Information related to the clinical management of the patients during a multiple casualty incident is found in the clinical sections of the *National EMS Education Standards* for each licensure level. The depth and breadth of training that must be

achieved by clinicians at each level should be determined by state and local requirements.

- **Landing Zone Operations**

  The intent of this section is to give an overview of operating safely in and around a landing zone during air medical operations and transport. The safety considerations of setting up and operating in a landing zone should be taught by properly trained experts who have the proper knowledge and experience in the area of air medical transportation. The depth and breadth of information that is needed by each level of clinician should be determined by state and local regulations. Information related to the clinical management of the patient being cared for during air medical operations is found in the clinical sections of the *National EMS Education Standards* for each licensure level.

- **Rescue Operations**

  The intent of this section is to provide an overview of rescue operations including, but not limited to, vehicle extrication, low/high angle, water, trench and confined space to ensure the safety of EMS personnel and patients during these events. This does not prepare the entry-level student to become competent or qualified to work in these rescue environments. Information related to the clinical management of the patient being cared for during rescue incidents is found in the clinical sections of the *National EMS Education Standards* for each personnel level.

- **Hazardous Materials**

  Information related to the clinical management of the patient exposed to hazardous materials is found in the clinical sections of the *National EMS Education Standards* for each personnel level. This information may be done as a corequisite or prerequisite, or as part of the entry-level course as determined by state and local requirements.

AR001304

Training in this area should only be done by those properly trained and credentialed to provide the required training. Federal regulations require that, at a minimum, EMS personnel must be trained at the Hazardous Materials Awareness level. State and local regulations may have additional requirements that are above and beyond federal regulations. EMS educators should work in collaboration with local fire or emergency management authorities to determine the proper training level required and assuring that properly credentialed instructors are providing the training. The information contained in the hazardous materials awareness programs are above and beyond the scope of national EMS programs for the entry-level provider.

- **Mass Casualty Incidents Due to Active Threats and Disaster**

  The intent of this section is to give an overview of operating during a terrorist event or during a natural or man-made disaster. Instruction in this area should be done by properly trained and knowledgeable individuals in this area. State and local regulations may have additional requirements that are above and beyond federal regulations. Information related to the clinical management of patients exposed to a terrorist event or involved in a disaster is found in the clinical sections of the *National EMS Education Standards* for each personnel level.

## Public Health

Since the release of the original *National EMS Education Standards* in 2009, EMS has made substantial progress from being viewed as simply a provider of medical transport to a true out-of-hospital health care resource. The changes to the public health section of the *Standards* reflect this evolution in EMS. Public health prevention and pandemic preparedness efforts are essential functions in the future as EMS continues to be at the crossroads between health care, public health and public safety.

The EMS clinician of the future will be expected to integrate into pandemic plans, assist in vaccinations and act as the initial point of entry into robust community health programs.

The new standards are intended to prepare the entry-level provider to work alongside and collaboratively with specially trained community paramedics, social workers, public health organizations, health care entities, emergency management agencies and non-governmental organizations in their day-to-day duties, and lay the foundation for advancement into specialized roles.

## Pharmacology

An EMS culture of safety is a universal goal within the industry. A key area for safety is the administration of medications in the prehospital setting. The lack of desired pharmacology competency among EMS program graduates was identified by the *EMS Scope of Practice* subject matter experts, in EMS evidenced-based literature and numerous other sources. When it comes to pediatric populations, EMS for Children identified a significant need for additional training in this area and called for specific teaching for pediatric dosing and troubleshooting abnormal situations. As a result, the pharmacology section has been expanded for EMR, EMT, AEMT and paramedics. It is not enough to solely teach pharmacology in a traditional didactic manner. This skill should include didactic, psychomotor and affective instruction. There should be significant opportunities to practice the skill before leaving the education program. Simulation and, ideally, actual patient encounters should be offered to students. Emphasis and specific focus should be given to psychomotor practice of adult, pediatric and geriatric medication administration due to the complexity of drug dosing and the chance of error.

AR001305

## EMS Safety, Wellness and Resilience

Workforce safety and wellness has been expanded to reflect principles of stress management, responder mental health, resilience and suicide prevention across all levels. With greater number of responders reporting thoughts of suicide, and suicide rates among first responders significantly exceeding those of the general population, a foundational level of knowledge is crucial to addressing this professional and occupational crisis. An overall greater emphasis on mental health resources is also recommended.

Standard safety precautions, use of personal protective equipment, illness and injury prevention, and lifting and moving patients continue to be emphasized at all levels of emergency responders. Other areas that have been added include crew resource management across all levels and disease transmission in the EMT, AEMT and paramedic curricula.

## Pediatric and Geriatric Content Competencies

Individual sections for pediatrics and geriatrics have been removed, with education content addressing these special populations now incorporated throughout the education standards. This change is based on recommendations from pediatric-focused stakeholders, scientific evidence and consensus among clinical partners.

Concepts related to geriatric and pediatric patients deserve equitable attention and should be taught repeatedly throughout every section of a course resulting in an earlier assimilation of the content. Pediatric stakeholders reported that anxiety, unfamiliarity with pediatric patients and equipment, and discomfort on the part of rescuers calls for aggressive remedies. These findings may be associated with the low frequency and high acuity of pediatric encounters.

The need for better EMS assessment, diagnosis, treatment, safe medication administration, airway management and appropriate pain management has been identified. In every aspect of education, troubleshooting and critical thinking are required when clinical situations are confusing or problematic. As students acquire knowledge, skills and abilities, opportunities to compare and contrast pediatric, adult and geriatric populations will enhance and deepen learning.

During each section of the *Standards*, relevant pediatric and geriatric content should be discussed in detail as they aren't covered in a separate section. Incorporation of this special population information into the general content should improve the comfort level of students by making the care of these patients part of everyday operations.

EMS education should include knowledge from the cradle to the grave. Pediatric and geriatric topics should no longer be minimized, in comparison to "adult" topics, or relegated to an isolated component of an EMS course, which can create a perception that the content is somehow less important.

EMS education and care should be family-centered. Family-centered care is a clinical methodology for the planning, delivery and evaluation of health care which is established in an affirming partnership that collaboratively involves patients, families and the health care providers. Family-centered care represents a significant transition away from paternalistic medicine to that which is founded on pillars of respect, collaboration, information sharing and shared decision-making.

While family-centered care is often taught as an area of focus for children with special needs, it should be integrated into the care of all patients. In the case of children with special health care needs, the family's knowledge of a child's condition can be immensely valuable. Yet, even among children with

AR001306

simple, acute medical emergencies, families and children often experience high levels of stress. Family-centered care seeks to help patients and families retain a sense of control. This includes providing opportunities for family members to be present during medical transport and invasive procedures. The approach recognizes that each family is unique, integral and essential for health care safety and quality. The values of collaboration, responsiveness and united decision-making are at the forefront of treatment. The beliefs, desires, and values from cultural backgrounds of the family and patient are considered and respected. Health care workers communicate with complete information and in an unbiased and respectful manner. When choices are made, decision-making involves all parties as coequal parts and decision-makers are known and informed, and health care clinicians listen to and honor patient and family choices. When family-centered care is optimal, there is high-quality care with safety, and family and patient satisfaction are achieved.

The reader will find phrases such as "include age-related variations in pediatric and geriatric patients" and "include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients." These phrases are intended to remind and direct EMS educators to elevate the importance of geriatric and pediatric education within each section.

AR001307

# National EMS Education Standards

**LEGEND**

The first letter refers to **Breadth**, which can be:
- Simple (S)
- Foundational (F)
- Comprehensive (C)

The second letter refers to **Depth**, which can be:
- Simple (S)
- Fundamental (F)
- Complex (C)

*For more information refer to Fig. 2 and Fig. 2.1 (Depth/Breadth Terminology) on p.11-12.*

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Preparatory** | **Preparatory** | Uses knowledge of the **EMS** system, safety/well-being of the **EMR**, medical/legal issues and ethical issues at the scene of an emergency while awaiting a higher level of care. | Applies knowledge of the **EMS** system, safety/well-being of the **EMT**, medical/legal and ethical issues to the provision of emergency care. | Applies knowledge of the **EMS** system, safety/well-being of the **AEMT**, medical/legal and ethical issues to the provision of emergency care. | Integrates knowledge of **EMS** systems, the safety/well-being of the paramedic, and medical/legal and ethical issues intended to improve the health of **EMS** personnel, patients and the community. |
| | EMS Systems | • EMS systems (S,S)<br>• Roles, responsibilities and professionalism of EMS personnel (S,S)<br>• Quality improvement vs. quality assurance (S,S)<br>• Role of medical oversight (S,S)<br>• Culture of safety / patient safety (S,S)<br>• Continuum of care (S,S) | • EMS systems (S,F)<br>• Roles, responsibilities and professionalism of EMS personnel (F,F)<br>• Quality improvement vs. quality assurance (S,F)<br>• Role of medical oversight (S,S)<br>• Culture of safety / patient safety (S,F)<br>• Continuum of care (S,F)<br>• History of EMS (S,F)<br>• Systems of care, e.g., Stroke, STEMI, Trauma, Pediatrics (S,F)<br>• MIH/CP and other EMS-related specialty roles (S,S) | • EMS systems (S,F)<br>• Roles, responsibilities and professionalism of EMS personnel (F,F)<br>• Quality improvement vs. quality assurance (F,F)<br>• Role of medical oversight (F,F)<br>• Culture of safety / patient safety (F,F)<br>• Continuum of care (F,F)<br>• History of EMS (S,F)<br>• Systems of care, e.g., Stroke, STEMI, Trauma, Pediatrics (F,F)<br>• MIH/CP and other EMS-related specialty roles (F,F) | • EMS systems (C,C)<br>• Roles, responsibilities, and professionalism of EMS personnel (C,C)<br>• Quality improvement vs. quality assurance (C,C)<br>• Role of medical oversight (C,C)<br>• Culture or safety / patient safety (C,C)<br>• Continuum of care (F,F)<br>• History of EMS (F,F)<br>• Systems of care, e.g., Stroke, STEMI, Trauma, Pediatrics (C,C)<br>• MIH/CP and other EMS-related specialty roles (F,F) |

AR001308

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Preparatory** | Workforce Safety and Wellness | • Standard safety precautions (S,S)<br>• Personal protective equipment (S,S)<br>• Lifting and moving patients (S,S)<br>• Crew resource management (S,S)<br>• Stress management (F,F)<br>• Prevention of work-related injuries and illnesses (F,F)<br>• Responder mental health, resilience and suicide prevention (F,F)<br>• Wellness principles (F,F)<br>• Disease transmission (S,S) | • Standard safety precautions (F,F)<br>• Personal protective equipment (F,F)<br>• Lifting and moving patients (F,F)<br>• Crew resource management (F,F)<br>• Stress management (F,F)<br>• Prevention of work-related injuries and illnesses (F,F)<br>• Responder mental health, resilience and suicide prevention (F,F)<br>• Wellness principles (F,F)<br>• Disease transmission (F,F) | • Standard safety precautions (F,F)<br>• Personal protective equipment (F,F)<br>• Lifting and moving patients (F,F)<br>• Crew resource management (F,F)<br>• Stress management (F,F)<br>• Prevention of work-related injuries and illnesses (F,F)<br>• Responder mental health, resilience and suicide prevention (F,F)<br>• Wellness principles (F,F)<br>• Disease transmission (F,F) | • Standard safety precautions (C,C)<br>• Personal protective equipment (C,C)<br>• Lifting and moving patients (C,C)<br>• Crew resource management (F,F)<br>• Stress management (C,C)<br>• Prevention of work-related injuries and illnesses (C,C)<br>• Responder mental health, resilience and suicide prevention (C,C)<br>• Wellness principles (C,C)<br>• Disease transmission (C,C) |
| | Research | • Impact of research on EMR care (S,S)<br>• Data collection (S,S) | • Impact of research on EMT care (S,S)<br>• Data collection (S,S)<br>• Evidence-based decision making (S,S) | • Impact of research on AEMT care (S,S)<br>• Data collection (S,S)<br>• Evidence-based decision making (S,S) | • Impact of research on Paramedic care (S,S)<br>• Data collection (S,S)<br>• Evidence-based decision making (S,S)<br>• Research principles to interpret literature and advocate evidence-based practice (F,F) |
| | Documentation | • Recording patient findings (S,S) | • Recording patient findings (S,S)<br>• Principles of medical documentation and report writing (F,F)<br>• Supporting medical necessity (S,S) | • Recording patient findings (S,S)<br>• Principles of medical documentation and report writing (C,F)<br>• Supporting medical necessity (S,S) | • Recording patient findings (S,S)<br>• Principles of medical documentation and report writing (C,C)<br>• Supporting medical necessity (S,S) |
| | EMS System Communication | • Call for resources (S,S)<br>• Transfer care of the patient (S,S)<br>• Interact within the team structure (S,S) | • EMS communication system (S,S)<br>• Communication with other health care professionals to include cohesive and organized patient handoff (S,S)<br>• Team communication and dynamics (S,S)<br>• Telemetric monitoring devices and transmission of clinical data, including video data (S,S) | • EMS communication system (F,F)<br>• Communication with other health care professionals to include cohesive and organized patient handoff (F,F)<br>• Team communication and dynamics (F,F)<br>• Telemetric monitoring devices and transmission of clinical data, including video data (S,S) | • EMS communication system (C,C)<br>• Communication with other health care professionals to include cohesive and organized patient handoff (C,C)<br>• Team communication and dynamics (C,C)<br>• Telemetric monitoring devices and transmission of clinical data, including video data (S,S) |

AR001309

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Preparatory** | Therapeutic Communication | • Health care literacy (S,S)<br>• Interviewing techniques (S,S)<br>• Verbal defusing strategies (S,S)<br>• Managing communication challenges (S,S)<br>• Family centered care (S,S) | • Health care literacy (S,S)<br>• Interviewing techniques (F,F)<br>• Verbal defusing strategies (F,F)<br>• Managing communication challenges (F,F)<br>• Family centered care (F,F)<br>• Adjusting communication strategies for age, stage of development, patients with special needs (S,S)<br>• Non-discriminatory communication that addresses inherent or unconscious bias, is culturally aware and sensitive, and intended to improve patient outcome (S,S) | • Health care literacy (F,F)<br>• Interviewing techniques (F,F)<br>• Verbal defusing strategies (F,F)<br>• Managing communication challenges (F,F)<br>• Family centered care (F,F)<br>• Adjusting communication strategies for age, stage of development, patients with special needs (S,S)<br>• Non-discriminatory communication that addresses inherent or unconscious bias, is culturally aware and sensitive, and intended to improve patient outcome (S,S) | • Health care literacy (C,C)<br>• Interviewing techniques (C,C)<br>• Verbal defusing strategies (F,F)<br>• Managing communication challenges (C,C)<br>• Family centered care (F,F)<br>• Adjusting communication strategies for age, stage of development, patients with special needs (C,C)<br>• Non-discriminatory communication that addresses inherent or unconscious bias, is culturally aware and sensitive, and intended to improve patient outcome (C,C) |
| | Medical/Legal and Ethics | • Consent/refusal of care (S,S)<br>• Confidentiality (S,S)<br>• Advanced directives (S,S)<br>• Tort and criminal actions (S,S)<br>• Evidence preservation (S,S)<br>• Statutory responsibilities (S,S)<br>• Mandatory reporting (S,S)<br>• Ethical principles/moral obligations (S,S)<br>• End-of-life issues (S,S) | • Consent/involuntary consent/refusal of care (F,F)<br>• Confidentiality (F,F)<br>• Advanced directives (F,F)<br>• Tort and criminal actions (F,F)<br>• Evidence preservation (F,F)<br>• Statutory responsibilities (F,F)<br>• Mandatory reporting (F,F)<br>• Ethical principles/moral obligations (F,F)<br>• End-of-life issues (S,S)<br>• Patient rights/advocacy (S,S) | • Consent/involuntary consent/refusal of care (F,F)<br>• Confidentiality (F,F)<br>• Advanced directives (F,F)<br>• Tort and criminal actions (F,F)<br>• Evidence preservation (F,F)<br>• Statutory responsibilities (F,F)<br>• Mandatory reporting (F,F)<br>• Ethical principles/moral obligations (F,F)<br>• End-of-life issues (S,S)<br>• Patient rights/advocacy (S,S) | • Consent/involuntary consent/ refusal of care (C,C)<br>• Confidentiality (C,C)<br>• Advanced directives (C,C)<br>• Tort and criminal actions (C,C)<br>• Evidence preservation (F,F)<br>• Statutory responsibilities (C,C)<br>• Mandatory reporting (C,C)<br>• Ethical principles/moral obligations (C,C)<br>• End-of-life issues (C,C)<br>• Health care regulation (C,C)<br>• Patient rights/advocacy (C,C)<br>• Ethical tests and decision making (C,C) |

AR001310

Back to Table of Contents >

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Anatomy and Physiology** | Uses knowledge of the anatomy and function of the upper airway, heart, vessels, blood, lungs, skin, muscles and bones as the foundation of emergency care. | Applies knowledge of the anatomy and function of all human systems to the practice of EMS. | Integrates knowledge of the anatomy and physiology of the airway, respiratory and circulatory systems to the practice of EMS. | Integrates knowledge of the anatomy and physiology of all human systems |

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Medical Terminology** | Uses medical and anatomical terms. | Uses anatomical and medical terms and abbreviations in written and oral communication with colleagues and other health care professionals. | Same as EMT Level | Integrates anatomical and medical terminology and abbreviations into written and oral communication with colleagues and other health care professionals. |

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Pathophysiology** | Uses knowledge of shock and respiratory compromise to respond to life threats. | Applies knowledge of the pathophysiology of respiration and perfusion to patient assessment and management. | Applies knowledge of the pathophysiology of respiration and perfusion to patient assessment and management. | Integrates knowledge of pathophysiology of major human systems. |

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Life Span Development** | Uses knowledge of age-related differences to assess and care for patients. | Applies knowledge of life span development to patient assessment and management. | Same as EMT Level | Integrates knowledge of life span development. |

AR001311

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Public Health** | **Public Health** | Has an awareness of local public health resources and their role in public health. | Applies knowledge of the principles of public health epidemiology including public health emergencies, public health monitoring, health promotion and illness and injury prevention. | Same as EMT level | Applies knowledge of principles of public health and epidemiology including public health emergencies, health promotion and illness and injury prevention. |
| | Public Health Overview | • EMS roles in public health (S,S)<br>• Infection prevention and control (S,S)<br>• Human trafficking (S,S) | • EMS roles in public health (S,S)<br>• Infection prevention and control (S,S)<br>• Human trafficking (S,S)<br>• EMS EHR reporting and data collection (S,S)<br>• Governmental/ nongovernmental roles & resources (S,S)<br>• Public health mission and goals (S,S)<br>• Social, geographic, economic, demographic determinants of health (S,S)<br>• Patient and community education (S,S)<br>• Injury prevention and wellness (S,S)<br>• Unique pediatric, geriatric and special populations public health concerns (S,S)<br>• Screenings and vaccinations/ immunizations (S,S) | • EMS roles in public health (S,S)<br>• Infection prevention and control (S,S)<br>• Human trafficking (S,S)<br>• EMS EHR reporting and data collection (S,S)<br>• Governmental/ nongovernmental roles & resources (S,S)<br>• Public health mission and goals (S,S)<br>• Social, geographic, economic, demographic determinants of health (S,S)<br>• Patient and community education (S,S)<br>• Injury prevention and wellness (S,S)<br>• Unique pediatric, geriatric and special populations public health concerns (S,S)<br>• Screenings and vaccinations/ immunizations (F,F)<br>• Impacts of political, social and economic issues (F,F)<br>• Infectious disease (F,F) | • EMS roles in public health (C,F)<br>• Infection prevention and control (F,F)<br>• Human trafficking (S,S)<br>• EMS EHR reporting and data collection (S,S)<br>• Governmental/ nongovernmental roles & resources (S,S)<br>• Public health mission and goals (S,S)<br>• Social, geographic, economic, demographic determinants of health (S,S)<br>• Patient and community education (S,S)<br>• Injury prevention and wellness (S,S)<br>• Unique pediatric, geriatric and special populations public health concerns (S,S)<br>• Screenings and vaccinations/ immunizations (C,F)<br>• Impacts of political, social and economic issues (F,F)<br>• Infectious disease (C,F)<br>• Patient disposition, selecting destination, ambulance transport (C,F)<br>• Bioinformatics (C,F) |

AR001312

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Pharmacology** | Pharmacology | Uses knowledge of the medications that the EMR may administer in an emergency. | Applies knowledge of the medications the EMT may administer to a patient during an emergency and chronic or maintenance medications the patient may be taking. | Applies (to patient assessment and management) knowledge of the medications carried by AEMTs that may be administered to a patient during an emergency and chronic or maintenance medications the patient may be taking. | Integrates knowledge of pharmacology to formulate a treatment plan intended to mitigate emergencies and improve the overall health of the patient. |
| | Principles of Pharmacology | • Medication safety (S,S)<br>• Kinds of medications used during an emergency (S,S) | • Medication safety (F,F)<br>• Medication legislation (F,F)<br>• Naming (F,F)<br>• Classifications (F,F)<br>• Storage and security (F,F)<br>• Medication interactions (S,S)<br>• Adverse drug reactions (S,S)<br>• Metabolism and excretion (F,F)<br>• Mechanism of action (F,F)<br>• Medication response relationships (F,F) | • Medication safety (C,C)<br>• Medication legislation (C,C)<br>• Naming (C,C)<br>• Classifications (C,C)<br>• Storage and security (C,C)<br>• Medication interactions (C,C)<br>• Adverse drug reactions (C,C)<br>• Pharmacokinetics (C,C)<br>• Pharmacodynamics (C,C)<br>• Schedules (C,C) | • Medication safety (C,C)<br>• Medication legislation (C,C)<br>• Naming (C,C)<br>• Classifications (C,C)<br>• Storage and security (C,C)<br>• Medication interactions (C,C)<br>• Adverse drug reactions (C,C)<br>• Pharmacokinetics (C,C)<br>• Pharmacodynamics (C,C)<br>• Schedules (C,C) |
| | Medication Administration | • Use a Medication Cross Check procedure (S,S)<br>• Use an autoinjector (S,S)<br>• Use a unit-dose, premeasured intranasal device (S,S)<br>• Use of tools/resources to facilitate safe administration of weight-based dosing. | • Use a Medication Cross Check procedure (F,F)<br>• Use an autoinjector (S,S)<br>• Use a unit-dose, premeasured intranasal device (S,S)<br>• Administer medications to a patient (F,F)<br>• Provide pain management, including ethical and safety considerations (F,F)<br>• Routes of administration (S,S) | • Use a Medication Cross Check procedure (F,F)<br>• Use an autoinjector (S,S)<br>• Use a unit-dose, premeasured intranasal device (S,S)<br>• Administer medications to a patient (C,C)<br>• Provide pain management, including ethical and safety considerations (C,C)<br>• Routes of administration (C,C)<br>• Resources for safe administration of weight-based dosing (F,F) | • Use a Medication Cross Check procedure (F,F)<br>• Use an autoinjector (S,S)<br>• Use a unit-dose, premeasured intranasal device (S,S)<br>• Administer medications to a patient (C,C)<br>• Provide pain management, including ethical and safety considerations (C,C)<br>• Routes of administration (C,C)<br>• Resources for safe administration of weight-based dosing (F,F) |

AR001313

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Pharmacology** | Acute Medications | • Names (S,S)<br>• Effects (S,S)<br>• Indications (S,S)<br>• Contraindications (S,S)<br>• Side effects (S,S)<br>• Routes of administration (S,S)<br>• Dosages (S,S) | • Names (F,S)<br>• Effects (S,S)<br>• Indications (F,S)<br>• Contraindications (F,S)<br>• Side effects (F,S)<br>• Routes of administration (F,S)<br>• Dosages (F,S)<br>• Actions (F,S)<br>• Complications (F,S)<br>• Interactions (F,S) | • Names (C,C)<br>• Effects (C,C)<br>• Indications (C,C)<br>• Contraindications (C,C)<br>• Side effects (C,C)<br>• Routes of administration (C,C)<br>• Dosages (C,C)<br>• Actions (C,C)<br>• Complications (C,C)<br>• Interactions (C,C) | • Names (C,C)<br>• Effects (C,C)<br>• Indications (C,C)<br>• Contraindications (C,C)<br>• Side effects (C,C)<br>• Routes of administration (C,C)<br>• Dosages (C,C)<br>• Actions (C,C)<br>• Complications (C,C)<br>• Interactions (C,C) |
| | Chronic or Maintenance Medications | No knowledge related to this competency is applicable at this level. | Specific medication classes to be determined locally<br>• Class names (S,S)<br>• Class indications (S,S)<br>• Class complications (S,S)<br>• Class side effects (S,S)<br>• Polypharmacy (S,S) | Specific medication classes to be determined locally<br>• Class names (S,S)<br>• Class indications (S,S)<br>• Class complications (S,S)<br>• Class side effects (S,S)<br>• Polypharmacy (S,S) | Specific medication classes and examples to be determined locally<br>• Class names (F,S)<br>• Class indications (F,S)<br>• Class complications (F,S)<br>• Class side effects (F,S)<br>• Polypharmacy (F,S) |

AR001314

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Airway Management, Respiration and Ventilation** | **Airway Management, Respiration and Ventilation** | Applies knowledge of anatomy and physiology to assure a patent airway, adequate mechanical ventilation and respiration while awaiting additional **EMS** response for patients of all ages. | Applies knowledge of anatomy and physiology to patient assessment and management in order to assure a patent airway, adequate mechanical ventilation and respiration for patients of all ages. | Applies knowledge of upper airway anatomy and physiology to patient assessment and management in order to assure a patent airway, adequate mechanical ventilation and respiration for patients of all ages. | Integrates knowledge of anatomy, physiology and pathophysiology into the assessment to develop and implement a treatment plan with the goal of assuring a patent airway, adequate mechanical ventilation and respiration for patients of all ages. |
| | Airway Management (Include age-related variations in pediatric and geriatric patients) | • Airway anatomy (F,S)<br>• Airway assessment (F,S)<br>• Techniques of assuring a patent airway (F,S) | • Airway anatomy (F,F)<br>• Airway assessment (F,F)<br>• Techniques of assuring a patent airway (F,F) | • Airway anatomy (F,F)<br>• Airway assessment (F,F)<br>• Techniques of assuring a patent airway (F,F) | • Airway anatomy (C,C)<br>• Airway assessment (C,C)<br>• Techniques of assuring a patent airway (C,C) |
| | Respiration (Include age-related variations in pediatric and geriatric patients) | • Anatomy of the respiratory system (F,S)<br>• Physiology and pathophysiology of respiration (F,S)<br>  - Pulmonary ventilation<br>  - Oxygenation<br>  - Respiration<br>    • External<br>    • Internal<br>    • Cellular<br>• Assessment and management of adequate and inadequate respiration (F,S)<br>• Supplemental oxygen therapy (F,S) | • Anatomy of the respiratory system (F,F)<br>• Physiology and pathophysiology of respiration (F,C)<br>  - Pulmonary ventilation<br>  - Oxygenation<br>  - Respiration<br>    • External<br>    • Internal<br>    • Cellular<br>• Assessment and management of adequate and inadequate respiration (F,C)<br>• Supplemental oxygen therapy (F,C) | • Anatomy of the respiratory system (C,F)<br>• Physiology and pathophysiology of respiration (F,C)<br>  - Pulmonary ventilation<br>  - Oxygenation<br>  - Respiration<br>    • External<br>    • Internal<br>    • Cellular<br>• Assessment and management of adequate and inadequate respiration (F,C)<br>• Supplemental oxygen therapy (F,C) | • Anatomy of the respiratory system (C,C)<br>• Physiology and pathophysiology of respiration (C,C)<br>  - Pulmonary ventilation<br>  - Oxygenation<br>  - Respiration<br>    • External<br>    • Internal<br>    • Cellular<br>• Assessment and management of adequate and inadequate respiration (C,C)<br>• Supplemental oxygen therapy (C,C) |
| | Ventilation (Include age-related variations in pediatric and geriatric patients) | • Assessment and management of adequate and inadequate ventilation (F,S)<br>• Effect of ventilation on cardiac output (F,S) | • Assessment and management of adequate and inadequate ventilation (F,F)<br>• Effect of ventilation on cardiac output (F,F) | • Assessment and management of adequate and inadequate ventilation (C,F)<br>• Effect of ventilation on cardiac output (C,F) | • Assessment and management of adequate and inadequate ventilation (C,C)<br>• Effect of ventilation on cardiac output (C,C) |

AR001315

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Assessment** | Assessment | Use scene information and patient assessment findings to identify and manage immediate life threats and injuries within the scope of practice of the EMR. | Applies scene information and patient assessment findings (scene size up, primary and secondary assessment, patient history and reassessment) to guide emergency management. | Same as EMT Level | Integrate scene and patient assessment findings with knowledge of epidemiology and pathophysiology to form a field impression. This includes developing a list of differential diagnoses through clinical reasoning to modify the assessment and formulate a treatment plan. |
| | Scene Assessment | • Scene safety/situational awareness (C,C)<br>• Scene management (F,F)<br>• Impact of the environment on patient care (F,F)<br>• Addressing hazards (F,F)<br>• Violence (F,F)<br>• Need for additional or specialized resources (F,F)<br>• Standard precautions (F,F)<br>• Multiple patient situations (F,F) | • Scene safety/situational awareness (C,C)<br>• Scene management (F,F)<br>• Impact of the environment on patient care (F,F)<br>• Addressing hazards (F,F)<br>• Violence (F,F)<br>• Need for additional or specialized resources (F,F)<br>• Standard precautions (F,F)<br>• Multiple patient situations (F,F) | • Scene safety/situational awareness (C,C)<br>• Scene management (F,F)<br>• Impact of the environment on patient care (F,F)<br>• Addressing hazards (F,F)<br>• Violence (F,F)<br>• Need for additional or specialized resources (F,F)<br>• Standard precautions (F,F)<br>• Multiple patient situations (F,F) | • Scene safety/situational awareness (C,C)<br>• Scene management (C,C)<br>• Impact of the environment on patient care (C,C)<br>• Addressing hazards (C,C)<br>• Violence (C,C)<br>• Need for additional or specialized resources (F,F)<br>• Standard precautions (F,F)<br>• Multiple patient situations (C,C) |
| | Primary Assessment<br><br>(Include age-related variations in pediatric and geriatric patients) | • Primary assessment (S,S)<br>• Begin interventions needed to preserve life (S,S) | • Primary assessment (F,S)<br>• Integration of treatment/procedures needed to preserve life (F,S) | • Primary assessment (F,F)<br>• Integration of treatment/procedures needed to preserve life (F,F) | • Primary assessment (C,C)<br>• Integration of treatment/procedures needed to preserve life (C,C) |

AR001316

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Assessment** | **History Taking**<br><br>(Include age-related variations in pediatric and geriatric patients) | • Determining the chief complaint (S,S)<br>• Mechanism of injury/ nature of illness (S,S)<br>• Associated signs and symptoms (S,S) | • Investigation of the chief complaint (F,F)<br>• Mechanism of injury/nature of illness (F,F)<br>• Associated signs and symptoms (F,F)<br>• Past medical history (F,F)<br>• Pertinent negatives (F,F) | • Investigation of the chief complaint (F,F)<br>• Mechanism of injury/nature of illness (F,F)<br>• Associated signs and symptoms (F,F)<br>• Past medical history (F,F)<br>• Pertinent negatives (F,F) | • Investigation of the chief complaint (C,C)<br>• Mechanism of injury/nature of illness (C,C)<br>• Associated signs and symptoms (C,C)<br>• Past medical history (C,C)<br>• Pertinent negatives (C,C)<br>• Interviewing techniques (C,C)<br>• Therapeutic communication and adaptive interview techniques (C,C) |
| | **Secondary Assessment**<br><br>(Include age-related variations in pediatric and geriatric patients) | • Assessment of vital signs (S,S)<br>• Assessment of pain (S,S)<br>• Performing a rapid full body scan (S,S) | • Assessment of vital signs (F,F)<br>• Assessment of pain (F,F)<br>• Techniques of physical examination (F,F)<br>  - Respiratory system including breath sound quality<br>  - Cardiovascular system<br>  - Neurological system<br>  - Musculoskeletal system<br>  - Major anatomical regions | • Assessment of vital signs (C,F)<br>• Assessment of pain (C,F)<br>• Techniques of physical examination (C,F)<br>  - Respiratory system including breath sound quality<br>  - Cardiovascular system<br>  - Neurological system<br>  - Musculoskeletal system<br>  - Major anatomical regions | • Assessment of vital signs (C,C)<br>• Assessment of pain (C,C)<br>• Techniques of physical examination (C,C)<br>  - Respiratory system including breath sound quality<br>  - Cardiovascular system<br>  - Neurological system<br>  - Musculoskeletal system<br>  - Major anatomical regions |
| | **Monitoring Devices** | No knowledge related to this competency is applicable at this level. | • Pulse oximetry (S,S)<br>• Non-invasive blood pressure (S,S)<br>• Cardiac monitoring – 12 lead ECG acquisition and transmission (S,S)<br>• Blood glucose determination (S,S) | • Pulse oximetry (S,S)<br>• Non-invasive blood pressure (S,S)<br>• Cardiac monitoring – 12 lead ECG acquisition and transmission (S,S)<br>• Blood glucose determination (S,S)<br>• End tidal $CO_2$ monitoring and interpretation of waveform capnography (S,S)<br>• Venous blood sampling (S,S) | • Pulse oximetry (S,S)<br>• Non-invasive blood pressure (S,S)<br>• Cardiac monitoring – 12 lead ECG acquisition and transmission (F,F)<br>• Blood glucose determination (S,S)<br>• End tidal $CO_2$ monitoring and interpretation of waveform capnography (F,F)<br>• Venous blood sampling (S,S)<br>• 12-lead ECG interpretation (F,F)<br>• Blood chemistry analysis (F,F) |
| | **Reassessment**<br><br>(Include age-related variations in pediatric and geriatric patients) | • How and when to reassess patients (S,S) | • How and when to reassess patients (F,F) | • How and when to reassess patients (F,F) | • How and when to reassess patients (C,C) |

AR001317

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Medicine** | **Medicine** | Recognizes and manages life threats based on assessment findings of a patient with a medical emergency while awaiting additional emergency response. | Applies knowledge to provide basic emergency care and transportation based on assessment findings for an acutely ill patient. | Applies knowledge to provide basic and selected advanced emergency care and transportation based on assessment findings for an acutely ill patient. | Integrates assessment findings with principles of epidemiology and pathophysiology to formulate a field impression and implement a treatment/disposition plan for a patient with a medical complaint. |
| | Medical Overview (Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Assessment and management of a medical complaint (S,S) | • Pathophysiology, assessment, and management of a medical complaints to include (S,F)<br> - Transport mode<br> - Destination decisions | • Pathophysiology, assessment, and management of a medical complaints to include (F,F)<br> - Transport mode<br> - Destination decisions | • Pathophysiology, assessment, and management of a medical complaints to include (C,C)<br> - Transport mode<br> - Destination decisions |
| | Abdominal and Gastrointestinal Disorders (Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Anatomy, presentations and management of shock associated with gastrointestinal bleeding (S,S) | • Acute and chronic gastrointestinal hemorrhage (F,F)<br>• Other gastrointestinal disorders to be determined locally (S,S) | • Acute and chronic gastrointestinal hemorrhage (F,F)<br>• Other gastrointestinal disorders to be determined locally (S,S) | • Acute and chronic gastrointestinal hemorrhage (C,C)<br>• Bowel obstruction (C,C)<br>• Liver and biliary tract disorders (F,F)<br>• Pancreatitis (S,S)<br>• Inflammatory disorders (S,S)<br>• Peritonitis (S,S)<br>• Other gastrointestinal disorders to be determined locally (S,S) |

AR001318

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Medicine** | **Cardiovascular**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Chest pain (S,S) | • Acute coronary syndrome (F,F)<br>• Hypertensive emergencies (S,S)<br>• Aortic aneurysm/dissection (F,F)<br>• Thromboembolism (F,F)<br>• Heart failure (F,F)<br>• Other cardiovascular disorders to be determined locally (S,S) | • Acute coronary syndrome (C,F)<br>• Hypertensive emergencies (F,S)<br>• Aortic aneurysm/dissection (F,F)<br>• Thromboembolism (F,F)<br>• Heart failure (F,F)<br>• Other cardiovascular disorders to be determined locally (S,S) | • Acute coronary syndrome (C,C)<br>• Hypertensive emergencies (C,C)<br>• Aortic aneurysm/dissection (F,F)<br>• Thromboembolism (F,F)<br>• Heart failure (C,C)<br>• Non-traumatic cardiac tamponade (C,C)<br>• Cardiogenic shock (C,C)<br>• Vascular disorders (C,C)<br>• Cardiac rhythms (C,C)<br>• Conditions that predispose patients to cardiac rhythm disturbances including WPW, Brugada, long QT syndrome and others (C,C)<br>• Infectious diseases of the heart: endocarditis, myocarditis, pericarditis (F,F)<br>• Congenital heart disease (F,F)<br>• Hypertrophic cardiomyopathy (F,F)<br>• Other cardiovascular disorders to be determined locally (S,S) |
| | **Disorders of the Eyes, Ears, Nose, and Throat**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Epistaxis (S,S) | • Epistaxis (S,S)<br>• Other eye, ear, nose and throat disorders to be determined locally (S,S) | • Epistaxis (F,F)<br>• Post-surgical oropharyngeal hemorrhage (F,F)<br>• Other eye, ear, nose and throat disorders to be determined locally (S,S) | • Epistaxis (F,F)<br>• Post-surgical oropharyngeal hemorrhage (F,F)<br>• Common or major diseases of the eyes, ears, nose and throat (F,F)<br>• Other eye, ear, nose and throat disorders to be determined locally (S,S) |

AR001319

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Medicine** | **Endocrine Disorders**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Awareness that diabetic emergencies cause altered mental status (S,S) | • Diabetic emergencies (F,F)<br>• Other endocrine disorders to be determined locally (S,S) | • Diabetic emergencies (C,F)<br>• Other endocrine disorders to be determined locally (S,S) | • Diabetic emergencies (C,C)<br>• Chronic diabetes (C,C)<br>• Adrenal disease (S,S)<br>• Pituitary and thyroid disorders (S,S)<br>• Inborn errors of metabolism (S,S)<br>• Other endocrine disorders to be determined locally (S,S) |
| | **Genitourinary/Renal**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Blood pressure assessment in hemodialysis patients (S,S) | • Complications related to renal dialysis (S,S)<br>• Complications related to urinary catheter management (not insertion) (S,S)<br>• Kidney stones (S,S)<br>• Sexual assault (Female and Male) (F,F)<br>• Other GI/Renal to be determined locally (S,S) | • Complications related to renal dialysis (F,S)<br>• Complications related to urinary catheter management (not insertion) (S,S)<br>• Kidney stones (F,S)<br>• Sexual assault (Female and Male) (F,F)<br>• Other GI/Renal to be determined locally (S,S) | • Complications of dialysis (C,C)<br>• Complications related to urinary catheter management (not insertion) (S,S)<br>• Renal calculi (C,C)<br>• Sexual assault (Female and Male) (C,C)<br>• Acute/chronic renal failure (C,C)<br>• Acid base disturbances (C,C)<br>• Fluid and electrolytes (C,C)<br>• Infection (F,F)<br>• Male genital tract conditions (F,F)<br>• Other GI/Renal to be determined locally (S,S) |
| | **Hematology**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | No knowledge related to this competency is applicable at this level. | • Sickle cell crisis (S,S)<br>• Clotting disorders (S,S)<br>• Other hematologic disorders to be determined locally (S,S) | • Sickle cell crisis (F,F)<br>• Clotting disorders (S,S)<br>• Other hematologic disorders to be determined locally (S,S) | • Sickle cell disease (C,C)<br>• Coagulopathies (F,F)<br>• Blood transfusion complications (F,F)<br>• Hemostatic disorders (F,F)<br>• Red blood cell disorders (F,F)<br>• White blood cell disorders (F,F)<br>• Other hematologic disorders to be determined locally (S,S) |

AR001320

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Medicine** | **Immunology**<br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/ or emergencies associated with pediatric and geriatric patients) | • Anaphylactic reactions (S,S) | • Allergic and anaphylactic reactions (F,F)<br>• Other immunological disorders to be determined locally (S,S) | • Allergic and anaphylactic reactions (C,C)<br>• Systemic Inflammatory Response Syndrome (SIRS) (C,C)<br>• Other immunological disorders to be determined locally (S,S) | • Allergic and anaphylactic reactions (C,C)<br>• Systemic Inflammatory Response Syndrome (SIRS) (C,C)<br>• Hypersensitivity (C,C)<br>• Anaphylactoid reactions (C,C)<br>• Collagen vascular disease (F,F)<br>• Transplant-related problems (F,F)<br>• Immunodeficiency syndromes (acquired or congenital) (F,F)<br>• Other immunological disorders to be determined locally (S,S) |
| | **Infectious Diseases**<br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/ or emergencies associated with pediatric and geriatric patients) | • Awareness of patient who may have an infectious disease (S,S)<br>• How to disinfect and decontaminate equipment after treating a patient (S,S) | • Assessment and management of a patient who may have an infectious disease (S,S)<br>• How to decontaminate the ambulance and equipment after treating a patient (S,S)<br>• Sepsis and septic shock (S,S)<br>• Other infectious diseases to be determined locally (S,S) | • Assessment and management of a patient who may have an infectious disease (S,S)<br>• How to decontaminate the ambulance and equipment after treating a patient (S,S)<br>• Sepsis and septic shock (F,F)<br>• HIV (F,F)<br>• Hepatitis B (F,F)<br>• Antibiotic resistance (F,F)<br>• Current infectious diseases prevalent in the community (F,F)<br>• Vaccine-preventable diseases (F,F)<br>• Other infectious diseases to be determined locally (S,S) | • Assessment and management of a patient who may have an infectious disease (S,S)<br>• How to decontaminate the ambulance and equipment after treating a patient (S,S)<br>• Sepsis and septic shock (C,C)<br>• HIV-related disease (C,C)<br>• Hepatitis (C,C)<br>• Meningitis (C,C)<br>• Antibiotic resistance (F,F)<br>• Current infectious diseases prevalent in the community (F,F)<br>• Vaccine-preventable diseases (C,C)<br>• Viral diseases: RSV, Herpes zoster (F,F)<br>• Sexually transmitted infections (F,F)<br>• Tetanus (S,S)<br>• Vector-borne diseases (S,S)<br>• Tuberculosis (S,S)<br>• Emerging infectious disease (S,S)<br>• Other infectious diseases to be determined locally (S,S) |

AR001321

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Medicine** | **Neurology**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/ or emergencies associated with pediatric and geriatric patients) | • Decreased level of responsiveness (S,S)<br>• Seizure (S,S)<br>• Stroke (S,S) | • Decreased level of responsiveness (S,S)<br>• Seizure (F,F)<br>• Stroke (F,F)<br>• Dementia vs. delirium (S,S)<br>• Alzheimer's disease (S,S)<br>• Headache (F,F)<br>• Brief Resolved Unexplained Event (BRUE) (F,F)<br>• Other neurological disorders to be determined locally (S,S) | • Decreased level of responsiveness (F,F)<br>• Seizure (C,F)<br>• Stroke (F,F)<br>• Dementia vs. delirium (S,S)<br>• Alzheimer's disease (S,S)<br>• Headache (F,F)<br>• Brief Resolved Unexplained Event (BRUE) (F,F)<br>• Parkinson's disease (S,S)<br>• Other neurological disorders to be determined locally (S,S) | • Decreased level of responsiveness (C,C)<br>• Seizure (C,C)<br>• Stroke (C,C)<br>• Dementia vs. delirium (S,S)<br>• Alzheimer's disease (S,S)<br>• Headache (C,C)<br>• Brief Resolved Unexplained Event (BRUE) (F,F)<br>• Parkinson's disease (S,S)<br>• Hydrocephalus – CSF diversion devices or shunts (F,F)<br>• Other neurological disorders to be determined locally (S,S) |
| | **Non-Traumatic Musculoskeletal Disorders**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/ or emergencies associated with pediatric and geriatric patients) | • Non-traumatic fractures (S,S) | • Non-traumatic fractures (F,F)<br>• Other non-traumatic musculoskeletal disorders to be determined locally (S,S) | • Non-traumatic fractures (F,F)<br>• Other non-traumatic musculoskeletal disorders to be determined locally (S,S) | • Non-traumatic fractures (F,F)<br>• Disorders of the spine (F,F)<br>• Joint abnormalities (F,F)<br>• Muscle abnormalities (F,F)<br>• Overuse syndromes (F,F)<br>• Rhabdomyolysis (F,F)<br>• Other non-traumatic musculoskeletal disorders to be determined locally (S,S) |

AR001322

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Medicine** | **Psychiatric or Behavioral Emergencies**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/ or emergencies associated with pediatric and geriatric patients) | • Recognition of behaviors that pose a risk to the EMR, patient or others<br>• Recognition of suicide risk | • Basic principles of the mental health system (S,S)<br>• Patterns of violence, abuse and neglect (S,S)<br>• Acute psychosis (F,F)<br>• Suicide ideation (F,F)<br>• Excited delirium (F,F)<br>• Anxiety (F,F)<br>• Depression (F,F)<br>• Medical fear (F,F)<br>• Substance use disorder (F,F)<br>• PTSD (F,F)<br>• Other psychiatric/behavioral disorders to be determined locally (S,S) | • Basic principles of the mental health system (S,S)<br>• Patterns of violence, abuse and neglect (F,F)<br>• Acute psychosis (F,F)<br>• Suicide ideation (C,C)<br>• Excited delirium (F,F)<br>• Anxiety (F,F)<br>• Depression (F,F)<br>• Medical fear (F,F)<br>• Substance use disorder/ addictive behavior (C,C)<br>• PTSD (F,F)<br>• Other psychiatric/behavioral disorders to be determined locally (S,S) | • Basic principles of the mental health system (S,S)<br>• Patterns of violence, abuse and neglect (C,C)<br>• Suicide ideation (C,C)<br>• Excited delirium (C,C)<br>• Anxiety (C,C)<br>• Depression (C,C)<br>• Medical fear (F,F)<br>• Substance use disorder/ addictive behavior (C,C)<br>• PTSD (C,C)<br>• Acute psychosis (C,C)<br>• Cognitive disorders (F,F)<br>• Thought disorders (F,F)<br>• Mood disorders (F,F)<br>• Neurotic disorders (F,F)<br>• Somatoform disorders (F,F)<br>• Factitious disorders (F,F)<br>• Personality disorders (F,F)<br>• Other psychiatric/behavior disorders to be determined locally (S,S) |

AR001323

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Medicine** | **Respiratory**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Respiratory distress/failure/arrest (F,F)<br>• Upper airway obstruction (S,S)<br>• Lower airway disease: Asthma, bronchiolitis, pneumonia, chronic obstructive pulmonary disease (COPD) (S,S) | • Respiratory distress/failure/arrest (F,F)<br>• Upper airway obstruction (F,F)<br>• Lower airway disease: Asthma, bronchiolitis, pneumonia, chronic obstructive pulmonary disease (COPD) (F,F)<br>• Spontaneous pneumothorax (F,F)<br>• Pulmonary edema (F,F)<br>• Other respiratory disorders to be determined locally (S,S) | • Respiratory distress/failure/arrest (F,F)<br>• Upper airway diseases: foreign body, croup, epiglottitis (C,F)<br>• Lower airway disease: Asthma, bronchiolitis, pneumonia, chronic obstructive pulmonary disease (COPD) (C,F)<br>• Spontaneous pneumothorax (F,F)<br>• Pulmonary edema (C,F)<br>• Other respiratory disorders to be determined locally (S,S) | • Respiratory distress/failure/arrest (F,F)<br>• Upper airway diseases: foreign body, croup, epiglottitis (C,C)<br>• Lower airway disease: Asthma, bronchiolitis, pneumonia, chronic obstructive pulmonary disease (COPD), bronchopulmonary dysplasia (C,C)<br>• Spontaneous pneumothorax (C,C)<br>• Pulmonary edema (C,C)<br>• Other respiratory disorders to be determined locally (S,S) |
| | **Toxicology**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Carbon monoxide poisoning (S,S)<br>• Nerve agent poisoning (S,S)<br>• Opioid toxicity (S,S)<br>• How and when to contact a poison control center (S,S) | • Carbon monoxide poisoning (S,S)<br>• Nerve agent poisoning (S,S)<br>• Opioid toxicity (S,S)<br>• How and when to contact a poison control center (S,S)<br>• Poisons (inhaled, ingested, injected, absorbed) (F,F)<br>• Alcohol intoxication and withdrawal (F,F)<br>• Other toxicological disorders to be determined locally (S,S) | • Carbon monoxide poisoning (S,S)<br>• Nerve agent poisoning (S,S)<br>• Opioid toxicity (F,F)<br>• How and when to contact a poison control center (S,S)<br>• Poisons (inhaled, ingested, injected, absorbed) (F,F)<br>• Alcohol intoxication and withdrawal (F,F)<br>• Other toxicological disorders to be determined locally (S,S) | • Carbon monoxide poisoning (C,C)<br>• Nerve agent poisoning (S,S)<br>• Opioid toxicity (F,F)<br>• How and when to contact a poison control center (S,S)<br>• Poisons (inhaled, ingested, injected, absorbed) (F,F)<br>• Alcohol intoxication and withdrawal (C,C)<br>• Toxidromes (C,C)<br>  - Cholinergic<br>  - Anticholinergic<br>  - Sympathomimetic<br>  - Sedative/hypnotics<br>  - Opioid<br>  - Corrosive<br>  - Knockdown<br>• Chronic or maintenance medications (C,C)<br>• Drugs of abuse (C,C)<br>• Non-FDA approved medications and supplements (C,C)<br>• Serotonin Syndrome (C,C)<br>• Malignant Hyperthermia (C,C)<br>• Other toxicological disorders to be determined locally (S,S) |

AR001324

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Shock and Resuscitation** | **Shock and Resuscitation** | Uses assessment information to recognize shock, respiratory failure or arrest, and cardiac arrest based on assessment findings and manages the emergency while awaiting additional emergency response. | Applies knowledge of the causes, pathophysiology and management of shock, respiratory failure or arrest, cardiac failure or arrest, termination of resuscitative efforts and post resuscitation management. | Applies knowledge to provide basic and selected advanced emergency care and transportation based on assessment findings for a patient in shock, respiratory failure or arrest, cardiac failure or arrest, termination of resuscitative efforts and post resuscitation management. | Integrates knowledge of causes and pathophysiology into the management of cardiac arrest and peri-arrest states. |
| | Shock<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for pediatric and geriatric patients) | • Definition (S,S)<br>• Physiologic response (S,S) | • Essential components in normal perfusion (F,S)<br>• Physiologic response (S,S)<br>• Types of shock (S,S)<br>• Treatment of shock (S,S) | • Essential components in normal perfusion (F,F)<br>• Physiologic response (F,F)<br>• Types of shock (F,F)<br>• Treatment of shock, hypoperfusion and dehydration (C,C)<br>• Complications of shock (F,F)<br>• Circulatory assist devices (F,F) | • Essential components in normal perfusion (C,C)<br>• Physiologic response (C,C)<br>• Types of shock (C,C)<br>• Treatment of shock, hypoperfusion and dehydration (C,C)<br>• Complications of shock (C,C)<br>• Circulatory assist devices (C,C) |
| | Resuscitation from Cardiac Arrest<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for pediatric and geriatric patients) | • Ethical issues in resuscitation (S,S)<br>• CPR physiology (S,S)<br>• Resuscitation system components (S,S)<br>• Special arrest and peri-arrest situations (S,S) | • Ethical issues in resuscitation (C,C)<br>• CPR physiology (F,F)<br>• Resuscitation system components (F,F)<br>• Special arrest and peri-arrest situations (F,F)<br>• Postresuscitation support (F,F)<br>• Termination of resuscitation (F,F) | • Ethical issues in resuscitation (C,C)<br>• CPR physiology (F,F)<br>• Resuscitation system components (F,F)<br>• Special arrest and peri-arrest situations (F,F)<br>• Postresuscitation support (C,C)<br>• Termination of resuscitation (C,C) | • Ethical issues in resuscitation (C,C)<br>• CPR physiology (C,C)<br>• Resuscitation system components (C,C)<br>• Special arrest and peri-arrest situations (C,C)<br>• Postresuscitation support (C,C)<br>• Termination of resuscitation (C,C)<br>• Premorbid conditions (C,C) |

AR001325

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Trauma** | **Trauma** | Uses knowledge to recognize and manage life threats based on assessment findings for an acutely injured patient while awaiting additional emergency medical response. | Applies knowledge to provide basic emergency care and transportation based on assessment findings for an acutely injured patient. | Applies knowledge to provide basic and selected advanced emergency care and transportation based on assessment findings for an acutely injured patient. | Integrates assessment findings with principles of epidemiology and pathophysiology to formulate a field impression to implement a treatment/disposition plan for an acutely injured patient. |
| | Trauma Overview<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | No knowledge related to this competency is applicable at this level. | • Trauma scoring (F,F)<br>• Transport and destination issues (F,F)<br>• Transport mode (F,F) | • Trauma scoring (F,F)<br>• Transport and destination issues (F,F)<br>• Transport mode (F,F) | • Trauma scoring (C,C)<br>• Transport and destination issues (C,C)<br>• Transport mode (F,F) |
| | Abdominal and Genitourinary Trauma<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Blunt versus penetrating mechanisms (S,S)<br>• Evisceration (S,S)<br>• Impaled object (S,S) | • Blunt versus penetrating mechanisms (F,S)<br>• Evisceration (S,S)<br>• Impaled object (S,S)<br>• Solid and hollow organ injuries (F,S)<br>• Injuries to the internal or external genitalia (F,S) | • Blunt versus penetrating mechanisms (F,F)<br>• Evisceration (S,S)<br>• Impaled object (S,S)<br>• Solid and hollow organ injuries (F,F)<br>• Injuries to the internal or external genitalia (F,F)<br>• Vascular injury (F,F)<br>• Retroperitoneal injuries (F,F) | • Blunt versus penetrating mechanisms (F,F)<br>• Evisceration (S,S)<br>• Impaled object (S,S)<br>• Solid and hollow organ injuries (F,F)<br>• Injuries to the internal or external genitalia (F,F)<br>• Vascular injury (F,F)<br>• Retroperitoneal injuries (F,F) |
| | Bleeding<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Bleeding (S,S) | • Bleeding (F,F) | • Bleeding (F,F)<br>• Fluid resuscitation (C,C) | • Bleeding (F,F)<br>• Fluid resuscitation (C,C) |

AR001326

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Chest Trauma**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Blunt versus penetrating mechanisms (S,S)<br>• Open chest wound (S,S)<br>• Impaled object (S,S) | • Blunt versus penetrating mechanisms (F,S)<br>• Open chest wound (S,S)<br>• Impaled object (S,S)<br>• Hemothorax (F,S)<br>• Pneumothorax (F,S)<br>• Cardiac tamponade (F,S)<br>• Rib fractures (F,S)<br>• Flail chest (F,S)<br>• Commotio cordis (F,S) | • Blunt versus penetrating mechanisms (F,S)<br>• Open chest wound (S,S)<br>• Impaled object (S,S)<br>• Hemothorax (F,F)<br>• Pneumothorax (F,F)<br>• Cardiac tamponade (F,F)<br>• Rib fractures (F,F)<br>• Flail chest (F,F)<br>• Commotio cordis (F,S)<br>• Traumatic aortic disruption (F,F)<br>• Pulmonary contusion (F,F)<br>• Blunt cardiac injury (F,F)<br>• Traumatic asphyxia (F,F) | • Blunt versus penetrating mechanisms (F,S)<br>• Open chest wound (S,S)<br>• Impaled object (S,S)<br>• Hemothorax (C,C)<br>• Pneumothorax (C,C)<br>• Cardiac tamponade (C,C)<br>• Rib fractures (C,C)<br>• Flail chest (C,C)<br>• Commotio cordis (F,S)<br>• Traumatic aortic disruption (C,C)<br>• Pulmonary contusion (C,C)<br>• Blunt cardiac injury (C,C)<br>• Traumatic asphyxia (C,C)<br>• Tracheobronchial disruption (C,C)<br>• Diaphragmatic rupture (C,C) |
| **Environmental Emergencies**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Drowning (S,S)<br>• Temperature-related illness (S,S)<br>• Bites and envenomations (S,S)<br>• Lightning injury (S,S)<br>• Other environmental emergencies to be determined locally (S,S) | • Drowning (F,F)<br>• Temperature-related illness (F,F)<br>• Bites and envenomations (F,F)<br>• Lightning injury (F,F)<br>• Other environmental emergencies to be determined locally (S,S) | • Drowning (F,F)<br>• Temperature-related illness (F,F)<br>• Bites and envenomations (F,F)<br>• Lightning injury (F,F)<br>• Other environmental emergencies to be determined locally (S,S) | • Drowning (C,C)<br>• Temperature-related illness (C,C)<br>• Bites and envenomations (C,C)<br>• Lightning injury (C,C)<br>• Other environmental emergencies to be determined locally (S,S) |

*Trauma*

AR001327

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Trauma** | **Head, Facial, Neck, and Spine Trauma**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Life threats (S,S)<br>• Spine trauma (S,S) | • Life threats (S,S)<br>• Spine trauma (F,F)<br>• Penetrating neck trauma (F,F)<br>• Laryngotracheal injuries (F,F)<br>• Shaken Baby Syndrome (F,F)<br>• Facial fractures (S,S)<br>• Skull fractures (S,S)<br>• Foreign bodies in the eyes (S,S)<br>• Globe rupture (S,S)<br>• Dental trauma (S,S)<br>• Severe epistaxis (S,S) | • Life threats (S,S)<br>• Spine trauma (F,F)<br>• Penetrating neck trauma (F,F)<br>• Laryngotracheal injuries (C,F)<br>• Shaken Baby Syndrome (F,F)<br>• Facial fractures (C,F)<br>• Skull fractures (S,S)<br>• Foreign bodies in the eyes (S,S)<br>• Globe rupture (S,S)<br>• Dental trauma (S,S)<br>• Severe epistaxis (S,S) | • Life threats (S,S)<br>• Spine trauma (C,C)<br>• Penetrating neck trauma (C,C)<br>• Laryngotracheal injuries (C,C)<br>• Shaken Baby Syndrome (F,F)<br>• Facial fractures (C,F)<br>• Skull fractures (C,C)<br>• Foreign bodies in the eyes (S,S)<br>• Globe rupture (S,S)<br>• Dental trauma (S,S)<br>• Severe epistaxis (S,S)<br>• Unstable facial fractures (F,F)<br>• Orbital fractures (F,F)<br>• Perforated tympanic membrane (F,F)<br>• Mandibular fractures (C,C) |
| | **Multi-System Trauma**<br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Multi-system trauma (S,S) | • Multi-system trauma (F,F)<br>• Blast injuries (F,F) | • Multi-system trauma (C,F)<br>• Blast injuries (F,F) | • Multi-system trauma (C,C)<br>• Blast injuries (C,C) |
| | **Nervous System Trauma**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Traumatic brain injury (S,S) | • Traumatic brain injury (F,F)<br>• Spinal cord injury (F,F) | • Traumatic brain injury (C,F)<br>• Spinal cord injury (F,F) | • Traumatic brain injury (C,C)<br>• Spinal cord injury (C,C)<br>• Spinal shock (C,C)<br>• Cauda equina syndrome (F,F)<br>• Nerve root injury (F,F)<br>• Peripheral nerve injury (F,F) |

AR001328

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Trauma** | **Orthopedic Trauma**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Open fractures (S,S)<br>• Closed fractures (S,S)<br>• Dislocations (S,S)<br>• Amputations (S,S) | • Open fractures (F,F)<br>• Closed fractures (F,F)<br>• Dislocations (F,F)<br>• Amputations/replantation (F,F)<br>• Upper and lower extremity orthopedic trauma (F,F)<br>• Sprains/strains (F,F)<br>• Pelvic fractures (F,F) | • Open fractures (F,F)<br>• Closed fractures (F,F)<br>• Dislocations (F,F)<br>• Amputations/replantation (C,F)<br>• Upper and lower extremity orthopedic trauma (F,F)<br>• Sprains/strains (F,F)<br>• Pelvic fractures (C,F) | • Open fractures (C,C)<br>• Closed fractures (C,C)<br>• Dislocations (C,C)<br>• Amputations/replantation (C,F)<br>• Upper and lower extremity orthopedic trauma (C,C)<br>• Sprains/strains (F,F)<br>• Pelvic fractures (C,F)<br>• Pediatric fractures (F,F)<br>• Tendon laceration/ transection/ rupture (Achilles and patellar) (F,F) |
| | **Soft Tissue Trauma**<br><br>(Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Wounds (avulsion, bite, laceration, puncture, incision) (S,S)<br>• Burns (electrical, chemical, thermal) including inhalation injury (S,S)<br>• Chemicals in the eye and on the skin (S,S) | • Wounds (avulsion, bite, laceration, puncture, incision) (F,F)<br>• Burns (electrical, chemical, thermal, radiation) including inhalation injury (F,F)<br>• Chemicals in the eye and on the skin (S,S)<br>• Crush/compartment syndrome (S,S)<br>• High-pressure injection injury (S,S) | • Wounds (avulsion, bite, laceration, puncture, incision) (F,F)<br>• Burns (electrical, chemical, thermal, radiation) including inhalation injury (F,F)<br>• Chemicals in the eye and on the skin (S,S)<br>• Crush/compartment syndrome (F,S)<br>• High-pressure injection injury (S,S) | • Wounds (avulsion, bite, laceration, puncture, incision) (C,C)<br>• Burns (electrical, chemical, thermal, radiation) including inhalation injury (C,C)<br>• Chemicals in the eye and on the skin (S,S)<br>• Crush/compartment syndrome (C,C)<br>• High-pressure injection injury (S,S) |
| | **Special Considerations in Trauma** | • Pregnant patient (S,S)<br>• Pediatric patient (S,S)<br>• Geriatric patient (S,S) | • Pregnant patient (F,F)<br>• Pediatric patient (F,F)<br>• Geriatric patient (F,F)<br>• Cognitively impaired patient (F,F) | • Pregnant patient (C,F)<br>• Pediatric patient (C,F)<br>• Geriatric patient (C,F)<br>• Cognitively impaired patient (C,F) | • Pregnant patient (C,C)<br>• Pediatric patient (C,C)<br>• Geriatric patient (C,C)<br>• Cognitively impaired patient (C,C) |

AR001329

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Special Patient Populations** | **Special Patient Populations** | Recognizes and manages life threats based on simple assessment findings for a patient with special needs while awaiting additional emergency response. | Applies knowledge of growth, development and aging and assessment findings to provide basic emergency care and transportation for a patient with special needs. | Applies knowledge of growth, development and aging and assessment findings to provide basic and selected advanced emergency care and transportation for a patient with special needs. | Integrates assessment findings with principles of pathophysiology and knowledge of psychosocial needs to formulate a field impression and implement a treatment/disposition plan for patients with special needs. |
| | Gynecology (Include psychosocial aspects of age-related assessment and treatment modifications for the major or common diseases and/or emergencies associated with pediatric and geriatric patients) | • Shock associated with vaginal bleeding (S,S) | • Vaginal bleeding (F,F)<br>• Infections (S,S)<br>• Other gynecological disorders to be determined locally (S,S) | • Vaginal bleeding (F,F)<br>• Infections (S,S)<br>• Other gynecological disorders to be determined locally (S,S) | • Vaginal bleeding (C,C)<br>• Infections (F,F)<br>• Ovarian emergencies (F,F)<br>• Vaginal foreign body (F,F)<br>• Other gynecological disorders to be determined locally (S,S) |
| | Obstetrics | • Normal delivery (S,S)<br>• Vaginal bleeding in the pregnant patient (S,S) | • Normal delivery (F,F)<br>• Vaginal bleeding in the pregnant patient (S,S)<br>• Normal pregnancy (anatomy and physiology) (F,F)<br>• Pathophysiology of complications of pregnancy (F,F)<br>• Assessment of the pregnant patient (F,F)<br>• Abnormal delivery (nuchal cord, prolapsed cord, breech, shoulder dystocia, prematurity, multiparity) (F,F)<br>• Third trimester and antepartum bleeding (placenta previa. placental abruption) (F,F)<br>• Spontaneous abortion/miscarriage (F,F)<br>• Ectopic pregnancy (F,F)<br>• Preeclampsia/eclampsia (F,F)<br>• Postpartum complications (S,S) | • Normal delivery (F,F)<br>• Vaginal bleeding in the pregnant patient (S,S)<br>• Normal pregnancy (anatomy and physiology) (F,F)<br>• Pathophysiology of complications of pregnancy (F,F)<br>• Assessment of the pregnant patient (F,F)<br>• Abnormal delivery (nuchal cord, prolapsed cord, breech, shoulder dystocia, prematurity, multiparity) (F,F)<br>• Third trimester and antepartum bleeding (placenta previa. placental abruption) (F,F)<br>• Spontaneous abortion/miscarriage (F,F)<br>• Ectopic pregnancy (F,F)<br>• Preeclampsia/eclampsia (F,F)<br>• Postpartum complications (C,C) | • Normal delivery (C,C)<br>• Vaginal bleeding in the pregnant patient (S,S)<br>• Normal pregnancy (anatomy and physiology) (C,C)<br>• Pathophysiology of complications of pregnancy (C,C)<br>• Assessment of the pregnant patient (C,C)<br>• Abnormal delivery (nuchal cord, prolapsed cord, breech, shoulder dystocia, prematurity, multiparity) (C,C)<br>• Third trimester and antepartum bleeding (placenta previa. placental abruption) (F,F)<br>• Spontaneous abortion/miscarriage (C,C)<br>• Ectopic pregnancy (C,C)<br>• Preeclampsia/eclampsia (C,C)<br>• Postpartum complications (C,C)<br>• High-risk pregnancy (C,C)<br>• Complications of labor (fetal distress, premature rupture of membranes, rupture of uterus) (C,C)<br>• Hyperemesis gravidarum (S,S)<br>• Postpartum depression (S,S) |

AR001330

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **Special Patient Populations** | Neonatal Care | • Newborn stabilization (S,S)<br>• Neonatal resuscitation (S,S) | • Newborn stabilization (F,F)<br>• Neonatal resuscitation (F,F) | • Newborn stabilization (F,F)<br>• Neonatal resuscitation (F,F) | • Newborn stabilization (C,C)<br>• Neonatal resuscitation (C,C)<br>• Anatomy and physiology of neonatal circulation (C,C) |
| | Pediatrics | The Education Standards now integrate assessment, diagnostic, treatment and disposition modifications for pediatric-specific diseases and emergencies into each section of the document. | | | |
| | Geriatrics | The Education Standards now integrate assessment, diagnostic, treatment and disposition modifications for geriatric-specific diseases and emergencies into each section of the document | | | |
| | Patients with Special Challenges | • Recognizing and reporting abuse and neglect (S,S) | • Recognizing and reporting abuse and neglect (S,S)<br>• Abuse/Intimate partner violence (S,S)<br>• Neglect (S,S)<br>• Child/dependent adult maltreatment (S,S)<br>• Homelessness (S,S)<br>• Poverty (S,S)<br>• Bariatrics (S,S)<br>• Technology dependent (locally determined) (S,S)<br>• Hospice/ terminally ill (S,S)<br>• Tracheostomy care/dysfunction (S,S)<br>• Homecare (S,S)<br>• Sensory deficit/loss (S,S)<br>• Developmental disability (S,S)<br>• Autism Spectrum Disorder (S,S)<br>• Orthotics/prosthetics (S,S) | • Recognizing and reporting abuse and neglect (S,S)<br>• Abuse/Intimate partner violence (F,F)<br>• Neglect (F,F)<br>• Child/dependent adult maltreatment (F,F)<br>• Homelessness (F,F)<br>• Poverty (F,F)<br>• Bariatrics (F,F)<br>• Technology dependent (locally determined) (F,F)<br>• Hospice/ terminally ill (F,F)<br>• Tracheostomy care/dysfunction (F,F)<br>• Homecare (F,F)<br>• Sensory deficit/loss (F,F)<br>• Developmental disability (F,F)<br>• Autism Spectrum Disorder (F,F)<br>• Orthotics/prosthetics (S,S) | • Recognizing and reporting abuse and neglect (S,S)<br>• Abuse/Intimate partner violence (C,C)<br>• Neglect (C,C)<br>• Child/dependent adult maltreatment (C,C)<br>• Homelessness (F,F)<br>• Poverty (C,C)<br>• Bariatrics (C,C)<br>• Technology dependent (vagal nerve stimulators, CSF diversion devices or shunts, VAD, pacemakers, gastric tubes and others to be locally determined) (C,C)<br>• Hospice/ terminally ill (C,C)<br>• Tracheostomy care/dysfunction (C,C)<br>• Homecare (F,F)<br>• Sensory deficit/loss (F,F)<br>• Developmental disability (F,F)<br>• Autism Spectrum Disorder (F,F)<br>• Orthotics/prosthetics (S,S) |

AR001331

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **EMS Operations** | **EMS Operations** | Knowledge of operational roles and responsibilities to ensure patient, public and personnel safety | Same as EMR Level | Same as EMR Level | Same as EMR Level |
| | Emergency Response Vehicles | • Risks and responsibilities of emergency response and radio communications (S,S)<br>• Risks and responsibilities of operating emergency vehicles (S,S) | • Risks and responsibilities of emergency response and radio communications (S,S)<br>• Risks and responsibilities of operating emergency vehicles (S,S)<br>• Pediatric transport considerations (F,F)<br>• Risks and responsibilities of transport (F,F) | • Risks and responsibilities of emergency response and radio communications (S,S)<br>• Risks and responsibilities of operating emergency vehicles (S,S)<br>• Pediatric transport considerations (F,F)<br>• Risks and responsibilities of transport (F,F) | • Risks and responsibilities of emergency response and radio communications (S,S)<br>• Risks and responsibilities of operating emergency vehicles (S,S)<br>• Pediatric transport considerations (F,F)<br>• Risks and responsibilities of transport (F,F) |
| | Incident Management<br><br>(The extent of information presented in this area will vary at the regional and local level.) | • Establish and work within the incident management system (S,S) | • Establish and work within the incident management system (F,F)<br>• Understand the principles of Crew Resource Management (F,F) | • Establish and work within the incident management system (F,F)<br>• Understand the principles of Crew Resource Management (F,F) | • Establish and work within the incident management system (F,F)<br>• Understand the principles of Crew Resource Management (F,F) |
| | Multiple Casualty Incidents<br><br>(The extent of information presented in this area will vary at the regional and local level.) | • Operational goals (F,F)<br>• Field triage (F,F) | • Operational goals (F,F)<br>• Field triage (F,F)<br>• Destination determination (F,F)<br>• Treatment principles (F,F) | • Operational goals (F,F)<br>• Field triage (F,F)<br>• Destination determination (F,F)<br>• Treatment principles (F,F) | • Operational goals (F,F)<br>• Field triage (F,F)<br>• Destination determination (F,F)<br>• Treatment principles (F,F) |
| | Air Medical<br><br>(The extent of information presented in this area will vary at the regional and local level.) | • Safe air medical operations (S,S)<br>• Criteria for utilizing air medical response (S,S)<br>• Medical risks/needs/advantages (S,S) | • Safe air medical operations (S,S)<br>• Criteria for utilizing air medical response (S,S)<br>• Medical risks/needs/advantages (F,F) | • Safe air medical operations (S,S)<br>• Criteria for utilizing air medical response (S,S)<br>• Medical risks/needs/advantages (F,F) | • Safe air medical operations (S,S)<br>• Criteria for utilizing air medical response (S,S)<br>• Medical risks/needs/advantages (F,F) |

AR001332

| | | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|---|
| **EMS Operations** | **Rescue Operations**<br><br>(The extent of information presented in this area will vary at the regional and local level.) | • Safety principles of rescue operations (S,S) | • Safety principles of rescue operations (S,S) | • Safety principles of rescue operations (S,S) | • Safety principles of rescue operations (S,S) |
| | **Hazardous Materials**<br><br>(The extent of information presented in this area will vary at the regional and local level.) | • Risks and responsibilities of operating on the scene of a hazardous materials incident (S,S) | • Risks and responsibilities of operating on the scene of a hazardous materials incident (S,S) | • Risks and responsibilities of operating on the scene of a hazardous materials incident (S,S) | • Risks and responsibilities of operating on the scene of a hazardous materials incident (S,S) |
| | **Mass Casualty Incidents due to Terrorism and Disaster**<br><br>(The extent of information presented in this area will vary at the regional and local level.) | • Risks and responsibilities of operating on the scene of a natural or man-made disaster (F,F) | • Risks and responsibilities of operating on the scene of a natural or man-made disaster (F,F) | • Risks and responsibilities of operating on the scene of a natural or man-made disaster (F,F) | • Risks and responsibilities of operating on the scene of a natural or man-made disaster (F,F) |

AR001333

# Clinical Behavior/Judgment

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Assessment** | • Perform a simple assessment to identify life threats, identify injuries requiring spinal motion restriction and conditions requiring treatment within the scope of practice of the EMR: | • Perform a basic history and physical examination to identify acute complaints and monitor changes.<br>• Formulate a field diagnosis based upon an actual and/or potential illness or injury. | • Perform a basic history and physical examination to identify acute complaints and monitor changes.<br>• Formulate a field diagnosis based upon an actual and/or potential illness or injury. | • Perform a comprehensive history and physical examination to identify factors affecting the health and health needs of a patient.<br>• Relate assessment findings to underlying pathological and physiological changes in the patient's condition.<br>• Integrate and synthesize the multiple determinants of health and clinical care.<br>• Formulate a field diagnosis based on an analysis of comprehensive assessment findings, anatomy, physiology, pathophysiology and epidemiology.<br>• Perform health screening and referrals. |
| **Therapeutic Communication and Cultural Humility** | • Effectively communicates in a non-discriminatory manner that addresses inherent or unconscious bias, is culturally aware and sensitive, and intended to improve patient outcome. | | | |
| **Psychomotor Skills** | • Safely and effectively perform all psychomotor skills within the *National EMS Scope of Practice Model* AND state Scope of Practice at this level. | | | |

AR001334

# Clinical Behavior/Judgment

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Professionalism** | Demonstrate professional affective domain behaviors including but not limited to:<br>• Integrity<br>• Empathy/compassion<br>• Self-motivation<br>• Appearance/personal hygiene<br>• Self-confidence<br>• Communications<br>• Time management<br>• Teamwork/diplomacy<br>• Respect<br>• Patient advocacy<br>• Careful delivery of service<br>• Lifelong learning | | | Is a role model of exemplary professional affective domain behaviors including but not limited to:<br>• Integrity<br>• Empathy/compassion<br>• Self-motivation<br>• Appearance/personal hygiene<br>• Self-confidence<br>• Communications<br>• Time management<br>• Teamwork/diplomacy<br>• Respect<br>• Patient advocacy<br>• Careful delivery of service<br>• Lifelong learning |
| **Decision Making** | • Initiates simple interventions based on assessment findings. | • Initiates interventions based on assessment findings intended to provide symptom relief (within the provider's scope of practice) while providing access to definitive care<br>• Evaluates the effectiveness of interventions and modifies treatment plan accordingly. | | • Performs interventions as part of a treatment plan intended to provide symptom relief and improve the overall health of the patient.<br>• Evaluates the effectiveness of interventions and modifies treatment plan accordingly.<br>• Evaluates decision making strategy for cognitive errors to enhance future critical thinking skills (metacognition) |
| **Record Keeping** | • Report and document assessment findings and interventions performed. | • Report and document assessment findings, interventions performed, and clinical decision making | | |
| **Team Dynamics** | • Manage the scene until care is transferred to an EMS team member licensed at a higher level arrives. | • The entry-level clinician serves as a team member, while gaining the experience necessary to function as the team leader. | | |
| **Safety** | • Ensure the safety of the rescuer, other public safety personnel, civilians and the patient. | | | |

AR001335

## Educational Infrastructure

| | EMR | EMT | AEMT[2] | Paramedic |
|---|---|---|---|---|
| **Educational Facilities** | • Facility sponsored or approved by sponsoring agency<br>• Sponsoring agency commitment to diversity, equity and inclusion<br>• ADA compliant facility<br>• Sufficient space for class size<br>• Controlled environment | | | Reference Committee on Accreditation for EMS Professions (CoAEMSP) Standards and Guidelines (www.coaemsp.org)[1] |
| **Student Space** | • Provide space sufficient for students to attend classroom sessions, take notes, and participate in classroom activities<br>• Provide space for students to participate in kinematic learning and practice activities | | | |
| **Instructional Resources** | • Provide basic instructional support material<br>• Provide audio, visual, and kinematic aids to support and supplement didactic instruction | | | |
| **Instructor Preparation Resources** | • Provide space for instructor preparation<br>• Provide support equipment for instructor preparation | | | |
| **Storage Space** | • Provide adequate and secure storage space for instructional materials | | | |

[1] *The National EMS Education Agenda for the Future*: A Systems Approach (2000) calls for national accreditation of Paramedic programs. The Commission on Accreditation of Allied Health Education Programs (CAAHEP) accredits programs upon the recommendation of the Committee on Accreditation of Educational Programs for the Emergency Medical Services Professions (CoAEMSP). CAAHEP is the only national agency that offers Paramedic educational programmatic accreditation and is used or recognized by most states. Recognition of national accreditation remains the responsibility of each state.

[2] The 2019 and 2021 updated *National Scope of Practice Model* call for national accreditation of AEMT programs. The target for full implementation of AEMT program accreditation is January 1, 2025. Until that date, AEMT programs should reference the existing infrastructure suggestions within this document. The Commission on Accreditation of Allied Health Education Programs (CAAHEP) accredits programs upon the recommendation of the Committee on Accreditation of Educational Programs for the Emergency Medical Services Professions (CoAEMSP).CAAHEP is the only national agency that offers EMS programmatic accreditation and is used or recognized by most states. Recognition of national accreditation remains the responsibility of each state.

AR001336

## Educational Infrastructure

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Sponsorship** | Sponsoring organizations shall be one of the following:<br>• Accredited educational institution<br>• Public safety organization<br>• Accredited hospital, clinic or medical center, or<br>• Other state approved institution or organization | | | Reference Committee on Accreditation for EMS Professions (CoAEMSP) Standards and Guidelines (www. coaemsp.org)[1] |
| **Programmatic Approval** | • Sponsoring organization shall have programmatic approval by authority having jurisdiction for program approval (state) | | | |
| **Faculty** | Course primary instructors should:<br>• Be educated at a level higher than they are teaching; however, as a minimum, they must be educated at the level they are teaching<br>• Have completed an approved instructor training program or equivalent | | | |
| **Medical Director Oversight** | • Provide medical oversight for all medical aspects of instruction | | | |
| **Hospital/Clinical Experience** | • None required at this level | • The student must demonstrate the ability to perform an adequate assessment and implement an adequate treatment plan.<br>  - These can be performed in an emergency department, ambulance, clinic, nursing home, doctor's office, on a standardized patient or in an alternative clinical environment when clinical access is not available. | • The student must demonstrate the ability to perform an adequate assessment and implement an adequate treatment plan. | |

**57**

AR001337

# Educational Infrastructure

| | EMR | EMT | AEMT | Paramedic |
|---|---|---|---|---|
| **Field Experience** | • None required at this level | • The student should participate in and document patient contacts in a field experience in an ambulance, mobile health care experience, or simulated environment when ambulance experience is not available as approved by the medical director and program director. This may occur in an ambulance, ambulance experience, or simulated environment when ambulance experiences are not available. | • The student must participate in and document both patient contacts and team leadership roles in a field experience approved by the medical director and program director. | Reference Committee on Accreditation for EMS Professions (CoAEMSP) Standards and Guidelines (www.coaemsp.org)[1] |
| **Course Length** | • Instructors may use a variety of formats to deliver content including but not limited to:<br>  - Independent student preparation<br>  - Synchronous or asynchronous instruction<br>  - Face-to-face instruction<br>  - Pre- or co-requisites<br>• **Course length should be based on competency, not hours**<br>  - Consensus opinion is that students should need a minimum of 48 didactic and laboratory clock hours to cover the material. | • Instructors may use a variety of formats to deliver content including but not limited to:<br>  - Independent student preparation<br>  - Synchronous or asynchronous instruction<br>  - Face-to-face instruction<br>  - Pre- or co-requisites<br>• **Course length should be based on competency, not hours**<br>  - Consensus opinion is that students should need a minimum of 150 clock hours including the four integrated phases of education (didactic, laboratory, clinical and field) to cover the material | • Instructors may use a variety of formats to deliver content including but not limited to:<br>  - Independent student preparation<br>  - Synchronous or asynchronous instruction<br>  - Face-to-face instruction<br>  - Pre- or co-requisites<br>• **Course length should be based on competency, not hours**<br>  - Consensus opinion is that students should need a minimum of 200 clock hours beyond EMT requirements including the four integrated phases of education (didactic, laboratory, clinical and field) to cover the material | |
| **Course Design** | • Provide the following components of instruction:<br>  - Didactic instruction<br>  - Skills laboratories | • Provide the following components of instruction:<br>  - Didactic instruction<br>  - Skills laboratories<br>  - Hospital/clinical experience<br>  - Field experience | | |
| **Student Assessment** | • Perform knowledge, skill and professional behavior evaluation based on educational standards and program objectives<br>• Provide several methods of assessing achievement<br>• Provide assessment that measures, as a minimum, entry-level competency in all domains | | | |
| **Program Evaluation** | • Provide evaluation of program instructional effectiveness<br>• Provide evaluation of organizational and administrative effectiveness of program | | | |

AR001338

# Glossary

**Academic institution** – Body or establishment instituted for an educational purpose that provides college credit or awards degrees.

**Accreditation** – The granting of approval by an official review board after meeting specific requirements. Typical requisites may cover areas such as program structure, processes, resources and student evaluation. The review board is nongovernmental and the review is collegial and based on self-assessment, peer assessment and judgment. The purpose of accreditation is student protection and public accountability. Additionally, accreditation can provide consistent quality education evaluation for a program's continual improvement and provides for a more consistent and uniform graduate competency.

**Advanced-level care** – Care that has greater potential benefit to the patient, but also greater potential risk to the patient if improperly or inappropriately performed. It is more difficult to attain and maintain competency in and requires significant background knowledge in basic and applied sciences. This level of care includes invasive and pharmacological interventions.

**Affective domain** – Describes learning in terms of feelings/emotions, attitudes and values. Additionally, the affective domain covers many professional behaviors that are required by an EMS clinician to perform his or her role as a health care provider. (NAEMSE, 2020)

**Asynchronous instruction/learning** – An instructional method that allows the learner to use a self-directed and self-paced learning format to move through the content of the course. In this type of instruction, learner-to-learner and learner-to-instructor interactions are independent of time and place. Communications and submission of work typically follow a schedule while learners and instructors do not interact at the same time.

**Certification** – The issuing of a certificate by a private agency based upon deemed competency established through standards adopted by that agency and met by the individual.

**Cognitive domain** – Describes learning that takes place through the process of thinking—it deals with facts and knowledge. (NAEMSE, 2020)

**Competency** – Expected behavior or knowledge to be achieved within a defined area of practice.

**Credential** – Generic term referring to all forms of professional qualification.

**Credentialing** – The umbrella term that includes the concepts of accreditation, licensure, registration and professional certification. Credentialing can establish criteria for fairness, quality, competence, and/or safety for professional services provided by authorized individuals, for products or for educational endeavors. Credentialing is the process by which an entity, authorized and qualified to do so, grants formal recognition to or records the recognition status of individuals, organizations, institutions, programs, processes, services or products that meet predetermined and standardized criteria. (NOCA, 2006)

**Credentialing agency** – An organization that certifies an institution's or individual's authority or claim of competence in a course of study or completion of objectives.

**Curriculum** – A particular course of study, often in a specialized field. For EMS education, it has traditionally included instructional techniques, detailed lesson plans with identified objectives and

AR001339

numerous forms of learner evaluation. Curriculum is developed and adopted at the education program based upon National EMS Education Standards and state and local regulatory requirements. The use of local advisory groups can help tailor education to a local community's needs.

**Didactic** – The instructional theory, the lesson content. (NAEMSE, 2020)

**Distributive education** – A generic term used to describe a variety of learning delivery methods that attempt to accommodate a geographical separation (at least for some of the time) of the instructor and learners. Distributed education includes computer and web-based instruction, distance learning through television or video, web-based seminars, video conferencing and electronic and traditional educational models.

**Domains** – A category of learning. (See Affective domain, Cognitive domain, and Psychomotor domain.) (NAEMSE, 2020)

**Entry-level competence** – The level of competence expected of an individual who is about to begin a career. The minimum competence necessary to practice safely and effectively.

**Health screening** – A test or exam performed to find a condition before symptoms begin. Screening tests may help find diseases or conditions early when they may be easier to treat. (Medline Plus definition)

**Instructional Guidelines** – An emeritus resource document that provided crossover guidance for instructional content within the 2009 National EMS Education Standards.

**Licensure** – The act of granting an entity permission to do something that the entity could not legally do without such permission. Licensing is generally viewed by legislative bodies as a regulatory effort to protect the public from potential harm.

In the health care delivery system, an individual who is licensed tends to enjoy a certain amount of autonomy in delivering health care services. Conversely, the licensed individual must satisfy ongoing requirements that ensure certain minimum levels of expertise. A license is generally considered a privilege, not a right.

**Medical oversight** – Physician review and approval of clinical content and matters relevant to medical authority.

**National EMS Core Content** – The document that defines the domain of out-of-hospital care.

**National EMS Education Program Accreditation** – The accreditation process for institutions that sponsor EMS educational programs.

**National EMS Education Standards** – The document that defines the entry-level terminal knowledge content (depth and breadth), clinical behavior/judgement, and educational infrastructure for each licensure level.

**National EMS Scope of Practice Model** – The document that defines the scope of practice of the various levels of EMS licensure.

**Patient simulation** – An alternative to a human patient to help students improve patient assessment and management skills; a high-fidelity patient simulator provides realistic simulation that responds physiologically to student therapies. These simulators have realistic features such as chests that rise and fall with respirations, pupils that react to light, pulses that can be palpated, etc.

**Post-graduate internship and/or experience** – Experience gained after the student has completed and graduated from school.

AR001340

**Practice analysis** – A study conducted to determine the frequency and criticality of the tasks performed in practice.

**Preceptor** – A clinical teacher or instructor who is responsible for evaluating and ensuring student progress during hospital and field experiences. This individual typically has training to be able to function effectively in the role.

**Primary instructor** – A person who possesses the appropriate academic and/or allied health credentials and understanding of the principles and theories of education, and the required instructional experience necessary to provide quality instruction to students. (NAEMSE, 2020)

**Program director** – The individual responsible for an educational program or programs.

**Psychomotor domain** – Describes learning that takes place through the attainment of skills and bodily or kinesthetic movements. (NAEMSE, 2020)

**Registration agency** – An agency that is traditionally responsible for providing a product used to evaluate a chosen area. States may voluntarily adopt this product as part of their licensing process. The registration agency is also responsible for gathering and housing data to support the validity and reliability of its product.

**Regulation** – A rule or a statue that prescribes the management, governance or operation parameters for a given group; tends to be a function of administrative agencies to which a legislative body has delegated authority to promulgate rules and regulations to "regulate a given industry or profession." Most regulations are intended to protect public health, safety and welfare.

**Scope of practice** – The description of what a licensed individual legally can and cannot perform.

**Standardized patient** – An individual who has been thoroughly trained to accurately simulate a real patient with a medical condition; a standardized patient plays the role of a patient for students learning patient assessment, history taking skills, communication skills and other skills.

**Standard of care** – The domain of acceptable practice, as defined by scope of practice, current evidence, industry consensus and experts. Standard of care can vary depending on the independent variables of each situation.

**Synchronous instruction** – Instructional method whereby learners and instructors interact at the same time, either in the classroom or via a computer-driven course. This method allows for more immediate learner guidance and feedback using face-to-face, instant text-based messaging or real-time voice communications.

**Team leader** – Someone who leads the call and provides guidance and direction for setting priorities, scene and patient assessment and management. The team leader may not actually perform all the interventions but may assign others to do so.

AR001341

# References

National Association of EMS Physicians, (Kuehl, A. E., Ed.), Prehospital Systems and Medical Oversight, Third Edition. 2002. Dubuque, IA: Kendall/Hunt Publishing Company.

National Association of EMS Educators. (2020). *Foundations of Education, An EMS Approach, Third Edition.* Burlington, MA: Jones and Bartlett Learning.

National Organization for Competency Assurance. (2006). *NOCA's Basic Guide to Credentialing Terminology.* Washington, DC: National Organization for Competency Assurance.

Ruple, J. A., et al. (2004). State of EMS Education Research Project. *Prehospital Emergency Care,* 9, 203-212.

Ruple, J. A., et al. (2006). Commonalities of the EMS Education Workforce (2004) in the United States. *Prehospital Emergency Care,* 10, 229-238.

NHTSA. (1996). *Emergency Medical Services, Agenda for the Future.* Washington, DC: National Highway Traffic Safety Administration. http://www.nhtsa.dot.gov/people/injury/ems/agenda/emsman.html

NHTSA. (2019). *Emergency Medical Services Agenda 2050.* Washington, DC: National Highway Traffic Safety Administration. https://www.ems.gov/pdf/EMS-Agenda-2050.pdf

NHTSA. (2005*). Emergency Medical Services Core Content.* Washington, DC: National Highway Traffic Safety Administration. http://www.nhtsa.dot.gov/people/injury/ems/EMSCoreContent/images/EMSCoreContent.pdf

NHTSA and Health Resources and Services Administration. (2000). *Emergency Medical Services Education Agenda for the Future: A Systems Approach.* Washington, DC: National Highway Traffic Safety Administration. https://www.ems.gov/pdf/education/EMS-Education-for-the-Future-A-Systems-Approach/EMS_Education_Agenda.pdf

NHTSA and Health Resources and Services Administration. (2007). *National EMS Scope of Practice Model.* Washington, DC: National Highway Traffic Safety Administration. https://www.ems.gov/education/EMSScope.pdf

NHTSA and Health Resources and Services Administration. (2019). *National EMS Scope of Practice Model.* Washington, DC, US Department of Transportation. https://www.ems.gov/pdf/National_EMS_Scope_of_Practice_Model_2019.pdf

NHTSA and Health Resources and Services Administration. (2021). *National EMS Scope of Practice Model.* Washington, DC, US Department of Transportation. https://www.ems.gov/pdf/National_EMS_Scope_of_Practice_Model_2019_Change_Notices_1_and%20_2_August_2021.pdf

AR001342

# Acknowledgements and Stakeholder Input

## Education Standards Revision Team Leadership:

Director: Bryan Ericson, MEd, RN, NRP, Hurst, TX
Co-Chair: Paul Rosenberger, BS, MPA, EdD, NRP, Dallas, TX
Co-Chair: Art Hsieh, MA, NRP, Santa Rosa, CA
Coordinator: Kenneth Navarro, PhD(c), Dallas, TX
Medical Director: Katherine Remick, MD, FAAP, FACEP,
    FAEMS, Austin, TX
Medical Director: Joshua Stilley, MD, FACEP, FAAEM, FAEMS,
    Columbia, MO

## Education Standards Revision Team Members*:

Deborah Akers, NRP, Glen Allen, VA
Steve Cole, MEd, NRP, Boise, ID (Paramedic Level Lead)
Lindi Holt, PhD, NRP, NCEE, Indianapolis, IN (AEMT Level Lead)
Mark Malonzo, EdD(c), NRP, Los Angeles, CA
Gina Riggs, MEd, NRP, Poteau, OK
Jose Salazar, BA, MPH, NRP, Leesburg, VA
Karla Short, BBA, MEd, EdD, Columbus OH (EMR/EMT
    Level Lead)
Bill Young, EdD, NRP, Richmond, KY

## NAEMSE Leadership:

Linda Abrahamson, MA, RN, EMTP, NCEE, Oak Lawn, IL
Stephen Perdziola, BS, Pittsburgh, PA

## Administrative Support:

Jamie Royster, BS, Dallas, TX

* The Revision Team was chosen by NAEMSE in consultation with NHTSA and HRSA, and
  comprised educators whose backgrounds and experiences represented a diverse range of
  communities, educational institutions and EMS systems.

## Federal Partners:
### National Highway Traffic Safety Administration (NHTSA) Office of EMS

David Bryson, EMT, EMS Specialist, Washington, DC
Kate Elkins, MPH, CPH, NRP, EMS Specialist, Washington, DC
Jon Krohmer, MD, FACEP, FAEMS, OEMS Director, Washington, DC

### Health Resources and Services Administration (HRSA), Maternal and Child Health Bureau's EMS for Children (EMSC) Program

Sara Kinsman, MD, PhD, MCHB DCAFH Director, Washington, DC
Theresa Morrison-Quinata, DCAFH EMSC Branch Chief,
    Washington, DC
Diane Pilkey, RN, MPH, DCAFH Senior Nurse Consultant,
    Washington, DC

## RedFlash Group:

Tricia Duva, BA, Encinitas, CA
Michael Gerber, MPH, NRP, Washington, DC
Keith Griffiths, BA, Encinitas, CA
Wendy Martin, BS, MPC, Encinitas, CA

AR001343

# Stakeholder Organizations Who Provided Input

Academy of International Mobile Health Integration

American Academy of Pediatrics – NRP Steering Committee

American Ambulance Association

American College of Emergency Physicians

American College of Surgeons Committee on Trauma

Association of Air Medical Services

Association of Critical Care Transport

Commission on Accreditation of Ambulance Services

Commission on Accreditation of Medical Transport Systems

Committee on Accreditation of Educational Programs for the EMS Professions/Commission on Accreditation of Allied Health Education Programs

Congress of Mobile Medical Professionals

EMS for Children (Health Resources and Services Administration, Maternal Child and Health Bureau)

EMS for Children Innovation & Improvement Center

Emergency Nurses Association

Georgia Department of Public Health

International Association of EMS Chiefs

International Association of Fire Chiefs

International Association of Fire Fighters

International Association of Flight & Critical Care Paramedics

State of Minnesota EMS Regulatory Board

National Association of EMS Physicians

National Association of EMTs

National Association of State EMS Officials

National EMS Management Association

National Fire Protection Agency

National Registry of EMTs

National Volunteer Fire Council

New Hampshire Department of Safety, Division of Fire Standards and Training and EMS

New Jersey State EMS Council, 17th District

North Carolina Office of EMS

US Army

US Air Force

## Project Meetings

- First Development Meeting – May 2-3, 2019, Pittsburgh, PA
- Association Liaison/Stakeholder Call – July 15, 2019
- Second Development Meeting – October 3-4, 2019, Washington, DC
- Instructional Guideline Revision Meeting – January 30-February 1, 2020, Hurst, TX
- Association Liaison/Stakeholder Call – August 11, 2020
- Revision Meeting (virtual) – October 9, 2020
- Third Development Meeting (virtual) – January 28, 2021

## Public Comment Periods

- August 16-September 20, 2019
- February 17-March 17, 2020
- November 13-December 14, 2020

AR001344

# Appendix A: Resources for EMS

## National Organizations:

American Academy of Emergency Medicine (AAEM): https://www.aaem.org/

American Academy of Pediatrics (AAP): https://www.aap.org/en-us/Pages/Default.aspx

American Academy of Orthopedic Surgeons (AAOS): https://www.aaos.org/

American Ambulance Association (AAA): https://ambulance.org

American College of Emergency Physicians (ACEP): https://www.acep.org/

American College of Surgeons Committee on Trauma (ACS COT): https://www.facs.org/Quality-Programs/Trauma

American Medical Association (AMA): https://www.ama-assn.org/

American Public Health Association (APHA): https://www.apha.org/

American Trauma Society (ATS): https://www.amtrauma.org/

Association of Air Medical Services (AAMS): https://aams.org/

Association of State and Territorial Health Officials (ASTHO): https://www.astho.org/

Center for Disease Control: https//www.cdc.gov/

Commission on Accreditation of Allied Health Education Programs (CAAHEP): https://www.caahep.org/

Commission on Accreditation of Ambulance Services (CAAS): https://www.caas.org/

Commission of Accreditation of Medical Transport Systems (CAMTS): https://www.camts.org/International

AR001345

## National Organizations:

Commission of Accreditation of Medical Transport Systems (CAMTS): https://www.camts.org/International

Committee on Accreditation of Educational Programs for the Emergency Medical Services Professions (CoAEMSP): https://coaemsp.org/

Emergency Nurses Association (ENA): https://www.ena.org/

International Academies of Emergency Dispatch (IAED): https://www.emergencydispatch.org/home

International Association of Emergency Managers (IAEM): https://www.iaem.org/

International Association of EMS Chiefs (IAEMSC): https://www.iaemsc.org/

International Association of EMTs and Paramedics (IAEP): https://www.iaep.org/

International Association of Fire Chiefs (IAFC): https://www.iafc.org/

International Association of Firefighters: https://www.iaff.org/

International Association of Flight & Critical Care Paramedics (IAFCCP): https://www.iafccp.org/

National Association of County & City Health Officials (NACCHO): https://www.naccho.org/about

National Association of EMS Educators (NAEMSE): https://naemse.org/

National Association of EMS Officials (NASEMSO): https://nasemso.org/

National Association of EMS Physicians (NAEMSP): https://naemsp.org/

National Association of Emergency Medical Technicians (NAEMT): https://naemt.org/

National EMS Advisory Council: https://www.ems.gov/memsac.html

National EMS Management Association (NEMSMA): https://www.nemsma.org/

AR001346

## National Organizations:

National EMS Quality Alliance (NEMSQA): https://www.nemsqa.org/

National Fire Protection Association (NFPA): https://www.nfpa.org/

National Organization of State Offices of Rural Health (NOSORH): https://nosorh.org/

National Registry of Emergency Medical Technicians (NREMT): https://www.nremt.org

National Volunteer Fire Council (NVFC): https://www.nvfc.org/about/

Safe States Alliance: https://www.safestates.org/

Society for Academic Emergency Medicine: https://www.saem.org/home

## Federal Agencies:

Federal Interagency Committee on EMS (FICEMS): https://www.ems.gov/ficems.html

*Department of Transportation:* https://www.transportation.gov/

Federal Highway Administration (FHWA): https://ops.fhwa.dot.gov/eto_tim_pse/preparedness/tim/index.htm

National Highway Traffic Safety Administration (NHTSA): https://www.ems.gov/

*Department of Homeland Security* (DHS): https://www.dhs.gov/

U.S. Fire Administration (USFA): https://www.usfa.fema.gov/

*Department of Health and Human Services* (DHHS): https://www.hhs.gov/

Agency for Healthcare Research and Quality (AHRQ): https://www.ahrq.gov/

Centers for Disease Control and Prevention (CDC): https://www.cdc.gov/

National Institute for Occupational Safety and Health (NIOSH): https://www.cdc.gov/niosh/index.htm

AR001347

# Federal Agencies:

Centers for Medicare & Medicaid Services (CMS): https://www.cms.gov/

Health Resources & Services Administration (HRSA): https://www.hrsa.gov/

Indian Health Service (IHS): https://www.ihs.gov/

National Institutes of Health (NIH): https://www.nih.gov/

Office of the Assistant Secretary for Preparedness and Response (ASPR): https://www.phe.gov/about/aspr/Pages/default.aspx

Substance Abuse and Mental Health Services Administration (SAMHSA): https://www.samhsa.gov/

*Federal Communications Commission* (FCC): https://www.fcc.gov/

*Department of Defense* (DoD): https://dod.defense.gov/

Office of the Assistant Secretary of Defense for Health Affairs: https://www.health.mil/About-MHS/OASDHA

*Department of the Interior* (DOI): https://www.doi.gov/

National Park Service (NPS): https://www.nps.gov/index.htm

*Department of Agriculture* (USDA): https://www.usda.gov/

U.S. Forest Service (USFS): https://www.fs.usda.gov/

*Department of Labor* (DOL): https://www.dol.gov/

AR001348

## Other Sources:

Occupational Safety and Health Administration (OSHA): https://www.osha.gov/

National Highway Traffic Safety Administration (NHTSA): www.EMS.gov

American Heart Association ECC: https://cpr.heart.org/en/resuscitation-science/cpr-and-ecc-guidelines

EMSC Innovation and Improvement Center (EIIC): https://emscimprovement.center/

National EMS Advisory Council (NEMSAC): https://www.ems.gov/nemsac.html

National EMS Information System (NEMSIS): https://nemsis.org/

Prehospital Care Research Forum: https://www.cpc.mednet.ucla.edu/pcrf

Prehospital Guidelines Consortium: http://prehospitalguidelines.org/

AR001349



December 9, 2021

AR001350



# Legal Differences Between Certi cation and Licensure

Although the general public continues to use the terms interchangeably, there are important functional distinctions between certification and licensure.

### Certification

The federal government has defined "certification" as the process by which **a non-governmental organization grants recognition to an individual who has met predetermined qualifications specified by that organization.** [1] Similarly, the National Commission for Certifying Agencies (http://www.credentialingexcellence.org/ncca)defines certification as "a process, often voluntary, by which individuals who have demonstrated the level of knowledge and skill required in the profession, occupation, role, or skill are identified to the public and other stakeholders."[2] Accordingly, there are three hallmarks of certification (as functionally defined).

Certification is:

1. voluntary process;
2. by a private organization;
3. for the purpose of providing the public information on those individuals who have successfully completed the certification process (usually entailing successful completion of educational and testing requirements) and demonstrated their ability to perform their profession competently.

Nearly every profession certifies its members in some way, but a prime example is medicine. Private certifying boards certify physician specialists. Although certification may assist a physician in obtaining hospital privileges, or participating as a preferred provider within a health insurer's network, it does not affect his legal authority to practice medicine. For instance, a surgeon can practice medicine in any state in which he is licensed regardless of whether or not he is certified by the American Board of Surgery.

AR001351

### Licensure

Licensure, on the other hand, is the state's grant of legal authority, pursuant to the state's police powers, to practice a profession within a designated scope of practice. Under the licensure system, states define, by statute, the tasks and function or scope of practice of a profession and provide that these tasks may be legally performed only by those who are licensed. As such, licensure prohibits anyone from practicing the profession who is not licensed, regardless of whether or not the individual has been certified by a private organization.

### What if my state certifies, not licenses, EMS professionals?

Confusion between the terms "certification" and "licensure" arises because many states call their licensure processes "certification," particularly when they incorporate the standards and requirements of private certifying bodies in their licensing statutes and require that an individual be certified in order to have state authorization to practice. The use of a certification issued by the National Registry by some states as a basis for granting individuals the right to practice as EMTs and calling the authorization granted "certification" is an example of this practice. Nevertheless, certification by the National Registry, by itself, does not give an individual the right to practice.

**Regardless of what descriptive title is used by a state agency, if an occupation has a statutorily or regulatorily defined scope of practice and only individuals authorized by the state can perform those functions and activities, the authorized individuals are licensed. It does not matter if the authorization is called something other than a license; the authorization has the legal effect of a license.**

In sum, the National Registry is a private, non-profit, certifying organization. The various State EMS Offices or like agencies serve as the state licensing agencies. Certification by the National Registry is a distinct process from licensure; and it serves the important independent purpose of identifying for the public, state licensure agencies and employers, those individuals who have successfully completed the Registry's educational requirements and demonstrated their skills and abilities in the mandated examinations. Furthermore, the National Registry's tracking of adverse licensure actions and criminal convictions provides an important source of information which protects the public and aids in the mobility of EMT providers.

[1] U.S. Department of Health, Education, and Welfare, Report on Licensure and Related Health Personnel Credentialing (Washington, D.C.: June, 1971 p. 7) .
[2] NCCA Standards for the Accreditation of Certification Programs, approved by the member organizations of the National Commission for Certifying Agencies in February, 2002 (effective January, 2003).

AR001352

(http://www.facebook.com/theNREMT/)    (https://www.instagram.com/nationalregistryofemts/)    (http://twitter.com/NREMT)    (https://www.youtube.com/c/NationalF

## The Registry

About Us (/about/about-us)

Contact (/Document/Support-Center)

Board of Directors (/Team/Board)

Team (/team/leadership)

Careers (/Document/Careers)

History (/about/history)

News (/news)

Research (/document/research)

Store (/store)

## Topics

Recertification (/document/recertification)

EMS Compact (/document/replica)

Maps, Stats & Data (/maps)

NCCP Recertification (/document/nccp)

Paramedic Portfolio (/document/paramedic-portfolio)

## Information For

Candidates (/document/candidates)

Program Directors (/partners/program

Training Officers (/partners/training-o

Medical Directors (/partners/medical-(

State Officials (/Partners/State-Officia

Educators (/Partners/EMS-Educators)

Volunteers (/partners/Volunteers)

The Public (/document/public-ems)

## Quick Links

Annual Reports (/about/annual-reports)

EMS Job Board (http://emtjobs.nremt.org/)

How Do I...? (/document/how-do-i)

Policies (/policies)

Resources (/document/resources)

State EMS Agencies (/Resources/State-EMS-offices)

COVID-19 Updates (/Document/covid-19)

© Copyright 2001 2023, Version 2023.2, National Registry of Emergency Medical Technicians

AR001353

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 36



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 7, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was scheduled to work from (b) (7)(E) at BRA, and after reporting for duty, he was assigned to work a detail near (b) (7)(E) Texas. BPA (b) (6) ( )( ) confirmed that on that date, he had a government-owned vehicle (GOV) available for his use throughout his working shift. BPA (b) (6), (b) (7)(C) stated that at approximately 12:00 p.m., Supervisory BPA (SBPA) (b) (6), (b) (7)(C) BRA, put out a message to BPA (b) (6), (b) (7)(C) unit working in (b) (7)(E) that everyone was to report to Uvalde regarding a school shooting, and SBPA (b) (6), (b) (7)(C) directed them to get in touch with SBPA (b) (6), (b) (7)(C) BRA, for further instructions (timestamp 00:11:47).

BPA (b) (6), (b) (7)(C) could not recall how the message regarding the school shooting was transmitted to him and his coworkers from SBPA (b) (6), (b) (7)(C)

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001355



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) stated he drove alone utilizing the GOV's emergency lights and sirens the entire way from Brackettville to Uvalde. BPA (b) (6), (b) (7)(C) stated that while he was driving, SBPA (b) (6), (b) (7)(C) relayed a message advising which radio channel to utilize for the incident and instructed him to report directly to the Uvalde Civic Center. BPA (b) (6), (b) (7)(C) stated that all the responding law enforcement agency's radios were patched together, and he could hear the Texas Department of Public Safety, the Uvalde County Sheriff's Office, and BPAs putting out a lot of radio traffic.

BPA (b) (6), (b) (7)(C) stated that upon his arrival at the civic center, he saw other BPAs who indicated they needed assistance with the school buses that were on the way to the civic center with teachers and students. BPA (b) (6), (b) (7)(C) stated that while they were waiting on the buses to arrive, he and the other BPAs explained to parents who had gathered at the civic center that the children would need to first go inside the civic center before they could be released. BPA (b) (6), (b) (7)(C) stated he assisted with the arrival of two or three busloads of teachers and students. He noted he and his fellow BPAs created a lane by using their physical presence, thereby allowing them a clear pathway to walk from the bus into the civic center.

BPA (b) (6), (b) (7)(C) could not specifically identify which USBP supervisor was issuing orders at the civic center; however, he believed it may have been someone from the Uvalde Station. BPA (b) (6), (b) (7)(C) stated he believed USBP had command and control of the area immediately outside of the civic center, as they were the only agency with enough personnel there to assist (timestamp 00:22:31).

BPA (b) (6), (b) (7)(C) denied ever seeing or hearing anyone from USBP giving directives to agents or officers from other agencies, noting that later in the operation, he observed other agencies appeared to have positions on the perimeter (timestamp 00:23:13).

BPA (b) (6), (b) (7)(C) stated that other than telling the parents outside of the civic center that they needed to let the students go inside of the civic center after getting off the bus, he issued no direct orders to anyone (timestamp 00:23:42).

BPA (b) (6), (b) (7)(C) denied having any conflicts with parents outside of the civic center, noting that they understood there was a process in place (timestamp 00:24:28).

BPA (b) (6), (b) (7)(C) recalled he worked with BRA BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) outside of the Uvalde Civic Center, noting that all the other BPAs were from other stations, and he did not know them by name.

BPA (b) (6), (b) (7)(C) stated there were people dropping off water bottles, which he helped hand out to the parents who were gathered outside the civic center. BPA (b) (6), (b) (7)(C) denied treating anyone medically while at the site (timestamp 00:29:08).

BPA (b) (6), (b) (7)(C) stated response time was a factor in USBP responding to the incident at the school and indicated that because of the types of training they participate in, they can assist other agencies if needed. BPA (b) (6), (b) (7)(C) denied hearing any shots fired on the date of the incident,



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



being issued a body-worn camera, or maintaining any emails, texts, or reports discussing the incident (timestamp 00:30:16).

BPA (b) (6), (b) (7)(C) stated that once all the children and parents departed the civic center, they repositioned and set up a perimeter where they fielded questions from the public, some of whom were attempting to access the civic center to vote. BPA (b) (6), (b) (7)(C) stated that later in the afternoon, Watch Commander (b) (6), (b) (7)(C) BRA, was in charge of the USBP personnel that remained at the civic center. BPA (b) (6), (b) (7)(C) stated that at approximately 5:45 p.m., he was relieved of his duties and instructed to return to his post of duty. BPA (b) (6), (b) (7)(C) stated another BPA he did not know replaced him. BPA (b) (6), (b) (7)(C) stated he reported back to BRA and then proceeded to his residence. BPA (b) (6), (b) (7)(C) confirmed he has engaged in Active Shooter training (timestamp 00:37:35).

Prior to concluding the interview, BPA (b) (6), (b) (7)(C) utilized printed maps to outline his actions on May 24, 2022, in response to the Robb Elementary School shooting (Attachment 2).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by BPA (b) (6), (b) (7)(C) |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 37



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

AR001358

 

# U.S. CUSTOMS AND BORDER PROTECTION
# OFFICE OF PROFESSIONAL RESPONSIBILITY
# INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 7, 2023, SSA (b) (6), (b) (7)(C) nd SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he began his shift at (b) (7)(E) attended the daily muster, and then departed CAR. BPA (b) (6), (b) (7)(C) said he received a call from the duty supervisor to return to CAR because he would be going to Uvalde. BPA (b) (6), (b) (7)(C) said he then retrieved a rifle and magazines and rode with BPA (b) (6), (b) (7)(C) CAR, to Uvalde. BPA (b) (6), (b) (7)(C) said BPA (b) (6), (b) (7)(C) is a USBP Emergency Medical Technician (EMT) (timestamp 00:09:00).

BPA (b) (6), (b) (7)(C) aid that while enroute to Uvalde, they received text messages from Watch Commander (WC) (b) (6), (b) (7)(C) CAR, who directed them to the Uvalde Civic Center (timestamp 00:10:30).

BPA (b) (6), (b) (7)(C) said WC (b) (6), (b) (7)(C) raveled to Uvalde in a separate vehicle. BPA (b) (6), (b) (7)(C) said that when he and BPA (b) (6), (b) (7)(C) arrived at the civic center, WC (b) (6), (b) (7)(C) assigned them to a parking lot on the same side of the building as the Walgreens (timestamp 00:12:20).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001359



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) said they were advised by WC (b) (6), (b) (7)(C) to keep traffic in and out of the parking lot to a minimum. He said they remained at that same spot during the entire time in Uvalde (timestamp 00:12:45).

BPA (b) (6), (b) (7)(C) said they received word from either a deputy or a Trooper that people were coming to the civic center to vote, or they were looking for their children who had been transported from the school. He said if a parent came looking for their child, the parent was then directed towards a door where other uniformed officers were (timestamp 00:13:30).

BPA (b) (6), (b) (7)(C) said they were never directed to turn any parents away and never directed any parents away. BPA (b) (6) (7)(C) said he never witnessed any CBP personnel turn any parents away.

BPA (b) (6), (b) (7)(C) said there were other members of management at the civic center. He said Deputy Patrol Agent in Charge (DPAIC) (b) (6), (b) (7)(C) CAR, was providing information to them (timestamp 00:14:50).

BPA (b) (6), (b) (7)(C) said he never went into the civic center. He also said he never went to Robb Elementary School (timestamp 00:15:40).

BPA (b) (6), (b) (7)(C) said he did not see any CBP employees restrict parents from seeing their children. He also said he did not see any actions by CBP employees that restricted anybody's right to vote at the civic center (timestamp 00:16:31).

BPA (b) (6), (b) (7)(C) said that in reference to his authority, he viewed it more as an "all hands on deck" type of thing. BPA (b) (6), (b) (7)(C) stated he was directed to respond to Uvalde (timestamp 00:17:05).

BPA (b) (6), (b) (7)(C) said he did not witness any shooting. He did not wear a body camera. BPA (b) (6), (b) (7)(C) said he does not have any of the text messages he exchanged with WC (b) (6), (b) (7)(C) He said he does not have any emails regarding the incident. BPA (b) (6), (b) (7)(C) said he has had Active Shooter training. He said he did not use any of his Active Shooter training, since he did not go to the school (timestamp 00:17:48).

BPA (b) (6), (b) (7)(C) said he started his shift at (b) (7)(E) He estimated that from the time he left the station after muster, to when he was called back was 15 to 20 minutes tops. BPA (b) (6), (b) (7)(C) said he arrived at the civic center at approximately 3:30 p.m. (timestamp 00:18:26).

BPA (b) (6), (b) (7)(C) said he does not know the time he left the civic center (timestamp 00:19:15).

He said he does recall the sun was going down on the drive back to CAR. He said upon his arrival at the station, he remained at the station and assisted with processing. BPA (b) (6), (b) (7)(C) aid the drive from Carrizo Springs to Uvalde takes about an hour (timestamp 00:21:15).




**U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY
INVESTIGATIVE OPERATIONS DIRECTORATE**

BPA ▮▮▮ said they drove ▮▮▮ **(b) (7)(E)** ▮▮▮ which is right near the civic center (timestamp 00:24:10).  BPA ▮▮▮ drew out his route on the provided maps (Attachment 2).

BPA ▮▮▮ said that after they left the civic center, they stopped and ate lunch (timestamp 00:25:30).

BPA ▮▮▮ said they did not run lights and siren while on the way to the civic center.  He said they "10-3" that right away, about five minutes into the drive (timestamp 00:28:12).

[Agent's Note: 10-3 is radio communication code meaning to stop transmitting or stop.]

BPA ▮▮▮ said he would feel comfortable with saying that he left the civic center between 6:00 p.m. and 7:00 p.m. (timestamp 00:30:08).

BPA ▮▮▮ said he did not see BPA ▮▮▮ render any type of first aid to anyone while at the civic center.  He stated they returned to the station together (timestamp 00:32:15).

BPA ▮▮▮ said nobody expressed any sort of discontent with him while he was at the civic center (timestamp 00:34:42).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA ▮▮▮ |
| 2 | Maps reviewed by BPA ▮▮▮ |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 38



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                    EXHIBIT 38

AR001362

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**


# INVESTIGATIVE ACTIVITY REPORT

| **CASE NUMBER:** | UF2022586 | **FIELD OFFICE:** | Del Rio DSAC Office |
|---|---|---|---|
| **CASE AGENT:** | SA (b) (6), (b) (7)(C) | | |
| **CASE TITLE:** | Uvalde Texas School Shooting w/ Fatalities | | |
| **ACTIVITY CONDUCTED:** | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 7, 2023, SSA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he worked the day shift at BRA. He recalled being assigned as the Field Training Officer (FTO) for three trainees identified as BPA (b) (6), (b) (7)(C) BRA, BPA (b) (6), (b) (7)(C) BRA, and BPA (b) (6), (b) (7)(C) BRA. BPA (b) (6), (b) (7)(C) said he and his assigned trainees were tracking a group of individuals who illegally entered the U.S. (timestamp 11:18:38).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001363

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

BPA (b) (6), (b) (7)(C) said he heard about the incident at Robb Elementary School in Uvalde from the helicopter pilot who provided air support to assist him and his trainees with tracking the group of individuals who entered the U.S. He recalled the helicopter pilot reported over the radio he had to terminate his air support assistance to respond to a school shooting. BPA (b) (6), (b) (7)(C) said he called (b) (6), (b) (7)(C) who worked at the Uvalde School District, to ask what she knew of an alleged school shooting. He recalled his supervisor, Supervisory BPA (SBPA) (b) (6), (b) (7)(C) BRA, contacted him and informed him he and his trainees needed to respond to the civic center in Uvalde and to contact SBPA (b) (6), (b) (7)(C) BRA, upon their arrival. BPA (b) (6), (b) (7)(C) was unable to remember if SBPA (b) (6), (b) (7)(C) contacted him via radio or cellular telephone (timestamp 11:21:36).

BPA (b) (6), (b) (7)(C) said the drive to Uvalde took approximately 40 to 45 minutes, and they arrived around 12:00 p.m. He said his route of travel began south of (b) (7)(E) (b) (7)(E) and continued to Uvalde. He was unable to recall any radio communication during the trip to Uvalde. He stated he had his emergency lights activated the entire trip, and the siren was activated when they approached traffic. BPA (b) (6), (b) (7)(C) said he attempted to contact SBPA (b) (6), (b) (7)(C) on the drive to Uvalde via his cellular telephone, but he was unable to make contact. He stated none of the trainees in his vehicle made any telephone calls or spoke with anyone on the drive to Uvalde (timestamp 11:26:27).

BPA (b) (6), (b) (7)(C) recalled seeing other agents and local law enforcement officers (LEOs) when they arrived at the Uvalde Civic Center. He said they parked their vehicle and heard from an unknown individual that vans and buses were bringing children to the civic center, and they were to safeguard the children as they entered the building. They were also advised to tell any parents wanting to take their child that they needed to go inside to check their children out. He said they spread out and stood alongside the civic center sidewalk. BPA (b) (6), (b) (7)(C) stated he had no interaction with any of the parents who arrived at the civic center other than to greet people near him. He recalled remaining at the location where the children arrived for approximately one or two hours. While there, he remembered an unknown Texas Department of Public Safety Trooper provided information that there was a possibility that the shooter's girlfriend had made some threats on social media about wanting to "finish the job" or was mad. BPA (b) (6), (b) (7)(C) and his three trainees were asked to do perimeter security of the Uvalde Civic Center in case she arrived at their location. He said they continued to perform perimeter security at the Uvalde Civic Center until they left between 5:00 p.m. and 6:00 p.m. (timestamp 11:29:48).

BPA (b) (6), (b) (7)(C) said he did not report to anyone when he arrived at the Uvalde Civic Center. He stated he never contacted SBPA (b) (6), (b) (7)(C) when he arrived at the civic center, but he did contact Watch Commander (WC) (b) (6), (b) (7)(C) BRA. He was unable to recall what they spoke about. BPA (b) (6), (b) (7)(C) did not recall any USBP command and control at the Uvalde Civic Center. BPA (b) (6), (b) (7)(C) said he did not recall any specific LEO acting in a command capacity or being in charge while they were at the Uvalde Civic Center. He reiterated he and his trainees arrived, and he was told by someone to help get the kids into the civic center so the parents could go inside to get their children. He said he never provided orders to anyone at the Uvalde Civic Center other than to the three trainees under his supervision (timestamp 11:35:17).

---


BPA (b) (6), (b) (7)(C) recalled talking to a man he believed worked at Robb Elementary School who was taking injured children off the bus and just being cordial to the people he encountered at the civic center. BPA (b) (6), (b) (7)(C) was unable to provide the names of the individuals he spoke with. He stated he never exercised any authority that impacted any individual's movement during his time at the Uvalde Civic Center. He said he never had to tell any parent arriving to claim their child not to take their child with them while he was at the Uvalde Civic Center (timestamp 11:38:44).

BPA (b) (6), (b) (7)(C) said he never provided any aid to any member of the public while at the Uvalde Civic Center. He stated he never saw anyone arrive injured. BPA (b) (6), (b) (7)(C) stated it was the city and the state's "show", and he was there as a support agency representative. He said that while he was at the Uvalde Civic Center, he never heard any shots fired or reported any gunfire. He stated he never made any telephone calls or updates to anyone back at his USBP station while he was at the Uvalde Civic Center (timestamp 11:42:12).

BPA (b) (6), (b) (7)(C) believed SBPA (b) (6), (b) (7)(C) may have gone to a local high school where parents were trying to get their children, or he may have gone to Robb Elementary School. He recalled hearing this while he was at the civic center, but he could not recall who he heard it from (timestamp 11:43:51).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|:---:|:---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

# UF2022586
# EXHIBIT 39



DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION
OFFICE OF PROFESSIONAL RESPONSIBILITY

O F F I C I A L   U S E   O N L Y

UF2022586                                        EXHIBIT 39

AR001366




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

## DETAILS OF ACTIVITY

On February 7, 2023, SA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP r____se to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, at approximately 11:45 a.m., he was having lunch with (b) (6), (b) (7)(C) in Carrizo Springs when she informed him of her discovery through social media that a shooting had occurred at Robb Elementary School.

BPA (b) (6), (b) (7)(C) stated that later, he reported for swing shift duty at CAR at the normal briefing time at (b) (7)(E) BPA (b) (6), (b) (7)(C) stated that during the briefing, BPAs were notified by Watch Commander (WC) (b) (6), (b) (7)(C) CAR, that a shooting had occurred at Robb Elementary School in Uvalde (timestamp 14:05:50).

WC (b) (6), (b) (7)(C) advised CAR BPAs to respond to the Hillcrest Funeral Home to provide additional security around the perimeter of Robb Elementary School. At approximately (b) (7)(E) BPA (b) (6), (b) (7)(C) along with his partner BPA (b) (6), (b) (7)(C) CAR, departed CAR in their USBP patrol vehicle dressed in their USBP uniforms (timestamp 14:09:00).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001367

 

BPA ▓(b) (6), (b) (7)(C)▓ stated he and BPA ▓(b) (6), (b) (7)(C)▓ traveled to Uvalde northbound via U.S. Highway 83. BPA ▓(b) (6), (b) (7)(C)▓ stated that while enroute, he received information from a USBP group chat via text message to respond to the civic center instead of the funeral home (timestamp 14:11:30).

BPA ▓(b) (6), (b) (7)(C)▓ stated he did not know who gave the specific command to respond to the civic center. BPA ▓(b) (6), (b) (7)(C)▓ further stated that since the incident had occurred several hours prior, he and BPA ▓(b) (6), (b) (7)(C)▓ responded in their USBP vehicle at a normal speed without using emergency lights and siren (timestamp 14:10:35).

BPA ▓(b) (6), (b) (7)(C)▓ said they arrived at the civic center at approximately 4:00 p.m. (timestamp 14:10:05).

He and BPA ▓(b) (6), (b) (7)(C)▓ were met by WC ▓(b) (6), (b) (7)(C)▓ and were instructed to position their patrol vehicle on the north side parking lot of the civic center for the purpose of blocking public access into the civic center (timestamp 14:14:00).

BPA ▓(b) (6), (b) (7)(C)▓ stated that other than receiving instructions from WC ▓(b) (6), (b) (7)(C)▓ he was unaware of an established incident command structure at the scene (timestamp 14:17:15).

BPA ▓(b) (6), (b) (7)(C)▓ said that while on the north side of the civic center, WC ▓(b) (6), (b) (7)(C)▓ instructed BPA ▓(b) (6), (b) (7)(C)▓ and he to redirect family members to the main entrance of the civic center, where they would be provided with further information regarding the incident. Both BPAs also directed members of the media to another section of the civic center. BPA ▓(b) (6), (b) (7)(C)▓ stated he never gave any aid, nor did he exercise his law enforcement authority with family members or members of the public.

BPA ▓(b) (6), (b) (7)(C)▓ stated he and BPA ▓(b) (6), (b) (7)(C)▓ maintained their position on the north side of the civic center until they were relieved by officers from the Dilley, Texas Police Department (DPD) at approximately 6:30 p.m. (timestamp 14:19:35).

After being relieved by DPD, BPA ▓(b) (6), (b) (7)(C)▓ stated W ▓(b) (6), (b) (7)(C)▓ dvised him and BPA ▓(b) (6), (b) (7)(C)▓ to return to CAR (timestamp 14:20:35).

BPA ▓(b) (6), (b) (7)(C)▓ stated he believed USBP's role in the incident was to respond to the scene of the incident and assist where needed (timestamp 14:22:13).

## ATTACHMENTS

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA ▓(b) (6), (b) (7)(C)▓ |

AR001368

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 40



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

**UF2022586**                                                          **EXHIBIT 40**

AR001369



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

## INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 7, 2023, ASAC (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) said that on May 24, 2022, he was assigned to the BRA brush crew and was working at a remote location near (b) (7)(E) with limited radio and cell phone service, when he initially learned of the shooting at Robb Elementary School. BPA (b) (6), (b) (7)(C) was working in USBP uniform and driving a marked USBP vehicle. BPA (b) (6), (b) (7)(C) was working with BRA BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) as well as BRA BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) who were BPA trainees (timestamp 00:50:10).

BPA (b) (6), (b) (7)(C) said he initially learned of the shooting at Robb Elementary School from a helicopter pilot who was working with BPA (b) (6), (b) (7)(C) and other BPAs tracking a group of undocumented migrants. The helicopter pilot advised he was leaving to respond to a school shooting in Uvalde. BPA (b) (6), (b) (7)(C) did not remember at what time the pilot left. BPA (b) (6), (b) (7)(C) estimated he and the other BPAs continued tracking the group of undocumented migrants for approximately 30 to 45 minutes before being notified to respond to Uvalde (timestamp 00:16:15).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|
| Approved by: | | Date: | |

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001370

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

BPA (b) (6), (b) (7)(C) said he did not remember how he was instructed to respond to Uvalde. BPA (b) (6), (b) (7)(C) believed a fellow BPA might have received instruction from Supervisory BPA (SBPA) (b) (6), (b) (7)(C) BRA, to respond to Uvalde and relayed the message to BPA (b) (6), (b) (7)(C) and the others tracking the group of undocumented migrants (timestamp 00:17:01).

BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) eparted for Uvalde. BPA (b) (6), (b) (7)(C) did not receive any updates while enroute to Uvalde and said communications and updates were limited.

BPA (b) (6), (b) (7)(C) said he, along with other BPAs and law enforcement agencies, traveled to Uvalde together in multiple vehicles. BPA (b) (6), (b) (7)(C) was unable to remember which specific law enforcement agencies traveled to Uvalde with him and the other BPAs. BPA (b) (6), (b) (7)(C) could not specifically remember but believed he activated his emergency lights while traveling to Uvalde but not his vehicle siren (timestamp 00:24:40).

While traveling to Uvalde, BPA (b) (6), (b) (7)(C) and the other BPAs were advised to respond to the Uvalde Civic Center. BPA (b) (6), (b) (7)(C) recalled being instructed by UBSP to respond to the civic center but did not remember who provided the instruction or how it was received (timestamp 01:51:57).

Although BPA (b) (6), (b) (7)(C) was unable to remember how this instruction was received or who provided the instruction, he recalled the instruction to report to the civic center was received from USBP.

BPA (b) (6), (b) (7)(C) said he arrived at the civic center with BPAs (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) timestamp 00:24:49).

BPA (b) (6), (b) (7)(C) did not recall seeing SBPA (b) (6), (b) (7)(C) at the civic center (timestamp 00:26:12).

BPA (b) (6), (b) (7)(C) did not believe he notified anyone with USBP that he had arrived at the civic center (timestamp 01:51:40).

BPA (b) (6), (b) (7)(C) explained that on May 24, 2022, when he arrived at the Uvalde Civic Center, other BPAs were already there and advised him that children were being brought to the civic center, and the school district wanted parents to sign out their children inside the civic center to account for the students. BPA (b) (6), (b) (7)(C) xplained that when the children arrived, they were directed into the civic center. BPA (b) (6), (b) (7)(C) did not remember the name of the BPA he spoke to concerning the arrival of the children and the school district plan to have parents sign out their children before leaving the civic center.

BPA (b) (6), (b) (7)(C) said that as the buses with children arrived and parents arrived, he and other BPAs directed the children inside and advised parents that they needed to sign out their children inside the civic center, so the school district could account for them. BPA (b) (6), (b) (7)(C) repeatedly



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



announced that parents needed to sign out their children inside the civic center, so the school district could account for all students (timestamp 00:24:15).

BPA (b) (6), (b) (7)(C) and other BPAs provided security at the civic center by standing at locations near the civic center (timestamp 00:27:27).

BPA (b) (6), (b) (7)(C) and other BPAs spoke with individuals wanting to enter the building and directed them to a school official. BPA (b) (6), (b) (7)(C) said arriving parents were directed to the front door of the civic center to speak with a school official or administrator (timestamp 00:31:27).

BPA (b) (6), (b) (7)(C) explained that most parents entered the civic center, but there were a few grieving parents outside the civic center while BPAs provided security. The school district was responsible for the plan and procedure for parents to retrieve their children from the civic center, and he and other BPAs directed parents inside the civic center to sign out their children for accountability as required by the school district (timestamp 00:31:53).

BPA (b) (6), (b) (7)(C) said there was a school administrator or principal at the civic center who seemed to be in charge (timestamp 00:33:50).

BPA (b) (6), (b) (7)(C) did not know the name of the administrator or principal but described him as a Hispanic male, approximately 5'8", heavy build, wearing a suit with grey hair and a medium complexion. BPA (b) (6), (b) (7)(C) estimated the administrator or principal was approximately 50 years of age.

BPA (b) (6), (b) (7)(C) said that while at the civic center, he consoled parents and might have placed his hand on a parent's shoulder (timestamp 00:35:05).

BPA (b) (6), (b) (7)(C) did not use force to restrain anyone's movement while at the civic center (timestamp 00:36:08).

BPA (b) (6), (b) (7)(C) and other BPAs repeatedly told parents they needed to sign out their children inside the civic center, so the school district could account for all students (timestamp 00:36:55).

BPA (b) (6), (b) (7)(C) said the parents seemed to understand that the school district wanted to account for the children, and he did not believe it was a significant issue (timestamp 00:38:19).

BPA (b) (6), (b) (7)(C) did not provide first aid to anyone while at the civic center (timestamp 00:54:10).

BPA (b) (6), (b) (7)(C) said that while at the civic center, he received information that a female made a comment on social media about finishing the job or a similar comment and that she might be driving a black car (timestamp 00:28:33).

BPA (b) (6), (b) (7)(C) received information concerning the social media post from another BPA (timestamp 01:53:05).




BPA (b) (6), (b) (7)(C) explained that after receiving this information, he and other BPAs were alert, looking for the female and black vehicle. After receiving the information concerning the social media post, BPA (b) (6), (b) (7)(C) and other BPAs spoke with the occupants of approaching vehicles to determine their purpose for being there and directed them to school officials or to where the media was gathered, as appropriate.

BPA (b) (6), (b) (7)(C) stated that after receiving the information concerning the female with the black vehicle, he and other BPAs attempted to obtain additional information to identify the female and vehicle (timestamp 01:01:35).

BPA (b) (6), (b) (7)(C) advised members of the media where other media personnel were gathering. BPA (b) (6), (b) (7)(C) knew other law enforcement agencies were at the civic center, but he was unable to remember which agencies (timestamp 01:02:36).

BPA (b) (6), (b) (7)(C) recalled that after he received information concerning the social media post, Watch Commander (WC) (b) (6), (b) (7)(C) BRA, arrived at the civic center. However, BPA (b) (6), (b) (7)(C) could not remember when WC (b) (6), (b) (7)(C) arrived (timestamp 01:02:01).

BPA (b) (6), (b) (7)(C) explained that school district personnel developed and implemented the plan to release children to their parents, and he and other BPAs told parents that children needed to be signed out inside the civic center. BPA (b) (6), (b) (7)(C) overheard teachers discussing the arrival of students and how they would be taken into the civic center, so the school district could account for all students (timestamp 00:58:35).

BPA (b) (6), (b) (7)(C) said that while traveling from Brackettville to Uvalde, he did not receive any additional instruction or information (timestamp 00:55:30).

BPA (b) (6), (b) (7)(C) did not remember receiving any additional information or hearing radio communications concerning the response to the school shooting. BPA (b) (6), (b) (7)(C) was not told what they were responding to and did not understand the significance of the incident until he arrived at the civic center (timestamp 00:55:50).

BPA (b) (6), (b) (7)(C) was not aware of any USBP supervisor being in charge at the civic center (timestamp 01:01:39).

BPA (b) (6), (b) (7)(C) recalled that after the female and black vehicle associated with the social media post were located, he and other BPAs were allowed to leave the civic center, but BPA (b) (6), (b) (7)(C) was unable to remember what time he left the civic center (timestamp 00:54:30).

After leaving the Uvalde Civic Center, BPA (b) (6), (b) (7)(C) returned to BRA. BPA (b) (6), (b) (7)(C) said he did not go to Robb Elementary School in Uvalde on May 24, 2022 (timestamp 00:53:45).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) believed he and other BPAs did a good job at the civic center and did what administrators wanted done (timestamp 01:04:01).

BPA (b) (6), (b) (7)(C) believed BPAs, as law enforcement officers, had a duty to respond to a mass shooting (timestamp 01:05:32).

BPA (b) (6), (b) (7)(C) explained USBP is a law enforcement organization, and he wished communication was better. BPA (b) (6), (b) (7)(C) believed that with the available information, he and other BPAs did the best they could. BPA (b) (6), (b) (7)(C) agreed that as a federal law enforcement officer employed by a law enforcement organization, he had a duty and responsibility to protect the lives of the public (timestamp 01:10:27).

CBP OPR investigators showed maps to BPA (b) (6), (b) (7)(C) depicting the area north of Uvalde, south of Uvalde, the city of Uvalde, Uvalde schools, and Robb Elementary School (timestamp 00:38:49) (Attachment B).

The maps were labeled one through five, respectively. On map one of north Uvalde, BPA (b) (6), (b) (7)(C) marked the route he traveled into Uvalde on May 24, 2022, and indicated he traveled from (b) (7)(E) Texas, then onto U.S. Highway 90 into Uvalde. BPA (b) (6), (b) (7)(C) indicated map two of south Uvalde was not applicable. On the map three of Uvalde, BPA (b) (6), (b) (7)(C) again marked his route of travel to Uvalde on May 24, 2022. On map four of the Uvalde schools, BPA (b) (6), (b) (7)(C) identified the Uvalde Civic Center where he responded on May 24, 2022, indicated where he parked his USBP vehicle, and indicated where USBP vehicles were parked at the civic center to control traffic after information was received concerning a threat of a possible second shooter (timestamp 01:12:23).

Additionally, BPA (b) (6), (b) (7)(C) indicated that he was diverted from Robb Elementary School to the Uvalde Civic Center to provide security. BPA (b) (6), (b) (7)(C) indicated map five of Robb Elementary School was not applicable, since he did not respond to the school and was not at Robb Elementary School on May 24, 2022.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he did not have a body-worn camera. BPA (b) (6), (b) (7)(C) did not have any text messages or emails concerning the CBP response to the Robb Elementary School shooting and did not produce any reports concerning the incident (timestamp 01:10:50).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 41



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                    EXHIBIT 41

AR001375

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

## INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 8, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was scheduled to work from (b) (7)(E) until (b) (7)(E) at BRA, and after reporting for duty, he was assigned to work a detail near (b) (7)(E). BPA (b) (6), (b) (7)(C) confirmed that on that date, he was working with his Field Training Officer (FTO) BPA (b) (6), (b) (7)(C) BRA, as well as two other trainees identified as BPA (b) (6), (b) (7)(C) BRA, and BPA (b) (6), (b) (7)(C) BRA. BPA (b) (6), (b) (7)(C) said BPA (b) (6), (b) (7)(C) was assigned a government-owned vehicle (GOV) that accommodated himself and his fellow trainees.

BPA (b) (6), (b) (7)(C) stated that at approximately 1:30 p.m., they were completing their work detail and heard a radio transmission from a helicopter advising there was a school shooting in Uvalde. BPA (b) (6), (b) (7)(C) stated that a short time later, a radio transmission was communicated by Supervisory BPA (SBPA) (b) (6), (b) (7)(C) BRA, that all BRA working agents were being ordered to report to the civic center in Uvalde (timestamp 00:12:32).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|
| Approved by: | | Date: | |

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001376





BPA (b) (6), (b) (7)(C) stated he and his team left immediately for Uvalde from the location where they were working and utilized the GOV's emergency lights and siren the entire way. BPA (b) (6), (b) (7)(C) said that while enroute, they received no further instructions or information about what had happened; however, BPA (b) (6), (b) (7)(C) was relaying some information she had received that the shooting took place at Robb Elementary School.

BPA (b) (6), (b) (7)(C) stated that upon their arrival at the civic center, at approximately 2:00 p.m., he and his team were trying to identify what assistance was needed. A person that was possibly a school official told them they needed help clearing a path so that the students being transported to the civic center could get inside (timestamp 00:16:43).

BPA (b) (6), (b) (7)(C) said that at one point, a Texas Department of Public Safety Trooper told him and his team to continue to keep the area clear for the vehicles arriving at the civic center with students. BPA (b) (6), (b) (7)(C) indicated that as they were waiting for the buses to arrive, he and the other USBP agents spoke with the parents who were asking questions, noting that everyone at the scene was following directives. BPA (b) (6), (b) (7)(C) clarified that the students arriving on the buses were being ushered into the civic center to check them against the school roster, so they could then be properly released to their parents.

BPA (b) (6), (b) (7)(C) stated that at some point, he received a directive to assist with creating a perimeter around the civic center due to a secondary threat that was being investigated. BPA (b) (6), (b) (7)(C) stated that outside of giving out a few bottles of water, he did not provide any type of aid to anyone on site.

BPA (b) (6), (b) (7)(C) stated CBP has the authority to respond to emergency situations and noted that Uvalde has a lot of USBP agents that live or work in the area.

BPA (b) (6), (b) (7)(C) denied ever hearing any gun shots, ever reporting to Robb Elementary School, ever having a body-worn camera activated during his shift, or ever generating any type of official report regarding his activities that day (timestamp 00:22:54).

BPA (b) (6), (b) (7)(C) stated that at approximately 4:30 p.m. or 5:00 p.m., Watch Commander (WC) (b) (6), (b) (7)(C) BRA, told him and his team that another shift of agents would be relieving them of their duties, and they were to return to their post of duty. BPA (b) (6), (b) (7)(C) stated that throughout the event, there were numerous law enforcement officials from a myriad of agencies that arrived and provided assistance. BPA (b) (6), (b) (7)(C) stated he reported back to BRA, arriving at approximately 6:00 p.m., and then he proceeded to his residence. BPA (b) (6), (b) (7)(C) confirmed he has engaged in Active Shooter training (timestamp 00:25:14).

Prior to concluding the interview, BPA (b) (6), (b) (7)(C) utilized printed maps to outline his actions on May 24, 2022, in response to the Robb Elementary School shooting (Attachment 2).




**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|:---:|:---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by BPA (b) (6), (b) (7)(C) |

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 42



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

UF2022586                                                          EXHIBIT 42

AR001379




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

## DETAILS OF ACTIVITY

On February 8, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code **(b) (7)(E)** (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) is a certified Emergency Medical Technician (EMT) for USBP.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was on duty and assigned to the USBP Checkpoint **(b) (7)(E)** BPA (b) (6), (b) (7)(C) said that at approximately 11:45 a.m., he left the checkpoint to assist two other BPAs with a potential smuggling vehicle on U.S. Highway 57 (timestamp 00:11:51).

BPA (b) (6), (b) (7)(C) said that at approximately 12:20 p.m., he received a phone call from Supervisory BPA (SBPA) (b) (6), (b) (7)(C) EGS, stating he (BPA (b) (6), (b) (7)(C)) needed to respond to Uvalde due to an active shooter situation (timestamp 00:12:55).

BPA (b) (6), (b) (7)(C) said he drove back to the checkpoint to grab his gear prior to driving to Uvalde. He said the drive back to the checkpoint was between 10 and 15 minutes (timestamp 00:13:00).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001380




BPA⬛said he left the checkpoint at approximately 12:35 p.m. He said SBPA⬛provided him with an address to the Command Post (CP) in Uvalde. BPA⬛said the CP was at the funeral home across the street from Robb Elementary School (timestamp 00:14:00).

BPA⬛said that after he parked his vehicle, he saw SBPA⬛who advised the situation was under control, and they needed to go to the Uvalde Station (UVA) to muster. He said the muster was supposed to start at (b) (7)(E) He said he left for the station at about 1:45 p.m. (timestamp 00:15:30). BPA⬛drew his route of travel on the provided maps (Attachment 2).

BPA⬛said that after he arrived at UVA, a message was received about a possible second shooter. BPA⬛said he returned to Robb Elementary School. He said he was there about 10 to15 minutes when he was approached by Deputy Patrol Agent in Charge (DPAIC)⬛EGS. He said DPAIC⬛directed BPA⬛to ride with him to Flores Elementary School (timestamp 00:17:45).

BPA⬛stated that when they arrived at Flores Elementary School, he assisted with directing traffic until the school was cleared out (timestamp 00:19:40).

BPA⬛said he directed some parents to doors where the children were located (timestamp 00:20:55).

BPA⬛stated nobody provided him any direction to do this, he just became aware of what was going on and directed people from there (timestamp 00:21:45).

BPA⬛said Texas Department of Public Safety (TXDPS) was on scene (timestamp 00:22:20).

BPA⬛said he remained on scene for about two hours. He said he cleared from the school at approximately 5:30 p.m. (timestamp 00:23:30).

BPA⬛said he did not see any CBP personnel restricting parents from accessing their children (timestamp 00:24:20).

He said that during the time he was directing traffic at Flores Elementary School, the people he dealt with were all very respectful (timestamp 00:25:20).

BPA⬛said he did not have to render any type of first aid to anyone (timestamp 00:26:10).

BPA⬛said that after he and DPAIC⬛cleared from Flores Elementary School, they returned to the CP at Robb Elementary School (timestamp 00:26:45).

He said that after arriving at the CP, it was determined they were no longer needed. He went to his vehicle and began to drive back to EGS. BPA⬛estimated this occurred at about 6:00 p.m. (timestamp 00:27:00).





BPA (b) (6), (b) (7)(C) estimated that he arrived at EGS to end his shift around 7:00 p.m. BPA (b) (6), (b) (7)(C) said he was not ordered to write any type of memorandums. He said he was offered time off if needed to deal with the event (timestamp 00:27:38).

Regarding USBP's authority to assist with this type of event, BPA (b) (6), (b) (7)(C) stated he is an EMT and first responder, so it is his responsibility to assist when needed under the approval of his supervisor (timestamp 00:28:30).

BPA (b) (6), (b) (7)(C) said he never heard any shots while at the scene (timestamp 00:30:00).

BPA (b) (6), (b) (7)(C) said he did not have a body-worn camera. He said he does not have any text messages or emails regarding the incident (timestamp 00:30:50).

BPA (b) (6), (b) (7)(C) said he did receive Active Shooter training while at the USBP academy. He said his post-academy training consisted of refresher training (timestamp 00:33:00).

## ATTACHMENTS

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by BPA (b) (6), (b) (7)(C) |

OFFICIAL USE ONLY

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 43



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

OFFICIAL USE ONLY

**UF2022586**                                                       **EXHIBIT 43**

AR001383

 

## U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 8, 2023, SSA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) said that on May 24, 2022, he was on duty, wore his rough-duty uniform, worked the (b) (7)(E) shift, and his work assignment was to respond to sensor activations in the BRA area of responsibility (AOR).

BPA (b) (6), (b) (7)(C) said he heard about the incident at Robb Elementary School in Uvalde on his service radio. He recalled performing sign cutting with his training unit when a call came out on his service radio for all agents to report to the Uvalde Civic Center (timestamp 09:15:30).

He said he did not know it was a school shooting and believed it was just a shooting around a school. He recalled working with BPA (b) (6), (b) (7)(C) BRA, Field Training Officer (FTO), and BRA BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) when the call came over their service radios. He was unable to provide the name of the individual who directed agents to respond to the Uvalde Civic Center (timestamp 09:16:55).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001384



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) stated he remembered getting the order to respond, hurrying to their vehicle, "going lights and sirens", and getting there in approximately 35 to 40 minutes. He believed they arrived at the Uvalde Civic Center around 1:00 p.m. to 1:30 p.m. He said his coworker, BPA (b) (6), (b) (7)(C) drove them to Uvalde. He believed they began their drive to Uvalde at a ranch at (b) (7)(E) took Farm to Market Road 1572 up to U.S. Highway 90, and stayed on that road to Uvalde. He recalled another USBP vehicle followed them up to the Uvalde Civic Center, but he did not know who was in the other vehicle (timestamp 09:19:10).

BPA (b) (6), (b) (7)(C) stated all he knew was his FTO told them they were to report to the civic center, and they were not going to Robb Elementary School (timestamp 09:25:16).

He said that when they arrived at the Uvalde Civic Center, there were a lot of vehicles and parents looking for their children. He said he received orders to funnel the children getting off from buses into the civic center, to not let parents take their kids, and to have the parents wait until the kids were accounted for. BPA (b) (6), (b) (7)(C) recalled meeting up with a BPA (b) (6), (b) (7)(C) (first name unknown), BRA, when they arrived at the civic center. He could not recall who was providing instructions to everyone at the civic center when they arrived. He said the instructions he took came from BPA (b) (6), (b) (7)(C) (timestamp 09:28:01).

BPA (b) (6), (b) (7)(C) said that when he arrived at the civic center, he could not recall who was in charge. He recalled orders being provided to responding law enforcement officers (LEOs). The orders were to ensure kids arriving got into the building, to make sure no parents took their kids when they got off the bus, and to make sure the area was clear, so there was a clear path to the building as the kids were going in. He could not recall who gave those orders but thought it may have been a teacher from Robb Elementary School. He did not provide any orders or guidance to responding LEOs. He said he did not remember anyone from USBP being in charge when they arrived (timestamp 09:30:24).

BPA (b) (6), (b) (7)(C) explained his actions upon his arrival at the Uvalde Civic Center. He recalled the instruction to keep the pathway clear from the buses to the front of the civic center doors for the kids to get into the building. He reiterated the instruction was given to make sure the parents did not get their kids right when they get off the bus and the parents had to follow the protocols in place to pick up their children. He said he and other BPAs formed a line along the pathway to allow the kids to get into the building. He believed they performed this task for approximately two hours.

BPA (b) (6), (b) (7)(C) explained he heard a threat was made to the civic center, which led to perimeter security around the civic center being set up. He stated he was on the backside corner of the civic center. He recalled hearing the threat made to the civic center was from the shooter's girlfriend. He believed he performed perimeter security at the Uvalde Civic Center for approximately three hours. He was unable to recall who provided the information about the threat by the shooter's girlfriend or who gave the order to perform the perimeter security (timestamp 09:37:22).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA<sup>(b) (6), (b) (7)(C)</sup> said his interactions with the public consisted of answering questions presented to him by parents about their children and explaining to parents the process to get their children from the civic center.  He said he never exercised any authority that impacted the movement of individuals during the event.  He said the people he encountered followed their directions (timestamp 09:38:35).

BPA<sup>(b) (6), (b) (7)(C)</sup> stated he did not provide any type of aid to members of the public while he was at the Uvalde Civic Center.  He said USBP's role in the incident was to provide security.  He said USBP's authority/responsibility to respond to the incident was to provide security.  He stated he never heard any shots fired during the time he was at the Uvalde Civic Center (timestamp 09:39:39).

BPA<sup>(b) (6), (b) (7)(C)</sup> recalled leaving the civic center around 5:00 p.m.  He said he returned to BRA without making a stop, but he could not recall the time he arrived at the station.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 44



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

 

# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 8, 2023, SA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was assigned to the USBP Eagle Pass South Side processing facility, working his normal shift from (b) (7)(E) At approximately 1:00 p.m., BPA (b) (6), (b) (7)(C) received a telephone call from Supervisory BPA (SBPA) (b) (6), (b) (7)(C) EGT, informing him a shooting had occurred at Robb Elementary School (timestamp 11:33:05).

SBPA (b) (6), (b) (7)(C) told BPA (b) (6), (b) (7)(C) to respond to EGT to retrieve a USBP vehicle and then to respond to Uvalde. BPA (b) (6), (b) (7)(C) stated that at the time, he was not provided with any specific instructions to perform upon arrival in Uvalde, but later understood he was activated specifically because he was a Peer Support Member.

BPA (b) (6), (b) (7)(C) stated that at approximately 2:00 p.m., he departed EGT in his USBP patrol vehicle dressed in his USBP uniform (timestamp 11:35:00).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001388



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA ████ was traveling alone in his patrol vehicle behind BPA ████████████ EGT, who was traveling in his patrol vehicle. BPA ████ said he did not hear any radio transmissions while enroute to Uvalde. BPA ████ said he received a phone call from SBPA ████████ ████ EGT, who advised him to respond to the USBP Uvalde Station (UVA) (timestamp 11:38:15).

Both BPAs traveled to Uvalde via U.S. Highway 57 with overhead vehicle lights activated (timestamp 11:36:15). They arrived at UVA at approximately 2:40 p.m. (timestamp 11:38:40).

BPA ████ stated that while at UVA, he was not given any specific instructions but helped by getting food and water and was available as a Peer Support Member. BPA ████ stated he never had any contact with the public in Uvalde and continued to help at UVA until approximately 5:30 p.m. BPA ████ stated when BPA ████████████ USBP, Eagle Pass South Station (EGS) Peer Support Coordinator arrived, he advised him to return to Eagle Pass (timestamp 11:42:25).

BPA ████ stated he believed USBP's role in the incident was to respond and help at the incident location.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|:---:|:---|
| 1 | StarWitness interview of BPA ████████████ |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 45



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

**UF2022586**                                                    **EXHIBIT 45**

 

## U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 8, 2023, SSA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was on duty, in uniform, and assigned riverine patrol on the Rio Grande River. He said BPA (b) (6), (b) (7)(C) who heard about the incident over a news radio station, told him (BPA (b) (6), (b) (7)(C) about the incident at Robb Elementary School. He recalled BPA (b) (6), (b) (7)(C) assisted the vessel commander to get their boat out of the water, so BPA (b) (6), (b) (7)(C) could exit the vessel to respond with BPA (b) (6), (b) (7)(C) to an active shooter incident in Uvalde. Supervisory BPA (SBPA) (b) (6), (b) (7)(C) EGT, gave the order for BPA (b) (6), (b) (7)(C) and BPA (b) (6), (b) (7)(C) to travel together to respond to Uvalde. BPA (b) (6), (b) (7)(C) indicated he and BPA (b) (6), (b) (7)(C) were Emergency Medical Technicians (EMTs). BPA (b) (6), (b) (7)(C) believed they received the call from SBPA (b) (6), (b) (7)(C) to respond to Uvalde around 11:30 a.m. to 12:00 p.m. The trip took approximately one hour, and they got to Uvalde around 1:00 p.m. (timestamp 12:17:30).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001391



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) recalled their ambulance already had all their gear inside, and they took the M-4 rifle from the riverine vessel with them. He said BPA (b) (6), (b) (7)(C) drove, and they drove up to Pryor, TX and then took U.S. Highway 83 to Uvalde. BPA (b) (6), (b) (7)(C) did not recall any updates over the service radio or via cellular telephone regarding Uvalde until they got close to the Uvalde area. As they got close, he recalled switching to the Uvalde channel on his service radio and hearing a lot of talking. He stated he and BPA (b) (6), (b) (7)(C) were talking to each other, planning what they would do when they got to Uvalde. He said the conversation dealt with EMT stuff and what they needed to do when they arrived. He said their EMT vehicle traveled to Uvalde with emergency lights activated, and they only used the sirens as traffic approached. He stated nobody caravanned with them on their drive to Uvalde (timestamp 12:22:04).

BPA (b) (6), (b) (7)(C) explained that as they neared Uvalde, their plan was to go to Robb Elementary School. When they arrived, they parked as close to the school as they could, grabbed their EMT gear, and started heading towards the school. He recalled an unknown SBPA encountered them and advised they head towards the funeral home, as that was a rallying point and for them to look for Watch Commander (WC) (b) (6), (b) (7)(C) BPA (b) (6), (b) (7)(C) was unable to recall WC (b) (6), (b) (7)(C) first name or his USBP Station. He located WC (b) (6), (b) (7)(C) and was told that everyone that needed treatment had been treated and for them to rally up at the Uvalde Station (UVA) for a debriefing. BPA (b) (6), (b) (7)(C) believed they arrived at the funeral home in Uvalde around 1:00 p.m. (timestamp 12:23:55).

BPA (b) (6), (b) (7)(C) believed they only spent approximately 15 minutes at the funeral home in Uvalde. He recalled that during his briefing by WC (b) (6), (b) (7)(C) there was radio traffic indicating the girlfriend of the Robb Elementary School shooting suspect was potentially going to finish what he started, so they decided to perform security at another school. They got information that there were gunshots at a local high school, and they followed a local law enforcement officer (LEO) towards the high school where the shots were allegedly fired. Enroute, they heard on the service radio the report of shots fired at the high school was not true. They decided to go to a local elementary school close by to provide security for the school. They traveled to Dalton Elementary School, arrived at approximately 1:20 p.m., and spent the next five hours providing security at the school (timestamp 12:27:02).

BPA (b) (6), (b) (7)(C) stated he only contacted WC (b) (6), (b) (7)(C) when he arrived in Uvalde. He said the suspect's vehicle was in the ditch when they arrived, and it appeared to be secured. He recalled many LEO vehicles everywhere. He said he and BPA (b) (6), (b) (7)(C) were worried about their assignments, what they would do, and did not really worry about anything else when they arrived. He believed WC (b) (6), (b) (7)(C) was in charge of him when he arrived in Uvalde because he was the only person he spoke with at the funeral home. He did not observe any orders being provided to responding LEOs, and he said he never provided any orders or guidance to responding LEOs. He said that other than speaking with WC (b) (6), (b) (7)(C) it did not appear to him that anyone from USBP was in charge (timestamp 12:29:07).

BPA (b) (6), (b) (7)(C) explained that upon arrival at Dalton Elementary School, there was a large LEO presence. He recalled being told parents were attempting to get their kids out of the school prior



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



to lockdown, and the principal informed the parents there had to be an orderly method to retrieve their children instead of everyone attempting to come into the school all at once. He said he, BPA (b) (6), (b) (7)(C) and BPA/EMT (b) (6), (b) (7)(C) (first name unknown but current Lead EMT out of BPA (b) (6), (b) (7)(C) sector and formerly assigned to USBP Carrizo Springs Station, Texas), remained at the school to provide security to make sure the girlfriend of the Robb Elementary School shooting suspect did not show up.

BPA (b) (6), (b) (7)(C) said his only interactions with members of the public involved communicating with several parents who arrived at the school wanting to pick up their children. He advised them of the school's procedures and requirements they needed to follow to retrieve their children from the school. He stated he never rendered aid to any member of the public while in Uvalde. He said he never exercised any authority that impacted any individual's movement during the event while in Uvalde.

SSA (b) (6), (b) (7)(C) asked BPA (b) (6), (b) (7)(C) what he believed the USBP's role was in the shooting incident at Robb Elementary School. BPA (b) (6), (b) (7)(C) said his role was to provide security in case something was to spark up again (timestamp 12:35:40).

He clarified there was not much for him to do in Uvalde. He referenced jurisdiction and stated the school handled most of what was going on.

SSA (b) (6), (b) (7)(C) asked BPA (b) (6), (b) (7)(C) what his understanding was regarding USBP's authority/responsibility to respond to the incident. He stated, "I just assumed all law enforcement, if you're the closest guy, you do what you have to do." (timestamp 12:36:01).

He clarified it did not matter about federal, state or local. He said if he was the closest guy, he would do what he had to do. BPA (b) (6), (b) (7)(C) did not recall if he or BPA (b) (6), (b) (7)(C) contacted SBPA (b) (6), (b) (7)(C) to report they left Uvalde to return to EGT. He did not know what time they made it back to the station.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 46



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                 EXHIBIT 46

AR001394

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| **CASE NUMBER:** | UF2022586 | **FIELD OFFICE:** | Del Rio DSAC Office |
|---|---|---|---|
| **CASE AGENT:** | SA (b) (6), (b) (7)(C) | | |
| **CASE TITLE:** | Uvalde Texas School Shooting w/ Fatalities | | |
| **ACTIVITY CONDUCTED:** | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 8, 2023, SA (b) (6), (b) (7)(C) and ASAC (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning her involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, she was assigned to BRA and was in the field training unit. BPA (b) (6), (b) (7)(C) commenced her shift at (b) (7)(E) and was in USBP uniform. BPA (b) (6), (b) (7)(C) was working with fellow BRA BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) who was serving as their Field Training Officer. All of them were assigned to ride together in a marked USBP vehicle.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001395





BPA (b) (6), (b) (7)(C) and her assigned partners were working in a remote location near (b) (7)(E) located approximately 10 miles south of Brackettville, when they heard about the incident over the USBP radio. BPA (b) (6), (b) (7)(C) stated that at approximately 12:00 p.m., they heard a request over the radio on the BRA channel for any available units to report to Uvalde. Following, BPA (b) (6), (b) (7)(C) called an unknown manager at BRA, who advised BPA (b) (6), (b) (7)(C) there had been a shooting in Uvalde and directed BPA (b) (6), (b) (7)(C) to report to the civic center in Uvalde along with BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) (timestamp 00:14:30).

BPA (b) (6), (b) (7)(C) stated this was when she first learned that there had been a shooting (timestamp 00:44:38).

BPA (b) (6), (b) (7)(C) stated that from (b) (7)(E) they traveled up Farm to Market Road (FM) 1572, then turned east on U.S. Highway 90 into Uvalde. BPA (b) (7)(C) stated they were traveling using their emergency lights and sirens, and BPA (b) (6), (b) (7)(C) was driving (timestamp 00:26:05).

BPA (b) (6), (b) (7)(C) stated they arrived at the civic center in Uvalde at approximately 1:30 p.m. BPA (b) (6), (b) (7)(C) stated that upon arrival at the civic center, she and BPAs (b) ( ), ( ) ( )(C) and C were directed by BPA (b) (6), (b) (7)(C) to stand on the civic center's sidewalk to facilitate crowd control. This was because the area was overcrowded with people and students arriving by bus who needed to go into the civic center to get checked in to be accounted for. BPA (b) (6), (b) (7)(C) stated they performed these duties for approximately 45 minutes. At BPA (b) (6), (b) (7)(C) direction, they then relocated to the civic center's perimeter area, where they provided security through the end of their shift after receiving information to be on the lookout for an unknown female (timestamp 00:14:50).

BPA (b) (6), (b) (7)(C) stated there were multiple law enforcement agencies at the civic center, but she did not see any one agency in charge. BPA (b) (6), (b) (7)(C) stated their efforts at the civic center were to assist school administrators, and she believed that school administrators were in charge at the civic center (timestamp 00:29:40).

BPA (b) (6), (b) (7)(C) stated that prior to becoming a BPA, she was (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) BPA (b) (6), (b) (7)(C) stated she recalled seeing two Uvalde school administrators at the civic center, Director of Communications (b) (6), (b) (7)(C) and Assistant Superintendent (b) (6), (b) (7)(C) timestamp 00:30:35).

BPA (b) (6), (b) (7)(C) stated that while she was providing crowd control, she informed people they needed to check in at the civic center to pick up arriving students. BPA (b) (6), (b) (7)(C) stated that the entire time she was at the civic center, she did not have any issues with anyone, she did not use any type for force with anyone, and she did not render aid to anyone (timestamp 00:23:15).

BPA (b) (6), (b) (7)(C) stated she did not have a body-worn camera on the date of the incident. BPA (b) (6), (b) (7)(C) stated she did not have any text messages relevant to the incident and had not generated any reports, memorandums, or emails pursuant to the incident. BPA (b) (6), (b) (7)(C) stated that aside from the Texas Rangers, she had not provided a statement to anyone else concerning the



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



incident. BPA (b) (6), (b) (7)(C) stated she had participated in Active Shooter training while at the USBP Academy (timestamp 00:32:53).

BPA (b) (6), (b) (7)(C) stated they departed back to BRA from the civic center after the end of their shift (b) (7)(E) and they did not go to Robb Elementary School or elsewhere in Uvalde (timestamp 00:40:18).

BPA (b) (6), (b) (7)(C) stated her understanding of USBP's authority and responsibility to respond to this incident was based on USBP's role to provide assistance to other agencies wherever they were needed, to include crowd control and first aid (timestamp 00:45:11).

During the interview, BPA (b) (6), (b) (7)(C) was presented with maps illustrating Uvalde and the surrounding area. BPA (b) (6), (b) (7)(C) annotated the route of travel taken from (b) (7)(E) to Uvalde. BPA (b) (6), (b) (7)(C) also identified the location of the civic center in Uvalde where they responded to (Attachment 2).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 47



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                   EXHIBIT 47



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 8, 2023, ASAC (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was working the day shift from (b) (7)(E) but he worked approximately one additional hour. BPA (b) (6), (b) (7)(C) was in uniform and driving a marked USBP vehicle. BPA (b) (6), (b) (7)(C) was assigned to the EGT Planning Team and was likely preparing a report on May 24, 2022. BPA (b) (6), (b) (7)(C) said he received a call from a USBP supervisor and was asked to retrieve uniforms from EGT and take them to the USBP Uvalde Station (UVA) (timestamp 00:14:25).

BPA (b) (6), (b) (7)(C) estimated he was notified of the shooting at Robb Elementary School between approximately 12:45 p.m. and 1:00 p.m. (timestamp 00:41:20).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001399



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) explained he is a member of the CBP Peer Support Program, and he was requested to take the USBP uniforms as part of the Peer Support Program. BPA (b) (6), (b) (7)(C) did not remember the name of the USBP supervisor who requested he take the uniforms to Uvalde, but it was a supervisor from EGT. The uniforms were needed for BPAs who had blood on their uniforms.

BPA (b) (6), (b) (7)(C) and BPA (b) (6), (b) (7)(C) EGT, traveled together to Uvalde. While driving to Uvalde, BPA (b) (6), (b) (7)(C) activated both the emergency lights and sirens on his USBP vehicle. BPA (b) (6), (b) (7)(C) believed he arrived at UVA at approximately 2:20 PM. On May 24, 2022, BPA (b) (6), (b) (7)(C) did not go to Robb Elementary School, the Uvalde Civic Center, or any Uvalde school (timestamp 00:26:55).

BPA (b) (6), (b) (7)(C) said that once he arrived at UVA, he went into the muster room and was asked to assist with organizing uniforms. BPA (b) (6), (b) (7)(C) also assisted with food preparation and subsequently with additional uniforms (timestamp 00:28:50).

BPA (b) (6), (b) (7)(C) remained at UVA for a while to assist with anything more that was needed. BPA (b) (6), (b) (7)(C) believed he notified BPA (b) (6), (b) (7)(C) EGT, the Peer Support Coordinator, that he had arrived at UVA (timestamp 00:31:21).

BPA (b) (6), (b) (7)(C) said that on May 24, 2022, he did not observe any orders being given to any responding law enforcement officers; he did not provide orders to any responding law enforcement officers; he did not have any interactions with the public; he did not exercise any authority impacting the movement of any member of the public; he did not use force against any member of the public; and he did not render aid to any member of the public (timestamp 00:33:52).

BPA (b) (6), (b) (7)(C) said he believed that as a federal law enforcement officer, he had authority to assist in a response to the shooting at Robb Elementary School to the extent needed to ensure the safety of the public and fellow BPAs (timestamp 00:34:48).

BPA (b) (6), (b) (7)(C) said that as a federal law enforcement officer, he was responsible for protecting lives (timestamp 00:35:41).

BPA (b) (6), (b) (7)(C) said that on May 24, 2022, he was not wearing a body-worn camera. BPA (b) (6), (b) (7)(C) believed he might have called or sent a text message to BPA (b) (6), (b) (7)(C) concerning his response to Uvalde (timestamp 00:36:24).

BPA (b) (6), (b) (7)(C) did not prepare any reports or emails concerning the Robb Elementary School shooting (timestamp 00:37:36).

After arriving at the UVA, BPA (b) (6), (b) (7)(C) discussed the Robb Elementary School shooting with others at the station (timestamp 00:37:42).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) said he has not participated in Active Shooter training but was present during an Active Shooter training to take photos of the training. BPA (b) (6), (b) (7)(C) did not specifically remember taking online Active Shooter training.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|:---:|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 48



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                           EXHIBIT 48



# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of SOS (b) (6), (b) (7)(C) | | |

## DETAILS OF ACTIVITY

On February 8, 2023, SA (b) (6), (b) (7)(C) and ASAC (b) (6), (b) (7)(C) interviewed SOS (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

SOS (b) (6), (b) (7)(C) stated that on May 24, 2022, he was assigned to the DRT, Sector Intelligence Unit (SIU), from (b) (7)(E) SOS (b) (6), (b) (7)(C) a second-level supervisor, was at SIU when he first heard of the incident in Uvalde (timestamp 00:10:22).

Upon hearing of the incident, SOS (b) (6), (b) (7)(C) walked from the SIU office to the DRT Border Intelligence Center (BIC) office located by SIU at DRT Headquarters. SOS (b) (6), (b) (7)(C) stated he did not remember what time he heard of the incident but recalled the situation was still ongoing. SOS (b) (6), (b) (7)(C) stated he was having a meeting with Deputy Patrol Agent in Charge (DPAIC) (b) (6), (b) (7)(C) DRT, SIU (timestamp 00:11:24).

SOS (b) (6), (b) (7)(C) stated that on May 24, 2022, he was wearing the black and tan uniform consisting of a black polo shirt with a USBP insignia, khaki pants, and tan boots (timestamp 00:12:22).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001403




SOS (b) (6), (b) (7)(C) stated he learned of the incident when he received a text message from Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) DRT, SIU, asking SOS (b) (6), (b) (7)(C) if he had heard about the incident. SOS (b) (6), (b) (7)(C) stated he did not recall the exact contents of the text message other than it was about a shooting at a school in Uvalde. SOS (b) (6), (b) (7)(C) stated that upon receiving the message, he and DPAIC (b) (6), (b) (7)(C) walked from SIU to BIC. SOS (b) (6), (b) (7)(C) stated that once he was at BIC, he started hearing additional information over the radio (timestamp 00:14:52).

SOS (b) (6), (b) (7)(C) stated the drive from Del Rio to Uvalde is a little over an hour. SOS (b) (6), (b) (7)(C) stated he initially remained at BIC and spent the majority of his time querying vehicle license plates received over the radio as well as calls to BIC. SOS (b) (6), (b) (7)(C) stated he performed the queries to help assist in identifying the shooter and any possible associates (timestamp 00:20:27).

SOS (b) (6), (b) (7)(C) stated he did not direct Border Patrol Agents (BPAs) or any other CBP personnel to respond to Uvalde. SOS (b) (6), (b) (7)(C) stated he subsequently fielded a call from BPA (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) USBP, Eagle Pass South Station (EGS), Texas, the DRT Peer Support Coordinator, who requested SOS (b) (6), (b) (7)(C) respond to the USBP Uvalde Station (UVA). SOS (b) (6), (b) (7)(C) stated he was a Peer Support Member and responded to UVA in a peer support role. SOS (b) (6), (b) (7)(C) stated he did not recall what time he responded to UVA but stated it was soon after hearing reports that the subject was neutralized [killed] (timestamp 00:24:15).

SOS (b) (6), (b) (7)(C) stated he traveled alone from Del Rio to UVA, and it took him around an hour (timestamp 00:36:42).

SOS (b) (6), (b) (7)(C) stated he was not utilizing emergency lights or sirens. SOS (b) (6), (b) (7)(C) stated he could not recall what time he arrived but said it was possibly around 3:00 p.m. SOS (b) (6), (b) (7)(C) stated he was driving an unmarked USBP vehicle and drove east on U.S. Highway 90, which was a direct route (timestamp 00:28:47).

SOS (b) (6), (b) (7)(C) stated he drove straight to UVA and never went to Robb Elementary School or any other location in Uvalde. SOS (b) (6), (b) (7)(C) stated that upon his arrival, he did not recall notifying anyone in Del Rio that he had arrived. SOS (b) (6), (b) (7)(C) stated he coordinated with other members of the Peer Support Team at UVA (timestamp 00:39:27).

SOS (b) (6), (b) (7)(C) stated he remained at UVA for several hours performing peer support duties. SOS (b) (6), (b) (7)(C) stated he could not recall what time he departed but said it was around sundown.

SOS (b) (6), (b) (7)(C) stated he did not have any in-person contact with any members of the public during his response to Uvalde, he did not use his authority to impact anyone's movements, and he did not provide aid to anyone (timestamp 00:33:53).

SOS (b) (6), (b) (7)(C) also stated that while in Uvalde, he never directed any subordinates to perform any duties or take any actions with any members of the public (timestamp 01:03:47).

 

SOS (b) (6), (b) (7)(C) stated he did not know who was in charge at UVA when he was there. SOS (b) (6), (b) (7)(C) explained he spent the majority of his time conducting peer support duties (timestamp 00:41:10).

SOS (b) (6), (b) (7)(C) stated his understanding of USBP's authority to respond to the incident was based on BPAs' authority to make arrests for felonies committed in their presence, such as in this case of an active shooter. SOS (b) (6), (b) (7)(C) stated that in a hypothetical situation, if a BPA, while attempting to make an arrest within the scope of their duties, encountered a deadly force situation, then, if necessary, the use of deadly force would be authorized (timestamp 00:45:53).

SOS (b) (6), (b) (7)(C) stated USBP's responsibility to respond to an incident such as the shooting was based on the general duty of law enforcement officers to act to protect lives. SOS (b) (6), (b) (7)(C) stated USBP typically and routinely assisted other law enforcement agencies in a support role to perform their duties (timestamp 00:47:01).

SOS (b) (6), (b) (7)(C) stated he did not have an assigned body-worn camera on the date of the incident. SOS (b) (6), (b) (7)(C) stated he no longer had the work phone where he received the initial notification text message sent to him by PAIC (b) (6), (b) (7)(C) because he had turned it in and obtained a replacement. During the interview, SOS (b) (6), (b) (7)(C) stated he would try and access his old phone to obtain a screenshot of the message (timestamp 00:48:11).

SOS (b) (6), (b) (7)(C) stated he had not generated any reports, memorandums, or emails pursuant to the incident. SOS (b) (6), (b) (7)(C) stated he did not have any discussions detailing his response to the incident. SOS (b) (6), (b) (7)(C) stated that aside from the Texas Rangers, he did not provide a statement to anyone else concerning the incident. SOS (b) (6), (b) (7)(C) stated he had participated in Active Shooter training several times during his USBP career to include once while stationed in Deming, New Mexico, and other times while stationed in Del Rio (timestamp 00:51:09).

During the interview, OPR interviewers presented SOS (b) (6), (b) (7)(C) with maps illustrating Uvalde and the surrounding area. SOS (b) (6), (b) (7)(C) annotated the route of travel he took from Del Rio to Uvalde. SOS (b) (6), (b) (7)(C) also identified the approximate location of UVA where he had responded (Attachment 2).

Following his interview, SOS (b) (6), (b) (7)(C) notified OPR interviewers he had located his old phone, but no messages were available due to it being reset.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of SOS (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by SOS (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 49



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                    EXHIBIT 49

AR001406

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 9, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was working an overtime shift that began at (b) (7)(E) and ended that evening at approximately 6:30 p.m. or 7:00 p.m. BPA (b) (6), (b) (7)(C) recollected that on the morning of May 24, 2022, he was driving a fifteen-passenger marked transport van, government owned vehicle (GOV), assisting with a smuggling load that had been detained outside of Uvalde. BPA (b) (6), (b) (7)(C) stated that following the operation, he drove his GOV back into Uvalde. He was heading southbound on 4th Street near Dalton Elementary School when he heard a radio transmission from UVA indicating there was an active shooter at Robb Elementary School (timestamp 00:12:12).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001407




BPA (b) (6), (b) (7)(C) could not recall the time the notification of the active shooter was communicated; however, he stated it would have been captured on the USBP, Del Rio Sector (DRT), dispatch radio (b) (7)(E) BPA (b) (6), (b) (7)(C) stated that shortly after the notification of the active shooter, his assigned radio frequency was patched together with other local law enforcement agencies.

BPA (b) (6), (b) (7)(C) stated he immediately activated his GOV's lights and sirens and drove from N. 4th Street to U.S. Highway 90, to U.S. Highway 83 south, to the south side of Robb Elementary School. BPA (b) (6), (b) (7)(C) stated that while enroute to Robb Elementary School, he communicated with BPA (b) (6), (b) (7)(C) UVA, because they were on the same route, and BPA (b) (6), (b) (7)(C) indicated he would head to the west side of the school.

BPA (b) (6), (b) (7)(C) stated that as he was driving down Old Carrizo Road on the southeast side of the school, he noticed other law enforcement units already at the scene parking their vehicles. BPA (b) (6), (b) (7)(C) stated he parked his GOV and asked a Texas Department of Public Safety (TXDPS) Trooper doing traffic control at the intersection what was happening, and the Trooper stated, "The chief is in the room with the guy." (timestamp 00:14:59).

BPA (b) (6), (b) (7)(C) stated that based upon the Trooper's response, he believed the situation inside was a "standoff" (timestamp 00:15:11).

BPA (b) (6), (b) (7)(C) stated he began conducting traffic control at the intersection while noting that people were attempting to drive down the road or park, and people on foot were beginning to gather.

BPA (b) (6), (b) (7)(C) stated that during this time, he heard over the radio that the subject had a long gun. BPA (b) (6), (b) (7)(C) stated the Trooper that was initially there doing traffic control left their location on foot and took up another position, leaving BPA (b) (6), (b) (7)(C) alone in the intersection. BPA (b) (6), (b) (7)(C) stated that as he directed vehicle traffic, he immediately recognized that the CBP helicopter (b) (7)(E) was flying above the school (timestamp 00:16:59).

BPA (b) (6), (b) (7)(C) also observed who he believed to be an off-duty law enforcement officer walking toward the school with bolt cutters to cut the locks on the pedestrian gates outside the school. BPA (b) (6), (b) (7)(C) stated he saw BPA (b) (6), (b) (7)(C) UVA, park his GOV and go towards the school cafeteria while asking BPA (b) (6), (b) (7)(C) to keep an eye on his K-9 inside the GOV (timestamp 00:17:30).

BPA (b) (6), (b) (7)(C) also recollected a man climbing in the back of his truck to get an elevated position to video record, noting he told the man to get down because the suspect had a long gun. BPA (b) (6), (b) (7)(C) stated Supervisory BPA (SBPA) (b) (6), (b) (7)(C) DRT, stopped in front of him in his GOV, and BPA (b) (6), (b) (7)(C) stated, "All I know is it's around the corner. It's that back building." SBPA (b) (6), (b) (7)(C) responded "10-4" and took off to the other side of the school (timestamp 00:18:19).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) advised he started seeing children being evacuated out of the south side of the school and heard a radio transmission that they were to be transported to the Uvalde Civic Center. BPA (b) (6), (b) (7)(C) stated he passed this information along to the parents that had gathered nearby. BPA (b) (6), (b) (7)(C) stated he assisted other law enforcement personnel in running the students and teachers to the mesquite trees behind the school to stage for transportation. BPA (b) (6), (b) (7)(C) recalled that some of the children were crying. BPA (b) (6), (b) (7)(C) stated he got a case of water out of his GOV and while doing so, decided to utilize his GOV to assist with transporting the students and teachers to the civic center. BPA (b) (6), (b) (7)(C) stated he ran into the school superintendent and notified him the children would be transported to the civic center. BPA (b) (6), (b) (7)(C) said two school buses came and were loaded with students and teachers, and he loaded his GOV with two teachers and those students who were under the control of those teachers (timestamp 00:21:31).

BPA (b) (6), (b) (7)(C) recalled that as they were loading students into the buses and his GOV, an older male came up and grabbed one of the students stating the student was his grandchild. BPA (b) (6), (b) (7)(C) indicated he initially told the male he could not take the student but deferred to a teacher who approved the child going with the male (timestamp 00:23:55).

BPA (b) (6), (b) (7)(C) stated he followed the two school buses with his red and blue lights activated. BPA (b) (6), (b) (7)(C) stated they traveled to the civic center with the flow of traffic, where he made contact with SBPA (b) (6), (b) (7)(C) UVA, who was there with the UVA brush crew that included UVA BPAs (b) (6), (b) (7)(C) BPA First Name Unknown (FNU) (b) (6), (b) (7)(C) and BPA FNU (b) (6), (b) (7)(C) BPA (b) (6), (b) (7)(C) stated there was a large number of parents already gathered at the civic center; however, the children were unloaded and walked into the civic center without issue.

BPA (b) (6), (b) (7)(C) stated he departed the civic center in his GOV with the two school buses while noting he broke off from the buses because they were taking a different route back to Robb Elementary School. BPA (b) (6), (b) (7)(C) stated that on his route back, he identified a large group of teachers and students gathered at a residence about two blocks east of Robb Elementary School. BPA (b) (6), (b) (7)(C) stated he stopped his GOV and loaded more teachers and students as a school bus was approaching to load the remaining people. BPA (b) (6), (b) (7)(C) believed he contacted SBPA (b) (6), (b) (7)(C) via cell phone to advise he would be returning to the civic center with another load of students and teachers.

Prior to departing, BPA (b) (6), (b) (7)(C) saw an ambulance parked near the school, and he asked a female to take his Individual Patrol Officer Kit to the medical personnel, and they would know how to utilize the contents. BPA (b) (6), (b) (7)(C) stated he drove back to the civic center and dropped off the second load of students and teachers and assisted with making a path to get them inside. BPA (b) (6), (b) (7)(C) stated he then returned the same way to the south side of Robb Elementary School; however, he heard there was a large number of students gathered at the funeral home on the north side of the school and decided to make his way to that location. BPA (b) (6), (b) (7)(C) stated he had to park his GOV and walk to the funeral home, where he spoke with a female he recognized and was informed there were school buses coming to the location to pick up students and teachers. BPA (b) (6), (b) (7)(C) stated he saw Deputy Chief Patrol Agent (b) (6), (b) (7)(C)




DRT, Assistant Chief Patrol Agent (b) (6), (b) (7)(C) DRT, and BPA (b) (6), (b) (7)(C) UVA, outside of the funeral home attempting to keep a crowd of people back who were yelling and cursing in Spanish. BPA (b) (6), (b) (7)(C) stated the people were angry because a BPA in full uniform, whom BPA (b) (6), (b) (7)(C) did not know or recognize, had retrieved their child, and the parents were asking why they had to go to the civic center to get their children, and the BPA did not (timestamp 00:35:07).

BPA (b) (6), (b) (7)(C) stated he departed the funeral home because he heard a transmission on his handheld radio indicating there were additional students that needed transported near Old Carrizo Road and the south side of Robb Elementary School. BPA (b) (6), (b) (7)(C) stated he made his way in his GOV to where the students were gathered and immediately recognized Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) Brackettville Station (BRA), Texas, SBPA (b) (6), (b) (7)(C) UVA, and BPA (b) (6), (b) (7)(C) UVA, standing with the students across from the school (timestamp 00:35:56).

BPA (b) (6), (b) (7)(C) stated they loaded the students and teachers in the GOV and proceeded to travel to the civic center, where he dropped them off and assisted with getting them inside.

BPA (b) (6), (b) (7)(C) stated he then returned to Robb Elementary School, parked his GOV, and met up with SBPA (b) (6), (b) (7)(C) U.S. Border Patrol (USBP), Erie Station (ERP), Pennsylvania, who was assigned to UVA at the time. BPA (b) (6), (b) (7)(C) and SBPA (b) (6), (b) (7)(C) walked to an impromptu muster that was taking place on the north side of the school in the schoolyard. BPA (b) (6), (b) (7)(C) indicated the muster was led by Chief Patrol Agent Jason Owens, DRT, who spoke to all the USBP personnel on site and directed all personnel to report to UVA for a muster with TXDPS. As he was driving to UVA, BPA (b) (6), (b) (7)(C) advised there was a radio transmission regarding a secondary threat to the civic center, so he went directly to the civic center to assist with securing that facility. Upon arriving at the civic center, he spoke with Aviation Enforcement Agent (AEA) (b) (6), (b) (7)(C) CBP, Air and Marine Operations, Uvalde, who indicated they were securing the site and taking all students and parents inside of the building (timestamp 00:43:11).

BPA (b) (6), (b) (7)(C) stated there was another radio transmission indicating they needed personnel to secure the other Uvalde schools. BPA (b) (6), (b) (7)(C) made the decision to drive to Flores Elementary School and park his GOV. BPA (b) (6), (b) (7)(C) stated Watch Commander (WC) (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) UVA, and WC (b) (6), (b) (7)(C) UVA, also reported to the same location. They secured the school exits and ultimately formed a perimeter around the cafeteria, where all the students were gathered. BPA (b) (6), (b) (7)(C) said he was making decisions as the situation evolved. BPA (b) (6), (b) (7)(C) stated that eventually, parents began showing up, and the students were systematically released from Flores Elementary School. BPA (b) (6), (b) (7)(C) stated the last student was picked up from Flores Elementary School at approximately 6:30 p.m. BPA (b) (6), (b) (7)(C) stated he departed the school and returned to UVA, where he briefly spoke with WC (b) (6), (b) (7)(C) and WC (b) (6), (b) (7)(C) and then departed to his residence.




BPA <span style="background:black">(b) (6), (b) (7)(C)</span> clarified that he self-deployed to Robb Elementary School upon hearing there was an active shooter at the school (timestamp 01:22:53).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> stated he has never participated in any Active Shooter training (timestamp 01:23:24).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> clarified that upon initially responding to Robb Elementary School, he met face to face with BPA <span style="background:black">(b) (6), (b) (7)(C)</span> prior to BPA <span style="background:black">(b) (6), (b) (7)(C)</span> departing to the west side of the school where he encountered the shooting suspect's wrecked vehicle in the ditch. BPA <span style="background:black">(b) (6), (b) (7)(C)</span> stated that upon first responding to the school and taking up a position conducting traffic and crowd control, he encountered members of the public that were attempting to cross the street. BPA <span style="background:black">(b) (6), (b) (7)(C)</span> stated some people were frustrated and were moving toward the school, prompting him to say, "Get the fuck back." (timestamp 01:28:25).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> denied physically touching or pushing any member of the public (timestamp 01:28:40).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> tated that while standing in front of the school conducting traffic and crowd control, he was there for approximately ten or fifteen minutes prior to the students being evacuated from the school. Further, BPA <span style="background:black">(b) (6), (b) (7)(C)</span> clarified that BPA <span style="background:black">(b) (6), (b) (7)(C)</span> arrived at his location in an unmarked GOV prior to the first group of students being evacuated to the mesquite trees behind the school, and he said the CBP helicopter, <span style="background:black">(b) (7)(E)</span> was flying overhead (timestamp 01:34:38).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> stated that upon his first arrival at Robb Elementary School, he could not say if any particular agency was in command and control of the scene; however, from the radio transmissions, he knew the Uvalde Police Department (UPD) was involved and assisting (timestamp 01:38:13).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> denied issuing any orders or commands to fellow law enforcement officers while assisting at the site (timestamp 01:38:35).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> stated he did not see anyone from USBP assume command and control of the situation at the school (timestamp 01:39:04).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> denied impacting any person's movement or restricting anyone in any way (timestamp 01:39:52).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> stated his purpose in raising his voice or swearing when communicating with the public that day was for the safety of the public due to the suspect involved in the school shooting having a long arm (timestamp 01:40:38).

BPA <span style="background:black">(b) (6), (b) (7)(C)</span> denied providing any medical aid to the public (timestamp 01:41:06).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) stated that at no point during the day did anyone issue him an order or directive to assist with transporting students and teachers to the civic center, and he made the decision on his own. BPA (b) (6), (b) (7)(C) could not estimate how long it took for him to complete three separate trips to the civic center. BPA (b) (6) (b) (7)(C) could not recall ever hearing anything on the radio that the situation inside of the school had been effectively resolved. BPA (b) (6), (b) (7)(C) stated USBP's role on May 24, 2022, was to show up and assist. He added the authority to do so is from being a human being in law enforcement to show up and assist with whatever needed to be done. BPA (b) (6), (b) (7)(C) denied wearing a body-worn camera during his shift, denied having any pertinent text messages or emails that relate to the incident, and denied having to write a report detailing his activities on May 24, 2022 (timestamp 01:50:51).

BPA (b) (6), (b) (7)(C) clarified that prior to the third time he picked up students and teachers and stopped at the funeral home, he noted there were helicopters and ambulances parked outside of the school. To him, this indicated the situation inside of the school had been resolved. Prior to concluding the interview, BPA (b) (6), (b) (7)(C) utilized printed maps to outline his actions on May 24, 2022, in response to the Robb Elementary School shooting (Attachment 2).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 50



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586

EXHIBIT 50

AR001413

 

# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 9, 2023, SA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated his normal duty hours are from (b) (7)(E) and on May 24, 2022, he was an instructor for an Emergency Medical Technician (EMT) class at USBP Del Rio Sector (DRT). At approximately 12:30 p.m., BPA (b) (6), (b) (7)(C) was informed by fellow EMT instructor, BPA (b) (6), (b) (7)(C) USBP, Brackettville Station (BRA), Texas, to retrieve his medical kit because they were leaving to go to Uvalde (timestamp 12:47:20).

After he retrieved his kit, BPA (b) (6), (b) (7)(C) met Watch Commander (WC) (b) (6), (b) (7)(C) DRS, to obtain keys for an unmarked government vehicle. WC (b) (6), (b) (7)(C) advised BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) that their medical support may be needed at Robb Elementary School. Other than to respond directly to Robb Elementary School, WC (b) (6), (b) (7)(C) did not give any specific instructions for BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) after they arrived in Uvalde (timestamp 12:50:13).

At approximately 12:40 p.m., BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) who were both in uniform, departed the city of Del Rio together in an unmarked government vehicle and traveled on U.S. Highway

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001414





90 heading eastbound directly to Uvalde. Initially, BPA (b) (6), (b) (7)(C) activated the emergency overhead lights on his vehicle, but the lights stopped working before they left the city of Del Rio (timestamp 12:48:50).

At approximately 1:30 p.m., BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) arrived in Uvalde (timestamp 12:50:56).

BPA (b) (6), (b) (7)(C) said that upon arrival, he followed standard USBP protocol for a mass casualty incident, which was to report directly to the on-scene incident commander. BPA (b) (6), (b) (7)(C) met with Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) BRA, who directed him to the incident command center located at Hillcrest Funeral Home (Hillcrest) (timestamp 12:51:30).

At approximately 1:35 p.m., BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) arrived at Hillcrest and were directed to sign in on the log inside Hillcrest. Afterwards, BPA (b) (6), (b) (7)(C) inquired about who was in charge for medical personnel at the incident and was directed to (b) (6), (b) (7)(C) (unknown name) from San Antonio, Texas Emergency Medical Services (EMS). While meeting with (b) (6), (b) (7)(C) BPA (b) (6), (b) (7)(C) stated he was informed all medical personnel were being redirected to Uvalde Regional Medical Center (timestamp 12:53:30).

At approximately 1:45 p.m., BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) departed for Uvalde Regional Medical Center, but while enroute, USBP dispatch, call sign (b) (6), (b) (7)(C) advised via radio there was a suspected shooter at the Uvalde High School. At that point, they decided to redirect to the high school, arriving at approximately 1:50 p.m. (timestamp 12:57:00).

Upon arrival, BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) approached a school resource officer and asked him where the incident command center was. The school resource officer then directed BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) to an exterior door of a long hallway and told them they would be posted there. BPA (b) (6), (b) (7)(C) noticed BPA-Programs (BPA-P) (b) (6), (b) (7)(C) DRT, and Supervisory BPA (SBPA) (b) (6), (b) (7)(C) USBP, Artesia, New Mexico, who was a BPA with DRT at that time, were also in the hallway and helped them to clear rooms inside the building. After they were done clearing the rooms, BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) exited the school building and met with an unknown USBP supervisor who advised them that additional perimeter security was needed at Morales Junior High School, which was a block away from Uvalde High School (timestamp 13:01:12).

BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) departed Uvalde High School at approximately 2:20 p.m. and arrived at Morales Junior High School at 2:23 p.m. Upon arrival, BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) found an area along the perimeter of the school that was lacking law enforcement presence and decided to post there. They provided security there for approximately one hour before they were relieved by an officer from an unknown sheriff's department (timestamp 13:03:30).

After being relieved, BPA (b) (6), (b) (7)(C) stated he heard from other officers on scene that additional security was needed at Flores Elementary School. BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) departed Morales Junior High School at approximately 3:23 p.m. and arrived at Flores Elementary School at 3:25 p.m. (timestamp 13:08:00).



BPA (b) (6), (b) (7)(C) stated that while at Flores Elementary School, he provided security and passed along information he received to parents. This included information that the school administrators were not releasing children unless the parents were in a vehicle. BPA (b) (6), (b) (7)(C) stated he did not provide any aid to the public at any of the locations he was at, nor did he exercise any law enforcement authority to restrict anyone's movements (timestamp 13:23:56).

BPA (b) (6), (b) (7)(C) said that after about an hour of providing security at Flores Elementary School, he spoke with other BPAs on scene who advised him they were not aware that his presence was needed at any other location in Uvalde. At approximately 4:25 p.m., BPA (b) (6), (b) (7)(C) contacted BPA (b) (6), (b) (7)(C) who was serving as the Sector Medical Coordinator, DRT, at that time, and informed him he and BPA (b) (6), (b) (7)(C) were going to return to Del Rio (timestamp 13:09:40).

[Agent's Note: (b) (6), (b) (7)(C) is now a Deportation Officer with U.S. Immigration and Customs Enforcement, (b) (6), (b) (7)(C)

BPA (b) (6), (b) (7)(C) stated he believed USBP's role during the incident was that it was their duty as federal law enforcement officers to respond to incidents and provide protection where needed (timestamp 13:11:10).

## ATTACHMENTS

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 51



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

AR001417



# U.S. CUSTOMS AND BORDER PROTECTION
# OFFICE OF PROFESSIONAL RESPONSIBILITY
# INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| | | | |
|---|---|---|---|
| **CASE NUMBER:** | UF2022586 | **FIELD OFFICE:** | Del Rio DSAC Office |
| **CASE AGENT:** | SA (b) (6), (b) (7)(C) | | |
| **CASE TITLE:** | Uvalde Texas School Shooting w/ Fatalities | | |
| **ACTIVITY CONDUCTED:** | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 9, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed (BPA) (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he began his shift at (b) (7)(E) He said that after the daily muster at about 2:45 p.m., he received a call to return to the station's armory. He stated that CAR BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) also received calls. He said the agents were assigned rifles and traveled to Uvalde. He said that initially, they were told to go to the funeral home near Robb Elementary School, but while on the way, they were rerouted to the civic center (timestamp 00:13:31).

BPA (b) (6), (b) (7)(C) said two of the BPAs were assigned to the west side of the civic center parking lot near the Walgreens and the other two were assigned to the lot on the opposite side. He said the four BPAs were all within view of each other (timestamp 00:15:10).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001418



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) estimated the agents did not leave CAR until 3:00 p.m. or 3:30 p.m. (timestamp 00:16:15).

BPA (b) (6), (b) (7)(C) said he and BPA (b) (6), (b) (7)(C) rode together. BPA (b) (6), (b) (7)(C) said Watch Commander (WC) (b) (6), (b) (7)(C) CAR, and Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) CAR, also traveled to Uvalde (timestamp 00:17:36).

BPA (b) (6), (b) (7)(C) said that when they left CAR, they took State Highway 85 to Farm to Market Road 1407 north to Crystal City, Texas then to La Pryor, Texas and into Uvalde on U.S. Highway 83 (timestamp 00:8:00).

BPA (b) (6), (b) (7)(C) estimated he arrived at the civic center at about 4:30 p.m. to 5:00 p.m. He said he could not recall if there was any one particular law enforcement agency in command at the civic center (timestamp 00:20:10).

BPA (b) (6), (b) (7)(C) said he never witnessed any CBP personnel prohibit parents from reaching their kids (timestamp 00:22:05).

BPA (b) (6), (b) (7)(C) said the four CAR BPAs remained on scene at the civic center until 6:30 p.m. or 7:30 p.m., until they were relieved by some local officers. He said the CAR agents went to eat and then went back to CAR (timestamp 00:23:40).

BPA (b) (6), (b) (7)(C) said that at some point after their arrival, there was a discussion about a potential second shooter, but he did not recall the time frame. He said that eventually, someone from Uvalde County advised the alleged second shooter, the girlfriend of the Robb Elementary School shooter, was located, and an all clear was given (timestamp 00:25:00).

BPA (b) (6), (b) (7)(C) said he did not have to render aid to anyone (timestamp 00:26:26).

BPA (b) (6), (b) (7)(C) did not have a body-worn camera. He said he does not have any emails or messages regarding the situation and did not recall being instructed to provide a memorandum (timestamp 00:26:45).

BPA (b) (6), (b) (7)(C) said he underwent Active Shooter training in 2017. In reference to USBP authority to respond, he said that in the Active Shooter training he received, as a reasonable adult in this job, you respond to it [the situation], and you need to go (timestamp 00:27:30).

BPA (b) (6), (b) (7)(C) said the four BPAs that responded from CAR discussed on the way to Uvalde why things took so long [referring to the time it took to enter the classroom and confront the shooter]. BPA (b) (6), (b) (7)(C) said regarding the Active Shooter training, you cannot stop to think; you just have to move (timestamp 00:28:36).




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 52



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                         EXHIBIT 52

AR001421

 

# U.S. CUSTOMS AND BORDER PROTECTION
# OFFICE OF PROFESSIONAL RESPONSIBILITY
# INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

## DETAILS OF ACTIVITY

On February 8, 2023, SA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was on duty as a canine handler (K-9) patrolling the area of U.S. Highway 277 during the day shift in Carrizo Springs when a coworker told him the news about the shooting at Robb Elementary School (timestamp 11:47:45).

Shortly after hearing the news, BPA (b) (6), (b) (7)(C) stated he received a phone call from his Peer Support Coordinator, BPA (b) (6), (b) (7)(C) USBP, Eagle Pass South Station (EGS), Texas, who advised him of the shooting and to respond to Robb Elementary School (timestamp 11:49:15).

BPA (b) (6), (b) (7)(C) was unable to recall the time he received the phone call from BPA (b) (6), (b) (7)(C) but understood from the conversation he was being activated as a Peer Support Member to provide assistance in a peer support role.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|
| Approved by: | | Date: | |

WARNING: This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001422



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA ██████████ departed Carrizo Springs alone in his assigned K-9 patrol vehicle wearing his USBP uniform but was unable to recall the time he departed or whether he activated the emergency overhead lights on his patrol vehicle (timestamp 11:51:25).

From Carrizo Springs, BPA ██████████ traveled on U.S. Highway 277 east towards State Highway 191 and then took U.S. Highway 83 north to Uvalde. BPA ██████████ stated that when he was approximately 15 miles from Uvalde, he received a phone call from BPA ███████ directing him to respond to the USBP Uvalde Station (UVA), and they would meet each other there. BPA ██████████ stated he could not recall the time he received the phone call from BPA ██████████ (timestamp 11:52:40).

BPA ██████████ could not recall the time he arrived at UVA, but after he arrived, he met with BPA ██████████ who advised him other BPAs would soon be arriving at UVA from Robb Elementary School. BPA ██████████ told him to assist the incoming BPAs with any needs they had (timestamp 11:54:15).

BPA ██████████ said that when the BPAs arrived, he was able to identify BPAs that looked distraught and offered to speak with them regarding their experience. BPA ██████████ stated he did not know the BPAs he spoke with by name (timestamp 11:55:15).

BPA ██████████ remained at UVA for approximately three hours until 6:00 p.m., when he was notified by BPA ██████████ his assistance was no longer needed. BPA ██████████ stated he did not have any contact with the public while in Uvalde (timestamp 11:56:15).

BPA ██████████ then called CAR to advise he would be going off duty and returning to his home in Uvalde.

BPA ██████████ stated he understood USBP's role was to provide assistance as law enforcement wherever needed.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA ██████████ |

FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 53



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                    EXHIBIT 53

 

# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 9, 2023, SSA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was assigned to work in uniform in the CAR area of responsibility. He said he worked the (b) (7)(E) shift. BPA (b) (6), (b) (7)(C) recalled hearing about the incident at Robb Elementary School while driving to work from a coworker, who he believed was reading the news or got a text message about the shooting.

BPA (b) (6), (b) (7)(C) reported to CAR for his (b) (7)(E) shift and was briefed by station management on the shooting. He recalled being told the situation was handled, there was nothing left to do, and he would remain in Carrizo Springs, TX to work his shift. He remembered being called back to CAR after he had reported to his assigned area and was told he would pair up with BPA (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) BPA (b) (6), (b) (7)(C) nd BPA (b) (6), (b) (7)(C) CAR, were to pair up and go to Uvalde to relieve the BPAs working dayshift who were working security (Timestamp 13:37:27).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001425



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



He believed there were several BPAs from the dayshift in Uvalde, but the only one he could recall was BPA (b) (6), (b) (7)(C) CAR. He recalled leaving CAR and heading to Uvalde around 3:10 p.m. to 3:15 p.m.

BPA (b) (6), (b) (7)(C) said he left CAR and took U.S. Highway 83 north to Uvalde. He rode with BPA (b) (6), (b) (7)(C) and the other two BPAs rode in a separate vehicle. He recalled they activated their emergency lights to begin the trip to Uvalde, but an unknown Watch Commander called and told them there was no need to have their emergency equipment activated, so they deactivated their lights and sirens near Crystal City, Texas. He said he and his two coworkers were the only two vehicles that traveled to Uvalde.

BPA (b) (6), (b) (7)(C) did not receive any communication from anyone on the drive to or as they neared Uvalde. He recalled utilizing his government phone to locate the dayshift agents needing relief. He was unable to recall the individual who told him the dayshift agents were at the Uvalde Civic Center, but he said that was where they were located. BPA (b) (6), (b) (7)(C) and the other three agents relieved the dayshift BPA agents from CAR and were asked to direct traffic at the Uvalde Civic Center (Timestamp 13:39:42).

He was unable to recall who asked him to direct traffic, and he believed they arrived at the Uvalde Civic Center at approximately 4:00 p.m. He believed he directed traffic for approximately two to three hours.

BPA (b) (6), (b) (7)(C) recalled a lot of traffic traveling past the Uvalde Civic Center when they arrived and said the traffic was on a main road that went through the city. He described the scene as chaotic. He was unsure of who was in charge at the Uvalde Civic Center because there were multiple agencies present. He said he did not observe any orders being provided to responding law enforcement officers (LEOs) except for the order he received to help direct traffic. He stated he did not provide any orders or guidance to any responding LEOs. BPA (b) (6), (b) (7)(C) stated it did not appear anyone from USBP was in charge (Timestamp 13:54:57).

BPA (b) (6), (b) (7)(C) said he interacted with the public by providing information to civilians on where to go to vote, where to park, where to get their children, and telling them not to block the spaces where the children in the Uvalde Civic Center would enter and exit. BPA (b) (6), (b) (7)(C) said he did not exercise any authority which impacted any individual's movement during his time at the Uvalde Civic Center. He stated he did not render aid to any members of the public during his time at the civic center.

BPA (b) (6), (b) (7)(C) said USBP's role in the incident in Uvalde was to support local law enforcement. He explained Uvalde was a small city, and they needed all the help they could get. Regarding USBPs authority to respond, BPA (b) (6), (b) (7)(C) said, "Well, we're just like I said, we're just there to support the local law enforcement. We, we, even in Carrizo, we always supporting law enforcement...We're here to help and exercise authority if needed, if need be. If somebody's trying to cause harm, we're there to protect the public as well," (Timestamp 13:57:47).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) recalled he returned to the CAR at approximately 8:00 p.m. to 9:00 p.m.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 54



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586 EXHIBIT 54

AR001428

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| **CASE NUMBER:** | UF2022586 | **FIELD OFFICE:** | Del Rio DSAC Office |
|---|---|---|---|
| **CASE AGENT:** | SA (b) (6), (b) (7)(C) | | |
| **CASE TITLE:** | Uvalde Texas School Shooting w/ Fatalities | | |
| **ACTIVITY CONDUCTED:** | Interview of WC (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 9, 2023, ASAC (b) (6), (b) (7) C and SA (b) (6), (b) (7)(C) interviewed WC (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

WC (b) (6), (b) (7)(C) stated that on May 24, 2022, he was working the day shift. WC (b) (6), (b) (7)(C) recalled the day was hectic with involvement in a smuggling attempt and assistance being provided to another agency. On May 24, 2022, WC (b) (6), (b) (7)(C) was in uniform and driving a marked USBP vehicle (timestamp 00:15:50).

WC (b) (6), (b) (7)(C) was unable to remember when he first learned of the shooting at Robb Elementary School, but he believed it was near lunchtime (timestamp 00:16:01).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001429



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



WC (b) (6), (b) (7)(C) was unable to remember specifically how he first learned of the shooting, but he said it was through a radio or phone communication. WC (b) (6), (b) (7)(C) did not remember when he left Brackettville for Uvalde, but he recalled he traveled into Uvalde using U.S. Highway 90. While traveling from Brackettville to Uvalde, WC (b) (6), (b) (7)(C) USBP vehicle had a flat tire, and he did not have a spare tire. WC (b) (6), (b) (7)(C) waited on the roadside while a spare tire was delivered to him, which delayed him approximately 45 minutes. While waiting for the spare tire, WC (b) (6), (b) (7)(C) learned the shooter had been confronted and shot. After receiving this information, WC (b) (6), (b) (7)(C) decided to return to Bracketteville. However, as he was changing the flat tire, WC (b) (6), (b) (7)(C) learned through radio communications that a female made threats on social media, so he continued to Uvalde. While traveling to Uvalde, WC (b) (6), (b) (7)(C) activated the vehicle's emergency lights and siren. WC (b) (6), (b) (7)(C) did not travel with anyone into Uvalde (timestamp 00:22:26).

WC (b) (6), (b) (7)(C) was unable to remember specifically when he arrived in Uvalde, but he recalled it was after he had received information concerning the female making threats on social media and prior to her arrest (timestamp 00:18:39).

WC (b) (6), (b) (7)(C) was not directed to respond to Uvalde for the shooting (timestamp 00:17:44).

WC (b) (6), (b) (7)(C) responded to Uvalde, since BRA Border Patrol Agents (BPAs) he supervised responded to Uvalde (timestamp 00:17:53).

While traveling to Uvalde, WC (b) (6), (b) (7)(C) heard numerous radio communications concerning activity related to the shooting in Uvalde (timestamp 00:20:09).

These radio communications concerned activity at multiple locations in Uvalde. WC (b) (6), (b) (7)(C) believed that when he arrived at the civic center, he notified BRA on the radio of his arrival (timestamp 00:32:44).

WC (b) (6), (b) (7)(C) provided the names of BRA BPAs who responded to Uvalde on May 24, 2022 (timestamp 00:33:40).

When asked to describe the situation he encountered at the civic center, WC (b) (6), (b) (7)(C) said he pulled perimeter security and that it was an election day (timestamp 00:38:40).

WC (b) (6), (b) (7)(C) described the situation at the civic center as "controlled chaos" and one of the saddest things he had seen (timestamp 00:39:45).

When WC (b) (6), (b) (7)(C) arrived at the civic center, he did not receive any instruction, and while at the civic center, he did not receive any instruction (timestamp 00:40:32).

WC (b) (6), (b) (7)(C) never learned who had overarching command and control at the civic center (timestamp 00:41:44).





WC [(b) (6), (b) (7)(C)] observed law enforcement officers being given limited instruction at the civic center (timestamp 00:42:58).

WC [(b) (6), (b) (7)(C)] believed that on May 24, 2022, he only spoke with fellow BPAs. On May 24, 2022, while at the civic center, WC [(b) (6), (b) (7)(C)] only provided instruction to BRA BPAs (timestamp 00:44:20).

WC [(b) (6), (b) (7)(C)] said Patrol Agent in Charge (PAIC) [(b) (6), (b) (7)(C)] Carizzo Springs Station (CAR), Texas, was the highest ranking USBP official he saw at the civic center (timestamp 00:47:48).

WC [(b) (6), (b) (7)(C)] did not have any interaction with school district officials concerning their plan to release students to parents.

WC [(b) (6), (b) (7)(C)] stated that on May 24, 2022, he did not exercise any authority impacting the movements of any individual (timestamp 00:49:40).

WC [(b) (6), (b) (7)(C)] said that on May 24, 2022, he did not render aid to any member of the public. WC [(b) (6), (b) (7)(C)] departed the Uvalde Civic Center at approximately 4:30 p.m. or 5:00 p.m. (timestamp 00:52:21).

When asked to explain his understanding of USBP authority to respond to the shooting at Robb Elementary School and the associated incidents, WC [(b) (6), (b) (7)(C)] said it would be through the assistance request, a mutual aid agreement, and "Just pure being a human being." (timestamp 00:50:17).

When asked to explain the USBP's responsibility to respond to the shooting and associated incidents, WC [(b) (6), (b) (7)(C)] responded, "Just being human beings… There's people dying… You've got to react." (timestamp 00:51:15).

WC [(b) (6), (b) (7)(C)] believed that on May 24, 2022, he directed BRA BPAs [(b) (6), (b) (7)(C)] and [(b) (6), (b) (7)(C)] [(b) (6), (b) (7)(C)] who are Emergency Medical Technicians (EMTs), to respond to Robb Elementrary School (timestamp 00:53:50).

During the interview, WC [(b) (6), (b) (7)(C)] was shown maps depicting the area north of Uvalde; south of Uvalde; the city of Uvalde; Uvalde schools; and Robb Elementary School (timestamp 00:23:12) (Attachment 2).

These maps are labeled one through five, respectively. On map one of north Uvalde, WC [(b) (6), (b) (7)(C)] indicated his route of travel and where his vehicle had the flat tire. On map two of south Uvalde, WC [(b) (6), (b) (7)(C)] indicated it was not applicable. On map three of Uvalde, WC [(b) (6), (b) (7)(C)] again indicated his travel route. On map four of the Uvalde schools, WC [(b) (6), (b) (7)(C)] indicated he traveled to the Uvalde Civic Center, the approximate location where he parked his vehicle, and that he was not at any of the Uvalde schools. On map five of Robb Elementary School, WC [(b) (6), (b) (7)(C)] indicated it was not applicable.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



WC (b) (6), (b) (7)(C) stated that on May 24, 2022, he was not wearing a body-worn camera. WC (b) (6), (b) (7)(C) believed he sent text messages on May 24, 2022, relating to the incident. WC (b) (6), (b) (7)(C) explained that he no longer had the government cell phone he used on May 24, 2022, since he was issued a new government cell phone. WC (b) (6), (b) (7)(C) explained the cell phone he used on May 24, 2022, was returned to Special Operations Supervisor (b) (6), (b) (7)(C) BRA, who serves as the Local Property Officer. WC (b) (6), (b) (7)(C) believed the cell phone he used on May 24, 2022, is currently at USBP Del Rio Sector. WC (b) (6), (b) (7)(C) did not send any emails concerning the response to the shooting at Robb Elementary School. WC (b) (6), (b) (7)(C) did not prepare any reports concerning the USBP's response to the shooting at Robb Elementary School. WC (b) (6), (b) (7)(C) participated in a phone interview with a Texas Ranger. WC (b) (6), (b) (7)(C) informed the Texas Ranger that he was not at Robb Elementary School, and the interview ended shortly thereafter (timestamp 00:55:21).

Additionally, WC (b) (6), (b) (7)(C) received Active Shooter training within the last 10 years through USBP El Paso, Texas.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of WC (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by WC (b) (6), (b) (7)(C) |



## U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Additional Information Provided by WC (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On March 29, 2023, WC (b) (6), (b) (7)(C) sent Senior SA (b) (6), (b) (7)(C) CBP OPR, text messages related to the CBP response to the school shooting (Attachment 1).

On March 31, 2023, and April 4, 2023, ASAC (b) (6), (b) (7)(C) spoke with WC (b) (6), (b) (7)(C) concerning the text messages. WC (b) (6), (b) (7)(C) provided additional information concerning the messages, including last names of those mentioned in the messages and an explanation of a messages referencing "Tim Hortons", "B1" and "Hot Miking."

Review of the messages and information provided on March 31, 2023, and April 4, 2023, by WC (b) (6), (b) (7)(C) indicated the messages begin at 11:49 a.m., and were sent between WC (b) (6), (b) (7)(C) and Supervisory Border Patrol Agent (SBPA) (b) (6), (b) (7)(C) BRA. In these messages, BPA (b) (6), (b) (7)(C) asked if Border Patrol Agent (BPA) (b) (6), (b) (7)(C) BRA, should be sent to Robb Elementary School since additional Emergency Medical Technicians (EMT) might be needed. WC (b) (6), (b) (7)(C) instructed SBPA (b) (6), (b) (7)(C) to contact the USBP Uvalde Station (UVA) to see if additional EMTs were needed.

SBPA (b) (6), (b) (7)(C) subsequently told WC (b) (6), (b) (7)(C) that he could not reach any UVA management, but the BPA who answered the phone said to send the EMTs to Uvalde, so BPA (b) (6), (b) (7)(C) and BPA (b) (6), (b) (7)(C) BRA, responded. SBPA (b) (6), (b) (7)(C) then told WC (b) (6), (b) (7)(C) he was responding to Uvalde.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|
| Approved by: | | Date: | |

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001433



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



WC (b) (6), (b) (7)(C) then sent a message stating "Tim Hortons what is know when you go and seeing if you need anything else" and SBPA (b) (6), (b) (7)(C) responded 10-4. WC (b) (6), (b) (7)(C) explained to ASAC (b) (6), (b) (7)(C) that he was using voice to text when he sent message, and he was unable to explain the meaning of this message and believed the voice to text might have not worked correctly.

WC (b) (6), (b) (7)(C) asked SBPA (b) (6), (b) (7)(C) if he and BPA (b) (6), (b) (7)(C) were wearing body armor and SBPA (b) (6), (b) (7)(C) responded that he had body armor, but he did not know about BPA (b) (6), (b) (7)(C) WC (b) (6), (b) (7)(C) told SBPA (b) (6), (b) (7)(C) that Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) BRA, instructed them to stage at the USBP Uvalde Checkpoint and SBPA (b) (6), (b) (7)(C) as ed if they could proceed to a convenience store five blocks from the school. WC (b) (6), (b) (7 C) responded "From B1" and "They just took it off line. One UVA agent was Hot Miking." WC (b) (6), (b) (7)(C) explained that when he referenced "B1" he was advising SBPA (b) (6), (b) (7)(C) that the instruction to stage at the Checkpoint was from PAIC (b) (6), (b) (7)(C) Additionally, WC (b) (6), (b) (7)(C) clarified his messages concerning the "Hot Miking" and taking it "off line" by explaining a BPA unknowingly had the transmission key pressed on his radio and others could not communicate on the radio channel so the BPA's radio or that channel was taken off-line allowing others to communicate during the incident.

WC (b) (6), (b) (7)(C) then asked SBPA (b) (6), (b) (7)(C) for BPA (b) (6), (b) (7)(C) UVA phone number, which SBPA (b) (6), (b) (7)(C) provided.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | Text messages between WC (b) (6), (b) (7)(C) and SBPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 55



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                        EXHIBIT 55



# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA-P (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 9, 2023, SA (b) (6), (b) (7)(C) and ASAC (b) (6), (b) (7)(C) interviewed BPA-P (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

BPA-P (b) (6), (b) (7)(C) stated that on May 24, 2022, he was assigned to DRT as the less-lethal coordinating officer. BPA-P (b) (6), (b) (7)(C) was accompanied by Supervisory Border Patrol Agent (SBPA) (b) (6), (b) (7)(C) Harpers Ferry, West Virginia, and SBPA (b) (6), (b) (7)(C) Harpers Ferry, who were both assigned to CBP Law Enforcement Safety and Compliance (LESC) as use of force instructors. They were conducting observations of DRT's firearms and less-lethal training programs at the USBP Brackettville Station (BRA), Texas (timestamp 00:11:32).

BPA-P (b) (6), (b) (7)(C) said their uniforms (SBPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) and BPA-P (b) (6), (b) (7)(C) consisted of a USBP polo shirt with Department of Homeland Security insignia, as well as tan pants and a gun belt. BPA-P (b) (6), (b) (7)(C) and SBPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) were in an unmarked USBP vehicle driven by BPA-P (b) (6), (b) (7)(C) and were about to depart BRA when they crossed paths with an unknown BPA who advised them there had been an incident in Uvalde (timestamp 00:12:15).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001436



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA-P (b) (6), (b) (7)(C) stated the vehicle he was driving did not have a functioning USBP radio or emergency equipment. BPA-P (b) (6), (b) (7)(C) stated that due to the circumstances, he proceeded to Uvalde as fast as he could whenever there was no traffic. BPA-P (b) (6), (b) (7)(C) stated they were passed up by many emergency vehicles with lights and sirens on while on their way to Uvalde. BPA-P (b) (6), (b) (7)(C) stated they were not directed to respond to Uvalde. BPA-P (b) (6), (b) (7)(C) stated it was a decision he made with SBPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) (timestamp 00:32:20).

BPA-P (b) (6), (b) (7)(C) stated he did not know where Robb Elementary School was, so he called BRA to get more information. BPA-P (b) (6), (b) (7)(C) stated that during the call, he was told by an unknown person at BRA that the incident at Robb Elementary School was the result of a bailed out smuggling load, and the load driver had absconded from a vehicle wreck and was shooting at law enforcement from the school. BPA-P (b) (6), (b) (7)(C) stated he did not find out until much later what had actually occurred (timestamp 00:18:10).

BPA-P (b) (6), (b) (7)(C) stated he drove on U.S. Highway 90 from Brackettville to Uvalde (timestamp 00:19:07).

BPA-P (b) (6), (b) (7)(C) stated he drove to Robb Elementary School but had to park several hundred yards away on Geraldine Street due to a large volume of law enforcement vehicles that were parked and blocking the way to Robb Elementary School. BPA-P (b) (6), (b) (7)(C) stated that upon arrival, they followed other arriving law enforcement officers and made their way to the area of the funeral home and Robb Elementary School. BPA-P (b) (6), (b) (7)(C) described the scene as very chaotic but also without a sense of urgency. BPA-P (b) (6), (b) (7)(C) stated there was no "stimulus" or "driving force" such as the sound of gunfire, calls for help, or someone on a bullhorn providing directions to law enforcement and Emergency Medical Services (EMS) staging areas. BPA-P (b) (6), (b) (7)(C) stated that based on Advanced Law Enforcement Rapid Response Training (ALERRT) and Active Shooter trainings he had previously received, he knew to look or listen for stimulus. BPA-P (b) (6), (b) (7)(C) stated he considered Geraldine Street a problem because law enforcement vehicles were completely occluding the ingress and egress of EMS vehicles. BPA-P (b) (6), (b) (7)(C) stated he attempted to find the drivers of the law enforcement vehicles blocking the roadway; however, he was not successful (timestamp 00:22:07).

BPA-P (b) (6), (b) (7)(C) stated he subsequently made the independent decision set up a traffic control point on Geraldine Street and Evans Street along with a Uvalde Police Department (UPD) police officer or a Uvalde Consolidated Independent School District Police Department (UCISDPD) police officer, whose last name was (b) (6), (b) (7)(C) to try to limit the scope of the vehicle congestion problem and facilitate access to EMS. BPA-P (b) (6), (b) (7)(C) stated he asked law enforcement officers arriving at the location to park along the sides of Geraldine Street and Evans Street to keep the roadway accessible to EMS. BPA-P (b) (6), (b) (7)(C) stated this allowed for at least one or two EMS vehicles to travel through the area. BPA-P (b) (6), (b) (7)(C) stated he and Officer (b) (6), (b) (7)(C) were also joined by off-duty Border Patrol Agent (BPA) (b) (6), (b) (7)(C) BRA (timestamp 00:24:38).

BPA-P (b) (6), (b) (7)(C) stated he believed he had called Watch Commander (b) (6), (b) (7)(C) USBP, Del Rio Station (DRS), to notify her he had responded to Uvalde. BPA-P (b) (6), (b) (7)(C) stated he could



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



not identify a command-and-control structure at the scene when he arrived. BPA-P (b) (6), (b) (7)(C) stated that while at the traffic control point, he heard the incident command center was at the funeral home located across the street from Robb Elementary School. BPA-P (b) (6), (b) (7)(C) stated that upon hearing this, he made his way there and asked a random officer who the incident commander was. BPA-P (b) (6), (b) (7)(C) stated he was pointed in the direction of an unknown UPD police officer or UCISDPD police officer who was sitting behind a desk in a very small room within the funeral home.

BPA-P (b) (6), (b) (7)(C) stated that upon arrival, he observed the incident commander holding a small piece of paper in his hand with the name (b) (6), (b) (7)(C) and possibly a date of birth or Social Security number. BPA-P (b) (6), (b) (7)(C) stated he observed the incident commander yell at a female UPD police officer, telling her he needed to know everything about (b) (6), (b) (7)(C) yesterday. BPA-P (b) (6), (b) (7)(C) stated he later learned from watching a news conference that the mayor of Uvalde was seated next to the unknown incident commander who BPA-P (b) (6), (b) (7)(C) described as a younger male, either white or Hispanic. BPA-P (b) (6), (b) (7)(C) stated that while inside the room, he made contact with an unknown officer who was next to the incident commander and who appeared to know what was going on. BPA-P (b) (6), (b) (7)(C) stated he told the unknown officer that he and Officer (b) (6), (b) (7)(C) were screening traffic at the intersection of Geraldine and Evans. BPA-P (b) (6), (b) (7)(C) stated he asked the officer if he wanted them to proceed carrying out this duty or if they were needed elsewhere. BPA-P (b) (6), (b) (7)(C) stated the officer told him they were doing exactly what he needed them to do. BPA-P (b) (6), (b) (7)(C) stated he provided his phone number to this officer and proceeded back to the traffic control point. BPA-P (b) (6), (b) (7)(C) stated he did not observe orders being directed to anyone else while he was at the incident command center (timestamp 00:34:49).

BPA-P (b) (6), (b) (7)(C) stated that aside from directing arriving law enforcement officers where to park, he did not provide orders to any law enforcement officers (timestamp 00:41:01).

BPA-P (b) (6), (b) (7)(C) stated that while he was manning the traffic control point, SBPA (b) (6), (b) (7)(C) DRT, SBPA (b) (6), (b) (7)(C) DRT, BPA (b) (6), (b) (7)(C) DRT, and BPA (b) (6), (b) (7)(C) DRT, who are all also Firearms Instructors, along with SBPA (b) (6), (b) (7)(C) Harpers Ferry, LESC, arrived and proceeded farther towards Robb Elementary School and obtained more information. SBPA (b) (6), (b) (7)(C) informed him it had been a school shooting, and children had died. BPA-P (b) (6), (b) (7)(C) stated the BPAs must have arrived at least thirty 30 minutes after he did (timestamp 00:41:28).

BPA-P (b) (6), (b) (7)(C) stated that while he was there, he did not receive any orders from anyone in USBP and did not observe anyone with USBP directing orders (timestamp 00:43:01).

BPA-P (b) (6), (b) (7)(C) stated his interactions with members of the public pertained to the time he manned the traffic control point. BPA-P (b) (6), (b) (7)(C) stated that if a member of the public advised him they lived beyond the traffic control point, he would let them in, and if parents arrived looking for their children, he would direct them to the family reunification site at the civic center.



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA-P ██████ stated that at one point, he heard there was a lookout for the shooter's aunt, but it was very basic information and only that she was wearing a tank-top shirt and had tattoos. BPA-P ██████ stated that soon after he heard about this lookout, he observed a female passenger who appeared to match the description leaving in a car on Geraldine Street. BPA-P ██████ stated he yelled to unknown officers standing ahead of him to direct the car to stop, which they did. BPA-P ██████ stated he then approached the car's passenger side and observed the female did not match the description, and he allowed the car to proceed. BPA-P ██████ stated this interaction took about 15 to 20 seconds. BPA-P ██████ stated he did not recall the people in the car taking issue with his actions (timestamp 00:47:32).

BPA-P ██████ stated that while he was manning the traffic control point, he did not allow non-EMS or law enforcement vehicles down Geraldine Street to keep it clear for EMS. BPA-P ██████ stated he did this because he felt it was the most appropriate thing for him to do with the information he had at that time. BPA-P ██████ reiterated this allowed at least one or maybe two EMS ambulances to travel down the street as a result of his actions. BPA-P ██████ stated it was his decision to establish that traffic control point, and he had requested Officer ██████ assistance to do it (timestamp 00:53:00).

BPA-P ██████ stated he never used force with any member of the public and did not provide aid to anyone (timestamp 00:54:45).

BPA-P ██████ stated that on May 25, 2022, he emailed WC ██████ a timeline outlining his response to Uvalde (Attachment 2).

BPA-P ██████ read his email and said he received initial notification of the incident at approximately 11:45 a.m. when he was in Brackettville (timestamp 00:56:18).

Upon reading his email, BPA-P ██████ stated that from the traffic control point, he received information from SBPA ██████ indicating assistance was needed with crowd control at the Uvalde Hospital where he proceeded to go with SBPA ██████ (timestamp 01:02:42).

BPA-P ██████ estimated he arrived at the hospital between 1:00 p.m. and 1:30 p.m. BPA-P ██████ stated he only spent a short amount of time at the hospital because at approximately 1:30 p.m., BPA ██████ USBP, Eagle Pass South Station (EGS), Texas, who is the DRT Peer Support Coordinator, contacted him telephonically and requested he proceed to the USBP Uvalde Station (UVA) to provide Peer Support Member (PSM) services. BPA-P ██████ stated he departed the hospital at approximately 1:45 p.m. BPA-P ██████ stated that while he was at the hospital, he became aware of a female who was speaking with U.S. Marshals Service (USMS) Deputies. BPA-P ██████ stated the female yelled obscenities at the USMS deputies, BPA-P ██████ and SBPA ██████ The female subsequently went inside the hospital, and a USMS Deputy informed BPA-P ██████ the female was a relative of the shooter. BPA-P ██████ stated he did not have any interactions with this female (timestamp 01:42:30).

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA-P (b) (6), (b) (7)(C) continued reading his email and explained he arrived at UVA in time for the (b) (7)(E) muster. BPA-P (b) (6), (b) (7)(C) stated he remained at UVA providing PSM services to affected agents until approximately 7:00 p.m. when he departed UVA with BPA (b) (6), (b) (7)(C) UVA, who is the USBP Chaplain, to drive one of the affected agents to his residence in San Antonio, Texas. BPA-P (b) (6), (b) (7)(C) then traveled back to Del Rio where he arrived at approximately 11:15 p.m. (timestamp 01:04:54).

BPA-P (b) (6), (b) (7)(C) stated BPA (b) (6), (b) (7)(C) who assisted in manning the traffic control point, had a child who was in Robb Elementary School at the time of the shooting.

Concerning his understanding of USBP's authority to respond to this incident, BPA-P (b) (6), (b) (7)(C) stated BPAs had the ability to use reasonable and necessary force to protect themselves or others based on case law from Graham versus Connor and Tennessee versus Garner. Concerning his understanding of USBP's responsibility to respond to this incident, BPA-P (b) (6), (b) (7)(C) stated any law enforcement agency has the obligation to protect life. BPA-P (b) (6), (b) (7)(C) stated CBP would not have an Active Shooter training program if they did not want to make a difference in such situations (timestamp 01:11:37).

During the interview, OPR interviewers presented BPA-P (b) (6), (b) (7)(C) with maps illustrating Uvalde and the surrounding area. BPA-P (b) (6), (b) (7)(C) annotated the route of travel he took from Brackettville to Robb Elementary School in Uvalde. BPA-P (b) (6), (b) (7)(C) also identified the location where he parked his USBP vehicle and where he established the traffic control point near Geraldine Street and Evans Street (Attachment 3).

BPA-P (b) (6), (b) (7)(C) stated he might have relevant text messages but would need time to verify, and if so, he would provide them post interview. BPA-P (b) (6), (b) (7)(C) stated he did not have an assigned body-worn camera on the date of the incident. BPA-P (b) (6), (b) (7)(C) stated that following the incident, he generated the email he provided; however, he did not generate any other reports or memorandums about the incident. BPA-P (b) (6), (b) (7)(C) stated that aside from the Texas Rangers, he did not have discussions detailing his response to this incident. BPA-P (b) (6), (b) (7)(C) a CBP certified firearms and less lethal instructor, stated he had received ALERRT training in 2021 and Active Shooter training in 2018 (timestamp 01:38:06).

Prior to concluding the interview, OPR interviewers presented BPA-P (b) (6), (b) (7)(C) with a photograph to identify Officer (b) (6), (b) (7)(C) however, BPA-P (b) (6), (b) (7)(C) did not identify the subject in the photograph (timestamp 02:23:10).

Following the interview, BPA-P (b) (6), (b) (7)(C) provided SA (b) (6), (b) (7)(C) a digital copy of the email he sent to WC (b) (6), (b) (7)(C) on May 25, 2022. BPA-P (b) (6), (b) (7)(C) had no relevant text messages (Attachment 4).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|:---:|:---|
| 1 | StarWitness interview of BPA-P (b) (6), (b) (7)(C) |
| 2 | Timeline provided by BPA-P (b) (6), (b) (7)(C) |
| 3 | Maps reviewed by BPA-P (b) (6), (b) (7)(C) |
| 4 | Email provided by BPA-P (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 56



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                          EXHIBIT 56

AR001442



# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 9, 2023, ASAC (b), (6), (b) (7)( and SA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was on duty, working in uniform, and driving a marked USBP vehicle. During this time, BPA (b) (6), (b) (7)(C) typically worked from (b) (7)(E) (b) (7)(E) On May 24, 2022, BPA (b) (6), (b) (7)(C) first learned of the shooting at Robb Elementary School while working on a USBP boat with BPA (b) (6), (b) (7)(C) EGT. At approximately 1:00 p.m., BPA (b) (6), (b) (7)(C) received a phone call from their supervisor, Supervisory BPA (SBPA) (b) (6), (b) (7)(C) EGT. SBPA (b) (6), (b) (7)(C) directed BPA (b) (6), (b) (7)(C) and BPA (b) (6), (b) (7)(C) to respond to the funeral home in Uvalde, since they are both Emergency Medical Technicians (EMT) (timestamp 00:12:48).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001443



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Later, while listening to news on the radio, BPA ██████ learned of the shooting at Robb Elementary School and believed that was the reason he was directed to respond to Uvalde. While traveling into Uvalde, BPA ██████ did not receive any updates concerning the response to the shooting. BPAs ██████ and ██████ traveled from Eagle Pass to Uvalde together, and BPA ██████ activated the emergency lights and siren while driving the USBP vehicle. BPA ██████ traveled to Uvalde on U.S. Highway 57, turned in La Pryor, Texas, and traveled into Uvalde (timestamp 00:15:48).

While traveling to Uvalde, BPA ██████ received information from social media indicating the shooting was the result of a failed smuggling attempt, and the driver of the vehicle absconded into the school (timestamp 00:16:25).

At approximately 2:00 p.m., BPAs ██████ and ██████ arrived at Uvalde. BPAs ██████ and ██████ did not travel with anyone to Uvalde.

BPA ██████ said that when he arrived near the funeral home by Robb Elementary School, he parked the USBP vehicle several blocks away, since there were numerous law enforcement vehicles in the area. After parking the vehicle, BPAs ██████ and ██████ took their medical equipment with them to the funeral home. While at the funeral home BPA ██████ saw BPA ██████ Brackettville Station (BRA), Texas, and Patrol Agent in Charge (PAIC) ██████ ██████ EGT (timestamp 00:31:28).

BPA ██████ said that at the funeral home, he notified PAIC ██████ that he arrived, but BPA ██████ did not speak with any state or local law enforcement officer nor school district officials (timestamp 00:38:35).

At the funeral home, BPAs ██████ and ██████ learned they were not needed and were instructed to report to either the USBP Del Rio Station (DRS) or USBP Uvalde Station (UVA). BPA ██████ was unable to remember which USBP Station he was instructed to report to by PAIC ██████ As BPAs ██████ and ██████ were driving away from the area of the funeral home, they heard radio communications concerning a possible threat to other Uvalde schools. BPAs ██████ and ██████ saw another USBP vehicle with activated emergency equipment and decided to follow the vehicle to assist. BPAs ██████ and ██████ then went to Dalton Elementary School in Uvalde (timestamp 00:35:15).

When asked to describe the command-and-control structure at the funeral home and Robb Elementary School, BPA ██████ said it was difficult to determine who was in charge (timestamp 00:39:32).

BPA ██████ did not know who was in charge at the funeral home and did not observe any instruction being provided to responding law enforcement officers. BPA ██████ did not provide orders or guidance to any responding law enforcement officer (timestamp 00:40:10).

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



While at the funeral home near Robb Elementary School, BPA ████ (b) (6), (b) (7)(C) did not use force, take action to impede anyone's movement, or provide medical aid to anyone (timestamp 00:41:01).

BPA ████ (b) (6), (b) (7)(C) arrived at Dalton Elementary School at approximately 2:30 p.m. At approximately 3:00 p.m., BPA ████ (b) (6) (b) (7)(C) moved the marked USBP vehicle into the driveway at Dalton Elementary School to control traffic (timestamp 00:41:37).

While at Dalton Elementary School, BPA ████ (b) (6), (b) (7)(C) saw parents waiting to pick up children, but the school was locked down. BPA ████ (b) (6), (b) (7)(C) and other BPAs provided security at the school. BPA ████ (b) (6), (b) (7)(C) told arriving parents the school was locked down and students would not be released until the lockdown was lifted (timestamp 00:46:28).

BPA ████ (b) (6), (b) (7)(C) provided the names of BPAs he saw at Dalton Elementary School (timestamp 00:47:30).

After the lockdown was lifted at Dalton Elementary School, at the request of the principal, BPA ████ (b) (6), (b) (7)(C) and other BPAs assisted Dalton Elementary School staff with releasing students to parents. BPA ████ (b) (6) (b) (7)(C) said he and other BPAs obtained driver licenses from parents and relayed parent information to school officials, who would then bring the student to the front of the school for release. BPA ████ (b) (6), (b) (7)(C) stated the process of releasing students was slow, and it took a few hours (timestamp 01:01:18).

BPA ████ (b) (6), (b) (7)(C) did not know who was in charge at Dalton Elementary School. While at Dalton Elementary School, BPA ████ (b) (6), (b) (7)(C) did not observe direction being given to responding law enforcement officers. Additionally, BPA ████ (b) (6), (b) (7)(C) did not provide orders to any responding law enforcement officers (timestamp 00:50:50).

When asked if while at Dalton Elementary School he exercised authority impacting anyone's movement, BPA ████ (b) (6), (b) (7)(C) responded that he guessed so since parents were not allowed to enter the school. BPA ████ (b) (6), (b) (7)(C) explained that the school principal was out front, and BPA ████ (b) (6), (b) (7)(C) explained to arriving parents that since the school was in lockdown, the school was not releasing students (timestamp 00:54:10).

While at Dalton Elementary School, BPA ████ (b) (6), (b) (7)(C) did not use force against anyone or provide any medical treatment to anyone (timestamp 00:51:15).

During the interview, BPA ████ (b) (6), (b) (7)(C) was shown maps depicting the area north of Uvalde; south of Uvalde; the city of Uvalde; Uvalde schools; and Robb Elementary School (timestamp 00:17:30).

These maps are labeled one through five, respectively (Attachment 2).

On map one of north Uvalde, BPA ████ (b) (6), (b) (7)(C) indicated it was not applicable. On map two of south Uvalde, BPA ████ (b) (6), (b) (7)(C) indicated the route he traveled from Eagle Pass to Uvalde and that he arrived in Uvalde at approximately 2:00 p.m. On map three of Uvalde, BPA ████ (b) (6), (b) (7)(C) indicated it

---



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



was also not applicable. On map four of the Uvalde schools, BPA ▮(b) (6), (b) (7)(C)▮ indicated that once he arrived in Uvalde, he traveled to the funeral home near Robb Elementary School and subsequently to Dalton Elementary School. On this map, BPA ▮(b) (6), (b) (7)(C)▮ also indicated locations where he parked the USBP vehicle near Dalton Elementary School. On map five of Robb Elementary School, BPA ▮(b) (6), (b) (7)(C)▮ indicated he arrived at the funeral home near Robb Elementary School at approximately 2:05 p.m. and approximately where he parked the USBP vehicle a few blocks from the funeral home (timestamp 00:18:50).

When asked to explain his understanding of USBP's authority to respond to the shooting at Robb Elementary School and associated incidents, BPA ▮(b) (6), (b) (7)(C)▮ said he understood from his limited Active Shooter training that the first responding law enforcement officer was responsible until a more senior law enforcement officer responded. BPA ▮(b) (6), (b) (7)(C)▮ clarified that he saw USBP in more of a support role unless USBP was first to respond to an incident. When asked to explain his understanding of USBP's responsibility to respond to the shooting at Robb Elementary School and associated incidents in Uvalde, BPA ▮(b) (6), (b) (7)(C)▮ explained that USBP previously assisted in emergency responses. BPA ▮(b) (6), (b) (7)(C)▮ again explained he viewed the incident as more of a local matter, and USBP was in a support role unless USBP was the first to arrive at the incident (timestamp 01:04:10).

Additionally, BPA ▮(b) (6), (b) (7)(C)▮ said that since he is an EMT, USBP previously had him assist with large public events, so he could provide medical treatment, if needed (timestamp 01:07:30).

On May 24, 2023, BPA ▮(b) (6), (b) (7)(C)▮ was not wearing a body-worn camera. BPA ▮(b) (6), (b) (7)(C)▮ believed he sent a text message concerning his response to Uvalde. BPA ▮(b) (6), (b) (7)(C)▮ explained that a few days after May 24, 2022, he provided a brief timeline of his activities in response to a USBP request. BPA ▮(b) (6), (b) (7)(C)▮ did not send any emails or write any reports concerning his response to the shooting at Robb Elementary School. BPA ▮(b) (6), (b) (7)(C)▮ was interviewed by a Texas Ranger concerning his response to the Robb Elementary School shooting (timestamp 01:11:39).

When asked if he received any Active Shooter training, BPA ▮(b) (6), (b) (7)(C)▮ said he received some limited training concerning clearing rooms in conjunction with quarterly firearms training.

Following the interview, BPA ▮(b) (6), (b) (7)(C)▮ provided ASAC ▮(b) (6), (b) (7)(C)▮ and SA ▮(b) (6), (b) (7)(C)▮ with the two text messages he exchanged concerning his response to the Robb Elementary School shooting. The text messages provided by BPA ▮(b) (6), (b) (7)(C)▮ do not contain dates, but the messages were exchanged on May 27, 2022, at approximately 8:43 a.m. (Attachment 3).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|:---:|:---|
| 1 | StarWitness interview of BPA ▮(b) (6), (b) (7)(C)▮ |
| 2 | Maps reviewed by BPA ▮(b) (6), (b) (7)(C)▮ |
| 3 | Text messages provided by BPA ▮(b) (6), (b) (7)(C)▮ |

OFFICIAL USE ONLY

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 57



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

OFFICIAL USE ONLY

UF2022586                                                    EXHIBIT 57

 

# U.S. CUSTOMS AND BORDER PROTECTION
# OFFICE OF PROFESSIONAL RESPONSIBILITY
# INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 10, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) said that on May 24, 2022, he was assigned to training in UVA and his tour of duty began at (b) (7)(E) (timestamp 00:14:20).

He said he wore his normal duty uniform, which consisted of a green shirt and green pants. He explained there was a break in training when the Uvalde Police Department requested assistance over the radio (timestamp 00:14:53).

BPA (b) (6), (b) (7)(C) said Supervisory BPA (SBPA) (b) (6), (b) (7)(C) UVA, who was also attending the training, had access to the armory. BPA (b) (6), (b) (7)(C) said he checked out a rifle from the armory (timestamp 00:15:10).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001448



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA [(b) (6), (b) (7)(C)] said he paired up with BPA [(b) (6), (b) (7)(C)] UVA, and they drove to Robb Elementary School together (timestamp 00:16:24).

BPA [(b) (6), (b) (7)(C)] said he did not know where the school was located but figured it out (timestamp 00:17:30).

BPA [(b) (6), (b) (7)(C)] said that when they arrived at the school, they parked on the northeast side of the school on Geraldine Street, about 50 to 60 yards from the school (timestamp 00:18:04).

He said that after they parked, nobody appeared to know anything, and nothing had been confirmed. He said they continued to be on the lookout for the shooter (timestamp 00:18:48).

BPA [(b) (6), (b) (7)(C)] estimated that from the time the call was received, to when they arrived on scene, it was about 20 minutes (timestamp 00:20:38).

BPA [(b) (6), (b) (7)(C)] said that when they arrived, they moved slowly towards the school. He said there was a lot of commotion and chaos. He said parents were making comments such as, "What are you guys doing?" (timestamp 00:20:50).

He said he did not see any law enforcement out and about. He said the first area he staged was on the north side of the school and moved to the west side and provided a perimeter around the school. BPA [(b) (6), (b) (7)(C)] said he used a vehicle in the parking lot as cover as he observed agents pulling kids out of the classroom (timestamp 00:21:20).

BPA [(b) (6), (b) (7)(C)] said his position was about 20 yards from the school. He said the funeral home would have been behind him to the left (timestamp 00:22:30).

He said the location of the shooter still had not been confirmed. BPA [(b) (6), (b) (7)(C)] said he then moved to the entrance located at north end of the school. He said that area appeared to be covered by law enforcement (timestamp 00:24:00).

BPA [(b) (6), (b) (7)(C)] said he then went to the southeast end wing of the school looking toward the inner part of the school (timestamp 00:24:45).

BPA [(b) (6), (b) (7)(C)] then used a map to provide a better overview of where he staged on the southeast side of the wing. BPA [(b) (6), (b) (7)(C)] said he remained at that location to cover the perimeter for the rest of the time he was there (timestamp 00:27:11).

When asked if he heard any shooting, BPA [(b) (6), (b) (7)(C)] responded, "No I didn't hear anything from the beginning." He then stated, "I did hear the final, I mean, I guess, when the shooter ended up shooting again. I heard it; it was very, wasn't very clear, but I heard some shooting," (timestamp 00:27:20).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



BPA (b) (6), (b) (7)(C) stated that is when everyone said we need to get in there because we knew there was something going on inside (timestamp 00:27:40).

BPA (b) (6), (b) (7)(C) aid he thought it was the shooter shooting (timestamp 00:27:52).

When asked to confirm if he heard shots, he responded, "Shots correct." BPA (b) (6), (b) (7)(C) said the shots sounded like banging. BPA (b) (6), (b) (7)(C) said the banging occurred after they had already pulled some children from the classrooms on that side of the building as well (timestamp 00:29:25).

BPA (b) (6), (b) (7)(C) said he recalled the following personnel present on that side of the building with him: SBPA (b) (6), (b) (7)(C) UVA, and UVA BPAs (b) (6), (b) (7)(C) BPA (b) (6), (b) (7)(C) said he did remember other law enforcement personnel were present at the door on that side of the wing (timestamp 00:31:00).

He said he did not know any of the officers from the other agencies (timestamp 00:34:00).

BPA (b) (6), (b) (7)(C) said he entered the school when the shooter was down (timestamp 00:34:31).

The union representative requested to take a break (timestamp 00:34:43).

[Agent's Note: There was a significant break in the interview. A second video had to be started when the interview resumed.]

On this same date, the interview resumed using a new StarWitness recording. The recording was uniquely identified by Authentication Code (b) (7)(E) (1 hour and 14 minutes).

BPA (b) (6), (b) (7)(C) said he did not notice any law enforcement agency in control of the scene. He said he just picked up based on what was going on that USBP was there to assist with security (timestamp 00:6:35).

BPA (b) (6), (b) (7)(C) confirmed two photos of himself taken from screen shots of body-worn camera video footage outside the school (Attachment 2) (timestamp 00:12:00).

BPA (b) (6), (b) (7)(C) said he does recall guiding a teacher who had sustained an injury to a general area where the children were running (timestamp 00:16:47).

The NBPC representative requested a break (timestamp 00:17:34).

The interview resumed (timestamp 00:20:30).

BPA (b) (6), (b) (7)(C) said he does not recall when he heard there would be a breach or that the shooter was down (timestamp 00:22:25).




BPA (b) (6), (b) (7)(C) said the consensus of what might be going on was someone was shooting a gun (timestamp 00:27:50).

BPA (b) (6), (b) (7)(C) recalled saying there was a hot microphone on the radio (timestamp 00:31:54).

BPA (b) (6), (b) (7)(C) recalled the helicopters being loud (timestamp 00:34:30).

BPA (b) (6), (b) (7)(C) aid he did not consider the scene to be an active shooter scenario because he did not hear anything (timestamp 00:37:00).[Agent's Note: BPA (b) (6), (b) (7)(C) had earlier stated he heard shooting.]

BPA (b) (6), (b) (7)(C) aid he is not an Emergency Medical Technician (EMT) and did not render any aid to anyone (timestamp 00:37:45).

SSA (b) (6), (b) (7)(C) requested to take a break (timestamp 00:40:27).

The interview resumed (timestamp 00:57:20).

BPA (b) (6), (b) (7)(C) described his parking location on the north side of the school using the provided maps (Attachment 3) (timestamp 00:01:01).

[Agent's Note: At the conclusion of the interview, BPA (b) (6), (b) (7)(C) was advised he would need to be interviewed again at a later date.]

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA (b) (6), (b) (7)(C) |
| 2 | Photos provided by BPA (b) (6), (b) (7)(C) |
| 3 | Maps reviewed by BPA (b) (6), (b) (7)(C) |



# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On March 23, 2023, SA (b) (6), (b) (7)(C) and ASAC (b) (6), (b) (7)(C) interviewed BPA (b) (6), (b) (7)(C) UVA, Texas, concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA (b) (6), (b) (7)(C) was interviewed by CBP OPR on February 10, 2023. At the time of interview, CBP OPR was not aware that BPA (b) (6), (b) (7)(C) entered the school and classrooms after the shooter was down. For this reason, BPA (b) (6), (b) (7)(C) first interview was concluded when BPA (b) (6), (b) (7)(C) tated he entered the building. A follow up interview was rescheduled for March 23, 2023, to discuss BPA (b) (6), (b) (7)(C) response from the moment he entered the building to the end of his shift.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001452



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



On May 24, 2022, prior to the breach into the classroom, BPA ▮▮ was providing security on the south exterior area of the building. He entered the building through the south entrance after hearing the shooter was down (timestamp 00:32:20). However, he does not recall how he heard the shooter was down, nor which classroom the shooter was in (timestamp 00:32:35). BPA ▮▮ entered a classroom which he described as dark and with the lights off, inside he saw what appeared to him as deceased children laying on the floor (timestamp 00:34:01). Inside the classroom, BPA ▮▮ assisted BPA **(b) (6), (b) (7)(C)** UVA, with carrying a child victim whom he believed to be a girl to the medical triage area (timestamp 00:34:39). The medical triage area was set up by the T-intersection in front of the bathrooms (timestamp 00:30:08).

BPA ▮▮ was unable to recall specific details about his activities and movements after entering the building or what he did after assisting BPA **(b) (6), (b) (7)(C)** with the child. BPA ▮▮ only recalled exiting the building through the west entrance (timestamp 00:37:04).

When he exited the building, BPA ▮▮ saw a group of USBP Emergency Medical Technicians (EMT) working on another victim. He recalled seeing BPAs **(b) (6), (b) (7)(C)** UVA, and **(b) (6), (b) (7)(C)** ▮▮ USBP Tactical Unit, in this group (timestamp 00:38:20). BPA ▮▮ then went to a tree, he did not know how he knew to go to the tree, but while there, Chief Patrol Agent Jason Owens, Del Rio Sector, addressed the BPAs present and advised them to report to UVA for a debrief. BPA ▮▮ drove back to UVA and arrived during the **(b) (7)(E)** afternoon muster. BPA ▮▮ ended his shift and drove to his residence (timestamp 00:42:08).

BPA ▮▮ stated he responded to a shooter in a school. BPA ▮▮ did not know there were children in the classroom with the shooter until after he entered the classroom (timestamp 01:02:06). BPA ▮▮ did not know what authority USBP had to respond to the incident at Robb Elementary School. He also did not know if he had Peace Officer status in the state of Texas. BPA ▮▮ did not provide any medical aid, he did not exercise his authority to impact anyone's movement, he did not restrain or use force on anyone (timestamp 01:38:00).

BPA ▮▮ was shown maps depicting the area north of Uvalde; south of Uvalde; the city of Uvalde; Uvalde schools; and Robb Elementary School (Attachment 2). These maps are labeled 1-8, respectively. BPA ▮▮ marked what he recalled from May 24, 2022, using the map labeled 8.e.- Robb Elementary School Layout, Uvalde TX (timestamp 01:31:54). All other maps were not applicable.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA ▮▮ |
| 2 | Maps reviewed by BPA ▮▮ |

---

O F F I C I A L  U S E  O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 58



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L  U S E  O N L Y

UF2022586                                                    EXHIBIT 58

AR001454



# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of PAIC (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 10, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed PAIC (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

PAIC (b) (6), (b) (7)(C) stated that on May 24, 2022, his scheduled shift of duty began at (b) (7)(E) and was scheduled to end at (b) (7)(E) PAIC (b) (6), (b) (7)(C) stated he began his day at CAR; however, following muster, he drove his government-owned vehicle (GOV) to a scheduled meeting with several oil industry stakeholders. PAIC (b) (6), (b) (7)(C) advised that Deputy PAIC (DPAIC) (b) (6), (b) (7)(C) CAR, Special Operations Supervisor (SOS) (b) (6), (b) (7)(C) CAR, and Supervisory Border Patrol Agent (SBPA) (b) (6), (b) (7)(C) CAR, also attended the recognition event for law enforcement that was scheduled to begin at approximately 10:30 a.m. or 11:00 a.m. PAIC (b) (6), (b) (7)(C) clarified that DPAIC (b) (6), (b) (7)(C) CAR, may also have been at the meeting.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001455



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



PAIC (b) (6), (b) (7)(C) stated someone in the group he was with received a telephone call or a text message advising of a possible active shooter in Uvalde. PAIC (b) (6), (b) (7)(C) stated he called Executive Officer (XO) (b) (6), (b) (7)(C) USBP, Del Rio Sector (DRT); however, he did not answer. PAIC (b) (6), (b) (7)(C) stated he then contacted PAIC (b) (6), (b) (7)(C) USBP, Del Rio Station (DRS), who was acting Division Chief at DRT at the time, and told him they were getting information about a possible active shooter in Uvalde. PAIC (b) (6), (b) (7)(C) advised they were hearing the same information (timestamp 00:15:28).

PAIC (b) (6), (b) (7)(C) stated he told PAIC (b) (6), (b) (7)(C) it looked like they were going to start moving, and he advised him to "hold on", as they were currently working on setting up a DRT emergency operations center and patching the radios (timestamp 00:16:33).

Following the conversation with PAIC (b) (6), (b) (7)(C) PAIC (b) (6), (b) (7)(C) relayed to the group that DRT had the same information and advised them to hold on and stand down because nobody knew what was going on yet. PAIC (b) (6), (b) (7)(C) indicated they continued with the meeting, and then someone in the group told him SBPA (b) (6), (b) (7)(C) CAR, who is an Emergency Medical Technician (EMT), was rounding up the other CAR EMTs, and they were going to start heading to Uvalde. PAIC (b) (6), (b) (7)(C) responded to hold on (timestamp 00:17:07).

PAIC (b) (6), (b) (7)(C) stated Deputy Chief (b) (6), (b) (7)(C) Dimmit County, Texas, Sheriff's Office, who is a former BPA, announced to the entire stakeholder group that his agency was also getting information of an active shooter event in Uvalde, so the meeting was cut short. PAIC (b) (6), (b) (7)(C) stated there were many pieces of information pouring in; however, he recollected one of the first things he heard being reported from the USBP group he was with was that BPA (b) (6), (b) (7)(C) CAR, was leaving his shift because one of his children attended a school in Uvalde (timestamp 00:19:28).

PAIC (b) (6), (b) (7)(C) stated that as far as he knows, BPA (b) (6), (b) (7)(C) was not discouraged by any supervisor from leaving his shift, noting that he had every right to take leave (timestamp 00:21:19).

PAIC (b) (6), (b) (7)(C) stated he saved a picture of a text message he received from PAIC (b) (6), (b) (7)(C) that stated there was no need to send anyone, so the reason nobody was going was because his boss was telling him nobody goes (timestamp 00:22:44).

PAIC (b) (6), (b) (7)(C) stated he remembers sending an email to all CAR supervisors while at the oil industry meeting advising they needed to stand down and await further information (timestamp 00:24:12).

PAIC (b) (6), (b) (7)(C) was shown an email, dated May 24, 2022, originally sent to him at 12:25 p.m. as part of an Evolving Situation Report (ESR) notification that provided a timeline of events unfolding in Uvalde. PAIC (b) (6), (b) (7)(C) explained the ESR was sent to all USBP station leadership, second-line supervisors and above, telling all station PAICs not to send anyone to the Uvalde incident unless directed by them. PAIC (b) (6), (b) (7)(C) confirmed he forwarded the ESR email at 12:31



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



p.m. to all CAR supervisors, so they would be updated on what he was hearing and that the order was communicated to stand down unless otherwise directed (timestamp 00:30:22).

PAIC ████ stated the original ESR appeared to be created by BPA (b) (6), (b) (7)(C) USBP, Falfurrias Station (FLF), Texas, and was then sent to the USBP Del Rio Border Intelligence Center.

PAIC ████ referenced his personal cell phone to read the contents of a screenshot of a text string between he and PAIC ████ on May 24, 2023, noting that at 12:00 p.m., PAIC ████ sent a message stating there was "no need to send at this time", to which PAIC ████ responded "thanks". Further, PAIC ████ stated he received another text message from PAIC ████ at 12:47 p.m. stating, "ICP is Hillcrest Funeral Home.", to which PAIC ████ responded, "10-4.", and PAIC ████ then responded, "Have agents report there for assignment." (timestamp 00:33:15).

PAIC ████ stated that prior to getting the text from PAIC ████ he received a call from PAIC ████ indicating CAR agents were already moving toward Uvalde, and PAIC ████ responded by telling him nobody from CAR is going because he previously told him not to send anyone. Following the telephone call and subsequent text messages received from PAIC ████ advising to send agents to Uvalde, PAIC ████ stated he spoke with his group at the stakeholder meeting. He instructed SBPA ████ he would be his Incident Commander (IC) at the Hillcrest Funeral Home, which would be the Incident Command Center (ICC) and advised him to also direct all EMTs to report there and contact SBPA ████ for more instructions (timestamp 00:34:45).

PAIC ████ stated the stakeholder meeting he was attending was ultimately terminated, and after getting into his GOV to head back to CAR, he did not hear much traffic on the CAR radio channel, so he suspected that much of the communications amongst BPAs was being done via cell phone and text messaging (timestamp 00:50:27).

PAIC ████ said he left the stakeholder meeting enroute to CAR between 1:15 p.m. and 1:30 p.m. and made it back prior to the (b) (7)(E) muster. PAIC ████ stated that following the (b) (7)(E) muster, he received a phone call directing him to send a second wave of CAR relief agents to Uvalde. That group included himself, DPAIC ████ DPAIC ████ SBPA (b) (6), (b) (7)(C) CAR, and CAR BPAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) (timestamp 00:54:59).

PAIC ████ stated that upon his arrival at the Uvalde Civic Center, it was very disorganized, and the first thing he heard about was that SBPA ████ was mad because Chief Patrol Agent (CPA) Jason Owens, DRT, gave an order, and SBPA ████ wanted to do the opposite. SBPA ████ argued with CPA Owens, prompting Deputy CPA (DCPA) ████ DRT, to tell SBPA ████ that SBPA ████ was being unprofessional (timestamp 00:56:07).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



PAIC ████ stated that on his drive from CAR to Uvalde, he drove with his emergency lights activated. Further, PAIC ████ stated that at some point on the drive to Uvalde, he received a message that was put out indicating WC **(b) (6), (b) (7)(C)** USBP, Uvalde Station (UVA), was designated as the point of contact for all USBP personnel, and he would tell those responding where to go. PAIC ████ stated DPAIC ████ first contacted WC **(b) (6), (b) (7)(C)** on the way and was told he did not know what was going on. PAIC ████ stated SBPA ████ was said to be at the civic center; therefore, PAIC ████ directed DPAIC ████ to advise all those responding from CAR to report to the Uvalde Civic Center (timestamp 00:58:25).

PAIC ████ stated that based on what he was being told, there was nothing for them to do at the school where the shooting took place and that the students that survived were being taken to the civic center for reunification with family members. PAIC ████ stated nobody at the Uvalde Civic Center had command or control, noting there were a lot of different agencies represented. PAIC ████ stated he spoke with a male at the civic center who appeared to be in charge. He recollected the male was the Dilley, Texas, Chief of Police who denied being in command of the scene when asked (timestamp 01:03:56).

PAIC ████ recollected arriving at the civic center between 3:30 p.m. and 4:00 p.m., and he remained there for approximately one and a half hours. PAIC ████ said he possibly saw WC **(b) (6), (b) (7)(C)** CAR, at the civic center, and he met with PAIC **(b) (6), (b) (7)(C)** Brackettville Station (BRA), Texas. They worked together to relieve USBP personnel with those that had just arrived from his station. PAIC ████ stated that between 5:30 p.m. and 6:00 p.m., he and DPAIC ████ went to UVA where they saw the following USBP personnel: CPA Owens, peer support personnel, USBP Border Patrol Tactical Unit (BORTAC) members, the DRT PAIC of BORTAC **(b) (6), (b) (7)(C)** who is now the PAIC of USBP Nogales Station, Arizona, SBPA **(b) (6), (b) (7)(C)** CAR, and SBPA **(b) (6), (b) (7)(C)** DRT (timestamp 01:15:05).

PAIC ████ stated SBPA ████ indicated she was collecting clean uniforms from other stations so personnel could change out of their bloody clothing prior to leaving UVA. PAIC ████ stated he and DPAIC ████ returned to the civic center and noticed the entrances that were previously blocked by law enforcement were opened. PAIC ████ attempted to find out if USBP was needed at that site any longer and ultimately determined they could relieve all personnel for the day. PAIC ████ stated he made it back to his residence between 7:30 p.m. and 8:00 p.m.

PAIC ████ denied seeing anyone issuing orders to law enforcement personnel upon his arrival at the civic center (timestamp 01:21:05).

PAIC ████ stated the only orders he issued were to USBP personnel (timestamp 01:21:55).

PAIC ████ denied providing any type of aid to members of the public or exercising any authority restricting the movement of the public (timestamp 01:24:53).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



PAIC (b) (6), (b) (7)(C) stated USBP's role in the incident that occurred was to support in any way possible (timestamp 01:25:21).

PAIC (b) (6), (b) (7)(C) stated his understanding is USBP had no jurisdiction or authority at the incident, and their role was simply to provide support, noting that he had no authority, and there was nothing for him to enforce (timestamp 01:26:10).

PAIC (b) (6), (b) (7)(C) stated he did not have a body-worn camera on the date of the incident and has not taken Active Shooter training. He also denied ever being at Robb Elementary School or ever generating a report or memorandum describing his activities on May 24, 2022 (timestamp 01:30:53).

PAIC (b) (6), (b) (7)(C) clarified that SBPA (b) (6), (b) (7)(C) and SBPA (b) (6), (b) (7)(C) were at the Uvalde Hospital to provide peer support to a BORTAC agent who sustained a minor injury during the incident at Robb Elementary School. Additionally, PAIC (b) (6), (b) (7)(C) clarified that the argument between SBPA (b) (6), (b) (7)(C) and CPA Owens was over something related to the medical field; however, he is unsure of the specifics or where the argument occurred.

Prior to concluding the interview, PAIC (b) (6), (b) (7)(C) described his route of travel from CAR to Uvalde and utilized printed maps to outline his actions on May 24, 2022, in response to the Robb Elementary School shooting (Attachment 2).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|:---:|:---|
| 1 | StarWitness interview of PAIC (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by PAIC (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 59



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                    EXHIBIT 59

AR001460



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of SCBPO (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 10, 2023, SA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed SCBPO (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School.  The interview was audio and video recorded using StarWitness.  The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary.  The video recording of the interview should be reviewed for additional details.

SCBPO (b) (6), (b) (7)(C) stated that on May 24, 2022, he was assigned to U.S. Immigration and Customs Enforcement, Homeland Security Investigations, Del Rio (HSI/Del Rio), as a Task Force Officer (TFO) and was working the (b) (7)(E) shift.  On that day, SCBPO (b) (6), (b) (7)(C) was at the federal courthouse in Del Rio when he received a group text message notification from investigators from the Texas Department of Public Safety (TXDPS) at approximately 11:36 a.m.  The notification was regarding a possible active shooter incident at Robb Elementary School in Uvalde (timestamp 10:02:25).

SCBPO (b) (6), (b) (7)(C) and his partner, Special Agent (SA) (b) (6), (b) (7)(C) HSI/Del Rio, both agreed that since Uvalde is approximately 70 miles away from Del Rio, the incident would probably be under control before they could arrive; therefore, it was not necessary for them to respond.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|
| Approved by: | | Date: | |

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD).  You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD.  The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001461



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



At approximately 11:50 a.m., SCBPO ▓▓▓ and SA ▓▓▓ concluded their activities at the courthouse. SA ▓▓▓ then told SCBPO ▓▓▓ he was scheduled to meet with the district attorney in Uvalde; therefore, he drove to Uvalde and responded to Robb Elementary School first to see if his assistance was needed. Shortly after speaking with SA ▓▓▓ SCBPO ▓▓▓ stated he received a call from his supervisor with HSI, Group Supervisor (GS) ▓▓▓ HSI/Del Rio. GS ▓▓▓ told him to respond to the command center at the Hillcrest Funeral Home in Uvalde (timestamp 10:04:30).

SCBPO ▓▓▓ then responded to HSI/Del Rio to pick up TFO ▓▓▓ Val Verde County, Texas Sheriff's Office. At approximately 12:13 p.m., SCBPO ▓▓▓ and TFO ▓▓▓ left Del Rio wearing plainclothes and traveling together in an unmarked patrol vehicle. SCBPO ▓▓▓ stated he activated the vehicle's overhead lights and siren and traveled eastbound on U.S. Highway 90 to Uvalde (timestamp 10:05:30).

SCBPO ▓▓▓ and TFO ▓▓▓ arrived at the Hillcrest Funeral Home at approximately 1:02 p.m. (timestamp 10:07:50).

Upon arrival, SCBPO ▓▓▓ and TFO ▓▓▓ were met by Lieutenant (Lt.) ▓▓▓ TXDPS, who informed SCBPO ▓▓▓ that SA ▓▓▓ was on the second entry team at Robb Elementary School. SCBPO ▓▓▓ said ▓▓▓ told him and TFO ▓▓▓ the initial entry teams at Robb Elementary School would be arriving at Hillcrest Funeral Home and asked if they could look out for SA ▓▓▓ to ascertain if he needed any assistance. SCBPO ▓▓▓ said he had observed unknown members of the entry team at Robb Elementary School receiving medical attention for shrapnel wounds.

While at the Hillcrest Funeral Home, SCBPO ▓▓▓ and other HSI SAs were approached by an unknown officer from the Uvalde Police Department who said there was an alleged report that the girlfriend of the Robb Elementary School shooter threatened to go to Uvalde High School to finish the job. At approximately 1:30 p.m., SCBPO ▓▓▓ and TFO ▓▓▓ left the Hillcrest Funeral Home for Uvalde High School and rode in a vehicle driven by SA ▓▓▓ HSI, Chattanooga, Tennessee, who was with HSI/Del Rio at the time (timestamp 10:09:45).

At approximately 1:35 pm., SCBPO ▓▓▓ stated they arrived at Uvalde High School, where he immediately observed parents arguing with local law enforcement officers at the rear of the school. SCBPO ▓▓▓ stated he assisted the officers while they were trying to calm the parents. SCBPO ▓▓▓ urther stated he did not give any verbal commands to any of the parents, and he did not restrict their movements or exercise any law enforcement authority (timestamp 10:12:25).

SCBPO ▓▓▓ remained at Uvalde High School for approximately 30 minutes until he was notified by other HSI agents they received instructions from the command center to report to the Hillcrest Funeral Home (timestamp 10:14:20).




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

After arriving at the Hillcrest Funeral Home, SCBPO (b) (6), (b) (7)(C) was met by GS (b) (6), (b) (7)(C) who told him and other HSI agents to return to Uvalde High School to assist the school faculty with the children who were going to be released to their parents. SCBPO (b) (6), (b) (7)(C) stated he provided protection for the school faculty and escorted children from the school lunchroom to their parent's cars in the school parking lot.

At approximately 6:30 p.m., SCBPO (b) (6), (b) (7)(C) departed Uvalde High School after GS (b) (6), (b) (7)(C) notified him and other HSI agents to respond to the fairgrounds for a debrief (timestamp 10:16:10).

SCBPO (b) (6), (b) (7)(C) left the fairgrounds after the debrief at approximately 6:30 p.m. and arrived in Del Rio at approximately 8:30 p.m.

SCBPO (b) (6), (b) (7)(C) stated he was aware there was a command-and-control structure at Hillcrest Funeral Home but did not enter the building to make any observations. SCBPO (b) (6), (b) (7)(C) further stated any information that was communicated from the command-and-control structure was first communicated to his supervisor, GS (b) (6), (b) (7)(C) who then communicated the information to other HSI agents at the scene (timestamp 10:17:30).

SCBPO (b) (6), (b) (7)(C) said he believed USBP's role during the incident was to assist where needed.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of SCBPO (b) (6), (b) (7)(C) |

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 60



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

UF2022586                                                          EXHIBIT 60

AR001464

 

## U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of SBPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 10, 2023, SSA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed SBPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

SBPA (b) (6), (b) (7)(C) said that on May 24, 2022, he worked a (b) (7)(E) shift. His uniform that day was a black polo shirt displaying a Department of Homeland Security logo with "USBP" stitched underneath and tan cargo pants. He recalled his assignment that day was to work management inquiries and work with the transition of the USBP, Critical Incident Team (CIT) to CBP OPR. He said he, Supervisory Border Patrol Agent (SBPA) (b) (6), (b) (7)(C) and Border Patrol Agent-Programs (BPA-P) (b) (6), (b) (7)(C) DRT, traveled to Eagle Pass, Texas, to assist SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) OPR/Del Rio, with conducting interviews for a critical incident involving a migrant death.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001465




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

During the trip to Eagle Pass, he recalled hearing spotty communication on his service radio about an incident taking place in Uvalde. SBPA **(b) (6), (b) (7)(C)** and his two coworkers got to Eagle Pass, and during a witness interview related to a migrant death, SA **(b) (6), (b) (7)(C)** received a telephone call and informed everyone they all needed to respond to Uvalde to assist with a critical incident involving CBP employees and a shooting (timestamp 11:13:48).

SBPA **(b) (6), (b) (7)(C)** said he, SA **(b) (6), (b) (7)(C)** and BPA-P **(b) (6), (b) (7)(C)** drove together to Uvalde. SBPA **(b) (6), (b) (7)(C)** stated emergency equipment was activated at some points while they were enroute to Uvalde. He clarified the vehicle's lights and sirens were activated when they needed to overtake civilian vehicles. He recalled the route of travel taken from the USBP Eagle Pass South Station to Uvalde was an unknown loop to U.S. Highway 57, to Farm to Market Road 481, to U.S. Highway 90, to Evans Street, to Robb Elementary School (timestamp 11:17:55).

SBPA **(b) (6), (b) (7)(C)** explained their plan was to assist CBP OPR with whatever was needed after the incident and that CBP OPR was in the lead for them. He said they were going to meet up as close to Robb Elementary School as possible once they arrived. Upon arrival, SBPA **(b) (6), (b) (7)(C)** recalled parking approximately two blocks away from the school and walking towards the school. SBPA **(b) (6), (b) (7)(C)** was communicating with SA **(b) (6), (b) (7)(C)** when they got to the front of Robb Elementary School (timestamp 11:20:53).

SBPA **(b) (6), (b) (7)(C)** remembered school buses taking kids from the school while they stood outside the front of the school. He clarified the incident at the school was already over by the time they arrived on foot at the front of the school. He said they never went inside the school and remained outside for approximately 10 minutes before they walked to the command center at the funeral home adjacent to the school (timestamp 11:26:15).

SBPA **(b) (6), (b) (7)(C)** SBPA **(b) (6), (b) (7)(C)** and BPA-P **(b) (6), (b) (7)(C)** signed into the command center and met with SA **(b) (6), (b) (7)(C)** and acting Resident Agent in Charge **(b) (6), (b) (7)(C)** OPR/Del Rio, for approximately 10 to 15 minutes. He recalled an unknown Texas Department of Public Safety (TXDPS) Trooper relaying information that a secondary threat possibly existed because the shooter's girlfriend was planning to "finish the job," (timestamp 11:26:58).

The unknown Trooper requested for people at the command center to go out and secure the other schools in the town. SBPA **(b) (6), (b) (7)(C)** remembered their assignment, given to them by ASAC **(b) (6), (b) (7)(C)** was to secure Dalton Elementary School (timestamp 11:27:25).

He said, text communications relaying additional information occurred among acting RAC **(b) (6), (b) (7)(C)** SA **(b) (6), (b) (7)(C)** SA **(b) (6), (b) (7)(C)** SBPA **(b) (6), (b) (7)(C)** BPA-P **(b) (6), (b) (7)(C)** and he. The text messages exchanged involved where they were going.

SBPA **(b) (6), (b) (7)(C)** explained that after leaving the command center and prior to going to Dalton Elementary School, they traveled to the USBP Uvalde Station (UVA) to check out hard-plate body armor and M-4 rifles. He recalled SBPA **(b) (6), (b) (7)(C)** UVA, provided him and his coworkers with the M-4s and hard-plate body armor (timestamp 11:29:08).

AR001466



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



He was unable to recall what time they arrived at UVA. After they secured the body armor and M-4 rifles, they drove to Dalton Elementary School, where they provided perimeter security and helped direct traffic with other state and local law enforcement officers (LEOs) (timestamp 11:32:06).

He said he and his coworkers kept in contact with acting RAC (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) via text to inform them of their movements and whereabouts during their time in Uvalde. He said he also provided his supervisor, Special Operations Supervisor (SOS) (b) (6), (b) (7)(C) DRT, and SBPA (b) (6), (b) (7)(C) DRT, with telephonic status updates during their time in Uvalde (timestamp 11:33:57).

SBPA (b) (6), (b) (7)(C) said nobody at Dalton Elementary School gave them any orders, and they took it upon themselves to direct traffic. SBPA (b) (6), (b) (7)(C) described the situation in Uvalde as very chaotic when they arrived. He noted many different law enforcement agencies present on scene, and it appeared to him the Troopers were in charge. He based his opinion on one unknown Trooper providing assignments to LEOs at the command center (timestamp 11:35:29).

SBPA (b) (6), (b) (7)(C) did not observe any orders being provided to responding LEOs. He described what he saw as people asking other LEOs to respond to different locations to help. He said he never provided any orders or guidance to any responding LEOs. SBPA (b) (6), (b) (7)(C) stated it did not appear that anyone from USBP was in charge (timestamp 11:36:47).

He said his interactions with the public consisted of answering questions and directing people to where they needed to go to retrieve their children.

SBPA (b) (6), (b) (7)(C) stated he directed civilians' movement when he informed arriving parents, they needed to follow procedures in place for them to pick up their children. He said he never had to go "hands on" with anyone in Uvalde. He said he never rendered any aid to anyone while he was in Uvalde (timestamp 11:38:49).

SBPA (b) (6), (b) (7)(C) said that when he arrived in Uvalde, the role of USBP was a support role (timestamp 11:39:23).

SBPA (b) (6), (b) (7)(C) stated it was a support role; a public safety aspect to help keep the public safe (timestamp 11:40:10).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of SBPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 61



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                          EXHIBIT 61

 

# U.S. CUSTOMS AND BORDER PROTECTION
# OFFICE OF PROFESSIONAL RESPONSIBILITY
# INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of DPAIC (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 10, 2023, SA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed DPAIC (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code **(b) (7)(E)** (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

DPAIC (b) (6), (b) (7)(C) stated that on May 24, 2022, he was on duty and in uniform during his normal shift from **(b) (7)(E)** when he received a text message from Supervisory Border Patrol Agent (SBPA) (b) (6), (b) (7)(C) CAR, at approximately 12:00 p.m. regarding an active shooter threat at a school in Uvalde (timestamp 18:46:07).

After the text message, DPAIC (b) (6), (b) (7)(C) informed his supervisor, Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) CAR, of the active shooter incident. DPAIC (b) (6), (b) (7)(C) further stated PAIC (b) (6), (b) (7)(C) then contacted Acting Division Chief (b) (6), (b) (7)(C) USBP, Del Rio Sector (DRT), and asked if there was a need for more Border Patrol Agents (BPAs) to respond to Uvalde. Acting Division Chief (b) (6), (b) (7)(C) told PAIC (b) (6), (b) (7)(C) there were enough personnel already enroute to Uvalde and told him to hold off on sending any additional USBP personnel (timestamp 14:48:15).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001469




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

DPAIC (b) (6), (b) (7)(C) stated that at approximately 1:30 p.m., Acting Division Chief (b) (6), (b) (7)(C) instructed USBP personnel to respond primarily with Emergency Medical Technicians (EMTs) first and then later with additional personnel for security at other buildings in Uvalde. At approximately 3:00 p.m., DPAIC (b) (6), (b) (7)(C) started heading to Uvalde from Carrizo Springs in his personally owned vehicle, following behind PAIC (b) (6), (b) (7)(C) and Watch Commander (WC) (b) (6), (b) (7)(C) CAR, who were driving their individual patrol vehicles. DPAIC (b) (6), (b) (7)(C) stated they traveled on U.S. Highway 83 directly to Uvalde. While enroute to Uvalde, DPAIC (b) (6), (b) (7)(C) stated he was coordinating via cell phone with WC (b) (6), (b) (7)(C) on where to respond in Uvalde.

DPAIC (b) (6), (b) (7)(C) stated he arrived in Uvalde between 3:30 p.m. and 4:30 p.m. and drove directly to the civic center (timestamp 14:54:55).

When he arrived at the civic center, DPAIC (b) (6), (b) (7)(C) noticed there were several other officers from the Uvalde Police Department, as well as BPAs already on scene who were providing perimeter security. DPAIC (b) (6), (b) (7)(C) stated the Dilly, TX Police Department Police Chief appeared to be in charge of security at the time and was deciding who could go in and out of the civic center (timestamp 14:57:00).

DPAIC (b) (6), (b) (7)(C) also met with DPAIC (b) (6), (b) (7)(C) CAR, and DPAIC (b) (6), (b) (7)(C) USBP, Uvalde Station (UVA), to ascertain what other assistance was needed. Afterwards, DPAIC (b) (6), (b) (7)(C) assisted with establishing additional perimeter security at the civic center and directed BPAs from the swing shift to relieve initial perimeter security personnel. DPAIC (b) (6), (b) (7)(C) also told additional BPAs that responded to the civic center to report to the command center at Hillcrest Funeral Home for further instructions. DPAIC (b) (6), (b) (7)(C) stated he had very limited interaction with the public, mainly talking with parents he knew personally.

At approximately 5:00 p.m., DPAIC (b) (6), (b) (7)(C) met with PAIC (b) (6), (b) (7)(C) who told him and WC (b) (6), (b) (7)(C) to respond to UVA. After arriving at UVA, DPAIC (b) (6), (b) (7)(C) walked to the muster room along with other BPAs. In the muster room, Chief Patrol Agent Jason Owens, USBP, Del Rio Sector, addressed the BPAs and thanked them for their assistance. DPAIC (b) (6), (b) (7)(C) stated he left UVA at approximately 6:30 p.m. and returned to his home in Uvalde.

DPAIC (b) (6), (b) (7)(C) stated he believed USBP's role was to assist to stop any threat and provide security and assistance.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of DPAIC (b) (6), (b) (7)(C) |

# UF2022586
# EXHIBIT 62



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of BPA-P (b) (6), (b) (7)(C) | | |

## DETAILS OF ACTIVITY

On February 10, 2023, SA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed BPA-P (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

BPA-P (b) (6), (b) (7)(C) stated that on May 24, 2022, he was assigned to the Professional Standards Branch (PSB), Management Inquiry Team (MIT), DRT. BPA-P (b) (6), (b) (7)(C) was on duty on this date and assigned to work from (b) (7)(E) BPA-P (b) (6), (b) (7)(C) was wearing a black USBP polo shirt and tan pants, which was the standard attire for PSB (timestamp 00:09:38).

BPA-P (b) (6), (b) (7)(C) stated that on this date, he was accompanied by Supervisory Border Patrol Agent (SBPA) (b) (6), (b) (7)(C) DRT, and (SBPA) (b) (6), (b) (7)(C) DRT MIT. He stated they had been dispatched by their supervisor, Special Operations Supervisor (SOS) (b) (6), (b) (7)(C) DRT, to respond the USBP Soft-Sided Facility (SSF) in Eagle Pass, Texas, to assist SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) OPR/Del Rio, with conducting interviews related to an incident in Eagle Pass (timestamp 00:10:32).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|
| Approved by: | | Date: | |

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001472




**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

BPA-P (b) (6), (b) (7)(C) tated SBPA (b) (6), (b) (7)(C) was driving their assigned unmarked USBP vehicle (timestamp 00:15:05).

BPA-P (b) (6), (b) (7)(C) stated that while conducting interviews at SSF, SBPAA (b) (6), (b) (7)(C) was contacted telephonically and advised for them to respond to Uvalde due to the shooting incident (timestamp 00:11:25).

He did not recall the time the phone call was received. BPA-P (b) (6), (b) (7)(C) stated he believed it was SOS (b) (6), (b) (7)(C) who advised SA (b) (6), (b) (7)(C) for them to respond. BPA-P (b) (6), (b) (7)(C) stated the distance from Eagle Pass to Uvalde is approximately 63 to 64 miles (timestamp 00:13:08).

BPA-P (b) (6), (b) (7)(C) stated he was uncertain when they received the orders to respond. BPA-P (b) (6), (b) (7)(C) stated they responded using their lights and sirens. BPA-P (b) (6), (b) (7)(C) stated it took them about an hour to travel from Eagle Pass to Uvalde. BPA-P (b) (6), (b) (7)(C) stated they were not part of a vehicle caravan when they were driving over there. BPA-P (b) (6), (b) (7)(C) was uncertain what time they arrived. BPA-P (b) (6), (b) (7)(C) stated he believed SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) also responded from Eagle Pass to Uvalde, but BPA-P (b) (6), (b) (7)(C) stated he did not see them when they departed (timestamp 00:17:05).

BPA-P (b) (6), (b) (7)(C) explained that earlier, when they were traveling south from Del Rio to Eagle Pass via U.S. Highway 277, near Quemado, Texas, they heard an unknown USBP Uvalde Station (UVA) BPA come over the USBP radio and say there had been a shooting at Robb Elementary School in Uvalde. BPA-P (b) (6), (b) (7)(C) stated he did not know what time it was. BPA-P (b) (6), (b) (7)(C) stated they were traveling near the river [Rio Grande] when they heard this and were far away from Uvalde (timestamp 00:13:45).

BPA-P (b) (6), (b) (7)(C) stated that while traveling from Eagle Pass to Uvalde, they did not hear anything over their USBP radio (timestamp 00:19:33).

BPA-P (b) (6), (b) (7)(C) stated that it went silent. BPA-P (b) (6), (b) (7)(C) stated their route of travel was U.S. Highway 57, then Farm to Market Road 481, then U.S. Highway 90 into Uvalde. BPA-P (b) (6), (b) (7)(C) stated they drove directly to Robb Elementary School (timestamp 00:21:55).

BPA-P (b) (6), (b) (7)(C) stated there were so many law enforcement vehicles that they had to park approximately one-fourth to one-half of a mile away from the school. BPA-P (b) (6), (b) (7)(C) stated that after they parked, they began walking towards Robb Elementary School. BPA-P (b) (6), (b) (7)(C) stated that while he and SBPA (b) (6), (b) (7)(C) and SBPA (b) (6), (b) (7)(C) were walking, they encountered SBPA (b) (6), (b) (7)(C) USBP, Carrizo Springs Station (CAR), Texas, who is also an Emergency Medical Technician (EMT), and he had his gear with him. BPA-P (b) (6), (b) (7)(C) stated SBPA (b) (6), (b) (7)(C) informed them he had been in the classroom, the situation was over, and there were many deceased.

BPA-P (b) (6), (b) (7)(C) stated they remained outside of the school's fence for a short time and then walked over to the incident command center located at the funeral home (timestamp 00:24:11).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

BPA-P (b) (6), (b) (7)(C) tated that while at the incident command center, they heard the shooter's girlfriend had posted a threat online, something to the effect that she was going to finish the job (timestamp 00:24:45).

BPA-P (b) (6), (b) (7)(C) stated SBPA (b) (6), (b) (7)(C) and SBPA (b) (6), (b) (7)(C) received instructions for them to go to Dalton Elementary School. BPA-P (b) (6), (b) (7)(C) stated he did not know who told them to go over there. BPA-P (b) (6), (b) (7)(C) stated that while he was in the area of Robb Elementary School, he did not provide aid to anyone and did not use his authority to prevent anyone from doing anything (timestamp 00:26:40).

BPA-P (b) (6), (b) (7)(C) described the scene at Robb Elementary School as complete chaos and stated that it did not appear that anyone was in charge (timestamp 00:44:29).

BPA-P (b) (6), (b) (7)(C) stated he and SBPA (b) (6), (b) (7)(C) and SBPA (b) (6), (b) (7)(C) only had their sidearms, so they first stopped at UVA to pick up body armor and long arms and then drove to Dalton Elementary School (timestamp 00:25:23).

BPA-P (b) (6), (b) (7)(C) stated that when he went to UVA, he did not have any contact with any members of the public. BPA-P (b) (6), (b) (7)(C) stated he did not know what time it was when they did this. BPA-P (b) (6), (b) (7)(C) stated that while at Dalton Elementary School, he initially assisted school officials by helping reunite arriving parents with their children (timestamp 00:28:18).

BPA-P (b) (6), (b) (7)(C) stated school officials were requesting parents provide identification before releasing any children to them. BPA-P (b) (6), (b) (7)(C) stated that on approximately four occasions, parents provided him with their identifications. He provided their identification information to school officials, who released the children, and BPA-P (b) (6), (b) (7)(C) reunited the children with their parents. BPA-P (b) (6), (b) (7)(C) stated vehicle traffic from arriving parents was causing a lot of congestion at the entrance to the school, so he and SBPA (b) (6), (b) (7)(C) assisted with traffic control at the entrance to the school. BPA-P (b) (6), (b) (7)(C) stated their actions at Dalton Elementary School were at the request of the school principal. BPA-P (b) (6), (b) (7)(C) did not know the principal's name but described her as an Anglo female estimated to be in her mid-50s (timestamp 00:31:08).

BPA-P (b) (6), (b) (7)(C) stated he believed the school principal was in charge at Dalton Elementary School (timestamp 00:44:20).

BPA-P (b) (6), (b) (7)(C) stated he never provided instructions or orders to anyone else in law enforcement. BPA-P (b) (6), (b) (7)(C) stated that while at Dalton Elementary School, he did not provide aid to anyone and did not use any type of force to prevent anyone from doing anything (timestamp 00:31:51).

BPA-P (b) (6), (b) (7)(C) estimated they left Dalton Elementary School at approximately 6:00 p.m. (timestamp 00:58:32).





He went to UVA to drop off the body armor and long arms, and then he headed back to Del Rio with SBPA (b) (6), (b) (7)(C) and arrived there after dark (timestamp 01:21:26).

BPA-P (b) (6), (b) (7)(C) stated SA (b) (6), (b) (7)(C) departed from UVA to San Antonio, where he resided (timestamp 01:24:53).

Concerning his understanding of USBP's authority to respond to this incident, BPA-P (b) (6), (b) (7)(C) stated he understood it to be in a back-up role to assist local and state officials (timestamp 00:32:48).

Concerning his understanding of USBP's responsibility to respond to this incident, BPA-P (b) (6), (b) (7)(C) stated it was in a back-up role. He continued to say if USBP was the first one there, then as first responders, the responsibility would be for the safety of the general public (timestamp 00:34:37).

BPA-P (b) (6), (b) (7)(C) stated he did not have a body-worn camera on the date of the incident (timestamp 00:36:36).

BPA-P (b) (6), (b) (7)(C) stated he did not have any relevant text messages concerning the incident. BPA-P (b) (6), (b) (7)(C) stated he had not generated any emails, reports, or memorandums about the incident. BPA-P (b) (6), (b) (7)(C) stated that aside from a brief telephonic interview with the Texas Rangers, he had not had discussions with anyone concerning his response to this incident (timestamp 00:38:44).

BPA-P (b) (6), (b) (7)(C) stated he had been in law enforcement for 22 years and believed that he had participated in Active Shooter training but did not recall when (timestamp 00:40:12).

During the interview, BPA-P (b) (6), (b) (7)(C) was presented with maps illustrating Uvalde and the surrounding area. BPA-P (b) (6), (b) (7)(C) annotated the route of travel they took from Eagle Pass to Uvalde. BPA-P (b) (6), (b) (7)(C) also identified the approximate location where they parked their USBP vehicle and the route they walked towards Robb Elementary School, the incident command center, and back to their vehicle. BPA-P (b) (6), (b) (7)(C) annotated that they spent approximately 45 minutes at this location before departing to UVA and then to Dalton Elementary School. BPA-P (b) (6), (b) (7)(C) identified Dalton Elementary School on the corresponding map. BPA-P (b) (6), (b) (7)(C) indicated he did not know what time they arrived at Dalton Elementary School but estimated they departed at approximately 6:00 p.m. (Attachment 2).

## ATTACHMENTS

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of BPA-P (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by BPA-P (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 63



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                         EXHIBIT 63

AR001476



# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of SA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 10, 2023, SA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed SA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

SA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was employed as a Border Patrol Agent (BPA) working on a Management Inquiry/Critical Incident Team out of USBP Del Rio Sector (DRT). SA (b) (6), (b) (7)(C) intended to meet up with SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) OPR/Del Rio, at the U.S. Border Patrol (USBP) Eagle Pass South Station (EGS), Texas, to do interviews associated with an unrelated drowning incident that occurred in Eagle Pass. SA (b) (6), (b) (7)(C) drove an unmarked Dodge Durango government-owned vehicle (GOV) with Supervisory BPA (SBPA) (b) (6), (b) (7)(C) DRT, and Border Patrol Agent-Programs (BPA-P) (b) (6), (b) (7)(C) DRT. SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) were together in a separate GOV. SA (b) (6), (b) (7)(C) wore a black polo shirt with U.S. Department of Homeland Security (DHS) markings and tan cargo pants.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001477




SA (b) (6), (b) (7)(C) heard over the GOV radio that someone entered Robb Elementary School with a long arm and shots were fired. SA (b) (6), (b) (7)(C) called Special Operations Supervisor (SOS) (b) (6), (b) (7)(C) DRT, on his cell phone and reported the information provided over the radio. SOS (b) (6), (b) (7)(C) initially directed SA (b) (6), (b) (7)(C) to continue to EGS to handle the drowning investigation. SA (b) (6), (b) (7)(C) saw several Texas Department of Public Safety (TXDPS) units traveling toward Uvalde with their emergency equipment activated and called SA (b) (6), (b) (7)(C) on his cell phone to discuss possibly diverting to Uvalde. SA (b) (6), (b) (7)(C) called his contacts and said that they needed to continue to Eagle Pass to handle the drowning. As SA (b) (6), (b) (7)(C) and the others continued toward Eagle Pass, the radio traffic was broken and eventually ceased (timestamp 00:10:26).

SA (b) (6), (b) (7)(C) said he parked at a soft-sided facility near EGS to wait for SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) and heard broken radio traffic requesting all available units to respond to Uvalde. SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) arrived at the station, and the group broke up into two interview teams to conduct the first of several required interviews pertaining to the drowning. In the middle of the second interview of each team, SA (b) (6), (b) (7)(C) received a call on his cell phone instructing SA (b) (6), (b) (7)(C) SA (b) (6), (b) (7)(C) SA (b) (6), (b) (7)(C) SBPA (b) (6), (b) (7)(C) and BPA-P (b) (6), (b) (7)(C) to respond to Uvalde. SA (b) (6), (b) (7)(C) SBPA (b) (6), (b) (7)(C) and BPA-P (b) (6), (b) (7)(C) left Eagle Pass in the Dodge Durango GOV, and SAs (b) (6), (b) (7)(C) and (b) (6), (b) (7)(C) left in SA (b) (6), (b) (7)(C) Dodge Charger GOV. SA (b) (6), (b) (7)(C) said both GOVs activated their emergency equipment, and the trip from Eagle Pass to Uvalde took approximately 40 minutes (timestamp 00:13:05).

SA (b) (6), (b) (7)(C) said there were a significant amount police and emergency vehicles and personnel around Robb Elementary School, so SA (b) (6), (b) (7)(C) parked approximately two blocks away on Geraldine Street near where the shooter crashed his vehicle in the ditch. SA (b) (6), (b) (7)(C) arrived at Robb Elementary School after the shooter had been stopped, and the injured were removed from the scene. As SA (b) (6), (b) (7)(C) was walking toward the school, he saw SBPA (b) (6), (b) (7)(C) USBP, Carrizo Springs Station (CAR), Texas. SBPA (b) (6), (b) (7)(C) said the situation in the school was bad, and at least 13 children had been killed. SA (b) (6), (b) (7)(C) also saw BPA (b) (6), (b) (7)(C) CAR, who said (b) (6), (b) (7)(C) heard that the shooter's girlfriend was threatening to send someone else to finish the job. When SA (b) (6), (b) (7)(C) reached the parking lot at Robb Elementary School, TXDPS had a controlled crime scene and was not letting anyone in the school (timestamp 00:14:38).

SA (b) (6), (b) (7)(C) said he called SA (b) (6), (b) (7)(C) on his cell phone, and SA (b) (6), (b) (7)(C) said he was parked at the funeral home across the street from Robb Elementary School SA (b) (6), (b) (7)(C) walked to the parking lot of the funeral home to meet up with SA (b) (6), (b) (7)(C) SA (b) (6), (b) (7)(C) entered the incident command center at the funeral home and signed in. A TXDPS supervisor told SA (b) (6), (b) (7)(C) and the others there was an active threat to other local schools and instructed them to go to a local school. As they prepared to go to another school, Assistant Chief Patrol Agent (ACPA (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) DRT, told SA (b) (6), (b) (7)(C) that Chief Patrol Agent (CPA) Jason Owens, DRT, wanted to address everyone at the USBP Uvalde Station (UVA) (timestamp 00:18:09).

SA (b) (6), (b) (7)(C) stated SBPA (b) (6), (b) (7)(C) BPA-P (b) (6), (b) (7)(C) and he left the incident command center at the funeral home and drove to UVA to get rifles and body armor. They were only at UVA for a few minutes and then left to go to Dalton Elementary School (timestamp 00:21:26).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



There were lots of parents and law enforcement in the parking lot at Dalton Elementary School. SA ███ saw SBPA ███ Border Patrol Search, Trauma, and Rescue Unit (BORSTAR), DRT. SA ███ said there was no command structure at Robb Elementary School or at Dalton Elementary School. SA ███ observed several senior TXDPS supervisors at the funeral home, but it was not clear who was in command (timestamp 00:22:50).

SA ███ said that on the way to Dalton Elementary School, he heard over the GOV radio that shots were fired at Uvalde High School. Soon after hearing this, U.S. Border Patrol Tactical Unit (BORTAC) personnel broadcast over the radio that no shots were fired, and they were on scene clearing the school. The parking lot was chaotic at Dalton Elementary School. Parents were in cars and walking around waiting to pick their children up from school. The principal of Dalton Elementary School took command and control of the scene by having parents pull up to the school in their vehicles to get their children. The resulting traffic slowed the process until TXDPS arrived and began traffic control (timestamp 00:26:05).

SA ███ stated he instructed parents they needed to approach in their vehicle, provide identification, and then their child would be released from the school. SA ███ helped the principal release the children for approximately 30 minutes. Several local officers began helping the principal get school children to their parents. SA ███ began assisting BPA-P ███ and SBPA ███ with traffic control when the area became too congested. SA ███ said he never had an argument or had to go hands on with anyone at Dalton Elementary School. SA ███ believed he was at Dalton Elementary School for approximately four hours (timestamp 00:26:52).

SA ███ said he thought it was his responsibility to assist the local police when the circumstances required. SA ███ did not know the exact statutory authority that gives USBP the authority to assist the local police during a school shooting. At Dalton Elementary School, SA ███ believed it was his duty to assist the principal with extracting the children from the school and getting them to their parents. SA ███ believed he was at Dalton Elementary School assisting the principal and controlling traffic until approximately 5:30 p.m. SA ███ said SA ███ called him on his cell phone and asked him to pick up some Gatorades and meet SA ███ back at the funeral home. SA ███ SBPA ███ and BPA-P ███ left Dalton Elementary School and picked up some Gatorades at a gas station on the corner and then met SA ███ and Assistant Special Agent in Charge (ASAC) ███ OPR/Del Rio, who was the acting Resident Agent in Charge at OPR/Del Rio at that time, at the funeral home. ASAC ███ talked to them for a minute and eventually told them they could go home. SA ███ SBPA ███ and BPA-P ███ left the funeral home and returned their body armor and rifles to UVA. SA ███ went home after returning his gear to UVA (timestamp 00:32:20).

SA ███ said he did not hear any shots fired on the date of the incident and was not issued a body-worn camera (timestamp 00:35:47).





SA [(b) (6), (b) (7)(C)] said there was an OPR group text addressing the location, well-being, and information about the threat as it became known. SA [(b) (6), (b) (7)(C)] received the texts on his USBP-issued work cell phone. SA [(b) (6), (b) (7)(C)] turned in that cell phone when he accepted a position as an SA with CBP OPR (timestamp 00:36:01).

SA [(b) (6), (b) (7)(C)] was not aware of any specific email updates sent during the incident but believed USBP sent out Evolving Situation Reports (ESRs) after the incident. SA [(b) (6), (b) (7)(C)] did not complete any written reports about the incident and was briefly interviewed by TXDPS several weeks after the incident via phone asking about SA [(b) (6), (b) (7)(C)] involvement (timestamp 00:36:42).

SA [(b) (6), (b) (7)(C)] aid he received Active Shooter training while at CAR. The training included participants from TXDPS, the Dimmit County, Texas, Sheriff's Office, school police, and Texas Game Wardens. SA [(b) (6), (b) (7)(C)] said USBP hosted the weeklong Active Shooter training at a local middle school in Carrizo Springs in 2017 or 2018 using simulation rounds and focusing on clearing rooms and moving in on the active shooter (timestamp 00:38:05).

SA [(b) (6), (b) (7)(C)] said he never rendered medical aid to anyone throughout the incident on May 24, 2022 (timestamp 00:39:48).

Prior to concluding the interview, SA [(b) (6), (b) (7)(C)] utilized printed maps to outline his actions on May 24, 2022, in response to the Robb Elementary School shooting (Attachment 2).

## ATTACHMENTS

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of SA [(b) (6), (b) (7)(C)] |
| 2 | Maps reviewed by SA [(b) (6), (b) (7)(C)] |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 64



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586        EXHIBIT 64

AR001481

 

# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of SBPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 10, 2023, SA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed SBPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

SBPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was on duty and assigned to work at CAR. SBPA (b) (6), (b) (7)(C) said he was assigned to work from (b) (7)(E) wore the standard green USBP uniform, and had a marked USBP vehicle (timestamp 00:09:36).

SBPA (b) (6), (b) (7)(C) stated he learned of the incident when he was contacted telephonically by one of his subordinates, Border Patrol Agent (BPA) (b) (6), (b) (7)(C) CAR. BPA (b) (6), (b) (7)(C) advised SBPA (b) (6), (b) (7)(C) there had been an incident at his child's school, and BPA (b) (6), (b) (7)(C) also informed SBPA (b) (6), (b) (7)(C) that BPA (b) (6), (b) (7)(C) worked at the same school. SBPA (b) (6), (b) (7)(C) stated BPA (b) (6), (b) (7)(C) was uncertain what was going on but indicated there had been a chase, and a subject had gone into the school. BPA (b) (6), (b) (7)(C) asked SBPA (b) (6), (b) (7)(C) if he could take leave to head over there. SBPA (b) (6), (b) (7)(C) stated he approved BPA (b) (6), (b) (7)(C) leave. BPA (b) (6), (b) (7)(C) proceeded from the CAR Checkpoint, where he was assigned, to CAR to get his personal vehicle (timestamp 00:10:38).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001482




SBPA (b) (6), (b) (7)(C) stated there were limited personnel at the CAR checkpoint where BPA (b) (6), (b) (7)(C) was assigned, so he (SBPA (b) (6), (b) (7)(C) responded to the checkpoint to provide cover for BPA (b) (6), (b) (7)(C) while waiting for another BPA from the field to arrive (timestamp 00:12:33).

SBPA (b) (6), (b) (7)(C) stated he told BPA (b) (6), (b) (7)(C) not to wait for him to arrive at the checkpoint and to head straight to the station to get his personal vehicle, which BPA (b) (6), (b) (7)(C) did. SBPA (b) (6), (b) (7)(C) stated that after he arrived at the checkpoint, he and other BPAs there were monitoring the radio and heard someone yelling on the radio saying there were kids or something to that effect. SBPA (b) (6), (b) (7)(C) then began to realize there was more to the situation. SBPA (b) (6), (b) (7)(C) stated he was not sure at what time, but several CAR BPAs that were also Emergency Medical Technicians (EMTs) were sent from CAR to Uvalde. SBPA (b) (6), (b) (7)(C) stated he believed Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) CAR, had directed the BPA/EMTs to respond (timestamp 00:15:58).

SBPA (b) (6), (b) (7)(C) stated he began to monitor his USBP assigned ATAK (Android Team Awareness Kit) phone, which allowed SBPA (b) (6), (b) (7)(C) to view the locations of BPAs responding from CAR to Uvalde. SBPA (b) (6), (b) (7)(C) stated that through the ATAK phone, he could see the BPA/EMTs were responding, going up U.S. Highway 83 (timestamp 00:17:08).

SBPA (b) (6), (b) (7)(C) stated that while he was at the checkpoint, he received a call from BPA (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) USBP, Eagle Pass South Station (EGS), Texas, who is also the USBP Del Rio Sector (DRT) Peer Support Coordinator, requesting SBPA (b) (6), (b) (7)(C) respond to Uvalde to provide peer support services (timestamp 00:17:52).

SBPA (b) (6), (b) (7)(C) explained he was a Peer Support Member (PSM). SBPA (b) (6), (b) (7)(C) stated he in turn notified BPA (b) (6), (b) (7)(C) CAR, also a PSM, to report to Uvalde to provide peer support service as well. SBPA (b) (6), (b) (7)(C) stated that after BPA (b) (6), (b) (7)(C) call, he departed the checkpoint (timestamp 00:23:23).

SBPA (b) (6), (b) (7)(C) stated he could not recall the time he departed but believed it was after law enforcement officers had breached the room where the shooter was because he heard something to that effect over the radio before he departed. SBPA (b) (6), (b) (7)(C) stated that before he departed the checkpoint, BPA (b) (6), (b) (7)(C) CAR, who is also an EMT, departed the checkpoint to Uvalde, following the initial orders for BPA/EMTs to respond (timestamp 00:19:45).

SBPA (b) (6), (b) (7)(C) stated he departed the checkpoint alone in a marked USBP vehicle and had his emergency equipment activated (timestamp 00:21:25).

SBPA (b) (6), (b) (7)(C) stated he was not part of a convoy of vehicles. SBPA (b) (6), (b) (7)(C) said he drove up U.S. Highway 83, and then turned onto U.S. Highway 90 into Uvalde. SBPA (b) (6), (b) (7)(C) stated that aside from directing BPA (b) (6), (b) (7)(C) o respond to Uvalde, he did not order or direct anyone else to respond (timestamp 00:22:22).




SBPA (b) (6), (b) (7)(C) stated he informed his upper management he had been activated to Uvalde to provide peer support services. SBPA (b) (6), (b) (7)(C) stated that while he was driving to Uvalde, he heard over the radio for BPAs to report to the USBP Uvalde Station (UVA), so he drove directly there. Upon arrival, he went into the station and met with affected BPAs to provide them with peer support services (timestamp 00:24:51).

SBPA (b) (6), (b) (7)(C) stated that one of the BPAs who stood out to him was BPA (b) (6), (b) (7)(C) UVA, who is also a Firearms Instructor (FI). SBPA (b) (6), (b) (7)(C) tated BPA (b) (6), (b) (7)(C) was wearing a red FI polo shirt, but SBPA (b) (6), (b) (7)(C) noticed BPA (b) (6), (b) (7)(C) tan pants were covered in blood (timestamp 00:30:52).

SBPA (b) (6), (b) (7)(C) stated that while he was at UVA, he heard BPAs talking about a threat that the shooter's girlfriend had reportedly made, something to the effect of finishing the job (timestamp 00:32:40).

SBPA (b) (6), (b) (7)(C) stated that upon hearing this, he shifted from a peer support role to wanting to provide security and departed UVA, along with BPA (b) (6), (b) (7)(C) USBP Brackettville Station (BRA), Texas. SBPA (b) (6), (b) (7)(C) stated he drove BPA (b) (6), (b) (7)(C) from UVA to BPA (b) (6), (b) (7)(C) ehicle, which was parked in the vicinity of Robb Elementary School, and then SBPA (b) (6), (b) (7)(C) headed to the Uvalde Hospital (timestamp 00:50:48).

SBPA (b) (6), (b) (7)(C) stated that while at the hospital, he recalled seeing BPA (b) (6), (b) (7)(C) CAR, BPA (b) (6), (b) (7)(C) CAR, SBPA (b) (6), (b) (7)(C) CAR, and SBPA (b) (6), (b) (7)(C) UVA, who were there to see an injured BPA. SBPA (b) (6), (b) (7)(C) stated BPA (b) (6), (b) (7)(C) was off duty but was wearing his gear. SBPA (b) (6), (b) (7)(C) stated BPA (b) (6), (b) (7)(C) was not being himself, and SBPA (b) (6), (b) (7)(C) learned BPA (b) (6), (b) (7)(C) had been one of the first BPAs at the school (timestamp 00:35:14).

SBPA (b) (6), (b) (7)(C) stated that upon meeting with the BPAs, SBPA (b) (6), (b) (7)(C) told SBPA (b) (6), (b) (7)(C) she had just received a phone call and said they needed to report to the Uvalde Civic Center, where children were being reunited with parents, and people were also voting. SBPA (b) (6), (b) (7)(C) estimated he only spent approximately five to ten minutes at the hospital before driving to the civic center (timestamp 00:34:25).

SBPA (b) (6), (b) (7)(C) stated he and the aforementioned BPAs and SBPAs responded to the civic center (timestamp 00:36:38).

SBPA (b) (6), (b) (7)(C) described the civic center as chaos. SBPA (b) (6), (b) (7)(C) stated there were people everywhere, and news crews were arriving. SBPA (b) (6), (b) (7)(C) stated he and the others provided security outside of the civic center, and he personally directed and also escorted arriving parents to the civic center's entrance (timestamp 00:39:05).

SBPA (b) (6), (b) (7)(C) stated he recalled BPAs (b) (6), (b) (7)(C) and BPA (b) (6), (b) (7)(C) CAR, being at the civic center when he was there (timestamp 00:44:10).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



SBPA (b) (6), (b) (7)(C) stated he did not have any incidents with anyone and never used his authority to affect anyone's movements or render aid to anyone (timestamp 00:41:50).

SBPA (b) (6), (b) (7)(C) stated he was at the civic center for several hours, until past 4:00 p.m., but he was uncertain what time it was. SBPA (b) (6), (b) (7)(C) stated that after he departed the civic center, he went back to UVA where he parked his USBP vehicle and made arrangements to be picked up and taken home because he lived in Uvalde (timestamp 00:52:53).

Concerning his understanding of USBP's authority to respond to this incident, SBPA (b) (6), (b) (7)(C) stated that as first responders, the priority was to send EMTs to assist then to ensure the safety of the EMTs due to possible threats. Concerning his understanding of USBP's responsibility to respond to the incident, SBPA (b) (6), (b) (7)(C) stated it was a matter of public safety (timestamp 00:46:18).

SBPA (b) (6), (b) (7)(C) stated he did not have a body-worn camera on the date of the incident (timestamp 00:54:40).

SBPA (b) (6), (b) (7)(C) stated he did not have text messages concerning the incident. SBPA (b) (6), (b) (7)(C) stated he did not generate any emails, reports, or memorandums about the incident. SBPA (b) (6), (b) (7)(C) stated that aside from an interview with a Texas Ranger, he did not have discussions with anyone concerning his response to the incident. SBPA (b) (6), (b) (7)(C) stated he had participated in a week-long Active Shooter training in Del Rio in approximately 2015 or 2016. SBPA (b) (6), (b) (7)(C) stated that the day after the incident, he and others provided a verbal timeline of the incident to Watch Commander (WC) (b) (6), (b) (7)(C) CAR (timestamp 00:55:45).

During the interview, OPR interviewers presented SBPA (b) (6), (b) (7)(C) with maps illustrating Uvalde and the surrounding area. SBPA (b) (6), (b) (7)(C) annotated the route of travel he took from Carrizo Springs to Uvalde. SBPA (b) (6), (b) (7)(C) also identified the Uvalde Civic Center and annotated he was at the parking lot and provided crowd control (Attachment 2).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of SBPA (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by SBPA (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 65



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

**UF2022586**                                      **EXHIBIT 65**

AR001486



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of CBPO (b) (6), (b) (7)(C) | | |

## DETAILS OF ACTIVITY

On February 13, 2023, SSA (b) (6), (b) (7)(C) and SSA (b) (6), (b) (7)(C) interviewed CBPO (b) (6), (b) (7)(C) concerning her involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using StarWitness. The recording was uniquely identified by Authentication Code (b) (7)(E) Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

CBPO (b) (6), (b) (7)(C) is permanently assigned to the Del Rio POE. Since February 2022, CBPO (b) (6), (b) (7)(C) has been detailed to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). On May 24, 2022, she was assigned to the ATF as an Analytical Targeting Officer (ATO).

CBPO (b) (6), (b) (7)(C) said that on May 24, 2022, she worked from (b) (7)(E) Shortly after the events began, she received text messages on her ATF-issued phone that there was an active shooter but did not recall the time the messages were received (timestamp 00:19:15).

CBPO (b) (6), (b) (7)(C) said that after she completed her shift, she went home (timestamp 00:20:00).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001487




She said there was talk that blood donations were needed. She said her ATF supervisor (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) Del Rio, asked who would be able to respond. She said she contacted the Del Rio POE for permission to respond and was told she could respond (timestamp 00:20:30).

CBPO (b) (6), (b) (7)(C) said she drove her personally-owned vehicle to Uvalde and arrived at the civic center at about 4:00 p.m. CBPO drew her route of travel on the provided maps (Attachment 2). CBPO (b) (6), (b) (7)(C) wore her CBPO uniform (timestamp 00:21:40).

CBPO (b) (6), (b) (7)(C) said that when she arrived, she met with members of her assigned ATF team (timestamp 00:22:00).

CBPO (b) (6), (b) (7)(C) aid there did not appear to be any agency in charge of what was going on at the civic center (timestamp 00:25:10).

CBPO (b) (6), (b) (7)(C) said she remained at the civic center for about 40 minutes to an hour (timestamp 00:25:25).

CBPO (b) (6), (b) (7)(C) said that after she left the civic center, she went to the Incident Command Post at the funeral home across from Robb Elementary School (timestamp 00:25:40).

She called around to see if she could donate blood and was advised blood was not needed (timestamp 00:26:00).

CBPO (b) (6), (b) (7)(C) then asked her ATF supervisor if she was still needed and, he told her no. CBPO (b) (6), (b) (7)(C) said she then departed for home and arrived back in Del Rio at about 7:00 p.m.

CBPO (b) (6), (b) (7)(C) does not have any of the text messages related to this incident (timestamp 00:28:30).

CBPO (b) (6), (b) (7)(C) said she took Highway 90 from Del Rio to the Uvalde Civic Center (timestamp 00:29:50).

CBPO (b) (6), (b) (7)(C) did not initially recall who she talked to at the Del Rio POE, but later remembered she spoke with Port Director (b) (6), (b) (7)(C) Del Rio, for permission to respond (timestamp 00:32:20).

CBPO (b) (6), (b) (7)(C) said she did not render aid to anyone (timestamp 00:33:30).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of CBPO (b) (6), (b) (7)(C) |
| 2 | Maps reviewed by CBPO (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 66



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                    EXHIBIT 66

AR001489

 

**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of WC (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 13, 2023, Senior Special Agent (SSA) (b) (6), (b) (7)(C) CBP OPR SAC Detroit, and SSA (b) (6), (b) (7)(C) CBP OPR SAC Washington, conducted an interview of U.S. Border Patrol (USBP) Watch Commander (WC) (b) (6), (b) (7)(C) USBP Sector Headquarters, Del Rio, TX (DRT) regarding her involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The entirety of the interview was audio/video recorded utilizing StarWitness equipment under Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

WC (b) (6), (b) (7)(C) stated that on May 24, 2022, she reported to USBP Del Rio Station (DRS) in uniform for her shift of duty that began at (b) (7)(E) and was scheduled to end at (b) (7)(E) WC (b) (6), (b) (7)(C) advised her permanent position with USBP was Special Operations Supervisor (SOS); however, at that time she was serving in an acting capacity as the "A" chief of the Training and Traumatic Incident Management Branch (TTIMB).

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001490



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



WC (b) (6), (b) (7)(C) stated that she does not remember who she first spoke with regarding the active shooter in Uvalde, TX; however, noted that around noon she received multiple phone calls from multiple people regarding the situation. WC (b) (6), (b) (7)(C) advised that on that date she had the DRS firing range instructors doing range assessments with headquarters personnel at the USBP Brackettville Station (BRA). WC (b) (6), (b) (7)(C) recollected receiving a text message from Sector Programs Agent (SPA) (b) (6), (b) (7)(C) saying they were enroute to Uvalde, and at first believed they were going to the USBP Uvalde Station (UVA) firing range until she spoke with him on the telephone. WC (b) (6), (b) (7)(C) stated she received a call from SBPA (b) (6), (b) (7)(C) who was in the car with DRT Deputy Chief Patrol Agent in Charge (DPAIC) (b) (6), (b) (7)(C) regarding the incident. WC (b) (6), (b) (7)(C) was directed by SBPA (b) (6), (b) (7)(C) to get all available emergency medical technicians (EMTs) activated and ready to respond to Uvalde for an active shooter situation at Robb Elementary School. WC (b) (6), (b) (7)(C) directly notified BPA/EMT (b) (6), (b) (7)(C) and BPA/EMT (b) (6), (b) (7)(C) of the need for them to report immediately to Uvalde, noting they were at DRT conducting training; however, based on the request for assistance they were being activated to respond to Uvalde. WC (b) (6), (b) (7)(C) stated BPA (b) (6), (b) (7)(C) and BPA (b) (6), (b) (7)(C) left immediately and, on their way to Uvalde, were going to BRA to pick up a trailer with gear that was already packed and ready to go. WC (b) (6), (b) (7)(C) also dispatched DRT peer support coordinator BPA (b) (6), (b) (7)(C) to Uvalde (Timestamp 00:07:46).

WC (b) (6), (b) (7)(C) stated she stayed at DRT in order to field incoming calls as the situation unfolded and to communicate activation messages as required. WC (b) (6), (b) (7)(C) advised she received a telephone call from SBPA (b) (6), (b) (7)(C) asking that she attempt to gather as many articles of clothing as possible to be taken to UVA for those that responded to change into. That was followed by a call from Chief Patrol Agent (CPA) Jason Owens advising to get all available peer support members to UVA for an after brief. WC (b) (6), (b) (7)(C) was unable to provide a timeline of when she fielded the referenced telephone calls, noting that she fielded a rolling barrage of calls without a break. She stated what she was hearing telephonically about the incident did not match what was being reported by the media, and she recognized the situation was very bad (Timestamp 00:15:23).

WC (b) (6), (b) (7)(C) advised that in the summer of 2022, DRT was requested to develop a list of activations and roles related to the Uvalde school shooting and provide it to CBP OPR. WC (b) (6), (b) (7)(C) stated the list of activations was completed by DRT DPAIC (b) (6), (b) (7)(C) and included over one hundred names. WC (b) (6), (b) (7)(C) confirmed that on May 24, 2022, she also activated Mission Support Specialist (b) (6), (b) (7)(C) and SBPA (b) (6), (b) (7)(C) for peer support assistance. WC (b) (6), (b) (7)(C) noted that BPA (b) (6), (b) (7)(C) would have also activated additional peer support personnel based upon her direction.

WC (b) (6), (b) (7)(C) stated she did not hear any radio transmissions and received all information about the incident via telephone calls. She was unaware that an incident command post was established in the DRT radio room until after May 24, 2022. WC (b) (6), (b) (7)(C) denied having any emails or text messages about the incident (Timestamp 00:22:54).



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



WC (b) (6), (b) (7)(C) stated she spoke with BPA (b) (6), (b) (7)(C) and provided him support following his return to DRT. WC (b) (6)  (b) (7)(C) could not recall what time she left DRS, but she continued working from home later that evening.

WC (b) (6), (b) (7)(C) stated her understanding is that USBP arrived to assist in a support capacity. WC (b) (6), (b) (7)(C) stated nothing was reported to indicate who had command or control of the situation as it unfolded. WC (b) (6), (b) (7)(C) stated she believed the Uvalde Police Department (UPD) and Uvalde school officers were at Robb Elementary School, along with representatives from Texas Department of Public Safety (TXDPS), Border Patrol Tactical Unit (BORTAC) SBPA (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) and several firearms instructors from Uvalde.. She stated these groups were taking their direction from UPD. WC (b) (6), (b) (7)(C) stated USBP's role that day was a support capacity to assist other agencies and that you take the orders and directives from the first on scene incident commander. WC (b) (6), (b) (7)(C) stated that during an active shooter or barricaded subject, USBP would be acting in a support capacity to assist at the request of other law enforcement agencies (Timestamp 00:35:15).

WC (b) (6), (b) (7)(C) described a situation involving BPA (b) (6), (b) (7)(C) wherein he rendered aid to the last child at the scene. When he attempted to move the child to a stretcher, he was supporting the child's back and neck **(b) (6), (b) (7)(C)** WC (b) (6), (b) (7)(C) stated that she does not know any further details and cannot say for sure what exactly BPA (b) (6), (b) (7)(C) observed because there were several children he was helping. WC (b) (6), (b) (7)(C) stated that other USBP personnel who were on scene at Robb Elementary School included BPA **(b) (6), (b) (7)(C)** Sector Programs Agent (SPA) **(b) (6), (b) (7)(C)** and BPA first name unknown (FNU) (b) (6), (b) (7)(C) (Timestamp 00:43:47).

WC (b) (6), (b) (7)(C) denied having any knowledge of any directions from Chief Owens or DRT leadership in which they advised EMTs not to assist with the care needed on site (Timestamp 00:50:55).

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
|---|---|
| 1 | StarWitness interview of WC (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 67



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                                                      EXHIBIT 67



# U.S. CUSTOMS AND BORDER PROTECTION
## OFFICE OF PROFESSIONAL RESPONSIBILITY
## INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of CBPO (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On February 13, 2023, SSA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed CBPO (b) (6), (b) (7)(C) concerning her involvement in the CBP response to the May 24, 2022, shooting at the Uvalde Robb Elementary School. The interview was audio and video recorded using Star Witness. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This Investigative Activity Report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

CBPO (b) (6), (b) (7)(C) was on duty on the morning of May 24, 2022, worked in plain clothes, and was assigned to a U.S. Drug Enforcement Administration (DEA) task force in Del Rio. She heard about the shooting at Robb Elementary School while working an operation in Eagle Pass, Texas. One of the other task force members notified the group of the shooting. She recalled hearing there was an active shooter at Robb Elementary School (Timestamp 11:13:04)

The group supervisor for DEA informed her and the other task force members that they were going to respond to Uvalde and provide any support necessary (Timestamp 11:13:32).

She responded to Uvalde in her unmarked government vehicle, and followed other DEA agents all the way to Uvalde. She believed she departed Eagle Pass between 11:50 a.m. and 12:05 p.m. She recalled the drive to Uvalde took approximately 50 minutes. She believed she had her emergency lights activated during her entire drive to Uvalde.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001494



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



CBPO (b) (6), (b) (7)(C) and other DEA task force members arrived in Uvalde and drove until they reached a location approximately two blocks from Robb Elementary School. While enroute, she recalled hearing over her service radio, "The shooter was down," (Timestamp 11:18:25).

Since she followed other DEA agents to Uvalde, she did not notify anyone upon their arrival at Robb Elementary School. She and other DEA agents stood outside the gate at the school to assist with crowd control and to keep order. She and the other DEA agents then walked to the command center located at the funeral home. At the command center, she did not witness anyone giving commands to other law enforcement officers.

CBPO (b) (6), (b) (7)(C) was unable to describe the command-and-control structure at the funeral home because she never entered the conference room. She recalled a funeral home worker telling her the school shooter had shot at him before entering the school. After she departed from the funeral home, she recalled all DEA personnel were contacted by Acting Supervisor (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) DEA, Del Rio, to respond to the hospital to provide crowd control assistance. CBPO (b) (6), (b) (7)(C) believed she stayed at the command center at the funeral home for approximately 30 minutes (Timestamp 11:23:24).

CBPO (b) (6), (b) (7)(C) stated she took her unmarked government vehicle to the hospital, parked, and was tasked with guarding the emergency room door alongside another DEA agent for approximately two to three hours. Her interaction with the parents consisted of civilians looking for their children. She recalled having no information to provide them. CBPO (b) (6), (b) (7)(C) stated she did not put hands on any civilians during her time in Uvalde.

After providing security and crowd control at the hospital, she returned to a street near Robb Elementary School where she met up with the other DEA agents on her task force for a brief meeting. She recalled several DEA supervisors from San Antonio, Texas provided a briefing to the DEA personnel. She believed she was at the briefing for approximately 30 minutes before she was allowed to drive back to Del Rio. She believed she got home around 7:00 p.m. (Timestamp 11:27:24).

CBPO (b) (6), (b) (7)(C) said she never exercised any authority which impacted any individual's movements during her time in Uvalde. She stated she never provided aid to any individual except to comfort one individual during her time in Uvalde. SSA (b) (6), (b) (7)(C) asked CBPO (b) (6), (b) (7)(C) what she believed U.S. Border Patrol's (USBP's) role was in the incident at Robb Elementary School. CBPO (b) (6), (b) (7)(C) stated she had no direct knowledge. She said that from what she heard, USBP entered the building, but that was not first-hand information.

SSA (b) (6), (b) (7)(C) asked CBPO (b) (6), (b) (7)(C) what she believed USBP's authority/responsibility to respond to the incident at Robb Elementary School was. CBPO (b) (6), (b) (7)(C) explained her belief that USBP are first responders.

During her time in Uvalde, she recalled seeing her supervisor, Supervisory CBPO (b) (6), (b) (7)(C) Del Rio, who was assigned to a U.S. Immigration and Customs Enforcement, Homeland Security



**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**
**INVESTIGATIVE OPERATIONS DIRECTORATE**



Investigations (HSI) task force. He was working outside the Robb Elementary School gate aiding individuals exiting the school after the incident.

**ATTACHMENTS**

| ATTACHMENTS | DESCRIPTION |
| --- | --- |
| 1 | StarWitness interview of CBPO (b) (6), (b) (7)(C) |

O F F I C I A L   U S E   O N L Y

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

# UF2022586
# EXHIBIT 68



**DEPARTMENT OF HOMELAND SECURITY**
**U.S. CUSTOMS AND BORDER PROTECTION**
**OFFICE OF PROFESSIONAL RESPONSIBILITY**

O F F I C I A L   U S E   O N L Y

UF2022586                        EXHIBIT 68

AR001497

 

# U.S. CUSTOMS AND BORDER PROTECTION
# OFFICE OF PROFESSIONAL RESPONSIBILITY
# INVESTIGATIVE OPERATIONS DIRECTORATE

# INVESTIGATIVE ACTIVITY REPORT

| CASE NUMBER: | UF2022586 | FIELD OFFICE: | Del Rio DSAC Office |
|---|---|---|---|
| CASE AGENT: | SA (b) (6), (b) (7)(C) | | |
| CASE TITLE: | Uvalde Texas School Shooting w/ Fatalities | | |
| ACTIVITY CONDUCTED: | Interview of DCPA (b) (6), (b) (7)(C) | | |

**DETAILS OF ACTIVITY**

On March 17, 2023, SA (b) (6), (b) (7)(C) and SA (b) (6), (b) (7)(C) interviewed DCPA (b) (6), (b) (7)(C) concerning his involvement in the CBP response to the May 24, 2022, shooting at Robb Elementary School. The interview was audio and video recorded using StarWitness equipment. The recording was uniquely identified by Authentication Code (b) (7)(E) (Attachment 1).

This investigative activity report does not detail every statement made during the interview but provides a summary. The video recording of the interview should be reviewed for additional details.

DCPA (b) (6), (b) (7)(C) stated that on May 24, 2022, he was the Acting DCPA for DRT, his permanent position was Division Chief of Operations. DCPA (b) (6), (b) (7)(C) learned about the incident at Robb Elementary School at approximately 11:00 a.m. when Patrol Agent in Charge (PAIC) (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) USBP Comstock Station, and Special Operations Supervisor (SOS) (b) (6), (b) (7)(C) DRT, reported there was an active shooter situation at an elementary school in Uvalde (timestamp 00:37:30). DCPA (b) (6), (b) (7)(C) asked for additional details regarding the situation and was told there was nothing else to report and that Border Patrol agents (BPA) were en route.

I affirm that my statements in this report are true and correct to the best of my knowledge and belief.

| Prepared by: | | Date: | |
|---|---|---|---|

| Approved by: | | Date: | |
|---|---|---|---|

**WARNING:** This document, along with any attachment(s), is loaned to you for official use only and remains the property of U.S. Customs and Border Protection Office of Professional Responsibility Investigative Operations Directorate (IOD). You are prohibited from copying, releasing, retransmitting, disseminating, disclosing, or otherwise sharing the document or its attachments within or outside CBP without prior, written approval from IOD. The contents of this document and its attachment(s) may contain information, which is unclassified, law enforcement sensitive, proprietary, privileged, or confidential, and may be legally protected or otherwise exempt from public disclosure under the Freedom of Information Act, 5 U.S.C. § 552 and Privacy Act of 1974.

AR001498



DCPA ▓▓ stated that realizing the importance of the scenario, he interrupted Chief Patrol Agent (CPA) Jason Owens, DRT, who was on a call, to inform him of the situation. DCPA ▓▓ also informed CPA Owens he was going to deploy to the scene. DCPA ▓▓ stated that because of the distance from DRT to Uvalde, he expected the incident to be over by the time he arrived and added he would likely assume an incident command role. However, to be safe, DCPA ▓▓ directed SOS ▓▓ to bring M-4 rifles with them (timestamp 00:40:00). SOS ▓▓ met DCPA ▓▓ PAIC ▓▓ and Assistant CPA (ACPA) ▓▓ DRT, at DCPA ▓▓ government vehicle with three M-4s. DCPA ▓▓ PAIC ▓▓ and ACPA ▓▓ were gearing up, and after obtaining the weapons and ammunition, departed DRT en route to Uvalde.

DCPA ▓▓ explained that as he was driving to Uvalde, PAIC ▓▓ and ACPA ▓▓ assisted with fielding telephone calls and taking notes. According to DCPA ▓▓ CPA Owens departed shortly after him en route to Uvalde, while PAIC ▓▓ DRT, stayed to set up a command post at DRT. PAIC ▓▓ said he would assist with handling decisions at the DRT level and any communications between DRT and Washington, D.C. (timestamp 00:44:00).

DCPA ▓▓ stated that after approximately 15 minutes, he received a call from PAIC ▓▓ who informed him the situation might be legitimate. According to PAIC ▓▓ there were reports of 911 calls which indicated there could be at least nine victims. DCPA ▓▓ subsequently activated the lights and sirens on his vehicle to get to the scene as fast as possible. DCPA ▓▓ instructed PAIC ▓▓ to order all emergency medical technicians (EMT) within driving distance to deploy to the vicinity of the school and be ready to respond when necessary. DCPA ▓▓ assumed the local police department and the Texas Department of Public Safety (TXDPS) would have control of the situation and would provide instructions of where to respond. DCPA ▓▓ also instructed the DRT Training and Traumatic Incident Management Branch to have peer support and chaplain resources on standby (timestamp 00:47:00).

DCPA ▓▓ stated he received more updates as they got closer to Uvalde and explained all the information received indicated the situation was real. According to DCPA ▓▓ even with "spotty" radio traffic and an open microphone, everything they heard pointed to the fact they were responding to an active shooter scenario. DCPA ▓▓ stated that at one point, he heard someone calling to and guiding children (timestamp 00:50:00). DCPA ▓▓ added, however, he did not hear anyone announce the shooter had been shot or killed (timestamp 00:51:00).

DCPA ▓▓ stated that moments later, he began hearing reports the shooter was a barricaded subject and recalled receiving this information from PAIC ▓▓ (timestamp 00:52:30). DCPA ▓▓ explained there was a difference between the response to an active shooter and the response to a barricaded subject. DCPA ▓▓ explained the response to an active shooter was immediate, whereas the response to a barricaded subject allowed more time to reassess the situation. DCPA ▓▓ added he believed they would arrive in time to participate in the unfolding situation that may have required negotiations to occur over hours and possibly days.